UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————
                                    )
IN RE NEXIUM (ESOMEPRAZOLE)         )          CIVIL ACTION
ANTITRUST LITIGATION                )          NO. 12-md-02409-WGY
                                    )
———————————————————————

YOUNG, D.J.                                September 11, 2013

<u>MEMORANDUM AND ORDER</u>

I.    **INTRODUCTION**

A group of wholesale drug distributors (the "Direct

Purchasers") and health and welfare benefit funds (the "End-

Payors"[1]) (collectively, the "Plaintiffs"), on behalf of

themselves and all others similarly situated, brings this

multidistrict, putative class action against AstraZeneca AB,

Aktiebolaget Hassle, and AstraZeneca LP (collectively,

"AstraZeneca"), Ranbaxy Pharmaceuticals, Inc., Ranbaxy Inc., and

Ranbaxy Laboratories Ltd. (collectively, "Ranbaxy"); Teva

Pharmaceutical Industries, Ltd. and Teva Pharmaceuticals USA,

Inc. (collectively, "Teva"); and Dr. Reddy's Laboratories Ltd.

and Dr. Reddy's Laboratories, Inc. (collectively, "Dr. Reddy's")

(collectively, with Ranbaxy and Teva, the "Generic Defendants")

---

[1] On certain occasions in the briefs, the End-Payors are
alternatively referred to as "indirect purchasers." <u>See, e.g.</u>,
Defs.' Mem. Supp. Their Mot. Dismiss Indirect Purchasers'
Consol. Am. Compl. (Dkt. No. 114) Pursuant Fed. Rule Civil
Procedure 12(b)(6), ECF No. 156.  The Court, however, believes
the former appellation to be more apt than the latter.

(collectively, with AstraZeneca, the "Defendants") for alleged

violations of state and federal antitrust laws.[2]   Specifically,

the Plaintiffs contend that AstraZeneca and each of the three

Generic Defendants entered into reverse payment agreements to

keep generic versions of AstraZeneca's heartburn medication --

sold under the brand name Nexium -- out of the market, thereby

facilitating the extraction of supracompetitive rents by virtue

of AstraZeneca's artificially secured monopoly market position.

---

[2] The Direct Purchasers have lodged the following charges
against the Defendants: (1) conspiracy to monopolize, in
violation of Sherman Act section 2, 15 U.S.C. § 2, against
AstraZeneca and Ranbaxy; (2) conspiracy to monopolize, in
violation of Sherman Act section 2, against AstraZeneca and
Teva; (3) conspiracy to monopolize, in violation of Sherman Act
section 2, against AstraZeneca and Dr. Reddy's; (4) agreement in
restraint of trade, in violation of Sherman Act section 1, 15
U.S.C. § 1, against AstraZeneca and Ranbaxy; (5) agreement in
restraint of trade, in violation of Sherman Act section 1,
against AstraZeneca and Teva; (6) agreement in restraint of
trade, in violation of Sherman Act section 1, against
AstraZeneca and Dr. Reddy's; (7) monopolization, in violation of
Sherman Act section 2, against AstraZeneca; (8) attempt to
monopolize, in violation of Sherman Act section 2, against
AstraZeneca; (9) agreement in restraint of trade, in violation
of Sherman Act section 1, against all of the Defendants; and
(10) conspiracy to monopolize, in violation of Sherman Act
section 2, against all of the Defendants.  See Consol. Am.
Compl. & Demand Jury Trial ¶¶ 166-234, ECF No. 131.
     For their part, the End-Payors' in their consolidated
complaint have set forth state-based claims for relief that are
largely analogous to the Direct Purchasers' federal claims, as
well as a standalone claim for declaratory relief under sections
1 and 2 of the Sherman Act and injunctive relief under section
16 of the Clayton Act, 15 U.S.C. § 26.  See Corrected Consol.
Am. Class Action Compl. & Demand Jury Trial ¶¶ 157-195, ECF No.
114.

The Defendants filed five motions to dismiss the
Plaintiffs' claims under Federal Rule of Civil Procedure
12(b)(6) ("Rule 12(b)(6)").  The key issues in these motions can
be subdivided into two groups: those relating to the Direct
Purchasers and those relating to the End-Payors.  With respect
to the Direct Purchasers, the Defendants argue that (1) the
exclusionary conduct at issue falls within the scope of
AstraZeneca's Nexium-related patents, so no action for antitrust
liability may lie; and (2) even if antitrust liability would
otherwise attach to the Defendants' conduct, (a) the doctrine of
Noerr-Pennington renders the challenged agreements immune from
antitrust scrutiny and (b) the Direct Purchasers' challenge to
the particular agreement between AstraZeneca and Ranbaxy is
time-barred under the relevant federal statute of limitations.
With respect to the End-Payors, the Defendants argue that (1)
the applicable state-specific statutes of limitations bar the
End-Payors' claims with respect to the agreement between
AstraZeneca and Ranbaxy; (2) the End-Payors lack standing under
both Article III and Federal Rule of Civil Procedure 23 ("Rule
23") to bring their claims; and (3) the End-Payors' claims
brought under the antitrust laws of eight states (Arizona,
Illinois, Mississippi, New York, South Dakota, Tennessee, Utah,
and West Virginia) and Puerto Rico and the consumer protection

statutes of two states (Massachusetts and North Carolina) are deficient for various reasons.[3]

At a motion hearing held on April 18, 2013, the Court denied all of the Defendants' motions and asked for further briefing on the viability of the End-Payors' Rule 23 standing and claims under Illinois law.  Upon reflection, however, the Court acknowledges that it may have acted hastily on some of the matters presented and, therefore, takes the time here to revisit some of its earlier conclusions.  Moreover, at the time of the motion hearing, the parties -- and, quite frankly, the Court -- were waiting with bated breath for the Supreme Court's decision in Federal Trade Commission v. Actavis, 133 S. Ct. 2223 (2013), which was anticipated to have significant implications for the instant case by resolving fundamental questions concerning the lawfulness of reverse payment agreements.  Therefore, although the Court has no reason to modify its judgment with respect to the Defendants' motion to dismiss the Direct Purchasers' claims, the recent arrival of Actavis compels the Court to adjust its rationale in light of that opinion.  Finally, armed with

---

[3] The Defendants also assert that the End-Payors' claims should additionally be dismissed on the same grounds as those proffered in their motion to dismiss the Direct Purchasers.  See Defs.' Mem. Supp. Their Mot. Dismiss Indirect Purchasers' Consol. Am. Compl. (Dkt. No. 114) Pursuant Fed. Rule Civil Procedure 12(b)(6), at 2-4, ECF No. 156.  Because of their expressly duplicative nature, these grounds will only be discussed in the section of this memorandum dealing with the Direct Purchasers.  See infra section II.B.

additional briefing supplied by the parties, the Court is now prepared to rule on the Rule 23 standing and Illinois law issues left unaddressed at the motion hearing.

### A.   Procedural Posture

The End-Payors filed a consolidated complaint on February 1, 2013, Corrected Consol. Am. Class Action Compl. & Demand Jury Trial ("End-Payors' Compl."), ECF No. 114, after the Court was called upon to intercede in a dispute over which of the parties' attorneys would serve as lead class counsel, see In re Nexium (Esomeprazole) Antitrust Litig., No. 12-md-02409-WGY, 2013 WL 326215 (D. Mass. Jan. 24, 2013).  One month later, on March 1, 2013, the Defendants filed their motion to dismiss the End-Payors' consolidated complaint, Defs.' Mot. Dismiss Indirect Purchasers' Consol. Am. Compl., ECF No. 155, together with their supporting memorandum of law, Defs.' Mem. Supp. Their Mot. Dismiss Indirect Purchasers' Consol. Am. Compl. (Dkt. No. 114) Pursuant Fed. Rule Civil Procedure 12(b)(6) ("Defs.' Mot. Dismiss End-Payors"), ECF No. 156.  The End-Payors filed their memorandum in opposition to the Defendants' motion to dismiss on March 22, 2013.  End-Payor Class Pls' Mem. Opp'n Defs.' Mot. Dismiss ("End-Payor's Mem. Opp'n"), ECF No. 189.  The Defendants filed their reply to the End-Payors' opposition in further support of their motion on April 5, 2013.  Defs.' Reply Mem. Further Supp. Their Mot. Dismiss Indirect Purchasers' Consol.

Am. Compl. (Dkt. No. 114) Pursuant Fed. Rule Civil Procedure 12(b)(6) ("Defs.' Reply End-Payors"), ECF No. 208.

The Direct Purchasers, for their part, filed a consolidated complaint with this Court on February 21, 2013.  Consol. Am. Compl. & Demand Jury Trial ("Direct Purchasers' Compl."), ECF No. 131.  The following day, each of the Defendants separately moved to dismiss the Direct Purchasers' complaint, appending to their respective motions memoranda of law in support.  Mot. Dr. Reddy's Labs. Dismiss Direct Purchasers' Consol. Am. Compl., ECF No. 132; Mem. Supp. Mot. Dr. Reddy's Labs. Dismiss Direct Purchasers' Consol. Am. Compl. ("Dr. Reddy's Mem."), ECF No. 133; AstraZeneca Defs.' Mot. Dismiss Direct Purchasers' Consol. Am. Compl., ECF No. 134; AstraZeneca Defs.' Mem. Supp. Their Mot. Dismiss Direct Purchasers' Consol. Am. Compl. (Dkt. No. 131) Pursuant Fed. Rule Civil Procedure 12(b)(6) ("AstraZeneca's Mem."), ECF No. 135; Teva Defs.' Mot. Dismiss, ECF No. 136; Teva Defs.' Mem. Supp. Its Mot. Dismiss Direct Purchaser Pls.' Consol. Am. Compl. ("Teva's Mem."), ECF No. 137; Def. Ranbaxy's Mot. Dismiss Direct Purchasers' Consol. Am. Compl., ECF No. 138; Def. Ranbaxy's Mem. Law Supp. Its Mot. Dismiss Direct Purchasers' Consol. Am. Compl. ("Ranbaxy's Mem."), ECF No. 139. On March 15, 2013, the Direct Purchasers filed four memoranda in

opposition to each of the Defendants' motions to dismiss.[4]
Direct Purchaser Class Pls.' Opp'n Dr. Reddy's Mot. Dismiss, ECF
No. 167; Direct Purchaser Class Pls.' Opp'n AstraZeneca's Mot.
Dismiss ("Direct Purchasers' Opp'n AstraZeneca's Mot. Dismiss"),
ECF No. 168; Direct Purchaser Class Pls.' Opp'n Teva's Mot.
Dismiss ("Direct Purchasers' Opp'n Teva's Mot. Dismiss"), ECF
No. 169; Direct Purchaser Class Pls.' Opp'n Ranbaxy's Mot.
Dismiss ("Direct Purchasers' Opp'n Ranbaxy's Mot. Dismiss"), ECF
No. 170.  AstraZeneca filed a reply in further support of its
motion to dismiss on March 29, 2013, AstraZeneca Defs.' Reply
Mem. Further Supp. Mot. Dismiss Direct Purchasers' Consol. Am.
Compl. (Dkt. No. 131) Pursuant Fed. Rule Civil Procedure
12(b)(6), ECF No. 194, and on April 1, 2013, the Generic
Defendants followed suit, Reply Mem. Law Supp. Def. Ranbaxy's
Mot. Dismiss Direct Purchasers' Consol. Am. Compl. ("Ranbaxy's
Reply"), ECF No. 199; Reply Supp. Mot. Dr. Reddy's Labs. Dismiss
Direct Purchasers' Consol. Am. Compl., ECF No. 200; Teva Defs.'

---

[4] The Direct Purchasers moved to file a single, consolidated
memorandum in opposition to the Defendants' motions to dismiss,
Direct Purchaser Pls.' Mot. File Single Consol. Mem. Opp'n Four
Mots. Dismiss, ECF No. 162, but the Court denied their request,
Elec. Order, Mar. 13, 2013, ECF No. 165.  As a result, in an
attempt to minimize redundancy, each of the Direct Purchasers'
four opposition memoranda respond to a different set of
arguments raised in the Defendants' motions.  See Direct
Purchaser Class Pls.' Opp'n AstraZeneca's Mot. Dismiss 8 n.24,
ECF No. 168 (matching each of the Direct Purchasers' opposition
memoranda with corresponding arguments made by the Defendants).

Reply Mem. Supp. Their Mot. Dismiss Direct Purchaser Pls.'
Consol. Am. Compl., ECF No. 201.

At a motion hearing held on April 18, 2013, the Court
denied all of the Defendants' motions, Elec. Clerk's Notes, Apr.
18, 2013, ECF No. 218, and requested further briefing on the
End-Payors' Rule 23 standing and claims under Illinois law, Mot.
Hr'g Tr. 42:16-17, Apr. 18, 2013, ECF No. 216.  Per the Court's
instructions, the parties submitted briefs on these two issues
on May 2, 2013.  Defs.' Supplemental Mem. Supp. Their Mot.
Dismiss Indirect Purchasers' Consol. Am. Compl. (Dkt. No. 114)
Pursuant Fed. Rule Civil Procedure 12(b)(6) ("Defs.'
Supplemental Mem."), ECF No. 223; End-Payor Class Pls.'
Supplemental Mem. Opp'n Defs.' Mot. Dismiss ("End-Payors'
Supplemental Mem."), ECF No. 224.

### B. Regulatory and Transactional Background

#### 1. Hatch-Waxman Regime

Before a drug manufacturer may market a new drug to the
public, it must first seek the approval of the United States
Food and Drug Administration ("FDA") by filing a New Drug
Application ("NDA") with the agency.  Actavis, 133 S. Ct. at
2228.  The road to NDA approval is long and fraught with
expense, as the process requires applicants to submit, inter
alia, a description of the proposed drug's components and
composition; reports on the safety and effectiveness of the

drug; and an explanation of how the drug will be manufactured, processed, and packaged.  See 21 U.S.C. § 355(b)(1).  Drugs that have been approved by the FDA are then listed in a publication known colloquially as the "Orange Book."  See Approved Drug Products with Therapeutic Equivalence Evaluations (Orange Book), U.S. Food & Drug Admin., http://www.fda.gov/Drugs/InformationOnDrugs/ucm129662.htm (last updated Aug. 23, 2013).

The Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (codified as amended at 15, 21, 28, and 35 U.S.C.) -- known more commonly by its popular title, the "Hatch-Waxman Act," derived from the surnames of the Act's principal sponsors -- was passed with the express purpose of expediting the entry of noninfringing generic competitors into pharmaceutical drug markets in order to decrease healthcare costs for consumers.  See PLIVA, Inc. v. Mensing, 131 S. Ct. 2567, 2574 (2011).  Under the Hatch-Waxman Act, generic drug manufacturers wishing to market a generic version of a brand-name drug need not undertake the extensive and expensive NDA process; instead, they may file an Abbreviated New Drug Application ("ANDA").  Actavis, 133 S. Ct. at 2228.  An ANDA must show that the generic drug contains the same active ingredients, route of administration, dosage form, and strength as the brand-name drug, as well as demonstrate that the generic

9

and brand-name drugs are bioequivalent.  See 21 U.S.C.

§ 355(j)(2)(A)(ii)-(iv).  In addition, an ANDA must contain one

of four certifications: (1) that no patent for the brand-name

drug has been filed, (2) that the patent for the brand-name drug

has expired, (3) that the generic manufacturer will not seek to

market its drug before the expiration of the patent for the

brand-name drug, or (4) that the patent for the brand-name drug

is invalid or will not be infringed by the proposed generic

alternative.  Id. § 355(j)(2)(A)(vii).  Choosing the last of

these options, referred to as a "paragraph IV" certification,

"automatically counts as patent infringement, and often means

provoking litigation."[5]  Actavis, 133 S. Ct. at 2228 (citation

omitted) (quoting Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S,

132 S. Ct. 1670, 1677 (2012)) (internal quotation marks omitted)

(citing 35 U.S.C. § 271(e)(2)(A)).

     To encourage generic manufacturers to bring their drugs to

market and assume the potential risk of defending against a

patent infringement action, the Hatch-Waxman Act grants 180 days

of market exclusivity to the first generic manufacturer to file

---

[5] If a generic manufacturer files a paragraph IV
certification and a brand manufacturer files a patent
infringement suit against the generic manufacturer within forty-
five days of receiving notice of the paragraph IV certification,
the FDA will not grant final approval to the ANDA until either
thirty months have passed or a court has issued a decision
deeming the patent invalid or not infringed, whichever is
earlier.  See 21 U.S.C. § 355(c)(3)(C); Eli Lilly & Co. v.
Medtronic, Inc., 496 U.S. 661, 677-78 (1990).

an ANDA containing a paragraph IV certification (the "first-filer"), 21 U.S.C. § 355(j)(5)(B)(iv), meaning that the FDA is disallowed from approving ANDAs from competing generic manufacturers for the same drug.  The Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2006 (codified as amended at 26 and 42 U.S.C.), however, provides a number of conditions under which a first-filer can forfeit its eligibility for 180-day exclusivity, see 21 U.S.C. § 355(j)(5)(D)(i)(I)-(VI), the most relevant of which for the purposes of this case is the so-called "failure-to-market" provision, see id. § 355(j)(5)(D)(i)(I).  Once the first-filer forfeits its 180-day exclusivity, however, no other generic applicant may enjoy such a benefit.  See id. § 355(j)(5)(D)(iii)(II).

### 2. Authorized Generics and No-Authorized Generic Agreements

An authorized generic is essentially a brand-name drug produced by a brand manufacturer but marketed under a generic label.  See Sanofi-Aventis v. Apotex Inc., 659 F.3d 1171, 1174 (Fed. Cir. 2011).  Because brand manufacturers have already obtained FDA approval to sell their brand-name drugs, they are free to launch authorized generics during the first-filer's 180-day exclusivity window in an effort to recoup some of the monopoly profits that are inherently lost by generic market

entry.  See id. at 1775; Fed. Trade Comm'n, Authorized Generic

Drugs: Short-Term Effects and Long-Term Impact i-iv (2011),

available at

http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf

[hereinafter FTC Report on Authorized Generics].  A brand

manufacturer may, however, opt to forgo its right to market an

authorized generic by entering into a "no-authorized generic"

agreement with the first-filer.  See Erica N. Andersen, Note,

Schering the Market: Analyzing the Debate over Reverse-Payment

Settlements in the Wake of the Medicare Modernization Act of

2003 and In Re Tamoxifen Citrate Litigation, 93 Iowa L. Rev.

1015, 1063 (2008).  Such agreements commonly take the form of an

exclusive license that allows the first-filer to market a

generic version of the brand manufacturer's brand-name drug

during the 180-day exclusivity period.  FTC Report on Authorized

Generics, supra, at 21.

### C. Facts Alleged[6]

#### 1. AstraZeneca's New Drug Application Filing

On December 3, 1999, AstraZeneca filed NDA No. 21-153, by

which it sought FDA approval to market under the brand name

---

[6] Because the facts alleged in the Direct Purchasers' and
End-Payors' complaints largely mirror one another, this Court
here adopts the facts alleged in the latter and largely excludes
parallel citation references to similar provisions in the
former.

Nexium a proton pump inhibitor ("PPI") containing esomeprazole magnesium as its active ingredient.[7]  End-Payors' Compl. ¶¶ 64-65.  AstraZeneca received the FDA's approval for its NDA on February 20, 2001.  Id. ¶ 65.  In conjunction with its NDA, AstraZeneca listed fourteen patents in the FDA Orange Book as relating to Nexium or a way of using Nexium.  Id. ¶ 66.

### 2. The Generics' Abbreviated Drug Application Filings

#### a. Ranbaxy's ANDA Filing

Four years later, the generic drug manufacturer Ranbaxy filed ANDA No. 77-830 and notified AstraZeneca that it sought to market generic versions of Nexium.  Id. ¶ 73.  In addition to its notice, Ranbaxy included a certification pursuant to paragraph IV that stated that the commercial manufacture, use, and/or sale of any generic Nexium product would not infringe any of AstraZeneca's valid patents listed in the Orange Book to the extent that they expired after October 2007.  Id.

In response, AstraZeneca filed proceedings in the District Court for the District of New Jersey (the "New Jersey District Court") on November 21, 2005, bringing suit under the Hatch-Waxman Act.  Id. ¶ 74.  AstraZeneca claimed that Ranbaxy's generic version of Nexium would infringe six patents -- U.S.

---

[7] Nexium is recommended for individuals who suffer from erosive esophagitis and symptomatic gastroesophageal reflux disease.  See End-Payors' Compl. ¶ 65.

Patent No. 5,714,504 (the "'504 patent"); U.S. Patent No.

5,877,192 (the "'192 patent"); U.S. Patent No. 6,875,872 (the

"'872 patent"); U.S. Patent No. 6,428,810 (the "'810 patent");

U.S. Patent No. 6,369,085 (the "'085 patent"); and U.S. Patent

No. 5,948,789 (the "'789 patent") -- including five which were

listed in the Orange Book.[8]  Id.

Although AstraZeneca initiated proceedings against Ranbaxy,

the End-Payors allege that AstraZeneca faced a high likelihood

that the patents under which AstraZeneca sued would be

invalidated once challenged by generic manufacturers.  Id.

This is because, the End-Payors' allege, the purported invention

of esomeprazole, Nexium's active ingredient, is "prima facie

obvious in light of the prior art," id. ¶ 67 -- that is, it was

obvious in light of the information that was already in the

public domain, including AstraZeneca's prior PPI, Prilosec, or

so the End-Payors contend, id.[9]

---

[8] The following nine other Nexium patents listed in the
Orange Book did not form the basis of AstraZeneca's litigation
against Ranbaxy: U.S. Patent No. 4,786,505 (the "'505 patent");
U.S. Patent No. 4,853,230 (the "'230 patent"); U.S. Patent No.
4,738,974 (the "'974 patent"); U.S. Patent No. 5,690,960 (the
"'960 patent"); U.S. Patent No. 5,900,424 (the "'424 patent");
U.S. Patent No. 7,411,070 (the "'070 patent"); U.S. Patent No.
6,147,103 (the "'103 patent"); U.S. Patent No. 6,191,148 (the
"'148 patent"); and U.S. Patent No. 6,166,213 (the "'213
patent").  Id. ¶ 75.

[9] The End-Payors seek to substantiate this allegation by
making reference to collateral rulings of the European Patent
Office in 2006 and 2011 in connection with two European Nexium

### b. Teva's ANDA Filing

Several months later, on January 26, 2006, Teva notified AstraZeneca that it had filed ANDA No. 78-003 and sought to market generic versions of Nexium, id. ¶ 77; as part of Teva's notification, it also included a paragraph IV certification stating that its intentions regarding generic manufacture would not infringe any of AstraZeneca's valid patents listed in the Orange Book, id.

In response, AstraZeneca filed proceedings in the New Jersey District Court on March 8, 2006, bringing suit under the Hatch-Waxman Act.  Id. ¶ 78.  AstraZeneca claimed that Teva's generic version of Nexium would infringe five patents listed in the Orange Book.[10]  Id.

### c. Dr. Reddy's ANDA Filing

Later that same year, on August 17, 2006, Dr. Reddy's filed ANDA No. 78-279 and similarly notified AstraZeneca that it

---

patents, in which the challenged patents were determined invalid on account of their failure to satisfy the "inventive-step" patentability requirement, the European equivalent of the U.S. nonobviousness requirement.  Id. ¶ 71.

[10] AstraZeneca claimed Teva's generic Nexium would infringe the '504, '192, '872, '810, and '085 patents.  But AstraZeneca subsequently amended its complaint to withdraw its allegation that Teva infringed the '810 patent and add an allegation that Teva infringed the '070 patent.  Id. ¶ 78.  Eight other Nexium patents listed in the Orange Book (the '505, '230, '974, '960, '424, '103, '148, and '213 patents) did not form the basis of AstraZeneca's litigation against Teva and would not have prevented Teva from entering the market in late 2008.  See id. ¶ 79.

sought to market generic versions of Nexium, id. ¶ 81; as part of Dr. Reddy's notification, it also included a paragraph IV certification that its intentions regarding generic manufacture would not infringe valid claims based on seven of AstraZeneca's patents listed in the Orange Book, id.  On December 4, 2007, Dr. Reddy's amended its ANDA to state that it would not infringe the '504, '192, '872 patents, or that they were not valid.  Id.

Once again, in response, AstraZeneca filed proceedings in the New Jersey District Court on January 17, 2008, bringing suit under the Hatch-Waxman Act.  Id. ¶ 82.  AstraZeneca claimed that Dr. Reddy's generic version of Nexium would infringe three patents listed in the Orange Book.[11]  Id.

### 3. AstraZeneca's Alleged Reverse Payment Agreements With the Generic Defendants

#### a. AstraZeneca's Alleged Reverse Payment Agreement With Ranbaxy

After the parties had completed discovery, but before the New Jersey District Court could enter any rulings on the merits of the case, AstraZeneca allegedly entered into a reverse payment agreement with Ranbaxy on April 14, 2008 (the "AstraZeneca/Ranbaxy Agreement").  Id. ¶ 90.  Under this agreement, AstraZeneca agreed to end its proceedings against

---

[11] AstraZeneca claimed that Dr. Reddy's generic Nexium would infringe the '504, '872, and '085 patents.  Id. ¶ 82.  In reply to Dr. Reddy's answer, AstraZeneca also alleged that Dr. Reddy's generic Nexium would infringe its '192 patent.  Id.

Ranbaxy, and the court entered a consent judgment (the same day that the thirty-month stay on FDA approval of Ranbaxy's generic Nexium expired).  Id.

In consideration for Ranbaxy's agreeing to (1) admit that the '504, '192, '789, '872, '810, and '085 patents were enforceable and valid; (2) admit that Ranbaxy's generic Nexium would infringe the '504, '192, '789, and '872 patents; and (3) delay the launch of its generic Nexium until May 27, 2014, AstraZeneca agreed to pay Ranbaxy over $1,000,000,000.  Id. ¶¶ 91-92.

After Ranbaxy allegedly entered into the reverse payment agreement with AstraZeneca, Malvinder Singh, Ranbaxy's chief executive officer, purportedly stated that Ranbaxy had secured as much as $1.5 billion in prospective revenue between the commencement of the reverse payment agreement and the end of Ranbaxy's 180-day period of marketing exclusivity in 2014 envisaged by the agreement.  Id. ¶ 93.  AstraZeneca, the Plaintiffs allege (upon information and belief), has already handed over millions of dollars to Ranbaxy under their reverse payment agreement.  Id.; Direct Purchasers' Compl. ¶ 120. According to information gleaned from a press release issued two days after the alleged reverse payment agreement, however, the majority of the value accruing to Ranbaxy under the agreement will not become available until 2014.  End-Payors' Compl. ¶ 94.

The one billion dollars of value accruing to Ranbaxy, the End-Payors contend, consisted of AstraZeneca's agreeing to refrain from producing its own authorized generic version of Nexium during the 180-day exclusivity period, a product which would otherwise stand in direct competition with Ranbaxy's generic Nexium.  Id.

The End-Payors allege that AstraZeneca and Ranbaxy's representation of these payments as the grant of an exclusive license, in return for Ranbaxy's rendering manufacturing and distribution services to AstraZeneca, however, is merely obfuscatory.  Id. ¶ 95.  In other words, they were structured to disguise the true value that Ranbaxy was conferring on AstraZeneca by virtue of Ranbaxy's agreement to delay entering the market in competition with Nexium.  Id.  AstraZeneca, the End-Payors contend, would never have agreed to refrain from competing with Ranbaxy within Ranbaxy's prospective market for the generic Nexium, nor would it have earmarked Ranbaxy as its supplier of Nexium and authorized generic distributor of two of AstraZeneca's other PPI drugs, had Ranbaxy not agreed to delay its competition with AstraZeneca for more than six years.  Id.

Under the terms of AstraZeneca's alleged reverse payment agreement with Ranbaxy, Ranbaxy's 180-day market exclusivity period did not begin until May 27, 2014.  Id.  The End-Payors allege therefore that, were it not for the reverse payment

agreement between AstraZeneca and Ranbaxy, Ranbaxy, the first-
moving generic manufacturer, could have entered the market
several years earlier (and perhaps as early as April 2008). Id.
¶ 75.

> **b. Teva's and Dr. Reddy's Attempt to
> Break the Bottleneck Resulting
> from the Alleged
> AstraZeneca/Ranbaxy Reverse
> Payment Agreement**

After AstraZeneca and Ranbaxy allegedly entered into their
reverse payment agreement, Teva moved for declaratory judgment
against AstraZeneca on April 30, 2008. Id. ¶ 96. Teva sought
to obtain a ruling of invalidity and noninfringement with
respect to the patents listed in the Orange Book as to which
AstraZeneca had not commenced proceedings against Teva following
Teva's ANDA filing for its generic version of Nexium.[12] Id. The
End-Payors argue that Teva's motivation for filing its motion
for declaratory judgment was to obtain a favorable opinion with
respect to all of the Nexium patents AstraZeneca had listed in
the Orange Book. Id. Had Teva obtained what it sought, it
would have succeeded in "uncork[ing] the FDA approval
bottleneck" which had been previously fastened tight when

---

[12] Dr. Reddy's subsequently filed its own motion for
declaratory judgment in May 2008, by which it sought a similar
judgment affirming the noninfringement of those patents listed
in the Orange Book which AstraZeneca had failed to assert
previously in its infringement actions against the Generic
Defendants. Id. ¶ 96.

AstraZeneca had settled with the first-filing generic, Ranbaxy. Id.

When AstraZeneca sought to dismiss Teva's motion for declaratory judgment for lack of jurisdiction, Teva accused AstraZeneca of manipulating the Hatch-Waxman regime by trying "to take advantage of what[, in Teva's view, was] an invalid and illegitimate patent monopoly."  Id. ¶ 97 (emphasis omitted) (internal quotation marks omitted).  This is because, were Teva not allowed to challenge AstraZeneca's Nexium patents, the AstraZeneca/Ranbaxy Agreement would have succeeded in maintaining the bottleneck for six years, which would prevent any generic manufacturer from entering the market despite the suspected invalidity of AstraZeneca's Nexium patents.[13]  Id.

### c. AstraZeneca's Alleged Reverse Payment Agreement With Teva

Before the court could enter a final judgment in the principal matter concerning Teva's alleged infringement of AstraZeneca's patents,[14] however, AstraZeneca allegedly entered

---

[13] Although the New Jersey District Court denied AstraZeneca's motion to dismiss Teva's declaratory judgment for lack of jurisdiction, it granted AstraZeneca's motion to stay declaratory judgment until AstraZeneca's principal infringement action against Teva had been resolved.  Id. ¶ 98.

[14] The End-Payors allege that, despite the parties' briefing of claim construction in the summer of 2009, both parties requested that the court delay its construal of their claims to drag out litigation past January 7, 2010, by which time the

into a reverse payment agreement with Teva (the

"AstraZeneca/Teva Agreement"), which ended the litigation

between the parties.  Id. ¶ 99.  The End-Payors allege that the

parties entered into this agreement on (or about) January 7,

2010.  Id.  The New Jersey District Court memorialized the

agreement in a consent judgment.  AstraZeneca's Mem., Ex. 5,

Consent J. ("AstraZeneca/Teva Consent J.") ¶ 8, at 3-4, ECF No.

135-7.

Teva, under the terms of the reverse payment agreement,

allegedly agreed to (1) admit that the patents listed in the

Orange Book at that time relating to Nexium would be

"enforceable and valid with respect to certain products"; (2)

admit that its generic Nexium would infringe the '504, '192,

'789, '085, and '872 patents, as well as U.S. Patent No.

7,411,070; and (3) delay the launch of its generic Nexium until

May 27, 2014.  End-Payors' Compl. ¶ 100.

For Teva's part, the End-Payors allege that Teva had "an

enormous contingent liability to AstraZeneca."  Id. ¶ 102.  This

potential liability arose from Teva's decision on September 9,

2004, to begin manufacturing "at risk" a generic version of

AstraZeneca's Prilosec through its partner, Impax.  Id.  Teva

and Impax together shouldered the risk associated with their

---

parties had entered into the reverse payment agreements.  Id. ¶
99.

generic version of Prilosec.  Id.  When, in 2008, the Federal
Circuit upheld a decision from the Southern District of New York
that AstraZeneca's Prilosec patents were valid and thereby
infringed by Impax's generic, In re Omeprazole Patent Litig.,
536 F.3d 1361, 1375 (Fed. Cir. 2008), Teva was exposed to the
risk of substantial liability.  End-Payors' Compl. ¶ 102.

     As part of the consideration for the reverse payment
agreement, Teva and AstraZeneca allegedly agreed that Teva need
only pay an amount to AstraZeneca for its prior infringement of
AstraZeneca's patents that AstraZeneca determined would not be
financially significant.  Id.  The End-Payors allege that
AstraZeneca's forgiveness of a significant portion of Teva's
contingent liability was tantamount to a payment from
AstraZeneca to Teva.  Id.

     Whatever the pretextual reasons given for these corporate
decisions, the import of AstraZeneca's agreement with Teva, the
End-Payors allege, was to delay generic entry into the market
for Nexium until May 27, 2014.  Id. ¶ 103.  Without Teva's
alleged agreement to delay competition resulting from its
launching a generic version of Nexium, the End-Payors contend,
AstraZeneca would not have forgiven (so significant a portion
of) Teva's contingent liability.  Id.

                         **d. AstraZeneca's Alleged Reverse
                             Payment Agreement With Dr. Reddy's**

AstraZeneca allegedly entered into a similar reverse payment agreement with Dr. Reddy's (the "AstraZeneca/Dr. Reddy's Agreement") on January 28, 2011, before the court could enter a final judgment concerning Dr. Reddy's alleged infringement of AstraZeneca's Nexium patents.  Id. ¶ 104.  This brought any Nexium-related litigation between AstraZeneca and Dr. Reddy's to an end.  Id.

In consideration for Dr. Reddy's agreement to refrain from challenging AstraZeneca's Nexium patents and to defer its launching a generic version of Nexium until May 27, 2014, AstraZeneca allegedly agreed to forgive Dr. Reddy's contingent liability to AstraZeneca arising from Dr. Reddy's production of a generic version of AstraZeneca's Accolate "at risk" in November 2010.  Id. ¶¶ 104-106.  The End-Payors allege that, after AstraZeneca appealed the court's decision to grant Dr. Reddy's motion for summary judgment on the matter of its infringement of AstraZeneca's Accolate patents, Dr. Reddy's faced the risk of significant damages in connection with its possible patent infringement.  Id. ¶ 106.  AstraZeneca's agreement to forgive this contingent liability, the End-Payors allege, constituted a payment to Dr. Reddy's.  Id.

Under the terms of AstraZeneca's alleged agreement with Dr. Reddy's, AstraZeneca withdrew its claim against Dr. Reddy's for infringement of the '085 patent, following which the parties

entered a consent agreement endorsed by the court which maintained that Dr. Reddy's generic Nexium did not infringe the '085 patent.  Id. ¶ 83.

Dr. Reddy's filed suit on May 19, 2008, seeking declaratory judgment confirming that its generic Nexium would not infringe the '960, '424, '103, '148, '213, and '810 patents, id. ¶ 84; AstraZeneca admitted in its answer that Dr. Reddy's generic Nexium would not infringe the '148 or '810 patents, id.

The End-Payors allege that the AstraZeneca/Dr. Reddy's Agreement was designed to foreclose generic entry into the market until AstraZeneca's patents expired on May 27, 2014.  Id. ¶ 107.  Had Dr. Reddy's not agreed to this delay, the End-Payors' submit, AstraZeneca would never have agreed to drop its case against Dr. Reddy's.  Id.

The End-Payors allege that the effect of the AstraZeneca/Teva and AstraZeneca/Dr. Reddy's Agreements, between AstraZeneca and the second and third ANDA filers, was to ensure that the bottleneck resulting from the AstraZeneca/Ranbaxy Agreement remained securely in place.  Id. ¶ 108.

### 4. Anticompetitive Effects of AstraZeneca's Alleged Reverse Payment Agreements With the Generic Defendants

The End-Payors allege that AstraZeneca's reverse payment agreements were anticompetitive.  Id. ¶ 109.  This is because

the agreements were designed to deprive the putative class
members of a market in which generic drug manufacturers made
commercial decisions based upon the strength of drug patents,
balanced against the countervailing risks of litigation, free
from the distortive influence of brand manufacturers' payments.
Id. ¶ 110.

Such reverse payment agreements, the End-Payors further
allege, are inconsistent with the purpose of the Hatch-Waxman
Act, as they enabled AstraZeneca to (1) delay the entry of less
expensive generic versions of Nexium, (2) fix the price of
Nexium, (3) maintain a monopoly in the United States for Nexium,
and (4) allocate the entirety of the market for delayed-release
esomeprazole magnesium in the United States to AstraZeneca.   Id.

Were it not for these reverse payment agreements, the End-
Payors allege, a generic ANDA filer would have obtained FDA
approval to begin marketing on (or about) April 14, 2008, and it
would have been in a position to begin selling its generic
version not long thereafter.   Id. ¶ 111.  After the end of the
180-day exclusivity period granted to this generic ANDA filer,
other generics would be permitted to enter the market, resulting
in further competition.   Id.

The End-Payors therefore allege that the Defendants' action
in concert unlawfully allowed AstraZeneca to sell Nexium at
supracompetitive prices.   Id. ¶ 112.

## II.    ANALYSIS

### A.  Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts sufficient "to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  The grounds of entitlement to relief set forth in the complaint must constitute "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555. Nevertheless, a defendant's burden "is a heavy one when a motion to dismiss is filed." Stein v. Smith, 270 F. Supp. 2d 157, 164 (D. Mass. 2003) (Lindsay, J.).  In its consideration of a motion to dismiss, the Court is instructed to "accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiffs." Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 48 (1st Cir. 2009).

### B.  Direct Purchasers' Claims

#### 1. Legality of Reverse Payment Agreements after Actavis

Two of the remaining eleven active Nexium patents are set to expire on May 27, 2014, and the remainder of the active Nexium patents will expire on dates ranging from November 25,

2014, to November 3, 2019.[15]  See Direct Purchasers' Compl. ¶ 73.
The Defendants argue that the May 27, 2014, generic market entry
date set out in the New Jersey District Court's consent
judgments is the earliest date that any of the patents at issue
would have expired and that any alleged anticompetitive effects
flowing from the settlement agreements underlying the consent
judgments would fall squarely within the term of AstraZeneca's
otherwise exclusionary period of monopoly patent power.  See
AstraZeneca's Mem. 9-10; Teva's Mem. 13-14; Ranbaxy's Mem. 8.

Until recently, there was deep disagreement among the
courts of appeals as to how reverse payment agreements ought be
viewed under the law.  To wit, one set of circuits followed the
"scope-of-the-patent" test (upon which the Defendants' argument
is predicated), which held that "absent sham litigation or fraud
in obtaining the patent, a reverse payment settlement is immune
from antitrust attack so long as its anticompetitive effects
fall within the scope of the exclusionary potential of the
patent." Federal Trade Comm'n v. Watson Pharms., Inc., 677 F.3d
1298, 1312 (11th Cir. 2012), rev'd sub nom., Actavis, 133 S. Ct.
2223; accord In re Ciprofloxacin Hydrochloride Antitrust Litig.
("Cipro"), 544 F.3d 1323, 1336 (Fed Cir. 2008), abrogated by
Actavis, 133 S. Ct. 2223; In re Tamoxifen Citrate Antitrust

---

[15] Three of the formerly active Nexium patents listed in the
FDA Orange Book in connection with AstraZeneca's NDA expired in
2007.  See Direct Purchasers' Compl. ¶ 73.

Litig. ("Tamoxifen"), 466 F.3d 187, 212-13 (2d Cir. 2006),
abrogated by Actavis, 133 S. Ct. 2223.   The Third Circuit in In
re K-Dur Antitrust Litigation ("K-Dur"), 686 F.3d 197 (3d Cir.
2012), vacated, Merck & Co. v. La. Wholesale Drug Co., 133 S.
Ct. 2849 (mem.), Upsher-Smith Labs., Inc. v. La. Wholesale Drug
Co., 133 S. Ct. 2849 (mem.), adopted an alternative, "quick-
look" rule-of-reason test that instructs juries to regard
reverse payments as "prima facie evidence of an unreasonable
restraint of trade, which could be rebutted by showing that the
payment[s] (1) [were] for a purpose other than delayed entry or
(2) offer[] some pro-competitive benefit."[16]   Id. at 218.

The Supreme Court was called upon to address this circuit
split, and in Actavis, it formally pronounced on the legality of
reverse payments.   See 133 S. Ct. 2223.   In so doing, the
Supreme Court rejected the widely followed scope-of-the-patent

---

[16] Although the Third Circuit formally stood alone in
opposition to its sister circuits, earlier jurisprudence in the
Sixth and District of Columbia Circuits provides additional
foundation for the Third Circuit's reasoning.   See In re
Cardizem CD Antitrust Litig., 332 F.3d 896, 908 (6th Cir. 2003)
(ruling that an agreement effecting a delay in market entry by
generic drug manufacturers is "a classic example of a per se
illegal restraint of trade"); Andrx Pharms., Inc. v. Biovail
Corp. Int'l, 256 F.3d 799, 811 (D.C. Cir. 2001) (holding that a
reverse payment agreement "could reasonably be viewed as an
attempt to allocate market share and preserve monopolistic
conditions").

test.[17]  Id. at 2230-34.  The Supreme Court did not go so far as to endorse K-Dur's strict, presumptively-unlawful test, however. Id. at 2237-38.  Instead, it adopted a rule-of-reason standard as a middle-of-the-road compromise, the contours of which have been left to the lower courts to etch.  See id.

Rule-of-reason analysis demands a determination as to "whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." Arizona v. Maricopa Cnty. Med. Soc'y, 457 U.S. 332, 343 (1982). Judges engaging in rule-of-reason analysis are directed to consider three primary factors: (1) whether "the alleged agreement involved the exercise of power in a relevant economic market," (2) whether "this exercise had anti-competitive consequences," and (3) whether "those detriments outweighed

---

[17] The reasons for taking such action were fivefold: (1) reverse payments raise a "potential for genuine adverse effects on competition," Actavis, 133 S. Ct. at 2234 (quoting Federal Trade Comm'n v. Ind. Fed'n of Dentists, 476 U.S. 447, 460 (1986)) (internal quotation marks omitted); (2) "these anticompetitive consequences will at least sometimes prove unjustified," id. at 2235-36; (3) "where a reverse payment threatens to work unjustified anticompetitive harm, the patentee likely possesses the power to bring that harm about in practice," id. at 2236; (4) "[a]n unexplained large reverse payment itself would normally suggest that the patentee has serious doubts about the patent's survival," id.; and (5) "the fact that a large, unjustified reverse payment risks antitrust liability does not prevent litigating parties from settling their lawsuit," id. at 2237.  See generally id. at 2234-37.

efficiencies or other economic benefits."[18]  Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 61 (1st Cir. 2004).  The Court now weighs each of these factors.

### 2. Rule-of-Reason Analysis

#### a. Market Power in the Relevant Market

The first rule-of-reason criterion to address is whether the Defendants exercised market power in the relevant market. The Defendants argue that the Direct Purchasers have failed to allege a plausible relevant market, see Dr. Reddy's Mem. 15-17; AstraZeneca's Mem. 10-17, suggesting that the Court need not even reach the question of whether the Defendants conceivably possess the market power necessary for the Direct Purchasers to state claims against them under the Sherman Act, 15 U.S.C. §§ 1-2.  Specifically, the Defendants contend that the Direct Purchasers' proposed market -- namely, brand Nexium and generic equivalents that also share its active ingredient, esomeprazole magnesium -- is far too narrow because it excludes other

---

[18] Although this three-factor inquiry is set forth in a First Circuit case in which only section 1 of the Sherman Act was at issue, see Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 61 (1st Cir. 2004), various other courts, including the Supreme Court, have held that the rule of reason applies with equal force to claims brought under section 2, see, e.g., Standard Oil Co. of N.J. v. United States, 221 U.S. 1, 61-62 (1911); cf., e.g., United States v. Microsoft Corp., 253 F.3d 34, 59 (D.C. Cir. 2001) (per curiam).

products that are either similar in chemical composition or used
to treat comparable medical conditions.  Dr. Reddy's Mem. 15-17
(noting that the Direct Purchasers' complaint "spends several
paragraphs . . . describing the similarities in structure
between Prilosec (omeprazole) and Nexium (esomeprazole)," id. at
16 (citing Direct Purchasers' Compl. ¶¶ 75-78)); AstraZeneca's
Mem. 13-17 (noting that the Direct Purchasers' complaint alleges
that other PPIs, as well as H2 blockers and non-prescription
antacids, "are used to treat the same or similar conditions" as
Nexium, id. at 14 (quoting Direct Purchasers' Compl. ¶ 71)
(internal quotation marks omitted), and that "observed
differences in healing rates and symptom relief for Nexium and
Prilosec may reflect differences in dose rather than metabolic
or pharmacologic differences," id. at 17 (quoting Direct
Purchasers' Compl. ¶ 89) (internal quotation marks omitted)).

     The Defendants' arguments ring hollow upon review of the
case law.  In order to state a claim under section 1 of the
Sherman Act, a plaintiff must demonstrate that "the defendant
had market power in the relevant market, and the specific intent
to restrain competition."  CVD, Inc. v. Raytheon Co., 769 F.2d
842, 851 (1st Cir. 1985).  Relatedly, under section 2 of the
Sherman Act, a plaintiff must show that "the defendant had the
specific intent to monopolize the relevant market, and a
dangerous probability of success."  Id.  The Supreme Court has

declared that, for antitrust purposes, a "relevant market" is
made up of "commodities reasonably interchangeable by consumers
for the same purposes." United States v. E.I. du Pont de
Nemours & Co., 351 U.S. 377, 395 (1956).  The reasonable
interchangeability of a set of products is not dependent on the
similarity of their forms or functions; instead, "[s]uch limits
are drawn according to the cross-elasticity of demand for the
product in question -- the extent to which purchasers will
accept substitute products in instances of price fluctuation and
other changes." George R. Whitten, Jr., Inc. v. Paddock Pool
Builders, Inc., 508 F.2d 547, 552 (1st Cir. 1974); see also
Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962) ("The
outer boundaries of a product market are determined by the
reasonable interchangeability of use or the cross-elasticity of
demand between the product itself and substitutes for it.").

The Direct Purchasers' complaint expressly alleges that
"Nexium does not exhibit significant, positive cross-elasticity
of demand with respect to price with any product other than AB-
rated generic versions of Nexium." Direct Purchasers' Compl. ¶
145.  The fact that other drugs may be used to treat heartburn
and related conditions is immaterial to the present inquiry.
See, e.g., United States v. Archer-Daniels-Midland Co., 866 F.2d
242, 248 & n.1 (8th Cir. 1988) (concluding that, although high
fructose corn syrup and sugar serve near-identical functional

purposes, the absence of strong cross-price elasticity between the two products suggested that they were not in fact within the same market).  The Supreme Court has held that a properly constituted market may indeed be comprised of a single product, Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 481-82 (1992), and lower courts across the country have on numerous occasions ruled that both a brand-name drug and its generic analogs can fall within the bounds of a relevant market, see, e.g., In re Terazosin Hydrochloride Antitrust Litig., 352 F. Supp. 2d 1279, 1319 n.40 (S.D. Fla. 2005) (deeming a relevant market to be composed of branded and generic terazosin hydrochloride); In re Cardizem CD Antitrust Litig. ("Cardizem"), 105 F. Supp. 2d 618, 680-81 (E.D. Mich. 2000) (accepting plaintiffs' contention that branded and generic versions of a heart medication with the chemical compound diltiazem hydrochloride constitute a single market), aff'd, 332 F.3d 896 (6th Cir. 2003).  Although it may be beyond this Court's competence to confirm the accuracy of the Direct Purchasers' characterization of the reasonable interchangeability of brand Nexium with other drugs, such a factually intensive determination is better left for resolution by a jury, see Eastman Kodak, 504 U.S. at 482 (observing that "[t]he proper market definition . . . can be determined only after a factual inquiry into the 'commercial realities' faced by consumers," id.

(quoting <u>United States</u> v. <u>Grinnell Corp.</u>, 384 U.S. 563, 572

(1966))); <u>Todd</u> v. <u>Exxon Corp.</u>, 275 F.3d 191, 199-200 (2d Cir.

2001) (explaining that "[b]ecause market definition is a deeply

fact-intensive inquiry, courts hesitate to grant motions to

dismiss for failure to plead a relevant product market"), so, by

definition, the Defendants' motions to dismiss cannot be

sustained on this ground.[19]

_____

[19] What is more, in this particular case, the Direct
Purchasers may not even need to allege a relevant market in
order to state their Sherman Act claims.  The relevant market
serves merely as a proxy for market power when direct evidence
of market power is unavailable.  IIB Phillip E. Areeda & Herbert
Hovenkamp, <u>Antitrust Law</u> ¶ 531a, at 232 (3d ed. 2007) ("Finding
the relevant market and its structure is typically not a goal in
itself but a mechanism for considering the plausibility of
antitrust claims that the defendants' business conduct will
create, enlarge, or prolong market power.").  <u>But see</u> <u>id.</u> ¶
531a, at 233 ("Even when direct measures of power are feasible,
courts would still find market definition useful . . . .  Thus,
while market definition and computation of market share is often
said to be a surrogate for more 'direct' measures of market
power, it is often more than a surrogate.").  Where direct
evidence of market power <u>is</u> available, however, a plaintiff need
not attempt to define the relevant market.  <u>Id.</u> ¶ 531f, at 241.
Such appears to be the case here, <u>see</u> Direct Purchasers' Compl.
¶¶ 143-145, 147-151 (alleging that "[AstraZeneca] had the power
to maintain the price of the drug it sold as Nexium at
supracompetitive levels without losing substantial sales to
other products prescribed and/or used for the same purposes as
Nexium," <u>id.</u> ¶ 143, and that "AstraZeneca . . . enjoyed high
barriers to entry with respect to competition . . . due to
patent and other regulatory protections and high costs of entry
and expansion," <u>id.</u> ¶ 150), which would tend to eliminate the
need formally to define a relevant market, <u>see</u> <u>Coastal Fuels of
P.R., Inc.</u> v. <u>Caribbean Petroleum Corp.</u>, 79 F.3d 182, 196-97
(1st Cir. 1996).

Taking the relevant market to be comprised of brand and generic Nexium alone for the purposes of this memorandum, this Court reaches the conclusion that the Direct Purchasers' complaint alleges more than enough facts to enable a reasonable jury to find that the Defendants exercise market power.  Market power can be proven in one of two ways: either by (1) "direct evidence of market power (perhaps by showing actual supracompetitive prices and restricted output)" or by (2) "circumstantial evidence of market power . . . [which] show[s] that the defendant has a dominant share in a well-defined relevant market and that there are significant barriers to entry in that market and that existing competitors lack the capacity to increase their output in the short run." Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 196-97 (1st Cir. 1996) (citation omitted).  This Court need not engage in an extensive analysis of circumstantial evidence of market power because direct evidence of such power is available -- the Direct Purchasers have thoroughly alleged that AstraZeneca, in its position as a monopolist, has been able to charge supracompetitive prices for brand Nexium.  See Direct Purchasers' Compl. ¶¶ 143-145, 147-151 (alleging, inter alia, that "Nexium does not exhibit significant, positive cross-elasticity of demand with respect to price with any product other than AB-rated generic versions of Nexium," id. ¶ 145, and

that "AstraZeneca . . . sold Nexium at prices well in excess of marginal costs, and substantially in excess of the competitive price, and enjoyed high profit margins," id. ¶ 148).

### b. Anticompetitive Consequences

The second rule-of-reason criterion to address is whether the Defendants' exercise of market power generated anticompetitive consequences.  The Generic Defendants argue that the Direct Purchasers have failed to allege how the settlement agreements between AstraZeneca and each of the Generic Defendants have caused a cognizable injury to competition.  Ranbaxy's Mem. 12-13; Dr. Reddy's Mem. 11-15; Teva's Mem. 17-19.  Specifically, the Generic Defendants claim that the Direct Purchasers' assertion that the Generic Defendants would have entered the market prior to the expiration of the Nexium patents but for the settlement agreements is far too speculative to state an actionable claim.  The theories upon which this argument is founded differ slightly among the Generic Defendants: Ranbaxy and Teva contend that there is no indication that they would have prevailed in their patent litigations against AstraZeneca or that they would have launched "at-risk" generic versions of Nexium, Ranbaxy's Mem. 12-14; Teva's Mem. 17-19, whereas Dr. Reddy's raises identical arguments with respect to its own patent litigation with AstraZeneca but further contends that Ranbaxy's first-filing status would

nevertheless have precluded it from entering the market at any time before the closing of Ranbaxy's 180-day exclusivity window (unless Dr. Reddy's received a favorable court decision and had tentative approval from the FDA).  Dr. Reddy's Mem. 11-15.

To state a claim under the federal antitrust laws, a plaintiff must sufficiently allege an "antitrust injury." Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990) (emphasis omitted) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)) (internal quotation mark omitted).  An antitrust injury is described as an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  Id. (quoting Brunswick, 429 U.S. at 489) (internal quotation mark omitted).  "[An] injury, although causally related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny."  Id.

There is support in the case law for the proposition that allegations waxing poetic on the probability of successful patent invalidity or unenforceability claims and of a proposed would-have-been date of generic market entry that rest upon but-for theories of causation will not suffice to raise a triable antitrust issue.  See, e.g., Watson Pharms., 677 F.3d at 1312-13 ("[I]t is simply not true that an infringement claim that is

'likely' to fail actually will fail. . . . Rational parties settle to cap the cost of litigation and to avoid the chance of losing."); In re Ciprofloxacin Hydrochloride Antitrust Litig. ("Cipro"), 261 F. Supp. 2d 188, 199-202 (E.D.N.Y. 2003) (holding that plaintiffs' allegations that brand defendant's patent was invalid or unenforceable and that brand defendant "paid enormous sums of money to avoid a judicial determination of the patent infringement case," id. at 200, were not enough to state a triable claim).  Certain authority cuts the other way, however. See, e.g., Andrx Pharms., Inc. v. Biovail Corp. Int'l, 256 F.3d 799, 804, 808-09 (D.C. Cir. 2001) ("One can fairly infer from [the agreement providing for the payment of $10 million per quarter to a generic manufacturer] . . . that but for the Agreement, [the generic manufacturer] would have entered the market." Id. at 809).  Moreover, the fact that each of the Generic Defendants have launched at-risk products in the past, see Direct Purchasers' Opp'n Teva's Mot. Dismiss 11 & nn.44-47, would seem to undermine the notion that they would not have done so in this case.  Finally, in response to Dr. Reddy's separate allegation regarding first-filers, courts have looked with particular skepticism upon agreements that allow first-filers to exploit their 180-day exclusivity period by prohibiting other generic competitors from entering the market without a demonstrated intention to market their generic drug.  See, e.g.,

Watson Pharms., 677 F.3d at 1311 (noting that a settlement whose purpose is to facilitate a bottleneck in generic market entry would "create[] anticompetitive effects beyond the scope of the patent"); Andrx Pharms., 256 F.3d at 809 ("Although it is true that the first to file an ANDA is permitted to delay marketing as long as it likes, the statutory scheme does not envision the first applicant's agreeing with the patent holder of the pioneer drug to delay the start of the 180-day exclusivity period.").

Part III of the Supreme Court's opinion in Actavis added an additional gloss to standard antitrust-injury analysis, however. There, the Supreme Court explained that a rule-of-reason approach to reverse payment agreements is preferable to quick-look treatment because "the likelihood of a reverse payment bringing about anticompetitive effects depends upon its size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification." 133 S. Ct. at 2237. In other words, only those reverse payment agreements whose anticompetitive consequences are sufficiently great and sufficiently unrelated to the settlement of a particular patent dispute will be censured by the courts.

In the instant case, the Plaintiffs allege that AstraZeneca agreed to pay over $1,000,000,000 to Ranbaxy and enter into a

39

no-authorized generic agreement with it, see End-Payors' Compl.
¶¶ 92, 94, which seems like outsize accommodation from a company
to whom Ranbaxy was purportedly liable for patent infringement.
It is also alleged that Teva and Dr. Reddy's were forgiven by
AstraZeneca of contingent liabilities tied to their infringement
of AstraZeneca's patents in Prilosec and Accolate, respectively,
see id. ¶¶ 102-106, which is entirely disconnected from
AstraZeneca's earlier Nexium-related suits against these
parties.  Moreover, as section II.B.1.c explains, there exists
no persuasive procompetitive justification for the alleged
agreements at issue.  Taking all intendments in the light most
favorable to the Direct Purchasers, then, the no-authorized
generic agreement between AstraZeneca and Ranbaxy and
AstraZeneca's forgiveness of Teva's and Dr. Reddy's contingent
liabilities related to the infringement of non-Nexium-related
patents sufficiently implicate adverse anticompetitive
consequences to allow the Direct Purchasers' claims to proceed.

     Yet even if it can be said that the Defendants' reverse
payment agreements were sufficiently anticompetitive, it is not
readily apparent that the Direct Purchasers have recourse under
the antitrust laws, so the Generic Defendants claim, because the
Generic Defendants did not receive any kind of monetary payment
from AstraZeneca in exchange for their alleged commitment to

stay out of the market.[20]  See Dr. Reddy's Mem. 10-11; Teva's

Mem. 14-17; Ranbaxy's Mem. 8-12.  Instead, AstraZeneca and

Ranbaxy allegedly entered into a "no-authorized generic

agreement" granting Ranbaxy "an exclusive license . . . to

market generic delayed-release esomeprazole magnesium during

Ranbaxy's first-filer 180-day period of generic market

exclusivity," Direct Purchasers' Compl. ¶ 121, while Teva and

Dr. Reddy's were allegedly forgiven by AstraZeneca of contingent

liabilities for past patent infringement, id. ¶¶ 129-130, 133-

134.

　　　It is true that some courts have opted for a narrow

construal of the term "payment."  See, e.g., In re Lamictal

Direct Purchaser Antitrust Litig., No. 12-995 (WHW), 2012 WL

6725580, at *6 (D.N.J. Dec. 6, 2012) (holding that "the term

'reverse payment' is not sufficiently broad to encompass any

benefit that may fall to [a generic manufacturer] in a

negotiated settlement" and that "[t]he Third Circuit's K-Dur

opinion is directed towards settlements when a generic

manufacturer is paid off with money"); Asahi Glass Co. v.

---

[20] The Generic Defendants, however, pay no heed to the
Direct Purchasers' allegation that "AstraZeneca has already paid
Ranbaxy millions of dollars under their Agreement."  Direct
Purchasers' Compl. ¶ 120.  That said, because this allegation
was made simply upon information and belief -- and, more
importantly, because the inclusion of a monetary payment in the
AstraZeneca/Ranbaxy agreement ultimately does not affect this
Court's analysis -- this Court has no qualms crediting the
Generic Defendants' account.

Pentech Pharms., Inc., 289 F. Supp. 2d 986, 994 (N.D. Ill. 2003)
(reasoning that "[i]f any settlement agreement is thus to be
classified as involving a forbidden 'reverse payment,' we shall
have no more patent settlements").  This Court need not take the
same tack, however.  Cf. In re Lipitor Antitrust Litig., No.
3:12-cv-2389 (PGS), 2013 WL 4780496, at *26 (D.N.J. Sept. 5,
2013) (allowing plaintiffs challenging an alleged reverse
payment agreement to amend their complaint to include
allegations beyond those of a purely monetary nature).  Nowhere
in Actavis did the Supreme Court explicitly require some sort of
monetary transaction to take place for an agreement between a
brand and generic manufacturer to constitute a reverse payment.
Admittedly, the Supreme Court spoke only to the merits of cash
payouts as a quid pro quo for promises of delayed generic market
entry.  See, e.g., 133 S. Ct. at 2229 (describing a brand
manufacturer's agreement with three generic manufacturers to
"pay millions of dollars to each generic"); id. at 2233 (noting
that "[i]n reverse payment settlements, . . . a party with no
claim for damages (something that is usually true of a paragraph
IV litigation defendant) walks away with money simply so it will
stay away from the patentee's market").  Yet Actavis only
involved a brand manufacturer's bargain with three generic
manufacturers "to pay millions of dollars to each generic," see
id. at 2229, so the Supreme Court's confined analysis hardly

seems surprising.  This Court does not see fit to read into the opinion a strict limitation of its principles to monetary-based arrangements alone.[21]  Adopting a broader interpretation of the word "payment," on the other hand, serves the purpose of aligning the law with modern-day realities.[22]

---

[21] Indeed, even Chief Justice Roberts, who authored the dissenting opinion in the case, acknowledged that nonmonetary forms of consideration carry worth in the antitrust context. See id. at 2239 (Roberts, C.J., dissenting) (commenting that the brand defendant "gave its competitors something of value (money) and, in exchange, its competitors gave it something of value (dropping their legal claims)").

[22] The Federal Trade Commission, one of the two federal agencies responsible for enforcing federal antitrust laws, has published numerous studies suggesting that nonmonetary pay-for-delay agreements in which a brand drug manufacturer declines to sell an authorized generic during a first-filer's 180-day exclusivity period constitute reverse payments.  See, e.g., FTC Report on Authorized Generics, supra, at 152 (concluding that "[a] review of recent brand-generic settlements reveals that agreements not to compete with ANDA-generics through an [authorized generic] have become a recognized mode for a brand to provide compensation to generics and, therefore, can be used as exclusion payments in patent settlement agreements"); Fed. Trade Comm'n, Pay-for-Delay: How Drug Company Pay-Offs Cost Consumer Billions 5 (2010), available at http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf (acknowledging that not all pay-for-delay agreements involve cash payments).  In addition, case law confirms that although contingent liabilities technically "depend[] on a future event that may not even occur[] to fix either [their] existence or [their] amount," Freeland v. Enodis Corp., 540 F.3d 721, 730 (7th Cir. 2008) (second alteration in original) (quoting In re Knight, 55 F.3d 231, 236 (7th Cir. 1995)) (internal quotation marks omitted), courts have nevertheless rejected the notion that such liabilities are without any value whatsoever, see, e.g., id. ("[A] contingent liability is not valued at its full amount . . . .  Rather, a contingent liability is valued at its face amount multiplied by the probability that it will become due.").

### c. Weighing Economic Detriments Against Economic Benefits

The final rule-of-reason criterion requires the Court to balance the economic detriments of the agreements at issue against the economic benefits thereof.  The Defendants have not put forward a shred of affirmative evidence tending to show that the agreements into which they allegedly entered produced any countervailing procompetitive benefits whatsoever.  See AstraZeneca's Mem.; Dr. Reddy's Mem.; Teva's Mem.; Ranbaxy's Mem.  The lone conceivable benefit of reverse payment agreements -- namely, the settlement of patent disputes -- cannot overcome the anticompetitive consequences discussed earlier in section II.B.1.b.  See Actavis, 133 S. Ct. at 2234-37 (entertaining a number of arguments against the brand and generic respondents' position in that case and ultimately holding that "these considerations, taken together, outweigh the single strong consideration -- the desirability of settlements  -- that led the Eleventh Circuit to provide near-automatic antitrust immunity to reverse payment settlements," id. at 2237).  "Where a reverse payment reflects traditional settlement considerations, such as avoided litigation costs or fair value for services, there is not the same concern that a patentee is using its monopoly profits to avoid the risk of patent invalidation or a finding of noninfringement." Id. at 2236.

Such traditional settlement considerations do not appear to be present here, however.  Moreover, the presumptive validity accorded to patents upon issuance has been cast in significant doubt by judges and empiricists alike, cf. Lear, Inc. v. Adkins, 395 U.S. 653, 670 (1969) (acknowledging that "the Patent Office is often obliged to reach its decision in an ex parte proceeding, without the aid of the arguments which could be advanced by parties interested in proving patent invalidity"); Fed. Trade Comm'n, Generic Drug Entry Prior to Patent Expiration: An FTC Study 16 (2002), available at http://www.ftc.gov/os/2002/07/genericdrugstudy.pdf (finding in a study of the success rate of paragraph IV challenges to brand-drug validity that "[g]eneric applicants prevailed 73 percent of the time"), and although patent holders enjoy broad exclusionary rights, see, e.g., U.S. Const. art. I, § 8, cl. 8 (granting to patent holders "the exclusive Right to their respective Writings and Discoveries" for limited periods of time); Dawson Chem. Co. v. Rohm & Haas Co., 448 U.S. 176, 215 (1980) (echoing "the long-settled view that the essence of a patent grant is the right to exclude others from profiting by the patented invention"), these rights are not limitless, see, e.g., Standard Oil Co. (Ind.) v. United States, 283 U.S. 163, 169 (1931) ("The limited monopolies granted to patent owners do not exempt them from the

prohibitions of the Sherman Act and supplementary
legislation.").

Accordingly, this Court holds that the Direct Purchasers
have pled facts sufficient at the motion-to-dismiss stage to
establish violations of sections 1 and 2 of the Sherman Act
under the rule of reason.

### 3. Exceptions to Antitrust Liability

The Defendants contend that even if their actions are
deemed anticompetitive, (1) all of the agreements between
AstraZeneca and the Generic Defendants ought enjoy Noerr-
Pennington immunity, see AstraZeneca's Mem. 4-8; and (2) the
relevant statute of limitations bars any Sherman Act claims
arising out of the AstraZeneca/Ranbaxy agreement,[23] Ranbaxy's

---

[23] The Court need not address the Defendants' contention
that Federal Circuit law governs this dispute, see AstraZeneca's
Mem. 8-9; Teva's Mem. 7-9, as the Supreme Court has already
weighed in on this issue, see Actavis, 133 S. Ct. at 2231 ("[I]t
would be incongruous to determine antitrust legality by
measuring [a reverse payment] settlement's anticompetitive
effects solely against patent law policy, rather than by
measuring them against procompetitive antitrust policies as
well. . . . [T]his Court has indicated that patent and antitrust
policies are both relevant in determining the 'scope of the
patent monopoly' -- and consequently antitrust law immunity --
that is conferred by a patent."); id. at 2236 ("[I]t is normally
not necessary to litigate patent validity to answer the
antitrust question . . . ."). But see id. at 2240 (Roberts,
C.J., dissenting) (asserting that questions of patent invalidity
and infringement, in the context of reverse payments, are
"plainly a question of patent law").

Mem. 5-6; see also AstraZeneca's Mem. 17-20.  The Court addresses each of these contentions in turn.

### a. Noerr-Pennington Immunity

The Noerr-Pennington doctrine grants antitrust immunity to persons and organizations who, with the intent to restrain trade and diminish competition, act in concert to petition the government to adopt laws and implement policies that are anticompetitive in nature.[24]  See Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 499 (1988).  Although it originally arose in the context of an individual's right to entreat the legislature and the executive, see United Mine Workers of Am. v. Pennington, 381 U.S. 657, 669-70 (1965); Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 136 (1961), the doctrine has since been deemed to cover advocacy before all organs of government, including, most relevantly for the present inquiry, courts, see, e.g., California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972).  Moreover, the Supreme Court has held that the Noerr-Pennington doctrine extends not only to "direct" petitioning but also to activities that are "'incidental' to a valid effort to influence governmental action."  Allied Tube,

---

[24] The rationale underlying the Noerr-Pennington doctrine is ostensibly rooted in the First Amendment's Petition Clause, which provides that "Congress shall make no law . . . abridging the right of the people . . . to petition the Government."  U.S. Const. amend. I.

486 U.S. at 499 (quoting Noerr, 365 U.S. at 143).  Ultimately,
though, "[t]he scope of [Noerr-Pennington's] protection depends
. . . on the source, context, and nature of the anticompetitive
restraint at issue."  Id.

     Writing on behalf of all of the Defendants, AstraZeneca
argues that because the New Jersey District Court entered
consent judgments sanctioning settlement agreements struck
between AstraZeneca and each of the three Generic Defendants,
any anticompetitive harms that flow from such agreements are
properly attributable to governmental -- not private -- action.
See AstraZeneca's Mem. 5-6.  For support, AstraZeneca contends
that the settlement agreements (1) imposed upon the Defendants
only the obligation "to file an executed consent judgment in the
[New Jersey District Court] within five business days of signing
the agreement," (2) "would become effective only when the
consent judgment was entered as an order by the [New Jersey
District Court]," and (3) would have been rendered null and void
in the event that the Defendants had failed to obtain the New
Jersey District Court's blessing within forty-five days of the
date of the consent judgment filings.  AstraZeneca's Mem. 5; see
also AstraZeneca's Mem., Ex. 1, Settlement Agreement
("AstraZeneca/Ranbaxy Settlement Agreement") §§ 2.1-2.3, at 5-6,
ECF No. 157; AstraZeneca's Mem., Ex. 2, Settlement Agreement
("AstraZeneca/Teva Settlement Agreement") §§ 2.1-2.3, at 6-7,

ECF No. 157-1; AstraZeneca's Mem., Ex. 3, Settlement Agreement

("AstraZeneca/Dr. Reddy's Settlement Agreement") §§ 2.1-2.3, at

6-7, ECF No. 157-2.[25]   Moreover, AstraZeneca stresses that it was

the New Jersey District Court that formally enjoined the Generic

Defendants from offering generic versions of Nexium in the

marketplace before May 27, 2014.   AstraZeneca's Mem. 6; see also

AstraZeneca's Mem., Ex. 4, Consent Order & Final J. ¶ 7, ECF No.

135-6; AstraZeneca/Teva Consent J. ¶ 8, at 3-4; AstraZeneca's

Mem., Ex. 6, Consent J. ¶ 3, at 32, ECF No. 135-8.

Courts are largely uniform in their view that private

settlement agreements entered into during the pendency of

litigation that are neither presented to nor approved by the

judge presiding over the dispute fall outside the ambit of

Noerr-Pennington immunity.   See, e.g., Andrx Pharms., 256 F.3d

at 818-19; Cardizem, 105 F. Supp. 2d at 634-36.   There is little

guidance, however, on the question of whether a judge's entry of

_____

[25] Technically, AstraZeneca's memorandum in support of its
motion to dismiss and the three partially redacted settlement
agreements referenced therein were filed eleven days apart.   The
disparity in the filing dates is explained, however, by the fact
that the Court denied AstraZeneca's motion to impound the
settlement agreements, see Elec. Order, Feb. 28, 2013, ECF No.
153; see also AstraZeneca Defs.' Mot. Impound Confidential
Materials, ECF No. 140, which led AstraZeneca to furnish these
documents to the Court at a later date.   Accordingly, for the
purposes of citation, this Court effectively treats the redacted
versions of the settlement agreements as though they were
appended to AstraZeneca's support memorandum in the first
instance.

a consent judgment falls squarely within the scope of Noerr-Pennington.

A thirteen-year-old law review article published in the Indiana Law Review proposes a sensible analytical approach whose adoption proves useful in determining whether the consent judgments at issue ought be covered under Noerr-Pennington. In the article, Raymond Ku draws upon language in the Supreme Court's decision in Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 –– to wit, that "[t]he scope of [Noerr-Pennington's] protection depends . . . on the source, context, and nature of the anticompetitive restraint at issue," id. at 499 –– to create a bidimensional framework:

> [T]he history of the right to petition and the Supreme Court's case law demonstrate that immunity is justified based upon the nature of the activity in question and the source of the injury to competition. This Article proposes that immunity attaches when:
>
> > 1) the conduct represents valid petitioning. Valid petitioning is defined as a formal or informal attempt to persuade an independent governmental decision maker consistent with the rules of the political forum in question, and
> >
> > 2) any anticompetitive harms flow directly or indirectly from those persuasive efforts.

Raymond Ku, Antitrust Immunity, the First Amendment and Settlements: Defining the Boundaries of the Right to Petition, 33 Ind. L. Rev. 385, 404 (2000). Ku asserts that this self-described, two-pronged "means/source test" ultimately can be

reduced to a single question: "Is the private conduct a valid
effort to influence government?"  Id. at 421.

Applying Ku's framework to the instant case, it becomes
clear that the consent judgments entered by the New Jersey
District Court are not eligible candidates for Noerr-Pennington
coverage.  Courts have acknowledged that the distinction between
private settlements and consent judgments is far from obvious
and modest at best.  See, e.g., Lorain NAACP v. Lorain Bd. of
Educ., 979 F.2d 1141, 1148 (6th Cir. 1992) (observing that a
consent decree is best described as a "strange hybrid in the
law," id. (quoting Brown v. Neeb, 644 F.2d 551, 557 (6th Cir.
1981)) (internal quotation marks omitted), that "is at once a
voluntary settlement agreement which could be fully effective
without judicial intervention and a final judicial order . . .
plac[ing] the power and prestige of the court behind the
compromise struck by the parties," id. (alteration in original)
(quoting Williams v. Vukovich, 720 F.2d 909, 920 (6th Cir.
1983)) (internal quotation marks omitted)); cf., e.g., Local No.
93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of
Cleveland, 478 U.S. 501, 519 (1986) ("[C]onsent decrees bear
some of the earmarks of judgments entered after litigation.  At
the same time, because their terms are arrived at through mutual
agreement of the parties, consent decrees also closely resemble
contracts.").  Unlike an opinion, which is aided by an

adversarial system that grants a judge the occasion formally to review the merits of the claims asserted, "the means employed in reaching [a consent judgment] are still the same as those used to enter into private settlement or any private commercial contract," Ku, supra, at 427, in that "the parties can be treated as orchestrating the decision-making process by privately negotiating the terms of the settlement and then presenting them to the court as a fait accompli which any court would be hard-pressed to reject," id. at 428.  The ways in which parties maneuver to transform a settlement agreement into a judicially approved consent judgment, then, cannot be fairly characterized as direct "petitioning" -- at least not as that word is commonly understood in the context of the political process.[26]  Cf. Sosa v. DIRECTV, Inc., 437 F.3d 923, 933 (9th Cir. 2006) (observing that "only litigation activities which

---

[26] In their memorandum in support of their motion to dismiss the End-Payors' complaint, the Defendants present an alternate interpretation of the relevant petitioning conduct, arguing that they "petition[ed] the [New Jersey District Court] to enter consent judgments as orders of the court enjoining Ranbaxy, Teva, and [Dr. Reddy's] from marketing a generic version of Nexium until May 2014."  Defs.' Mot. Dismiss End-Payors 3.  Even were this Court to adopt the Defendants' broader definition of "petitioning," the conclusion reached in this memorandum ultimately would be the same, as it is not the Defendants' mere efforts to obtain a consent judgment that the Plaintiffs are challenging.  Rather, the Plaintiffs have taken particular issue with the settlement agreements undergirding the consent judgments and the purported use of the New Jersey District Court as an instrument to legitimate the Defendants' allegedly anticompetitive arrangement.

constitute 'communication[s] to the court' may be fairly
described as 'petitions'" and that "[s]uch communications
include [a] complaint, an answer, a counterclaim and other
assorted documents and pleadings, in which plaintiffs or
defendants make representations and present arguments to support
their request that the court do or not do something," id. (first
and third alteration in original) (quoting Freeman v. Lasky,
Haas & Cohler, 410 F.3d 1180, 1184 (9th Cir. 2005)) (internal
quotation marks omitted)).

The entry of a consent judgment cannot be construed as
conduct that is "incidental" to litigation, either.  A wide
variety of activities -- including the delivery of presuit
demand letters, discovery communications, decisions to accept or
reject settlement offers, and threats to litigate -- have been
held exempt from antitrust liability under Noerr-Pennington.
See, e.g., Sosa, 437 F.3d at 936-38 (presuit demand letters);
Freeman, 410 F.3d at 1184 (discovery communications); Columbia
Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc., 944
F.2d 1525, 1528 (9th Cir. 1991) (decisions to accept or reject
settlement offers), aff'd on other grounds, 508 U.S. 49 (1993);
Coastal States Mktg., Inc. v. Hunt, 694 F.2d 1358, 1367-68 (5th
Cir. 1983) (threats to litigate).  Despite the breadth of their
diversity, however, all of these activities share a common
purpose and anticipate a common end: the persuasion of a

judicial officer to obtain a redress of grievances.  Consent

judgments effected at the behest of private parties, on the

other hand, do not share the same purpose.[27]  Although certain

resolutions to litigation require judicial approval, see, e.g.,

Antitrust Procedures and Penalties Act, Pub. L. No. 93-528, 88

Stat. 1706 (codified at scattered sections of 15 U.S.C.)

(mandating, in the resolution of antitrust actions, that "the

court . . . determine that the entry of [a consent] judgment is

in the public interest," 15 U.S.C. § 16(e)(1), by affirmatively

considering the impact of such judgment on competition, id. §

16(e)(1)(A)-(B)); Fed. R. Civ. P. 23(e) (allowing settlement of

a class action only if a court "approve[s] [the proposed

settlement agreement] . . . after a hearing and on finding that

it is fair, reasonable, and adequate," Fed. R. Civ. P.

23(e)(2)), most settlements can be made final without the stamp

of a judge, see Fed. R. Civ. P. 41(a)(1)(A) (allowing the

dismissal of an action by a plaintiff without a court order, so

long as the plaintiff gains the signatures of all parties to the

---

[27] The same argument can be made with respect to settlements
alone.  See Ku, supra, at 421-26.  Admittedly, courts have
deemed settlements between private parties and the state to be
incidental to the petitioning that takes place via litigation.
See, e.g., A.D. Bedell Wholesale Co. v. Philip Morris Inc., 263
F.3d 239, 252-54 (3d Cir. 2001).  These types of settlements are
quite distinguishable from those assented to between two or more
private parties, however, because, in the former case, the state
is operating as an actor that is directly engaged in the
decisionmaking process.

litigation on a stipulation of dismissal and files it, along
with a notice of dismissal, with the court); cf. also United
States v. Cannons Eng'g Corp., 720 F. Supp. 1027, 1035 (D. Mass.
1989) (Wolf, J.) ("Approval of a proposed consent decree is
committed to the discretion of the district court.  This
discretion is to be exercised in light of the strong policy in
favor of voluntary settlement of litigation." (citation
omitted)), aff'd, 889 F.2d 79 (1st Cir. 1990).

Such was the case here.  Nothing prohibited AstraZeneca and
the Generic Defendants from simply stipulating to a dismissal of
the patent infringement actions.  A decision of a court that
serves merely to memorialize a bargained-for agreement that
could have otherwise been resolved without judicial intervention
ought not benefit from the exemption allowed by Noerr-
Pennington.  Cf. MedImmune, Inc. v. Genentech, Inc., No. CV 03-
2567 MRP, 2003 WL 25550611, at *7 (C.D. Cal. Dec. 23, 2003)
(holding that an order and judgment executed by a judge was
eligible for Noerr-Pennington immunity because the result
achieved by the order and judgment -- namely, the reversal of a
priority decision by the U.S. Patent and Trademark Office's
Board of Patent Appeals and Interferences -- "could not have
been accomplished through private agreement").  Adopting the
alternative view would provide litigants with an avenue wholly

impervious to antitrust scrutiny simply by seeking out a court's rubber-stamped approval.

Of course, the prevailing rule under Noerr-Pennington remains that "[i]f anticompetitive harm is caused by the decision of a court, even though granted at the request of a private party, no private restraint of trade occurs because the intervening government action breaks the causal chain." Andrx Pharms., 256 F.3d 799 at 818; see also I Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 202c, at 166-67 (3d ed. 2006). Some courts have suggested, however, that where a judge plays nothing more than a perfunctory role in branding a privately ordered settlement with the imprimatur of law, the protections of Noerr-Pennington are not implicated. See, e.g., MedImmune, 2003 WL 25550611, at *6 (noting, with approval, the parties' understanding that "a court's stamp of approval will not immunize private anti-competitive agreements; genuine petitioning is necessary for Noerr-Pennington immunity to apply"); Cipro, 261 F. Supp. 2d at 212-13 (ruling that a consent judgment certifying agreements between a brand-name drug manufacturer and manufacturers of generic drugs to delay market competition and extinguish all patent litigation claims was not subject to Noerr-Pennington protection because the judge in the case "played no role other than signing the Consent Judgment," id. at 212, and "was . . . [not] even apprised of the terms

before he 'so ordered' the Consent Judgment," id. at 213, and
because "[t]he Consent Judgment did not include the terms of the
agreements," id. at 212-13).  The First Circuit has itself
suggested that it is aware of the meaningful difference between
action that is truly governmental in substance and action that
is simply governmental in form.  See George R. Whitten, Jr.,
Inc. v. Paddock Pool Builders, Inc., 424 F.2d 25, 33 n.8 (1st
Cir. 1970) ("An anti-competitive practice may receive only the
most cursory inspection by public officials, or public officials
may approve conduct without consideration or awareness of its
anti-competitive aspects.  The issue in such cases is not
whether the action was in form 'governmental', but whether the
real decision makers were public officials or private
businessmen." (citations omitted)).

      Having reviewed the record made available by the parties,
it is not apparent that the New Jersey District Court actually
played an independent role in drafting the terms in the consent
judgments.  Although AstraZeneca asserts that the New Jersey
District Court exercised its discretion in enjoining the Generic
Defendants from entering the market, AstraZenca's Mem. 6-8, the
underlying settlement agreements are heavily redacted, see
AstraZeneca/Ranbaxy Settlement Agreement; AstraZeneca/Teva
Settlement Agreement; AstraZeneca/Dr. Reddy's Settlement
Agreement, so it is unclear how much of the content found within

the consent judgments is properly attributable to the New Jersey

District Court judge's deliberation.  Moreover, the entering of

a consent decree does not, by itself, reflect a court's assent

to the substantive terms found therein, see, e.g., Liu v.

Amerco, 677 F.3d 489, 497 (1st Cir. 2012) (noting that "[a]

consent decree is neither an adjudication nor an admission by

[the defendant]"); Ku, supra, at 429 ("[W]hen asked to approve a

settlement agreement, a court is not being asked to determine

liability or approve the substance of the agreement."), so it is

unclear whether the judge could be fairly said to have endorsed

the terms of the settlement agreements.[28]  Therefore, this Court

cannot in good conscience accord the consent judgment entered by

the New Jersey District Court the aegis of antitrust immunity

under Noerr-Pennington.[29]

### b. Federal Statute of Limitations

---

[28] Despite the Defendants' protestations to the contrary, the fact that the settlement agreements would have been null and void absent the approval of the New Jersey District Court has no bearing on the present analysis.

[29] Indeed, the very fact that the Defendants can with a straight face advance this Noerr-Pennington argument based on consent judgments emphasizes that judges must be exceptionally wary of exercising their equitable powers at the joint behest of the parties.  Cf., e.g., United States v. Orthofix, Inc., Nos. 12-10169-WGY, 12-10374-WGY, 2013 WL 3853233 (D. Mass. July 26, 2013); SEC v. Citigroup Global Mkts., Inc., 827 F. Supp. 2d 328 (S.D.N.Y. 2011) (Rakoff, J.).  Far better to let the parties simply agree among themselves.

Federal antitrust enforcement actions are subject to a four-year statute of limitations.  15 U.S.C. § 15b.  Any such action that is not brought "within four years after the cause of action accrued" is deemed "forever barred."  Id.  Generally, a cause of action accrues under the Sherman Act when the plaintiff suffers an injury that is traceable to the defendant's conduct.  See In re Relafen Antitrust Litig., 286 F. Supp. 2d 56, 61 (D. Mass. 2003).  An exception to this default rule exists, however, where the defendant's conduct "constitute[s] a continuing violation of the Sherman Act . . . [that] inflict[s] continuing and accumulating harm."  Id. at 62 (first alteration in original) (quoting Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 502 n.15 (1968)) (internal quotation mark omitted).

The Defendants argue that the Direct Purchasers' Sherman Act claims relating to the AstraZeneca/Ranbaxy Agreement ought be dismissed because the consent judgment memorializing said agreement was entered by the New Jersey District Court on April 14, 2008, more than four years before the first direct purchaser complaint was filed (on August 27, 2012).  Ranbaxy's Mem. 5-6; see also AstraZeneca's Mem. 18.  The Defendants are correct. Therefore, to the extent that the Direct Purchasers seek to challenge the AstraZeneca/Ranbaxy reverse payment agreement

itself, this Court holds that the Direct Purchasers' claims are barred by the four-year statute of limitations.

The Defendants further contend that the continuing-violation exception is not applicable in the instant case because the alleged post-settlement agreement harms -- that is to say, the harms flowing from AstraZeneca's maintenance of supracompetitive brand Nexium prices -- "are not overt, but are instead 'the unabated inertial consequences of the initial violation.'"  Ranbaxy's Reply 3 (quoting Midwestern Mach. Co. v. Nw. Airlines, Inc., 392 F.3d 265, 270 (8th Cir. 2004)).

This Court disagrees.  Admittedly, courts are generally fairly hostile to invocations of the continuing-violation exception in instances where a plaintiff fails to allege that the defendant committed overt acts separate and apart from the initial act giving rise to the original injury.  See, e.g., Midwestern Mach., 392 F.3d at 271 ("Only where the monopolist actively reinitiates the anti-competitive policy and enjoys benefits from that action can the continuing violation theory apply."); Berkson v. Del Monte Corp., 743 F.2d 53, 55 (1st Cir. 1984) (suggesting that the plaintiff's antitrust claims based upon the defendants' allegedly wrongful agreement regarding the sale of banana-growing properties in Guatemala were barred by the four-year statute of limitations because "no subsequent overt act in furtherance of the alleged conspiracy [was]

described or even hinted at" in the plaintiff's complaint, id.,
so "any subsequent harm must be seen as the unabated inertial
consequence[ ] of the earlier events," id. (alteration in
original) (quoting In re Multidistrict Vehicle Air Pollution,
591 F.2d 68, 72 (9th Cir. 1979) (internal quotation marks
omitted)).  That said, the Supreme Court in Klehr v. A.O. Smith
Corp., 521 U.S. 179 (1997), observed the following:

> Antitrust law provides that, in the case of a
> "continuing violation," say, a price-fixing conspiracy
> that brings about a series of unlawfully high priced
> sales over a period of years, each overt act that is
> part of the violation and that injures the plaintiff,
> e.g., each sale to the plaintiff, starts the statutory
> period running again, regardless of the plaintiff's
> knowledge of the alleged illegality at much earlier
> times.

Id. at 189 (quoting 2 P. Areeda & H. Hovenkamp, Antitrust Law ¶
338b, at 145 (rev. ed. 1995)) (internal quotation marks
omitted).  In this way, "[a]lthough the business of a
monopolist's rival may be injured at the time the
anticompetitive conduct occurs, a purchaser, by contrast, is not
harmed until the monopolist actually exercises its illicit power
to extract an excessive price."  Berkey Photo, Inc. v. Eastman
Kodak Co., 603 F.2d 263, 295 (2d Cir. 1979) (emphasis added).
Indulging all inferences in the Plaintiffs' favor, then, it is
reasonable to assume here that, every time the Direct Purchasers
were overcharged for brand Nexium, they suffered a cognizable
injury.  See Berkey Photo, 603 F.2d at 295 ("So long as a

monopolist continues to use the power it has gained illicitly to overcharge its customers, it has no claim on the repose that a statute of limitations is intended to provide."); cf. also Hanover Shoe, 392 U.S. at 489 ("As long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows.").

### C. End-Payors' Claims

#### 1. State-Specific Statutes of Limitations

The Defendants argue that the End-Payors, who brought their actions under several state statutes, are precluded by those states' statutes of limitations from challenging the AstraZeneca/Ranbaxy Agreement.  Defs.' Mot. Dismiss End-Payors 4-5.  This is because the statutes of limitations, they argue, began running on the date the New Jersey District Court entered a consent judgment which affirmed the parties' decision to enter into the AstraZeneca/Ranbaxy Agreement.  Id.  Although the court entered the consent judgment on April 14, 2008, the End-Payors filed their complaint over four years after that date.  Id.

The statute of limitations in the following twenty-three states and territories under which the End-Payors seek to bring antitrust civil enforcement actions is four years (or lower): Arizona;[30] California;[31] Washington, D.C.;[32] Florida;[33] Illinois;[34]

---

[30] Ariz. Rev. Stat. § 44-1410(A) ("An action . . . to recover a civil penalty [in the antitrust contest] is barred if

Iowa;[35] Kansas;[36] Massachusetts;[37] Michigan;[38] Minnesota;[39]

Mississippi;[40] Nebraska;[41] Nevada;[42] New Mexico;[43] New York;[44] North

---

it is not commenced within <u>four years</u> after the cause of action accrues." (emphasis added)).

[31] Cal. Bus. & Prof. Code § 16750.1 ("Any civil action to enforce any cause of action for a violation of this chapter shall be commenced within <u>four years</u> after the cause of action accrued." (emphasis added)); <u>id.</u> § 17208 ("Any action to enforce any cause of action pursuant to this chapter shall be commenced within <u>four years</u> after the cause of action accrued.  No cause of action barred under existing law on the effective date of this section shall be revived by its enactment." (emphasis added)).

[32] D.C. Code § 28-4511(b) ("An action [brought by private parties or the District of Columbia government to enforce restraint-of-trade provisions and] to recover damages is barred if the action is not commenced within <u>four (4) years</u> after the cause of action accrues . . . ." (emphasis added)).

[33] Fla. Stat. § 501.207(5) ("No action may be brought by the enforcing authority under this section more than <u>4 years</u> after the occurrence of a violation of this part or more than 2 years after the last payment in a transaction involved in a violation of this part, whichever is later." (emphasis added)).

[34] 740 Ill. Comp. Stat. § 10/7(2) ("Any action for damages under this subsection is forever barred unless commenced within <u>4 years</u> after the cause of action accrued . . . ." (emphasis added)).

[35] Iowa Code § 553.16(2) ("Suit under section 553.12[, allowing individuals injured by violation of the Iowa Competition Law to seek certain remedies,] must be commenced within <u>four years</u> after the cause of action accrues or, if there is a fraudulent concealment of this cause of action, within four years after the cause of action becomes known, whichever period is later." (emphasis added)).

[36] Kan. Stat. § 60-512 ("The following actions shall be brought within <u>three (3) years</u>: (1) All actions upon contracts, obligations or liabilities expressed or implied but not in

writing.  (2) An action upon a liability created by a statute other than a penalty or forfeiture." (emphasis added)).

[37] Mass. Gen. Laws ch. 260, § 5A ("Actions arising on account of violations of any law intended for the protection of consumers . . . shall be commenced only within four years next after the cause of action accrues." (emphasis added)).

[38] Mich. Comp. Laws § 445.781(2) ("An action to recover damages under [the provision of the Michigan Antitrust Reform Act allowing injured parties to bring actions for relief] is barred if not commenced within 4 years after the claim for relief or cause of action accrues . . . ." (emphasis added)).

[39] Minn. Stat. § 325D.64(1) ("An action under [the Minnesota Antitrust Law of 1971], shall be forever barred unless commenced within four years of the date upon which the cause of action arose." (emphasis added)).

[40] Miss. Code. § 15-1-49(1) ("All actions for which no other period of limitation is prescribed shall be commenced within three (3) years next after the cause of such action accrued, and not after." (emphasis added)).  But see Miss. Code. § 15-1-49(2) ("In actions for which no other period of limitation is prescribed and which involve latent injury or disease, the cause of action does not accrue until the plaintiff has discovered, or by reasonable diligence should have discovered, the injury." (emphasis added)).

[41] Neb. Rev. Stat. § 59-1612 ("Any action to enforce a claim for damages [for unfair competition] shall be forever barred unless commenced within four years after the cause of action accrues . . . ." (emphasis added)).

[42] Nev. Rev. Stat. § 598A.220(2) ("An action brought [by private or public parties for the enforcement of unfair trade practices provisions] is barred if it is not commenced: (a) Within 4 years after the cause of action accrues, or if the cause of action is based upon a conspiracy in violation of this chapter, within 4 years after the plaintiff discovered, or by the exercise of reasonable diligence, should have discovered the facts relied upon for proof of the conspiracy . . . ." (emphasis added)).

[43] N.M. Stat. § 57-1-12(B) ("An action brought under [New Mexico restraint-of-trade provisions] to recover damages is

Carolina;[45] North Dakota;[46] Oregon;[47] Puerto Rico;[48] South Dakota;[49]

Tennessee;[50] Utah;[51] and West Virginia.[52]   In the following three

---

barred if it is not commenced within four years after the cause of action accrues or within four years after the plaintiff discovered, or by the exercise of reasonable diligence should have discovered, the facts relied upon for proof of the cause of action, whichever is later." (emphasis added)).

[44] N.Y. Gen. Bus. Law § 340(5) ("An action to recover damages caused by a violation of this section must be commenced within four years after the cause of action has accrued." (emphasis added)).

[45] N.C. Gen. Stat. § 75-16.2 ("Any civil action brought under this Chapter to enforce the provisions thereof shall be barred unless commenced within four years after the cause of action accrues." (emphasis added)).

[46] N.D. Cent. Code § 51-08.1-10(2) ("An action under [provisions providing remedies for the enforcement of the Uniform State Antitrust Act] to recover damages is barred if it is not commenced within four years after the claim for relief accrues . . . ." (emphasis added)).

[47] Or. Rev. Stat. § 646.800(2) ("An action under [provisions providing civil penalties for violation of state antitrust laws] to recover damages shall be commenced within four years after the cause of action accrued . . . ." (emphasis added)).

[48] P.R. Laws Ann. tit. 10, § 268 (c) ("The judicial action to recover damages in accordance with the provisions of subsections (a) and (b) of this section shall be commenced within four (4) years after the cause of action accrued." (emphasis added)).

[49] S.D. Codified Laws § 37-1-14.4 ("An action [brought by private parties suffering antitrust harms] . . . to recover damages is barred if it is not commenced within four years after the claim for relief accrues . . . ." (emphasis added)).

[50] Tenn. Code § 28-3-105 ("The following actions shall be commenced within three (3) years from the accruing of the cause of action." (emphasis added)).

states, however, the statute of limitations is six years:

Maine,[53] Vermont,[54] and Wisconsin.[55]

None of the relevant exceptions to the ordinary running of

the four-year statutes of limitations in the initial twenty-

three jurisdictions apply.  The co-payers have not, for example,

alleged that the Defendants were engaged in fraudulent

---

[51] Utah Code § 76-10-3117(2) ("Any other action pursuant to this act is barred if it is not commenced within <u>four years</u> after the cause of action accrues . . . ." (emphasis added)).

[52] W. Va. Code § 47-18-11 ("Any action brought to enforce the provisions of this article shall be barred unless commenced within <u>four years</u> after the cause of action arose, or if the cause of action is based upon a conspiracy in violation of this article, within four years after the plaintiff discovered, or by the exercise of reasonable diligence should have discovered the facts relied upon for proof of the conspiracy.  For the purpose of this section, a cause of action for a continuing violation is deemed to arise at any time during the period of such violation." (emphasis added)).

[53] Me. Rev. Stat. tit. 14, § 752 ("All civil actions shall be commenced within <u>6 years</u> after the cause of action accrues and not afterwards, except actions on a judgment or decree of any court of record of the United States, or of any state, or of a justice of the peace in this State, and except as otherwise specially provided." (emphasis added)).

[54] Vt. Stat. tit. 12, § 511 ("A civil action, except one brought upon the judgment or decree of a court of record of the United States or of this or some other state, and except as otherwise provided, shall be commenced within <u>six years</u> after the cause of action accrues and not thereafter." (emphasis added)).

[55] Wis. Stat. § 133.18(2) ("A civil action for damages or recovery of payments under this chapter is barred unless commenced within <u>6 years</u> after the cause of action accrued." (emphasis added)).

concealment, nor have the End-Payors alleged any other ground for tolling the statute of limitations.

Therefore, to the extent that the End-Payors seek to challenge the AstraZeneca/Ranbaxy reverse payment agreement itself (as opposed to the continuing harm arising from this agreement, which claims may continue as discussed above, see supra section II.B.3.b), this Court holds that the End-Payors' claims are barred by the statute of limitations in the following twenty-three jurisdictions which are subject to a four-year, or lower, limitations period: Arizona; California; Washington, D.C.; Florida; Illinois; Iowa; Kansas; Massachusetts; Michigan; Minnesota; Mississippi; Nebraska; Nevada; New Mexico; New York; North Carolina; North Dakota; Oregon; Puerto Rico; South Dakota; Tennessee; Utah; and West Virginia.[56]  The End-Payors, however, may still seek to challenge the AstraZeneca/Ranbaxy Agreement in the three states which have a six-year statute of limitations (Maine, Vermont, and Wisconsin).

---

[56] But cf. In re Buspirone Patent Litig., 185 F. Supp. 2d 363, 380 (S.D.N.Y. 2002) ("The parties have provided supplemental briefs indicating how the relevant statute of limitations provisions work in each of the fifty jurisdictions across the country.  This motion is nevertheless premature because, as discussed above, the parties have not yet briefed the prior choice of law question, which will determine which laws govern the respective claims of the different plaintiffs. This motion should thus be dismissed without prejudice to refiling once the class certification issues have been decided.").

## 2. Standing

### a. Article III Standing

The Defendants argue that the majority of the twenty-six state claims ought be dismissed.  Defs.' Mot. Dismiss End-Payors 5.  This is because, the Defendants contend, the End-Payors only have Article III standing to assert antitrust or consumer protection claims in the states in which they suffered an injury.  Id. 6; Defs.' Supplemental Mem. 1.  The Defendants argue that, according to the relevant choice-of-law rules, the state in which the End-Payors suffered the alleged injury is the state in which they reside.  Defs.' Mot. Dismiss End-Payors 5-6.  Because the end-payor health and welfare benefit funds, the named plaintiffs, reside only in five states (California, Florida, Illinois, Michigan, and New York), the Defendants contend that the End-Payors only have standing to bring claims in those five states.  Id.

The End-Payors' rejoinder, however, is two-fold: first, they argue, the putative class representatives have Article III standing to advance claims because they, as putative class representatives, have co-paid or reimbursed others for Nexium in seventeen of the twenty-six states which have passed Illinois Brick-repealer statutes,[57] End-Payors' Mem. Opp'n 6; and second, once Article III standing is established for the named

---

[57] For further explanation of Illinois Brick-repealer statutes, see infra section II.C.3.b.

representatives, the End-Payors argue, they need only satisfy
the requirements of Rule 23 under class action law to advance
claims for the absent members of the putative class (at such
time that this Court considers it appropriate to consider
whether the proposed class may be certified), id.

Article III of the Constitution contains a requirement of
justiciability which limits the jurisdiction of Article III
courts to active "Cases" and "Controversies."  U.S. Const. art.
III, § 2, cl. 1.  The Supreme Court has interpreted this clause
as articulating the "irreducible constitutional minimum" of
standing.  Bennett v. Spear, 520 U.S. 154, 162 (1997).

A court's inquiry into Article III standing contains the
three following elements: a plaintiff must allege "[1] personal
injury [2] fairly traceable to the defendant's allegedly
unlawful conduct and [3] likely to be redressed by the requested
relief."  Allen v. Wright, 468 U.S. 737, 751 (1984); accord
Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992).
The burden is on the plaintiff to show that these requirements
are satisfied.  Lujan, 504 U.S. at 561; Steel Co. v. Citizens
for a Better Environment, 523 U.S. 83, 104 (1998).  But the
Court may construe the complaint in favor of the plaintiff,
taking the allegations made therein as true.  See Warth v.
Seldin, 422 U.S. 490, 501 (1975).  Generally speaking, named
representatives in class actions must allege a personal injury.

Lewis v. Casey, 518 U.S. 343, 357 (1996).  As the subsequent analysis will indicate, this requirement is not so clear cut with respect to putative class representatives in class action disputes.[58]  See, e.g., Glass Dimensions, Inc. v. State St. Bank & Trust Co., 285 F.R.D. 169, 174-75 (D. Mass. 2012) (Tauro, J.); In re Relafen Antitrust Litig., 221 F.R.D. 260, 267-70 (D. Mass. 2004).

The Defendants contend that (1) standing is a threshold issue which must be resolved at the motion-to-dismiss stage, Defs.' Mot. Dismiss End-Payors 6; and (2) the End-Payors' lack standing to pursue claims on behalf of absent class members (because they may only bring claims against the Defendants under the laws of states in which they have made reimbursements), id. at 8.  In making both submissions, the Defendants erroneously conflate the requirements of Article III, for the purposes of assessing constitutional standing of the named plaintiffs, with the procedural requirements of Rule 23,[59] which are designed to

---

[58] Part of the reason for this confusion arises from the fact that the "named plaintiffs" and (putative) "class representatives" are not necessarily the same.  This is because "[c]lass counsel need not put forward all named plaintiffs, or only named plaintiffs as proposed class representatives."  1 Newberg on Class Actions § 2:1, at 58 (5th ed. 2013).

[59] Under Rule 23, "[o]ne or more members of a class may sue or be sued as representative parties," Fed. R. Civ. P. 23(a), so long as the four requirements of numerosity, commonality, typicality, and adequacy of representation are satisfied.

determine whether a putative class representative for whom Article III standing has already been established may also raise the claims of the class which it purports to represent.

This Court agrees with the Defendants' contention that Article III standing must be resolved at the motion-to-dismiss stage. But the named plaintiffs' allegations that they paid or reimbursed others for Nexium, at supracompetitive prices, in seventeen of the twenty-six states which have passed Illinois Brick-repealer statutes, End-Payors' Mem. Opp'n 6; End-Payors' Compl. ¶ 179, is sufficient to establish these requirements of personal injury (overpayment). As the Sixth Circuit has noted, "once an individual has alleged a distinct and palpable injury to himself he has standing to challenge a practice even if the injury is of a sort shared by a large class of possible litigants." Senter v. Gen. Motors Corp., 532 F.2d 511, 517 (6th Cir. 1976). The End-Payors' reimbursement of, and simultaneous co-payment with,[60] their members for their purchase of drugs at supracompetitive prices, allegedly obtained through illegal means, is properly characterized as a monetary injury. See End-Payors' Compl. ¶ 179. It is fairly traceable from the

---

[60] The End-Payors, in their supplemental brief, provide an interesting analysis whereby, they argue, the End-Payors, rather than reimbursing their members, "become[] obligated to pay the pharmacy the balance of the total price for the prescription" when their members make co-payments. End-Payors' Supplemental Mem. 1.

Defendants' allegedly unlawful (anticompetitive) conduct to the named plaintiff End-Payors' obligation to pay the supracompetitive balance on their putative class members' co-payments for Nexium in various states.  This injury is likely to be redressed through the requested compensatory and injunctive relief sought in the states where the putative class members made payments or reimbursements.[61]

The Defendants reject this analysis because, they claim, the First Circuit's decision in <u>Plumbers' Union Local No. 12</u>

---

[61] Although the Defendants contend that this Court must engage in a choice-of-law analysis in order to determine what they characterize as the standing of the named class representatives, Defs.' Mot. Dismiss End-Payors 8-10; Defs.' Reply End-Payors 3, it would be premature for the Court to commence this analysis at this stage before the parties are able to engage in discovery.  This is because the putative class consists of members who have suffered harm in many more states than the named plaintiffs; the End-Payors, indeed, describe the putative class as constituting the following:

> All persons or entities who purchased and/or paid for some or all of the purchase price for Nexium and/or its AB-rated generic equivalents in Arizona, California, Florida, Illinois, Iowa, Kansas, Massachusetts, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin and the District of Columbia and Puerto Rico . . . .

End-Payors' Compl. ¶ 113.  The End-Payors' complaint futher alleges that, "[f]or purposes of the Class definition, persons or entities 'purchased' Nexium or its generic equivalent if they paid or reimbursed some or all of the purchase price." <u>Id.</u>  To hold that the class representatives may only pursue claims in their principal place of business would be improvident because it would risk jeopardizing the interests of other members of the putative class who purchased Nexium in a range of states.

Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762 (1st Cir. 2011), stands for the proposition that "a named plaintiff may assert only those claims for which that plaintiff has Article III standing." Defs.' Supplemental Mem. 6. While the Court acknowledges this principle, the present facts are clearly distinguished from those in Plumbers' Union.

Plumbers' Union concerned a putative class action brought by institutional investors, pension funds, and welfare funds against eight trust funds for misrepresentations made in relation to the purchase of trust certificates representing mortgage-backed securities. The First Circuit held there that, where no named plaintiff had purchased six of the eight trust certificates in question, the named plaintiffs did not have Article III standing to pursue claims with respect to the six trusts that they had not purchased. 632 F.3d at 771.

In Plumbers' Union, the First Circuit held that "named plaintiffs [had] no claim on their own behalf based on trust certificates that they did not buy; and they bought no certificates issued by six of the defendant trusts." Id. at 768. Here, by contrast, each of the named end-payor plaintiffs has claims against each of the defendants based on their alleged overpayments for Nexium. The End-Payors have therefore made out their Article III "requisite of an ordinary case or controversy [of] an injury to the plaintiff traceable to the defendant," id.

(citing Lujan, 504 U.S. at 560–61), pleading sufficient facts to show Article III standing as to each of the named plaintiffs.

### b. Ortiz Exception

Even if, contrary to this Court's holding, it were not the case that each of the Defendants were liable to each of the named end-payor plaintiffs by virtue of their having overpaid for Nexium, Plumbers' Union preserves an exception to the strict standing analysis in those unusual circumstances presented in class action disputes where the interests of the named plaintiffs, in bringing claims for which they do have Article III standing, are sufficiently aligned with the interests of the putative class over which they do not have Article III standing. Id. at 770.  It is to this analysis of the exception laid down in Plumbers' Union that the Court now turns.

The rejoinder to the Defendants' two-fold contention has already been articulated by this Court in its previous opinion, In re Relafen Antitrust Litig., 221 F.R.D. 260.[62]  See also Glass Dimensions, 285 F.R.D. at 174 (noting that once a plaintiff establishes his own standing, the question of whether a plaintiff will be able to represent the putative class "depends

---

[62] Although the Defendants claim that the law has changed since this Court's opinion in Relafen, this Court holds that any change in the law following recent rulings of the First Circuit in Plumbers' Union does not implicate the ability of the named end-payor plaintiffs to represent the putative class in this case for the reasons articulated below.

solely on whether he is able to meet the additional criteria encompassed in Rule 23 of the Federal Rules of Civil Procedure" (quoting Fallick v. Nationwide Mut. Ins. Co., 162 F.3d 410, 423 (6th Cir. 1998)) (internal quotation marks omitted)).

In Relafen, a multidistrict antitrust litigation previously before this Court, the defendant SmithKline made a similar argument that because the named end-payor plaintiffs only purchased the drug in question in certain of the states under whose laws the claims were made, they lacked standing to assert the claims of the other class members who purchased the drug in different states; SmithKline contended therefore that the "named end payor plaintiffs' lack of standing renders them inadequate representatives." 221 F.R.D. at 267. Citing to another of this Court's opinions in Mowbray v. Waste Management Holdings, Inc., 189 F.R.D. 194 (D. Mass. 1999), where this Court held that a single named plaintiff bringing a contract claim under Illinois law could adequately represent the claims of class members arising under the laws of a plurality of states, the Court in Relafen duly rejected SmithKline's argument. This is because, the Court ruled in Relafen, "the Supreme Court's decision in Ortiz v. Fibreboard Corp., 527 U.S. 815 (1999), created an exception to ordinary jurisdictional principles." Relafen, 221 F.R.D. at 268.

In Ortiz, the Supreme Court held that the typical order by
reference to which an Article III court determines
justiciability may be inverted in certain limited circumstances:

> Ordinarily, of course, this or any other Article III
> court must be sure of its own jurisdiction before
> getting to the merits.  But the class certification
> issues are . . . "logically antecedent" to Article III
> concerns, and themselves pertain to statutory
> standing, which may properly be treated before Article
> III standing.  Thus the issue about Rule 23
> certification should be treated first, "mindful that
> [the Rule's] requirements must be interpreted in
> keeping with Article III constraints. . . ."

Ortiz, 527 U.S. at 831 (alteration in original) (citations
omitted) (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591,
612-13 (1997)); see also Amchem, 521 U.S. at 612 ("We agree that
'[t]he class certification issues are dispositive'; because
their resolution here is logically antecedent to the existence
of any Article III issues, it is appropriate to reach them first
. . . ." (alteration in original) (citation omitted) (quoting
Georgine v. Amchem Prods., Inc., 83 F.3d 610 (3d Cir. 1996),
aff'd sub nom., Amchem, 521 U.S. 591 (1997)); cf. also Arizonans
for Official English v. Arizona, 520 U.S. 43, 66 (1997) ("[W]e
need not definitively resolve the [Article III standing] issue.
Rather, we will follow a path we have taken before and inquire,
as a primary matter, whether originating plaintiff Yniguez still
has a case to pursue.").  See generally Daniel D. DeVougas,
Note, Without A Leg to Stand on? Class Representatives, Federal

Courts, and Standing Desiderata, 97 Cornell L. Rev. 627 (2012) (noting that the more exacting form of standing scrutiny is not the best tool for addressing unmeritorious class actions). Other circuits have also interpreted Supreme Court precedent to allow for the determination of class certification prior to addressing issues of standing.  See, e.g., Payton v. Cnty. of Kane, 308 F.3d 673, 680, 682 (7th Cir. 2002).

Although the Defendants argue that the law has moved on since this Court's application of the Ortiz exception in Relafen, relying on the First Circuit decision in Plumbers' Union, in fact, the First Circuit opinion retains the Ortiz exception so that it can be applied in circumstances such as those presented by the present case.  But see Hoffman v. UBS-AG, 591 F. Supp. 2d 522, 530–32 (S.D.N.Y. 2008) (noting that the determination of class certification before standing articulated in Ortiz and Amchem had been limited to the "unique context of global-mass settlements").

In Plumbers' Union, the First Circuit noted that it was inclined to follow its determination in Barry v. St. Paul Fire & Marine Insurance Co., 555 F.2d 3 (1st Cir. 1977), aff'd, 438 U.S. 531 (1978), Plumbers' Union, 632 F.3d at 770, that there was "no error in the district court's decision to adhere strictly to the traditional [standing] rules," Barry, 555 F.2d at 13.  This prompted the First Circuit to conclude that,

because "the necessary identity of issues and alignment of incentives is not present" with respect to the sales of certificates in the six trusts which no named plaintiff purchased, the claims based on those six trusts must fail. Plumbers' Union, 632 F.3d at 771.

The First Circuit, however, marked out the following significant exception:

> The qualification, on which we reserve judgment, is one where the claims of the named plaintiffs necessarily give them -- not just their lawyers -- essentially the <u>same incentive to litigate</u> counterpart claims of the class members because the establishment of the named plaintiffs' claims necessarily establishes those of other class members.

Plumbers' Union, 632 F.3d at 770 (emphasis added).  This Court holds that the requisite "identity of issues" and "alignment of incentives" is present amongst the End-Payors here.  All members of the putative class have a common interest in litigating claims arising from the Defendants' allegedly anticompetitive collusion designed to cause the End-Payors to pay supracompetitive prices across the several states.

### c. Rules Enabling Act

Defendants further contend that the Rules Enabling Act, 28 U.S.C. § 2072, compels this Court to refrain from holding that the present facts are subsumable under the <u>Ortiz</u> exception. Defs.' Mot. Dismiss End-Payors 7.  This argument is unpersuasive.  28 U.S.C. section 2072 provides, in relevant

part, that the general rules of practice which the Act empowers the Supreme Court to prescribe for federal district courts "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b).

This Court, however, is not using Rule 23 to modify any substantive rights; rather, it is relying on the line of Supreme Court authority leading to _Ortiz_ and recognized as an exception in the First Circuit's opinion in _Plumbers' Union_. Because this Court relies on the Supreme Court's interpretation of Article III's standing requirements, it can hardly be charged with relying on Rule 23 to modify any of the parties' substantive rights. Moreover, this Court has determined that the named plaintiffs have Article III standing to pursue their claims, _see_ _supra_ section II.C.2.a; the Court is merely deferring to the stage at which it will ask the questions relating to the prerequisites for class representation, which are governed not by the Constitution, but by class action law. Because the decision of this Court to defer its scrutiny of the Rule 23 requirements until the time for class certification is supported by the Supreme Court's interpretation in _Ortiz_, it does not fall foul of the Rules Enabling Act. This Court therefore postpones its determination as to whether the named representatives may pursue claims on behalf of its absent class members under Rule

23 until the time it entertains the certification of the putative class.

### 3. End-Payors' Claims Under State Antitrust and Consumer Protection Laws

The Defendants argue that the End-Payors' claims brought under the antitrust laws of eight states and Puerto Rico, as well as under two state consumer protection statutes, are deficient for various reasons.  The Court leaves intact its denials of the Defendants' motion to dismiss the End-Payor claims arising under Arizona, Massachusetts, Mississippi, New York, North Carolina, South Dakota, Tennessee, and West Virginia law.  Therefore, no further exposition on the claims relating to those states' laws will be provided here.  Instead, the Court will furnish an answer on the End-Payors' Illinois-based claims and revisit its rulings with respect to those claims depending upon Puerto Rico and Utah law.

### a. Illinois-Based Claims

The Defendants contend that the Illinois Antitrust Act, 740 Ill. Comp. Stat. §§ 10/1 to 10/12, "requires that all indirect purchaser class suits be brought by the Illinois Attorney General."  Defs.' Mot. Dismiss End-Payors 14.  Illinois law states that "no person shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act, with the sole exception of this

State's Attorney General, who may maintain an action <u>parens</u> <u>patriae</u> as provided in this subsection." 740 Ill. Comp. Stat. § 10/7.

The End-Payors, however, argue that Illinois law is preempted by Rule 23 where it purports to govern the procedural mechanism by which litigants can bring suit in federal courts. End-Payors' Mot. Opp'n 19. Although the End-Payors argue that the Illinois Antitrust Act must be preempted by Rule 23 in accordance with the Supreme Court's analysis in <u>Shady Grove</u> <u>Orthopedic Associates, P.A.</u> v. <u>Allstate Insurance Co.</u>, 559 U.S. 393 (2010), this Court holds that <u>Shady Grove</u> is distinguishable, as there is an important distinction between the New York law the Supreme Court scrutinized in <u>Shady Grove</u> and the Illinois law in question here.

In <u>Shady Grove</u>, a plurality of the justices noted that the New York law excluding a particular kind of claim from eligibility for class actions within a section of New York procedural law governing the prerequisites for class action was preempted by Rule 23. <u>Id.</u> at 399 (plurality opinion); <u>see also</u> <u>id.</u> at 436 (Stevens, J., concurring in part and concurring in the judgment). Justice Scalia, writing for the plurality, noted that (1) the New York law purported to govern procedure; (2) federal procedural rules apply in federal courts; and (3) where state laws conflict with Rule 23, Rule 23 governs, as it

"provides a one-size-fits-all formula for deciding the class-action question." Id. at 399 (plurality opinion).

The Illinois Antitrust Act, however, does not appear in a generally applicable section of that state's laws which merely governs procedure. Instead, it is contained in the state's antitrust statute, which confers substantive rights upon its citizens. Unlike the New York law, which purported to govern the prerequisites for class actions generally, the Illinois Antitrust Act relates to –– and is informed by the state's policy decisions in relation to –– the rights of those suffering injury as a result of anticompetitive conduct. As a judge in the Southern District of New York noted, quoting Justice Stevens's concurrence in Shady Grove, which, as the narrowest opinion, is controlling, the Illinois statute "provides a procedure that is 'so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy.'" In re Digital Music Antitrust Litig., 812 F. Supp. 2d 390, 416 (S.D.N.Y. 2011) (quoting Shady Grove, 559 U.S. at 420 (Stevens, J., concurring in part and concurring in the judgment)).

Were this Court to hold that Rule 23 trumped the relevant provision of Illinois law here, it would be "an application of a federal rule that effectively abridges, enlarges, or modifies a state-created right or remedy." Id. at 422. Such a holding

would go too far.  For the foregoing reasons, the Illinois claims must be dismissed.

### b. Puerto Rico-Based Claims

The Defendants argue that the End-Payors cannot assert antitrust claims under Puerto Rico law in light of the Supreme Court's opinion in Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977).  Defs.' Mot. Dismiss End-Payors 15.  In Illinois Brick, the Supreme Court held that indirect purchasers of goods produced by firms engaged in anticompetitive conduct were too remote from that conduct to be regarded as injured within the meaning of the Clayton Act.  431 U.S. at 746-48.

Although a number of states have passed state laws known as Illinois Brick-repealers which specifically grant end-payors the right to sue for antitrust violations, the validity of which was upheld by Supreme Court in California v. ARC America Corp., 490 U.S. 93 (1989), end-payors cannot assert antitrust claims under the law of states which have not passed such repealers, Digital Music Antitrust Litig., 812 F. Supp. 2d at 413.  Because Puerto Rico's Antitrust Act, P.R. Laws, tit. 10, §§ 257-276, "is modeled after federal antitrust statutes," Rivera-Muñiz v. Horizon Lines Inc., 737 F. Supp. 2d 57, 61 (D.P.R. 2010) (citing Pressure Vessels of P.R., Inc. v. Empire Gas de P.R., 137 D.P.R.

497, 509–18 (1994)),[63] a number of courts have held that, just as indirect purchasers lack standing under federal law, so too do indirect purchasers lack standing under Puerto Rico law.  See, e.g., In re Static Random Access Memory (SRAM) Antitrust Litig., No. 07-md-01819 CW, 2010 WL 5094289, at *4 (N.D. Cal. Dec. 8, 2010); In re TFT-LCD (Flat Panel) Antitrust Litig., 599 F. Supp. 2d 1179, 1188 (N.D. Cal. 2009) ("The Court finds . . . that the indirect purchaser plaintiffs lack standing under the Puerto Rico statute.").  But see Rivera-Muñiz, 737 F. Supp. 2d at 61 (noting that "[a]lthough federal jurisprudence has implied special standing requirements into private antitrust actions . . . , Puerto Rico explicitly rejects any such limitations" because, as the district court goes on to suggest, "Puerto Rico liberally construes its standing requirements in private antitrust cases" (citations omitted)).

For the foregoing reasons -- in light of the fact that Puerto Rico antitrust law has been interpreted in accordance with federal antitrust law, which does not allow claims from indirect purchasers following Illinois Brick, and in the absence of evidence showing that Puerto Rico has repealed Illinois Brick

---

[63] See also The Shell Co. (P.R.) Ltd. v. Los Frailes Serv. Station, Inc., 551 F. Supp. 2d 127, 135 (D.P.R. 2007) ("Puerto Rico courts generally follow federal antitrust law when interpreting local antitrust laws.").

-- this Court dismisses the claims arising under the Puerto Rico law.

### c. Utah-Based Claims

The Defendants argue that the End-Payors' claims brought under the Utah Antitrust Act, Utah Code §§ 76-10-3101 to 76-10-3118,[64] ought be dismissed for "failure to meet Utah's statutory citizenship or residency requirement." Defs.' Mot. Dismiss End-Payors 16.

The Utah Antitrust Act provides, in relevant part, as follows:

> A person who is a <u>citizen</u> of this state or a <u>resident</u> of this state and who is injured or is threatened with injury in his business or property by a violation of the Utah Antitrust Act may bring an action for injunctive relief and damages, regardless of whether the person dealt directly or indirectly with the defendant. This remedy is in addition to any other remedies provided by law. It may not diminish or offset any other remedy.

Utah Code § 76-10-3109(1)(a) (emphasis added). A judge sitting in the District of New Jersey noted in <u>In re Magnesium Oxide Antitrust Litigation</u>, No. CIV. 10-5943(DRD), 2011 WL 5008090 (D.N.J. Oct. 20, 2011), that the plaintiffs "lack statutory standing to sue under Utah's antitrust laws because they have a citizenship/residency requirement." <u>Id.</u> at *8 n.10 (citing Utah Code § 76-10-3109(1)(a)).

---

[64] Since the Defendants' filing, the Utah Antitrust Act has been renumbered. Citations to said law reflect the current codification.

Utah's antitrust law therefore appears to require that a person suing under the antitrust statute be a "citizen" or "resident," Utah Code § 76-10-3109(1)(a); the End-Payors' complaint fails to plead that members of the putative class are citizens or residents of Utah.  The End-Payors further argue that Shady Grove preempts the Utah residency requirement.  See End-Payor's Mem. Opp'n 17-19.  For similar reasons to those articulated above, this argument is unavailing.  As with the foregoing analysis of the attorney general requirement under Illinois law, this Court holds that Utah's citizenship requirement is properly analyzed as defining the scope of plaintiffs' right to bring antitrust claims (a substantive right granted by the state) and is not merely a procedural provision relating to the litigants' management of claims.  This Court therefore dismisses, without prejudice, the End-Payors' claims under Utah law and grants leave to file an amended complaint so that the End-Payors can, if possible, remedy the pleading deficiencies in their consolidated complaint.

## III.   CONCLUSION

For the foregoing reasons, the Court:

GRANTS IN PART AND DENIES IN PART the Defendants' motions to dismiss the Direct Purchasers' and the End-Payors' claims challenging the AstraZeneca/Ranbaxy Agreement.  Specifically,

this Court GRANTS the Defendants' motions to dismiss insofar as the Direct Purchasers (on federal statute of limitations grounds) and the End-Payors (at least in the twenty-three states mentioned above which have a statute of limitations of four years or lower) seek to challenge the AstraZeneca/Ranbaxy Agreement.  This Court DENIES the Defendants' motions to dismiss insofar as the Direct Purchasers and the End-Payors seek to challenge continuing harms flowing from the AstraZeneca/Ranbaxy Agreement.  Additionally, this Court DENIES the Defendants' motion to dismiss the End-Payors insofar as the End-Payors seek to challenge the AstraZeneca/Ranbaxy Agreement in the three states mentioned above which have a six-year statute of limitations.

DENIES the Defendants' motions to dismiss with respect to the remainder of the Direct Purchasers' claims.

DENIES the Defendants' motion to dismiss the End-Payors' claims for lack of standing.

GRANTS IN PART AND DENIES IN PART the Defendants' motion to dismiss the End-Payors' claims under state antitrust and consumer protection laws.  Specifically, the Court GRANTS WITH PREJUDICE the Defendants' motion to dismiss the End-Payor claims arising under Illinois and Puerto Rico law.  The Court GRANTS WITHOUT PREJUDICE the Defendants' motion to dismiss the End-Payor claims arising under Utah law, with leave to file an

amended complaint.  The Court reaffirms, without further explication, that the Defendants' motion to dismiss the End-Payor claims arising under Arizona, Massachusetts, Mississippi, New York, North Carolina, South Dakota, Tennessee, and West Virginia law is DENIED.

     **SO ORDERED.**

                                          By the Court,

                                          /s/William G. Young
                                          WILLIAM G. YOUNG
                                          DISTRICT JUDGE