# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re NEXIUM (ESOMEPRAZOLE) ANTITRUST LITIGATION | MDL No. 2409 <br><br> Civil Action No. 1:12-md-02409 |
| This Document Relates To: <br><br> *American Sales Company, LLC v. AstraZeneca AB, et al.*, No. 12-cv-11711 (WGY) <br><br> *Meijer, Inc. and Meijer Distribution, Inc. v. AstraZeneca AB, et al.*, No. 12-cv-12291 (WGY) <br><br> *Value Drug Company and Burlington Drug Company, Inc. v. AstraZeneca PLC, et al.*, No. 12-cv-12293 (WGY) <br><br> *Rochester Drug Co-operative, Inc. v. AstraZeneca AB, et al.*, No. 12-cv-12299 (WGY) | |

# DEFENDANTS' OPPOSITION TO THE DIRECT PURCHASERS CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND .................................................................................................. 3

ARGUMENT ...................................................................................................................... 4

    I.      Strict Compliance with Rule 23 is Now Required ........................................... 4

    II.     The Proposed Class Fails the Numerosity Requirement................................. 6

            A.      Plaintiffs Fail to Meet Their Burden of Showing the Impracticability
                  of Joinder ................................................................................................... 6

                  1.      The number of direct purchasers does not render a joinder
                          action impracticable ................................................................... 8

                  2.      The geographic dispersion of this small group of direct
                          purchasers does not render joinder impracticable................................. 9

            B.      All Other Factors Support The Practicability of Non-Class Joinder ............... 11

    III.    Common Issues Do Not Predominate Over Individual Issues.................................... 13

            A.      Common Issues Do Not Predominate For Proof of the Fact of Injury ............ 13

            B.      Common Issues Do Not Predominate For Proof of Damages ......................... 17

    IV.    A Class Action is Not Superior to Coordinated Non-Class Actions
           by Direct Purchasers ................................................................................... 18

    V.    American Sales Company and Meijer Are Not Adequate Representatives of the
           Putative Class.............................................................................................. 20

CONCLUSION................................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
  269 F.R.D. 252 (S.D.N.Y. 2010) .................................................................. 12, 13

*Am. Express Co. v. Italian Colors Rest.*,
  133 S. Ct. 2304 (2013) ................................................................................... 6, 7

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) .......................................................................................... 19

*Andrews v. Bechtel Power Corp.*,
  780 F.2d 124 (1st Cir. 1985) ........................................................................ 8, 13

*Ansari v. New York Univ.*,
  179 F.R.D. 112 (S.D.N.Y. 1998) .................................................................. 9, 12

*Batesville Casket Co. EEO Litig.*,
  No. 83-0534, 1984 U.S. Dist. LEXIS 23586 (D.D.C. Sept. 14, 1984) ................... 9

*Block v. First Blood Assocs.*,
  125 F.R.D. 39 (S.D.N.Y. 1989) ........................................................................... 9

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ........................................................................................ 6, 7

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013) ..................................................................... 5, 6, 17, 18

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) ...................................................................... 11, 20

*Deposit Guar. Nat'l Bank v. Roper*,
  445 U.S. 326 (1980) .......................................................................................... 19

*Fewlass v. Allyn and Bacon, Inc.*,
  83 F.R.D. 161 (D. Mass. 1979) ............................................................................. 8

*Frazier v. Consol. Rail Corp.*,
  851 F.2d 1447 (D.C. Cir. 1988) ........................................................................... 8

*Garcia-Rubiera v. Calderon*,
  570 F.3d 443 (1st Cir. 2009) ............................................................................... 8

*Gen. Tel. Co. of the Nw., Inc. v. EEOC*,
  446 U.S. 318 (1980)........................................................................... 8

*Georgine v. Amchem Prods., Inc.*,
  83 F.3d 610 (3d Cir. 1996)............................................................. 19

*Hanover Shoe v. United Shoe Machinery Corp.*,
  392 U.S. 481 (1968)......................................................................... 18

*In re Cardizem CD Antitrust Litig.*,
  200 F.R.D. 297 (E.D. Mich. 2001) ................................................. 5

*In re GPU Antitrust Litig.*,
  253 F.R.D. 478 (N.D. Cal. 2008)................................................... 16

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008)................................................. 6, 14, 16

*In re Prograf Antitrust Litig.*,
  2013 U.S. Dist. LEXIS 62043 (D. Mass. Apr. 23, 2013) ............... 9, 19

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  2013 U.S. App. LEXIS 16500 (D.C. Cir. Aug. 9, 2013) ................. 5, 14

*In re Relafen Antitrust Litig.*,
  218 F.R.D. 337 (D. Mass. 2003)......................................... 5, 8, 10, 16

*In re Relafen Antitrust Litig.*,
  221 F.R.D. 260 (D. Mass. 2004)..................................................... 15

*In re Relafen Antitrust Litig.*,
  346 F. Supp. 2d 349 (D. Mass. 2004) ........................................ 18, 20

*In re Wellbutrin XL Antitrust Litig.*,
  2011 WL 3563385 (E.D. Pa. Aug. 11, 2011) ................................... 9

*Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp.*,
  149 F.R.D. 65 (D.N.J. 1993)......................................................... 8, 12

*Lundquist v. Sec. Pacific Auto. Fin. Serv. Corp.*,
  993 F.2d 11 (2d Cir. 1993)............................................................. 20

*Meijer, Inc. v. Warner Chilcott Holdings Co. III*,
  246 F.R.D. 293 (D.D.C. 2007)......................................................... 9

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   259 F.3d 154 (D.N.J. 2001) ............................................................. 19

*Reed v. Advocate Health Care, Inc.*,
   268 F.R.D. 573 (N.D. Ill. 2009) ...................................................... 16

*Sears, Roebuck and Co. v. Butler*,
   133 S. Ct. 2768 (2013) ..................................................................... 5

*Smilow v. Sw. Bell Mobile Sys., Inc.*,
   323 F.3d 32 (1st Cir. 2003) ............................................................. 19

*Van Meter v. Harvey*,
   272 F.R.D. 274 (D. Me. 2011) .......................................................... 8

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) ............................................................. passim

*Whirlpool Corp. v. Glazer*,
   133 S. Ct. 1722 (2013) ..................................................................... 5

**Rules**

Fed. R. Civ. P. 23 .................................................................... passim

**Other Authorities**

Greenhalgh Decl., Sept. 17, 2003, Dkt. 11, *In re Relafen Antitrut Litig.*, No. 1:01-cv-12239 ..... 10

*In re: Nexium Antitrust Litig.*, JPML No. 2409, Dkt. 53, at 13. ........................................... 10, 11

*Manual for Complex Litigation (Fourth)* (2004) ........................................................ 13

## INTRODUCTION

The proposed class of just 24 to 29 direct purchasers who are suing for up to $25.6 *billion* in single damages[1] is antithetical to Rule 23.  Rather than facilitating claims by a large number of individuals whose damages are too small to be litigated individually, the proposed class has the opposite effect.  It would allow major firms with purportedly massive claims to shield themselves from having to fully litigate their individual claims.  This case differs in three crucial respects from the Plaintiffs' list of cases certifying classes of direct pharmaceutical purchasers.

*First*, the class is unusually small and the claims are extraordinarily large.  Because of those two facts, Plaintiffs fail Rule 23(a)(1)'s requirement that class members be "so numerous" that it is "impracticable" to litigate without a class action.  The Supreme Court's recent decisions make clear that these Rule 23 standards are exacting and are not satisfied merely because it might be easier for the plaintiffs to litigate via a class action.

The cases express strong skepticism that classes smaller than 40 can satisfy numerosity.  And in this case there is nothing impracticable about these 29 or fewer direct purchasers litigating without a class action.  They include some of the nation's largest corporations and the size of their claims readily enables them to jointly pursue a non-class action.  Indeed, six retailers have already brought non-class claims in this action.  The 14 law firms across the country that have appeared for the class are surely able to pursue these same claims in a joinder action.  Non-class plaintiffs can join forces, retain common counsel, file coordinated actions, and litigate common issues on a common basis.  In this era of electronic discovery and ECF filings, geography is no impediment to this coordination.  The Court has ample authority to assure that

---

[1]     This figure, which far exceeds AstraZeneca's total net sales of Nexium (after accounting for all rebates) is preposterous, even before trebling.  Regardless, Plaintiffs endorse this figure and thus it provides the context for judging their motion.

joiner actions proceed in a sensible fashion.  If such procedures obligated joinder plaintiffs to travel to Boston a few times for court appearances, they could readily do so, given their resources and the claims at stake.  Thus, Plaintiffs fail both Rule 23(a)(1)'s requirement that the class is so numerous that non-class litigation would be "impracticable" and Rule 23(b)(3)'s requirement that a class action is the "superior" means of resolving this dispute.

*Second*, Plaintiffs' arguments and citations overwhelmingly rely on outdated legal propositions.  These include: presumptions in favor of class certification, refusals to weigh the factual bases for expert opinions, allowing uninjured members in a class, allowing the use of average prices to overcome the actual variations among class members, and other relaxations of Rule 23's requirements.  In the past two years the Supreme Court has rejected all of these propositions and has made clear that there must be strict compliance with Rule 23.  Plaintiffs are simply wrong in contending that these recent Supreme Court decisions change nothing.

*Third*, Plaintiffs also fail the Rule 23(b)(3)  requirement that common issues predominate, because proving the fact of injury and quantifying damages in this case are both highly individualized.  Contrary to the earlier cases relied upon by Plaintiffs, they now need a common method for proving and quantifying the injury to *every* class member.  Merely calculating an average price for the class cannot prove injury to every class member.  Their expert, Dr. Hartman, did not study how Nexium prices varied among direct purchasers, yet declared those prices to be "uniform."  Hartman Rpt. 1.  In fact, Nexium prices varied from more than $5.40 per pill for some class members to less than 45 cents per pill for others.  Given Plaintiffs' prediction that generic Nexium would have cost more than $1.00 per pill, common proof cannot show that all class members would have paid less for generics.  Under current law, Plaintiffs cannot use an average to conceal the widely diverging experiences of class members.  Yet, that is all they offer.

## FACTUAL BACKGROUND

The putative class consists of entities that purchased Nexium directly from AstraZeneca between August 27, 2008 and the date this Court decides the class certification motion.  Under Plaintiffs' motion, the number of class members depends on the "but-for" generic entry date. Their motion offers two such scenarios.  In scenario 1 (generic entry on April 14, 2008), there would be 29 members, consisting of 25 wholesalers, a pharmacy cooperative, a mail order prescription service, a retailer, and a hospital.  Johnson Rpt. ¶ 11.[2]  In scenario 2 (generic entry on January 1, 2012) there would be 24 members.  *Id.* at Ex. 3.  And if (much more realistically) generally occurred later, the class ultimately would have even fewer than 24 members.  *Id.*

This case involves unusually large purchase volumes.  According to Dr. Hartman, direct purchases of Nexium exceed $39 billion. Hartman Rpt. Attach. C.1.  Ten class members had purchases exceeding $85 million, and all but one class member had purchases exceeding $500,000.  Johnson Rpt. Ex. 2.  These dollar volumes have attracted at least 44 lawyers in 14 law firms, from Boston to Texas, to represent the putative direct purchaser class.  App. A.

The class is dominated by three national wholesalers: McKesson, Cardinal Health and AmerisourceBergen, which made 87.7% of total class purchases.  Johnson Rpt. Ex. 2.  They rank 14th, 19th and 32nd in the Fortune 500.  *Id.* at Ex. 4.  Combined, they would rank third in the Fortune 500 (after Wal-Mart and Exxon).  *Id.*, at ¶ 14.  The top four class members made 94.3% of total class Nexium purchases.  *Id.* at Ex. 2.  The national wholesalers and Frank W. Kerr (a smaller wholesaler) split their claims through partial assignments to eight entities, six of whom

---

[2]    This figure includes five firms from Puerto Rico.  Johnson Rpt. Ex. 2.  The class in the operative Complaint [Dkt. No.131 at ¶ 38] does not include U.S. territories.  Recognizing the numerosity problem, Plaintiffs' motion belatedly adds U.S. territories to the class.

(Giant Eagle, HEB, Kroger, Safeway, SuperValu and Walgreen) are pursuing coordinated joinder actions, and two of whom (ASC and Meijer) seek to represent the proposed class.

Plaintiffs' damages theory is that generic prices on average would have been cheaper than Nexium and that class members on average would have switched to generics and thereby paid less.  Dr. Hartman supports that conclusion solely by calculating averages for the class as a whole and ignoring any evidence of variations among class members that bear on whether (and, if so, by how much) they were actually injured.  In contrast, Defendants' expert, Dr. Johnson, has followed the legal dictates and tested the data for individual variation.  He finds that Dr. Hartman's averages conceal the class members' widely varying purchasing experiences.  The price of Nexium varied from 43 cents/pill for one class member to more than $5.40/pill for others.  Johnson Rpt. Ex. 6.  The price of the generic Prevacid product used by Dr. Hartman as his benchmark varied by more than 50%.  *Id*. at Ex. 8.  And the rate of switching from Prevacid to its generic varied from 0% to more than 85% between different classes of trade.  *Id*. at Ex. 12.

## ARGUMENT

## I.    STRICT COMPLIANCE WITH RULE 23 IS NOW REQUIRED

In the past two years the Supreme Court has issued a series of decisions that reject certain prior lower court cases and clarify the standards for class certification.  Plaintiffs rely heavily on these outdated cases and casually dismiss these recent Supreme Court decisions.

In *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), the Court rejected three propositions that underlie Plaintiffs' citations.  *First*, because it is Plaintiffs' burden to "justify a departure" from the usual rule that "litigation is conducted by and on behalf of the individual named parties only," there can be no "presumed" compliance with Rule 23.  *Id*. at 2550-51.  Yet,

Plaintiffs rely on cases that made such presumptions in class plaintiff's favor.[3]  *Second*, certain previous decisions, including this Court's decision in *In re Relafen Antitrust Litig.*, 218 F.R.D. 337 (D. Mass. 2003), refused to "resolve a factual dispute between experts" and asked only whether plaintiffs will offer common evidence "in support of their interpretation."  *Id.* at 345. But, *Wal-Mart* held that "Rule 23 does not set forth a mere pleading standard" and that the court must resolve factual disputes even if they "overlap with the merits."  131 S. Ct. at 2551.  *Third*, contrary to Plaintiffs' cases, which certified classes based on an alleged injury to the class in the aggregate, Pls.' Mem. at 19 n.67, *Wal-Mart* requires an injury to every proposed class member. *Id.* at 2552 n.7 (requiring that "all class members were victims").  The Court rejected the proposition that a plaintiff need only prove an injury to the class on "average," and can thereby disregard whether some class members did not in fact suffer injury.  *Id.* at 2561.

Next, in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013), the Court rejected the oft-stated concept that individualized damages do not bar class certification.  As it held: plaintiffs fall "far short of establishing that damages are capable of measurement on a classwide basis," and "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class."  *Id.*  Plaintiffs still advocate that concept and claim that *Comcast* "is limited to its peculiar facts."  Pls.' Mem. at 19.  But the Supreme Court disagrees and has twice vacated and remanded cases for further consideration in light of *Comcast*.  *Sears, Roebuck and Co. v. Butler*, 133 S. Ct. 2768 (2013); *Whirlpool Corp. v. Glazer*, 133 S. Ct. 1722 (2013).  Before *Comcast*, "the case law was far more accommodating to class certification."  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 2013 U.S. App. LEXIS 16500, at *25 (D.C. Cir. Aug. 9, 2013).

---

[3]      *E.g.*, Pls.' Mem. at 1 n.1 (citing *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 303 (E.D. Mich. 2001), which used the outdated theory that court "should err in favor of" a class).

Finally, in *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304 (2013), the Court

drew upon Rule 23 to reject the claim that antitrust policies require favoring class actions in the

arbitration context.  As the Court stated, Rule 23 "imposes *stringent requirements* for

certification that in practice exclude most claims." *Id*. at 2310 (emphasis added).  The Court

"specifically rejected" the argument that Rule 23 may be diluted on the ground that strict

compliance with its requirements "would frustrate [plaintiff's] attempt to vindicate the policies

underlying the antitrust laws." *Id.* (quotation omitted).

Thus, today, a plaintiff "must affirmatively demonstrate his compliance" with Rule 23.

*Wal-Mart*, 131 S. Ct. at 2551.  The district court must conduct a "rigorous analysis" of plaintiff's

evidence, *id.*, and review that evidence "critically." *In re New Motor Vehicles Canadian Export*

*Antitrust Litig.*, 522 F.3d 6, 17 (1st Cir. 2008) (citation omitted).  Failure to satisfy any element

of Rule 23(a) or 23(b)(3) requires denial of the motion. *Comcast*, 133 S. Ct. at 1432.

Here, at a minimum, Plaintiffs fail Rule 23(a)(1)'s numerosity requirement and both

requirements of Rule 23(b)(3) (predominance and superiority).

## II.     THE PROPOSED CLASS FAILS THE NUMEROSITY REQUIREMENT

### A.     Plaintiffs Fail To Meet Their Burden Of Showing The Impracticality Of Joinder

Only 24 to 29 entities purchased Nexium from AstraZeneca, depending on the but-for

generic entry date.  Dr. Hartman finds 26 to 31 class members, by including Smith Drug and

Valley Wholesale.  Hartman Rpt. Attach. D.1.  They are a division and a subsidiary, respectively,

of other class members, Johnson Rpt. ¶ 11 n.11, and should be excluded.  Hartman Dep. 69:2-18.

Rule 23(a)(1)'s numerosity requirement limits class actions to matters that otherwise

could not be litigated in a practical manner.  Traditionally, a defendant has full procedural rights

with respect to each plaintiff, *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979), including

taking discovery and requiring that a plaintiff prove its specific claims of injury.  Accordingly, to use the class action "exception to the usual rule," *id.*, it is not enough that a class action might be easier for plaintiffs.  Rather, Rule 23(a)(1) has two crucial requirements, which Plaintiffs ignore.

*First*, a non-class action must be "impracticable."[4]  It is not enough to establish that a joinder action might involve some additional cost or an inconvenience to plaintiffs.  Asserting procedural rights usually involves some cost.  But, there is a wide gulf between a non-class proceeding that imposes some "inconvenience" (the standard Plaintiffs advocate, Pls.' Mem. 7), and a non-class proceeding which is truly impracticable.  Where the stakes run in the *billions*, it takes a great deal of inconvenience before a non-class proceeding becomes "impracticable."

*Second*, the issue is not whether 29 (or fewer) separate lawsuits would be practical but whether "joinder" would be practical.  An uncoordinated series of actions might be unwieldy, but that is not the test under Rule 23(a)(1).  Thus, Plaintiffs' argument about the burdens of "multiple individual actions" and "25 lawsuits," Pls.' Mem. 7-8, misstates the legal requirement.

Applying these principles, Plaintiffs have not shown that joinder of, at most, 29 direct purchasers in a coordinated non-class proceeding would be "impracticable."  They do not describe how such a proceeding would be structured and why it would encounter insurmountable problems.  They completely ignore the history of joinder actions, such as in this very case, which shows how coordination actually works.  Instead, they perfunctorily mention two characteristics of the class: the number of members and their geographic dispersion.  But, neither factor shows that a joinder action would be impracticable under these circumstances.

---

[4]    Any suggestion that courts should water down this requirement in order to ease plaintiffs' burden in enforcing the antitrust laws is contrary to *American Express*, in which the Supreme Court recently enforced a contractual waiver of class arbitration even though "the plaintiff's cost of individually arbitrating [its] claim exceeds the potential recovery."  133 S. Ct. at 2307.

### 1.      The number of direct purchasers does not render a joinder action impracticable

Unquestionably, "a very small class may not meet the numerosity requirement because joinder of all members is practicable." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 131 (1st Cir. 1985) (citation omitted).   The First Circuit and this Court have identified 40 class members as an important guideline in the numerosity analysis.   *See Garcia-Rubiera v. Calderon*, 570 F.3d 443, 460 (1st Cir. 2009) (numerosity is generally satisfied if "the potential number of plaintiffs exceeds 40"); *Relafen*, 218 F.R.D. at 342 (40 is the number of "individuals generally found to establish numerosity").   Thus, "[g]iven the weight of authority and its positive citation by the First Circuit, the figure of forty is a useful guide in considering how many class members meet the numerosity requirement." *Van Meter v. Harvey*, 272 F.R.D. 274, 281 (D. Me. 2011).[5]

Although "[t]he numerosity requirement requires examination of the specific facts of each case," the Supreme Court has favorably cited decisions denying certification of classes having 16 to 37 plaintiffs.   *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 330 n.14 (1980).   Thus, cases have recognized that "joinder is preferable" where the class has "30 to 40 prospective members."   *Fewlass v. Allyn and Bacon, Inc.*, 83 F.R.D. 161, 165 (D. Mass. 1979).

Plaintiffs' citations primarily involve classes with far more than 29 members.   But even their few cases involving classes of comparable size prove very little "because courts have also refused to certify [larger classes]." *Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp.*, 149 F.R.D. 65, 74 n.16 (D.N.J. 1993).   For example, the First Circuit has affirmed denial of a class of 49 members.   *Andrews*, 780 F.2d at 132.

---

[5]      *See also Frazier v. Consol. Rail Corp.*, 851 F.2d 1447, 1456 n.10 (D.C. Cir. 1988) ("We are aware of no appellate decision reversing a district court's denial of class certification on grounds of inadequate numerosity where fewer than 40 prospective members exist.").

Moreover, the cases on which Plaintiffs rely have limited weight here.  For example, in *In re Prograf Antitrust Litig.*, 2013 U.S. Dist. LEXIS 62043, at *5 (D. Mass. Apr. 23, 2013), the parties *stipulated* to the class of 25 members, and the court's order contains no analysis of the claims at issue, the economics of non-class litigation, or what specific problem would render a joinder action impracticable.  The court in *Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 246 F.R.D. 293, 306 (D.D.C. 2007), relied on a "presumption that joinder would be impracticable" for a class of 25-30 members.  But, such a presumption improperly relieves plaintiffs of the burden to "affirmatively demonstrate [their] compliance with Rule 23." *Wal-Mart*, 131 S. Ct. at 2551.  The court in *In re Wellbutrin XL Antitrust Litig.*, 2011 WL 3563385, at *3-4 (E.D. Pa. Aug. 11, 2011), certified a class of 33 members without actually finding that a joinder action would be impracticable.  Moreover, none of these cases involved claims of comparable magnitude to the $25 billion plaintiffs seek here.

> **2.** **The geographic dispersion of this small group of direct purchasers does not render joinder impracticable**

Plaintiffs contend that the geographic dispersion of the putative class by itself renders joinder impracticable.  But, consistent with the realities of modern complex litigation, geographic dispersion is merely a factor in the numerosity analysis; it is not an absolute bar to practical litigation.  *See Ansari v. New York Univ.*, 179 F.R.D. 112, 115 (S.D.N.Y. 1998) (denying certification of class of 35 geographically dispersed members who, *inter alia*, had the financial resources to litigate); *Block v. First Blood Assocs.*, 125 F.R.D. 39, 42 (S.D.N.Y. 1989) ("[Geographic] dispersion is not enough to meet Rule 23(a)'s requirement.").[6]

---

[6]     *See also Batesville Casket Co. EEO Litig.*, No. 83-0534, 1984 U.S. Dist. LEXIS 23586, at *11 (D.D.C. Sept. 14, 1984) ("While geographic dispersion may be considered because it relates to the practicability of joinder . . . [t]he Rule does not require that the class be 'so (continued…)

9

In *Relafen*, 218 F.R.D. at 342, this Court recognized dispersion as favoring numerosity. But here, the per-plaintiff damages claims are some 80-fold greater than in *Relafen*, where the class was twice as numerous and product sales were only 2.5% of those here.[7] And, the Plaintiffs' depositions here show the unimportance of geography to the way they actually litigate.

Plaintiffs do not show why geographic dispersion would cause non-class litigation to be impractical here. They never explain what practical step the Court and the parties could not take due to the location of the direct purchasers. The high burden and strict compliance demanded by current Supreme Court decisions requires far more from Plaintiffs.

Moreover, the geographic dispersion present here can be handled with practical solutions. Modern discovery reduces the significance of geographic dispersion. Document productions now occur electronically and the 44 class counsel certainly can cover any depositions. Court filings are electronic. Expert reports are principally handled by counsel. Communications with clients generally occur electronically. Following the custom from other generic exclusion antitrust cases, both the class and non-class plaintiffs to date have not attended hearings in this case. As the direct class plaintiffs explained, they "have appeared *through their counsel* in courts nationwide." JPML No. 2409, Dkt. 53, at 13 (emphasis added).

The named plaintiffs' experience illustrates the relative unimportance of geography in these cases. In the approximately 16 antitrust cases in which Rochester Drug has sought class representative status, it has *never* met in person with the other plaintiffs or the class experts, nor has it attended a deposition other than its own. Doud Dep. 188:6-13; 246:1-11. It has attended

---

*geographically dispersed* that joinder of all members is impracticable.' Instead the Rule requires that the class be 'so *numerous* that joinder of all members is impracticable.'") (emphasis added).

[7]   *See* Greenhalgh Decl. 11, Sept. 17, 2003, Dkt. 11, *In re Relafen Antitrut Litig.*, No. 1:01-cv-12239 (citing sales of roughly $1 billion).

court just once, along with two mediations. *Id*. at 186:6-187:17. It has "no idea" where those 16 cases are pending. *Id*. at 184:6-8. The experience of the other four representatives, located from Vermont to Michigan, is similar. *See* Drew Dep. 133:8-137:5 (no Value Drug employee has attending any hearings or meetings with experts or other plaintiffs); Mitiguy Dep., 314:3-11 (Burlington Drug has not attended any hearings or any other depositions in this case); Schneider Dep. 244:8-245:5 (American Sales has not met with any other plaintiffs or experts); Romano Dep. 320:18-321:11 (no one from Meijer had previously traveled anywhere in this litigation). None of the class representatives met with Dr. Hartman. Hartman Dep. 53:1-19.

If a plaintiff rarely attends meetings or hearings when representing an entire class, it can hardly argue that it would regularly travel when suing solely for its own damages. Even if these Plaintiffs would attend court in a joinder action, coming to Boston a few times is not impractical for litigants seeking billions in damages. As they told the JPML, Boston "is reasonably convenient to all litigants." JPML No. 2409, Dkt. 53, at 13.

In *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1044 n.2 (8th Cir. 2000), twenty four individual plaintiffs from 14 states and Canada jointly pursued an antitrust case through trial and appeal. In the present case, the five retailers who have brought a non-class joinder action reside in these widely dispersed states: California (Safeway), Texas (HEB), Minnesota (SuperValu), Illinois (Walgreen), and Ohio (Kroger). Their action, litigated by joint counsel from Miami, demonstrates that far-flung entities can readily litigate these claims jointly.

## B.    All Other Factors Support The Practicality Of Non-Class Joinder

As shown by the foregoing, merely stating that there are 29 (or even 31) geographically dispersed class members does not come close to proving that a non-class action would be impractical here. The other recognized factors strongly weigh against a finding of numerosity.

*First*, the economics of these claims make joinder of individual claims entirely practical. *See Ansari*, 179 F.R.D. at 115 (denying class certification where "the prospective class members have the ability to bring individual suits"); *Liberty*, 149 F.RD. at 74 ("[A] class action is not appropriate when proposed class members are able to protect and defend their own interests."). Dr. Hartman's findings of $39 billion in Nexium sales and $25 billion in alleged damages during the class period preclude any argument that a class action is required. And, Plaintiffs make no such argument. The median class member had Nexium purchases of more than $22 million, and all but one class member had purchases exceeding $500,000. Johnson Rpt. Ex. 2. Counsel were literally fighting to lead this case and certainly could pursue a joinder action instead.

In *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 269 F.R.D. 252, 259 (S.D.N.Y. 2010), the court denied certification of a class of 100 geographically dispersed investors, including from the Middle East, because "each is a sophisticated, institutional investor whose alleged losses range in the *multiple millions* of dollars."[8] The same is true for the putative class here, which mostly consists of sizeable wholesalers. The issue is not whether each would find it attractive to sue entirely on its own. Rule 23(a)(1) focuses on the economics of *joinder*.

*Second*, any practical challenges would be mitigated by the Plaintiffs' incentive to litigate a joinder action in a coordinated fashion. They purportedly have "no conflicts" and share a "unity of interest." Pls.' Mem. 10. If so, in a joinder action, why would they refuse to

---

[8]    *See also Primavera Familienstiftung v. Askin*, 178 F.R.D. 405, 410 (S.D.N.Y. 1998) (denying certification of class of 38 to 40 institutional investors: "nor can joinder be said to be impracticable" where "the majority of potential class members invested well over $1 million . . . and none invest[ed] less than $100,000"); *Block*, 125 F.R.D. at 43  (denying certification of class of 57 "easily identifiable" limited partners who had invested $50,000 to $400,000); *Elliott Assocs. v. J. Henry Schroeder Bank & Trust Co.*, 655 F. Supp. 1281, 1285 (S.D.N.Y. 1987), *aff'd*, 838 F.2d 66 (2d Cir. 1988) (denying certification of class of 47 investors with a total claim for $25 million).

coordinate on common issues by duplicating effort?  And, if they fail to do so, the Court can

compel streamlining and coordination.  *See Manual for Complex Litigation (Fourth)*, § 11.211

(2004); *Abu Dhabi*, 269 F.R.D. at 258 ("[T]his Court efficiently and effectively managed

consolidated actions of ninety-six institutional investors.").  In *Relafen*, the docket does not

reveal any instance in which the eight separate retailer plaintiffs failed to coordinate.  So far, the

non-class retailer plaintiffs in this case are pursuing the same coordinated approach.

     *Third*, individual plaintiffs can readily identify each other for purposes of pursuing a

joinder action.  *See Andrews*, 780 F.2d at 132 ("Joinder is more likely to be practicable . . . where

class members can be easily identified."); *see Abu Dhabi*, 269 F.R.D. at 259 ("[T]he proposed

class consists of a 'finite number of people, all of whom are identifiable.'")

     In short, Plaintiffs' unsupported assertion that denial of certification will lead to dozens

of uncoordinated individual actions ignores the dictates of Rule 23, the self-interest of the direct

purchasers, and the considerable experience in how non-class joinder actions are actually

litigated.  Widely dispersed plaintiffs can litigate without a class action.  Given the purported

damages, there is no reason why it would be impracticable for direct purchasers to do so here.

## III.    COMMON ISSUES DO NOT PREDOMINATE OVER INDIVIDUAL ISSUES

     Rule 23(b)(3) requires that common issues predominate over individual issues.  An issue

is common only if resolution of the issue determines "each one of the [class members'] claims in

one stroke."  *Wal-Mart*, 131 S. Ct. at 2551.  Here, neither the fact of injury nor the amount of

damages can be resolved for all class members in "one stroke."

### A.    Common Issues Do Not Predominate For Proof Of The Fact Of Injury

     Although proof of the challenged agreements is a common issue, that alone does not

mean common issues predominate.  Rather, at a minimum, "plaintiffs need to demonstrate that

common issues prevail as to [both] the existence of a conspiracy and the fact of injury." *Motor Vehicles*, 522 F.3d at 19 n.18 (internal quotation omitted).  Here, proving fact of injury means proving that each direct purchaser would have switched to a generic and thereby paid a lower net price, assuming earlier generic entry.  Where such proof requires analysis of each individual class members' purchase strategies, volumes, and net prices, common issues do not predominate over individual issues.  *Id*.  Plaintiffs' proposed common proof "must include some means of determining that *each* member of the class was in fact injured." *Id.* at 28 (emphasis added); *see also Rail Freight,* 2013 U.S. App. LEXIS 16500, at *17-18 ("common evidence [must] show all class members suffered *some* injury").

Regardless of the facts in cases involving other drugs, the data here show at least two features precluding common proof of injury.  *First*, there was enormous variation in the sales price of Nexium.  For the class period as a whole, the average net price was approximately $4.42/pill.  Johnson Rpt. ¶ 7.  But, DMS Pharmaceutical Group paid an average net price of just 43 cents/pill, and Good Samaritan Hospital paid less than $2.00/pill.  *Id*. at Ex. 6.  Dr. Hartman calculates but-for generic prices of roughly $1.00-3.00/pill.  Hartman Rpt. Attach. C.3 and C.4 (column 8).  With at least one class member paying a brand price that is far *below* the but-for generic price, common evidence cannot prove injury to all class members.

Dr. Hartman's assertion at the outset of his report that such prices are "uniform" is seriously in error.  Hartman Rpt. 1.  He then claimed that price variations could be ignored because "the customers on a distribution curve for a branded drug will be somewhere on the same position on the distribution curve for the generic drug."  Hartman Dep. 122:21-123:2.  This crucial opinion does not appear in Dr. Hartman's report.  According to his deposition, Dr. Hartman's opinions stem from analyses in other cases which have not been provided to

Defendants and in which Dr. Hartman testified for the *indirect* purchasers.  *Id.* 198:16-200:22

("speculating" that work might have been done in Hytrin, Cipro, Ditropan or K-Dur); Hartman

Rpt. 3-4 (Hartman testified for indirect purchasers in those cases).

    *Second*, the benchmark used by Dr. Hartman shows that rates of switching to generics

varied from 0% to more than 90%, depending on the category of trade.  Johnson Rpt. Ex. 12.

The error in relying on averages is illustrated by the fact that Good Samaritan made only one

purchase of branded Nexium.  *Id.*  at ¶ 37.  Evidence of average market trends cannot prove why

this hospital bought Nexium directly from AstraZeneca (no other hospital did so) and whether it

would have purchased a generic.  It paid only $1.94/pill for this 2008 purchase of branded

Nexium.  *Id.* at ¶ 37, Ex. 6.  Dr. Hartman estimates 2008 generic prices of roughly $1.50-

$2.50/pill, Hartman Rpt. Attach. C.3, column 8, precluding any presumption that Good

Samaritan would have preferred a generic for this uncommon purchase.

    Plaintiffs and Dr. Hartman ignore these facts.  They cite studies and forecasts about the

average effect of generic entry, but none of those materials suggest that *all* direct purchasers

would have paid lower prices for generic versions of Nexium.  Indeed, they cite no document or

study that even purports to address that issue.  Hartman Dep. 115:10-14.  The fact that use of an

average is appropriate in some circumstances, such as general corporate planning, does make it

appropriate in this context where the law commands proof of injury to every class member.

    Dr. Hartman relies entirely on averages for every estimate of price and volume.  He

repeats the same mistake he made in *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 282 (D.

Mass. 2004) where this Court found that his reliance on "aggregate damages" cannot prove

injury under the laws of states that require a "more precise showing of individual impact," i.e.,

the current federal standard.  By definition, such averages do not depict the situation of

individual class members.  If proof of a mere average sufficed, common evidence would always

predominate, since even the most disparate class has a statistical average.

The First Circuit has made clear that reliance on averages is inadequate, especially where

there is evidence that individual class members do not conform to the average.[9]  *See Motor*

*Vehicles*, 522 F.3d at 28 ("The ability to calculate the aggregate amount of damages … does not

absolve plaintiffs from the duty to prove each [class member] was harmed.") (internal quotation

omitted); *Reed v. Advocate Health Care, Inc.*, 268 F.R.D. 573, 592 (N.D. Ill. 2009) (The "use of

averages … unacceptably masks the significant variation.").  By only using averages, Dr.

Hartman "evaded the very burden that he was supposed to shoulder—*i.e.*, that there is a common

methodology to measure impact" to all purchasers.  *In re GPU Antitrust Litig.*, 253 F.R.D. 478,

492 (N.D. Cal. 2008).

The Supreme Court has disapproved as a "novel project" the use of an "average" award

for the class, including those with no actual injury.  *See Wal-Mart*, 131 S. Ct. at 2561.  Using

Rule 23 to create a cause of action for uninjured class members violates The Rules Enabling Act,

28 U.S.C. § 2072(b) by enlarging substantive rights.  *Id.*[10]  Plaintiffs commit exactly that error.

Dr. Hartman reports nothing but averages and aggregate figures, entirely ignoring all of the

variations among class members that inform whether each could have suffered an injury.

---

[9]    The use of averages is particularly inappropriate in a class where four firms made 94% of total purchases and, therefore, the class average is driven almost entirely by a few firms.  The purchases of the 20 smallest class members were substantial in dollar terms, but together constitute just 1% of class purchases.  Johnson Rpt. Ex. 2.  The purchases of the 10 smallest firms are just 0.1% of the class total.  *Id*.  The purchases of a large portion of the class members thus play almost no role in the averages reported by Dr. Hartman.

[10]    In *Relafen*, 218 F.R.D. at 345, this Court indicated that it could certify the class and later exclude class members who presented problems of proving injury in fact.  But, *Wal-Mart* subsequently held that the existence of uninjured class members is a fatal defect at the class certification stage itself.  131 S. Ct. at 2552, 2561.

### B.     Common Issues Do Not Predominate For Proof Of Damages

As the Supreme Court recognized in *Comcast*, 133 S. Ct. at 1433, common issues also do not predominate when individualized inquiries are necessary to accurately measure the damages of each proposed class member.  That is the case here.  Dr. Hartman's approach of relying on averages does not accurately measure any individual purchaser's damages.

This case fundamentally differs from those involving a uniform overcharge to all class members where the only variable is the quantity of their purchases.  Here, Plaintiffs' theory is that, assuming earlier generic entry, they would have switched some purchases to generics and thereby paid less.  Every element in that analysis varies substantially among class members.

- Actual brand prices.  Nexium prices, net of direct rebates and other adjustments to direct purchasers' prices, varied from $0.43/pill to $5.41/pill.  Johnson Rpt. Ex. 6.  The discounts to direct purchasers ranged from less than 5% to more than 90%.  *Id.* at Ex. 7.

- But-for generic prices.  Dr. Hartman estimates the but-for price of generic Nexium by benchmarking against the price of generic Prevacid, another PPI.  But the data shows that the actual prices for generic Prevacid often were more than 50% higher or lower than Dr. Hartman's average.  *Id.* at Ex. 8.  And, generic prices do not track brand prices, as Dr. Hartman claimed without support.  *Id.* at ¶¶ 28-33, Ex. 11.  On the contrary, firms which paid below average brand prices often paid above average generic prices.  *Id.* at Ex. 10.

- Brand loyal purchases.  Purchases of branded Nexium after generic entry could have been priced lower or more than $1.00/pill higher than the actual price of Nexium, depending on the quarter.  Hartman Rpt., Attach. C.3, columns 3, 10.  Thus, a damages calculation requires knowing when the brand loyal purchases would have been made.

- <u>Generic conversion rates</u>.  The portion of Prevacid volume converted to generics varied from roughly 0% to more than 90%, depending upon the category of trade.  Johnson Rpt., Ex. 12.  Predicting such conversion for any given firm requires understanding its mix of customers and their demand for branded vs. generic drugs during the relevant time.[11]

- <u>Conversion to other drugs</u>.  When generic entry occurred for Prevacid, as many as 20% of customers switched to one of the many other PPIs.  *Id.* at ¶ 38.  Dr. Hartman considered such switching "not relevant."  Hartman Dep. 181:19-182:9.

- <u>Assignments</u>.  For some wholesalers there is a need to determine which purchases were resold to assignee retailers and thus are excluded from that wholesaler's damages.  The assigned purchases deviate significantly from average prices.  Johnson Rpt. ¶¶ 40-42.

Dr. Hartman completely ignores the actual variations in every element of a damages calculation.  But, *Wal-Mart* and *Comcast* bar the use of averages that disregard the varying experiences of class members.  A legally valid damages calculation would require detailed individualized inquiries of the above elements specific to each plaintiff.

## IV.  A CLASS ACTION IS NOT SUPERIOR TO COORDINATED NON-CLASS ACTIONS BY DIRECT PURCHASERS

Plaintiffs also fail to prove, as required by Rule 23(b)(3), that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  They do not

---

[11]    In addition, because of "generic bypass," the national wholesalers have vastly lower generic substitution rates than other direct purchasers.  *In re Relafen Antitrust Litig.*, 346 F. Supp. 2d 349, 368-69 (D. Mass. 2004).  This Court held in *Relafen* that the wholesalers may recover damages even for transactions which, given earlier generic entry, would not have occurred at all.  *Id.*  Respectfully, *Hanover Shoe v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), which underlies the decision in *Relafen*, concerns the situation where the price of the product itself is inflated.  Here, by contrast, the allegedly excluded product has a very different distribution system such that generic entry reduces a wholesaler's business.  Defendants do not intend to further argue the point here but preserve it for possible future resolution.

even attempt a realistic depiction of how non-class litigation would proceed and why a class

action is the "best" device. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d

154, 191 (D.N.J. 2001).  The court in *Prograf*, 2013 U.S. Dist. LEXIS 62043, at *10, found

superiority because it was more efficient to have "a single action," but there are many non-class

devices for effectively coordinating proceedings.

    With damages of nearly $1 billion per plaintiff, this case readily permits non-class

resolution.  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (the core concern of

the Federal Rules Advisory Committee was "people who individually would be without effective

strength to bring their opponents into court").[12]  Plaintiffs do not suggest that a class action is

needed, and the actions filed by non-class retailers prove otherwise.  *See Deposit Guar. Nat'l*

*Bank v. Roper*, 445 U.S. 326, 339 (1980) (class certification assumes "it is not economically

feasible to obtain relief within the traditional framework of . . . individual suits ").

    Moreover, the class' claims are highly concentrated among a few class members.  The

three largest class members account for 87.7% of class purchases and the top four account for

94.3% of class purchases.[13]  If any class is certified, the Court should exercise its discretion to

narrow the class, *see Lundquist v. Sec. Pacific Auto. Fin. Serv. Corp.*, 993 F.2d 11, 14 (2d Cir.

---

[12]     *See also Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 42 (1st Cir. 2003) ("The core
purpose of Rule 23(b)(3) is to vindicate the claims of consumers and other groups of people
whose individual claims would be too small to warrant litigation."); *Newton*, 259 F.3d at 191
(class action not superior if plaintiffs "would have a significant financial stake to raise stand-
alone claims"); *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 633 (3d Cir. 1996) (denying class
certification: "[t]his is not a case where 'the amounts at stake for individuals [are] so small that
separate suits would be impracticable") (internal quotation omitted), *aff'd*, 521 U.S. 591 (1997).

[13]     These figures decreased when the national wholesalers assigned some claims to non-class
retailers, but shifting claims away from the class action is not a point in favor of the class action.

1993), by at least excluding the three national wholesalers.[14]  These enormous firms do not need a class action to pursue their multi-billion dollar claims.

Plaintiffs argue that a class action avoids the possibility of inconsistent verdicts.  Pls.' Mem. 20.  They assume, without explanation, that a joinder action would have separate trials.  But, in *Concord Boat*  the 24 antitrust plaintiffs had a single trial.  And, the three national wholesalers, who dominate this class, cannot argue for the importance of unified litigation when they have split their claims among many other entities which otherwise would not be litigants.

The issue here is not whether all direct purchaser claims should be litigated in a single class action.  Certain wholesalers eliminated that option when they made assignments to non-class retailers.  Rather, the issue is whether to have both class *and* non-class actions, or just have non-class actions.  Plaintiffs say nothing on that subject.  Here, for example, the non-class joinder plaintiffs share one economist (Dr. Leffler).  Having class *and* non-class plaintiffs is not superior to having all direct purchasers in a single joinder action.

## V.  AMERICAN SALES COMPANY AND MEIJER ARE NOT ADEQUATE REPRESENTATIVES OF THE PUTATIVE CLASS

A class representative "must be part of the class."  *Wal-Mart*, 131 S. Ct. at 2550.  Two of the putative representatives (American Sales Co. and Meijer) are not members of the class.  Neither bought Nexium from AstraZeneca.  CAC ¶¶ 19-20.  Dr. Hartman omits them as class members.  Hartman Rpt. Attach. D.1.  Thus, neither ASC nor Meijer can represent the class.

### CONCLUSION

This Court should DENY the Direct Purchaser Plaintiffs' Motion for Class Certification.

---

[14]     In *Relafen*, the three national wholesalers opted out of the class.  *See id.*, 346 F. Supp. 2d at 368-69.

Dated:  September 11, 2013                Respectfully submitted,


/s/ Timothy C. Hester                                    /s/ Lisa Jose Fales
Timothy C. Hester (*pro hac vice*)                   J. Douglas Baldridge (*pro hac vice*)
Jonathan Gimblett (*pro hac vice*)                   Lisa Jose Fales (*pro hac vice*)
Andrew D. Lazerow (*pro hac vice*)                   Danielle R. Foley (*pro hac vice*)
COVINGTON & BURLING LLP                          Sarah Choi (*pro hac vice*)
1201 Pennsylvania Avenue, NW                      VENABLE LLP
Washington, DC 20004                              575 7th Street, NW
(202) 662-6000 (telephone)                        Washington, DC 20004
(202) 662-6291 (facsimile)                        (202) 344-4000
thester@cov.com                                   (202) 344-8300 (fax)
jgimblett@cov.com                                 jdbaldridge@venable.com
alazerow@cov.com                                  ljfales@venable.com
                                                  drfoley@venable.com
Dane H. Butswinkas                                schoi@venable.com
Paul B. Gaffney
John E. Schmidtlein                               Leslie F. Su (BBO No. 641833)
WILLIAMS & CONNOLLY LLP                          MINERVA LAW, P.C.
725 Twelfth Street, N.W.                          300 Brickstone Square, Suite 201
Washington, D.C. 20005                            Andover, MA 01810
(202) 434-5000 (telephone)                        (978) 494-4695
(202) 434-5029 (facsimile)                        leslie.su@minervalawpc.com
dbutswinkas@wc.com
pgaffney@wc.com                                   *Counsel for Ranbaxy*
jschmidtlein@wc.com                               *Pharmaceuticals, Inc., Ranbaxy Inc., and*
                                                  *Ranbaxy Laboratories, Ltd.*
William A. Zucker, Esq., BBO # 541240
MCCARTER & ENGLISH, LLP                          /s/ Kevin D. McDonald
265 Franklin Street                               Kevin D. McDonald (*pro hac vice*)
Boston, MA 02110                                  JONES DAY
617.449.6500                                      51 Louisiana Avenue, N.W.
617.607.9200 (facsimile)                          Washington, D.C. 20001-2113
wzucker@mccarter.com                              Telephone: +1.202.879.3939
                                                  Facsimile: +1.202.626.1700
*Counsel for AstraZeneca LP, AstraZeneca*          kdmcdonald@jonesday.com
*AB, and Aktiebolaget Hassle*

/s/ Karen N. Walker                                Andrew J. Miller (*pro hac vice*)
Karen N. Walker, P.C. (*pro hac vice*)            BUDD LARNER, PC
Rebecca A. Koch (*pro hac vice*)                  150 JFK Parkway
KIRKLAND & ELLIS LLP                              Short Hills, NJ 07078-0999
655 Fifteenth Street, N.W., Suite 1200            Telephone: +1.973.379.4800
Washington, D.C. 20005                            Facsimile: +1.973.379.7734
Telephone: (202) 879-5000                         amiller@buddlarner.com

Facsimile: (202) 879-5200
karen.walker@kirkland.com

Jay P. Lefkowitz, P.C. (*pro hac vice*)
601 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
jay.lefkowitz@kirkland.com

Laurence A. Schoen, BBO # 633002
Adam L. Sisitsky, BBO # 637532
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKYAND POPEO, P.C.
One Financial Center
Boston, MA 02111
Telephone: (617) 542-6000
Facsimile: (617) 542-2241
LASchoen@mintz.com
ALSisitsky@mintz.com

*Counsel for Teva Pharmaceuticals USA,*
*Inc. and Teva Pharmaceutical Industries,*
*Ltd.*

Brian T. Moriarty, BBO No. 665995
HAMILTON BROOK SMITH &
REYNOLDS
530 Virginia Road
Concord, MA 01742-9133
Telephone: +1.978.341.0036
Facsimile: +1.978.341.0136
brian.moriarty@hbsr.com

*Counsel for Dr. Reddy's*
*Laboratories, Inc.*

## APPENDIX A:

### Appearances For The Direct Purchaser Class

#### Counsel:

1. Peter A. Barile, III
2. Don Barrett
3. John P. Bjork
4. Brian D. Brooks
5. James E. Cecchi
6. Elena Chan
7. Russ Chorush
8. Caitlin G. Coslett
9. Eric L. Cramer
10. Stuart E. Des Roches
11. Jay W. Eisenhofer
12. Donna M. Evans
13. David P. Germaine
14. Bruce E. Gerstein
15. Ephraim E. Gerstein
16. Craig Glantz
17. Steven Gunther
18. Brian Herrington
19. Miranda Jones
20. Andrew W. Kelly
21. Peter Kohn
22. Chris Letter
23. Joseph T. Lukens
24. Jennifer MacNaughton
25. David S. Nalven
26. Linda P. Nussbaum
27. Joseph Opper
28. Kristen Johnson Parker
29. Peter S. Pearlman
30. John D. Radice
31. David C. Raphael
32. Susan C. Segura
33. Luke Smith
34. Daniel C. Simons

35. Thomas M. Sobol
36. David F. Sorensen
37. Sterling Starns
38. Adam Steinfeld
39. Archuna Tamoshunas.
40. Barry S. Taus
41. Lindsey H. Taylor
42. Nicholas Urban
43. Joseph M. Vanek
44. Andrew J. Vasicek

#### Law Firms

1. Barrett Law Office (MS)
2. Berger & Montague (PA)
3. Carella Byrne Cecchi Olstein Brody & Agnello (NJ)
4. Cohn Lifland Pearlman Herrmann & Knopf (NJ)
5. Faruqi & Faruqi (PA)
6. Garwin Gerstein & Fisher (NY)
7. Grant & Eisenhofer (NY)
8. Hagens Berman Sobol & Shapiro (MA)
9. Heim, Payne & Chorush (TX)
10. Odom & Des Roches (LA)
11. Radice Law Firm (NJ)
12. Smith Segura & Raphael (NY)
13. Taus Cebulash & Landan (NY)
14. Vanek Vickers & Masini (IL)

Sources: *In re Nexium (Esomeprazole) Antitrust Litigation*, No. 1:12-md-02409 (D. Mass.) Docket as of August 23, 2013 signature blocks of Direct Purchaser Class Consolidated Amended Complaint and Motion for Class Certification, and plaintiffs' standard e-mail cc: list.

## <u>CERTIFICATE OF SERVICE</u>

I, Andrew D. Lazerow, hereby certify that this document was electronically filed and served using the Court's ECF system on September 16, 2013.

<u>**/s/ Andrew D. Lazerow**</u>
Andrew D. Lazerow