# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEXIUM (ESOMEPRAZOLE) ANTITRUST LITIGATION | MDL No. 2409 |
| | Civil Action No. 1:12-md-02409 |

This Document Relates To:

*American Sales Company, LLC v. AstraZeneca AB, et al.*, No. 12-cv-11711 (WGY)

*Meijer, Inc. and Meijer Distribution, Inc. v. AstraZeneca AB, et al.*, No. 12-cv-12291 (WGY)

*Value Drug Company and Burlington Drug Company, Inc. v. AstraZeneca PLC, et al.*, No. 12-cv-12293 (WGY)

*Rochester Drug Co-Operative, Inc. v. AstraZeneca AB, et al.*, No. 12-cv-12299 (WGY)

## REPLY BRIEF IN FURTHER SUPPORT OF THE DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.  ARGUMENT ...................................................................................................... 3

    A.   JOINDER OF 29 CLASS MEMBERS IN TWELVE STATES AND ONE U.S. TERRITORY WOULD BE IMPRACTICABLE ........................................3

        1. The class is sufficiently numerous and geographically dispersed, making joinder impracticable........................................................................................... 3

        2. Class certification supports the enforcement of the antitrust laws. ...................... 6

    B.   THE EVIDENCE IN THIS CASE IS PREDOMINANTLY COMMON ..................7

        1. Defendants Misstate the Rule 23(b)(3) Requirements...........................................7

        2. Defendants' Criticisms of Dr. Hartman's Analysis Fail ...................................... 10

        3. Damages Can Be Proven on a Predominantly Common Basis............................ 15

    C.   A CLASS ACTION IS THE SUPERIOR MEANS TO TRY THIS CASE ..............18

    D.   ASC AND MEIJER ARE MEMBERS OF THE CLASS..........................................19

III. CONCLUSION ................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allapattah Services, Inc. v. Exxon Corp.*,
    61 F. Supp. 2d 1335 (S.D. Fla. 1999) ..................................................................................16

*Allen v. Isaac*,
    99 F.R.D. 45 (N.D. Ill. 1983) ................................................................................................5

*Am. Sales Co. v. SmithKline Beecham Corp.*,
    274 F.R.D. 127 (E.D. Pa. 2010) ..............................................................................4, 5, 6, 19

*Amchem Prods. v. Windsor*,
    521 U.S. 591 (1997)..............................................................................................................10

*American Sales Co., Inc. v. SmithKline Beecham Corp.*,
    2010 U.S. Dist. LEXIS 120177 (E.D. Pa. Nov. 10, 2010).....................................................20

*Andrews v. Bechtel Power Corp.*,
    780 F.2d 124 (1st Cir. 1985) ..................................................................................................3

*Ark. Educ. Ass'n. v. Bd. of Educ.*,
    446 F.2d 763 (8th Cir. 1971) ..................................................................................................4

*Basile v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    105 F.R.D. 506 (S.D. Ohio 1985) ...........................................................................................4

*Bergen Drug Company, Inc. v. Parke, Davis & Company*,
    307 F.2d 725 (3d Cir. 1962)....................................................................................................7

*Bert v. AK Steel Corp*,
    2006 U.S. Dist. LEXIS 22904 (Apr. 24, 2006 S.D. Ohio) ......................................................4

*Bradford v. AGCO Corp.*,
    187 F.R.D. 600 (W.D. Mo. 1999)............................................................................................4

*Butler v. Sears, Roebuck & Co.*,
    Nos. 11-8029, 12-8030, 2013 WL 4478200 (7th Cir. Aug. 22, 2013) ...............................9, 18

*Citizens Banking Co. v. Monticello State Bank*,
    143 F.2d 261 (8th Cir. 1944) ..................................................................................................4

*Colston v. Maryland Cup Corp.*,
    26 Fed. R. Serv. 940, 1978 U.S. Dist. LEXIS 15383 (D. Md. 1978) .......................................4

*Comcast Corporation v. Behrend*,
    133 S. Ct. 1426 (2013) ............................................................... passim

*Connor B. ex rel. Vigurs v. Patrick*,
    278 F.R.D. 30 (D. Mass. 2011) ....................................................9

*Crenshaw v. Maloney*,
    No. N-76-79, 1976 WL 13311 (D. Conn. May 6, 1976) ...........................4

*Curtis v. Commissioner Me. Dep't of Human Svcs.*,
    159 F.R.D. 339 (D. Me. 1994) .....................................................6

*Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*,
    375 F.2d 648 (4th Cir. 1967) ......................................................4

*Dale Electronics, Inc. v. R. C. L. Electronics, Inc.*,
    53 F.R.D. 531 (D.N.H. 1971) ......................................................4

*DG ex rel. Stricklin v. Devaughn*,
    594 F.3d 1188 (10th Cir. 2010) ...................................................8

*EEOC v. Printing Industry of Metropolitan Washington, D.C., Inc.*,
    92 F.R.D. 51 (D.D.C. Oct. 20, 1981) .............................................5

*Gaspar v. Linvatec Corp.*,
    167 F.R.D. 51 (N.D. Ill. May 23, 1996) .........................................4

*Gaudin v. Saxon Mortgage Servs., Inc.*,
    2013 WL 4029043 (N.D. Cal. Aug. 5, 2013) ...................................17

*Gintis v. Bouchard Transp. Co., Inc.*,
    596 F.3d 64 (1st Cir. 2010) .......................................................8

*Healy v. Int'l Bhd. of Elec. Workers, Local Union No. 134*,
    2013 WL 4494685 (N.D. Ill. Aug. 22, 2013) .................................17

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ..............................................................6, 7

*In re Buspirone Patent Litig.*,
    210 F.R.D. 43 (S.D.N.Y. 2002) ...............................................16, 19

*In re Carbon Black Antitrust Litig.*,
    CIV.A.03-10191-DPW, 2005 WL 102966 (D. Mass. Jan. 18, 2005)...........11

*In re Cardizem CD Antitrust Litig.*,
    200 F.R.D. 297 (E.D. Mich. 2001) .................................11, 16, 19, 20

*In re Cardizem CD Antitrust Litig.*,
    200 F.R.D. 326 (E.D. Mich. 2001) ....................................................................14

*In re Citigroup Accumulation Plan Litig.*,
    Civ. Action No. 00cv11912-NG, MDL No. 1354 (NG), 2010 WL 9067986 (D. Mass.
    Jan. 6, 2010), *aff'd*, 652 F.3d 88 (1st Cir. 2011).......................................................4

*In re Corrugated Container Antitrust Litig.*,
    No. M.D.L. 310, 1980 WL 1967 (S.D. Tex. 1980)..................................................16

*In re Flonase Antitrust Litig.*,
    284 F.R.D. 207 (E.D. Pa. 2012)....................................................................11, 15, 16

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2008).............................................................................................2

*In re Industrial Diamonds Antitrust Litig.*,
    167 F.R.D. 374 (S.D.N.Y.1996) ....................................................................................7

*In re K-Dur Antitrust Litig.*,
    Civ. Action No. 01-1652(JAG), 2008 WL 2699390 (D.N.J. Apr. 14, 2008) *aff'd*, *In re
    K-Dur Antitrust Litig.*, 686 F.3d 197 (3d Cir. 2012), *vacated*, *Merck & Co., Inc. v.
    Louisiana Wholesale Drug Co., Inc.*, 133 S. Ct. 2849 (2013) *& Upsher-Smith
    Laboratories, Inc. v. Louisiana Wholesale Drug Co., Inc.*, 133 S. Ct. 2849 (2013),
    *class certification holding reinstated*, *In re K-Dur Antitrust Litig.*, Nos. 10-2077, 10-
    2078, 10-2079, 10-4571, 2013 U.S. App. LEXIS 18859 (3d Cir. Sept. 9, 2013)...........4, 9, 16

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    202 F.R.D. 12 (D.D.C. 2001)........................................................................................16

*In re Lupron(R) Mktg. & Sales Practices Litig.*,
    228 F.R.D. 75 (D. Mass. May 12, 2005) ......................................................................17

*In re Neurontin Antitrust Litig.*,
    2011 U.S. Dist. LEXIS 7453 (D.N.J. Jan. 25, 2011) ...................................... passim

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
    522 F.3d 6 (1st Cir. 2008).....................................................................................2, 9, 10, 14

*In re Nifedipine Antitrust Litig.*,
    246 F.R.D. 365 (D.D.C. 2007).................................................................14, 16, 19, 20

*In re Northwest Airlines Corp.*,
    208 F.R.D. 174 (E.D. Mich. 2002) .................................................................................5

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    582 F.3d 156 (1st Cir. 2009) ................................................................................13, 14, 15

*In re Plywood Antitrust Litig.*,
   655 F.2d 627 (5th Cir. 1981) ............................................16

*In re Potash Antitrust Litig.*,
   159 F.R.D. 682 (D. Minn. 1995)............................................16

*In re Prograf Antitrust Litig.*,
   Master File No. 11-cv-10344-RWZ, 2013 WL 2395083 (D. Mass Apr. 23, 2013) ...........4, 15

*In re Prograf Antitrust Litigation,*
   2013 U.S. Dist. LEXIS 62043 (D. Mass. April 13, 2013) ......................................20

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   2013 U.S. App. LEXIS 16500 (D.C. Cir. Aug. 9, 2013) ....................................9, 10

*In re Relafen Antitrust Litig.*,
   218 F.R.D. 337 (D. Mass. 2003) (Young, C.J.) ............................................ passim

*In re Relafen Antitrust Litig.*,
   231 F.R.D. 52 (D. Mass. Sept. 28, 2005)................................................16

*In re Relafen Antitrust Litig.*,
   360 F. Supp. 2d 166 (D. Mass. 2005) ................................................7, 19

*In re Southeast Milk Antitrust Litig.*,
   2:08-MD-1000, 2010 WL 3521747 (E.D. Tenn. Sept. 7, 2010).................................5

*In re Static Random Access (SRAM) Antitrust Litig.*,
   C0701819CW, 2008 WL 4447592 (N.D. Cal. Sept. 29, 2008) .............................14

*In re Sugar Indus. Antitrust Litig.*,
   73 F.R.D. 322 (E.D. Pa. 1976).............................................16

*In re Terazosin Hydrochloride Antitrust Litig.*,
   220 F.R.D. 672 (S.D. Fla. 2004).............................................16

*In re Titanium Dioxide Antitrust Litig.,*
   2013 WL 1855980 (D. Md. May 1, 2013).............................................16

*In re Titanium Dioxide Antitrust Litig.*,
   No. Civ.A. RBD-10-0318, slip op. (D. Md. Aug. 28, 2012) ...............................8

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
   535 F. Supp. 2d 249 (D.N.H. 2007)...............................................15

*In re Universal Serv. Fund Tel. Billing Practices Litig.*,
   219 F.R.D. 661 (D. Kan. 2004)...............................................11

*In re Urethane Antitrust Litig.*,
237 F.R.D. 440 (D. Kan. 2006)..........................................................................................20

*In re Wellbutrin SR Direct Purchaser Antitrust Litig.*,
CIV. A. 04-5525, 2008 WL 1946848 (E.D. Pa. May 2, 2008)...................................16, 19, 20

*In re Wellbutrin XL Antitrust Litig.*,
Civ. Action No. 08-2431, 2011 WL 3563385 (E.D. Pa. Aug. 11, 2011)........................ passim

*In re Whirlpool Corp. Front-Loading Washer Prods. Liability Litig.*,
722 F.3d 838 (6th Cir. 2013) ............................................................................................9, 18

*In Re: Nexium (Esomeprazole) Antitrust Litig.*,
No. 12-md-02409-WGY (D. Mass. Feb. 4, 2013) .................................................................5

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*,
225 F.R.D. 208 (S.D. Ohio 2003) ......................................................................................19

*Klay v. Humana, Inc.*,
382 F.3d 1241 (11th Cir. 2004) .........................................................................................16

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
571 F.3d 672 (7th Cir. 2009) ..............................................................................................8

*Lanning v. SEPTA*,
176 F.R.D. 132 (E.D. Pa. 1997) (finding that plaintiffs "satisfied the numerosity
requirement just based on the twenty-two women who failed the 1993 test.")........................4

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
523 U.S. 26 (1998)...........................................................................................................1, 5

*Little Caesar Enterprises, Inc. v. Smith*,
172 F.R.D. 236 (E.D. Mich. 1997) .......................................................................................3

*Louisiana Wholesale Drug Co., Inc. v. Sanofi-Aventis*,
No. 07-7343, 2008 U.S. Dist. LEXIS 123291 (S.D.N.Y. Apr. 8, 2008) ................................19

*Manning v. Princeton Consumer Discount Co.*,
390 F. Supp. 320 (E. D. Pa. 1975) ........................................................................................4

*McCluskey v. Trs. Of Red DOT Corp ESOP & Trust*,
268 F.R.D. 670 (W.D. Wash. 2010) ......................................................................................6

*Meijer, Inc. v. Abbott Laboratories*,
2008 WL 4065839 (N.D. Cal. 2008) .......................................................................14, 19, 20

*Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*,
246 F.R.D. 293........................................................................................................... passim

*Messner v. Northshore Univ. Healthsystem*,
   669 F.3d 802 (7th Cir. 2012) ........................................................................10, 11

*Mims v. Stewart Title Guar. Co.*,
   590 F.3d 298 (5th Cir. 2009) .................................................................................8

*Munoz v. PHH Corp.*,
   2013 WL 2146925 (E.D. Cal. May 15, 2013) ......................................................17

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*,
   262 F.R.D. 58 (D. Mass. 2008)........................................................................13, 14

*Natchitoches Parish Hosp. Service Dist. v. Tyco Intern., Ltd.*,
   247 F.R.D. 253 (D. Mass. 2008)......................................................................6, 17

*New Eng. Carpenters Health Bens. Fund v. First Databank, Inc.*,
   244 F.R.D. 79 (D. Mass. Aug. 27, 2007)..............................................................17

*New England Carpenters Health Benefits Fund v. First DataBank, Inc.*,
   248 F.R.D. 363 (D. Mass. 2008)..............................................................1, 3, 15, 8

*Paxton v. Union Nat'l Bank*,
   688 F.2d 552 (8th Cir. 1982) .................................................................................4

*Philadelphia Electric Co. v. Anaconda American Brass Co. et al.*,
   43 F.R.D. 452 (E.D. Pa. 1968)............................................................................2, 4

*Rannis v. Recchia*,
   380 Fed. Appx. 646 (9th Cir. 2010)........................................................................4

*Riordan v. Smith Barney*,
   113 F.R.D. 60 (N.D. Ill. 1986)................................................................................5

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir. 1993)....................................................................................4

*Rochester Drug Co-Operative, Inc. v. Braintree Labs.*,
   796 F. Supp. 2d 560 (D. Del. 2011).........................................................................7

*Rosario v. Cook Cnty.*,
   101 F.R.D. 659 (N.D. Ill. 1983).............................................................................4, 6

*Rosario v. Valentine Ave. Disc. Store, Co.*,
   2013 U.S. Dist. LEXIS 77183 (E.D.N.Y. May 31, 2013) .....................................17

*Smilow v. Southwestern Bell Mobile Sys.*,
   323 F.3d 32 (1st Cir. 2003).....................................................................................16

*Sullivan v. DB Investments, Inc.*,
  667 F.3d 273 (3d Cir. 2011) (en banc) .................................................................8

*Swack v. Credit Suisse First Boston*,
  230 F.R.D. 250 (D. Mass. Sept. 14, 2005) ...........................................................17

*Tardiff v. Knox County*,
  365 F.3d 1 (1st Cir. 2004) ....................................................................................16

*Taylor v. CSX Transportation, Inc.*,
  264 F.R.D. 281 (N.D. Oh. 2007) ............................................................................6

*Teva Pharms. USA, Inc. v. Abbott Labs.*,
  252 F.R.D. 213 (D. Del. 2008) ..................................................................... passim

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) .............................................................................2, 8, 9, 10

*Whirlpool Corp. v. Glazer*,
  133 S. Ct. 1722 (2013) ..........................................................................................17

**OTHER AUTHORITIES**

6 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 18.41 (4th ed. 2002) ..............7

Rule 23 ............................................................................................................1, 4, 17

Rule 23(a) .................................................................................................................4

Rule 23(a)(1) .........................................................................................................3, 4

Rule 23(b)(3) ................................................................................................... passim

## I.    INTRODUCTION

This reply addresses three issues:

> *First,* courts warn that under Rule 23, joinder need only be impractical, not impossible, and no court has ever declined to certify a direct class of pharmaceutical purchasers in an antitrust case for lack of numerosity.  Defendants agree there are at least 24 members of the direct purchaser class, located in 12 different states and one U.S. territory, facts not different than other certified classes.  Must this court decline certification for lack of numerosity?

> *Second,* numerous courts in the First Circuit and elsewhere have concluded that antitrust impact and damages can be proven on a predominantly common basis using class-wide evidence in similar direct purchaser cases, and those courts applied rigorous class certification standards akin to those imposed by the Supreme Court in *Walmart* and *Comcast*.  Dr. Hartman uses the same type of class-wide evidence of impact and injury sanctioned by those courts.  Must this court decline certification because Defendants simply wish damages be proven one class member at a time?

> *Third,* common evidence shows that, absent Defendants' agreement to keep the generic off the market, virtually all class members would have purchased some less expensive generic Nexium, and even Defendants' own expert is unaware of pharmacies that only buy the brand (and pharmacies buy from wholesalers, class members here).  Nevertheless, Defendants' expert claims that *one* class member might have been uninjured.  Is that enough to  bar certification of the class?

First, the class here consists of companies scattered across the country, and accepting Defendants' joinder argument would mean substituting more than two-dozen cases and trials for one.  Even assuming discovery of individual cases were coordinated pursuant to a JPML order, each case would  need to be sent back to its home jurisdiction for trial.[1]  And depositions and discovery costs – which this Court wisely has kept under close control – would inevitably multiply.  None of this would be efficient or sensible, and juries across the country could reach conflicting verdicts.  As one court noted, "I see no necessity for encumbering the judicial process

---

[1] *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 40 (1998) (analyzing 28 U.S.C. § 1407's "straightforward language imposing the Panel's responsibility to remand" for trial).

with 25 lawsuits, if one will do."[2]

Second, Defendants try to dismiss the wall of precedent supporting class certification by claiming that the Supreme Court in *Wal-Mart*[3] and *Comcast*[4] changed the law so that it is now essentially impossible to certify an antitrust case.  Not so.  *Wal-Mart* did *not* hold that the mere chance that some class members might not be injured means a class cannot be certified.  And *Comcast* did *not* overturn decades of black letter law that predominance can be met even if some individual issues exist relating to damages.  Indeed, several decisions certifying direct purchaser generic-delay antitrust cases like this one applied the rigorous standards set forth in *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6 (1st Cir. 2008) and *In re Hydrogen Peroxide Antitrust* Litigation, 552 F.3d 305 (3d Cir. 2008).  Each court determined that antitrust impact and damages can be proven on a predominantly common basis using the same type of class-wide evidence that Dr. Raymond Hartman, Plaintiffs' expert, uses here.[5]

Third, Defendants' suggestion that class should be denied if there is a chance some class members may be uninjured would, likewise, mean class actions are not possible.  That is not the law, and even the class member Defendants focus on was likely injured with the rest of the class.  The other small disputes between the experts do not warrant denial of class treatment.

Defendants' real aim – that if class were denied, class members might not bring individuals suits for fear of retaliation or antagonizing their suppliers – cuts *in support* of class certification.  Class certification – by requiring that only a representative direct purchaser step

---

[2] *Philadelphia Electric Co. v. Anaconda American Brass Co. et al.*, 43 F.R.D. 452, 463 (E.D. Pa. 1968) (certifying a class of 25 potential members and noting, "[w]hile 25 is a small number compared to the size of the other classes being considered, it is a large number when compared to a single unit").

[3] *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011)

[4] *Comcast Corporation v. Behrend*, 133 S. Ct. 1426 (2013).

[5] *See* Pls' Br. at 6 n.13; *see also id*. n.12 (noting rigorous standard this court applied in *In re Relafen Antitrust Litig.*, 218 F.R.D. 337 (D. Mass. 2003) (Young, C.J.)).

forward on behalf of all others – ensures that the antitrust laws are vindicated and that

wrongdoers do not keep their ill-gotten gains.

## II.   ARGUMENT

### A.   JOINDER OF 29 CLASS MEMBERS IN TWELVE STATES AND ONE U.S. TERRITORY WOULD BE IMPRACTICABLE

"The 'impracticability' of Rule 23(a)(1) does not require impossibility, but only difficulty

or inconvenience in joining all members of the class."[6]

Defendants' challenge to numerosity ignores the nineteen cases certifying nearly identical

classes in similar pharmaceutical antitrust cases,[7] and argue that joinder is not impractical and

class members have sufficient incentive to sue individually.[8]  Defendants' myopic focus on the

number of class members ignores the realities of joinder, and the policies behind class and

antitrust litigation.[9]

#### 1.   The class is sufficiently numerous and geographically dispersed, making joinder impracticable.

Defendants agree that the proposed class numbers 29 to 24, depending on the date the

evidence at trial establishes that generic Nexium would have been available.[10]  District courts

---

[6] *Little Caesar Enterprises, Inc. v. Smith*, 172 F.R.D. 236, 242 (E.D. Mich. 1997).

[7] Pls' Br. at 1 n.1.

[8] Defs' Br. at 6-13.

[9] Defendants' argument that because class members are identifiable, certification should be denied is similarly misguided.  *See* Defs' Br. at 13.  *First*, class members often are individually identifiable from defendants' own records, as here.  *Second*, the same or virtually the same class was at issue in the prior generic delay cases certified as class actions. Defendants cite cases denying certification, but those cases say nothing more than class certification is fact-dependent.  *See Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 131 (1st Cir. 1985) ("The facts and circumstances of each case are to be taken into account to determine numerosity under 23(a)(1)."). The *Andrews* court cautioned that "numbers alone do not determine numerosity" and found joinder to be practical because "members of the subclass came from the same small geographic area – all living in southeastern Massachusetts…." *Id*. at 132.

[10] Plaintiffs have identified at least 31 to 26 proposed class members, depending on the causation scenario, directly from AstraZeneca's data. Defendants exclude two class members based on their subsidiary status.  In addition, proposed class representatives American Sales Company and Meijer are proceeding by assignment.

within the First Circuit repeatedly have certified similar sized classes;[11] courts have repeatedly

certified cases like this one involving delayed generic entry, including classes of 25 to 33

members;[12] and many other courts have certified classes of fewer than 30 members where

accompanying conditions suggest superiority of the class action.[13]

---

[11] *See In re Prograf Antitrust Litig.*, Master File No. 11-cv-10344-RWZ, 2013 WL 2395083, at *1 (D. Mass Apr. 23, 2013) (certifying a class of 25 pharmaceutical wholesalers); *In re Citigroup Accumulation Plan Litig.*, Civ. Action No. 00cv11912-NG, MDL No. 1354 (NG), 2010 WL 9067986, at *8-10 (D. Mass. Jan. 6, 2010)(certifying a subclass of 20, "all of whom are easily ascertainable"), *aff'd*, 652 F.3d 88 (1st Cir. 2011); *Dale Electronics, Inc. v. R. C. L. Electronics, Inc.*, 53 F.R.D. 531, 534-35 (D.N.H. 1971)(certifying a defendant class consisting of 13 members).

[12] *See In re Prograf Antitrust Litig.*, 2013 WL 2395083, at *1 (class of 25); *In re Wellbutrin XL Antitrust Litig.*, Civ. Action No. 08-2431, 2011 WL 3563385, *3-4 (E.D. Pa. Aug. 11, 2011)(class of 32); *Am. Sales Co. v. SmithKline Beecham Corp.*, 274 F.R.D. 127, 132-33 (E.D. Pa. 2010)(class of 33); *In re K-Dur Antitrust Litig.*, Civ. Action No. 01-1652(JAG), 2008 WL 2699390, at *3-4 (D.N.J. Apr. 14, 2008)(class of more than 40 members; citing cases with classes as few as 10 members) *aff'd*, *In re K-Dur Antitrust Litig.*, 686 F.3d 197 (3d Cir. 2012), *vacated*, *Merck & Co., Inc. v. Louisiana Wholesale Drug Co., Inc.*, 133 S. Ct. 2849 (2013) & *Upsher-Smith Laboratories, Inc. v. Louisiana Wholesale Drug Co., Inc.*, 133 S. Ct. 2849 (2013), *class certification holding reinstated*, *In re K-Dur Antitrust Litig.*, Nos. 10-2077, 10-2078, 10-2079, 10-4571, 2013 U.S. App. LEXIS 18859 (3d Cir. Sept. 9, 2013); *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R. 293, 305-06 & n.14 (30 members sufficient). Defendants attempt to dismiss Prograf because class was stipulated to, but the court conducted an independent and "rigorous analysis." *See In re Prograf Antitrust Litig.*, 2013 WL 2395083, at *1 n.2.

[13] *See, e.g.*, *Meijer, Inc. v. Warner Chilcott Holdings Co. III., Ltd.*, 246 F.R.D. 293, 305-06 n.13 & 14 (D.D.C. Oct. 22, 2007) (certifying a class that "includes at least 29, and possibly 30, members," and noting that "when courts in this Circuit have refused to certify small classes, they have done so based on findings that other elements of Rule 23(a) were not met, and not solely on a finding that the class lacked numerosity"); *Citizens Banking Co. v. Monticello State Bank*, 143 F.2d 261 (8th Cir. 1944) (certifying, under the predecessor to Rule 23, a 12-person class); *Philadelphia Electric Co. v. Anaconda American Brass Co.*, 43 F.R.D. 452, 463 (E.D. Pa. 1968) (certifying an antitrust class of 25, seeing "no necessity for encumbering the judicial process with 25 lawsuits, if one will do."); *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967) (finding 18 to be "a sufficiently large number to constitute a class in the existing circumstances"); *Ark. Educ. Ass'n. v. Bd. of Educ.*, 446 F.2d 763, 765 (8th Cir. 1971) (affirming a trial court ruling certifying a class of 20); *Bradford v. AGCO Corp.*, 187 F.R.D. 600, 604 (W.D. Mo. 1999) (certifying a class where defendant claimed 20 individuals would be eligible because joinder would be inefficient); *Robidoux v. Celani*, 987 F.2d 931, 935-36 (2d Cir. 1993) ("a court 'may certify a class even if it is composed of as few as 14 members'") (citing and quoting *Grant v. Sullivan*, 131 F.R.D. 436, 446 (M.D. Pa. 1990); *Rannis v. Recchia*, 380 Fed. Appx. 646, 651-52 (9th Cir. 2010) (certifying a 20-member class); *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 561 (8th Cir. 1982) (citing with approval cases certifying classes of 16 to 20); *Colston v. Maryland Cup Corp.*, 26 Fed. R. Serv. 940, at *8-9, 1978 U.S. Dist. LEXIS 15383 (D. Md. 1978) (finding a class of 25 "sufficient to meet the numerosity requirement of Rule 23(a)."); *Crenshaw v. Maloney*, No. N-76-79, 1976 WL 13311, at *1 (D. Conn. May 6, 1976) (certifying a class of 16); *Basile v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 105 F.R.D. 506, 508 (S.D. Ohio 1985) ("there is no reason to encumber the judicial system with 23 consolidated lawsuits when one will do") (citation omitted); *Bert v. AK Steel Corp*, 2006 U.S. Dist. LEXIS 22904 at *14 (Apr. 24, 2006 S.D. Ohio) (certifying class that may be less than 30, noting "There is no hard and fast rule about the number of potential class members required for certification. Classes as small as 17 identified individuals have been certified. The key to determining whether certification is appropriate under Rule 23(a)(1) rests on the impracticability of joinder.") (citations omitted); *Manning v. Princeton Consumer Discount Co.*, 390 F. Supp. 320, 324 (E. D. Pa. 1975) (14 class members sufficient for certification); *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 56-57 (N.D. Ill. May 23, 1996) (certifying a class of 18); *Rosario v. Cook Cnty.*, 101 F.R.D. 659, 661-62 (N.D. Ill. 1983) (certifying a class of 20); *Lanning v. SEPTA*, 176 F.R.D. 132, 147-48 (E.D. Pa. 1997) (finding that plaintiffs

*Cont'd*

Class members here are "spread geographically across the entire country,"[14] and courts recognize that geographic dispersion makes joinder impracticable,[15] including in pharmaceutical antitrust cases like this one.[16]

Defendants' joinder proposal invites the Court to replace one streamlined class case with more than two-dozen individual cases spread across the country. The Court has set strict limits, including fifteen depositions per side and a tight discovery schedule,[17] but if every proposed class member were to file an individual case, the number of depositions of only the plaintiffs might triple, and discovery very likely need to be extended. Even if discovery of individual cases could be coordinated pursuant to a JPML order, each case would have to be sent back to its home jurisdiction for trial (absent waiver),[18] which would not only greatly multiply litigation costs but also raise the risk of inconsistent verdicts. Nothing about the alleged wonders of "modern discovery" or the size of the damages claimed here can avoid the need for numerous trials in courts nationwide.

---

"satisfied the numerosity requirement just based on the twenty-two women who failed the 1993 test."); *EEOC v. Printing Industry of Metropolitan Washington, D.C., Inc.*, 92 F.R.D. 51, 53 (D.D.C. Oct. 20, 1981) ("[A]s few as 25-30 class members should raise a presumption that joinder would be impracticable, and thus the class should be certified.") (*citing* 1 Newberg, Class Actions § 1105b at 174 (1977)); *Riordan v. Smith Barney*, 113 F.R.D. 60, 62 (N.D. Ill. 1986) (certifying a class of 29); *Allen v. Isaac*, 99 F.R.D. 45, 49-53 (N.D. Ill. 1983) (certifying a class of 17).

[14] Declaration of Raymond S. Hartman in Support of the Certification of the Class of Direct Purchasers of Nexium, July 26, 2012 ("Hartman Decl.") at ¶ 65.

[15] Pls' Br. at 7-8. *See In re Northwest Airlines Corp.*, 208 F.R.D. 174, 217 (E.D. Mich. 2002) (citation omitted); *see also In re Southeast Milk Antitrust Litig.*, 2:08-MD-1000, 2010 WL 3521747, at *4 (E.D. Tenn. Sept. 7, 2010) ("fact that members of the proposed subclasses are spread throughout eleven states . . . and reside in 27 separate federal judicial districts makes joinder impracticable"); *Riordan v. Smith Barney*, 113 F.R.D. 60, 62 (N.D. Ill. 1986) (29 member class met requirements of 23(a)(1) when class members came from nine different states).

[16] *See, e.g.*, *Teva Pharms. USA, Inc. v. Abbott Labs.*, 252 F.R.D. 213, 225 n. 26 (D. Del. 2008) ("[w]here, as here, potential class members are from disparate geographical areas, this also weighs towards class certification"); *Am. Sales Co.*, 274 F.R.D. at 133 (joinder of 33 direct purchasers of Flonase dispersed across 14 states is impracticable). *See In re Relafen Antitrust Litig.*, 218 F.R.D. 337, 342 (D. Mass. 2003) (citation omitted) (Young, J.).

[17] *In Re: Nexium (Esomeprazole) Antitrust Litig.*, No. 12-md-02409-WGY (D. Mass. Feb. 4, 2013) [D.E. 115].

[18] *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 40 (1998) (analyzing 28 U.S.C. § 1407's "straightforward language imposing the Panel's responsibility to remand" for trial).

Defendants' proposal does not serve judicial economy.[19]  As the court recently explained in *Wellbutrin XL*, joining all direct purchasers of prescription drugs in one action would cause delays, complication, and substantial difficulties for the parties:

> The defendants argue that joinder is practicable in this case because the direct purchasers of Wellbutrin XL are large, sophisticated entities with sufficient financial resources to pursue their own claims and that each member could seek significant damages, if the claims are proven on the merits. Although the defendants are correct about the nature of the class members, judicial economy and geographic dispersion of the parties more heavily favor the use of a class action. . . . The class members' geographic dispersion would cause substantial difficulty for the parties to conduct discovery efficiently and to coordinate the litigation. . . . The Court finds that [discovery] delays and other complications would be greatly increased if all direct purchasers were joined in this suit.[20]

### 2.     Class certification supports the enforcement of the antitrust laws.

As the Supreme Court has recognized, "direct purchasers sometimes may refrain from bringing a treble-damage suit for fear of disrupting relations with their suppliers."[21] As Judge Saris has noted, "[d]istributor class members may be reluctant to bring actions against manufacturers, and thus 'a class action may be the only practical method for resolving their claims.'"[22]  A class action thus can help ensure the vindication of the antitrust laws.

Defendants are not proposing joinder because they want to litigate twenty-nine different cases; rather, Defendants hope that class members will decline to sue their suppliers if forced to

---

[19] *See McCluskey v. Trs. Of Red DOT Corp ESOP & Trust*, 268 F.R.D. 670, 674 (W.D. Wash. 2010) (describing "judicial economy [as] one of the two primary purposes behind class actions"). *Accord Curtis v. Commissioner Me. Dep't of Human Svcs.*, 159 F.R.D. 339, 340-41 (D. Me. 1994); *Taylor v. CSX Transportation, Inc.*, 264 F.R.D. 281, 288 (N.D. Oh. 2007).

[20] *In re Wellbutrin XL Antitrust Litig.*, 2011 WL 3563385, at *3. *See also Am. Sales Co.*, 274 F.R.D. at 137 ("[i]f all 33 members of the Proposed Class were to file suit individually, all of the parties involved, and the courts required to hear each suit, would expend significant resources to resolve identical issues."); *Rosario v. Cook Cnty.*, 101 F.R.D. at 662 (certifying a class of 20 because, like here, "[f]orcing the parties to relitigate a common core of issues unnecessarily multiplies the expense of litigation, whereas allowing a suit to proceed as a class action protects defendants as well as plaintiffs").

[21] *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 746 (1977).

[22] *Natchitoches Parish Hosp. Service Dist. v. Tyco Intern., Ltd.*, 247 F.R.D. 253, 273 n.6 (D. Mass. 2008) (citation omitted).

press their claims on an individual basis.  But that risk *supports* class certification.

The risk of under-deterrence is heightened where, as here, a defendant makes a sole-source product (Nexium), such that if the defendant were to retaliate by ceasing sales, the class member would have no other manufacturer to turn to.[23]  Class certification can make sure that defendants do not keep ill-gotten gains merely because their customers may be reluctant to sue their suppliers.[24]

As this Court recognized in *Relafen* in the context of rejecting defendants' argument concerning generic bypass, accepting defendants' argument there that bypassed units should be deducted would result in "a substantial portion of the harm attributed to [defendant's] conduct would go completely unredressed . . . [an] outcome [that] 'is not supported by *Illinois Brick* – or economics or fairness for that matter.'"[25]  Accepting Defendants' joinder argument here could pose a similar risk, and should be rejected for similar reasons.

## B.     THE EVIDENCE IN THIS CASE IS PREDOMINANTLY COMMON

### 1.     Defendants Misstate the Rule 23(b)(3) Requirements

Defendants concede, "proof of the challenged agreements is a common issue."[26]  The vast majority of the evidence, testimony, and expert discovery focuses on the agreements, their

---

[23] Though such retaliation often is unlawful, it does occur. *See, e.g.*, *Rochester Drug Co-Operative, Inc. v. Braintree Labs.*, 796 F. Supp. 2d 560, 567 (D. Del. 2011) (noting that "there is no dispute that defendant at bar terminated its business relationship with plaintiffs specifically as a result of plaintiffs' pursuit of [pharmaceutical antitrust] litigation"); *Bergen Drug Company, Inc. v. Parke, Davis & Company*, 307 F.2d 725 (3d Cir. 1962) (enjoining the defendant from refusing to sell its products to plaintiff upon the same terms as they are sold to other purchasers following defendant's retaliation against plaintiff for filing an antitrust case).

[24] *Cf. In re Industrial Diamonds Antitrust Litig.*, 167 F.R.D. 374, 386 (S.D.N.Y.1996) (finding class action superior method of adjudicating case where, among other things, some class members "still depend on [the defendants] for their supply of industrial diamond products and may be hesitant to disrupt those relationships."); 6 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 18.41 (4th ed. 2002) ("Class actions perform an important function in cases where individual franchisees or purchasers are reluctant to sue because they fear economic reprisal," and collecting cases).

[25] *In re Relafen Antitrust Litig.*, 360 F. Supp. 2d 166, 188 (D. Mass. 2005) (citation omitted).

[26] Defs' Br. at 13.

legality under the rule of reason, and the impact those agreement may have had on generic entry. That proof will dominate the trial. Antitrust impact, too, will be proven through predominantly or entirely common evidence, as will be the evidentially related issue of market power. In response, Defendants, however, suggest that one class member (DMS) *might* have suffered no injury, and argue that under *Wal-Mart*, that requires denial of class certification.[27] The defendants are wrong.

*First*, Rule 23(b)(3) does *not* require Plaintiffs to *prove* antitrust impact or damages at the class certification stage; rather, plaintiffs are required to proffer a predominantly common *method for proving* their case at trial. As the Supreme Court recently reaffirmed in *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, predominance requires that "*questions* common to the class predominate, and not that those questions will be answered on the merits in favor of the class."[28]

*Second*, numerous courts have flatly rejected the argument that the potential that a few class members may ultimately be shown to be uninjured somehow bars class certification.[29]

---

[27] Defs' Br. at 14.

[28] 133 S. Ct. 1184, 1191 (2013) (emphasis in original). *See also Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 676 (7th Cir. 2009) (rejecting defendant's argument that "before certifying a class the district judge was required to determine which class members had suffered damages," reasoning that that argument was "putting the cart before the horse" in a way that would "vitiate the economies of class action procedure; in effect the trial would precede the certification."); *In re Titanium Dioxide Antitrust Litig.*, No. Civ.A. RBD-10-0318, slip op. at 28-29 (D. Md. Aug. 28, 2012) ("Of course, at this stage of the litigation, Plaintiffs need not *prove* [antitrust impact], '[i]nstead, the task for plaintiffs at class certification is to demonstrate that the element of antitrust impact is *capable of proof* at trial through evidence that is common to the class rather than individual to its members.'" (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311-12 (3d Cir. 2008) (emphasis as supplied)) (a copy of this opinion is attached as Ex. 8 to the Declaration of Thomas M. Sobol in Support of Direct Purchaser Plaintiffs' Reply to Defendants' Opposition to the Direct Purchaser Class Plaintiffs' Motion for Class Certification ("Sobol Decl.")).

[29] *See Gintis v. Bouchard Transp. Co., Inc.*, 596 F.3d 64, 66-67 (1st Cir. 2010) (Souter, A.J., sitting by designation) ("[T]he focus will be on the plaintiffs' claim that common evidence will suffice to prove injury, causation and compensatory damages for at least a very substantial proportion of the claims that can be brought by putative class members."); *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 305 (3d Cir. 2011) (en banc); *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1198 (10th Cir. 2010) (quoting *Kohen*); *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298, 308 (5th Cir. 2009); *Kohen*, 571 F.3d at 677 ("[A] class will often include persons who have not been injured by the defendant's conduct; [. . .] Such a possibility or indeed inevitability does not preclude class certification, despite statements in some cases that it must be reasonably clear at the outset that all class members were injured by the defendant's conduct.") (internal citations omitted). *See In re Neurontin Antitrust Litig.*, 2011 U.S. Dist. LEXIS 7453, at *36-37 n.23 (D.N.J. Jan. 25, 2011) (impact defined as "widespread injury to the class").

Defendants claim that *Wal-Mart* changed the law,[30] but that is incorrect.[31]  As this Court has observed: "the *Wal-Mart* decision [involving 1.5 million potential class members] did not change the law for all class action certifications.  Instead, it provided guidance on how existing law should be applied to expansive, nationwide class actions that are very different from the case currently before the court."[32]

*Next*, Defendants claim "[t]he Supreme Court has disapproved as a "novel project" the use of an "average" award for the class, including those with no actual injury," again selectively quoting *Wal-Mart*.[33] Here again, the "novel project" of which the Court "disapprove[d]" was the plaintiffs' attempt to make an end-run around the law requiring individual determinations of discrimination plaintiffs' eligibility for backpay or reinstatement by using a "sample set" of the class members.[34]

Defendants' other citations are to dicta: neither *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6 (1st Cir. 2008), nor *In re Rail Freight Fuel Surcharge*

---

[30]Defendants say: "*Wal-Mart* requires an injury to every proposed class member. *Id.* at 2552 n.7 (requiring that 'all class members were victims')."  Defs' Br. at 5. Defendants' misquotation is apparent from even a cursory glance at the full text:

> In a pattern-or-practice case, the plaintiff tries to "establish by a preponderance of the evidence that ... discrimination was the company's standard operating procedure" … If he succeeds, *that showing will support a rebuttable inference that all class members were victims of the discriminatory practice,* and will justify "an award of prospective relief"….

*Wal-Mart*, 131 S. Ct. at 2552 n.7 (emphasis added, citations omitted).

[31] Several post-*Wal-Mart* decisions have continued to apply the rule that the presence of some small number of uninjured class members is irrelevant to class certification. *See In re Whirlpool Corp. Front-Loading Washer Prods. Liability Litig.*, 722 F.3d 838, 855 (6th Cir. 2013); *Butler v. Sears, Roebuck & Co.*, Nos. 11-8029, 12-8030, 2013 WL 4478200, at *2 (7th Cir. Aug. 22, 2013). In addition, the Third Circuit recently reinstated its class certification ruling in *K-Dur*, even though the proposed class in that case included several class members that may have had no injury.

[32]*Connor B. ex rel. Vigurs v. Patrick*, 278 F.R.D. 30, 33 (D. Mass. 2011) (denying motion for decertification).

[33] Defs' Br. at 16 (quoting 131 S. Ct. at 2561).

[34] *Wal-Mart*, 131 S. Ct. at 2561.  Interestingly, elsewhere the *Wal-Mart* opinion implies that commonality could have been met via a showing that "95 percent of the employment decisions" at issue were infected by stereotyping – though presumably, if the true standard were 100%, the Court would have phrased this "essential question" accordingly. *Id.* at 2553.

*Antitrust Litig.*, 2013 U.S. App. LEXIS 16500 at *17-18 (D.C. Cir. Aug. 9, 2013) held that "all class members" must prove injury at the class stage.[35]

Defendants' claim that a class action will expand the substantive rights of the uninjured class members, *see* Defs' Br. at 16, is unfounded: class members with no injury will receive no damages. "All of this is at best an argument that some class members' claims will fail on the merits if and when damages are decided, a fact generally irrelevant to the district court's decision on class certification."[36]

### 2. Defendants' Criticisms of Dr. Hartman's Analysis Fail

The direct purchaser class plaintiffs' expert, Dr. Raymond Hartman, examined and relied on the same type of common evidence and expert analysis that nearly twenty courts have concluded can prove, on a predominantly common, class-wide basis, that direct purchasers are overcharged when generic competition is unlawfully delayed.[37]

---

[35] In *Motor Vehicles*, the Court stated: "[T]he district court would need enough information to evaluate preliminarily whether the proposed model will be able to establish, without need for individual determinations for the many millions of potential class members, *which consumers were impacted by the alleged antitrust violation and which were not.*" 522 F.3d at 28 (emphasis added). *Rail Freight* dealt not with uninjured class members, but with technical problems with the expert's analysis: namely, that it generated false positives for non-class members that all parties agreed had not been injured.  2013 U.S. App. LEXIS 16500, at *18.  As those "false positives" were *not* class members, *Rail Freight* did not present the question of whether the presence of an uninjured party *in the class* warrants denial of certification. Instead, the court held those false positives indicated problems with the reliability of the expert's methodology, and therefore vacated and remanded to the district court "to reconsider its decision in light of *Comcast.*"  *Id.* at *26. That the quoted language in *Rail Freight* is dicta is further supported by examining the sole authority the opinion cited for this point, *Amchem Prods. v. Windsor*, 521 U.S. 591, 623-24 (1997) (cited in *Rail Freight* at *17), which likewise says nothing about injury to "all" class members. The cited pages simply discuss how different the plaintiffs' *claims* were in that case, as the plaintiffs there asserted personal injuries arising out of asbestos exposure that involved myriad variations between proposed class members. While disallowing class certification on such facts, the Supreme Court in *Amchem* took care to note that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem*, 521 U.S. at 625.

[36] *Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 823 (7th Cir. 2012).  The Court also has discretion to modify the class definition. *See Relafen*, 218 F.R.D. at 345 ("[T]he Court considered it appropriate to certify the class as currently defined while maintaining its authority later to amend the definition to exclude members who have not suffered injury because they would not have benefitted from reduced prices of Relafen or its generic equivalents.").  Defendants claim the Court's statement in *Relafen* is no longer good law in light of *Wal-Mart*, *see* Defs' Br. at 16 n.10, but as discussed above, Defendants miscite *Wal-Mart.*

[37] *See generally* Hartman Decl.

Defendants' expert, Dr. John H. Johnson IV, making his debut appearance on class certification in delayed generic entry cases, claims (i) there is variation in net Nexium prices paid by class members; (ii) there would be variation among class members in how much generic Nexium each would have purchased and at what price, and (iii) Dr. Hartman miscalculated net Nexium prices. [38]  Each lacks merit.

First, Dr. Johnson argues that the prices class members paid for Nexium, and the amount of generic Nexium they would have purchased had generic entry occurred and the generic prices they would have paid, will vary among class members, as will their individual damages.

But prices and purchases often vary among class members,[39] and it is well recognized that "[c]ommon proof of impact is possible without common damage amounts."[40]  The relevant question is whether there is a method of showing through predominantly common evidence (if credited by the jury) that prices for generic Nexium would have been lower than the prices paid for branded Nexium, and that class members would have substituted some amount of the lower priced generic for branded Nexium, had generics been available earlier.  Dr. Hartman's model addresses and answers precisely that question: generic prices *would* have been lower than brand prices, and all or virtually all class members *would* have purchased some amount of the less

---

[38] *See* Expert Report of Dr. John H. Johnson, IV on Direct Purchaser Class Certification, September 11, 2013 ("Johnson Rpt.").

[39] *Messner*, 669 F.3d at 819 ("By requiring uniformity of nominal price increases within and across contracts, the district court misread Rule 23(b)(3) to require a greater showing of common evidence than is contemplated by that rule.").

[40] *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 309 (E.D. Mich. 2001) (quoting *DeLoach v. Philip Morris Companies, Inc.*, 206 F.R.D. 551, 561 (M.D.N.C. 2002), in turn quoting *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 694 (D. Minn. 1995)). *See also In re Carbon Black Antitrust Litig.*, CIV.A.03-10191-DPW, 2005 WL 102966 (D. Mass. Jan. 18, 2005) ("diversity in damages suffered does not itself render the certification of a class unwarranted"); *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 232 (E.D. Pa. 2012) ("it uniformly has been held that differences among the members as to the amount of damages incurred does not mean that a class action would be inappropriate.") (quoting 7AA Charles Alan Wright, et al., Federal Practice and Procedure § 1781 (3d ed. 2005)); *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 219 F.R.D. 661, 676 (D. Kan. 2004) (fact that some customers had negotiated contracts "may have been impacted to a greater or lesser degree than other customers" but was "simply not a consideration in determining whether those customers were impacted by the alleged conspiracy").

expensive generic.

Dr. Hartman draws on the very same type of common evidence that about twenty prior courts, including this Court, have concluded can prove antitrust impact on a predominantly common, class-wide basis.  Dr. Hartman examined (1) the quantities purchased and prices paid for branded Nexium obtained from defendant AstraZeneca;[41] (2) numerous government and academic studies showing that generics are rapidly substituted for brands and that prices fall sharply when generics enter; (3) Defendants' own forecasts showing, including through the use of "analogs" or benchmarks, *i.e.*, data on other drugs that have undergone generic competition, that they expected this same pattern to apply to Nexium once generic competition began; (4) data on another benchmark drug (Prevacid) that underwent generic competition; and (5) the role that class members (mostly wholesalers) play as resellers in serving a much wider market including pharmacies nationwide, to conclude that all or virtually all class members suffered antitrust injury in the form of overcharges, assuming that Defendants' unlawfully delayed the entry of generic version of Nexium.[42]

Dr. Johnson admitted at his deposition that even a penny of overcharge qualifies as antitrust impact.  And that here, antitrust impact can be shown by showing that a class member would have purchased one unit of generic at a price below branded Nexium.[43]  The variation that Dr. Johnson touts is simply beside the point -- he cites only *one* class member (DMS) whose

---

[41] Defendants and their expert accuse Dr. Hartman of calculating net Nexium prices incorrectly, but (1) Dr. Hartman simply was not provided with full chargeback data at first, but corrected his calculations once he obtained complete data; and (2) AstraZeneca provided Dr. Johnson, but not the Plaintiffs, a "data dictionary" that helped explain how to calculate net Nexium prices.  *See* Rebuttal Declaration of Raymond S. Hartman, September 16, 2013 ("Hartman Rebuttal") at ¶ 40 and n.43 (Sobol Decl., Ex. 3).  Plaintiffs had expressly requested clarification of the sales data by letter dated July 15, 2013 (*see* Sobol Decl., Ex. 6), but received no answer.

[42] *See* Hartman Decl. at ¶¶ 11-12.

[43] *See* Johnson Dep., 9/13/13, at 43 (any amount of overcharges qualifies as antitrust injury) and at 73-74 (if direct purchaser would have substituted some generic at a lower price, that would show antitrust injury) (Sobol Decl., Ex. 5).

Nexium purchase price was low enough to even call impact into question.[44]

Overwhelming common evidence shows that all or virtually all class members would have purchased some amount of generic Nexium at lower prices. The FTC, for example, recently found that on average, within a year of generic entry, *90% of prescriptions* are filled by pharmacies with a generic in place of the brand, and generic prices are *85% lower* than the pre-generic brand prices.[45] For a multi-billion dollar brand drug like Nexium, it is plain that pharmacies would need to stock the generic once it became available (Dr. Johnson admits he has never heard of a pharmacy that buys *only* branded drugs),[46] and since pharmacies buy from wholesalers – the class here – wholesalers, too, would need to buy the generic.[47]

For all of Dr. Johnson's colorful charts and graphs, he only identifies *one* class member who paid a price for Nexium low enough that it is not immediately obvious that generics would have saved it money.[48] But even this class member's Nexium purchase price is *400% above* AstraZeneca's cost of producing an "authorized generic"[49] – meaning that there would have been plenty of room for a generic to underprice Nexium even for this class member.

Second, Dr. Johnson objects to the use of averages, but there is nothing wrong with using averages.[50] Defendants imply that proof that average "but for" generic prices would be

---

[44] Defendants also exaggerate the extent of variation. For 23 of 29 class members, average net prices for Nexium were within a dollar of each other. *See* Johnson Rpt. at ¶ 19 Ex. 6.

[45] *See* FTC, Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions (January 2010) at 8, *available at* http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf (last accessed Sept. 16, 2013).

[46] Johnson Dep. at 33 ("Q. Have you ever heard of a pharmacy in the United States that only buys brand drugs? A. No.").

[47] Hartman Decl. at ¶¶ 26-28, 39-42; Hartman Rebuttal at 2 and ¶ 27. Dr. Johnson identified one class member (DMS Pharmaceutical Group Inc.) ("DMS") that he says did not supply any pharmacies, and he was "not sure" about one more, Good Samaritan Hosp. & Hlth. *See* Johnson Dep. at 65.

[48] Johnson Rpt. at 20; Johnson Dep. at 58-60.

[49] *See* NEX-RBX 3514340 (Sobol Decl., Ex. 7); *see also* Hartman Rebuttal at 3 and n.6.

[50] *See*, *e.g.*, *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 262 F.R.D. 58, 69 (D. Mass. 2008) (certifying class where plaintiffs' expert "economic analysis only models how much the *average* price … from all supplies in
*Cont'd*

substantially lower than average Nexium prices can still allow an "uninjured" class member to recover, but as discussed, there is no legal requirement that all class members ultimately be able to recover, and in any event, Dr. Johnson has spotted only *one* class member (maybe two) who he says *might* not have been injured.

Defendants' reliance on *New Motor Vehicles* is misplaced: that case did not reject a proposed impact model because of evidence that individual class members "do not conform to the average."[51]  Rather, in evaluating a "novel and complex" theory of antitrust impact, the court noted that there were critical unquantifiable individual factors at play – namely, the individual plaintiffs' skills at negotiating a new car price – which the expert's methodology could not incorporate.[52]  Thus, the plaintiffs were left without *any* common means to determine at trial which class members were harmed. [53]  By contrast, here the theory that generic drugs are cheaper than their brand-name counterparts is neither novel nor complex.[54]

---

the industry would have fallen, rather than showing that all class members would have paid lower prices in the but-for world) (emphasis added); *Ovcon*, 246 F.R.D. at 309 (class-wide impact could be demonstrated because "average Ovcon 35 Product prices went down for all classes of trade in the proposed Class (including the [Big Three]) once generic Ovcon 35 became available."). *See, e.g., Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 262 F.R.D. 58, 69 (D. Mass. 2008) (certifying class where plaintiffs' expert "economic analysis only models how much the *average* price … from all supplies in the industry would have fallen, rather than showing that all class members would have paid lower prices in the but-for world") (emphasis added); *In re Wellbutrin XL Antitrust Litig.*, 2011 WL 3563385, at *14-15 (certifying class where plaintiffs' expert "propose[d] to calculate damages as the difference between the weighted-average price that class members paid … and the weighted average that class members would have paid but for the alleged conduct."); *Meijer, Inc. v. Abbott Laboratories*, 2008 WL 4065839, at *10 (N.D. Cal. 2008) ("Plaintiffs have proffered methods for calculating aggregate damages for overcharges paid by class members, based on average market prices.");*In re Static Random Access (SRAM) Antitrust Litig.*, C0701819CW, 2008 WL 4447592, at *6 (N.D. Cal. Sept. 29, 2008) (certifying class where plaintiffs' expert "methods for calculating aggregate damages for overcharges paid by class members, based on average market prices"); *In re Nifedipine Antitrust Litig.*, 246 F.R.D. 365, 369 (D.D.C. 2007) ("defendants' conduct had the effect of artificially maintaining the *average* price of generic and branded [drug]") (emphasis in original);*Ovcon*, 246 F.R.D. at 309 (class-wide impact could be demonstrated because "average Ovcon 35 Product prices went down for all classes of trade in the proposed Class (including the [Big Three]) once generic Ovcon 35 became available."); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 350 (E.D. Mich. 2001) (rejecting defendants' argument that plaintiffs' expert improperly used averages).

[51] Defs' Br. at 16.

[52] *New Motor Vehicles*, 522 F.3d at 29.

[53] *Id.* at 28-29.

[54] Because antitrust impact is defined as widespread harm to the class, Defendants' internal planning documents are

*Cont'd*

Finally, Dr. Johnson argues that Dr. Hartman miscalculated some net Nexium prices.  But as Dr. Hartman explains, AstraZeneca only recently gave Dr. Hartman a "data dictionary" (a dictionary that AstraZeneca had previously given to Dr. Johnson -- *but not to Plaintiffs* -- that explains how to adjust net Nexium prices).  And he explains that when the revised calculations are made, they *do not alter* the fundamental point that branded Nexium prices are *higher* than the prices at which generic Nexium would have been sold had it not been unlawfully blocked.[55]

### 3.   Damages Can Be Proven on a Predominantly Common Basis

Dr. Hartman calculates overcharges on an aggregate, class-wide basis.   Defendants wrongly suggest that such an aggregate method is no longer allowed after *Comcast*, and that Plaintiffs must have a common method of proving *individual* damage amounts.  Not so. The First Circuit, in approving Dr. Hartman's class-wide aggregate damages model in another case, recognized that "the use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself."[56]

In numerous generic suppression cases like this one, courts have analyzed and approved the methodology of calculating class-wide damages on an aggregate basis.[57]

---

highly relevant to showing that they expected generic esomeprazole prices to be lower than branded Nexium prices market-wide. Courts have repeatedly relied on such forecasts as a means of demonstrating class-wide impact. *See* Pls' Br. at 18 n.61 (citing cases).

[55] Hartman Rebuttal at ¶ 40.

[56] *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 197 (1st Cir. 2009). *See also New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, 248 F.R.D. 363, 371 (D. Mass. 2008) (approving Dr. Hartman's aggregate damages model "[a]fter a rigorous review of the expert analysis for purposes of class certification"); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 256 (D.N.H. 2007) (relying on aggregate damages model at settlement).

[57] *In re Prograf Antitrust Litig.*, MDL 2242, 2013 WL 2395083, at *3 (D. Mass. Apr. 23, 2013) ("together with prior decisions granting class certification where direct purchasers alleged that they paid overcharges because generic drug market entry was delayed, provide the basis for the Court to find that it will be feasible to calculate aggregate damages"); *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 233 (E.D. Pa. 2012) ("Assuming the jury renders an aggregate judgment, allocation will become an intra-class matter accomplished pursuant to a court-approved plan of allocation, and such individual damages allocation issues are insufficient to defeat class certification."); *In re Wellbutrin XL Antitrust Litig.*, 2011 WL 3563385, at *14-15 (approving aggregate damage assessment in analogous case); *In re Neurontin Antitrust Litig.*, 2011 U.S. Dist. LEXIS 7453, at *43  (same). *Teva Pharms. USA, Inc. v.*

*Cont'd*

Numerous courts have held that once the jury renders a verdict on the aggregate damages suffered by the class, the allocation of the class-wide award is of no concern to defendants, and may be accomplished by various means, including by a special master.[58]

Defendants claim *Comcast* overturns decades of black letter law[59] that the need for any

---

[58] *See, e.g., Klay v. Humana, Inc.*, 382 F.3d 1241, 1273 (11th Cir. 2004) (listing management tools for dealing with individual issues at damages phase, including appointing a special master); *In re Titanium Dioxide Antitrust Litig.,* 2013 WL 1855980 at *17 (D. Md. May 1, 2013) ("if the Defendants are found liable, then it may be appropriate for this Court to appoint a special master or Magistrate Judge of this Court, who could oversee the apportionment of individual damages);  *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 233 (E.D. Pa. 2012) ("GSK's other challenges to Rausser's methodology are concerns that relate primarily to the allocation of damages among individual class members, not to the computation of aggregate damages on a class-wide basis. Assuming the jury renders an aggregate judgment, allocation will become an intra-class matter accomplished pursuant to a court-approved plan of allocation, and such individual damages allocation issues are insufficient to defeat class certification.") (quotation and citation omitted); *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 699 (S.D. Fla. 2004) ("Further, Defendants' challenges to Dr. Hartman's methodologies are concerns that relate primarily to the allocation of damages among individual class members, not to the computation of aggregate damages on a class-wide basis. Assuming the jury renders an aggregate judgment, allocation will become an intra-class matter accomplished pursuant to a court-approved plan of allocation, and such individual damages allocation issues are insufficient to defeat class certification."); *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 30 (D.D.C. 2001) (damages can be calculated in the aggregate for the class as a whole, with allocation to individual class members done after trial); *Allapattah Services, Inc. v. Exxon Corp.,* 61 F. Supp. 2d 1335, 1343 n.16 (S.D. Fla. 1999) ("'once the defendant's total damages liability has been determined, then the allocation of that aggregate sum among class members is an internal class action accounting question that does not directly concern the defendant.'") (citation omitted); *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 698 (D. Minn. 1995) (discussing various methods to resolve individual damage issues while permitting the case to proceed as a class action, including appointing special masters and "using the defendants' transactional records to compute individual damages"); *In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 353 (E.D. Pa. 1976) ("Upon the establishment of such aggregate damages as may be assessed against defendants, the problem of allocations among classes and distribution within each class largely becomes a plaintiffs' problem, which should not militate against the certification of these classes.").  Or, a jury may be asked to decide on a damages formula, with its application being reserved for later, ministerial proceedings. *See, e.g., In re Plywood Antitrust Litig.*, 655 F.2d 627, 632, 635-36 (5th Cir. 1981); *In re Corrugated Container Antitrust Litig.*, No. M.D.L. 310, 1980 WL 1967 at *1-2 (S.D. Tex. 1980).

[59] *See, e.g. Smilow v. Southwestern Bell Mobile Sys.*, 323 F.3d 32, 40 (1st Cir. 2003) ("Where, as here, common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain.) (citation omitted); *see also Tardiff v. Knox County*, 365 F.3d 1, 6 (1st Cir. 2004) ("the need for individualized damage decisions does not ordinarily defeat predominance where there are still disputed common issues as to liability."); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 70 (D. Mass. Sept. 28, 2005) (certifying for settlement a class of end payor plaintiffs because "[i]ndividual issues primarily involve the amount of damages to be awarded to individual class members, a factor disfavored in determining predominance.");

*Cont'd*

---

individualized evidence to calculate damages will defeat predominance.  That is not what

*Comcast* held: as the dissent in *Comcast* explained, the case reached the Court upon plaintiffs'

stipulation that they were required to show that damages were measurable on a class-wide

basis.[60] In addition to the nine cases Plaintiffs previously cited, *see* Pls' Br. at 19 n.65, even more

courts have recognized that *Comcast* did not overturn existing law on damages and

predominance.[61]  Further, Defendants' attempt to attribute an unspoken substantive holding to

the Supreme Court's remand of *Sears, Roebuck and Co v. Butler* and *Whirlpool Corp. v.*

*Glazer*,[62] is futile: remand "does not necessarily imply that the Supreme Court has in mind a

different result in the case, nor does it suggest that [the appellate court's] prior decision was

---

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 247 F.R.D. 253, 269-70 (D. Mass. Aug. 29, 2008) ("'Even where there are some individualized damages issues,' common issues may predominate 'when liability can be determined on a class-wide basis.'") (quoting *In re Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d 124, 139 (2nd Cir. 2001)); *New Eng. Carpenters Health Bens. Fund v. First Databank, Inc.*, 244 F.R.D. 79, 85 (D. Mass. Aug. 27, 2007) (certifying a consumer class despite "differences in how different plans calculate co-pays"); *In re Lupron(R) Mktg. & Sales Practices Litig.*, 228 F.R.D. 75, 92 (D. Mass. May 12, 2005) (certifying a settlement class of plaintiffs whose individual issues "primarily involve the amount of damages to be awarded to individual class members, a factor disfavored in determining predominance."); *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 272 (D. Mass. Sept. 14, 2005) ("First Circuit precedent supporting a finding of predominance under 23(b)(3) even if individual issues may take center stage when it comes to damages.") (citation omitted).

[60] *See Comcast*, 133 S. Ct. at 1437 (Ginsburg and Breyer, JJ., dissenting) ("The oddity of this case [is that] the need to prove damages on a class[-]wide basis through a common methodology was never challenged by [plaintiffs]. . . . The Court's ruling is good for this day and case only. In the mine run of cases, it remains the 'black letter rule' that a class may obtain certification under Rule 23(b)(3) when liability questions common to the class predominate over damages questions unique to class members.") (citation omitted); *id.* at 1430 (noting plaintiffs did not contest that they had to show fact of damage and the amount of damages were capable of proof on a class-wide basis).

[61] *See, e.g.*, *Healy v. Int'l Bhd. of Elec. Workers, Local Union No. 134*, 2013 WL 4494685, at *7 (N.D. Ill. Aug. 22, 2013) (rejecting defendants argument that "the test for predominance dramatically changed" with *Comcast* and holding that it "does not come close to saying, as defendants suggest, that a class cannot be certified whenever there are variations among class members' damages."); *Gaudin v. Saxon Mortgage Servs., Inc.*, 2013 WL 4029043, at *9 (N.D. Cal. Aug. 5, 2013) (*Comcast* did not change that "[c]ourts in every circuit have ... uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations."); *Rosario v. Valentine Ave. Disc. Store, Co.*, 2013 U.S. Dist. LEXIS 77183, at *33-34 (E.D.N.Y. May 31, 2013) (certifying a class of employees and explaining predominance was satisfied: "While each class member will have different damages depending on the length of time they were employed, the wages they received, and the hours they worked, such questions do not defeat predominance. ... The district court can utilize a number of tools to manage the individualized damages issues in the class. Class wide issues predominate here and if necessary, the Court may use various tools to manage the individualized damages issues in the class."); *Munoz v. PHH Corp.*, 2013 WL 2146925, at *24 (E.D. Cal. May 15, 2013) ("the *Comcast* ruling does not break any new grounds under the Rule 23 analysis.") (citations and quotations omitted).

[62] *Comcast*, 133 S. Ct. 1722 (2013) (remanding both cases).

17

erroneous."[63]   Moreover, Defendants conspicuously fail to mention that in both cases, the

appellate courts on remand reinstated class certification and expressly limited the application of

*Comcast*. *See Butler v. Sears, Roebuck & Co.*, 11-8029, 2013 WL 4478200, at *3 (7th Cir. Aug.

22, 2013) (distinguishing *Comcast*); *In re Whirlpool Corp. Front-Loading Washer Products

Liab. Litig.*, 722 F.3d 838, 860 (6th Cir. 2013) (same).

> Judge Posner in fact rejected the very argument Defendants are pressing:
>
> > It would drive a stake through the heart of the class action device, in cases in
> > which damages were sought … to require that every member of the class have
> > identical damages. If the issues of liability are genuinely common issues, and the
> > damages of individual class members can be readily determined in individual
> > hearings, in settlement negotiations, or by creation of subclasses, the fact that
> > damages are not identical across all class members should not preclude class
> > certification.[64]

The predominance requirement is satisfied here.[65]

## C.      A CLASS ACTION IS THE SUPERIOR MEANS TO TRY THIS CASE

Defendants implausibly suggest that separate trials, or a permissive joinder action

managed by yet-to-be-determined procedures, or a class with the three national wholesalers

removed, would be superior to a class action, which is the normal procedure for delayed generic

entry cases like this.  Each of the opinions certifying antitrust classes brought by direct

purchasers of brand name drugs in response to drug manufacturers' efforts to illegally block or

delay the entry of less expensive generic substitutes held that superiority was met and each

certified a class including the three national wholesalers.[66]

---

[63] *In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*, 722 F.3d 838, 845 (6th Cir. 2013) (citations omitted).

[64] *Butler v. Sears, Roebuck & Co.*, 11-8029, 2013 WL 4478200, at *5 (7th Cir. Aug. 22, 2013).

[65] *See, e.g.*, *TriCor*, 252 F.R.D. at 228 (finding predominance because "each putative class member, had they pursued their claims individually, would have been required to prove identical facts, such as defendants' monopoly power, exclusionary scheme, effect on interstate commerce, conspiracy, and unreasonable restraint of trade.").

[66] *See, e.g., In re Wellbutrin XL Antitrust Litig.*, 2011 WL 3563385, at *16 ("The Court finds that the superiority
*Cont'd*

### D.    ASC AND MEIJER ARE MEMBERS OF THE CLASS

Defendants argue that American Sales Company ("ASC") and Meijer may not serve as class representatives because they did not buy Nexium directly from AstraZeneca and therefore are not members of the class,[67] based apparently on a misleading interpretation of a chart from Dr. Hartman's declaration.[68] ASC and Meijer indisputably possess valid assignments from direct purchasers and therefore, by operation of law, may proceed as direct purchasers in this case,[69]

---

requirement is met here. As discussed above, this action involves numerous complex issues of law and fact that are common to the class. Individual treatment of each class members' claims would require duplicative, expensive litigation, which would come at enormous expense to the parties and judicial economy. Class resolution would also avoid problems of inconsistent resolution. This result is consistent with other courts that have addressed similar cases.") (citations omitted); *In re Neurontin Antitrust Litig.*, 2011 U.S. Dist. LEXIS 7453, at *45-46 (finding superiority met); *Am. Sales Co., Inc. v. SmithKline Beecham Corp.*, 274 F.R.D. 127, 137 (E.D. Pa. 2010) ("I agree with the vast majority of district courts that in a delayed generic entry antitrust case such as this, a class action is superior to other methods of adjudication."*); In re Wellbutrin SR Direct Purchaser Antitrust Litig.*, 2008 WL 1946848, at *9-10; *Teva Pharms. USA, Inc. v. Abbott Labs.*, 252 F.R.D. 213, 226-27, 231 (D. Del. 2008) (finding superiority and certifying a class including the three national wholesalers); *Louisiana Wholesale Drug Co., Inc. v. Sanofi-Aventis*, No. 07-7343, 2008 U.S. Dist. LEXIS 123291, at *11 (S.D.N.Y. Apr. 8, 2008) ("Also pursuant to *Rule 23(b)(3)*, the Court determines that a class action is superior to other available methods for the fair and efficient adjudication of this action. The Court believes it is desirable, for purposes of judicial and litigant efficiency, to concentrate the claims of the Direct Purchaser Class in a single action. The Court also believes that there are few manageability problems presented by a case such as this.") (citation omitted); *In re Nifedipine Antitrust Litig.*, 246 F.R.D. 365, 371-72 (D.D.C. 2007) ("Here, plaintiffs argue that it would be inefficient to force each class member to prove the same nucleus of operative facts in dozens of separate trials. Moreover, plaintiffs argue that some claims may be so small as to make litigation unfeasible. I agree as to both."); *Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 246 F.R.D. 293, 313-14 (D.D.C. 2007) (superiority met); *In re Buspirone Patent & Antitrust Litig.*, 210 F.R.D. 43, 58-59 (S.D.N.Y. 2002) (finding superiority met and certifying a class despite objections related to the inclusion of the three national wholesalers); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 326 (E.D. Mich. 2001) (proceeding as class action will achieve economies for litigants and judiciary). *Cf. Meijer, Inc. v. Abbott Labs.*, 2008 WL 4065839, at *10 (N.D. Cal. Aug. 27, 2008) (certifying class of direct purchasers challenging exclusion of less-expensive competitors from market by illegal bundled pricing of Abbott's combination AIDS drug, and explaining: "The Court also finds that resolution of Plaintiffs' claims through a class action is superior to other available methods -- in particular, to Abbott's preferred method of notifying class members of the litigation and allowing them to intervene if they so desire. In antitrust cases such as this one, the damages of at least some individual class members are likely to be too small to justify litigation. A class action offers those with small claims the opportunity for meaningful redress. The difficulties raised by Abbott are manageable, and do not stand in the way of class certification."); *J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, 225 F.R.D. 208, 220 (S.D. Ohio 2003) (finding superiority met and certifying class of direct purchasers alleging entry of nearly-identical version of conjugated estrogen drug was suppressed using exclusionary contracts with managed care that violated § 1 of the Sherman Act).

[67] Defs' Br. at 20.

[68] Dr. Hartman had listed direct purchasers appearing in AstraZeneca's sales data and was not attempting to offer a legal conclusion as to the status of these purchasers.  *See* Hartman Decl., Attachment D; Hartman Dep. at 70-71 (Sobol Decl., Ex. 4).

[69] *See In re Relafen Antitrust Litig.*, 360 F. Supp. 2d 166, 187 (D. Mass. 2005) (drugstore plaintiffs were pursing pharmaceutical antitrust claims as assignees of "undisputed direct purchasers").

with all rights and responsibilities attendant, including serving as a class representative.[70]   Courts

commonly have certified direct purchaser classes led by assignees in pharmaceutical antitrust

cases,[71] and elsewhere.[72]   ASC and Meijer repeatedly have been found to be adequate class

representatives in pharmaceutical antitrust cases based on assignments,[73] and have never been

found to be inadequate.

Defendants make much of the fact that, in one instance, Dr. Hartman did not list ASC and

Meijer as class representatives.  But the listing was not intended to include assigned interests,

and thus his list was accurate.

## III.   CONCLUSION

For these reasons and those stated in the opening memorandum of law, the direct

purchasers respectfully request that the Court certify this action as a class under Fed.R. Civ.P.

23(b)(3).

Dated:  September 16, 2013                          Respectfully submitted,


                                                   /s/ **Thomas M. Sobol**
                                                   Thomas M. Sobol, BBO No. 471770
                                                   David S. Nalven, BBO No. 547220
                                                   Donna Evans, BBO No. 554613
                                                   Kristen Johnson Parker, BBO No. 667261

---

[70] *Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 246 F.R.D. 293, 296 n.3 (D.D.C. 2007), *quoting Fox-Greenwald Sheet Metal Co. v. Markowitz Bros.,* 452 F.2d 1346, 1358 n.69 (D.C. Cir. 1970) ("an assignee stands in the shoes of his assignor, deriving the same but no greater rights and remedies than the assignor then possessed.").

[71] *E.g., In re Prograf Antitrust Litigation,* 2013 U.S. Dist. LEXIS 62043 (D. Mass. April 13, 2013) (certifying class in which two named plaintiffs were assignees); *In re Wellbutrin SR Direct Purchaser Litig*., 2008 WL 1946848, at *4 ("numerous courts have certified litigation classes in which the named plaintiffs were operating under an assignment"); *In re Cardizem CD Antitrust Litig*., 200 F.R.D. 297, 304 (D. Mich. 2001) (pharmaceutical antitrust claims are typical where the plaintiffs are each "a direct purchaser, or assignee of a direct purchaser").

[72] *E.g., In re Urethane Antitrust Litig*., 237 F.R.D. 440, 448 (D. Kan. 2006).

[73] *E.g., American Sales Co., Inc. v. SmithKline Beecham Corp.*, 2010 U.S. Dist. LEXIS 120177 (E.D. Pa. Nov. 10, 2010); *In re Neurontin Antitrust Litig*., 2011 U.S. Dist. LEXIS 7453; *Teva Pharms. USA, Inc. v. Abbott Labs*., 252 F.R.D. 213 (D. Del. 2008); *In re Nifedipine Antitrust Litig*., 246 F.R.D. 365 (D.D.C. 2007); *Meijer, Inc. v. Abbott Labs*., 2008 WL 4065839 (N.D. Cal. 2008).

HAGENS BERMAN SOBOL
 SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Tel: (617) 482-3700
Fax: (617) 482-3003

*Liaison Counsel and Co-lead Counsel for
the Direct Purchaser Class*

David F. Sorensen
Daniel C. Simons
Jennifer MacNaughton
Caitlin G. Coslett
BERGER &MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

Bruce E. Gerstein
Joseph Opper
Elena Chan
Ephraim R. Gerstein
GARWIN GERSTEIN & FISHER LLP
1501 Broadway, Suite 1416
New York, NY 10036
Tel: (212) 398-0055
Fax: (212) 764-6620

*Co-lead Counsel for the Direct Purchaser
Class*

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas M. Sobol, hereby certify that on September 16, 2013, I caused a copy of the foregoing to be electronically filed via the Court's electronic filing system.  Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's electronic filing system.

<u>/s/ Thomas M. Sobol</u>
Thomas M. Sobol