# **<u>EXHIBIT 1</u>**

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ | ) | |
| In re: NEXIUM (ESOMEPRAZOLE) | ) | MDL No. 2409 |
| ANTITRUST LITIGATION | ) | |
| | ) | Civil Action No. 1:12-md-2409-WGY |
| This Document Relates to: | ) | |
| | ) | |
| All End-Payor Actions | ) | |
| _____ | ) | |

## EXPERT REPORT OF JAMES W. HUGHES
## IN SUPPORT OF DEFENDANTS' OPPOSITION TO
## <u>END PAYOR PLAINTIFFS' MOTION FOR CLASS CERTIFICIATION</u>

*Confidential – Subject to Protective Order*

**Contents**

I.    **Assignment** .......................................................................................... 2

II.   **Background and Experience** ................................................................ 2

III.  **Allegations in this Case** ...................................................................... 3

IV.  **Summary of Conclusions** .................................................................... 4

V.    **The Prescription Drug Market** .......................................................... 9

   A.   **Nexium and Related Pharmaceuticals** ........................................ 9

   B.   **General Description of Drug and Payment Flows** ..................... 11

   C.   **Implication of Drug and Payment Flows for Class Certification** ................. 14

VI.  **Impact of Allegations on Proposed Class Members Cannot be Demonstrated through Common Evidence** ........................................ 15

   A.   **Reliance on Averages under Dr. Rosenthal's Common Method** ................. 15

   B.   **Plan Sponsors and Insurers** ...................................................... 19

     1.   **Rebates** .............................................................................. 20

     2.   **Additional Examples of Uninjured Plan Sponsors and Insurers** ............... 24

     3.   **Cost Pass-Throughs** .......................................................... 27

   C.   **Consumers** ................................................................................ 29

     1.   **Uninjured Consumers** ...................................................... 30

     2.   **Consumers Receiving Alternative Treatments in the But-for World** ....... 36

VII. **Conflicts of Interest among Proposed Class Members and Representativeness of Named Plaintiffs** ............................................ 38

VIII. **Concluding Remarks** ........................................................................ 40

*Confidential – Subject to Protective Order*

## I.      Assignment

1.      I am the Thomas Sowell Professor of Economics at Bates College.  I have been asked by Counsel

for Defendants[1] to examine if the fact of injury (whether all members of the proposed class were injured

by the alleged conduct of the Defendants) and the nature and extent of alleged damages in this matter may

be adequately and accurately addressed through proof of common issues on a class-wide basis or whether

individualized inquiry is necessary to accurately determine whether and to what extent proposed class

members were injured.

2.      I have also been asked by Defendants to review and evaluate the declaration of Dr. Meredith

Rosenthal as it relates to class certification issues and to comment on her analysis.

3.      I reserve the right to supplement my opinions if asked to provide additional research or analysis,

or in response to additional materials that become available.


## II.     Background and Experience

4.      I specialize in the fields of Industrial Organization, Law and Economics, Health Economics,

Environmental Economics, and Labor Economics.  I earned my M.A. in Economics from Boston

University in 1978, and my Ph.D. in Economics from the University of Michigan in 1987.  I joined the

faculty of Amherst College in 1987 and the faculty of Bates College in 1992.  In 2005, I was named the

Thomas Sowell Professor of Economics.

5.      I have experience in the economic analysis of class certification issues in the pharmaceutical

industry.  I have testified and/or offered reports in matters involving the prescription pharmaceuticals

Cardizem CD, Cipro, Neurontin, Provigil, Rezulin, Risperdal, Skelaxin, and Procardia XL.[2]  I also have

---

[1] AstraZeneca AB, Aktiebolaget Hassle, and AstraZeneca LP (collectively "AstraZeneca"), Ranbaxy
Pharmaceuticals Inc., Ranbaxy Laboratories Ltd., and Ranbaxy, Inc. (collectively "Ranbaxy"), Teva Pharmaceutical
Industries Ltd. and Teva USA Inc. (collectively "Teva"), and Dr. Reddy's Laboratories Ltd. and Dr. Reddy's
Laboratories Inc. (collectively "Dr. Reddy's")

[2] In Re Cardizem CD Antitrust Litigation, Blue Cross Blue Shield of Michigan, et al v. Hoechst AG,  et al., U.S.
District Court, E.D. Mich., Case No. 01-72806; Altman v. Bayer Corp., (N.Y. Sup. Ct., Index No. 603820-00);
Cipro Cases I & II, JCCP Proceeding Nos.:  4154 & 4220, (Sup. Ct. Ca., San Diego County); In Re Neurontin
Antitrust Litigation, *Louisiana Wholesale Drug Company et al., v. Pfizer Inc., et al.* MDL Docket No. 1479, Master
Docket No. 02-CV-1390; King Drug Company of Florence Inc. et al., v. Cephalon Inc. et al.  U.S. District Court,

2

experience in the analysis of injury and damages issues in average wholesale price ("AWP") litigation.  I submitted reports in AWP actions in the states of Alabama, Alaska, Connecticut, Montana, and Nevada, and similar relator actions in Florida.[3]  I have also testified in a class certification matter involving the pharmacy benefit manager Medco Health Systems.[4]

6.      My curriculum vitae is attached as Appendix A, and a list of recent cases in which I have testified is attached as Appendix B.  In the course of my work, I have relied on case documents received from Counsel, academic publications and textbooks, press articles, and administrative employer health claims data from 59 self-insured Fortune 500 companies.  These materials are listed in Appendix C.  I am being compensated at the rate of $600 per hour.  My compensation in this matter is not contingent on the nature of my findings or on the outcome of this litigation, and I have no financial interest in the outcome of this litigation.  I have been assisted in this matter by staff of Analysis Group, Inc., who worked under my direction.

III.    **Allegations in this Case**

7.      I understand that Plaintiffs allege that AstraZeneca entered into illegal agreements not to compete with Dr. Reddy's, Ranbaxy, and Teva with respect to the sale of delayed release esomeprazole magnesium (brand name Nexium) until May 27, 2014.  Plaintiffs further allege that but for those agreements, "generic versions of Nexium would have been available to Plaintiffs and members of the

---

E.D. Penn., No. 2:06-cv-1797;Holoman, et al. v. Pfizer Inc., et al., No. 02 L 480 (Illinois 3rd Judicial Circuit); The State of Texas ex rel. Allen Jones v. Janssen, L.P. et al., Cause No. D-1-GV-04-001288 (250th Judicial District, Travis County, TX); In Re: Skelaxin (Metaxalone) Litigation, MDL Case No. 1:12-md-2343; Great Lakes Health Plan et al. v. Pfizer, et al., No. 1:01CV106 (N. Dist. WV).

[3] State of Alabama v. Abbott Laboratories Inc. et al., C.C. Montgomery County, Ala., Civil Action CV 2005-21; State of Connecticut v. Aventis Pharmaceuticals, Docket X07 CV03-0083299 S (CLD); In Re Pharmaceutical Industry Average Wholesale Price Litigation, in the matters of: State of Nevada v. American Home Prods. Corp., et al., 02-CV-12086-PBS; and State of Montana v. Abbott Labs., Inc., et al., 02-CV-12084-PBS, MDL NO. 1456, Master File No. 01-CV-12257-PBS; U.S. ex rel Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc. U.S. District Court, MA Civil Action No. 00 CV 10698 MEL; In Re Pharmaceutical Industry Average Wholesale Price Litigation, In the matter of United States of America ex rel. Ven-a-Care of the Florida Keys, Inc., v. Abbott Laboratories, Inc., CIVIL ACTION NO. 06-11337-PBS.

[4] Brady Enterprises, et al. v. Medco Health Solutions, et al., U.S. District Court, E.D. Penn., Civ. No. 03-4730.

3

*Confidential – Subject to Protective Order*

Class in the United States as early as April 14, 2008"[5] and that "Plaintiffs and the members of the Class would have already been able to purchase, and would have purchased, generic delayed-release esomeprazole magnesium at significantly lower prices" starting in April 2008.[6]

8.     The Plaintiffs' proposed class for indirect purchasers of Nexium is defined as:

> "All persons or entities in the United States and its territories who purchased and/or paid for some or all of the purchase price for Nexium and/or its AB-rated generic equivalents in Arizona, California, Florida, Illinois, Iowa, Kansas, Massachusetts, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, and the District of Columbia and Puerto Rico, in capsule form, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, during the period April 4, 2008 through and until the anticompetitive effects of Defendants' unlawful conduct cease. For purposes of the Class definition, persons or entities "purchased" Nexium or its generic equivalent if they paid or reimbursed some or all of the purchase price."[7]

9.     Plaintiffs also propose to exclude, among others, the following persons or entities:[8]

> a.     "Fully insured health plans (*i.e.*, plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members;"
>
> b.     " 'Flat co-pay' 'Cadillac plan' consumers who made purchases only via fixed dollar co-payments that do not vary between Nexium and its AB-rated generic equivalent;"[9]

## IV.   Summary of Conclusions

10.     I find that the fundamental issues of injury and damages to members of the proposed class cannot be evaluated on a class-wide basis, and that a substantial number of the proposed members of the class have not suffered any economic injury from the alleged delayed entry of generic Nexium until May 28, 2014, even assuming the truth of Plaintiffs' allegations.

---

[5] Corrected Consolidated Amended Class Action Complaint and Demand for Jury Trial, MDL No. 2409, Civil Action No.: 1:12-md-2409-WGY, February 1, 2013, para. 6.
[6] Id., para. 10.
[7] Memorandum of Law in Support of End-Payor Plaintiffs' Motion for Class Certification, MDL No. 2409, Civil Action No.: 1:12-md-2409-WGY, July 26, 2013, fn. 18.
[8] Other exclusions include: "Defendants and their officers, directors, management, employees, subsidiaries, or affiliates;" "All persons or entities who purchased Nexium or its AB-rated generic equivalent only directly from Defendants;" "All persons or entities who purchased Nexium or its AB-rated generic equivalent only for resale purposes;" "All government entities, except for government-funded employee benefit plans;" "Consumers who purchased or received Nexium or its AB-rated generic equivalent only through a Medicaid program; and" "The judges in this case and any members of their immediate families." Id., p. 4.
[9] Id., p. 4.

*Confidential – Subject to Protective Order*

11.     A summary of the  basis for my conclusions is as follows:

a.  Dr. Rosenthal's aggregate approach to determine injury and to estimate alleged overcharges relies on broad averages that fail to reflect the prices members of the proposed class paid for Nexium and fail to account for the variability of those prices.  As a result, Dr. Rosenthal's methodology calculates damages for proposed class members that are not injured by any alleged delay in the availability of a generic version of Nexium.

b.  Variability in Nexium prices plays a critical role in determining whether proposed class members are injured by the alleged delay in generic entry in this case.  Importantly, AstraZeneca paid $12.9 billion in rebates to non-government purchasers of Nexium (amounting to over 50 percent of rebate-eligible sales) between the second quarter of 2008 and the end of 2012.[10]  The amount of rebates paid to any particular proposed class member is not tied to any uniform list price, such as AWP, and rebates vary substantially across proposed class members.[11]  This variation in the amount of rebates received by class members breaks any possible link between the net price actually paid and any list price, and invalidates Dr. Rosenthal's use of average prices in her injury and overcharge calculations.[12]  Her claim that the use of averages is valid because "prices move in concert" due to their connection to "list prices" is clearly incorrect.  The variability in pricing is confirmed by my analysis of actual payment data for Nexium (which Dr. Rosenthal did not study), which show the net prices paid by consumers and third party payors ("TPPs") vary substantially from the averages Dr. Rosenthal relies on in her damages calculations.

c.  Based on the heterogeneous nature of the contractual relationships that govern the actual net payments for Nexium prescriptions and the wide range of prices associated with different contracts, many of the proposed class members were uninjured by the alleged delay in availability of a generic version of Nexium.  By relying on broad averages, Dr. Rosenthal's calculation fails to

---

[10] See Exhibit 2 and "Nexium_Indirect_Attachment_C.xlsx" produced by Dr. Rosenthal.
[11] For example, the ratio of Nexium rebates to sales for individual entities listed as PBMs in AstraZeneca's rebate data varies from a high of 58.7 percent to a low of 8.2 percent of sales.
[12] Deposition of Meredith Rosenthal, August 19, 2013, p. 175.

5

*Confidential – Subject to Protective Order*

identify and exclude from the class the wide spectrum of uninjured class members.  As Dr. Rosenthal states in her deposition, applying her calculation to determine injury and damages would over- or under-compensate many proposed class members.[13]  It would also result in damages being paid to numerous parties who in fact suffered no injury.  Several categories of uninjured consumers are part of the proposed class including, for example: (i) individuals who would have only purchased branded Nexium (if they purchased any version of Nexium at all) during the class period even if a generic version had been available; (ii) individuals who are not part of a "flat copay" plan, but who would not have seen their copayments decrease even if they switched to a generic version of Nexium after it became available, because their plan provides either for higher copayments for brand drugs only where an AB-rated generic equivalent is available or would have placed the generic versions of Nexium on a non-preferred tier similar to that for the brand drug; and (iii) consumers whose contributions to Nexium purchases were offset by vouchers paid by AstraZeneca that Dr. Rosenthal's analysis assumes would not be available from generic manufacturers.  As I detail further below, I also analyzed detailed claims data on consumer and plan sponsor prescription drug payments and find evidence that many consumers are likely uninjured by any alleged delay in entry of a generic version of Nexium.  Neither the uninjured members of the proposed class nor their Nexium transactions can be identified and excluded using a common method.  The issue of identification is critically important and may not simply be ignored until allocation in this matter, because a common method by definition cannot require individualized inquiries to identify the class members who are uninjured.

d.  Dr. Rosenthal's determination of injury and alleged overcharges for TPPs is also fatally flawed because, as noted previously, she improperly excludes from her calculations billions of dollars in rebates paid by AstraZeneca.

---

[13] Deposition of Meredith Rosenthal, August 19, 2013, p. 206.

*Confidential – Subject to Protective Order*

- Dr. Rosenthal acknowledges that AstraZeneca paid $12.9 billion in rebates during the period from the beginning of the class period through the end of 2012.[14]  Further, additional rebates have been and will be paid during the last five quarters of the class period through the first quarter of 2014 that would likely bring the total to $16.3 billion.[15]

- Dr. Rosenthal acknowledges that rebates must be treated as an offset to her point-of-service overcharge damage calculations, because such rebates have been paid in the actual world, and will not be paid on any transactions that switch to generic Nexium in the so-called but-for world.[16]  Yet, in her analysis, Dr. Rosenthal did not deduct the full $16.3 billion, and instead reduced her TPP "overcharge" calculations by only the $10.4 billion in rebates that she estimated were paid directly to "end payors" or passed through to such "end payors" by pharmacy benefit managers ("PBMs") through the first quarter of 2014.  In arriving at $10.4 billion in rebates, Dr. Rosenthal excluded $5.9 billion in rebates she asserts are not passed through by PBMs to plan sponsors and insurers.[17]

- This exclusion was made without any analysis of actual Nexium rebate pass-throughs or the individual contracts governing the rebate pass-through and pricing, and moreover, is internally inconsistent with the rest of Dr. Rosenthal's calculations in its treatment of PBMs.  PBMs are part of the proposed class (as they paid or reimbursed part of the purchase price for Nexium) and do not qualify for any exclusion that is part of the proposed class definition.  Rebates paid to PBMs therefore must be treated like rebates paid to any other proposed class member.  Further, Dr. Rosenthal used IMS price data as the starting point for all of her calculations, and IMS price data reflects the price that the

---

[14] Deposition of Meredith Rosenthal, August 19, 2013, p. 149.

[15] To calculate the $16.3 billion figure, rebates were extrapolated through Q1 2014 using the same trend function Dr. Rosenthal applies in her calculation of the rebate offset applied in her declaration. "Nexium_Indirect_Attachment_C.xlsx" produced by Dr. Rosenthal.

[16] Deposition of Meredith Rosenthal, August 19, 2013, pp. 144-146.

[17] Specifically, Dr. Rosenthal excludes rebates that she asserts are not passed through to "end payors" by PBMs because the contract between these parties specifies less than 100 percent rebate pass-through, or because the contract guarantees the "end payor" a fixed rebate per prescription and the actual level of AstraZeneca rebates exceeds that fixed rebate guarantee. (See "Nexium_Indirect_Attachment_C.xlsx" produced by Dr. Rosenthal.)

*Confidential – Subject to Protective Order*

PBM and/or the consumer pay to the pharmacy at the point of service.  What Dr. Rosenthal has done is combine the PBM and TPP for a particular transaction into one entity in her calculation of overcharges, yet she then ignores one of those two entities when accounting for rebates.  Internal consistency dictates that any rebates received by PBMs (or any other proposed class members) also be deducted to accurately compute any net overcharges.

- Dr. Rosenthal concedes that if the full $12.9 billion in actual Nexium rebates paid by AstraZeneca through 2012 (or $16.3 billion for the entire class period) were included in her damages calculations, it would offset all of the alleged overcharges that she computed for the TPPs, and her calculation would arrive at TPP aggregate damages of <u>zero.</u>[18]

e.  Named Plaintiffs are not representative of the vast majority of the proposed class.  Each and every Named Plaintiff in this matter is a union plan sponsor.  There are no commercial insurers, PBMs, or non-union plan sponsors among the Named Plaintiffs, even though all of these other constituencies are part of the proposed class.  Furthermore, despite the fact that millions of consumers nationwide paid all or part of the purchase price for their Nexium prescriptions during the class period, not one (insured or uninsured) is a Named Plaintiff.[19]  Such a narrow set of Named Plaintiffs is not representative of the proposed class as a whole, and there exists a substantial risk that the interests of the Named Plaintiff union health plans will conflict with the interests of the other proposed class members in terms of the allocation of any damages.

---

[18] Deposition of Meredith Rosenthal, August 19, 2013, pp. 155-156.

[19] Dr. Rosenthal estimates that there are over 135 million Nexium prescriptions that have been and will be filled during the class period, with as many as 6.7 million prescriptions in some quarters.  See Rosenthal Attachment C.3.a.

*Confidential – Subject to Protective Order*

## V.        The Prescription Drug Market

### A.        Nexium and Related Pharmaceuticals

12.        Nexium is one of many therapeutic alternatives that can be used to treat issues related to gastrointestinal disorders such as gastroesophageal reflux disease ("GERD").[20]   Therapeutic alternatives to Nexium include other branded drugs, generic versions of those drugs, and over-the-counter ("OTC") versions available without a prescription.   Nexium belongs to a specific class of drugs referred to as Proton Pump Inhibitors ("PPIs").   A wide array of PPIs is available to consumers including: branded products Prilosec, Prevacid, AcipHex, Protonix, Nexium, and Dexilant; generic products omeprazole (generic version of Prilosec), lansoprazole (generic version of Prevacid), and pantoprazole (generic version of Protonix); branded OTC versions of Prilosec and Prevacid; and generic OTC versions of omeprazole and lansoprazole.

13.        In addition to PPIs, gastrointestinal disorders are also treated by other classes of medications, such as $H_2$ receptor antagonists, which also reduce the production of acid, though by a different mechanism than PPIs.   There is a wide array of $H_2$ receptor antagonists available to consumers in prescription and OTC, and branded and generic versions.   $H_2$ receptor antagonists include frequently-used therapies such as Tagamet (cimetidine), Zantac (ranitidine), Pepcid (famotidine), and Axid (nizatidine). Finally, some consumers treat their gastrointestinal disorders by relying on OTC antacids, prescription prokinetics, and, in more extreme cases, surgical procedures such as fundoplication.

14.        The wide array of available therapeutic alternatives to Nexium, both in terms of prescription and OTC products, creates important considerations for class certification.   Patients and their physicians may consider the wide range of treatment options when choosing to use branded Nexium (or a generic version) at any point in a patient's treatment.   Factors including the formulary placement of Nexium and alternative therapies, such as a generic version, play an important role in the patient and physician's decision process.   Advertising by manufacturers of the alternative brand drugs can also impact the patient-

---

[20] Nexium Medication Guide, pp. 24-25.   Available at http://www.purplepill.com/pdf/NexiumMedicationGuide.pdf, accessed August 8, 2013.

*Confidential – Subject to Protective Order*

doctor decision process.  Furthermore, entry of a generic version of Nexium in the "but-for world" may have spurred entry of additional alternative therapies, such as an OTC version of branded Nexium.  As a result, patients who took branded Nexium during the class period would have had considerable options available to them had a generic version of Nexium been available and may well have chosen an alternative therapy other than branded or generic Nexium.  Patients' choice of therapy in this but-for world cannot be known for all class members using common proof, and factors that may have influenced each patient's choice requires individualized inquiry to ascertain.  Dr. Rosenthal inaccurately estimates damages by falsely assuming that no Nexium patients would have switched to an alternative therapy in the but-for world, *i.e.*, that all Nexium patients would have either remained on branded Nexium or switched to generic Nexium given earlier generic entry.

15.     Substantial evidence exists that plans encourage patients to consider multiple alternative therapies in the PPI category and that patients switch between PPIs.  AstraZeneca documents indicate substantial switching among the various brand and generic PPIs.[21]  As an example of a plan encouraging switching, Named Plaintiff United Food and Commercial Workers Union and Employers Midwest Health Benefits Fund ("UFCW") sent letters to members encouraging them to switch from Nexium to alternative PPIs, such as Prilosec OTC, which is covered on tiers with lower copayments.[22]  I also examined a dataset of patient prescription claims for plans associated with 59 self-insured employers in the US accounting for approximately 10 million individuals and found that 36 percent of those patients taking brand Nexium during the class period also received a prescription for an alternative PPI during the class period. On average, Nexium patients who received a prescription for an alternative PPI tried 1.3 PPIs other than Nexium.[23]

---

[21] See, for example, NEX-RBX 3525485-NEX-RBX 3525491.
[22] Deposition of Daniel Ryan, July 29, 2013, pp. 106-119.
[23] The data include the administrative claims for approximately 10 million privately-insured individuals covered by 59 self-insured Fortune 500 companies with locations in all areas of the United States for services provided during the class period (ending in 2012).

*Confidential – Subject to Protective Order*

B.     General Description of Drug and Payment Flows

16.     Manufacturers of branded drugs typically sell their pharmaceutical products to wholesalers who then resell the drug to both retail and mail-order pharmacies; these pharmacies, in turn, sell the drug to patients.  For patients who pay the full amount of the cost of the prescription (*i.e.*, "cash payors" or patients without pharmaceutical insurance coverage), the flow of payments is relatively straightforward: the patient pays the pharmacy for the drug, the pharmacy pays the wholesaler (or manufacturer if purchased directly), and the wholesaler pays the manufacturer.

17.     The vast majority of patients have pharmacy benefits as part of their health insurance plan.[24]  The payment flows for these patients are generally extremely complex and involve multiple entities that contribute to the reimbursement for the drug.  Payment to a pharmacy for a prescription may involve the patient (through copayments/coinsurance, deductibles, and other payments), the patient's health plan (*e.g.*, the employer or union plan sponsor), any commercial insurers associated with the plan, and the PBM contracted by the plan or insurer to administer the prescription drug benefit.  All of these entities are members of the proposed class according to the Plaintiffs' class definition.  On any particular Nexium transaction, as few as one or as many as all four of these entities will pay or reimburse "some or all" of the cost of a Nexium prescription.

18.     In administering the prescription drug benefit, one frequent role of the PBM is to establish drug formularies, which influence patient and physician drug choice.  For example, tiered formularies[25] encourage beneficiaries to use lower-cost prescription drugs.[26]  In a tiered formulary, each tier corresponds to a copayment and/or coinsurance rate that applies to all drugs on that tier.  Any given drug

---

[24] Just over 80 percent of the nonelderly population in the United States had health insurance in 2011, and nearly all consumers with health insurance also had prescription drug coverage.  (Kaiser Family Foundation, "The Uninsured: A Primer," October 2012, p. 1; Kaiser Family Foundation, "Prescription Drug Trends," May 2010, p. 5.)

[25] Formularies may be "open," where all FDA approved drugs (at least within certain therapeutic groups) are covered by the plan in some way, whether listed on the formulary or not.  The copayment may be higher for non-formulary drugs.  With a "closed" formulary, drugs not on the plan's formulary are not covered by the plan except in cases of medical necessity.  If a patient purchases a drug not on the plan's closed formulary, he or she generally must pay the full retail cost of that drug.  Halvorson, Audrey and John Watkins, "Prescription Drug Benefits in the United States," Chapter 9 in *Group Insurance*, William F. Bluhm, ed., et al., Fifth Edition, (Winsted, CT, Actex Publications, 2007), pp. 165-166.

[26] Navarro, Robert, Managed Care Pharmacy Practice, Second Edition, (Sudbury, MA, Jones and Bartlett Publishers, 2009), pp. 34-40.

*Confidential – Subject to Protective Order*

can be on different formulary tiers for different plans, and its placement on any given plan may change over time.  The number of tiers, and the copayment and/or coinsurance rate associated with a given tier, varies across plans and over time as well.  In addition to copayments and/or coinsurance, patients may also be responsible for pharmacy deductibles (where the patient pays the full cost of the prescription up to the deductible, and pays nothing or a share of the cost after the deductible is met) and/or may be responsible for an increased share or the full cost of the prescription due to maximum coverage limits (where the consumer pays a substantial portion or all of the cost of the drug once a maximum coverage amount for the year is reached).  In short, not only is there substantial variation across plans, but within the same plan there can be substantial variation across consumers and for the same consumer over time.[27]

19.      PBMs also control the cost of prescription drugs by negotiating rebates with brand-name pharmaceutical manufacturers in exchange for formulary access or favorable placement (*i.e.*, the brand manufacturer pays a higher rebate in return for the drug being placed on a preferred tier with a lower patient copayment), or for achieving other financial goals.[28]  In the case of Nexium, AstraZeneca paid $12.9 billion in rebates to PBMs from the second quarter of 2008 through 2012.  In addition to manufacturer rebates, PBMs also form networks of pharmacies that agree to accept discounted payments.

20.      Exhibit 1A illustrates one potential flow of payments for an individual prescription for a consumer with prescription drug benefits.  Under the scenario reflected in Exhibit 1A, the pharmacy is reimbursed for the prescription an amount determined by the pharmacy's contract with the PBM.  This total reimbursement is shared by the consumer, who pays a specified amount based on his or her contract with the health plan (this amount may reflect copayment, coinsurance, deductibles, and/or other types of contracted payments), and the PBM, who pays the difference between the total reimbursement and the consumer contribution.

---

[27] Formularies may adopt a number of additional controls on drug access, such as prior authorization for selected drugs, which allows for a review of individual prescription claims prior to approval, and therapy step-edits, which requires a patient to try a drug therapy preferred by the formulary before receiving a prescription non-preferred therapy. For example, see MRCC_000112-MRCC_000159.pdf at MRCC_000155.

[28] See Halvorson, Audrey and John Watkins, "Prescription Drug Benefits in the United States," Chapter 9 in *Group Insurance*, William F. Bluhm, ed., et al., Fifth Edition, (Winsted, CT, Actex Publications, 2007), p. 175.

*Confidential – Subject to Protective Order*

21.     Next, the PBM bills the insurer or plan sponsor for the prescription.  Depending on the terms of the contract between the PBM and plan sponsor or insurer, the amount billed may be equal to the total pharmacy reimbursement, plus an administrative fee, or the PBM charge to the plan sponsor or insurer may differ substantially from the pharmacy reimbursement.  For example, the PBM may charge the insurer or plan sponsor a higher amount than the PBM paid the pharmacy, a practice known as "spread pricing."  Alternatively, the contracted price paid by the plan sponsor or insurer to the PBM may specify a "discount guarantee" assuring the plan sponsor or insurer a net price for the drug off of AWP.  The price that the PBM charges the plan sponsor or insurer may be below or above the price the PBM paid to the pharmacy at the point of service.  The PBM also collects rebates from manufacturers, lowering its net cost of the drug.  The price paid by the plan sponsor or insurer to the PBM may be further offset by these rebates negotiated by the PBM and the contractual terms governing the pass-through of rebates from the PBM to the plan sponsor or insurer.

22.     The PBM may pass none, part, or all of these rebates onto plan sponsors and insurers, according to their negotiated contractual terms.  If the contract specifies a "rebate guarantee," the PBM will pay the guarantee amount to plan sponsors and insurers on each prescription, regardless of whether it received a rebate on the particular drug.  Many PBM contracts include price discount and rebate guarantees.  The contractual terms of these guarantees, which impact the flow of payments between parties, vary widely across PBMs, and the same PBM will often have different terms across plan sponsors and insurers.  The consumer provides funds to the plan sponsor through premium payments, and if the plan sponsor offers pharmacy benefits through an insurer, then the plan sponsor provides funds to the insurer through premium payments.  Exhibit 1B provides a more detailed illustration of possible drug and payment flows in the supply of prescription drugs to an insured consumer with prescription drug benefits.

23.     Each payment, rebate, and drug flow shown on Exhibits 1A and 1B represents a host of individually negotiated contracts that vary across parties and over time.  The portion of the price of any prescription purchase paid by each party is determined by the content and the confluence of the terms of these individual contracts.  In the case of Nexium, the share of the price paid (and questions of injury to

13

individual members of the proposed class) hinge on the specific contracts negotiated between the various PBMs and plans/insurers and how they treat the flow of manufacturer rebates.  More importantly, learning the flow of payments for one specific proposed class member for a particular prescription does not inform us about these crucial factors to determining injury for any other proposed class member for any other prescription, which will be guided by its own specific circumstances.

### C.      Implication of Drug and Payment Flows for Class Certification

24.      Based on the payment flows for Nexium prescriptions, four categories of entities are reflected in the Plaintiffs' proposed class definition.  Each of these entities is unique in structure and where they fall in the flow of payments for a Nexium prescription, but they are bound together by the contractual arrangements they enter into with one another.  The specifics of each contract dictate the terms under which each may be affected by the alleged delay in generic entry.  The entities include:

a.  *Plan Sponsors*:  Employers or employee organizations that organize and pay all or part of the health benefits of their members or employees.  Depending on the type of contract, plan sponsors may bear all, some, or none of the cost of pharmaceutical price changes.  Plan sponsors include employer plans and union benefit funds (including Taft-Hartley funds).  All Named Plaintiffs are union plan sponsors.

b.  *Commercial Insurers*:  Private sector entities that market and sell health insurance services to plan sponsors and individuals.  Depending on the contract, insurers may bear all, some, or none of the cost of pharmaceutical price changes during the contract period.  Despite the fact that the vast majority of insured individuals in the US are insured through such entities, there are no commercial insurers among the Named Plaintiffs.

c.  *Consumers*:  Individual consumers pay all or part of their prescription through copayment, coinsurance or cash prices.  No consumers (insured or uninsured) are included among the Named Plaintiffs.

d.  *Pharmacy Benefit Managers*:  PBMs are firms that market and sell a full range of prescription drug distribution services to insurers and plan sponsors.  Among these services are various cost-sharing arrangements with insurers, plan sponsors, and pharmacies that may cause PBMs to bear a portion of the cost of pharmacy price changes.  No PBMs are among the Named Plaintiffs, though the Named Plaintiffs in this case have contracted with or received services from PBMs during the class period.

25.      The four different categories of proposed class members are distinct from one another, and any given transaction involving a Nexium prescription may involve anywhere from one to all four categories

14

paying or reimbursing some or all of the cost of Nexium.[29]  The total net price paid in each transaction and the allocation of that cost between proposed class members is dependent upon individually negotiated and highly idiosyncratic contracts between plan sponsors and insurers, between these entities and PBMs, and between PBMs and pharmacies, as well as formulary and other provisions that vary substantially across plans and patients.  Thus, the extent to which any particular member of the proposed class is injured or not injured, and the share of the quantum of alleged damages allocated to that member, if any, depends on the provisions of the specific contracts affecting each Nexium prescription.

26.      No single allocation formula exists that will accurately and adequately capture this variation and ensure that uninjured individuals and entities are excluded from any recovery, that injured class members are accurately compensated, and that conflicts between class members are resolved.

## VI.      Impact of Allegations on Proposed Class Members Cannot be Demonstrated through Common Evidence

### A.      Reliance on Averages under Dr. Rosenthal's Common Method

27.      Dr. Rosenthal employs an aggregate overcharge calculation and erroneously concludes that she has established the use of a common method using common proof for calculating alleged damages to the proposed class.  In doing so, Dr. Rosenthal claims "[t]his aggregate methodology makes use of the mathematical identity that the average overcharge multiplied by the number of overcharged units is equal to the sum of class-wide damages.  Thus, even if the overcharge varies among Class members, my aggregate damage calculations will be accurate."[30]  In deposition, Dr. Rosenthal confirmed that she did not perform any statistical analysis to test the actual variation in Nexium prices, but defended the use of

---

[29] Plaintiffs and their expert, Dr. Rosenthal, propose to exclude several entities from their class definition, including "fully insured health plans" and "flat copay consumers."  While such exclusions are appropriate to omit uninjured payors from the class, the Plaintiffs' stated exclusions fall short of such an objective in two key respects: (1) by their very nature, many of the stated exclusions would require individualized inquiry; and (2) even under Dr. Rosenthal's aggregate damages calculation, the exclusions are insufficient to remove a large number of payors who are not injured by the alleged delay in generic entry.

[30] Declaration of Meredith Rosenthal in Support of Certification of the Class of End-Payor Purchasers of Nexium, July 26, 2013 ("Rosenthal Declaration"), para. 32.

*Confidential – Subject to Protective Order*

averages in her damages calculation by asserting that pharmaceutical prices "move in concert" across payors because they are based off of "list prices." [31]

28.      This assertion, key to Dr. Rosenthal's defense of a common method, is simply wrong, and her aggregate calculations result in overstated alleged overcharge totals and would result in damages being paid to uninjured members of the proposed class.  First, as described in detail below, substantial rebates paid by AstraZeneca and other contractual considerations governing the prices paid by proposed class members for Nexium prescriptions mean that "list prices" are not reflective of net prices actually paid by proposed class members, and that prices for Nexium do not "move in concert" across payors. AstraZeneca paid $12.9 billion in rebates to non-government purchasers of Nexium from the second quarter of 2008 through the end of 2012 (amounting to over 50 percent of rebate-eligible sales).  If Dr. Rosenthal's trending approach is applied to rebate payments for the remaining five quarters of the class period through the first quarter of 2014, then total rebates become $16.3 billion.  The amount of rebates paid to any particular class member is not tied to any uniform list price, such as AWP, and rebates vary substantially across class members.  For example, the ratio of Nexium rebates to sales for individual entities listed as PBMs in AstraZeneca's rebate data varies from a high of 58.7 percent to a low of 8.2 percent of sales.  See Exhibit 2 for a summary of aggregate rebates paid by AstraZeneca to PBMs, private insurers, Medicare accounts, and Federal Government entities.  As a result, the net prices paid for Nexium also vary considerably across proposed class members, reflecting the idiosyncratic and diverse contracts that govern payment for Nexium prescriptions.

29.      Second, even ignoring the point above, the "mathematical identity" Dr. Rosenthal relies on to calculate overcharges only holds if the "average overcharge" is the actual class-wide average.  In Dr. Rosenthal's calculation, as I explain below, she employs some datasets that cover only a portion of the entire class.[32]  Thus, the "average overcharge" implicit in her aggregate calculation is <u>not</u> the class-wide

---

[31] Deposition of Meredith Rosenthal, August 19, 2013, p. 175.
[32] For example, the Kaiser Family Foundation ("KFF") survey Dr. Rosenthal uses to determine her copayment and coinsurance shares and values reflects a non-representative sample of employer health plans.  It does not include union benefit plans such as the Named Plaintiffs.

*Confidential – Subject to Protective Order*

average, because the calculation does not use statistically representative, class-wide data.  As a result, her reliance on the "mathematical identity" is factually wrong and misleading.

30.     Dr. Rosenthal relies on aggregate data from IMS and summaries of survey data from Kaiser Family Foundation ("KFF") and the Pharmacy Benefit Management Institute ("PBMI") to approximate prices for Nexium and other factors in her calculations.  She does not rely on any of the pricing and formulary contracts produced by Named Plaintiffs that detail actual terms governing the prices paid by plan sponsors and consumers and the treatment of the substantial rebates paid by AstraZeneca for Nexium, nor does she rely on any data sources that contain actual payment flows for consumers or TPPs. I find evidence that Dr. Rosenthal's reliance on this type of data has two critically important shortcomings: 1) there exists extensive variation among the class members in the prices paid for Nexium, which Dr. Rosenthal's aggregate approach cannot account for, and therefore her model cannot be used as an accurate measure of injury for any particular class member; and 2) the variation in contractual terms governing the prices paid for Nexium and generic drugs results in many members of the proposed class who are uninjured by the alleged delay in availability of a generic version of Nexium.

31.     As a result of these shortcomings in Dr. Rosenthal's calculations, her aggregate alleged overcharge totals are overstated and her calculation would result in damages being paid to uninjured members of the proposed class.  By relying on an aggregate approach, Dr. Rosenthal's calculation fails to properly account for the complex payment flows resulting from the contractual relationships amongst the class members.  As I will show below, the pharmaceutical market for Nexium and other PPIs, and the contract terms of the Named Plaintiffs in this matter which affect the levels of payments and rebates received, have clear variation resulting in uninjured class members.

32.     To explore the extent of price variation specific to Nexium, I evaluated the variation in consumer and plan payments for Nexium claims for the period April 2008 through March 2012 from 59 self-funded employer-sponsored health benefit plans that provide prescription drug benefits to approximately 10

17

million plan participants.[33]  As shown in Exhibit 3A, the consumer contributions vary widely across claims, with the contribution level being as low as $0 on some claims and substantially over $150 on some 90 days' supply claims.  Not only is the range wide but there is also a high variance — *i.e.*, the bulk of the patient contributions are not bunched up near a common amount but rather are spread out over a broad range from $15 to $51 for 30 days' supply claims and $24 to $102 for 90 days' supply claims. These substantial variations in the prices paid for Nexium are significant in this case and are reflective of the wide range of formulary contract terms governing consumer contribution for prescription drug costs. As noted later, the nature of these formulary contract terms results in a number of consumers within the proposed class who would not suffer any injury from the alleged delayed launch of a generic version of Nexium.  As a result, Dr. Rosenthal's use of an average price paid is unrepresentative for many consumer class members and would result in damages being paid to uninjured consumers.

33.     Similar to the consumer contributions, the amounts paid by the plans for Nexium prescription claims also varies considerably.  For example, the bulk of plan payments ranged from just over $70 per prescription to over $190 per prescription for 30 days' supply, with some payments over $300, as shown in Exhibit 3B. [34]  Again, Dr. Rosenthal's average TPP contribution, which includes plans, is not representative of prices paid by many TPP class members, and does not account for TPP class members who were not injured.

34.     To illustrate these points, I compared Dr. Rosenthal's average consumer copayment/coinsurance and TPP contributions to the actual contributions by consumers from the employer claims data that is summarized in Exhibits 3A and 3B.[35]  Approximately half of actual consumer claims are at least 50 percent greater or 50 percent lower than Dr. Rosenthal's average price during the period from the second quarter of 2008 to the first quarter of 2012.  Similarly, approximately half of TPP claims are at least 50

---

[33] For claim comparability, I segmented the analysis by Nexium strength (20mg and 40mg) and days' supply.  I focus on 30- and 90-day supply prescriptions as they account for over 90 percent of all Nexium claims.
[34] The prices reported in claims data are gross payments, *i.e.*, prior to rebates.
[35] To separate the average brand prices shown in Dr. Rosenthal's Attachment C.3.a. into consumer and TPP contributions, I used her calculations in Attachment C.3.b. to determine the weighted average consumer copayment/coinsurance total in each quarter, and then subtracted this value from the average brand price to arrive at her implied TPP contribution.

*Confidential – Subject to Protective Order*

percent greater or 50 percent lower than Dr. Rosenthal's average over the same time period.  Not only is there substantial variation across class members in the actual amounts paid, but that variation would extend to the but-for treatment and associated costs had generic entry occurred at an earlier date.

35.     Dr. Rosenthal's reliance on aggregate prices and copayment/coinsurance rates for calculating consumer and plan sponsor or insurer damages masks the extensive variation in drug payments in both the actual and but-for worlds made by individual consumers, plan sponsors, insurers, and PBMs.  The stark difference between actual prices paid and the average price employed by Dr. Rosenthal demonstrates that her use of an average price for Nexium significantly overestimates or underestimates the actual payments by many Nexium class members, and that Dr. Rosenthal's use of averages, while mechanically possible, fails to accurately assess injury and calculate alleged damages to the members of the proposed class.

### B.    Plan Sponsors and Insurers

36.     Injury, if any, to plan sponsors and commercial insurers will depend on the particular contractual relationships governing the flow of payments for Nexium prescriptions.  The terms of these contracts vary by plan sponsor, by pharmacy network, by insurer and by PBM, as well as over time.  Determining the incidence of injury and extent of any damages requires detailed knowledge of these contracts, and their interaction, at any point in time.  Not only do these contracts detail the payment terms and rebate sharing between plan sponsors, insurers, and PBMs, but they also specify which class members benefit and which bear the cost of pharmaceutical price changes.

37.     To accurately determine the incidence of injury and calculate any resulting damages to plan sponsors and insurers, one would need to understand a significant number of factors affecting payments.  These factors include, for example: the price paid to PBMs net of rebates for branded Nexium, patient copayments and coinsurance, deductibles, out-of-pocket maximums, and benefit maximums at the time of Nexium purchases, the but-for world share of beneficiaries that would have switched to a generic version of Nexium and the formulary tier and associated but-for consumer contribution, the but-for share that

19

would have stayed on the brand, and the but-for share that would have switched to an alternative treatment. Each of these would need to be known throughout the class period and at the time of each Nexium purchase. The result is that any aggregate measure is sure to be inaccurate given that even slight differences across plans and insurers result in Nexium purchases where no injury occurred, and individualized inquiry is necessary.

38.     In addition, the PBM contract terms and definitions may also affect how the associated class members are injured, or whether in fact they are injured at all. For example, the PBM contract between Laborers International Union of North America Local 35 Health Care Fund ("Local 35") and Sav-Rx Prescription Services of Fremont, NE, defines a "generic" drug to mean "a drug whose United States government patent has expired and is marketed by three or more companies other than the innovator." Under this definition, an at-risk launch of generic esomeprazole prior to resolution of a patent dispute by a single manufacturer would not qualify it as a generic drug for purposes of determining the contractual discounts and rebates, and Local 35 would continue to receive the pricing terms associated with the brand drug despite the presence of an at-risk generic.[36]

### 1.     Rebates

39.     Of particular importance with respect to Nexium is the treatment of rebates within the PBM contracts. Even if the use of "average prices" was an appropriate way to measure class-wide damages and injury in this case (and it is not, for the above indicated reasons), Dr. Rosenthal's calculation of "average overcharges" paid by TPPs is incorrect because it improperly excludes billions of dollars in rebates paid by AstraZeneca. As shown in Exhibit 2, AstraZeneca paid out $12.9 billion in rebates for Nexium to non-government entities from the beginning of the class period through the end of 2012. Further, additional rebates have been and will be paid during the last five quarters of the class period that would bring the

---

[36] L35_000184-L35_000200, at L35_000185.  See also Deposition of Diane Klobukowski, August 6, 2013, pp. 96-100.

*Confidential – Subject to Protective Order*

total to $16.3 billion by the end of the first quarter of 2014.[37] Dr. Rosenthal acknowledges that rebates are an offset to her overcharge damage calculations, because such rebates have been paid in the actual world, and would not be paid on any transactions that switch to generic Nexium in the so-called but-for world.[38] Nevertheless, in her analysis, Dr. Rosenthal did not deduct the full $16.3 billion in rebates through the end of the class period, and instead reduced her TPP overcharge calculations by only the $10.4 billion in rebates that she estimated were paid directly to end payors or passed through to such end payors by PBMs. Specifically, Dr. Rosenthal excludes 36 percent of rebates that were not passed through from PBMs to TPPs to reflect results from the PBMI survey data she relies on and that represent the portion of plans from that survey where: (1) less than 100 percent of rebates would be directly passed-through from the PBM to the plan; and (2) the plan receives a fixed guaranteed rebate per prescription that is less than the amount of rebates the PBM negotiates with the manufacturer.[39] Dr. Rosenthal's exclusion of billions of dollars of rebates paid to PBMs is incorrect for several reasons.

40.     First, PBMs are part of the proposed class, as defined by Plaintiffs, because they paid or reimbursed "some or all of the purchase price of Nexium" and do not qualify for exclusion from the class. As Dr. Rosenthal acknowledges, PBMs pay part of the purchase price for Nexium to the pharmacy in the "large majority" of transactions.[40] Furthermore, as a result of contractual price guarantees and rebates, the price paid to PBMs by plan sponsors and insurers for a prescription is not the same as the price paid by the PBM to the pharmacy, and thus PBMs are responsible for paying at least part of the cost of Nexium. Accordingly, rebates paid to PBMs should be treated like rebates paid to any other class member.

41.     Second, Dr. Rosenthal used IMS price data as the starting point for all of her calculations, further supporting the inclusion of all rebates paid to PBMs, as IMS price data reflects the price that the PBM

---

[37] To calculate the $16.3 billion figure, rebates were extrapolated through Q1 2014 using the same trend function Dr. Rosenthal applies in her calculation of the rebate offset applied in her declaration.
"Nexium_Indirect_Attachment_C.xlsx" produced by Dr. Rosenthal.
[38] Deposition of Meredith Rosenthal, August 19, 2013, pp. 144-146.
[39] See "Nexium_Indirect_Attachment_C.xlsx" produced by Dr. Rosenthal. Dr. Rosenthal also excludes rebates paid to potentially brand-loyal consumers and certain government payors.
[40] Deposition of Meredith Rosenthal, Aug. 19, 2013, at p. 65.

*Confidential – Subject to Protective Order*

and/or the consumer pay to the pharmacy at the point of service.  Since the amounts paid by PBMs at the point of service are included in Dr. Rosenthal's Nexium price calculations and PBMs fall under the class definition, internal consistency dictates that any rebates received by PBMs (or any other proposed class members) also be deducted to accurately compute any net overcharges.  What Dr. Rosenthal has done is combine the PBM and TPP for a particular transaction into one entity in her calculation of overcharges, yet she then separates the two entities when accounting for rebates.  This is clearly inconsistent.  Failing to consider all rebates paid to PBMs, while at the same time including fully the effects of PBM payments on her aggregate calculations, is wrong under any economic principle.

42.     Third, Dr. Rosenthal did not actually observe any data on Nexium rebate payments from PBMs to plan sponsors to estimate pass-through (or actual rebate payments for any other drugs), nor did she review individual PBM pricing contracts and their terms.  Rather, Dr. Rosenthal arrived at an approximation of rebate pass-through from PBMs to plan sponsors and insurers based on a summary of survey data that is inadequate and flawed for this purpose.  The PBMI data used by Dr. Rosenthal reflects shares of employer-sponsored plans with different categorizations of rebate pass-through agreements, but the data were not adjusted to account for differences in the number of beneficiaries belonging to those plans.  As a result, small plans with few beneficiaries carry the same weight in the calculation as very large plans with many beneficiaries, overstating the influence of the small plans.  If the larger plans in the PBMI sample tend to have greater bargaining power and negotiate better rebate pass-through rates, Dr. Rosenthal's calculation would understate the amount of rebates directly passed-through from PBMs to plan sponsors.

43.     Finally, Dr. Rosenthal's approach ignores the fact that some rebates are passed through based on price discount guarantees rather than explicit rebate pass-through provisions.  For example, Named Plaintiff Fraternal Order of Police Miami Lodge No. 20 ("FOP") was offered several alternative PBM contractual terms, where the alternative with no rebate pass-through contained a deeper guaranteed price discount than alternatives that included some share of rebate pass-through.[41]  Thus, even rebates that are

---

[41] FOP 000265-FOP 000315, at FOP 000310.  Deposition of Lissette Priegues-Granado, August 6, 2013, pp. 127, 155-156, 160-161.

*Confidential – Subject to Protective Order*

not explicitly passed from the PBM to the plan sponsor or insurer may be indirectly passed through in the form of deeper price discount guarantees or other contractual terms.

44.     Correcting the treatment of rebates has a critical impact.  Dr. Rosenthal concedes that if the full $12.9 billion in actual Nexium rebates paid by AstraZeneca through 2012 (or $16.3 billion through the end of the class period) were included in her damages calculations, it would offset all of the alleged overcharges that she computed for the TPPs, meaning that the actual average net prices paid by TPPs during the class period would be less than the average price of generic Nexium, and her calculation would arrive at TPP aggregate damages of zero.[42]

45.     Furthermore, even if Dr. Rosenthal's reduced rebate offset was correct (and it is not), given the size of that rebate offset relative to her initial overcharge calculation and the substantial variation in prices observed across class members, it is highly probable that a number of individual TPPs were uninjured by the alleged delayed availability of a generic version of Nexium.  That is, even if Dr. Rosenthal's "average" TPP overcharge calculation were correct, the variation in net prices paid by different TPPs because of the variations in rebate amounts means that individualized inquiries would still be necessary to determine which TPPs were injured and which were not, let alone to what extent.

46.     Among just the Named Plaintiffs there are various examples of how rebate pass-throughs differ. [43]  As noted, FOP had a rebate arrangement with its PBM, Caremark, where any rebates received by the PBM were retained by the PBM and used to guarantee larger price discounts.[44]  FOP selected this pricing option over other contracts offered by Caremark that included some rebate pass-through, but smaller guaranteed price discounts.[45]  Effectively, FOP traded potential savings from rebates for larger guaranteed price discounts.  In a second example, International Brotherhood of Electrical Workers Local

---

[42] Deposition of Meredith Rosenthal, August 19, 2013, pp. 155-156.
[43] Rebate guarantees and rebate pass-through are common components of contracts between PBMs and plan sponsors, with 82 percent of large employer plans receiving rebates of some form via PBMs in the form of a flat guaranteed amount (32 percent), a share of rebates without a minimum guarantee (23 percent), or a share of rebates with a minimum guarantee (27 percent).  Pharmacy Benefit Management Institute, 2011-2012 Prescription Drug Benefit Cost and Plan Design Report, available at http://www.benefitdesignreport.com (accessed June 12, 2013), p. 28.
[44] This is known as the "Reinvested Rebates Pricing Offer" by Caremark. FOP 000180-FOP 000183, at FOP 000180.
[45] FOP_000211-FOP_000264.

*Confidential – Subject to Protective Order*

595 ("IBEW") and its PBM RxSolutions, Inc. had an agreement where RxSolutions guaranteed a fixed

rebate per claim.  In a third example, UFCW and its PBM Catamaran agreed on a rebate that is the greater

of 100 percent of the manufacturer rebate or a fixed dollar amount per claim.  Given the varied contract

terms between parties, the price the plan pays to the PBM is not always the same as the price the PBM

pays to the pharmacy.  Through these contractual terms, the total reimbursement to the pharmacy is

frequently shared between the consumer, the plan, and the PBM.  Different rebate terms and methods of

cost sharing between PBMs and other Named Plaintiffs are shown in Exhibit 4.

47.     Dr. Rosenthal's aggregate overcharge calculation does not appropriately adjust for all

AstraZeneca rebates paid, does not exclude all uninjured class members, and lacks a mechanism by which

to identify the extent of injury to any single class member.  In order to accurately compute the net prices

paid for Nexium by each PBM, plan sponsor and commercial insurer, it is necessary to analyze the

pricing and rebate guarantees embedded in each PBM contract, which by definition requires

individualized inquiries.

### 2.     Additional Examples of Uninjured Plan Sponsors and Insurers

#### a)     Pharmacy Pricing

48.     In some cases, plan sponsors and commercial insurers share pricing risk with pharmacies.  Some

contracts allow for fixed price agreements with pharmacies whereby for certain therapeutic classes, the

plan or insurer would reimburse the pharmacy the same price for any prescription for a drug belonging to

that class of therapies irrespective of which type of drug is used and whether the prescription is filled with

the brand or generic version of the drug.  Such agreements insulate the plan or insurer from pricing

variation, while the pharmacy assumes all of the risk from use of relatively more expensive drugs.  To the

extent that plan sponsors or insurers enter into these types of fixed price arrangements with pharmacies

for PPIs, those proposed class members would not be injured by any delay in generic entry.

*Confidential – Subject to Protective Order*

### b)      Reduced Consumer Copayment with Generic Entry

49.      Even if a generic version of Nexium would, on average, be cheaper than brand Nexium, certain

TPPs could be worse off from generic entry depending on their copay structures.  Under Dr. Rosenthal's

approach, the price paid by the TPP is essentially the point-of-service price minus what the consumer

pays (in copay or co-insurance).  Thus, whether a TPP pays less for the generic depends in part on its

copay structure.  To take a simplified example, assume that (1) a generic costs $30 less per prescription

than Nexium at the point of service and (2) the TPP has a copay under which the consumer pays $50 for

the brand and $15 for the generic.  In this example, the generic's total cost at point of service is $30

lower, but the consumer's share drops by $35, so the TPP actually pays $5 more for the generic.  This

phenomenon is likely to occur given the wide variation in consumer contributions across plans.  Based on

Dr. Rosenthal's calculations for her Scenario 1, the average gross price for Nexium that she claims would

have been filled by the generic in the but-for world was $238 per prescription prior to accounting for

rebates.[46]  Based on AstraZeneca's rebate data summarized in Exhibit 2, PBMs received rebates that

reflect 49% of sales between the second quarter of 2008 and 2012.  Applying this average rebate

percentage, a plan sponsor that is contracted to receive 100% rebate pass-through from their PBM would

receive roughly $117 in rebates per Nexium prescription ($117 = 49% x $238), for a net price per

prescription of $121 ($121 = $238 - $117).  The average but-for generic price implied by Dr. Rosenthal's

calculation is $113 per prescription, $8 less than the price of the brand.[47]  Therefore, if the TPP has a

copay structure under which the generic copay is at least $8 per prescription less than the copay for the

brand, the TPP would actually pay more for the generic.  Rather than sharing the savings with the

consumer, as Dr. Rosenthal's model assumes, such a TPP would effectively get none of the savings.  Dr.

---

[46] In Attachment C.3.a. of Dr. Rosenthal's declaration, she identifies class prescriptions that would have been
generic in her but-for world in column 6; summing this column over her class period (Q2 2008 through Q1 2014)
yields a total of 126,645,797 prescriptions.  Multiplying the number of prescriptions in column 6 by Dr. Rosenthal's
brand price in column 2 of the same Attachment and summing over her class period yields a total of
$30,143,191,657 in gross sales before adjusting for rebates.  The average gross price of $238 per prescription is
gross sales divided by total prescriptions ($238 = $30,143,191,657 / 126,645,797).
[47]  Following the same methodology as for brand price, multiplying the number of prescriptions in column 6 of
Attachment C.3.a. by Dr. Rosenthal's generic price in column 8 of the same Attachment and summing over her class
period yields a total of $14,348,446,476 in gross generic sales.  The average gross generic price of $113 per
prescription is gross generic sales divided by total prescriptions ($113 = $14,348,446,476 / 126,645,797).

*Confidential – Subject to Protective Order*

Rosenthal finds that the difference between average generic copays and average branded copays is significantly greater than $8 per prescription. As shown in Exhibit 5, the difference between brand and generic copays varies considerably from plan to plan, thus requiring an analysis of each plan's copay structure to determine whether the plan pays less for the generic.

50.     This point holds true even if one ignores the rebates to the PBM and adopts Dr. Rosenthal's much higher estimate of net prices to the TPPs. For example, under Dr. Rosenthal's Scenario 2, the implied average per prescription overcharge to TPPs is approximately $2.42 for prescriptions that would have been filled with a generic version of Nexium in the but-for world.[48] This average per prescription TPP overcharge is based on an average differential in consumer contribution of $36.66.[49] That is, it assumes the consumer's contribution (for example, in the form of a copay) is $36.66 less for the generic than for the brand. Thus, for any TPP with a copay (or other consumer contribution) differential greater than $39.08 per prescription ($36.66 + $2.42 = $39.08), the TPP pays more for the generic. Such differentials certainly exist. For example, starting in June 2010 Named Plaintiff Michigan Regional Council of Carpenters Employee Benefits Fund ("MRCC") had a tier 3 copayment of $100 and a tier 1 copayment of $25, for a $75 spread). With only a $2.42 per prescription average TPP overcharge, it would take only a slightly greater than average difference between brand and generic consumer contributions to reduce the TPP overcharge to zero or negative for any individual plan.

---

[48] Scenario 2 TPP overcharge per prescription is calculated as $84,067,972 in damages net of rebates between Q1 2012 and Q1 2014 in Attachment C.4.c. divided by 34,679,835 but-for generic prescriptions in Attachment C.4.b. This somewhat overstates the overcharge per prescription as the $84,067,972 in damages includes some damages from prescriptions that would have continued to have been for branded Nexium in the Dr. Rosenthal's but-for world. The corresponding number for Dr. Rosenthal's Scenario 1 is $14.87 in TPP overcharge per prescription.

[49] In Attachment C.4.b of Dr. Rosenthal's declaration, she identifies consumer copayment and coinsurance payment contributions and the number of prescriptions she assumes would have switched from brand to generic in her but-for world. The total number of class prescriptions that would have been generic in her but-for world are reported in column 1; summing this column over her class period (Q1 2012 through Q1 2014) yields a total of 34,679,835 prescriptions. Columns 3 and 4 contain her estimate of brand consumer copayment and coinsurance payments for those prescriptions in the actual world, and sum to $1,701,781,072 for an average contribution of $49.07 ($1,701,781,072 / 34,679,835). Columns 6 and 7 contain her estimate of generic consumer copayment and coinsurance payments for her but-for world, and sum to $430,553,976 for an average contribution of $12.42 ($430,553,976 / 34,679,835).

*Confidential – Subject to Protective Order*

### 3.     Cost Pass-Throughs

51.     Plan sponsors and insurers in the proposed class are not injured if they pass on any overcharge to other class members (*i.e.*, other plan sponsors) and/or beneficiaries outside the class in the form of higher premiums.  When health insurance costs are higher than they otherwise would have been (*e.g.*, due to delayed generic entry), plan sponsors and insurers do not typically absorb these higher expenditures through lower profits.  Insurers and plan sponsors will instead pass such higher expenditure through to ratepayors (*i.e.*, beneficiaries and/or plan sponsors), all or in part, in the form of higher premiums.

52.     Economic reasoning explains why insurers and plan sponsors often attempt to pass through any overcharge.  Economists typically view firms as profit-maximizing; since a prescription overcharge results in higher costs faced by an insurer or plan sponsor, these entities will seek to pass as much of the cost from the overcharge through to ratepayors as possible in order to earn maximum profits.[50]  Indeed, if insurers and sponsors were unable to pass through health insurance costs to ratepayors, these entities would eventually become unprofitable and ultimately exit the market.

53.     Evidence from the insurance industry demonstrates how insurers and plan sponsors pass through changes in health insurance costs in practice.  In underwriting group insurance, it is well established that current year total expenditures are the starting point for calculating future rates.  A leading reference on group insurance underwriting states:

> The pricing actuary's most valuable tool…in the prospective rating arsenal is the evaluation of the past experience of the group.  This evaluation of past experience for prospective rating will take place regardless of whether retrospective experience rating will apply, and regardless of the funding method.
>
> […]
>
> The starting point for prospective experience rating is the past claim experience for the group…Most claim data starts with the dollar amount of claims paid over the experience year.[51]

---

[50] In the case of the Named Plaintiffs, who are non-profit union plans, the plan may also seek to cover higher prescription costs through increased premiums in order to fund the plan.  See, for example, Deposition of Lissette Priegues-Granado, August 6, 2013, pp. 96-99, 113.
[51] Id., pp. 717–718.

*Confidential – Subject to Protective Order*

54.     In addition, if an insurer fails to adequately set premiums to cover costs in any given year and has been incurring losses, it may augment future rates using a "deficit recovery charge."[52]  The purpose of the charge is to recover losses incurred by the plan through higher premiums in future periods.[53]  In other words, the insurer passes on the higher costs and resulting losses to the plan's ratepayors, rather than bear them entirely through reduced profits.

55.     Aetna, a commercial insurer, states that it relies on historical costs when setting future premiums:

> Under prospective rating, a fixed premium rate is determined at the beginning of the policy period.  We typically cannot recover unanticipated increases in health care costs in the current policy period; however, we may consider prior experience for a product in the aggregate or for a specific customer, among other factors, in determining premium rates for future policy periods.[54]

56.     Aetna also indicates that in some cases it retrospectively adjusts premiums for a given year if the premium rate set at the beginning of the period differs from the actual costs incurred for that period:

> Under retrospective rating, we determine a premium rate at the beginning of the policy period. After the policy period has ended, the actual claim and cost experience is reviewed. If the actual claim costs and other expenses are less than expected, we may issue a refund to the plan sponsor based on this favorable experience. If the experience is unfavorable, in certain instances we may recover the resulting deficit through contractual provisions or consider the deficit in setting future premium levels.[55]

57.     Commercial insurers and plan sponsors vary in the degree to which they pass on the alleged overcharges in the form of higher premiums.  Some entities may be able to completely pass on any overcharge to ratepayors, in which case these entities are not injured by any alleged overcharge.  In other cases insurers are unable or do not fully pass on higher prices due to competitive or strategic reasons.[56]  Thus, the question of alleged injury and the extent of damages to a particular insurer would again vary

---

[52] Id., p. 731.
[53] Id., p. 731.
[54] Aetna Inc. Form 10-K for fiscal year ending December 31, 2012, p. 9.
[55] Aetna Inc. Form 10-K for fiscal year ending December 31, 2012, p. 9.
[56] "Experience Rating and Funding Methods," Chapter 35, in *Group Insurance*, William F. Bluhm, ed., et al., Fifth Edition, (Winsted, CT, Actex Publications, 2007), p. 733.

28

*Confidential – Subject to Protective Order*

across proposed class members, according to a particular insurer or plan's rating and underwriting decisions, as well as over time and according to the competitive situation.

58.     Plaintiffs and their expert, Dr. Rosenthal, propose no methodology that allows for the identification of plans or insurers that are not injured because they pass on higher pharmaceutical prices to consumers and other ratepayors through increased premiums.

### C.     Consumers

59.     To accurately determine the incidence of injury and calculate any resulting damages to insured consumers, one would need to understand a significant number of individual elements to each consumer's purchase.  These would include, for example: copayment or coinsurance amounts (or for cash paying customers, what their purchase price was), any deductibles, any out-of pocket maximums, any benefit maximums, if and when they would have selected the brand Nexium and/or generic version in the but-for world, the formulary tier for each but-for generic prescription purchase (or for cash paying customers, what their purchase price was), and any alternative therapy selected instead of brand or generic Nexium in the but-for world.  Each of these would need to be known throughout the class period and at time of each Nexium purchase.  Consequently, the specific characteristics of each consumer's drug formulary and that consumer's preferences can substantially impact whether or not a consumer suffered injury with respect to the allegations, and if so, the extent of the alleged injury.

60.     For example, among the Named Plaintiffs, substantial differences exist in the prescription drug coverage plans they administer, as summarized in Exhibit 5.  The number of drug tiers and associated copayment and coinsurance rates vary considerably across Named Plaintiffs, across beneficiary types for the same Named Plaintiff, and over time for the same beneficiary type.  All of these factors are critical to consider in determining what a consumer paid for Nexium in the actual world, what formulary incentives the consumer faces for switching to a generic version of Nexium and what the price difference, if any, would have been had they chosen the generic drug.

*Confidential – Subject to Protective Order*

### 1.      Uninjured Consumers

61.      I find substantial evidence that many consumers with prescription benefit coverage would have faced the same or higher consumer contribution had a generic version of Nexium been available.  For example, brand-loyal consumers, consumers belonging to plans where the generic version of Nexium would have been placed on the same tier occupied by Nexium in the actual world, and consumers who received a Nexium coupon that offset in part their contribution would all have paid the same or higher contribution following generic entry.  In addition, consumers whose consumption pattern would have changed when they switched to a lower-tier generic (*e.g.*, if they purchased the brand through 90-day mail-order prescriptions to save on the copayment, but purchased the generic through 30-day retail prescriptions for greater convenience) may pay more on a days-therapy basis for the generic.  My analysis of employer claims data for a subset of the proposed class further supports my conclusion that many consumers were not injured by the alleged foreclosure of generic Nexium, and that individualized inquiries are necessary to determine which consumers were injured and which were not.

#### a)      Brand-loyal consumers

62.      Brand-loyal consumers are those who would have continued to purchase Nexium despite the availability of a generic version in the but-for world.[57]  Brand-loyal consumers with health insurance would pay the same or higher copayment for branded Nexium after the introduction of generic delayed-release esomeprazole.[58]  Any alleged delay in generic entry, therefore, made these individual consumers better off than they would have been had the generic entered the market when Plaintiffs claim it would have.  Based on a comparison with other PPIs, my analysis of employer claims data suggests that 11 to 18

---

[57] Despite state generic substitution laws that encourage or require pharmacists to substitute generic for brand drugs, physicians can require a pharmacist to dispense the brand rather than a generic substitute with a dispense as written ("DAW") order.  Navarro, Robert, Managed Care Pharmacy Practice, Second Edition, (Sudbury, MA, Jones and Bartlett Publishers, 2009), pp. 402-404.

[58] For example, at least two Named Plaintiffs have formulary structures where this is the case.  See Exhibit 5.

*Confidential – Subject to Protective Order*

percent of patients would have continued to take only branded Nexium in the year following a generic launch.[59]  This represents a significant number of patients.

63.     For consumers on multi-tier plans, the non-preferred tiers correspond to a higher copayment requirement, as shown in Exhibit 5 for Named Plaintiffs, although the specific copayment or coinsurance rates associated with each tier varies substantially across plans.  Nexium is already a tier 3 non-preferred brand on some of the Named Plaintiffs' formularies (*e.g.*, on the UFCW formulary Nexium occupies tier 3) and would presumably stay on that tier or be no longer covered at all following entry of a generic version.  On other Named Plaintiff formularies Nexium is a preferred brand drug (*e.g.*, on the Caremark formulary used by FOP Nexium is listed as a "Primary/Preferred Drug"), and would likely move to being a non-preferred brand if a generic version became available.  Some plans also require beneficiaries to pay the cost difference between the brand and generic when purchasing a brand drug for which a generic exists.  Such provisions would cause a substantial increase in expenditure upon generic entry for brand-loyal consumers.

64.     Indeed, Dr. Rosenthal's own data demonstrate that, on average, consumers who would have purchased brand Nexium in the but-for world would have paid substantially more than in the actual world and therefore would not have been injured.[60]  For example, Dr. Rosenthal estimates that from the end of the 3rd quarter through the 15th quarter following generic entry, the brand price would have been between 2.6 percent and 83.4 percent higher than its pre-generic entry brand price and higher than the brand price in the corresponding quarters in the actual world.[61]  Clearly, consumers purchasing Nexium at a higher price in the but-for world are uninjured and should be excluded from the class.  In her deposition, Dr. Rosenthal confirmed that even under her analysis, damages for brand-loyal consumers are negative in some quarters, but that such consumers would still be part of the proposed class.  Dr. Rosenthal further confirmed that she arrived at positive "brand-brand" overcharges in her calculations only because she

---

[59] See Exhibits 7A and 7B.
[60] I note that the only alleged damage related to consumers who remain "brand-loyal" arises from consumers with coinsurance, as consumers paying a copayment would not have any difference in payment between the actual and but-for worlds, and therefore would not be injured.
[61] Rosenthal Declaration, Attachment C.2.b.

31

excluded, at the instruction of Counsel, all quarters where she found the brand price would have been higher in the but-for-world. [62] Excluding such offsetting benefits in an aggregate calculation results in an inaccurate and overstated aggregate overcharge for the class. There is no economic justification for looking only at particular periods within the full class period to determine whether a brand-loyal consumer was, or was not, injured. The only way to accurately make this determination is to compare the consumer's purchases in the actual and but-for worlds over the entire class period, something that Dr. Rosenthal failed to do for brand-loyal consumers. This is yet another example of why her aggregate numbers are inaccurate and do not provide an appropriate basis for measuring class-wide injury or damages.

65.     Lastly, Plaintiffs offer no method for identifying which consumer class members would have remained with brand Nexium upon generic entry, and therefore in many, if not all, cases would not have been injured by any delay in such entry. Dr. Rosenthal concedes that she has no way of identifying such brand loyalists, and as a result, did not and could not exclude them from her calculations.[63]

### b)     Consumers switching to generic with no cost benefit

66.     Some health plans have copay structures under which the copay for generic Nexium would not be any lower than the copay for brand Nexium was before generic entry. Any consumers with such a plan could not benefit from earlier generic entry. For example, some plans include non-preferred generics and non-preferred brands in the highest copayment tier. This is particularly true for therapeutic areas where there are a large number of competing drugs such as PPIs. As shown in Exhibit 6, Named Plaintiff UFCW currently assigns the generic version of some PPIs to the same non-preferred tier as the brand version, with the same copayment requirement. Specifically, both branded and generic Protonix appear on Tier 3. Had a generic version of Nexium been released at an earlier date, it is likely that it also would have been placed on a non-preferred tier for this plan. Furthermore, patients remaining on the brand may very well be damaged by generic entry, as the plan documents state: "If you request a brand-name drug

---

[62] Deposition of Meredith Rosenthal, August 19, 2013, pp. 105-106.
[63] Deposition of Meredith Rosenthal, August 19, 2013, pp. 93-94.

*Confidential – Subject to Protective Order*

when a generic equivalent is available (and medically appropriate), you will be responsible for paying the difference in cost between the generic and the brand-name drug, in addition to the brand-name copayment amount." Consumers on these plans may pay the same copayment for a generic version of Nexium as they did for branded Nexium in which case they would not be injured by any alleged delay in generic entry.

67.    Harvard Pilgrim, one of the largest health insurance providers in Massachusetts, also places generic PPIs on non-preferred tiers according to their publicly-available drug formulary.  In fact, Harvard Pilgrim places all PPIs, brand and generic versions, on Tier 3 with the highest beneficiary copayment, except for Nexium, which is available on Tier 2.  The entry of generic Nexium would therefore likely result in consumers receiving no cost savings, given Nexium's Tier 2 placement and generic PPIs' Tier 3 placement.  While it is not one of the Named Plaintiffs, Harvard Pilgrim may be typical of many other health plans in its treatment of PPIs and its plan members who purchased Nexium do conform to the Plaintiffs' class definition.  Similar to beneficiaries of the UFCW plan, consumers receiving prescription drug benefits through Harvard Pilgrim or any other health plan with similar treatment of PPIs are unlikely to benefit from entry of a generic version of Nexium, as the generic would likely be placed on a non-preferred tier similar to other generic PPIs.[64]

68.    Several of the Named Plaintiffs, including Local 35 and IBEW, placed single-source branded drugs, such as Nexium, on the same copayment tier as generic drugs.  For both of these Named Plaintiffs, Nexium was available with a $10 patient copayment during the class period.  If a generic version of Nexium were available, the generic version would have the same $10 patient copayment, while brand-Nexium would have been moved to a tier with a $20 patient copayment.[65]  As a result, plan members switching to the generic version of Nexium in the but-for world would pay the same $10 copayment that they paid in the actual world for branded Nexium and are uninjured.  Further, plan members who would have continued to purchase branded Nexium even after generic entry would see their copayment increase

---

[64] Harvard Pilgrim's Prescription Drug List, updated August 8, 2013, p. 87.
[65] Deposition of Diane Klobukowski, August 6, 2013, pp. 73-75.

*Confidential – Subject to Protective Order*

by $10 per prescription in the but-for world, meaning that such plan members actually benefited from any delay in the entry of generic Nexium. In her deposition, Dr. Rosenthal agreed that overcharges are zero to consumers in plans with tier structures similar to Local 35 and that these individuals are included in the proposed class.[66] Dr. Rosenthal further admitted that she could not quantify how many consumers in the proposed class are subject to such a plan, and that she had not considered this type of formulary structure despite the fact that at least two of the ten Named Plaintiffs are plans with such a copayment structure. There is no way to eliminate from the proposed class uninjured consumers who are subject to such plans other than through individualized inquiries.

### c)   Nexium coupons and other factors affecting consumer contributions

69.      During the class period, AstraZeneca has offered coupons to individual consumers who purchased Nexium to incentivize the purchase of Nexium and offset some of the consumer cost. These coupons covered all or a portion of the consumer's contribution, depending on the type of coupon and the consumer's contribution amount. For example, under one such coupon program, a consumer would pay up to $18 for branded Nexium, and AstraZeneca would then pay up to $50 on top of this $18 (up to $68), and the consumer would then cover any remainder above this. Another coupon program offered savings of up to $30 or $50 on refills depending on an individual's prescription coverage.[67] As Dr. Rosenthal concedes by reducing her calculation of alleged consumer damages by the total amount of Nexium vouchers, no such coupons or vouchers would be available for a generic version of Nexium. To the extent that AstraZeneca coupons result in a net consumer payment (*e.g.*, copayment less the coupon) for branded Nexium that was less than the but-for net consumer payment for a generic version of Nexium, then that consumer is uninjured.

70.      Other factors affect how much consumers pay for Nexium, including out-of-pocket maximums, deductibles, and the use of health reimbursement accounts funded by their employer. As an example,

---

[66] Deposition of Meredith Rosenthal, August 19, 2013, p. 57.
[67] See, AZ-NX-MDL-00823263, at p.5, UFCW_001263, and UFCW_001264.

*Confidential – Subject to Protective Order*

according to the 2012 Kaiser/HRET Survey, 87 percent of workers covered by employer-sponsored plans had an annual out-of-pocket maximum. Depending on the type of plan, spending on prescription drugs counts towards the out-of-pocket maximum for between 20 percent and 58 percent of workers who have an out-of-pocket maximum.[68] The extent to which a particular consumer is injured depends not only on copayment considerations, but also these other factors that determine patient payments. This means that there will be extensive variations not only between consumers from different plans, but also across consumers within the same plan (or the same individual consumer across different plan years) depending on whether a given consumer has hit an out-of-pocket maximum for the year.

### d)      Claims-based evidence of uninjured consumers

71.     I examined pharmaceutical claims data for three drugs sharing common factors with Nexium to investigate the extent to which uninjured consumers may be prevalent. Prilosec, Protonix, and Prevacid are all PPIs that have experienced generic entry at different points in time over the past decade, and in some cases they have also experienced OTC entry. For each of these three drugs, I identified all patients in claims data, which record actual consumer and plan payments for prescription drugs from 59 employer-sponsored health benefit plans reflecting approximately 10 million participants.[69] My analysis focused on patients who had a prescription claim for the studied drug (either Prilosec, Protonix, or Prevacid) in the year prior to and following generic entry (for the year following generic entry I analyzed months three through fifteen following generic launch, allowing for a three month washout/transition period following generic entry). For this analysis, I classified the patients into one of three categories: (i) brand-only (*i.e.*, "brand-loyal") patients, who filled a prescription for only the brand both in the year before and after generic entry; (ii) generic-only patients, who filled a prescription for the brand in the year before generic entry and for only the generic in the year after generic entry; and (iii) mixed brand and generic patients,

---

[68] By plan type: 20 percent for PPOs, 31 percent for HMOs, 41 percent for POS, and 35 percent for HDHP/SO plans. Kaiser Family Foundation and Health Research & Educational Trust, Employer Health Benefits 2012 Annual Survey, p. 126.

[69] As previously noted, the data include the administrative claims for approximately 10 million privately-insured individuals covered by 59 self-insured Fortune 500 companies with locations in all areas of the United States for services provided during the class period (ending in 2012).

*Confidential – Subject to Protective Order*

who filled a prescription for the brand in the year before generic entry and who had claims for both the generic and the brand in the year following generic entry.

72.     For the three drugs, Prilosec, Protonix, and Prevacid, between 26 percent and 33 percent of consumers (depending on the drug) paid the same or more on a days' therapy basis following generic entry than prior to generic entry, as shown in Exhibit 7A and 7B.  Of note, brand-loyal consumers made up between 27 and 38 percent of the consumers who paid more following generic entry, with the majority of consumers who paid more following generic entry falling into the generic only and mixed brand and generic consumer categories.

73.     Dr. Rosenthal does not demonstrate that the consumer payment pattern for Nexium in the face of generic entry would have been any different to that observed for Prilosec, Prevacid, and Protonix, with a large number of consumers paying the same or more following generic entry.  Such consumers would not have been injured by the alleged delay in launch of a generic version of Nexium.  Even if it were feasible to exclude brand-loyal consumers, that would still leave a substantial share of consumers in the proposed class who were not injured based on the Plaintiffs' allegations.

##     2.     Consumers Receiving Alternative Treatments in the But-for World

74.     Some consumers using Nexium in the actual world would have received an alternative treatment — that is, a treatment other than the generic esomeprazole — in the but-for world.  As described earlier, Nexium competes in a pharmaceutical market with multiple alternative therapies available, including other branded and generic drugs, and OTC drugs available without a prescription.

75.     It is well documented that brand drug marketing is reduced upon the entry of generic competitors.[70]  Such reductions in marketing effort in the but-for world raise the probability that some patients would have been prescribed an alternate brand or generic PPI or other therapy, or would have

---

[70] See Berndt, Ernst R., Margaret Kyle, and Davina Ling, "The Long Shadow of Patent Expiration: Generic Entry and Rx-to-OTC Switches," in Scanner Data and Price Indexes, Feenstra, Robert C., and Matthew D. Shapiro, eds. (Chicago, IL: University of Chicago Press, 2003), at p. 235.

*Confidential – Subject to Protective Order*

switched to an OTC PPI or other non-prescription treatment, because they would not be subject to branded Nexium marketing in the but-for world.

76.     Of particular relevance in this matter is the potential entry of OTC Nexium coinciding with entry of a generic prescription version of Nexium.  As the OTC version would benefit from the Nexium brand, consumer switching to OTC Nexium may be particularly strong for patients who took prescription Nexium in the actual world.  Despite its importance, Dr. Rosenthal admits that she did not examine the prevalence of OTC switching for PPIs in her overcharge calculations.[71]

77.     Named Plaintiffs vary in their coverage of OTC products, further complicating the method for identifying which consumers would have switched to the generic version of Nexium versus an alternative.  For example, Named Plaintiff UFCW conducted a significant campaign with its members and also utilized a formulary structure to encourage members to switch to OTC products, while Named Plaintiffs FOP and Local 35 did not cover OTC products at all.[72]  This variation across plans would result in differences in consumer behavior when deciding whether to switch to an OTC product or not.

78.     A second consideration of OTC Nexium entry is that availability of an OTC version may lead many plans to place generic prescription Nexium on a non-preferred tier with the same or similar copayment as the brand.  Plans would take this action to encourage consumers to purchase OTC Nexium rather than a prescription, thereby saving the plan the full cost of the prescription.  Some plans already place generic versions of PPIs on non-preferred tiers in response to OTC availability for other PPIs.  For example, Named Plaintiff UFCW lists the generic version of Protonix as a non-preferred drug with the highest copayment level, to encourage use of OTC Prilosec, OTC Prevacid, and generic prescription Prilosec (see Exhibit 6).[73]  In fact, Named Plaintiff UFCW sent letters to consumers attempting to get them to switch from Nexium to OTC Prilosec in 2008.[74]  If generic prescription Nexium is more likely to

---

[71] Deposition of Meredith Rosenthal, August 19, 2013, pp. 84-85.
[72] Deposition of Daniel Ryan, July 29, 2013, p. 83, 105-110; Deposition of Lissette Priegues-Granado, August 6, 2013, pp. 61; and Deposition of Diane Klobukowski, August 6, 2013, pp. 84-85.
[73] UFCW covers all or some of the cost of OTC Prilosec and OTC Prevacid, so long as they are obtained with a prescription. Deposition of Daniel Ryan, July 29, 2013, pp. 83-84.
[74] UFCW_001238-UFCW_001239.

*Confidential – Subject to Protective Order*

be assigned to a non-preferred tier with availability of OTC Nexium, then many consumers who switch from brand Nexium to a generic version of Nexium in the but-for world may end up paying the same copayment and not be injured.[75]

79.     Dr. Rosenthal's assumption that all branded Nexium prescriptions during the class period would have been filled as either branded or generic Nexium in her but-for world ignores the presence of these alternative treatments.  She therefore inaccurately estimates damages by falsely assuming that no Nexium patients would have switched to an alternative therapy.

## VII.     Conflicts of Interest among Proposed Class Members and Representativeness of Named Plaintiffs

80.     Conflicts of interest among different categories of class members present a particularly acute issue in this case, where the Named Plaintiffs all represent the same subset of only one category of the proposed class: union plan sponsors.  In fact, the interests of the Named Plaintiffs in terms of the allocation of damages may conflict with the interests of the other categories of proposed class members, given that there are no other types of plan sponsors (*e.g.*, employer-sponsored plans), no commercial insurers, no PBMs, and no consumers among the Named Plaintiffs.  Such a narrow set of Named Plaintiffs may result in an assessment and allocation of alleged damages that is at the expense of other unrepresented class members.   This is especially true where, as discussed above, once all rebates are taken into account, Dr. Rosenthal's own analysis shows that the TPPs, including union plans like the Named Plaintiffs, suffered aggregate damages of zero.

81.     Conflicts of interest between these entities are unavoidable.  Several entities may pay a portion of the purchase price for each prescription.  Assigning a greater share of the purchase price to one entity or category of entities (such as TPPs), on average, necessarily results in a smaller share of the purchase price being assigned to another entity (such as consumers).  Different assumptions in allocating the share of the

---

[75] UFCW's witness Daniel Ryan confirmed that "Nexium is a Tier 3 drug...the other forms of Prevacid and Protonix and their generic equivalents are Tier 3 drugs."  Deposition of Daniel Ryan, July 29, 2013, p. 82.

*Confidential – Subject to Protective Order*

purchase price across entities in the actual and but-for world can make a substantial difference in terms of computing which proposed class members were injured and which were not, as well as in allocating the quantum of damage between proposed class members to the extent there were any net overcharges for a given transaction.  As a result, deriving the assumptions used to allocate the share of the purchase price across the different entities can lead to conflicts.

82.     For example, conflicts of interest exist between class members on even a single Nexium transaction.  Consumers bear some share of the pharmacy prescription price paid through copayment, coinsurance, deductible, or other payments.  The PBM pays the pharmacy the remainder of the prescription price and collects manufacturer rebates, and passes on some, all, or none of the rebates to plans or insurers while recouping a contracted price from the plan or insurer.  Many conflicts of interest may exist amongst class members resulting from this transaction.

83.     Dr. Rosenthal's declaration fails to touch on many of these important conflicts between the proposed class members.  For example, Dr. Rosenthal's allocation of damages to consumers is based on KFF average copayment and coinsurance rates for employer sponsored health plans, with the remainder of the quantum of damage allocated to TPPs.  The KFF data are not nationally representative or representative of the class and focus only on employer sponsored plans (*i.e.*, they do not reflect union sponsored plans).  Dr. Rosenthal's approach also fails to account for consumer payments beyond just the copayment or coinsurance payment, such as deductibles paid by consumers and instances where an insured consumer must pay for the entire prescription because they have reached the maximum benefit limit on their plan.  As a result, even Dr. Rosenthal's calculation of the overall consumer share of aggregate damages is likely to be incorrect and alternative assumptions for determining the consumer share of payment would result in a different level of aggregate consumer damages and aggregate TPP damages, heightening the risk for conflicts.

39

*Confidential – Subject to Protective Order*

## VIII.    Concluding Remarks

84.    Based on the facts of the case and the evidence presented to me, and through my analysis of actual payments for Nexium and other PPIs, I conclude that the fundamental issues of injury and damages to members of the proposed class <u>cannot</u> be evaluated on a class-wide basis, and that a substantial number of the proposed members of the class have not suffered any economic injury from the alleged delayed entry of generic Nexium.  Even if the use of averages were an appropriate way to measure injury and damages for the proposed class (which it is not for the reasons discussed), Dr. Rosenthal has not presented a methodology for accurately computing damages for the proposed class, on an aggregate basis or otherwise.  Dr. Rosenthal's methodology calculates overcharges to proposed class members who suffered no injury, and would over-compensate some proposed class members at the expense of others.  Given the many variations in contracts, rebates, and financing arrangements governing the Nexium transactions at issue, individualized inquiries are necessary to accurately determine injury and damages for each proposed class member.

*Confidential – Subject to Protective Order*

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge and belief.

James W. Hughes

August 28, 2013

*Confidential – Subject to Protective Order*

**Exhibit 1A**
**Example of  One Type of Payment Flow for a Prescription Purchase**



*Confidential - Subject to Protective Order*

**Exhibit 1B**
**Drug and Payment Flows for an Insured Patient**



*Confidential - Subject to Protective Order*

**Exhibit 2**
**Summary of Nexium Rebates by Customer Category and Year**

| Customer Category | Q2 - Q4 2008 | 2009 | 2010 | 2011 | 2012 | Total | Percent of total |
|---|---|---|---|---|---|---|---|
| **I. Total Rebate Amounts** | | | | | | | |
| Pharmacy Benefit Managers: | $1,152,782,316 | $1,691,059,807 | $1,665,393,411 | $1,575,258,954 | $1,505,860,806 | **$7,590,355,293** | **55%** |
| Private Insurers and others: | $89,662,700 | $133,845,971 | $121,206,402 | $90,684,414 | $91,980,913 | **$527,380,400** | **4%** |
| Medicare Accounts: | $541,382,576 | $879,372,721 | $1,010,036,323 | $1,123,926,619 | $1,182,855,061 | **$4,737,573,301** | **34%** |
| Federal Government: | $121,108,211 | $190,701,392 | $200,517,104 | $208,741,355 | $188,374,299 | **$909,442,361** | **7%** |
| **Total:** | **$1,904,935,803** | **$2,894,979,891** | **$2,997,153,240** | **$2,998,611,342** | **$2,969,071,079** | **$13,764,751,356** | **100%** |
| **Total Excluding Federal Government:** | **$1,783,827,593** | **$2,704,278,499** | **$2,796,636,136** | **$2,789,869,988** | **$2,780,696,780** | **$12,855,308,995** | |
| | | | | | | | |
| **II. Total Rebate WAC Sales** | | | | | | | |
| Pharmacy Benefit Managers: | $2,739,134,259 | $3,517,895,985 | $3,217,547,743 | $3,046,831,107 | $2,862,441,266 | **$15,383,850,360** | **59%** |
| Private Insurers and others: | $264,885,252 | $393,141,135 | $371,670,913 | $305,261,204 | $288,740,661 | **$1,623,699,164** | **6%** |
| Medicare Accounts: | $1,056,879,841 | $1,535,083,212 | $1,719,930,805 | $1,832,740,533 | $1,982,416,171 | **$8,127,050,563** | **31%** |
| Federal Government: | $151,475,291 | $238,507,744 | $250,770,965 | $261,051,903 | $235,578,525 | **$1,137,384,429** | **4%** |
| **Total:** | **$4,212,374,643** | **$5,684,628,077** | **$5,559,920,426** | **$5,445,884,747** | **$5,369,176,622** | **$26,271,984,515** | **100%** |
| **Total Excluding Federal Government:** | **$4,060,899,352** | **$5,446,120,332** | **$5,309,149,461** | **$5,184,832,844** | **$5,133,598,097** | **$25,134,600,087** | |
| | | | | | | | |
| **III. Rebate to Sales Ratio** | | | | | | | |
| Pharmacy Benefit Managers: | 42% | 48% | 52% | 52% | 53% | **49%** | |
| Private Insurers and others: | 34% | 34% | 33% | 30% | 32% | **32%** | |
| Medicare Accounts: | 51% | 57% | 59% | 61% | 60% | **58%** | |
| Federal Government: | 80% | 80% | 80% | 80% | 80% | **80%** | |
| **Total:** | **45%** | **51%** | **54%** | **55%** | **55%** | **52%** | |
| **Total Excluding Federal Government:** | **44%** | **50%** | **53%** | **54%** | **54%** | **51%** | |

Notes:

[1] Pharmacy Benefit Managers includes customers identified in AstraZeneca rebate data as "Pharmacy Benefit Management Company" (customer code "PB") and "Mail Service Headquarters" (customer code "MS").

[2] Private Insurers and others includes customers identified in AstraZeneca rebate data as "Buying Group (GPO)" (customer code "BG"), "IPA/PPO Headquarters," (customer code "IP") and "HMO - Staff Model Headquarters" (customer code "SM").

[3] Medicare Account includes customers identified in AstraZeneca rebate data as "Medicare Account" (customer code "MA"). These include Pharmacy Benefit Management Medicare Accounts, for example organization names "Express Scripts (Medicare)" and "Medco Health Solutions Medicare".

[4] Federal Government includes customers identified in AstraZeneca rebate data as "Federal Government" (customer code "FG") and "Federal Gov't - VA Medical Center" (customer code "VA").

[5] Rebate to Sales Ratio is calculated by dividing Total Rebate Amounts by Total Rebate WAC Sales for each customer category for each year. Category and yearly total ratios are the ratio between category and yearly totals.

**Source:** "S-1938_Rebates_Extract.txt"

*Confidential - Subject to Protective Order*

**Exhibit 3A**
**Frequency of Nexium Claims by Patient Payment, Days' Supply, and Dosage**
April 2008-March 2012





**Notes:**

[1] A claim is included if: (1) the patient is eligible during the month of the claim, (2) days' supply is equal to 30 days or 90 days and (3) patient payment is greater than or equal to $0. Removing claims with days' supply not equal to 30 days or 90 days removes 7.3% of eligible claims. Removing claims with patient payment less than $0 removes an additional <.01%. Overall, the claims included in this analysis account for approximately 92.6% of eligible claims.

[2] Patient payment is the sum of copay, deductible, and coinsurance payments.

[3] For 30 days' supply, the three most frequent non-zero payment values among 20mg claims were $5 (10.6% of claims), $18 (10.2% of claims), and $50 (9.8% of claims) and, among 40mg claims, $5 (9.2% of claims), $18 (11.8% of claims), and $50 (14.6% of claims). For 90 days' supply, the three most frequent non-zero payment values among 20mg claims were $27 (13.3% of claims), $50 (8.5% of claims) and $100 (5.9% of claims) and, among 40mg claims, $27 (12.3% of claims), $50 (8.0% of claims), and $100 (9.3% of claims).

**Source:** Employer claims data.

*Confidential - Subject to Protective Order*

**Exhibit 3B**
**Frequency of Nexium Claims by Third-Party Payor Payment, Days' Supply, and Dosage**
April 2008-March 2012





**Notes:**

[1] A claim is included if: (1) the patient is eligible during the month of the claim, (2) days' supply is equal to 30 days or 90 days and (3) third-party payor payment is greater than or equal to $0. Removing claims with days' supply not equal to 30 days or 90 days removes 7.3% of eligible claims. Removing claims with third party payor payment less than $0 removes an additional <.01%. Overall, the claims included in this analysis account for approximately 92.6% of eligible claims.

[2] Third party payor payment is the sum of amount paid by the employer, amount paid by other carriers (*e.g.*, Medicare), and pharmacy dispensing fees.

[3] No third-party payment value accounts for more than 3.5% of any claim type.

**Source:** Employer claims data.

*Confidential - Subject to Protective Order*

**Exhibit 4**
**Summary of Selected Rebate and Discount Policies in Contracts between PBMs and Named Plaintiffs**

| Named Plaintiff: | | Fraternal Order of Police Miami Lodge 20[A] | United Food and Commercial Workers Unions and Employers Midwest Health Benefits Plan[B] | | International Brotherhood of Electrical Workers Local 595 Health and Welfare Fund[C] | |
|---|---|---|---|---|---|---|
| Contracted PBM: | | Caremark, Inc. | National Medical Health Card Systems, Inc. | Catamaran | RxSolutions, Inc. | OptumRX, Inc. (formerly RxSolutions, Inc.) |
| Date: | | 2/1/2008-12/31/2011 | 1/1/2008 - 12/31/2008 | September 2012 - present | 2/17/2010 - 5/31/2013 | 6/1/2013 - present |
| **I. Rebates** | | No rebates passed-through | Greater of pass-through or guaranteed fixed amount | | Guaranteed fixed amount | |
| *Pharmacy* | Pass-through: | N/A | 92% | 100% | N/A | N/A |
| | Fixed amount: | N/A | $1.67 per approved claim | $2.75 per net paid claim | $3.25 to $3.45 per paid claim | $16.00 per brand claim |
| *Mail-Order* | Pass-through: | N/A | 92% | 100% | N/A | N/A |
| | Fixed amount: | N/A | $1.67 per approved claim | $13.45 per net paid claim | $16.50 to 17.50 per paid claim | $60.00 per brand claim |
| **II. Brand pricing guarantees** | | | | | | |
| *Pharmacy* | Discount type: | U&C or MAC or AWP discount | U&C or AWP discount | U&C or AWP discount | AWP discount | AWP discount |
| | Discount off AWP: | 25.05% to 29.45% | 15.50% | 15.30% to 19.90% | 17.50% to 18.00% | 16.00% |
| *Mail-Order* | Discount type: | AWP discount | AWP discount | AWP discount | AWP discount | AWP discount |
| | Discount off AWP: | 33.15% to 38.10% | 21.00% | 23.10% | 23.00% to 25.50% | 21.00% to 22.50% |
| **III. Generic pricing guarantees** | | | | | | |
| *Pharmacy* | Discount type: | U&C or MAC or AWP discount | U&C or AWP discount | U&C or MAC or AWP discount | MAC with discount guarantee | MAC with discount guarantee |
| | Discount off AWP: | 62.25% to 70.75% | Non-MAC: 22.00% MAC: 58.00% | 76.00% to 77.00% | 62.00% | 70.00% to 71.00% |
| *Mail-Order* | Discount type: | MAC or AWP discount | AWP discount | MAC or AWP discount | AWP discount | MAC with discount guarantee |
| | Discount off AWP: | 64.00% to 73.00% | 55.00% | 77.00% | 70.00% to 73.00% | 73.00% to 76.00% |

*Confidential - Subject to Protective Order*

**Exhibit 4 (continued)**
**Summary of Selected Rebate and Discount Policies in Contracts between PBMs and Named Plaintiffs**

| | | International Union of Machinists and Aerospace Workers | | | |
|---|---|---|---|---|---|
| **Named Plaintiff:** | | District No. 15 Health Fund[D] | | Allied Services Division Welfare Fund[E] | |
| **Contracted PBM:** | | Express Scripts Inc. | | Atlantic Prescription Services | OptumRX, Inc. |
| **Dates:** | | 11/1/2009 - 7/31/2010 | 8/1/2010 - 12/31/2012 | 1/1/2008 - 10/31/2012 | 11/1/2012 - present |
| **I. Rebates** | | | | | |
| | | Greater of pass-through or guaranteed fixed amount | | Pass-through | Guaranteed fixed amount |
| *Pharmacy* | Pass-through: | 100% | 100% | Unknown | N/A |
| | Fixed amount: | $7.00 to $11.25 | $7.50 to $11.75 | N/A | $16.50 to $19.00 |
| *Mail-Order* | Pass-through: | 100% | 100% | Unknown | N/A |
| | Fixed amount: | $21.00 to $38.00 | $21.50 to $38.50 | N/A | $50.25 to $58.25 |
| **II. Brand pricing guarantees** | | | | | |
| *Pharmacy* | Discount type: | AWP discount guarantee | AWP discount guarantee | U&C or AWP discount | AWP discount |
| | Discount off AWP: | 18.00% to 23.00% | 16.45% to 20.59% | 15.00% | 15.3% to 17.8% |
| *Mail-Order* | Discount type: | AWP discount guarantee | AWP discount guarantee | U&C or AWP discount | AWP discount |
| | Discount off AWP: | 26.00% to 26.50% | 25.36% to 25.88% | 20.00% | 25.1% to 25.4% |
| **III. Generic pricing guarantees** | | | | | |
| *Pharmacy* | Discount type: | U&C or MAC or AWP discount | AWP discount guarantee | U&C or MAC or AWP discount | MAC |
| | Discount off AWP: | 66.50% | 70.00% to 71.00% | 22.00% | MAC |
| *Mail-Order* | Discount type: | MAC or AWP discount | AWP discount guarantee | U&C or MAC or AWP discount | MAC |
| | Discount off AWP: | 69.50% | 73.00% to 74.50% | 55.00% | MAC |

*Confidential - Subject to Protective Order*

**[A] The Fraternal Order of Police Miami Lodge # 20 Notes:**

[1]  The Fraternal Order of Police Miami Lodge 20 ("FOP") contracted with Caremark as a member of Health Action Council Ohio ("HAC"), a group of third-party payors.  The per claim discount levels set in the contract are contingent on HAC's Gross Revenue (over 6 months).  HAC's Gross Revenue is defined as "any HAC gross revenue derived from that certain Prescription Benefits Service Agreement dated January 1, 2008 between HAC and Caremark."  "Level 1 Pricing" would have been applied in 2008 and 2009 if HAC's Gross Revenue was less than or equal to $325 million and, in 2010 and 2011, if HAC's Gross Revenue was less than or equal to $450 million. "Level 2 Pricing" would have been applied in 2008 and 2009 if HAC's Gross Revenue was greater than $325 million and, in 2010 and 2011, if HAC's Gross Revenue was greater than $450 million.

[2]  FOP elected the "Reinvested Rebates Pricing Offer" which means that Caremark "shall retain any rebates received... In lieu of rebates, Caremark has increased the AWP discount for mail service prescriptions and retail prescriptions."

[3] The Retail discount is whichever is lower of the listed prices.  There is no additional dispensing fee associated with U&C. The terms of the contract read "for each Claim billed to Participating Group, electronically processed and dispensed to a Plan Participant through Caremark's National Network, the Participating Group shall pay Caremark the lower of:
• The Participating Pharmacy's U&C;
• The retail brand discount plus dispensing fee provided below; or,
• MAC plus dispensing fee provided below."

[4] Brand/Pharmacy pricing:

Level 1 Pricing: The AWP discount would have been 25.05% in 2008, 26.05% in 2009, 27.50% in 2010, and 28.75% in 2011.  The 2010 and 2011 discounts would have decreased by 0.20 percentage points if more than 25% of claims were Mail-Order.

Level 2 Pricing: The AWP discount would have been 25.25% in 2008, 26.25% in 2009, 27.95% in 2010, and 29.45% in 2011.   In 2010 and 2011, these discounts would have been decreased by 0.25 percentage points if more than 25% of claims were Mail-Order.

[5] Brand/Mail-Order pricing:

Level 1 Pricing: The AWP discount would have been 33.15% in 2008, 34.15% in 2009, 35.50% in 2010, and 37.50% in 2011. The 2010 and 2011 discounts would have been increased by 0.50 percentage points if more than 25% of claims were Mail-Order.

Level 2 Pricing: Level 1 discounts would have been increased by 0.10 percentage points.

[6] Generic/Pharmacy pricing:

Level 1 Pricing: The AWP discount would have been 62.25% in 2008, 64.00% in 2009, 68.50% in 2010, and 69.50% in 2011.

Level 2 Pricing: The AWP discount would have been 63.00% in 2008, 65.00% in 2009, 69.75% in 2010, and 70.75% in 2011. These discounts are overall retail generic guarantees over the contract

[7] Generic/Mail-Order pricing:

Level 1 pricing: The AWP discount would have been 64.00% in 2008, 67.50% in 2009, 71.50% in 2010, and 72.50% in 2011. The 2010 and 2011 discounts would have increased by 0.50 percentage points if more than 25% of claims were Mail-Order.

Level 2 Pricing: Level 1 discounts would have increased by 0.50 percentage points.

[8] The Pharmacy dispensing fee for brand and generic drugs was $1.50 in 2008, $1.45 in 2009, $1.30 in 2010, and $1.15 in 2011.  There was no Mail-Order dispensing fee in any year.

**[B] United Food and Commercial Workers Unions and Employers Midwest Health Benefits Plan Notes:**

*National Medical Health Card Systems, Inc. (1/1/2008 - 12/31/2008)*

[1] The contract specifies that the PBM will pass through "92% of all monies collected on behalf of the Client by the Manager from Gross Rebates."  The UFCW will either collect this amount or $1.67 per approved claim, whichever is greater.

[2] The Pharmacy discount is whichever is lower of the listed prices. MAC generics are priced at lower of U&C or AWP minus 58.00%.  Non-MAC generics are priced at lower of U&C or AWP minus 22.00%.  Non-member Pharmacy claims will be reimbursed at the lower of the submitted price and the fund's contracted rate.

[3] In-network Pharmacy claims priced at the lower of U&C and AWP minus 15.50%.  Non-member Pharmacy claims will be reimbursed at the lower of the submitted price and the fund's contracted

[4] Dispensing fee for Pharmacy drugs will be the actual fee paid by the manager, but shall be no more than $2.10 per prescription. Dispensing fee for Generic/Mail-Order drugs will be the actual fee paid by the manager, but shall be no more than $1.75 per prescription.  There is no dispensing fee for Brand/Mail-Order drugs.

*Confidential - Subject to Protective Order*

*Catamaran ( September 2012 - Present)*

[1] The deposed believes the contract started in September 2012.

[2] Rebates are the greater of 100% of the actual rebates and a fixed amount per claim.

[3] The same rebate structure applies to both "Retail" and "Retail 90" Pharmacy prescriptions.

[4] Specialty rebates are the greater of 100% of rebates or $2.75 per net paid claim.

[5] Brand/Pharmacy pricing:

Retail (up to 30 days' supply): the lower of U&C or AWP minus 15.30%.

Retail 90 (31+ days' supply): the lower of U&C or AWP minus 19.90%.

[6] Generic/Pharmacy pricing:

Retail (up to 30 days' supply): MAC generic drugs priced at the lower of U&C or Catamaran MAC.  Non-MAC generic drugs priced at the lower of U&C or AWP minus 15.30%.

Retail 90 (31+ days' supply): MAC generic drugs priced at the lower of U&C or Catamaran MAC.  Non-MAC generic drugs priced at the lower of U&C or AWP minus 19.90%.  Effective overall generic guarantee (ingredient cost) is as follows:  Year 1: AWP minus 76.00% Year 2: AWP minus 76.50% Year 3: AWP minus 77.00%.

[7] Generic/Mail-Order pricing: MAC drugs priced at Catamaran MAC.  Non-MAC generics priced at AWP minus 23.10%.  Effective overall generic guarantee (ingredient cost) is 77.00% for all years.

[8] Retail Pharmacy prescriptions (up to 30 days' supply) have a $1.35 dispensing fee.  Retail 90 Pharmacy (31+ days' supply) and Mail-Order prescriptions have a $0.00 dispensing fee.

## [C] International Union of Machinists and Aerospace Workers District No. 15 Health Fund Notes:

*RxSolutions, Inc. ( 2/17/2010 - 5/31/2013)*

[1] Brand/Pharmacy rebates are $3.25 per Paid Claim from June 2010 - May 2011, $3.35 per Paid Claim from June 2011 - May 2012, and $3.45 per Paid Claim from June 2012 - May 2013.

[2] Brand/Mail-Order rebates are $16.50 per Paid Claim from June 2010 - May 2011, $17.00 per Paid Claim from June 2011 - May 2012, and $17.50 per Paid Claim from June 2012 - May 2013.

[3] Brand/Pharmacy pricing: AWP minus 17.50% from June 2010 - May 2011, AWP minus 18.00% from June 2011 - May 2012, and AWP minus 18.00% from June 2012 - May 2013.

[4] Brand/Mail-Order pricing:

Without preferred mail benefit: AWP minus 23.0% from June 2010 - May 2011, AWP minus 23.5% from June 2011 - May 2012, and AWP minus 24.00% from June 2012 - May 2013.

With the preferred mail benefit: AWP minus 23.5% from June 2010 - May 2011, AWP minus 24.50% from June 2011 - May 2012, and AWP minus 25.5% from June 2012 - May 2013.

[5] While Generic/Pharmacy prescriptions are actually priced at MAC, the PBM guarantees an aggregate average discount for all generics of AWP minus 62.00%.

[6] Generic/Mail-Order pricing:

Without preferred mail benefit: AWP minus 70.00% from June 2010 - May 2011, AWP minus 70.50% from June 2011 - May 2013, and AWP minus 71.0% from June 2012 - May 2013.

With the preferred mail benefit: AWP minus 71.00% from June 2010 - May 2011, AWP minus 72.00% from June 2011 - May 2012, and AWP minus 73.00% from June 2012 - May 2013.

[7]The Pharmacy dispensing fee for brand and generic drugs is $1.50.  There is no Mail-Order dispensing fee.

*OptumRX, Inc. (6/1/2013 - Present)*

[1] Brand/Mail-Order pricing:

Without preferred mail benefit: AWP minus 21.00%.

With the preferred mail benefit: AWP minus 22.50%.

[2] While Generic/Pharmacy prescriptions are actually priced at MAC, the PBM guarantees an aggregate average discount for all generics of  AWP minus 70.00% in FY 2013, AWP minus 70.50% in FY 2014, and AWP minus 71.00% in FY 2015.

[3] Generic/Mail-Order pricing: MAC.

Without preferred mail benefit: PBM guarantees an aggregate average minimum discount of AWP minus 73.00% in FY 2013, AWP minus 74.00% in FY 2014, and AWP minus 75.00% in FY 2015.

With the preferred mail benefit: PBM guarantees an aggregate average minimum discount of AWP minus 74.00% in FY 2013, AWP minus 75.00% in FY 2014, and AWP minus 76.00% in FY 2015.

[4] The Pharmacy dispensing fee for brand and generic drugs is $1.50.  There is no Mail-Order dispensing fee.

*Confidential - Subject to Protective Order*

[D] International Union of Machinists and Aerospace Workers District No. 15 Health Fund Notes:

*Express Scripts Inc. (11/1/2009 - 7/31/2010)*

[1] I.A.M. District 15 Health Fund entered into agreements with Express Scripts that contained several permutations for pharmacy drug pricing and rebate guarantees. For Pharmacy pricing guarantees, "Option A" is available for plans with under 30,000 participating pharmacies, "Option B" for plans with under 40,000 participating pharmacies, and "Option C" for plans with over 50,000 participating pharmacies. Pricing guarantees often differ across "Managed Plans" and "All Other Plans" within each option. "Managed Plans" are identified by the use of certain formularies laid out by ESI in the terms of the amendment. For rebates, the plan's formulary determines rebate levels, with 2-tier plans (or 3-tier plans with a less than $15 copay differential) having different rebate guarantees than 3-tier plans with a minimum $15 copay differential.

[2] The contract states, "ESI will pay to Member an amount equal to the greater of 100% of Rebates (excludes 100% Copay Members), or the flat per Brand amount as follows; provided that the per Brand Drug Claim amount is available to Members on the ESI National Preferred Formulary."

[3] For 2-Tier Plan Design (or 3-tier with less than $15 Copay Differential), rebate guarantee is $7.00 per brand drug claim for members with step therapy and $7.25 for those without step therapy. For 3-Tier Plan Designs with minimum $15 Copay Differential, rebate guarantee is $8.00 per brand drug claim for members with step therapy and $11.25 for those without step therapy.

[4] For 2-Tier Plan Design (or 3-tier with less than $15 Copay Differential), rebate guarantee is $21.00 per brand drug claim for members with step therapy and $26.00 for those without step therapy. For 3-Tier Plan Designs with minimum $15 Copay Differential, rebate guarantee is $25.00 per brand drug claim for members with step therapy and $38.00 for those without step therapy.

[5] Brand/Pharmacy average annual effective discount:

For 1 - 34 days' supply: AWP minus 19.25% and AWP minus 19.75% respectively for "All other plans" and "Managed Plans" under Option A, AWP minus 18.75% and AWP minus 19.25% under Option B, and AWP minus 18.00% and AWP minus 18.50% under Option B.

For 84 - 90 day maintenance supply: Option A guarantees an AWP discount of 23.00%, Option B 22.00%, and Option C 21.00%.  Maintenance supply guarantees do not differ by plans status as

[6] Brand/Mail-Order average annual effective guarantee: AWP minus 26.50% for "Managed plans" and AWP minus 26.00% for "All Other Plans."

[7] Contract indicates that drugs only qualify for generic discount if the medication is licensed by more than 2 generic drug manufacturers and not subject to patent litigation.

[8] For Generic/Pharmacy prescriptions for both "Managed Plans" and "All Other Plans", the discount will be the lower of AWP minus 40%, DVHCC MAC, and U&C.  The contract guarantees an average annual minimum effective discount of AWP minus 66.50%.

[9] For Generic/Mail-Order prescriptions for both "Managed Plans" and "All Other Plans", the discount will be the lower of AWP minus 40% and DVHCC MAC.  The contract guarantees an average annual minimum effective discount of 69.50%.

[10] The Pharmacy dispensing fee for both brand and generic drugs is $1.00. There is no Mail-Order dispensing fee.

*Express Scripts Inc. (8/1/2010 - 12/31/2012)*

[1] The contract states, "ESI will pay to Member an amount equal to the greater of 100% of Rebates (excludes 100% Copay Members), or the flat per Brand amount as follows; provided that the per Brand Drug Claim amount is available to Members on the ESI National Preferred Formulary."

[2] For 2-Tier Plan Design (or 3-tier with less than $15 Copay Differential), rebate guarantee is $7.50 per brand drug claim for members with step therapy and $7.75 for those without step therapy. For 3-Tier Plan Designs with minimum $15 Copay Differential, rebate guarantee is $8.50 per brand drug claim for members with step therapy and $11.75 for those without step therapy.

[3] For 2-Tier Plan Design (or 3-tier with less than $15 Copay Differential), rebate guarantee is $21.50 per brand drug claim for members with step therapy and $26.50 for those without step therapy. For 3-Tier Plan Designs with minimum $15 Copay Differential, rebate guarantee is $25.50 per brand drug claim for members with step therapy and $38.50 for those without step therapy.

[4] Brand/Pharmacy AWP discount:

For 1 - 34 days' supply: AWP minus 18.00% and 18.78% respectively for "All other plans" and "Managed Plans" under Option A, 17.22% and 18.26% under Option B, and 16.45% and 17.48% under Option B.

For 84 - 90 day maintenance supply: Option A guarantees an AWP discount of 20.59%, Option B 19.55%, and Option C 18.52%. Maintenance supply guarantees do not differ by plan's status as a management plan.

[5] For the Brand/Mail-Order, AWP discount, the contract guarantees 25.88% for "Managed plans" and 25.36% for "All Other Plans."

[7] Contract indicates that drugs only qualify for generic discount if the medication is licensed by more than 2 generic drug manufacturers and not subject to patent litigation.

[8] For the Generic/Pharmacy, AWP discount, the contract guarantees 71.00% for "Managed Plans" and 70.00% for "All Other Plans."

[9] For the Generic/Mail-Order, AWP discount, the contract guarantees 74.50% for "Managed Plans" and 73.00% for "All Other Plans."

[6] The Pharmacy dispensing fee for both brand and generic drugs is $1.00. There is no Mail-Order dispensing fee.

*Confidential - Subject to Protective Order*

**[E] Allied Services Division Welfare Fund Notes:**

*Atlantic Pharmaceutical Services (1/12008 - 10/1/2012)*

[1] The provided PBM contract does not contain the percentage rebate passed-through to Allied ("Company or the Designated Plan, as directed by Company, shall be entitled to [BLANK]% of the net Formulary savings and rebate funds received for Designated Plans utilizing the APS Formulary, with the balance payable to APS.").  The deposed also was unaware of the percentage rebates received by Allied from Atlantic Pharmaceutical Services. However, it appears that Allied received rebates from Atlantic Pharmaceutical Services in the course of its business.

[2] The Pharmacy dispensing fee for brand and generic drugs is $2.00.  There is no Mail-Order dispensing fee.

*OptumRx (10/1/2012-present)*

[1] The rebate amount per claim depends upon whether the plan possesses an  "Incentivized" formulary or "Non-incentivized" formulary.  If the plan had an "Incentivized" formulary the rebated amounts would have been $18.25 per Brand Paid Claim in 2012 and $19.00 per Brand Paid Claim in 2013 for Pharmacy claims and $55.25 per Brand Paid Claim in 2012 and $58.25 per Brand Paid Claim in 2013 for Mail-Order claims.  If the plan had a "Non-incentivized" formulary, the rebate amounts would have been $16.50 per Brand Paid Claim in 2012 and $17.25 per Brand Paid Claim in 2013 for Pharmacy claims and $50.25 per Brand Paid Claim in 2012 and $52.75 per Brand Paid Claim in 2013 for Mail-Order claims.  Neither the deposed nor any of the documents were able to verify which type of formulary Allied had.

[2] Brand/Pharmacy, AWP discount:

For 1-34 days' supply: the AWP discount was 15.3% in 2012 and 15.5% in 2013

For greater than 34 days' supply: the AWP discount was 17.8% in both years.

[3] For Brand/Mail-Order claims: the AWP discount was 25.1% in 2012 and 25.4% in 2013.

[4] According to the PBM contract, the aggregate average minimum discount off AWP for MAC and non-MAC generics was 77.5%.

[5] The Pharmacy dispensing fee was $1.10 from 2012 - 2013. There was no Mail-Order dispensing fee in any year.

**Sources:**

[1] "FOP_000180-FOP_000183 -addendum1.10 r hc.pdf"

[2] "FOP_000189-FOP_000210 -addendum2.08 r hc.pdf"

[3] "FOP_000211-FOP_000264 - amendment 2 r hc.pdf"

[4] "FOP_000265-FOP_000315 - HAC part 1 r hc.pdf"

[5] Deposition of Lissette Priegues-Granado, August 6, 2013.

[6] "L35_00055-L35_000183 - SPD L35 LAB Healthfinal.pdf"

[7] "L35_000184-L35_000200 - Laborers Local 35 Contract January 2013.pdf"

[8] Deposition of Diane Klobukowski, August 6, 2013.

[9] "UFCW_000807-UFCW_000809.pdf"

[10] "UFCW_000810-UFCW_000812.pdf"

[11] "UFCW_000834-UFCW_000861.pdf"

[12] Deposition of Daniel Ryan, July 29, 2013.

[13] "IBEW000001 - IBEW000303.pdf"

[14] "IAM15_000001 - IAM15_000040 - 0003 - Redacted.pdf"

[15] "IAM15_000041 - IAM15_000063 - 0043 - Redacted.pdf"

[16] "ASD_000004-ASD_000098 - Nexium - ASD - Production - PBM contracts.pdf"

[17] Deposition of Tammy Chesler, August 7, 2013.

*Confidential - Subject to Protective Order*

**Exhibit 5**
**Characteristics of Selected Named Plaintiff Prescription Drug Plans**

| Named Plaintiff: | Laborers International Union of North America Local 35 Health Care Fund[A] | International Brotherhood of Electrical Workers Local 595 Health and Welfare Fund[B] | The Fraternal Order of Police Miami Lodge # 20[C] | United Food and Commercial Workers Unions and Employers Midwest Health Benefits Plan[D] | | |
|---|---|---|---|---|---|---|
| **I. Number of tiers** | Two | Two | Three | Four | | |
| **II. Tier label** | | | | | | |
| Tier 0 | N/A | N/A | N/A | Preferred drugs | | |
| Tier 1 | Generic/single-source brand | Generic/single-source brand | Generics | Most generic drugs | | |
| Tier 2 | Multi-source brand | Multi-source brand | Formulary brand | Most branded drugs | | |
| Tier 3 | N/A | N/A | Other brand | Non-preferred drugs | | |
| **III. 30 days' supply copayment/coinsurance** | | | | | | |
| Time Period | 1/1/2010-1/1/2011 | 8/27/2008 | 12/1/2008 | 1/1/2007 | 2007-2010 | 1/1/2013 |
| Tier 0 | N/A | N/A | N/A | $0 | $0 | $0 |
| Tier 1 | $10 | $10 | $10 | $4 | $7 | $4 |
| Tier 2 | $20 | $20 | $25 | $10 | $15 | $10 |
| Tier 3 | N/A | N/A | $40 | $25 | $25 | $25 |
| **IV. 90 days' supply copayment/coinsurance** | | | | | | |
| Time Period | 1/1/2010-1/1/2011 | 8/27/2008 | 12/1/2008 | 1/1/2007 | 2007-2010 | 1/1/2013 |
| Tier 0 | N/A | N/A | N/A | $0 | $0 | $0 |
| Tier 1 | $20 | $20 | $20 | $8 | $14 | $8 |
| Tier 2 | $40 | $40 | $50 | $20 | $30 | $20 |
| Tier 3 | N/A | N/A | $80 | $50 | $50 | $50 |
| **V. Other payment factors** | | | | | | |
| Maximum benefit | 100% of first $6,000 covered 75% of next $3,000 covered 50% of next $3,500 covered | None | None | $1,500 - $14,000 | | |
| Out-of-pocket maximum | None | None | None | None | | |
| Deductible | None | None | $25 | None | | |

*Confidential - Subject to Protective Order*

**Exhibit 5 (continued)**
**Characteristics of Selected Named Plaintiff Prescription Drug Plans**

| Named Plaintiff: | International Union of Machinists and Aerospace Workers District No. 15 Health Fund [E] | New York Hotel Trades Council Health Benefit Fund [F] | A.F. of L. - A.G.C. Building Trades Welfare Plan [G] | Allied Services Division Welfare Fund [H] | Michigan Regional Council of Carpenters Employee Benefits Fund [I] | | |
|---|---|---|---|---|---|---|---|
| **I. Number of tiers** | Two | Two | Two | Three | Two | Four | Four |
| **II. Tier label** | | | | | | | |
| Tier 0 | N/A | N/A | N/A | N/A | N/A | Over-the-counter | |
| Tier 1 | Generic/single-source brand | Generic | Generic | Generics | Generic | Generic | |
| Tier 2 | Multi-source brand | Brand | Brand | Formulary (preferred brand) | Brand | Plan-preferred brand-name | |
| Tier 3 | N/A | N/A | N/A | Non-preferred brand | N/A | Non-preferred brand name | |
| **III. 30 days' supply copayment/coinsurance** | | | | | | | |
| Time Period | 1/1/2013 | Uncertain | 2009-2010 | 2007-present | 1/1/2009 | 1/1/2010 | 1/1/2011 |
| Tier 0 | N/A | N/A | N/A | N/A | N/A | $0 | |
| Tier 1 | 20% coinsurance | $5 | 0% coinsurance | 20% coinsurance/$5 minimum | 25% coinsurance/$12 minimum | $10 | |
| Tier 2 | 20% coinsurance | $15 | 20% coinsurance | 20% coinsurance/$10 minimum | 25% coinsurance/$12 minimum | 25% coinsurance/$20 minimum | |
| Tier 3 | N/A | N/A | N/A | 20% coinsurance/$25 minimum | N/A | 35% coinsurance/$30 minimum | |
| **IV. 90 days' supply copayment/coinsurance** | | | | | | | |
| Time Period | 1/1/2013 | Uncertain | 2009-2010 | 2007-present | 1/1/2009 | 1/1/2010 | 1/1/2011 |
| Tier 0 | N/A | -- | N/A | N/A | N/A | $0 | $0 |
| Tier 1 | 20% coinsurance | -- | 0% coinsurance | 20% coinsurance/$5 minimum | $10 | $25 | $25 |
| Tier 2 | 20% coinsurance | -- | 20% coinsurance | 20% coinsurance/$10 minimum | $20 | $50 | $85 |
| Tier 3 | N/A | -- | N/A | 20% coinsurance/$25 minimum | N/A | $75 | $100 |
| **V. Other payment factors** | | | | | | | |
| Maximum benefit | $2,000 - $7,500 | None | None | $100,000-$2,000,000 | $15,000 | | |
| Out-of-pocket maximum | None | None | None | None | None | | |
| Deductible | None | None | $300 ($900 per family) Includes brand drugs only | $50 | None | | |

*Confidential - Subject to Protective Order*

**[A] Laborers International Union of North America Notes:**

[1] Although benefit summary indicates $10 copay for generic drugs and $20 for brand drugs, the summary notes that if "no generic drug exists for a given prescription, only the $10.00 'generic drug' co-payment will be applicable."

**[B] Brotherhood of Electrical Workers Local 595 Health and Welfare Fund Notes:**

[1] If a 90-day supply prescription is obtained at a retail pharmacy instead of by mail order, copays are $30 for generic/single-source brands and $60 for multi-source brands.

[2] Policy indicates that a maximum of 30 days' supply can be obtained at a retail pharmacy, except in the case of "triplicate narcotics drugs."

**[C] The Fraternal Order of Police Miami Lodge # 20 Notes:**

[1] As of 12/1/2008, 90-day prescriptions were required to be filled through mail order. Starting in April 2009, they can be filled at CVS as well.

**[D] United Food and Commercial Workers Unions and Employers Midwest Health Benefits Plan Notes:**

[1] Some UFCW health plan documentation that pre-dates the damages period refers to prescription drug copays as deductibles.

[2] The indicated time period reflects the date on the plan summary document from which the copayment levels were obtained. Different time periods may reflect different plans and not the same plan over time.

**[E] International Union of Machinists and Aerospace Workers District No. 15 Health Fund Notes:**

[1] For generics and single-source brands, there is a minimum copay of $10 and a maximum copay of $40.

[2] For multi-source brands, in addition to the 20% coinsurance, the beneficiary is responsible for paying the difference in cost between the brand and the generic equivalent, with a minimum copay of $10.  Plan payment is limited to 80% of the cost of the generic equivalent.

[3] Maximum benefit is per person, per calendar year.

[4] Plan summary documents indicate a deductible and out-of-pocket maximum may be applied for some out-of-network services. It is unclear whether these include prescription drugs.

**[F] New York Hotel Trades Council Health Benefit Fund Notes:**

[1] Plan indicates 30 days' supply is the maximum provided, although some drugs can be obtained in a 90 days' supply.

**[G] A.F. of L. - A.G.C. Building Trades Welfare Plan Notes:**

[1] Out-of-network pharmacies not covered in the state of Alabama.

[2] The plan has a $1,000,000 maximum benefit that is not specific to prescription drugs.

[3] The plan has $1,000 out-of-pocket maximum, but copays do not count towards it.

**[H] Allied Services Division Welfare Fund Notes:**

[1] The maximum benefit was $100,000 until 2011, with annual increases thereafter. In 2013, the maximum benefit is $2,000,000. This maximum benefit applies to all services, not just prescriptions.

[2] Prior to 2011, the plan had a $500,000 lifetime maximum benefit.

*Confidential - Subject to Protective Order*

**[I] Michigan Regional Council of Carpenters Employee Benefits Fund Notes:**

[1] When a generic equivalent is available and a brand name drug is purchased, the Participant and family members will be required to pay the difference in cost between the generic and brand name medication plus the applicable generic copay.

[2] The plan summary does not list OTC drugs as a separate tier, but rather states "The Plan Provides coverage for over-the-counter products for a $0 copay."

[3] The plan summary states, "Current Prescription Proton Pump Inhibitors (Nexium, Prevacid, Protonix, Omeprazole) are to be substituted with OTC Prilosec for $0 copay."

[4] For Residential participants and their families, a $20 copay for generics and a $40 copay for brand-name drugs is applied. For mail order, the copays are doubled. If the cost of the drug is less than the copay, the cost of the drug is applied instead of a copay.

[5] Documentation for plan design in 2010 and 2011 specifies prices for "Mail" service, not necessarily 90 days' supply.

**Sources:**

[1] "L35_00055-L35_000183 - SPD L35 LAB Healthfinal.pdf"

[2] "L35_000371-L35_000374.pdf"

[3] "IBEW000001 - IBEW000303.pdf"

[4] "FOP_000114-FOP_000123.pdf"

[5] "UFCW_000002-UFCW_000107.pdf"

[6] "UFCW_000135--UFCW_000216.pdf"

[7] "UFCW_000243-UFCW_000320.pdf"

[8] "IAM15_000064 - IAM15_000069 - 0626 - Redacted.pdf"

[9] "IAM15_000070 - IAM15_000078 - 0632.pdf"

[10] "NYHT_000001-NYHT_00061.pdf"

[11] "AFL-AGC_000110 - AFL-AGC_000167 - SPD 2009 (00093431).pdf"

[12] "AFL-AGC_000168 - AFL-AGC_000229 - SPD 2010 (00093432).pdf"

[13] "ASD_000099-ASD_000221 - Nexium - ASD - Production Plans.pdf"

[14] "MRCC_000112-MRCC_000159.pdf"

[15] "MRCC_000262_MRCC_000345.pdf"

[16] "MRCC_000521-MRCC_000541.pdf"

*Confidential - Subject to Protective Order*

**Exhibit 6**
**United Food Workers and Commercial Workers Union and Employers Midwest Health Benefits Fund**
**Formulary Status of PPIs**
**As of January 2013**

| Drug type | Brand | Formulary language | Effective date | Tier zero ($0 co-pay) | Tier 1 ($7 co-pay) | Tier Two ($15 co-pay) | Tier Three ($25 co-pay) | Blocks |
|---|---|---|---|---|---|---|---|---|
| Over-the-counter | Prilosec | Prilosec OTC W RX/blkd 03 12 | 3/01/2012 | | | | | X |
| | | Prilosec OTC W RX | Not listed | X | | | | |
| | | Prevacid 24 hr OTC | 1/11/2010 | | X | | | |
| Generic | Prilosec | Omeprazole rx | 8/01/2011 | X | | | | |
| | | Omeprazole (msg OTC cvrd with rx) block suspended | 8/01/2011 | | | | | |
| | | Omeprazole 40 mg block suspended Tier 0 | 8/01/2012 | X | | | | |
| | | Omeprazole 40mg | 11/05/2008 | | | | | X |
| | Prevacid | Kapidex; Prilosec OTC with rx and Lansporazole covered | 2/10/2009 | | | | X | |
| | Protonix | Reaffirm generic Protonix | 3/08/2008 | | | | X | |
| Brand | Prilosec | Branded Prilosec not mentioned in formulary | -- | | | | | |
| | Prevacid | Prevacid Rx blkd 01 10; Prevacid 24 cvrd T1 | 1/01/2010 | | | | | X |
| | AcipHex | Nizatidine, Aciphex | Not listed | | | | | X |
| | | Aciphex | Not listed | | | | | X |
| | Protonix | Protonix | Not listed | | | | X | |
| | Nexium | Nexium | Not listed | | | | X | |
| | | Nexium GRA all strengths DR | 9/20/2012 | | | | X | |
| | | Nexium granules | 11/05/2008 | | | | X | |
| | Dexilant/Kapidex | Kapidex; Prilosec OTC with rx and Lansporazole covered | 2/01/2009 | | | | | X |

**Note:** Formulary language field is as appears in the actual formulary.

**Source:** "UFCW_000862-UFCW_000877.pdf" and Deposition of Daniel Ryan, July 29, 2013.

*Confidential - Subject to Protective Order*

**Exhibit 7A**
**Comparison of Brand and Generic Use Post-Generic Launch**
**Select PPIs**

| | Prilosec[2] | Protonix[3] | Prevacid[4] |
|---|---|---|---|
| **Manufacturer** | AstraZeneca | Wyeth/Pfizer | Takeda |
| **Generic launch date** | 12/9/2002 | 12/24/2007 | 11/10/2009 |
| **Patients with at least one claim pre- and post-generic launch[1]** | 36,065 | 19,520 | 14,619 |
| **Brand-only[5]** | | | |
| Patients | 6,318 | 2,229 | 1,818 |
| Share | 18% | 11% | 12% |
| Patients with equal or increased costs post-generic launch[6] | 4,268 | 1,660 | 1,415 |
| Share of brand-only patients with equal or increased costs | 68% | 74% | 78% |
| **Generic-only[5]** | | | |
| Patients | 14,746 | 15,591 | 11,081 |
| Share | 41% | 80% | 76% |
| Patients with equal or increased costs post-generic launch[6] | 5,091 | 3,756 | 1,650 |
| Share of brand-only patients with equal or increased costs | 35% | 24% | 15% |
| **Mixed - brand and generic[5]** | | | |
| Patients | 15,001 | 1,700 | 1,720 |
| Share | 42% | 9% | 12% |
| Patients with equal or increased costs post-generic launch[6] | 2,584 | 637 | 705 |
| Share of brand-only patients with equal or increased costs | 17% | 37% | 41% |
| **All patients with at least one claim pre- and post-generic launch[1]** | | | |
| Patients with equal or increased costs post-generic launch[6] | 11,943 | 6,053 | 3,770 |
| Share of all patients with equal or increased costs | 33% | 31% | 26% |

**Sources:** Employer claims data and Drugs@FDA.

*Confidential - Subject to Protective Order*

**Notes:**

[1] Patients are included in the analysis if they are eligible for the full year preceding generic launch and the 15 months following generic launch (allowing for one month gap). In all analyses, a 3-month post-period washout is included to allow for the possibility that patients "run-out" their brand prescription before switching to the generic version. Thus, the post-period being considered begins 3 months following generic launch (*e.g.*, for a generic drug launched January 1, 2011 prescriptions would be examined in the period March 1, 2011 to March 1, 2012).

[2] Of the 67,727 patients that had at least one claim for brand or generic Prilosec in the year pre- and 15 months post-generic launch, 36,065 patients had both (i) one branded claim for Prilosec in the period pre-generic launch and (ii) one claim for any Prilosec in the period post-generic launch (53% of total patients with at least one Prilosec claim -- 36,065 / 67,727 = 53%).

[3] Of the 63,633 patients that had at least one claim for brand or generic Protonix in the year pre- and 15 months post-generic launch, 19,520 patients had both (i) one branded claim for Protonix in the period pre-generic launch and (ii) one claim for any Protonix in the period post-generic launch (31% of total patients with at least one Protonix claim -- 19,520 / 63,633 = 31%).

[4] Of the 46,534 patients that had at least one claim for brand or generic Prevacid in the year pre- and 15 months post-generic launch, 14,619 patients had both (i) one branded claim for Prevacid in the period pre-generic launch and (ii) one claim for any Prevacid in the period post-generic launch (31% of total patients with at least one Prevacid claim -- 14,619 / 46,534 = 31%).

[5] Brand-only patients had at least one branded prescription both pre- and post-generic launch and had no generic prescriptions in the same period. Generic-only patients had at least one branded prescription pre-generic launch and at least one generic prescription and no branded prescriptions post-generic launch.  Mixed patients had at least one branded prescription pre-generic launch and at least one branded and one generic prescription post-generic launch.

[6] A patient's average payment is calculated as the average patient payment (copay plus deductible plus coinsurance) per day supplied across all of his or her prescriptions.

[7] IV formulations of Protonix and Prevacid are not considered in this analysis.

*Confidential - Subject to Protective Order*



**Exhibit 7B**
**Patients with Equal or Increased Costs Post-generic Launch**
**Select PPIs**

**Notes:**
[1] Brand-only patients had at least one branded prescription both pre- and post-generic launch and had no generic prescriptions in the same period. Generic-only patients had at least one branded prescription pre-generic launch and at least one generic prescription and no branded prescriptions post-generic launch.  Mixed - brand and generic patients had at least one branded prescription pre-generic launch and at least one branded and one generic prescription post-generic launch.
[2] A patient's average payment is calculated as the average patient payment (copay plus deductible plus coinsurance) per day supplied across all of his or her prescriptions.
[3] IV formulations of Protonix and Prevacid are not considered in this analysis.

**Sources:** Employer claims data and Drugs@FDA.

*Confidential - Subject to Protective Order*

## APPENDIX A

| | |
|---|---|
| **NAME** | **James W. Hughes** |

**ADDRESS**   Home: 2 Stone Ridge Drive          Office: Department of Economics
Waterville, ME  04901                      Bates College
207-873-4239 (v)                             Lewiston, ME  04240
207-873-2314 (f)                             207-786-6193
jhughes@bates.edu

**DEGREES:**   Ph.D., Economics, The University of Michigan, 1987
M.A., Economics, Boston University, 1978
A.B., International and Comparative Studies, Boston University,
1977, *summa cum laude*, with distinction

**FIELDS:**   Industrial Organization and Antitrust Policy; Law and Economics; Health
Economics; Environmental Economics; Labor Economics
*Thesis: The Economics of Medical Malpractice Reform*

**ACADEMIC**
**POSITIONS:**   BATES COLLEGE, Lewiston, ME, 2005-.
Thomas Sowell Professor of Economics

BATES COLLEGE, Lewiston, ME, 2004-2005.
Professor of Economics

BATES COLLEGE, Lewiston, ME, 1999-2006.
Chair, Department of Economics

BATES COLLEGE, Lewiston, ME, 1997-2004.
Associate Professor of Economics

BATES COLLEGE, Lewiston, ME, 1992-1997.
Assistant Professor of Economics

AMHERST COLLEGE, Amherst, MA, 1987-1992.
Assistant Professor of Economics

STATE UNIVERSITY OF NEW YORK AT ALBANY, Albany,
NY, 1986-1987.
Assistant Professor of Economics

**ARTICLES IN**
**REFEREED**
**JOURNALS:**   "Finding the Lost Jockeys," (with Debra Barbezat), *Historical Methods*,
2014, *in press.*

A-1

*Confidential - Subject to Protective Order*

"A Comparison and Decomposition of Reform-Era Labor Force Participation Rates of China's Ethnic Minorities and Han Majority," (with M. Maurer-Fazio and Dandan Zhang), *International Journal of Manpower,* v. 31 n. 2, 2010, pp. 138-162 [also cited as IZA Discussion Paper #4148, April 2009].

"An Ocean Formed from One Hundred Rivers: The Effects of Ethnicity, Gender, Marriage, and Location on Labor Force Participation in Urban China," (with M. Maurer-Fazio and Dandan Zhang), in Gender, China, and the World Trade Organization, Gunseli Berik, Xiaoyuan Dong, and Gale Summerfield, eds., (London and New York, Routledge, Taylor and Francis Group, 2009) pp. 157-185.

"海纳百川：民族、性别、婚姻、地区等因素对中国城市地区劳动参与 的作用和影响," (with M. Maurer-Fazio and Dandan Zhang), (An Ocean Formed from One Hundred Rivers: The Effects of Ethnicity, Gender, Marriage, and Location on Labor Force Participation in Urban China,"), in Gunseli Berik, Xiaoyuan Dong, and Gale Summerfield edited 中国经济转型与女性经济学 (China's Economic Transition and Feminist Economics) Beijing: Economic Science Press, 2009, pp.130-157.

"An Ocean Formed From One Hundred Rivers: The Effects of Ethnicity, Gender, Marriage and Location on Labor Force Participation in Urban China, (with M. Maurer-Fazio and D. Zhang), *Feminist Economics,* v. 13, n. 3-4, July/October, 2007, pp. 159-187.

"Salary Structure Effects and the Gender Pay Gap in Academia," (with D. Barbezat), *Research in Higher Education*, v. 46, n 6, September, 2005.

"The Effect of Market Liberalization on the Relative Earnings of Chinese Women," (with M. Maurer-Fazio) *Journal of Comparative Economics*, v 30, n 4, pp. 709-731, December, 2002 [also cited as William Davidson Working Paper No. 460].

"An Analysis of the Effects of Marital Status, Educational Attainment, and Occupation on the Size and Composition of Urban China's Gender Wage Differentials," (with M. Maurer-Fazio) *Pacific Economic Review*, v. 7, n. 1, pp. 137-156, February, 2002.

"The Effect of Job Mobility on Academic Salaries," (with D. Barbezat), *Comtemporary Economic Policy,* v. 19, n. 4, October, 2001, pp 409-423.

"Health Consequences of Smoking and Its Regulation," (with Michael

A-2

Moore), *Frontiers in Health Policy* v. 4, 2001 pp.31-76  [also cited as NBER Working Paper #7979, October, 2000]

"Accounting for Censoring in Duration Data: An Application to Estimating the Effect of Tort Reforms on the Length of Time to Resolution of Medical Malpractice Claims" (with E. Savoca), *Journal of Applied Statistics* v. 26, n. 2, February, 1999, pp. 219-228

"allocation of litigation costs--American and English rules," (with Edward Snyder), *The New Palgrave Dictionary of Economics and the Law*, Peter Newman, editor, (London, The  Macmillan Press), July, 1998.

"Wal-Mart and Maine: The Effect on Employment and Wages," (with B. Ketchum), *Maine Business Indicators*, v. 42 n.2, Summer, 1997.

"The Effect of Legal Reforms on the Longevity of Personal Injury Claims," (with E. Savoca), *International Review of Law and Economics*, v 17, pp. 261-273, June, 1997.

"Basing Point Pricing and the German Steel Cartel: A Look at the 'New Competitive' Theory," (with Daniel Barbezat), *The Journal of Economic History*, March, 1996, pp. 215-222.

"Litigation Under the English and American Rules: Theory and Evidence," (with E. Snyder), *The Journal of Law and Economics,* April, 1995, p.225-250.

"Barriers to the Establishment of New Drug Treatment Facilities," (with F. Porell and H. Pollakowski),  *NIDA Services Research  Monograph: Access and Financing in Drug Abuse Services* (Gabrielle Denmead and Beatrice A. Rouse, eds.), no. 2, (1994).

"The English Rule for Allocating Legal Costs: Evidence Confronts Theory," (with E. Snyder), *Journal of Law, Economics, and Organization*, Fall, 1990, pp. 345-380.

"Sex Discrimination in Labor Markets: The Role of Statistical Evidence--Comment," (with Debra Barbezat), *The American Economic Review*, March, 1990, pp. 277-286.

The Effect of Medical Malpractice Reform Laws on Claim Disposition," *International Review of Law and Economics*,  June, 1989, pp. 57-78.

A-3

*Confidential - Subject to Protective Order*

"Policy Analysis of Medical Malpractice Reforms: What Can We Learn From Claims Data?" (with E. Snyder), *Journal of Business and Economic Statistics*, October, 1989, pp. 423-431.

"Evaluating Medical Malpractice Reforms," (with E. Snyder), *Contemporary Policy Issues*, April, 1989, pp. 83-98.

**EDITED VOLUMES AND CONFERENCE PROCEEDINGS**
"Economic Reforms, Gender, and Changing Patterns of Labor Force Participation in Urban and Rural China," (with James W. Hughes and Zhang Dandan) in *Conference Proceedings of the 2005 CES International Conference on Sustainable Growth in China*, Chongqing, China. 2005. Volume I-B, pp. 502-510.

"Risk Aversion and the Allocation of Legal Costs," (with G. Woglom), in David A. Anderson, ed., *DISPUTE RESOLUTION: Bridging the Settlement Gap*, (Greenwich, CT JAI Press, 1996).

**MONOGRAPHS:**
*Cost Estimates for Expanded Substance Abuse Benefits for Medicaid-Eligible Pregnant Women* (with M.J. Larson, G. Ritter, P. McQuide, C. Horgan), Institute for Health Policy, The Heller School, Brandeis University, 1993

*Socioeconomic Effects of Reducing Emissions of Chlorofluorocarbons (CFCs) in the OECD*, Environment Directorate, Organization for Economic Cooperation and Development, Paris, France (1983).

*Information Disclosure*, President's Regulatory Council, Washington, DC (1982).

**BOOK REVIEWS:**
*Insuring Medical Malpractice*, by Frank Sloan, Randall Bovbjerg, and Penny Githens, and *Medical Malpractice on Trial*, by Paul Weiler, reviewed in *Journal of Policy Analysis and Management*, v. 12, n. 2, Spring, 1993, pp. 396-399.

*Medicare's New Hospital Payment System*, by Louise Russell, reviewed in *Eastern Economic Journal*.

**WORKING PAPERS:**
"The Vietnam Migration and Human Traffficking Household Survey Pilot Project," (with Dinh Vu Trang Ngan and Conor Hughes) *in process.*

"'Napsterizing' Pharmaceuticals: Access, Innovation, and Consumer Welfare," (with M. Moore and E. Snyder), National Bureau of Economic Research Working Paper #9229, October, 2002, revised 2011.

A-4

*Confidential - Subject to Protective Order*

| | |
|---|---|
| **COURSES TAUGHT:** | Economics of Intellectual Property |
| | Law and Economics |
| | Labor Economics |
| | Economic Statistics |
| | Intermediate Microeconomic Theory |
| | Principles of Microeconomics |
| | The Economics of Women, Men, and Work |
| | Environmental and Natural Resource Economics |
| | Sustaining the Masses: Economic Development and Environmental Protection in the People's Republic of China |
| | Health Economics |
| | Environmental Issues in Economic Development |
| | Earth Under Siege: Global Warming and Atmospheric Change |
| | Principles of Macroeconomics |
| | Property, Liberty, and Law |
| | Industrial Organization and Antitrust Policy |
| | Business and Government |

**PRESENTATIONS:** "Finding the Lost Jockeys," Third International Conference on Sport and Society, Cambridge University, Cambridge, England, July 23-25, 2012.

"A Comparison of Reform-Era Labor Force Participation Rates of China and Han Majority" (with M. Maurer-Fazio and Dandan Zhang), Workshop on "Economy and Society Development in China and the World", Beijing October 13 and 14, 2011, hosted by: Institute of Ethnology and Anthropology Chinese Academy of Social Sciences.

"A Comparison and Decomposition of Reform-Era Labor Force Participation Rates of China's Ethnic Minorities and Han Majority," (with M. Maurer-Fazio and Dandan Zhang), American Economics Association Annual Meeting, Denver, CO, January, 2011.

"The Economic Status of China's Ethnic Minorities," (with M. Maurer-Fazio), Western Economics Association Pacific Rim Conference, Hong Kong SAR, China, January, 2005.

"'Napsterizing' Pharmaceuticals: Access, Innovation, and Consumer Welfare," (with M. Moore and E. Snyder), Applied Microeconomics and Economic and Legal Organization, Graduate School of Business, University of Chicago, October, 2002.

"'Napsterizing' Pharmaceuticals: Access, Innovation, and Consumer Welfare," (with M. Moore and E. Snyder), Annual Meeting of the

A-5

*Confidential - Subject to Protective Order*

Pharmaceutical Economics and Policy Council, Washington, DC, January 2002.

"The Gender Wage Gap in Urban China: The Effects of Institutional Change," (with M. Maurer-Fazio), Allied Social Sciences Association, Boston, MA  January, 2000.

"The Effect of Job Mobility on Academic Salaries," (with D. Barbezat), Western Economics Association Meetings, San Diego, CA  July, 1999.

"The Economics of the 'Loser-Pays" Rule," Edward T. Gignoux Inn of Court, Portland, Maine, February 12, 1997.

Keynote Address, Matriculation Dinner for the Class of 1999, Bates College, September 5, 1995.

Breckenridge Lecture,"Is the English Rule Really Cheaper?" Colby College, April 26, 1995.

"Can the English Rule Cure the Ills of Medical Malpractice?" presented to the Androscoggin County Medical Society, March 16, 1995.

"What Blue Cross Knows Can Hurt You:  Ethical Dilemmas in Private Medical Insurance,"  TGIF Lecture, Muskie Archives, March 3, 1995.

"Female Academics:  Mobility and the Returns to Seniority," Annual Meetings of the Southern Economics Association, Orlando, FL  November 20, 1994.

Breckenridge Lecture, "Economics of the English Rule," Colby College, April 20, 1994.

"Health Care Reform and Medical Malpractice: Smoke or Fire?" TGIF Lecture, Muskie Archives, March 4, 1994.

"Litigation Under the English and American Rules: Theory and Evidence," Annual Meetings of The American Economics Association, Boston, Massachusetts, January 5, 1994.

"Marketable Permits for Chlorofluorocarbon Regulation," Colby College, October, 1993.

*Confidential - Subject to Protective Order*

"Litigation Under the English and American Rules: Theory and Evidence," Research Seminar in Law and Economics, Harvard Law School, April 7, 1993.

"Litigation Under the English and American Rules: Theory and Evidence," Annual Meeting of the American Law and Economics Association, Yale University, May 1, 1992.

"NIMBY and the Location of Drug Treatment Facilities," National Institute on Drug Abuse, July, 1991.

American Bar Association, "Litigation, Justice, and the Public Good," San Diego, CA  April 25-27, 1991.

"Contingent Fees, Litigation, and the Quantity of Litigation," Annual Meeting of the Law and Society Association, May 31, 1990, Berkeley, CA

"The English Rule for Allocating Legal Costs: Evidence Confronts Theory," Annual Meeting of the Law and Society Association, Madison, WI, June 1, 1989.

"Controlling for Sample Selection in the Analysis of Closed Claim Data," Annual Meetings of the Western Economics Association, Vancouver, BC, Canada, July, 1988.

"Medical Malpractice Reforms and the Resolution of Claims," Annual Meetings of the Eastern Economics Association, Arlington, VA  March, 1987.

"Is the Sample of Litigated Claims Random?  Preliminary Results of a Trivariate Probit Estimator," Annual Meetings of the Eastern Economics Association, Baltimore, MD, March, 1986.

**PROFESSIONAL SERVICE**
Referee for: *Journal of Law and Economics, International Review of Law and Economics, Economic Inquiry, Journal of Risk and Insurance, Journal of Law, Economics, and Organization, Journal of Policy Analysis and Management, Behavioral Science and the Law, Social Sciences Quarterly.*

Reviewer for the National Science Foundation.

**PENDING GRANT APPLICATIONS:**
"The Vietnam Migration and Human Trafficking Household Survey," *Growth and Labor Markets in Low Income Countries Programme*, IZA, Bonn, Germany, €40,000.

A-7

*Confidential - Subject to Protective Order*

"The Vietnam Migration and Human Trafficking Household Survey," *SES—Economics*, National Science Foundation, $409,000.

**GRANTS AND AWARDS:**

"The Vietnam Migration and Human Trafficking Household Survey, Pilot Project," Bates Faculty Development Fund Grant, Bates College, 2012-2013.

The Vietnam Migration and Human Trafficking Household Survey, Pilot Project," PEAP Grant, The Harward Center for Community Engagement, Bates College, 2012-2013.

Phillips Faculty Fellowship, Bates College, 2012-2013.

"The 'Dis-Integration' of American Horse Racing," Bates College Faculty Development Fund Grant, 2010-2011.

Kroepsch Award for Excellence in Teaching, 2009-2010, Bates College.

"Inspirational Hall of Fame," Alfond Youth Center, Waterville, Maine, May, 2005.

Paganucci Award for Outstanding Community Service, Alfond Youth Center, Waterville, Maine, 2004.

Joint Student-Faculty Research Grant (with D. Barsky, '03), Freeman Foundation Asian Studies Grant Program, Bates College, 2002.

Curriculum Development Grant (with M. Maurer-Fazio and S. Yang), Freeman Foundation Asian Studies Grant Program, Bates College, 2002.

Mellon Summer Research Apprenticeship, Bates College, 2000.

Mellon Summer Research Apprenticeship, Bates College, 1998

The President's Fund for Faculty and Curricular Development, Bates College, 1997-1998.

Curricular Development Grant, Otis Fund, Bates College, 1997.

Mellon Summer Research Apprenticeship, Bates College, 1996.

Kroepsch Award for Excellence in Teaching, 1994-1995, Bates College.

A-8

*Confidential - Subject to Protective Order*

Amherst College Research Award (1991-1992) to examine the effect of no-fault medical malpractice insurance on the size of awards, the number of claims, and the number of medical injuries.

Post-Doctoral Research Fellow in the Economics of Mental Health, Brandeis University, Florence Heller School for Advanced Studies in Social Welfare, 1990-1991.

Research grant from The Robert Wood Johnson Foundation Medical Malpractice Program (1987-1988) to examine the long-term effects of medical malpractice reform legislation on the size, frequency, and disposition of medical malpractice claims.

Miner D. Crary Fellow, Amherst College, 1988-1989.

**NON-ACADEMIC POSITIONS:** LITIGATION CONSULTANT, 1990-
Economic expert for antitrust, regulation, and discrimination litigation. Retained on several cases involving the pharmaceutical industry, the prescription benefit manager industry, the environmental control industry, the synthetic rubber industry, nutritional supplement industry, the hospital industry, the automobile insurance industry, the sardine market, retail automobile sales, the retail gasoline market, school photography, musical instruments, airline transportation, and sex discrimination.

BRANDEIS INSTITUTE FOR HEALTH POLICY, Waltham, MA 1992-1993
Co-Author of a report on the residential housing market in the San Francisco-Oakland Bay Area, and the effect on property values resulting from locating residential drug treatment facilities in that market. Co-Author of a study of the effects on Medicaid expenditures of extending coverage for outpatient and residential drug treatment to pregnant drug users.

THE RAND CORPORATION, Santa Monica, CA  1985-1986.
Consultant on a study of the European chlorofluorocarbon industry for the U.S. Environmental Protection Agency.  Examined the effect of proposed regulations on competition within the European chemical industry.

ORGANIZATION FOR ECONOMIC COOPERATION AND DEVELOPMENT, Paris, France, 1982-1983
Author of a report to the Environment Directorate on the socioeconomic implications of chlorofluorocarbon emissions and their control in the OECD nations.  Report assessed progress in

A-9

*Confidential - Subject to Protective Order*

controlling emissions and quantifies the potential economic effects
of further emissions reductions.

SRI INTERNATIONAL, Menlo Park, CA  1981.
Consultant to the Regulatory Analysis and Management Program.
Project included construction of a programming model to assist petroleum
refineries in finding the least cost method of reducing emissions of volatile
organic chemicals.  Author of a manual on the use of information
disclosure in regulatory reform for the President's Regulatory Council.

U.S. ENVIRONMENTAL PROTECTION AGENCY,
Washington, DC, 1978-1980.
Economist in the Office of Pesticides and Toxic Substances.
Authored several reports on the effects of regulating toxic chemicals
through the use of marketable rights.  Responsible for economic
analyses of proposed regulations to limit uses of
chlorofluorocarbons and asbestos.

A-10

*Confidential - Subject to Protective Order*

# APPENDIX B

## James W. Hughes

### Experience as Testifying Expert since 2002

**In Re: Skelaxin (metaxalone) Antitrust Litigation,** U.S. District Court, E.D. Tenn., Lead Case No. 2:12-cv-4, MDL 2343.

**Johns et al. v. Bayer Corporation et al.,** U.S. District Court, S.D. Cal., Case No. 09 CV 1935 DMS JMA.

**The State of Texas ex rel. Allen Jones v. Janssen L.P. et al.,** 250th Judicial District, Travis County, TX, Cause No. D-1GV-04-001288.

**King Drug Company of Florence Inc. et al., v. Cephalon Inc. et al.** U.S. District Court, E.D. Penn., No. 2:06-cv-1797.

**In Re: Neurontin Antitrust Litigation,** *Louisiana Wholesale Drug Company et al., v. Pfizer Inc., et al.* MDL Docket No. 1479, Master Docket No. 02-CV-1390.

**Corbett v. TAP Pharmaceuticals, et al.,** Commonwealth Court of Pennsylvania, Dkt. No. 212 MD 2004.

**U.S. ex rel Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.** U.S. District Court, MA Civil Action No. 00 CV 10698 MEL.

**State of Alabama v. Abbott Laboratories Inc. et al.,** C.C. Montgomery County, Ala., Civil Action CV 2005-21.

**In Re Pharmaceutical Industry Average Wholesale Price Litigation,** In the matter of *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc., v. Abbott Laboratories, Inc.,* **CIVIL ACTION NO. 06-11337-PBS.**

**Patricia Griffiths v. Eastern Maine Medical Center,** U.S. District Court, ME, Civil Action 2:2008-CV-00220.

**Putney, Inc. v. Pfizer Inc. and MWI Veterinary Supply,** U.S. District Court, ME, Civil Docket No. 2:07-cv-00108-DBH.

**Axiom Plastics v. E.I. DuPont Canada Company,** Ontario (Canada) Sup.Ct. Court File No. 05-CV-302358 CP.

**In Re Pharmaceutical Industry Average Wholesale Price Litigation,** In the matters **of:** *State of Nevada v. American Home Prods. Corp., et al.,* 02-CV-12086-PBS; **and** *State*

B-1

*Confidential - Subject to Protective Order*

*of Montana v. Abbott Labs., Inc., et al.,* 02-CV-12084-PBS, **MDL NO. 1456, Master File No. 01-CV-12257-PBS.**

**State of Connecticut v. Aventis Pharmaceuticals**, **Docket X07 CV03-0083299 S (CLD).**

**In Re NBR Antitrust Litigation,** **U.S. District Court, W.D. Pa., Civil Action No. 03-1898.**

**In Re Cardizem CD Antitrust Litigation, Blue Cross Blue Shield of Michigan, et al v. Hoechst AG,  et al,** **U.S. District Court, E.D. Mich., Case No. 01-72806.**

**Cipro Cases I & II,** **JCCP Proceeding Nos.:  4154 & 4220, (Sup. Ct. Ca., San Diego County).**

**Holoman, et al. v. Pfizer Inc., et al.,** **No. 02 L 480 (Illinois 3rd Judicial Circuit).**

**Altman v. Bayer Corp.,** **(N.Y. Sup. Ct., Index No. 603820-00).**

**Great Lakes Health Plan et al. v. Pfizer, et al.,** **No. 1:01CV106 (N. Dist. WV).**

**Brady Enterprises, et al. v. Medco Health Solutions, et al.,** **U.S. District Court, E.D. Penn., Civ. No. 03-4730 .**

*Confidential - Subject to Protective Order*

APPENDIX C
DOCUMENTS RELIED UPON

**Bates Stamped and Other Case Documents**

- "AFL-AGC_000110 - AFL-AGC_000167 - SPD 2009 (00093431).pdf"
- "AFL-AGC_000168 - AFL-AGC_000229 - SPD 2010 (00093432).pdf"
- "ASD_000004-ASD_000098 - Nexium - ASD - Production - PBM contracts.pdf"
- "ASD_000099-ASD_000221 - Nexium - ASD - Production Plans.pdf"
- "AZ-NX-MDL-00823263.ppt"
- "FOP_000114-FOP_000123.pdf"
- "FOP_000180-FOP_000183 -addendum1.10 r hc.pdf"
- "FOP_000189-FOP_000210 -addendum2.08 r hc.pdf"
- "FOP_000211-FOP_000264 - amendment 2 r hc.pdf"
- "FOP_000265-FOP_000315 - HAC part 1 r hc.pdf"
- "IAM15_000001 - IAM15_000040 - 0003 - Redacted.pdf"
- "IAM15_000041 - IAM15_000063 - 0043 - Redacted.pdf"
- "IAM15_000064 - IAM15_000069 - 0626 - Redacted.pdf"
- "IAM15_000070 - IAM15_000078 - 0632.pdf"
- "IBEW000001 - IBEW000303.pdf"
- "L35_000184-L35_000200 - Laborers Local 35 Contract January 2013.pdf"
- "L35_000371-L35_000374.pdf"
- "L35_00055-L35_000183 - SPD L35 LAB Healthfinal.pdf"
- "MRCC_000112-MRCC_000159.pdf"
- "MRCC_000262_MRCC_000345.pdf"
- "MRCC_000521-MRCC_000541.pdf"
- "NEX-RBX 3525485.pdf"
- "NYHT_000001-NYHT_00061.pdf"
- "UFCW_000002-UFCW_000107.pdf"
- "UFCW_000135--UFCW_000216.pdf"
- "UFCW_000243-UFCW_000320.pdf"
- "UFCW_000807-UFCW_000809.pdf"

*Confidential - Subject to Protective Order*

- "UFCW_000810-UFCW_000812.pdf"

- "UFCW_000834-UFCW_000861.pdf"

- "UFCW_000862-UFCW_000877.pdf"

- "UFCW_001238-UFCW_001239.pdf"

- "UFCW_001263.pdf"

- "UFCW_001264.pdf"

- Corrected Consolidated Amended Class Action Complaint and Demand for Jury Trial, MDL No. 2409, Civil Action No.: 1:12-md-2409-WGY, February 1, 2013.

- Declaration of Meredith Rosenthal in Support of Certification of the Class of End-Payor Purchasers of Nexium, July 26, 2013.

    o "Nexium_Indirect_Attachment_C.xlsx"

- Memorandum of Law in Support of End-Payor Plaintiffs' Motion for Class Certification, MDL No. 2409, Civil Action No.: 1:12-md-2409-WGY, July 26, 2013.

- Nexium Rebate Extract, "S-1938_Rebates_Extract.txt".

**Depositions and Exhibits**

- Deposition of Tammy Chesler, August 7, 2013.

- Deposition of Lissette Priegues-Granado, August 6, 2013.

- Deposition of Diane Klobukowski, August 6, 2013.

- Deposition of Meredith Rosenthal, August 19, 2013.

- Deposition of Daniel Ryan, July 29, 2013.

**Publications**

- Berndt, Ernst R., Margaret Kyle, and Davina Ling, "The Long Shadow of Patent Expiration: Generic Entry and Rx-to-OTC Switches," in Feenstra, Robert C. and Matthew D. Shapiro, eds., in Scanner Data and Price Indexes, (Chicago, IL, University of Chicago Press, 2003).

- "Experience Rating and Funding Methods," Chapter 35, in William F. Bluhm, ed., et al., in Group Insurance, Fifth Edition, (Winsted, CT, Actex Publications, 2007).

- Halvorson, Audrey. and John Watkins, "Prescription Drug Benefits in the United States," Chapter 9 in William F. Bluhm ed., et al., Group Insurance, Fifth Edition, (Winsted, CT, Actex Publications, 2007).

- Kaiser Family Foundation and Health Research & Educational Trust, Employer Health Benefits Annual Survey, 2012.

- Kaiser Family Foundation, "Prescription Drug Trends," May 2010.

- Kaiser Family Foundation, "The Uninsured: A Primer," October 2012.

C-2

*Confidential - Subject to Protective Order*

- Navarro, Robert, Managed Care Pharmacy Practice, Second Edition, (Sudbury, MA, Jones and Bartlett Publishers, 2009).

- Pharmacy Benefit Management Institute, 2011-2012 Prescription Drug Benefit Cost and Plan Design Report, available at http://www.benefitdesignreport.com (accessed June 12, 2013).

## Websites

- Drugs@FDA, http://www.accessdata.fda.gov/scripts/cder/drugsatfda/.

- Harvard Pilgrim's Prescription Drug List, at https://www.harvardpilgrim.org/pls/ext/f?p=768:27:1997069775419060::NO:RP:P27_PDF:T4DrugListByCategory (accessed August 8, 2013).

- Nexium Medication Guide, at http://www.purplepill.com/pdf/NexiumMedicationGuide.pdf (accessed August 8, 2013).

## SEC Filings

- Aetna Inc. Form 10-K for fiscal year ending December 31, 2012.

## Other Sources

- Employer drugs and eligibility claims data.

*Confidential - Subject to Protective Order*