UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re: Nexium (Esomeprazole Magnesium) Antitrust Litigation* | MDL No. 2409 |
| This Document Relates to: | Civil Action No. 1:12-md-02409-WGY |
| *Walgreen* (No. 13-cv-10337-WGY) *Giant Eagle* (No. 13-cv-11305-WGY) *Rite Aid* (No. 13-cv-12074-WGY) | |

**CONSOLIDATED RETAILER PLAINTIFFS' OPPOSITION TO MOTIONS
TO STRIKE UNTIMELY EXPERT REPORTS**

The Retailer Plaintiffs submit this Opposition to the joint motion of Defendants AstraZeneca, Ranbaxy, and Teva, and the separate motion of Dr. Reddy's Laboratories ("DRL")[1] to strike four of the Retailer Plaintiffs' expert rebuttal reports, which were filed in accordance with the operative Case Management Order, Dkt. No. 404 ("CMO").[2] The motions should be denied.

**I. Introduction**

Contrary to Defendants' assertions, the exchange of expert reports in this case has occurred exactly as contemplated by Rule 26 and the CMO. Retailer Plaintiffs provided affirmative expert reports to support their antitrust claims against Defendants in the initial reports served on August 23. On September 30, Defendants served nineteen reply experts raising a host of new issues and asserting various criticisms and other objections to Retailer Plaintiffs' initial reports. Finally, on October 25, 2013, Retailer Plaintiffs served six rebuttal experts responding

---

[1] We refer to the four defendants collectively as "Defendants," and Ranbaxy, Teva, and DRL as the "Generic Defendants."

[2] Retailer Plaintiffs and Defendants all jointly stipulated to the schedule in the CMO. *See* Dkt. No. 404.

to Defendants' experts. As these expert reports were being exchanged, the parties continued to conduct relevant fact discovery, and, as expressly authorized by the CMO, the parties' experts discussed new evidence and issues arising from discovery obtained after August 20 in their various reply and rebuttal reports.

Despite Retailer Plaintiffs' compliance with the CMO, Defendants now seek to deny Retailer Plaintiffs an opportunity to provide any response to their own expert reports. As demonstrated below, all of the reports served on October 25 qualify as rebuttal reports pursuant to Rule 26(a)(2)(D)(ii) as interpreted by the courts, including this Court's recent opinion in *Glass Dimensions, Inc. v. State St. Bank & Trust Co.*, 290 F.R.D. 11, 16 (D. Mass. 2013). Additionally, these reports were independently authorized by the CMO because they address the additional relevant discovery obtained after August 20. Accordingly, there is no legal or factual basis for Defendants' motions, and Retailer Plaintiffs respectfully submit that Defendants' motions should be denied.

## II. Procedural and Factual Background

On August 23, 2013, Retailer Plaintiffs served the expert reports of Keith Leffler and John Thomas. Dr. Leffler is an antitrust economist who opined on the anti-competitive effects of the Defendants' conduct and calculated the overcharge damages caused by that conduct. *See* Leffler Report ¶¶6-8. Dr. Leffler's damages analysis considered alternative scenarios, including a scenario based on a hypothetical timeline of earliest possible entry by the respective Generic Defendants absent their agreements with AstraZeneca. *See id.* ¶10(B), (E), (G), (J). Professor Thomas, of Georgetown University Law School, provided opinions on certain aspects of patent law, including an overview of the patent system and AstraZeneca's Nexium patents, and an assessment of AstraZeneca's forgiveness of Teva and DRL's contingent liability with respect to

omeprazole and zafirkulast, respectively. *See* Thomas Report ¶¶10, 11-17, 58-60, 70-73. He also provided opinions in support of Dr. Leffler's hypothetical entry timeline, including an overview of the Hatch-Waxman framework and FDA approval process, and concluded that based solely on the applicable Hatch-Waxman exclusivities and 30-month stays, Ranbaxy, Teva, and DRL could have gotten final FDA approval to enter the market with their generic Nexium products on or about April 14, 2008, October 13, 2008, and June 4, 2010, respectively. *See* Thomas Report ¶¶18-57, 74-78.

On September 30, 2013, Defendants collectively served *nineteen* reply expert reports, including reports by four chemists (Bartlett, Davies, Luk, and MacMillan); four patent lawyers (Frank, Goffney, Figg, and Ware); two FDA experts (Sporn and Fleischer); two economists (Bell and Johnson), and seven assorted physicians, accountants and pharmacologists.[3] Defendants' reply reports collectively raised a large number of new issues and provided related new opinions, including opinions with respect to the validity and infringement of AstraZeneca's Nexium patents, an issue that Retailer Plaintiffs do not believe belongs in this case,[4] and with respect to a

---

[3] While the captions of several of these reports did not include the Retailer Plaintiffs' cases, Defendants subsequently confirmed that all nineteen reports were intended to apply to Retailer Plaintiffs.

[4] Contrary to Defendants' assertions, Retailer Plaintiffs do not have the burden of proof with respect to this issue. *See FTC v. Actavis, Inc.*, 133 S.Ct. 2223, 2236-37 (2013) ("[I]t is normally not necessary to litigate patent validity to answer the antitrust question . . . . An unexplained large reverse payment itself would normally suggest that the patentee has serious doubts about the patent's survival. And that fact, in turn, suggests that the payment's objective is to maintain supracompetitive prices to be shared among the patentee and the challenger rather than face what might have been a competitive market . . . . In a word, the size of the unexplained reverse payment can provide a workable surrogate for a patent's weakness, all without forcing a court to conduct a detailed exploration of the validity of the patent itself."). Retailer Plaintiffs' initial expert reports addressed their actual burden of proof under *Actavis* by providing opinions on the large and anti-competitive nature of the reverse payments in Defendants' settlement agreements, thereby providing a "workable surrogate" for re-litigating the weaknesses in AstraZeneca's patent claims against the Generic Defendants.

variety of regulatory problems that the Generic Defendants have purportedly experienced with their respective generic Nexium products. The ultimate purpose of these reports is to support Defendants' contentions that Defendants' agreements were not in fact anti-competitive, and that the Retailer Plaintiffs (and other plaintiffs) were not in fact harmed by Defendants' conduct.

After Retailer Plaintiffs' initial reports were served, the parties continued to take fact depositions. All but four of Defendants' fact witnesses were deposed *after* August 20, 2013. Many of Defendants' nineteen expert reports referred to or otherwise considered one or more of the relevant depositions taken after August 20.[5] One of Defendants' chemistry experts, Dr. Luk, was himself deposed on October 16.

On October 25, 2013, Retailer Plaintiffs responded to Defendants' nineteen reply reports with six rebuttal expert reports—two from Dr. Leffler and Professor Thomas responding to criticisms of their initial reports and four from experts who only provided rebuttal opinions in response to issues raised by Defendants. The rebuttal reports were by Dr. Jerrold Meinwald (a chemist), Jack Goldstein, Esq. (a patent lawyer), Dr. Marilyn Apfel (an FDA regulatory expert), and Dr. Laraine Meyers (an FDA bioequivalency expert). Each of these four rebuttal reports directly rebutted one or more opinions first offered in Defendants' expert reports. These four reports also included opinions based on facts disclosed at depositions taken after August 20, as

---

[5] For example, the Sporn Report repeatedly referenced the Jaworski (9/5), Krishnan (9/10), and Sankaran (9/6) Depositions when discussing the regulatory issues faced by Teva and Ranbaxy in getting FDA approval of their ANDAs. The Fleischer Report listed the Singh (8/26) Deposition among his materials considered, and the Fleischer Report discussed regulatory issues involving DRL on which Singh testified. Singh also testified about negotiating the zafirlukast settlement, and his deposition was considered by Defendants' patent expert Figg. Finally Dr. Bell, whose report provided opinions on almost all of the central issues of the case, cited or considered the Krishnan, Sankaran, Aboelezz (8/22), Barker (9/10), Bowman (8/23), Hester (8/28), Nath (9/6), and Palczuk (9/5) Depositions. As noted, all of these depositions occurred after August 20.

expressly authorized by the CMO even if (as Defendants erroneously claim) those opinions were not "technically in rebuttal."[6]

Based on the rebuttal opinions of Drs. Apfel and Meyers, Dr. Leffler revised his hypothetical entry timeline as it related to Ranbaxy and Teva.[7] *See* Leffler Rebuttal Report ¶¶3, 20, 56. Retailer Plaintiffs have moved to amend their complaints accordingly. *See* Dkt. No. 464.

## III. Argument

### A. The Meinwald, Goldstein, Apfel, and Meyers Reports are proper rebuttal reports

"[A]n expert report qualifies as a rebuttal report if it 'is intended solely to contradict or rebut evidence on the same subject matter identified' by the opposing party's expert report." *Glass Dimensions*, 290 F.R.D. at 16 (citing Fed. R. Civ. P. 26(a)(2)(D)(ii)).[8] Moreover, "[a]

---

[6] For example, Dr. Apfel and Dr. Meyers rebutted opinions on regulatory topics in the Sporn, Fleischer, and Bell Reports that were in turn informed by the Jaworski, Krishnan, Sankaran, and Singh Depositions. *See* Note 5 supra and Exhibits I-M. Mr. Goldstein rebutted opinions in the Figg Report that were also informed by the Singh Deposition. *See* Note 5 supra and Exhibit G. Finally Dr. Meinwald responded to the Luk Report with reference to the Luk Deposition. *See* Exhibit D.

[7] Based on Dr. Apfel's analysis, Dr. Leffler explicitly revised the entry date for Ranbaxy in his first scenario to December 2008, Leffler Rebuttal Report ¶3, and also revised the entry date for Teva to June 2009, 180 days after Ranbaxy. *See* Leffler Report ¶¶10(E), 10(J), 62, 66. The changed date for Ranbaxy did not require a revision of the DRL date, so it remained June 2010.

[8] Many of the cases relied on by Defendants are inapposite because they do not involve expert reports otherwise served in accordance with an operative case schedule, and therefore the cited propositions from those cases have been taken out of context. S*ee Ambit Corp. v. Delta Airlines, Inc.*, 707 F. Supp. 2d 74, 76 (D. Mass. 2010) (new expert declaration filed in opposition to summary judgment after the close of expert discovery); *B-K Cypress Log Homes Inc. v. Auto-Owners Ins. Co.*, 1:09-CV-211-GRJ, 2012 WL 1933766, at *2 (N.D. Fla. May 25, 2012) (new affidavit filed in support of Daubert motion which constituted untimely rebuttal report); *Gilbane Bldg. Co. v. Downers Grove Cmty. High Sch. Dist. No. 99*, 02 C 2260, 2005 WL 838679, at *8 (N.D. Ill. Apr. 5, 2005) (attempt to "supplement" expert report during Daubert motion proceedings with new opinions); *Cytyc Corp. v. Tripath Imaging, Inc.*, No. Civ.A. 03-11142-DPW, 2005 WL 1527883, at *5-6 (D. Mass. June 21, 2005) (scheduling order allowed for only two rounds of reports, and party attempted to serve a third round of untimely "response" reports); *Braun v. Lorillard Inc.*, 84 F.3d 230, 237 (7th Cir. 1996) (trial court held that plaintiff could not call a witness during case-in-chief due to failure to include that witness on the pre-trial list, and (continued…)

rebuttal expert may cite new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert." *Id.* Similarly, "[a]n expert may introduce new methods of analysis in a rebuttal report if they are offered to contradict or rebut another party's expert." *Id.* at 16 n.17 (quoting *In re Genetically Modified Rice Litig.*, 2010 WL 4483993, at *3 (E.D.Mo. Nov. 1, 2010)). *See also Haskins v. First Am. Title Ins. Co.,* No. 10-5044 RMB, 2013 WL 5410531, at *2-4 (D.N.J. Sept. 26, 2013) (holding that "rebuttal and reply reports may cite new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert" and refusing to strike a rebuttal report that discussed "surprising" new issues because they were raised in direct rebuttal to the opposing expert's conclusions); *Deseret Mgmt. Corp. v. U.S.*, 97 Fed. Cl. 272, 274 (2011) (cited in *Glass Dimensions*, 290 F.R.D. at 16 n.17) ("While a rebuttal expert report must address the same subject matter as the report it contradicts, limiting its analysis only to those methods proposed by the first expert would impose an additional restriction on parties that is not included in the Rules. Rather, an expert may introduce new methods of analysis in a rebuttal report if they are offered to contradict or rebut another party's expert.") (internal citations omitted); *MMI Realty Servs., Inc. v. Westchester Surplus Lines Ins. Co.*, Civ. No. 07-00466 BMK, 2009 WL 649894, at *2 (D.

---

plaintiff then tried to sidestep that decision by calling same witness for "rebuttal" instead); *IBM Corp. v. Fasco Indus., Inc.*, C-93-20326 RPA, 1995 WL 115421, at *2-3 (N.D. Cal. Mar. 15, 1995) (party tried to disclose new rebuttal witnesses after disclosure deadline for all experts); *D.G. ex rel. G. v. Henry, 08-CV-74-GKF-FHM*, 2011 WL 2881461, at *1 (N.D. Okla. July 15, 2011) (schedule did not provide for third round of reports, and plaintiffs sought leave to add two additional reports); *Stuhlmacher v. Home Depot USA, Inc.*, 2:10 cv 467, 2012 WL 5866297, at *2-3 (N.D. Ind. Nov. 19, 2012) ("supplemental" report attempted to include new opinions after the final reports deadline and after that expert's deposition); *Bay State Sav. Bank v. Baystate Fin. Servs.*, LLC, No. 03-40273-FDS, 2007 WL 6064455, at *7 (D. Mass. Mar. 23, 2007) (attempt to serve report after deadline); *Peals v. Terre Haute Police Dept.*, 535 F.3d 621, (7th Cir. 2008) (plaintiff tried to call a police officer to testify as a "rebuttal" witness in response to the plaintiff's own testimony on cross-examination).

Haw. 2009) (cited in *Glass Dimensions*, 290 F.R.D. at 16 n.17) (holding that plaintiff was entitled to submit rebuttal expert opinions based on flood categories and related industry guidelines even though those categories and guidelines were not considered by defendant's experts because "the discussion of those guidelines and category 3 flood issues [was] the basis for [plaintiff's expert's] rebuttal to [defendant's ] experts' conclusions").[9]

Indeed, one of the main purposes of rebuttal reports is to give the party with the burden of proof on an issue an expert response to the opposing experts' criticisms of that party's initial expert reports. *See Genetically Modified Rice*, 2010 WL 4483993 at *3 (denying motion to strike rebuttal report that introduced new issues and analysis, but only in response either to specific criticisms by an opposing expert or to an opposing expert's general criticism that the

---

[9] Many of the unreported cases from other jurisdictions relied on by Defendants actually confirm this proposition. *See Noffsinger v. The Valspar Corp.*, No. 09 C 916, 2011 WL 9795, *7 (N.D. Ill. Jan. 3, 2011) (striking some of plaintiffs' new rebuttal report, but allowing the parts of the report that could "fairly be deemed as responding to the conclusions of defendants' experts"); *Donell v. Fidelity Nat'l Title Agency of Nev.*, No. 2:07-cv-00001-KJD-PAL, 2012 WL 170990, *5 (D. Nev. Jan. 20, 2012) (noting that testimony can be "proper both in the case-in-chief and in rebuttal," and refusing to strike the contested rebuttal report to the extent it was offered "to explain, repel, contradict, disprove or impeach the opinions" of the opposing party's own expert); *In re Asbestos Prods. Liab. Litig.*, MDL No. 875, 2012 WL 661673, *12 (E.D. Pa. Feb. 8, 2012) (striking a purported rebuttal report because it did not actually address the opinions of the relevant opposing experts); *Gilbane*, 2005 WL 838679 at *11 (N.D. Ill. Apr. 5, 2005) (holding that excluded report would have been a rebuttal report if its purpose had been to rebut opinions expressed by the opposing party's expert); *Withrow v. Spears*, No. 12–06, 2013 WL 4510305, at *12-14 (D. Del. Aug. 22, 2013) (citing *Glass Dimensions* for the proposition that "rebuttal and reply reports 'may cite new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert,'" but reviewing the relevant reports in detail and finding that the purported rebuttal report did not meet this standard). To the extent the court in *Blake v. Securitas Sec. Servs.*, 292 F.R.D. 15 (D.D.C. 2013), appeared to suggest that rebuttal expert reports cannot advance new arguments or new evidence even in direct rebuttal to opposing experts, *see id.* at 17, that proposition is directly contradicted by *Glass Dimensions* (along with the cases cited in *Glass Dimensions*, and indeed all of the other procedurally-relevant cases cited by Defendants). Moreover, in substance the *Blake* court's reasoning was not inconsistent with *Glass Dimensions*, because it proceeded to review the relevant reports in detail and found that the purported rebuttal report was not in fact responsive to the opinions offered by the opposing party's experts. *Id.* at 18.

initial expert's previous conclusions were incorrect).[10]  Courts have repeatedly warned that "a rule automatically excluding rebuttal reports containing information that could have been included in an expert's original report 'would lead to the inclusion of vast amounts of arguably irrelevant material in an expert's report on the off chance that failing to include any information in anticipation of a particular criticism would forever bar the expert from later introducing relevant material.'" *Haskins*, 2013 WL 5419531 at *3 (quoting *Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D.N.J. 2004)).

In striking one purported rebuttal report and allowing another, the *Glass Dimensions* Court considered the substance of each report in detail.  *See* 290 F.R.D. at 16-17.  The Court explained how the specific opinions in the report it struck failed to directly contradict the opinions of the opposing report, in contrast to the opinions in the rebuttal report it refused to strike, which did provide substantive responses to the opinions of the opposing report.  *See id*.  The *Glass Dimensions* Court ultimately held that "[b]ecause [the allowed expert's] evidence and opinions directly 'contradict or rebut' [the opposing expert], the [allowed expert's] Report is a proper and timely rebuttal report."  *Id.* at 17.[11]

---

[10] Rebuttal reports would serve no purpose whatsoever if, as Defendants apparently contend, they can contain nothing "new" to the case.  Moreover, here Retailer Plaintiffs' rebuttal reports ultimately aided Dr. Leffler in revising his hypothetical entry scenarios in response to Defendants' experts' criticisms, and yet Defendants seek to deny Retailer Plaintiffs' experts a meaningful opportunity to revise their opinions even to the extent that they believe the Defendants' expert reports properly raised issues requiring further consideration.

[11] In every case cited by Defendants where the court struck an otherwise-timely report on the basis that it was not a proper rebuttal report, the court conducted a detailed comparison between the opposing party's reports and the purported rebuttal report first, to determine whether or not the purported rebuttal report responded to the opposing reports.  *See* Note 9 supra.  Yet none of the Defendants make any comparison between the opinions in Retail Plaintiffs' rebuttal reports and their own expert reports, nor do they even provide the Court with the material necessary to make such a comparison.  *See* Def. Mem. at Note 2.  As demonstrated in Exhibits A-M, a (continued…)

As demonstrated below and in the attached Exhibits,[12] the Meinwald, Goldstein, Apfel and Meyers Reports are proper rebuttal reports under this standard. To the extent these reports cite new evidence or introduce new analysis not previously contained in the first Thomas and Leffler Reports, that new content is proper because it is offered solely to contradict or rebut Defendants' own expert reports.

*i)   Meinwald*

Retailer Plaintiffs asked Dr. Meinwald "to review the expert reports of Drs. Paul Bartlett, David MacMillan, Stephen Davies, and Shen Luk, and offer [his] opinion on the content of those reports . . . [and] to provide [his] opinion as to whether the claims in the Nexium patents considered by those experts would have been obvious to a person of ordinary skill in the art at the time of the inventions claimed in those patents." Meinwald Report ¶12.

As demonstrated in Exhibits A through D, Dr. Meinwald carried out this assignment, and his report specifically responds to issues raised by Defendants' experts. Nothing in Defendants' motions suggests otherwise.[13] Accordingly, Dr. Meinwald's report is a proper rebuttal report that should not be stricken under Rule 26(a)(2)(D)(ii) or the CMO.

*ii)   Goldstein*

Retailer Plaintiffs asked Mr. Goldstein to respond to the Goffney, Ludwig, Figg, and Frank Reports on the subject of the patent litigation settlements. *See* Goldstein Report ¶3.

---

comparison of the Meinwald, Goldstein, Apfel, and Meyers Reports to Defendants' expert reports unambiguously shows that those reports properly rebut the Defendants' experts.

[12] Retailer Plaintiffs believe the attached exhibits are sufficient to resolve this motion, but will provide the Court with full copies of the relevant reports if it deems them necessary.

[13] Dr. Meinwald's report included an extensive background section, Meinwald Report ¶¶15-33, and that background supported Dr. Meinwald's specific rebuttal opinions as described in Exhibits A-D.

As demonstrated in Exhibits E through H, Mr. Goldstein carried out this assignment, and his report specifically responds to issues raised by Defendants' experts. Nothing in Defendants' motions suggest otherwise. Accordingly, Mr. Goldstein's report is a proper rebuttal report that should not be stricken under Rule 26(a)(2)(D)(ii) or the CMO.

    *iii)*    *Apfel*

In light of the Bell, Sporn, and Fleischer Reports, Retailer Plaintiffs asked Dr. Apfel to "review the regulatory record, specifically documentation concerning chemistry, manufacturing and controls ('CMC'), and give [her] opinion about when [the Generic Defendants'] generic forms of esomeprazole magnesium could have been marketed had the generic manufacturers not entered into deals with AstraZeneca agreeing to not compete in the Nexium market . . . [and] to give [her] opinion on whether a USP monograph for trihydrate esomeprazole magnesium published in December 2008 would have served as an independent regulatory barrier to the generics marketing their versions of esomeprazole magnesium." Apfel Report ¶8.

Dr. Apfel provides opinions with respect to when Ranbaxy, Teva, and DRL could have come to market. *See* Apfel Report ¶¶9, 13-22 (Ranbaxy); 10, 23-26 (Teva); and 11, 27-31 (DRL). She also addresses the issue raised by the Fleischer and Bell Reports, and discussed in the Singh Deposition, regarding whether a USP monograph would have prevented early entry by the Generic Defendants. *Id.* ¶¶ 12, 32-36. As demonstrated in Exhibits I through M, all of Dr. Apfel's opinions contradict or respond to one or more specific opinions asserted in the Bell, Sporn, and Fleischer Reports. Defendants' motions do not suggest otherwise. Accordingly, Dr. Apfel's report is a proper rebuttal report that should not be stricken under Rule 26(a)(2)(D)(ii) or the CMO.

*iv)   Meyers*

In light of Defendants' expert reports, particularly the Bell, Sporn, and Fleischer Reports, Retailer Plaintiffs asked Dr. Meyers to address when the Generic Defendants could have completed bioavailablity/bioequivalence testing so as to obtain FDA approval of their ANDAs. *See* Meyers Report ¶15.

Dr. Meyers provides her specific opinions with respect to the bioavailability/ bioequivalency testing of Ranbaxy, Teva, and DRL in Paragraphs 20-24 and 76 (All Generics); 37-43 and 58-66 (Ranbaxy); 44-47 and 67-71 (Teva); and 48-57 and 72-75 (DRL).[14]  As demonstrated in Exhibits I through M, all of Dr. Meyers' opinions contradict or respond to one or more specific opinions asserted in the Bell, Sporn, and Fleischer Reports.  Defendants' motions do not suggest otherwise.  Accordingly, her report is a proper rebuttal report that should not be stricken under Rule 26(a)(2)(D)(ii) or the CMO.

> B. <u>To the extent that they address facts not available when the Retailer Plaintiffs' initial reports were served, the rebuttal reports were specifically authorized by the CMO</u>

In the CMO, the Court ordered that rebuttal reports could include "facts acquired after August 20, 2013, even if not technically in rebuttal."  Numerous depositions were taken after August 20, providing testimony relevant to the Defendants' expert reports, and in turn the Retailer Plaintiffs' rebuttal reports.  *See* Notes 5 and 6 supra.

Consequently, the Meinwald, Goldstein, Apfel, and Meyers Reports were independently authorized by the CMO to provide opinions on issues addressed in the post-August 20 depositions (i.e., they would have been appropriate even if, contrary to the facts here, they were not restricted to rebutting opinions in Defendants' reports).

---

[14] Paragraphs 29-36 of the Meyers Report provide background that supports Dr. Meyers' specific opinions with respect to the Generic Defendants.

C. <u>The Retailer Plaintiffs' rebuttal reports did not violate any other requirement</u>

While failing to address the defining feature of a rebuttal report—whether it contradicts the opposing party's expert reports—Defendants invent a number of other purported requirements for rebuttal reports and claim that Plaintiffs' Reports fail to satisfy them. None of these requirements have any basis in the law.

First, Defendants suggest that a rebuttal report must be titled as a rebuttal report, or use the words rebut or rebuttal in its text. *See* Def. Mem. at 11, DRL Mem. at 7. This is an elevation of form over substance that is not authorized by Rule 26(a)(2)(D)(ii) or *Glass Dimensions*. Courts instead look at the substance of the report rather than its title when evaluating whether it is a proper rebuttal report. *See Deseret*, 97 Fed. Cl. at 274 (denying motion to strike report that was not entitled as a rebuttal report because "the analysis therein unmistakably served to rebut [the opposing party's] expert"); *Genetically Modified Rice*, 2010 WL 4483993 at *1, *4 (denying motion to strike a report that was not labeled as a rebuttal report because in substance it responded to the opposing experts' criticisms of a prior report).

Similarly, DRL would require Retail Plaintiffs' rebuttal reports to mention specifically the Defendant expert being rebutted and to specify exactly how each rebuttal opinion responds to a specific Defendant Expert. DRL Mem. at 7. DRL, however, provides no authority for the proposition that a rebuttal expert is required to mention all, or indeed any, of the specific opposing reports being rebutted. Rather, Rule 26(a)(2)(D)(ii), as properly construed by this Court in *Glass Dimensions*, requires instead that the opinions in a rebuttal report directly contradict or rebut the opposing party's experts "<u>on the same subject matter</u> identified by the

opposing party's expert report." *See* 290 F.R.D. at 16-17 (internal quotations omitted).[15] Here all of Retail Plaintiffs' rebuttal experts described with particularity the subject matter of their reports, and all of those subjects were previously identified in Defendants' own expert reports.

Defendants also repeatedly complain that Meinwald, Goldstein, Apfel, and Meyers did not themselves submit initial reports, making them "new" experts. Again, Defendants provide no authority for the proposition that otherwise-timely rebuttal experts must have submitted their own initial reports,[16] and, in fact, this Court in *Glass Dimensions* allowed a rebuttal report from an expert who had not submitted an initial report. *See* 290 F.R.D. at 15, 17. *See also MMI Realty*, 2009 WL 649894 at *1 (same). It is not surprising that Retailer Plaintiffs would need to retain new experts in the disciplines occupied by Defendants' experts in order to respond to those experts.

Defendants also misrepresent the similarities between Professor Thomas's initial reports and the rebuttal reports of Mr. Goldstein, Dr. Apfel, and Dr. Meyers. Professor Thomas is a law professor, not an FDA expert or patent practitioner. His opinions regarding FDA approval were

---

[15] In the course of disallowing one purported rebuttal report and allowing another, the *Glass Dimensions* Court noted that the disallowed report did not refer to the relevant opposing report, whereas the allowed report did. *See* 290 F.R.D. at 16, 17. However, the *Glass Dimensions* Court did not go on to cite this contrast as a basis for its decision. Rather, as described above, it then went through the substance of each report in detail, determining whether the expert provided direct responses to the opinions of the opposing report. That substantive analysis was the basis of the Court's decisions. *See id.* at 16-17.

[16] Defendants repeatedly suggest, without citation, that the introduction of new experts at the rebuttal report stage somehow violates the schedule in CMO. However, the CMO uses precisely the same language for reply reports ("Merits' Expert reply reports to be served") and rebuttal reports ("Merits' Expert rebuttal reports to be served"). *See* Dkt. 404. Defendants apparently contend that the exact same language which they believed authorized them to introduce *nineteen* new experts at the reply report stage prohibited Retailer Plaintiffs from introducing four new rebuttal experts to respond to those nineteen new reply experts. That proposed interpretation of the language in the CMO is absurd on its face. There is no language in the CMO limiting the parties with respect to the number or identity of the experts introduced at any given stage (a fact that the Defendants took advantage of themselves).

based solely on the applicable exclusivities and stays provided for in the Hatch-Waxman Act and not on specific FDA manufacturing and bioequivalence requirements. When Defendants sought to introduce experts with more specialized knowledge on these issues, Retailer Plaintiffs rebutted those opinions with their own more specialized experts. Nothing in the Federal Rules or the CMO prohibits a party from seeking more specialized expertise when necessary to rebut specific responsive arguments.[17] Indeed, Defendants themselves have different experts that address broadly similar issues with varying types and degrees of expertise. Courts have allowed new rebuttal experts in equivalent circumstances. *See Noffsinger*, 2011 WL 9795 at *7.[18]

### D. There has been no prejudice to Defendants

The Meinwald, Goldstein, Apfel, and Meyers Reports are proper rebuttal reports and were timely under the CMO. But even if some limited aspect of the reports were not proper rebuttal, Defendants have suffered no prejudice as a result of the filing of any of these reports on October 25. AstraZeneca, Ranbaxy, and Teva complain that the "tight pre-trial schedule . . . cannot accommodate the additions of six new experts, on top of the thirteen previously disclosed." Def. Mem. at 3.[19] DRL complains of the "huge amount of expert work occurring" and a "crush of deadlines," and asserts that responding to reports on such complex regulatory

---

[17] The fact that other plaintiffs in this MDL case may have offered their own initial expert reports on particular topics does not preclude Retailer Plaintiffs from offering rebuttal opinions in response to Defendants' experts.

[18] Notably, Professor Thomas does not provide rebuttal opinions on the same specific subjects as Goldstein, Apfel, or Meyers. Accordingly, Retailer Plaintiffs' rebuttal reports are not needlessly cumulative, and, in any event, such an argument would be improper at this stage of the case. *See Noffsinger*, 2011 WL 9795 at *7.

[19] Ironically, Defendants complain about the MDL plaintiffs collectively having employed exactly as many experts as they employed themselves (nineteen). And, of course, the Retailer Plaintiffs themselves only have six experts counting all of their rebuttal experts.

subjects "is no simple task." DRL Mem. at 10-11. But these are not cognizable forms of prejudice when Defendants themselves jointly moved for this schedule, and offered nineteen expert reply reports. Despite the large number, collective length, and overall complexity of Defendants' reply reports, Retailer Plaintiffs complied with the agreed schedule by serving their rebuttal reports on October 25, and Defendants now have until at least November 26, 2013, to file Rule 56 and *Daubert* motions.[20] In the meantime, Defendants may also depose Retailer Plaintiffs' rebuttal experts if they choose to, and deposition dates have been provided (and many scheduled) for each of the experts at issue.

In sum, both sides face the same tight schedule, and Retailer Plaintiffs faced significant time pressures as a result of the nineteen reply reports that Defendants served on September 30. Defendants should not be heard to complain that they face the same collective number of experts from all MDL Plaintiffs combined when all of the reports served by Retail Plaintiffs were authorized by Rule 26 and the CMO.

## IV. Conclusion

Defendants' experts first discussed various patent issues and raised various regulatory issues in the nineteen reply expert reports that Defendants served on September 30. Retailer Plaintiffs' six rebuttal experts timely responded to Defendants' experts on October 25, 2013. To the extent that Retailer Plaintiffs' rebuttal reports included new material, it was only provided for the purpose of rebutting Defendants' experts. Retailer Plaintiffs fully complied with Rule 26 and

---

[20] On November 5, Defendants approached the MDL plaintiffs about stipulating to an extension of the expert discovery period and subsequent motions deadlines, and Retailer Plaintiffs have agreed to that request. Unfortunately, contrary to Local Rule 7.1(a)(2), Defendants chose not to confer with Retailer Plaintiffs about such an extension prior to filing their motion to strike as an "expedited" motion, and Defendants failed to confer *at all* about their motion to cut Retailer Plaintiffs' time to respond to their motion to strike from fourteen days to only three business days.

the schedule in the Case Management Order, and Defendants' motions to strike four of Retailer Plaintiffs' rebuttal reports should be denied.

Dated: November 6, 2013

Respectfully submitted,

/s/ Brian C. Hill
Bernard D. Marcus
Moira Cain-Mannix
Brian C. Hill
Jonathan D. Marcus
MARCUS & SHAPIRA LLP
One Oxford Centre, 35th Floor
301 Grant Street
Pittsburgh, PA 15219
(412) 471-3490 (telephone)
(412) 391-8758 (facsimile)
E-mail: bdm@marcus-shapira.com
E-mail: mcm@marcus-shapira.com
E-mail: bch@marcus-shapira.com
E-mail: jdm@marcus-shapira.com
*Counsel for Giant Eagle, Inc.*

Scott E. Perwin (pro hac vice)
Anna T. Neill (pro hac vice)
KENNY NACHWALTER P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, FL 33131
Telephone: (305) 373-1000
E-mail: sperwin@knpa.com
E-mail: aneill@knpa.com
*Counsel for Walgreen*

Barry L. Refsin
HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103
Telphone: (215) 568-6200
E-mail: brefsin@hangley.com

                         Monica Rebuck
                         HANGLEY ARONCHICK SEGAL PUDLIN
                         & SCHILLER
                         4400 Deer Path Road, Suite 200
                         Harrisburg, PA 17110
                         Telephone: (717) 364-1007
                         E-mail: mrebuck@hangley.com
                         *Counsel for Rite Aid*

## **CERTIFICATE OF SERVICE**

  I, Brian C. Hill, hereby certify that this document was electronically filed and served using the Court's ECF system on November 6, 2013.

                 */s/* Brian C. Hill