UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

---

|  |  |  |
|---|---|---|
| | ) | |
| IN RE NEXIUM (ESOMEPRAZOLE) | ) | CIVIL ACTION |
| ANTITRUST LITIGATION | ) | NO. 12-md-02409-WGY |
| | ) | |

---

YOUNG, D.J.                                      November 14, 2013

MEMORANDUM AND ORDER

## I. INTRODUCTION

The named End-Payor plaintiffs seek class certification of
a class comprised of individual consumers, third-party payors
("TPPs"), union plan sponsors, and insurance companies that
purchased or provided reimbursements for Nexium in those states
that permit such an action.  See Corrected Consol. Am. Class
Action Compl. & Demand Jury Trial ("End-Payors' Compl.") ¶¶ 14-
23, ECF No. 114.  The named End-Payors move for class
certification under Federal Rules of Civil Procedure ("Rule")
23(a), (b)(2), and (b)(3).  End-Payor Pls.' Mot. Class
Certification ("End-Payors' Mot."), ECF No. 272; Pls.' Assented
Mot. Leave File Certain Docs. & References Thereto Under Seal
("Pls.' Assented Mot."), Ex. 1, Mem. Law Supp. End-Payor Pls.'
Mot. Class Certification ("End-Payors' Memo"), ECF No. 273-1.
AstraZeneca AB, Aktiebolaget Hassle, and AstraZeneca LP
(collectively, "AstraZeneca"); and Ranbaxy Pharmaceuticals,

Inc., Ranbaxy Inc., and Ranbaxy Laboratories, Ltd.
(collectively, "Ranbaxy"); Teva Pharmaceutical Industries, Ltd.
and Teva Pharmaceuticals USA, Inc. (collectively, "Teva"); and
Dr. Reddy's Laboratories Ltd. and Dr. Reddy's Laboratories, Inc.
(collectively, "Dr. Reddy's") (collectively, with Ranbaxy and
Teva, the "Generic Defendants") (collectively, with AstraZeneca,
the "Defendants") assert that the End-Payors are unable to meet
Rule 23(a)'s requirement of adequacy and Rule 23(b)(3)'s
requirement that questions of law or fact common to class
members predominate over individualized questions.  Defs.' Mem.
Law Opp'n End-Payor Pls.' Mot. Class Certification ("Defs.'
Memo") 6-8, 17-18, ECF No. 376.  The Defendants also challenge
the End-Payors' methodology for demonstrating common injury and
damages.  Id. at 12.  This Court concludes that the End-Payors
have sufficiently demonstrated a showing of adequacy of
representation and predominance of common questions to the class
to meet the requirements of class certification under Rules
23(a) and 23(b)(3).

## II.     CLASS CERTIFICATION ANALYSIS

### A. Rule 23(a)(4): Adequacy of Representation

Of the four Rule 23(a) threshold requirements, the
Defendants challenge only the End-Payors' showing of adequacy of
representation under 23(a)(4).  Defs.' Memo 17-18.  Rule

2

23(a)(4) requires that the representative parties will "fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4), and that "the interests of the representative party will not conflict with the interests of any of the class members." Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985). The purpose of this requirement is to uncover conflicts of interest between representative plaintiffs and class members that are "fundamental to the suit and that go to the heart of the litigation." Matamoros v. Starbucks Corp., 699 F.3d 129, 138 (1st Cir. 2012) (quoting 1 William B. Rubenstein, Newberg on Class Actions § 3:58 (5th ed. 2012))(internal quotation marks omitted).

In their motion for class certification, the named End-Payors argue that the interests of the named plaintiffs are "fully aligned with those of the absent Class members" because: (1) all End-Payors paid supracompetitive prices for Nexium and suffered the same type of injury; (2) TPPs and consumers suffered identical injuries because both groups were overcharged for the same product, Nexium; and (3) the named plaintiffs have demonstrated vigorous prosecution of this action, citing capable representation to date by experienced counsel. End-Payors' Memo 10-11.

The Defendants, in turn, point out that the named plaintiffs come from only one of the four groups of payors in

3

the putative End-Payor class (the ten named plaintiffs are all union plan sponsors), and that other courts have treated TPPs and consumers as "two fundamentally different groups," requiring separate counsel and representatives. Defs.' Memo 18 (citing In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 533 (3d Cir. 2004)). The Defendants conclude that the differences in damages among the four groups of payors would create conflict with the union plan representatives, who would seek to maximize their own recovery. Defs.' Memo 19 (citing Valley Drug Co. v. Geneva Pharms., Inc., 350 F.3d 1181, 1189 (11th Cir. 2003)).

Rule 23(a)(4) does not impose a requirement that named plaintiffs represent each sector of the putative class equally. Rather, the Rule's focus is on uncovering "conflicts of interest between named parties and the class they seek to represent." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997). A showing of an alignment of incentives between the class and the class representatives can sufficiently overcome a challenge on conflict of interest grounds. See In re Cardizem CD Antitrust Litig., 200 F.R.D. 326, 337 (E.D. Mich. 2001) (rejecting a conflict of interest challenge on the grounds that "[e]ach class member 'has the same interest in maximizing the aggregate amount of classwide damages.'"). Here, the alignment of incentives between the ten named plaintiffs and the members of the putative class is supported by the fact that all payors in the putative

4

class allegedly paid supracompetitive prices for a single

product, Nexium, and suffered identical economic injuries.  End-

Payors' Memo 10.  Moreover, the conflict of interest must be

"fundamental" to defeat the End-Payors' motion for class

certification.  Valley Drug Co., 350 F.3d at 1189

("Significantly, the existence of minor conflicts alone will not

defeat a party's claim to class certification: the conflict must

be a 'fundamental' one going to the specific issues in

controversy." (citing 7A Charles Alan Wright, Arthur R. Miller &

Mary Kay Kane, Federal Practice & Procedure § 1768, at 326 (2d

ed. 1986))); see also, e.g., In re K-Dur Antitrust Litig., 686

F.3d 197, 223 (3d Cir. 2012) ("Only a fundamental conflict will

defeat adequacy of representation."), vacated on other grounds

sub nom., Upsher-Smith Labs., Inc. v. Louisiana Wholesale Drug

Co., 133 S. Ct. 2849 (2013) (mem.), reinstated sub nom., In re

K-Dur Antitrust Litig., Nos. 10-2077, 10-2078, 10-2078, 10-4571,

2013 WL 5180857 (3d Cir. Sept. 9, 2013); Natchitoches Parish

Hosp. Serv. Dist. v. Tyco Int'l, Ltd., 247 F.R.D. 253, 266-69

(D. Mass 2008) (Saris, J.) (establishing adequacy of

representation because no fundamental conflicts of interest were

found).

Although the Defendants argue that the named union plan

sponsor plaintiffs are ill suited for fair and adequate

representation of the class, they have not shown the existence

of any fundamental conflict of interest.  True, the union plan
sponsors appear representative of only 10% of insured consumers.
Defs.' Memo 18 ("As plaintiffs' expert admits, only 10% of
insured consumers are covered by union health plans.").  The
Defendants point out that TPPs and consumers, as "two
fundamentally different groups," have been provided separate
counsel and representatives in other cases.  Defs.' Memo 18
(citing In re Warfarin, 391 F.3d at 533, explaining that
separate counsel and representatives were provided as a
protective measure against "potential for conflicts of interest
between and among consumers and TPPs").  The Third Circuit in In
re Warfarin, however, ruled the district court properly
certified a class of TPPs, consumers, and other indirect
purchasers because they "all shared the same goal of
establishing the liability of DuPont, suffered the same injury
resulting from the overpayment for warfarin sodium, and sought
essentially the same damages by way of compensation for
overpayment."  Id. at 532.  At this stage, the Court finds no
fundamental conflict of interest among the End-Payor groups that
would warrant the need for separate counsel and representatives.

     The Defendants' expert, Dr. James W. Hughes, opines that
having such a "narrow set" of representative plaintiffs will
result in problematic "assessment and allocation of alleged
damages."  Decl. Laurence A. Schoen Supp. Defs.' Opp'n End-Payor

Pls.' Mot. Class Certification, Ex. 1, Expert Report James W.
Hughes Supp. Defs.' Opp'n End Payor Pls.' Mot. Class
Certification ("Hughes Rpt.") ¶ 80, ECF No. 399-1.  For example,
Dr. Hughes points out that certain class members did not suffer
any damages, and that it will be too difficult to allocate
damages because various entities pay different portions of the
purchase price of prescriptions.  See id. ¶¶ 81-83.  At this
stage of litigation, however, potential issues with the damages
allocation are but weak indicators of existing conflicts of
interest between the named representative plaintiffs and the
remaining class members.  See Smilow v. Southwestern Bell Mobile
Sys., Inc., 323 F.3d 32, 41 (1st Cir. 2003) (holding that the
potential difficulty of damages calculations does not defeat
preclude class certification).  This Court determines that the
issue of the damages allocation may best be handled by class
definition and is otherwise appropriately reserved for trial.
Accordingly, this Court concludes the End-Payors have
demonstrated adequacy of representation, including the
requirement that class counsel be "qualified, experienced and
able to vigorously conduct the proposed litigation."  Andrews,
780 F.2d at 130.

### B. Rule 23(b)(2): The "Injunctive Class" is Improper

The named End-Payor plaintiffs move for class certification
under Rule 23(b)(2) for the purpose of forming an "Injunctive

Class" in those states that permit such an action.  End-Payors'
Mot. 2.  Rule 23(b)(2) provides for class certification where
"the party opposing the class has acted or refused to act on
grounds that apply generally to the class, so that final
injunctive relief or corresponding declaratory relief is
appropriate respecting the class as a whole."  Fed. R. Civ. P.
23(b)(2).  This type of class certification is "not appropriate
when money damages are the predominant relief that the
plaintiffs seek," DeRosa v. Massachusetts Bay Commuter Rail Co.,
694 F. Supp. 2d 87, 95 (2010) (Wolf, C.J.), and ought be applied
"only when a single injunction or declaratory judgment would
provide relief to each member of the class," Wal-Mart Stores,
Inc. v. Dukes, 131 S. Ct. 2541, 2557 (2011).

     The named End-Payors seek relief for violations of section
1 and 2 of the Sherman Act under section 16 of the Clayton Act,
which permits litigants to seek injunctive relief for violation
of the antitrust laws.  See 15 U.S.C. § 26; 15 U.S.C. §§ 1 & 2;
Mem. Law Supp. End-Payor Pls.' Mot. Class Certification ("End-
Payors' Third Memo") 20 n.45, ECF No. 388.  The relief sought
takes the form of an order enjoining AstraZeneca's reverse
payment agreements, which allegedly would allow for the entry of
generic Nexium and would restore competitive market equilibrium.
End-Payors' Third Memo 20.

Based upon the cursory arguments provided by the named End-Payors, the Court concludes that the requirements for Rule 23(b)(2) class certification have not been met.  While this Court has taken the position that it is "reasonable to assume" that antitrust injury is incurred with every Nexium brand overcharge, resulting in "continuing harms," injunctive relief is inappropriate where it is merely incidental to seeking monetary damages.  Mem. & Order ("Order") 61, 67, ECF No. 352 (ruling that it was reasonable to assume that violations of antitrust laws occur with every overcharge and that the End-Payors may still challenge these continuing harms).  In Wal-Mart, the Supreme Court held that the moving party in a Rule 23(b)(2) motion for class certification could not include damages claims unless they were "incidental to the injunctive or declaratory relief."  Wal-Mart, 131 S. Ct. at 2557.  Here, the End-Payors are attempting to sweep in substantial damages claims of over $2,300,000,000 under their Rule 23(b)(2) claim for injunctive relief.  This is an improper basis for class certification under Wal-Mart.

Further, enjoining the reverse payment agreements at the conclusion of a March 2014 trial (the scheduled month for trial) provides but little relief when the reverse payment agreements are set to expire just three months later, in May 2014.  With such limited injunctive relief, especially where the primary

relief sought is monetary damages, the Court rules that class
certification under Rule 23(b)(2) is inappropriate under the
governing law.

Accordingly, the End-Payors' motion for class certification
under Rule 23(b)(2), ECF No. 272, is DENIED.

### C. Rule 23(b)(3): Predominance of Common Questions

#### 1. The Legal Standard

The End-Payors' seek class certification under Rule
23(b)(3), which permits an action to proceed as a class action
where "the court finds that questions of law or fact common to
class members predominate over any questions affecting only
individual members" and where "a class action is superior to
other available methods for fairly and efficiently adjudicating
the controversy."  Fed. R. Civ. P. 23(b)(3).  The Court must
look to see "whether proposed classes are sufficiently cohesive
to warrant adjudication by representation," Amchem Prods., 521
U.S. at 623, an inquiry demanding greater scrutiny than the Rule
23(a) analysis, Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432
(2013) ("If anything, Rule 23(b)(3)'s predominance criterion is
even more demanding than Rule 23(a).").

A key question before this Court is whether the End-Payors
have demonstrated the predominance of common questions and the
superiority of a class action under recent interpretations of

these issues by the Supreme Court.  Specifically, this Court
must determine what level of judicial scrutiny ought be applied
when engaging in Rule 23(b)(3) analysis in light of the Supreme
Court's rulings in Wal-Mart, 131 S. Ct. 2541 (2011), and Comcast
Corp., 133 S. Ct. 1426 (2013), which seem to mark a shift in
Rule 23 analysis that indicates a more exacting standard for
showing commonality and the predominance of common questions.
See John Campbell, Unprotected Class: Five Decisions, Five
Justices, and Wholesale Change to Class Action Law, 13 Wyo. L.
Rev. 463, 465 (2013) ("In the last four years, the United States
Supreme Court has issued five opinions that dramatically alter
class action practice.").  Indeed, the Defendants insist in
their memorandum and during oral arguments at the September 16,
2013 motion hearing that these cases require the End-Payors to
demonstrate injury to each class member with proof of damages
that are "capable of measurement on a classwide basis."  Defs.'
Memo 3-4, 6 (citing Comcast, 133 S. Ct. at 1433; Wal-Mart, 131
S. Ct. at 2552 n.7, 2561).  The trial court must perform a
"rigorous analysis" that will often "entail some overlap with
the merits of the plaintiff's underlying claim." Wal-Mart, 133
S. Ct. at 2551-52 (citing General Tel. Co. of Sw. v. Falcon, 457
U.S. 147, 160 (1982) (class determination "generally involves
considerations that are 'enmeshed in the factual and legal
issues comprising the plaintiff's cause of action.'")).  Rule 23

11

class certification ought not, however, turn into a "free-ranging merits inquir[y]" through unnecessary demands for exact calculations of damages, particularly in cases like the one before this Court.  Amgen Inc. v. Connecticut Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1194-95 (2013).

Judge Samuel Conti in In re: Cathode Ray Tube Antitrust Litig., No. C-07-5944-SC, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013) considered a similar antitrust class certification motion and addressed the tension between requiring a rigorous analysis and avoiding the full merits analysis which is properly reserved for the jury:

> It is true that the Court's rigorous analysis overlaps
> with the merits of the IPPs' [Indirect-Purchaser
> Plaintiffs] claims and requires that the IPPs make an
> evidentiary case for predominance, Comcast, 133 S. Ct.
> at 1431; Amgen, 133 S. Ct. at 1196; Dukes, 131 S. Ct
> at 2551, but Defendants are trying to push the ISM
> [Interim Special Master] and the Court toward a full-
> blown merits analysis, which is forbidden and
> unnecessary at this point, Amgen, 133 S. Ct. at 1194-
> 95.

Id. at *5.  This Court agrees and seeks to sail the same course.

Before addressing the parties' expert opinions on damage models and predominance of common questions, the Court briefly addresses the Defendants' state law based arguments against class certification.

## 2. State Laws and Predominance

Although the issues raised by different state laws have been addressed by this Court when it resolved the Defendants' motion to dismiss, Order 62-67, the Defendants challenge both predominance and superiority under Rule 23(b)(3) because "the varying laws of 26 states" preclude predominance of common issues over individual questions of law or fact, Defs.' Memo 15.

As this Court ruled in Mowbray v. Waste Mgmt. Holdings, Inc., "[i]n order for certification to be proper under Rule 23(b), 'variations in state law [must not] swamp any common issues and defeat predominance.'" 189 F.R.D. 194, 199 (D. Mass. 1999) (citing Castano v. Am. Tobacco Co., 84 F.3d 734, 741 (5th Cir. 1996)) (second alteration original), aff'd, 208 F.3d 288 (1st Cir. 2000).

Echoing objections made in their motion to dismiss, the Defendants provide a list of statutory differences among state antitrust laws which they claim defeat predominance, since "even where state laws differ only in nuance, nuance can be significant, leaving [the] district court with the 'impossible task of instructing a jury on the relevant law.'" Defs.' Memo 15-16 (quoting Andrews v. AT&T Co., 95 F.3d 1014, 1024 (11th Cir. 1996)) (alteration original); Defs.' Memo, Ex. C, Variations in State Antitrust and Consumer Protection Claims ("Variations"), ECF No. 328-1.

For their part, the named End-Payors provide an overview of the relevant state antitrust statutes, highlighting the substantial similarities in the language between state and federal antitrust provisions.  Pls.' Assented Mot., App. B, Fed. Antitrust Law & State Law ("End-Payor Antitrust Overview"), ECF No. 273-3.  Moreover, as to the four states in which the named End-Payors make their claims under those states' consumer protection laws (Florida, California, Massachusetts, and Vermont), courts have held that the violation of traditional antitrust elements constitutes a violation of the relevant consumer protection statute.  See, e.g., Mack v. Bristol-Myers Squibb Co., 673 So. 2d 100, 104 (Fla. Dist. App. 1996) (holding that antitrust violations constitute violations of Florida's Deceptive and Unfair Trade Practices Act); Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 180 (1999) (finding that California's Unfair Competition Law "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable"); Vinci v. Waste Mgmt., Inc., 36 Cal. App. 4th 1811, 1814 n.1 (1995) (holding that California's Cartwright Act has "objectives identical to the federal antitrust acts"); Ciardi v. F. Hoffmann-La Roche, Ltd., 436 Mass. 53, 59-60 (2002) (analyzing state law violations via the federal antitrust statues and interpretations); Elkins v. Microsoft Corp., 174 Vt.

328, 338-41 (2002).   Therefore, this Court concludes that the variance in state laws and statutes of limitations do not bar class certification under Rule 23(b)(3).[1]

### 3. Proof of Common Impact

The named End-Payors argue that the predominance test is satisfied here because all class members depend upon the same theories of liability, proof of injury, and common proof of damages.   See End-Payors' Memo 13-16.   The Defendants counter that common questions do not predominate over individual questions because of the variance in injury among putative class members and because certain class members suffered no injury at all from the delay in generic marketing.   See Defs.' Memo 7-12.

Addressing the issue of common impact, the named End-Payors base their argument upon long-standing precedents to show that common antitrust impact predominates over any individual differences in damages incurred.   Citing to Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481 (1968), they argue that "[a]ntitrust impact occurs the moment the purchaser incurs an overcharge" and that "widespread impact among the class members"

---

[1] This Court has already addressed the statutes of limitations challenge by dismissing challenges to the AstraZeneca/Ranbaxy Agreement brought under Illinois, Puerto Rico, Utah, and Rhode Island law, as well as the twenty-three states with statutes of limitations of four years or less. Order 80-86; Order End-Payor Pls.' Mot. Leave Amend Consol. Am. Class Action Compl. ("Motion for Leave Order"), ECF No. 448.

is all that is needed to satisfy predominance.  End-Payor Pls.'
Reply Further Supp. Mot. Class Certification ("End-Payors'
Second Memo") 2, 3 n.8, ECF No. 363 (citing, inter alia Hanover
Shoe, 392 U.S. at 489; Kohen v. Pacific Inv. Mgmt. Co., 571 F.3d
672, 677 (7th Cir. 2009) (Posner, J.)).

The End-Payors proffer the opinions of Dr. Meredith
Rosenthal, a Professor of Health Economics and Policy at the
Harvard School of Public Health and an Academic Affiliate of
Greylock McKinnon Associates, a consulting and litigation
support firm.  Decl. Meredith Rosenthal Supp. Certification
Class End-Payor Purchasers Nexium ("Rosenthal Decl.") 1, ECF No.
273-7.  The Defendants counter with the opinions of Dr. James W.
Hughes, a Professor of Economics at Bates College with
specialties in Law and Economics and Health Economics, an
equally adept expert.  Hughes Rpt. 2.  Each expert trashes the
opinions of the other and advances her or his own theories.[2]

---

[2] As I write this paragraph, I'm struck by how "the more
things change the more they remain the same."  Jean-Baptiste
Alphonse Karr, Les Guêpes, Jan. 1849 ("plus ça change, plus
c'est la même chose").  Compare Professor Arthur Sutherland's
famous poem The Ship Blaireau describing the cases of Church v.
Hubbart, 6 U.S. (2 Cranch) 189 (1804) and Mason v. Ship
Blaireau, 6 U.S. (2 Cranch) 240 (1804):
      Well now they file their libels
          And they cite Sir William Scott.
      The sailors say the French must pay;
          Their counsel argues not.
Legal Chowder: Lawyering and Judging in Massachusetts 189-190
(Kass., J. ed. 2000).

Wisely, neither party challenges the qualifications of the other, reserving their fire for their rival's prognostications. See generally Meredith M. Price, Note & Comment, The Proper Application of Daubert to Expert Testimony in Class Certification, 16 Lewis & Clark L. Rev. 1349 (2012)(discussing standards applied to expert testimony at the class certification stage).  Unlike many of the generic delay cases that have preceded this one, see, e.g., Valley Drug, 350 F.3d at 1193-94; In re Flonase, 284 F.R.D. at 210; In re Relafen Antitrust Litig., 221 F.R.D. 260, 264 (D. Mass. 2004), this Court is faced with a universe of data that is limited to sales and price figures of brand-name Nexium only, as a generic version has been delayed by agreement until May 27, 2014.  Hughes Rpt. 3; Rosenthal Decl. ¶ 35.  As a result, no actual calculation of the alleged overcharges can be formulated.

While this is hardly fatal to the End-Payors' cause, the absence of actual historical data warrants a brief exposition of this Court's methodology.  Here the Court is faced with competing affidavits crafted by skilled attorneys and signed under oath by reputable academics including a professor of health economics and policy and a professor of economics with specializations in antitrust policy and health economics.  As this Court has observed, "[t]he affidavit is the Potemkin Village of today's litigation landscape . . . all lawyer-painted

façade and no interior architecture."  <u>United States</u> v.

<u>Massachusetts</u>, 781 F. Supp. 2d 1, 22, n.25 (D. Mass. 2011).

Accordingly, after careful review of the competing experts'

reports, this Court, applying the fair preponderance of the

evidence standard, has chosen the conclusions that appear based

on the application of reliable principles and methods to the

presented facts.  Fed. R. Evid. 702 (b)-(d).

These preliminary conclusions are in no sense "findings" of

fact. "Facts are like flint," said my mentor, Raymond A.

Wilkins, Chief Justice of the Massachusetts Supreme Judicial

Court.  <u>See</u> <u>Berthoff</u> v. <u>United States</u>, 140 F. Supp. 2d 50, 90

(D. Mass. 2001).  Fact-finding emerges only after full

evidentiary exposition, including searching cross-examination,[3]

none of which has taken place here.

---

[3] Nothing has so diluted and debased the importance of fact-finding in the federal courts as the requirement of the U.S. Sentencing Guidelines to find "faux facts" in the sentencing of offenders.  <u>United States</u> v. <u>West</u>, 552 F. Supp. 2d 74, 76 (D. Mass. 2008).  These sentencing conclusions are drawn from a mosaic of hearsay largely controlled by the government. The data may be based on uncharged, unproven, even acquitted conduct. <u>See</u> <u>United States</u> v. <u>Green</u>, 346 F. Supp. 2d 259, 278-79 (D. Mass. 2004), <u>vacated in part sub nom.</u>, <u>United States</u> v. <u>Yeje-Cabrera</u>, 430 F.3d 1 (1st Cir. 2005), <u>vacated and remanded sub nom.</u>, <u>United States</u> v. <u>Pacheco</u>, 434 F.3d 106 (1st Cir. 2006). It is indeed ironic that we today routinely impose lengthy prison sentences based on nothing more than uncorroborated hearsay but are exhorted to apply "rigorous analysis" to citizens seeking the benefits of collective action against a defendant.  <u>Wal-Mart</u>, 131 S. Ct. at 2551.

These conclusions are thus akin to the initial findings
that warrant admitting opinions under Federal Rule of Evidence
702, <u>see</u> <u>Daubert</u> v. <u>Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 589-
92 (1993), co-conspirator hearsay under Federal Rule of Evidence
801(d)(2)(E), <u>see</u> <u>United States</u> v. <u>Petrozziello</u>, 548 F.2d 20, 23
(1st Cir. 1977), or granting a preliminary injunction under
Federal Rule of Civil Procedure 65, <u>see</u> <u>Ross-Simons of Warwick,
Inc.</u> v. <u>Baccarat, Inc.</u>, 102 F.3d 12, 15-16 (1st Cir. 1996).

As a practical matter, this is what is meant by addressing
"considerations that are enmeshed in the factual and legal issue
comprising the plaintiff's cause of action," <u>Wal-Mart</u>, 131 S.
Ct. at 2552 (quoting <u>Falcon</u>, 457 U.S. at 160) (internal
quotation marks omitted), without engaging in a "full-blown
merits analysis." <u>In re Cathode Ray Tube</u>, 2013 WL 5391159, at
*5. Indeed, this is the practical application of what Professor
Linda S. Mullenix proposes in an excellent forthcoming article,
Putting Proponents to Their Proof: Evidentiary Rules at Class
Certification, 82 Geo. Wash. L. Rev. (forthcoming 2013),
available at http://ssrn.com/abstract=2276088.

### 4. Conclusions of Fact

With these constraints in mind, this Court concludes that
Dr. Rosenthal adequately demonstrates: 1) that prices for
esomeprazole thus continued artificially high as a result of the
Defendants' reverse payment agreements; and 2) that all class

members have been exposed to purchasing or paying for
esomeprazole magnesium at a supracompetitive price.  See
Rosenthal Decl. 15-18; Pl.'s Unopposed Mot. Leave File Mem. Law
Reply Defs.' Opp'n Pls.' Mot. Class Certification, Ex. A,
Rebuttal Decl. Meredith Rosenthal Supp. Certification Class End-
Payor Purchasers Nexium ("Rosenthal Rebuttal") 1, 11, ECF No.
361-2.

At the same time, the Court concludes from Dr. Hughes'
report that certain class members were not actually injured,
including more than a de minimis number of TPPs and consumers
who - through rebates, contracts, and brand-loyal purchasing -
suffered no damages from the foreclosure of a generic version of
Nexium to the market.  See Hughes Rpt. 20-36.  The issuance of
significant rebates by AstraZeneca, often up to 40-50% of
Nexium's retail purchase price, allowed TPPs to be buffered from
any overcharge injury resulting from generic foreclosure.
Defs.' Memo 10.  These rebates appear to have totaled
approximately $12,900,000,000 over the class period (exceeding
the $12,100,000,000 in total retail overcharges for TPPs
calculated by End-Payor expert, Dr. Rosenthal) suggesting that
TPPs did not suffer any injuries on an "aggregate basis."  Id.;
Hughes Rpt. ¶¶ 19, 39.[4]

---

[4] The parties (and potential interveners) raise a lot of
hullabaloo over this Court's refusal to accept filings under

Dr. Hughes also points out that under certain co-pay structures, a TPP could pay more for a generic drug for a brand name prescription where "the decrease in co-payment is more than the total net price drop."  Defs.' Memo 11 ("It is thus possible

---

seal.  It is true that AstraZeneca's present discounts granted to various purchasers constitute confidential business data. Even though there is here no suggestion that AstraZeneca is violating the Robinson-Patman Act, Pub. L. No. 74-692, 49 Stat. 1526 (codified at 15 U.S.C. § 13), revealing these present and ongoing relationships could embarrass AstraZeneca commercially as less favored purchasers jockey for better deals and most favored purchasers see their competitive advantage evaporating.

Naturally AstraZeneca here seeks a litigation advantage by spreading its particular discounts and discount policies before the Court to further the arguments made in the text above – it just doesn't want anyone else to know what it is doing. In short, it wants to win – but it doesn't want me to explain why (or why not).

This is simply unacceptable.  Courts are public institutions, deriving their just powers from the consent of the governed.  See Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 580 (1980).  Their moral authority arises in significant measure from the fact that "[j]udicial choice, at its best, is reasoned choice candidly explained."  Hon. Robert E. Keeton, Keeton on Judging in the American Legal System 5 (1999).

Here, it's no secret that AstraZeneca discounts Nexium sales and discounts deeply.  At the present stage of the litigation, this is all the Court needs to know to evaluate the expert reports at the level of generality set forth in the text above.  Accordingly, this Court has simply ignored the detailed data AstraZeneca seeks to place before it under seal.  These materials are to be returned to AstraZeneca.  Its motions to file these documents under seal are thus denied as moot (ECF Nos. 323, 367, 425) as are the motions of the potential intervenors (ECF Nos. 371, 385).

This problem, of course, is not going to go away.  Should the End-Payors prevail at trial, the actual assessment of damages may require the examination of these discounts in exquisite detail.  We can cross that bridge when we come to it, however, because the Court will reach that issue only if AstraZeneca is in violation of the antitrust laws, and that makes a significant difference.

for the TPP to suffer no injury from generic foreclosure even if the average total expenditure is higher for branded Nexium than it would be for the generic equivalent . . . . If the decrease in co-payment is more than the total net price drop, then the TPP is worse off from generic entry even though the total cost of the drug has decreased.").  Dr. Hughes further states, "[t]his phenomenon is likely to occur given the wide variation in consumer contributions across plans."  Hughes Rpt. ¶ 49.

Other uninjured TPPs include insurers that contracted with pharmacies to pay a fixed-price for an entire therapeutic class, regardless of brand or generic version.  See id. at ¶ 48.  These fixed price agreements "insulate the plan or insurer from pricing variation" and places pricing risk on the pharmacies. Id.  Dr. Hughes also posits that TPPs "pass through" any overcharges in the form of premiums, see id. at ¶¶ 51-58, and provides examples from large commercial insurers to demonstrate industry practices of using premiums to recover losses.  Id. at ¶ 54 ("In addition, if an insurer fails to adequately set premiums to cover costs in any given year and has been incurring losses, it may augment future rates using a 'deficit recovery charge.'").  Dr. Hughes, however, failed reliably to quantify the prevalence of his alleged problematic subgroups and thus fails to establish that they are sufficiently extensive to undermine Dr. Rosenthal's conclusions.  Dr. Hughes did not

provide any evidence that TPPs in the present class had fixed-price contracts with pharmacies, and his calculations regarding co-pay structures are made up of averages and may exaggerate variations among TPPs.  In sum, Dr. Hughes is able to identify only three categories of TPPs that <u>potentially</u> could be uninjured members of the putative class.  He does not establish the actual existence of uninjured TPP groups.  The Court does acknowledge, however, that certain TPPs certainly have been shielded from economic injury because of rebates, co-pay structures, and pricing contracts.

The Defendants posit that the proposed class includes uninjured consumers as well as TPPs.  Defs.' Memo 7.  The categories of uninjured consumers are said to include "brand loyalists," coupon purchasers from an AstraZeneca coupon program, and insured consumers under certain co-payment plans. <u>Id.</u> at 8-10.  "Brand loyalists" are described as consumers who remain loyal to the brand drug after generic entry.  <u>Id.</u> at 8. The Defendants also identify a group of Nexium consumers who participated in an AstraZeneca coupon program which provided "more than $185,000,000 in coupon vouchers, of up to $50 per branded Nexium prescription," and are thus claimed to be unaffected by generic delay.  <u>Id.</u> at 9.  Further, Defendants identify consumers that are in drug plans that provide the same co-payment for brand name and generic drugs, where higher co-

pays apply only after a generic equivalent becomes available.
Id. at 10.

The End-Payors' rebuttal to these challenges are
persuasive.  First, Dr. Rosenthal argues that only approximately
5.8 percent of all class prescriptions were attributed to "brand
copay, coninsurace, or cash-paying transactions with no
overcharge."  Rosenthal Rebuttal ¶ 25.  Second, she estimates
that Nexium co-pay coupons were only used in 2-4 percent of
prescriptions, which was accounted for in her overcharge
damages.  Id. at ¶ 30.  Third, she notes that coupon amounts
offered by AstraZeneca totaled only $185,000,000 out of
$27,400,000,000 in total Nexium sales from 2008 to 2013 —
arguably a trivial fraction of total sales.  Id.
At this stage in class certification, the Court determines that
the incidence of uninjured consumers and TPPs are insufficient
to overcome the showing of common antitrust impact to the
putative class, but the Court preserves the Defendants' right to
challenge individual damage claims at trial.

### D. PBMs are Excluded From the Putative Class

The Defendants argue that PBMs, or pharmacy benefit
managers, are included in the class, because PBMs accepted
AstraZeneca rebates for Nexium, formed networks of pharmacies,
and controlled the cost of prescription drugs by negotiating
rebates with manufacturers.  See Hughes Rpt. ¶¶ 16-19.  Due to

the complex and varied roles PBMs play in the billing,
negotiating, and pricing of prescription drugs among pharmacies
and manufacturers, Dr. Hughes persuasively contends that
antitrust injury is impossible to calculate among PBM class
members on a classwide basis.  See id. ¶¶ 21-23.  Further, "no
single allocation formula exists" to measure the variations in
net price paid by PBMs because the individual contracts differ
among insurers, PBMs, and pharmacies.  Id. ¶ 26.

     The named End-Payors essentially concede the point.  They
argue that PBMs were never a part of the putative class because
the class is limited strictly to end-payors that made purchases
"for consumption by themselves, their families, or their
members, employees, insureds, participants, or beneficiaries."
End-Payors' Second Memo 7.  PBMs are "mere conduits" for TPP
payments to pharmacies, and as financial intermediaries, are not
a part of the putative class.  Id.

     Per the End-Payors' suggestion, the Court expressly
excludes PBMs from the defined End-Payor class, barring them
from recovery in this lawsuit.  Id. at n.29 (suggesting the
exclusion of all PBMs without capitation agreements, although
both parties concur that capitation agreements are "virtually
non-existent".).

                    **E. Applying the Legal Framework**

The Court sets out by following well-trodden paths. Antitrust impact occurs the moment the purchaser incurs an overcharge.  See Hanover Shoe, 392 U.S. at 489-90.  The antitrust impact concept differs from the related task of assessing antitrust damages.  Id. at 490 ("A person whose property is diminished by a payment of money wrongfully induced is injured in his property."); Hawaii v. Standard Oil Co. of Cal., 405 U.S. 251, 262 n.14 (1972) ("[C]ourts will not go beyond the fact of this injury [i.e. antitrust impact] to determine whether the victim of the overcharge has partially recouped its loss in some other way . . . .").  This much, at least, is reasonably clear.

Here, it is reasonably clear that the foreclosure of a generic alternative to Nexium caused widespread impact among the proposed class members.  It is likewise reasonably clear, however, that a number of the proposed class members suffered no actual injury whatsoever.[5]

What of it?  The Defendants argue that Wal-Mart requires the moving party to "show that each class member was injured by

---

[5] The Court toyed with defining the proposed class to include only members who actually suffered economic injury.  Such a definition, however, would create an impermissible "fail-safe" class – one in which it is virtually impossible for the Defendants ever to "win" the case, with the intended class preclusive effects.  I am indebted for this insight to Matthew Stein, Esq., speaking at the ABA 17th Annual National Institute on Class Actions (October 24, 2013).

the defendants' allegedly wrongful conduct."  Defs.' Memo 6
(citing Wal-Mart, 131 S. Ct. at 2552 n.7, 2561).

Several courts, however, have held that at this class
certification stage of litigation, the inclusion of uninjured
class members is not fatal to class certification.  See DG ex
rel. Stricklin v. Devaughn, 594 F.3d 1188, 1198 (10th Cir.
2010); Mims v. Stewart Title Guar. Co., 590 F.3d 298, 308 (5th
Cir. 2009); In re Flonase, 284 F.R.D. at 226-27.  Judge Samuel
Conti most recently followed this line of cases in In re Cathode
Ray Tube, stating: "the Court finds now, that [plaintiffs'
expert's] analyses show common impact, and the IPPs [Indirect
Purchaser Plaintiffs] need not prove, at the class certification
stage, that every single class member was in fact injured in a
specific way."  2013 WL 5391159 at *6.

Assuming these decisions are consistent with Wal-Mart – and
this Court so concludes – the markers of the antitrust border
have been reached.

Now  - into the wild.

What is one to make of the 5-4 decision of the Supreme
Court in Comcast?  Not much, say Justices Ginsburg and Breyer
writing for the dissenters.  See Comcast, 133 S. Ct. at 1436
(Ginsburg & Breyer, JJ., dissenting) (stating that because the
Supreme Court addressed a different question from what was
presented by the parties, in a manner that was "unwise and

unfair to respondents," the opinion "breaks no new ground on the standard for certifying a class action under Federal Rule of Civil Procedure 23(b)(3)."). Respectfully no, say the Defendants, Comcast has worked a major alteration in the antitrust class action landscape. Defs.' Memo 3-4, 12, 13. Quoting Justice Scalia's majority opinion, they argue that a damages model is invalid if it "identifies damages that are not the result of the wrong" and must distinguish between injured and uninjured class members, or it would otherwise fail Rule 23. Defs.' Memo 13 (quoting Comcast, 133 S. Ct. at 1434); see also id. at 12 (stating that the End-Payors cannot merely "exclude uninjured plaintiffs from their class definition under Comcast, because those changes are not reflected in their economic model."). In Comcast, the putative class' model was fatally flawed because it "assumed the validity of all four theories of antitrust impact initially advanced by [the putative class]," when the district court had accepted only one theory of impact. Comcast, 133 S. Ct. at 1434 ("Respondents proposed four theories of antitrust impact . . . . [but] [t]he District Court accepted the overbuilder theory of antitrust impact as capable of classwide proof and rejected the rest." Id. at 1430-31.). As a result, the putative class was unable to calculate damages resulting solely from the overbuilder theory of antitrust impact, thus defeating their motion for class certification.

See id. at 1434 (ruling that the moving party cannot rely on methodology "that identifies damages that are not the result of the wrong.").

Here in contrast, the End-Payors present three theories of liability in their claims against AstraZeneca and the Generic Defendants: (1) the unreasonable restraint of trade; (2) monopolization and attempted monopolization; and (3) conspiracy to monopolize.  End-Payors' Third Memo 13-14; see also End-Payors' Compl. ¶¶ 46, 50, 53, 58, 63.  All three antitrust theories of liability arise from a singular set of transactions, the three reverse-payment agreements, which caused the delay of generic competition in the market and resulted in overcharges to the putative class.  See End-Payors' Third Memo 1, 13-14.  Dr. Rosenthal's aggregate damages calculation reflects these theories of antitrust impact (generic foreclosure) and, therefore, has laid out a damages case "consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation."  Comcast, 133 S. Ct. at 1433 (citing ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues 57, 62 (2d ed. 2010)).

Thus the Comcast majority's statement that the party moving for class certification in an antitrust contract must demonstrate the "existence of individual injury resulting from the alleged antitrust violation" which must be "capable of a

proof at trial through evidence that [is] common to the class
rather than individual to its members" is, strictly speaking,
dicta in the circumstances of this case.  <u>Comcast</u>, 133 S. Ct. at
1430 (citing <u>Behrend</u> v. <u>Comcast Corp</u>., 264 F.R.D. 150, 154 (E.D.
Pa. 2010)).  It is, however, powerful dicta deserving of the
most thoughtful analysis.

The most thorough, comprehensive (indeed encyclopedic)
treatment of the post-<u>Comcast</u> landscape is found in Judge J.
Paul Oetken's superb discussion in <u>Jacob</u> v. <u>Duane Reade, Inc.</u>,
No. 11 CIV. 160 (JPO), 2013 WL 4028147, at *3-10 (S.D.N.Y. Aug.
8, 2013).  It forms the template for this Court's analysis,
mindful of Judge Posner's observation that:

> It would drive a stake through the heart of the
> class action device, in cases in which damages
> were sought rather than an injunction or a
> declaratory judgment, to require every member of
> the class have identical damages.  If the issues
> of liability are genuinely common issues, and the
> damages of individual class members can be
> readily determined in individual hearings, in
> settlement negotiations, or by creation of
> subclasses, the fact that damages are not
> identical across all class members should not
> preclude class certification.  Otherwise
> defendants would be able to escape liability for
> tortuous harms of enormous aggregate magnitude
> but so widely distributed as not to be remediable
> in individual suits.

<u>Butler</u> v. <u>Sears, Roebuck and Co.</u>, 727 F.3d 796, 801 (7th Cir.
2013).  <u>See also</u> <u>In re Whirlpool Corp. Front-Loading Washer
Products Liability Litig.</u>, 678 F.3d 409, 420-21 (6th Cir. 2012),

vacated sub nom., Whirpool Corp. v. Glazer, 133 S. Ct. 1722
(2013).

Judge Oetken narrowly interprets the holding in Comcast to
require that a putative class must "demonstrate a linkage
between its theory of liability with its theory of damages."
Jacob, 2013 WL 4028147, at *11. In light of Wal-Mart, however,
"certification of both liability and damages together may
nevertheless prove untenable" because defendants have due
process rights to "defend each claim when damages are too
individualized." Id. Further, in light of the fact that the
courts may bifurcate damages and liability issues in certifying
a class, Comcast does preclude certification of just a liability
class "in the face of individualized proof of damages." Id.
This Court follows this line of analysis in the following
discussion of the End-Payors' damages model.

As a preliminary matter, this Court first addresses the
End-Payors' showing of classwide impact. Dr. Rosenthal
persuasively demonstrates that the End-Payors have suffered
classwide antitrust impact under a single theory of liability,
viz. that the Defendants entered into reverse payment agreements
with the purpose of extracting supracompetitive rents by virtue
of AstraZeneca's artificially secured monopoly position. Dr.
Rosenthal has shown through her "yardstick" measurement of
overcharges that all class members were impacted, and continue

to be impacted by generic foreclosure.   Rosenthal Decl. 11-14; Rosenthal Rebuttal ¶ 21.   Thus persuaded by the End-Payors' showing of classwide antitrust impact, the Court next examines the Defendants' challenges to Dr. Rosenthal's damages model.

The Defendants challenge the End-Payors' damages model by arguing correctly that certain class members may not have suffered any injury from the generic foreclosure.   This, they claim, renders class certification inappropriate due to the individual damages inquiries that would need to be conducted. See Defs.' Memo 2-3.

The damages arising from the antitrust injury must, as the Supreme Court has said in dicta, be demonstrated by a "common methodology" applicable to the class as a whole.   Comcast, 133 S. Ct. at 1430.   Even so, it is also clear in the First Circuit that "[t]he use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself."   In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156, 197 (1st Cir. 2009) (citing 3 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 10.5, at 483-86 (4th ed. 2002) ("Aggregate computation of class monetary relief is lawful and proper. Courts have not required absolute precision as to damages . . . .")).

The controversies that arise here center around whether the use of "averages" and "but for" damage calculations are acceptable methodologies, see, e.g., John H. Jackson & Gregory K. Leonard, Rigorous Analysis of Class Certification Comes of Age, 77 Antitrust L.J. 569, 575-585 (2011) (criticizing applications of the "but for" methodology), and whether recent class action jurisprudence allows for variance in damages among putative class members.  In defense of the End-Payors' aggregate damages model, Dr. Rosenthal explains her methodology as a "yardstick" approach, utilizing average measures, publicly available data, and a single "benchmark" brand-name price to calculate aggregate overcharges.  See Rosenthal Rebuttal ¶¶ 2, 17, 19.  Further, Dr. Rosenthal points out that the use of averages is widely used in econometrics, and has been utilized by Dr. Hughes and the Defendants themselves in their strategic planning documents.  See id. at 6-8.  Even if Dr. Rosenthal had calculated individualized damages, she argues that these individual amounts would add up roughly to the same amount of damages in the aggregate.  Schoen Decl., Ex. 2, Videotaped Dep. Meredith Rosenthal, Ph.D. ("Rosenthal Dep.") 205:19-206:3, ECF No. 329-2.

The Defendants strongly challenge the End-Payors' use of an averages model because it fails to account for differences in injury and losses among class members.  See Defs.' Memo. 12-13.

33

Dr. Hughes points out that the use of an averages model ignores the variations in purchase price, rebates, and contracts that "govern payment for Nexium prescriptions" and fails to identify "damages that are not the result of the wrong" under Comcast. 133 S. Ct. at 1434; Hughes Rpt. ¶ 28.  True, Dr. Rosenthal's methodology is not without flaws: she relies on aggregate data that merely approximate prices for Nexium, she uses data sets that cover an unrepresented part of the class, and she includes PBMs which the Court has now excluded.  Still, refocusing the inquiry on what is required in a class certification damages model, the Court concludes that Dr. Rosenthal quite properly conducted a classwide overcharge analysis to show common proof of damages, rather than an individualized inquiry, which is not required under Rule 23.

Dr. Hughes' damages calculation artificially accentuates any variations, and his arguments do not undercut the Court's conclusion that the aggregate calculations here appropriately capture the variations in the purchase price and reimbursements for Nexium.  For instance, variations among the contractual terms made between PBMs and the different End-Payor groups are minor when compared to how consistent the contracts actually are in terms of which costs are passed-through.  Rosenthal Rebuttal ¶ 15.  Here there is a "single benchmark" – the price of a brand name drug.  Id. ¶ 17.  Variations in the rebates received are

not fatal to classwide damages determination.  The reason for
this is that even where rebates are calculated into overcharge
damages, the price of esomeprazole magnesium will "trend
together over time because rebate arrangements frequently use
list prices as a reference point."  Id.  This is not the
allocation stage of litigation.  Apportioning damages ought wait
until liability is decided upon the merits.

As outlined above, Comcast has not changed the rule on what
is required for damages models in establishing Rule 23(b)(3)
predominance.  See Jacob, 2013 WL 4028147, at *11.  Comcast
simply requires the moving party to present a damages model that
directly reflects and is linked to an accepted theory of
liability under Rule 23(b)(3).  The Supreme Court in Comcast
very specifically pointed to the failure of the Indirect-
Purchaser Plaintiffs in that case to provide a measurement of
classwide damages attributed solely to the accepted overbuilder
theory of liability, which inevitably meant that "[q]uestions of
individual damage calculations" would overwhelm questions common
to the class.  133 S. Ct. at 1433 (2013).

Here, the record before the Court demonstrates that the
End-Payors, among them consumers, TPPs, insurance companies, and
union plan sponsors, have suffered identical overcharge injuries
stemming from the same set of transactions between AstraZeneca
and the three Generic Defendants to foreclose the market entry

of a generic Nexium.  Dr. Rosenthal's aggregate damages analysis demonstrates both common antitrust impact and damages to the class.  Further, the End-Payors at this stage of litigation need not prove individualized proof of injury.  In re Cathode Ray, 2013 WL 5391159, at *2.  Class certification of a damages class, subject to the modifications discussed above, is thus GRANTED to the End-Payor plaintiffs.

### F. Further Management of This Case

In light of the complexities limned above, it might be helpful to sketch certain considerations that the Court may face as the case proceeds.  The Court expresses no opinion on any of these matters.

Not every issue need be resolved at the class certification stage.  It is folly to pretend otherwise.  After all, the major problems here concern damages, while liability has yet to be established.

This case is proceeding apace to a firm March 2014 trial date.  As discovery is completed and trial looms, pre-trial conferences may be needed to address the practicalities of the trial process.  Obedient to the Supreme Court's command, this Court will eschew "[t]rial by [f]ormula," Wal-Mart, 131 S.Ct. at 2561 ("We disapprove [of] that novel project."), but will take steps to insure equality among litigants.  See Alexandra D.

Lahav, The Case for "Trial by Formula", 90 Tex. L. Rev. 571, 593-632 (2012).

It may then be necessary to revisit the class certified in this order.  Perhaps a liability-only class may prove fairest and most manageable.  See Butler v. Sears, Roebuck and Co., 727 F.3d 796, 801-802 (7th Cir. 2013).

Perhaps, if liability is established, competent evidence may lead to a jury finding of the average amount of the supracompetitive overcharge on a capitation basis.  It may then be appropriate to use this average as a baseline for further proceedings.  Many of the litigants may accept this baseline figure as an appropriate measure of damages.  Certain plaintiffs may seek greater damages in discrete proceedings.  The Defendants may seek to extinguish damages in discrete proceedings upon proof of discounts or the like.  See supra n.4.

None of this is meant as a prediction.  The point is simply that in a large class action such as this, management for trial[6] is a dynamic process, one which requires constant reevaluation and adjustment.  The End-Payors' counsel well know that their compensation, if any, turns on the sum of money actually paid to the victims of antitrust injury.  See Tr. Sched. Conf. 27-28,

---

[6] This Court speaks of "management for trial" rather than using the more familiar "case management" phrase to emphasize the goal of the entire process.  The matter is fully discussed in United States v. Massachusetts, 781 F. Supp. 2d at 21-26.

ECF No. 90.  They thus have every proper incentive to see these matters through to a successful conclusion.  Nor does this Court shrink from further proceedings to do discrete and accurate justice.  This is an MDL case.  Surely certain damage claims may properly be sent back from whence they came.  See DeLaventura v. Columbia Acorn Trust, 417 F. Supp. 2d 147, 152-55 (D. Mass. 2006) (critizing MDL practice for holding trial-ready cases in the transferee district simply to dragoon settlement). Moreover, the possibility of multiple proceedings after a classwide liability determination hardly offends the rights of any of these litigants.  See Walker v. R.J. Reynolds Tobacco Co., Nos. 12-13500, 12-14731, 2013 WL 5832015, at *8-10 (11th Cir. 2013).[7]

---

[7] Walker upholds the innovative trial management decisions of the judges of the Middle District of Florida.  After class action proceedings in the courts of Florida, see Engle v. Liggett Grp., Inc., 945 So.2d 1246 (Fla. 2006), that district wound up with over 5,000 individual tobacco product liability suits to try.

One of America's most productive federal district courts, United States v. Massachusetts, 781 F. Supp. at 26, each judge of the Middle District of Florida handles a caseload of 513 civil cases.  Administrative Office of the U.S. Courts, U.S. District Court – Judicial Caseload Profile, Federal Court Management Statistics, http://jnet.ao.dcn/sites/default/files/pdf/FCMS_District_Profile s_September_2012.pdf#page=91 (last visited Nov. 13, 2013). Moreover, the Middle District of Florida is a true trial court. While a citizen's right to sit on the nation's federal juries has declined by nearly a third over the last eight years (32.54% to be exact), see SEC v. EagleEye Asset Mgmt., No. 11-11576-WGY, 2013 WL 5498182, at *2 n.5 (D. Mass. Oct 4, 2013), in the Middle

## III. CONCLUSION

While this Court has scrupulously considered and applied
the legal framework mandated by controlling precedent, the Court
takes comfort in the knowledge that the result reached here also
fits comfortably within Professor Louis Kaplow's brilliant
"conceptual framework for analyzing how decisions are optimally
made at each juncture in multistage legal proceedings . . . ."
Louis Kaplow, Multistage Adjudication, 126 Harv. L. Rev. 1179,
1296 (2013).  Professor Kaplow writes:

> At nonfinal stages, such as motions to dismiss
> and for summary judgment in U.S. civil
> litigation, the decision to continue a case in
> some particular scenario rather than to terminate
> it has three central consequences: by raising the
> expected costs of prospective harmful acts,
> deterrence is enhanced; by increasing costs of
> benign acts, chilling is intensified; and by the
> very act of proceeding to the next stage,
> adjudication costs are incurred. When the
> deterrence gain exceeds the sum of chilling costs
> and continuation costs, continuation is optimal.
> To the extent feasible, legal systems need to
> heed this lesson if they are to impose liability
> for harmful acts as often as possible in order to
> discourage their commission, penalize benign

District of Florida it has actually increased by 17.29% over the
same period.
      Having boiled the 5,000+ individual cases down to 1360
cases that are actually triable, the judges of the Middle
District of Florida reached out to their colleagues nationwide.
At present, thirty-eight judges from every geographical circuit
sitting in all five of the locations where Middle Florida holds
court are scheduled to try as many of these Engle progeny cases
as can be reached in 2014. No vanishing jury trial here –
indeed, this intricate procedural and practical challenge shows
the federal district courts at their best, a truly national
court system.

conduct only infrequently in order to avoid significantly chilling such behavior, and accomplish these objectives without undue effort and expense.

Id.

For the reasons set forth above, the End-Payors' motion for certification of a damages class under Rule 23(b)(3) is ALLOWED and the motion for certification of an injunctive class under Rule 23(b)(2) is DENIED.  This Court certifies the following damages class:

> All persons or entities in the United States and its territories who purchased or paid for some or all of the purchase price for Nexium or its AB-rated generic equivalents in Arizona, California, Florida, Iowa, Kansas, Massachusetts, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin and the District of Columbia, in capsule form, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, during the period April 14, 2008 through and until the anticompetitive effects of Defendants' unlawful conduct cease. For purposes of the Class definition, persons or entities "purchased" Nexium or its generic equivalent if they paid or reimbursed some or all of the purchase price.[8]

---

[8] Pursuant to the Court's Order, see ECF No.352, and its Order addressing the End-Payor Plaintiffs' Motion for Leave to Amend Consolidated Amended Class Action Complaint, see ECF No. 448, this class definition applies specifically to the End-Payors' challenges against the reverse payment agreements made between AstraZeneca and Teva ("AstraZeneca/Teva Agreement"), and AstraZeneca and Dr. Reddy's ("AstraZeneca/Dr.Reddy's Agreement").  In regards to the agreement between AstraZeneca and Ranbaxy ("AstraZeneca/Ranbaxy Agreement"), the End-Payor

Excluded from the class are the following groups:

a. Defendants and their officers, directors, management, employees, subsidiaries, or affiliates;

b. All persons or entities who purchased Nexium or its AB-rated generic equivalent only directly from Defendants;

c. All persons or entities who purchased Nexium or its AB-rated generic equivalent only for resale purposes;

d. All government entities, except for government-funded employee benefit plans;

e. Fully insured health plans (i.e., plans that purchased insurance from another third-party payor covering 100 percent of the plan's reimbursement obligations to its members);

f. "Flat co-pay" "Cadillac Plan" consumers who made purchases only via fixed dollar co-payments that do not vary between Nexium and its AB-rated generic equivalent;

g. Consumers who purchased or received Nexium or its AB-rated generic equivalent only through a Medicaid program;

h. All pharmacy benefit managers without capitation agreements, regardless of whether they accepted AstraZeneca rebates for Nexium; and

i. The judges in this case and any members of their immediate families.

---

class is limited to the following states: Maine, Vermont, and Wisconsin.

SO ORDERED.

                                        /s/ William G. Young
                                        WILLIAM G. YOUNG
                                        DISTRICT JUDGE