UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

——————————————————————
                                    )
IN RE NEXIUM (ESOMEPRAZOLE)         )          CIVIL ACTION
ANTITRUST LITIGATION                )          NO. 12-md-02409-WGY
                                    )
——————————————————————

YOUNG, D.J.                                    December 11, 2013

**MEMORANDUM AND ORDER**

I.    **INTRODUCTION**

       This case presents a multidistrict, putative class action

against AstraZeneca AB, Aktiebolaget Hassle, and AstraZeneca LP

(collectively, "AstraZeneca"), Ranbaxy Pharmaceuticals, Inc.,

Ranbaxy Inc. and Ranbaxy Laboratories, Ltd. (collectively,

"Ranbaxy"); Teva Pharmaceutical Industries, Ltd. and Teva

Pharmaceuticals USA, Inc. (collectively, "Teva"); and Dr.

Reddy's Laboratories Ltd. and Dr. Reddy's Laboratories, Inc.

(collectively, "Dr. Reddy's") (collectively, with Ranbaxy and

Teva, the "Generic Defendants") (collectively, with AstraZeneca,

the "Defendants") for alleged violations of federal antitrust

laws involving AstraZeneca's heartburn medication, Nexium.  This

opinion addresses a motion for class certification of the Direct

Purchaser plaintiffs.  The putative Direct Purchaser class is

comprised of wholesalers and retailers that purchased brand drug

Nexium directly from AstraZeneca and that "will purchase generic

Nexium directly from one or more of other Generic Defendants." Consolidated Am. Compl. & Demand Jury Trial ("Direct Purchasers Compl."), ¶ 19, ECF No. 131.  They move for class certification under Federal Rules of Civil Procedure ("Rules") 23(a) and (b)(3).  Id. ¶ 19-23, 38.

## II.  ANALYSIS

The Defendants raise many of the same challenges to the Direct Purchasers' motion for class certification as they did against the End-Payors.  Compare Defs.' Opp'n Direct Purchasers Class Pls.' Mot. Class Certification ("Defs.' Opp'n"), ECF No. 377, with Defs.' Mem. Law Opp'n End-Payor Pls.' Mot. Class Certification ("Defs.' End-Payor Mem."), ECF No. 376.  On November 14, 2013, the Court granted the End-Payors class certification.  Mem. & Order, ECF No. 519.  Noting that the same analysis applies with full force and effect to the Direct Purchaser class, the Court here focuses on those matters germane to the Direct Purchasers.

### A.  Rule 23(a)(1): Numerosity of the Class

In a motion for class certification, the moving party must establish the four threshold requirements under Rule 23(a). Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2548 (2011). Unlike their opposition to the End-Payors' motion for class certification, here the Defendants strongly contest whether the

Direct Purchaser plaintiffs satisfy the numerosity requirement. See Defs.' Opp'n 6-13.  Numerosity requires the class to be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a).  Courts have generally held that classes exceeding forty plaintiffs are deemed sufficient, although courts within this circuit have certified classes with sizes similar to that presented here.  See, e.g., In re Prograf Antitrust Litig., No. 1:11-cv-10344-RWZ, 2013 WL 2395083, at *1 (D. Mass. Apr. 23, 2013) (Zobel, J.) (certifying a class of twenty-five pharmaceutical wholesalers); In re Citigroup, Inc. Capital Accumulation Plan Litig., No. 00cv11912-NG, 2010 WL 9067986, at *8-10 (D. Mass. Jan. 6, 2010) (Gertner, J.), aff'd, 652 F.3d 88 (1st Cir. 2011) (certifying a subclass of twenty participants in an employee stock compensation program).

### 1.   Class Below Forty Members

The expert for the named Direct Purchasers, Dr. Raymond Hartman, measures the putative class according to two "but-for" generic entry dates, April 14, 2008 and January 1, 2012, resulting in either thirty-one or twenty-six class members, respectively.  Notice Filing Unredacted Copy Decl. Raymond S. Hartman Supp. Certification Class Direct Purchasers Nexium, Ex. 1, Decl. Raymond S. Hartman Supp. Certification Class Direct Purchasers Nexium ("Hartman Decl."), ¶¶ 37, 65, ECF No. 401-1. The Court however, adopts the Defendants' figures of twenty-nine

or twenty-four members, which account for the consolidation of
two entities with their parent corporations.  Decl. Thomas A.
Isaacson Supp. Defs.' Opp'n Direct Purchaser Class Pls.' Mot.
Class Certification (Dkt. No. 266), Ex. 1, Expert Report Dr.
John H. Johnson, IV Direct Purchaser Class Certification,
("Johnson Rpt.") ¶ 11 n.11, ECF No. 356-1.

　　While the Defendants point out that this range falls well
below the suggested threshold of forty members, Defs.' Opp'n 8,
(citing García-Rubiera v. Calderón, 570 F.3d 443, 460 (1st Cir.
2009) and In re Relafen Antitrust Litig., 218 F.R.D. 337, 342
(D. Mass. 2003), which relied on the suggested number of forty
class members to satisfy numerosity), it is clear that district
courts have taken a more flexible approach to the numerosity
analysis.  The named Direct Purchasers cite to cases from this
circuit, and to numerous cases from other circuits, to
demonstrate the frequency with which courts have certified
classes of fewer than forty members.  Reply Br. Further Supp.
Direct Purchaser Class Pls.' Mot. Class Certification ("Pls.'
Reply Brief"), 4-5 nn.11-13, ECF No. 395.  For example, in a
multidistrict generic delay case in this district, Judge Rya
Zobel, after a "rigorous analysis" under the requirements of
Rule 23(a), certified a class of twenty-five pharmaceutical
wholesalers suing as direct purchasers.  In re Prograf Antitrust
Litig., 2013 WL 2395083, at *1 n.2.  In another generic delay

case, a class of thirty-three direct purchasers was certified "[b]ecause of the complexity and sheer volume of discovery in this case and because the 33 direct purchasers are located across the country."  In re Wellbutrin XL Antitrust Litig., Civ. Action No. 08-2431, 2011 WL 3563385, at *3 (E.D. Pa. Aug. 11, 2011).

The test for numerosity requires the Court to address the question of whether "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  The reasoning of this Court in a recent case is instructive.  This Court, in Liberty Media Holdings, LLC v. Swarm Sharing Hash File, 821 F. Supp. 2d 444 (D. Mass. 2011), held that permissive joinder of thirty-eight defendants was proper under Rule 20.  See id. at 451-52.  The moving plaintiffs in Liberty Media met the dual requirements for Rule 20: first, their claims arose from the "same transaction or occurrence," because all defendants were "part of a BitTorrent swarm that infringed upon Liberty Media's rights by collectively downloading and distributing its copyrighted Motion Picture file," id. at 451; and second, their copyright infringement claims involved "common questions of law and fact" that were identical against all defendants.  Id.  Even though "certain defendants may later present different factual circumstances to support individual legal defenses, at this stage in the litigation, joinder is proper based on the common questions of

law and fact . . . ." Id. The Court's joinder analysis in

Liberty Media, relying on non-numeric factors like "same

occurrence" and commonality, provides a comparative line of

reasoning to the present question -- whether numerosity is met.

Acknowledging that the size of the putative Direct

Purchasers class alone does not establish a clear case for

numerosity, the Court considers non-numeric factors to determine

whether joinder of twenty-four or twenty-nine members is

impracticable in this present case.

### 2. Subjective Factors in Numerosity Analysis

Subjective factors such as the geographic location of

proposed class members, the nature of the action, and matters of

judicial economy must be taken into account in this inquiry.

See 5 James Wm. Moore et al., Moore's Federal Practice §

23.22[1][a]-[f] (3d ed. 1999) (listing subjective factors to

consider when determining whether a class is sufficiently

numerous); see also Meijer, Inc. v. Warner Chilcott Holdings Co.

III, 246 F.R.D. 293, 306 (D.D.C. 2007) ("Significantly, 'the

test for impracticability of joinder is not simply a test of the

number of class members.  When the class is large, numbers alone

are dispositive, but when the class is small, factors other than

numbers are significant.'") (quoting Riordan v. Smith Barney,

113 F.R.D. 60, 62 (N.D. Ill. 1986)).  First, the named Direct

Purchasers state that the putative class members are

geographically dispersed "throughout the country," and joinder would be "difficult, inconvenient, and costly."  Notice Filing Unredacted Copy Direct Purchasers Class Pls.' Mem. Supp. Mot. Class Certification, Ex. 1, Direct Purchasers Class Pls.' Mem. Law Supp. Mot. Class Certification ("Pls.' Mem.") 7, ECF No. 365-1.  Second, the Court recognizes that many courts have given favorable treatment to class actions in the "private enforcement of antitrust laws."  Town of New Castle v. Yonkers Contracting Co., 131 F.R.D. 38, 41 (S.D.N.Y. 1990) ("Since private enforcement of antitrust laws provides a supplement to governmental enforcement, it is our view that class action treatment of alleged antitrust violations is appropriate and desirable."); see, e.g., In re Carbon Black Antitrust Litig., No. Civ.A. 03-10191-DPW, 2005 WL 102966 at *9 (D. Mass. 2005) (Woodlock, J.) (explaining that class certification analysis was conducted "recognizing the interplay between the policy objectives of both the antitrust provisions and of class certification," and that "[c]ourts have noted that class actions are a particularly appropriate mechanism for achieving such enforcement . . . ."); In re Vitamins Antitrust Litig., 209 F.R.D. 251, 258 (D.D.C. 2002) ("Moreover, it has long been recognized that class actions play an important role in the private enforcement of antitrust actions.").  The Court adopts these views here.  Third, judicial economy would best be served

by certifying the Direct Purchaser class, primarily because all putative class members seek damages stemming from the same, identical transactions between AstraZeneca and the Generic Defendants.  Despite the Defendants' arguments that modern discovery and litigation practices would lessen the costs of joinder, see Defs.' Opp'n 10, and that individual class members are economically capable of bringing individual suits,[1] it seems here that litigating the same exact claims in multiple courts across the country is "impracticable."

The Court thus determines the numerosity requirement to have been sufficiently met under Rule 23(a)(1), and accepts the Defendants' calculations for the class size to be twenty-four or twenty-nine members, depending on the determination of a "but-for" generic entry date.

As the Direct Purchaser plaintiffs have properly met the requirements under Rule 23(a)(2) and (3), commonality and typicality, the Court will move on to address the fourth requirement, adequacy of class representation.

**B.   Rule 23(a)(4): Adequacy of Representation**

Rule 23(a)(4) requires that the representative parties will "fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4), and that "the interests of the

---

[1] The Defendants concede that the median purchase of Nexium by each of the members of the putative Direct Purchaser class exceeded $22,000,000.  Defs.' Opp'n 12.

representative party will not conflict with the interests of any of the class members." Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985). Adequacy also requires that class counsel be "qualified, experienced and able to vigorously conduct the proposed litigation." Id. at 130.

The Defendants do not challenge the competency of class counsel, and the record contains no evidence impugning their qualifications. See Linda S. Mullenix, Taking Adequacy Seriously: The Inadequate Assessment of Adequacy in Litigation and Settlement Classes, 57 Vand. L. Rev. 1687 (2004). Rather, the Defendants dispute whether assignees of direct purchaser claims can be included in the proposed class and serve as class representatives. Defs.' Opp'n 20. Class representatives, of course, "must be part of the class." Wal-Mart, 131 S. Ct. at 2550 (quoting East Tex. Motor Freight Sys., Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)). Specifically, the Defendants argue that two of the five named Direct Purchaser plaintiffs, American Sales Company, LLC ("ASC") and Meijer, Inc. with Meijer Distribution, Inc. (collectively, "Meijer"), are improperly included in the proposed class because "[n]either bought Nexium from AstraZeneca." Defs.' Opp'n 20. To support this claim, the Defendants point out that ASC and Meijer were excluded from the list of direct purchasers in Dr. Hartman's expert report. Id.; see Hartman Decl., Attachment D.1, Direct Customer List Scenario

1, D.2, Direct Customer List Scenario 2.  This argument is not
compelling.  This list, as the named Direct Purchasers note, is
not a list of plaintiffs with legal standing to sue, but rather
is a list of direct purchasers taken from AstraZeneca's sales
data.  Pls.' Reply Brief 19 n.68.  As stated in the Direct
Purchasers' complaint and expert report, ASC and Meijer are both
assignees of the claims of direct purchasers that bought Nexium
from AstraZeneca within the class period.  ASC sues on behalf of
itself and on behalf of McKesson Corp., and Meijer sues on
behalf of Frank W. Kerr Co.  Direct Purchasers Compl. ¶¶ 19-20;
Johnson Rpt. ¶ 12.  As a result, the Court holds that assignees
ASC and Meijer can serve as class representatives.

     Ample precedent exists for the proposition that assignees
can be adequate class representatives.  This Court in In re
Relafen Antitrust Litigation, involving a generic delay
antitrust case, allowed drugstore plaintiffs, who were assignees
of the claims of several wholesalers, to sue for overcharge
damages.  360 F. Supp. 2d 166, 187 (D. Mass. 2005) ("[T]he
drugstore plaintiffs had been expressly assigned the rights of
several national wholesalers, undisputed direct purchasers that
had opted out of the direct purchaser plaintiffs' class.").
More recently, the Second Circuit in Cordes & Co. Financial
Services, Inc. v. A.G. Edwards & Sons, Inc., rejected a per se
rule that assignees cannot serve as adequate class

representatives.  502 F.3d 91, 101 (2d Cir. 2007) (holding that assignees properly stood before the court "in the shoes of" class members as "assimilated members of the class."). This Court follows its decision in In re Relafen, 360 F. Supp. 2d 166, as well as numerous other decisions that have allowed for assignees to be included within a proposed class. Accord In re Vitamin C Antitrust Litig., 279 F.R.D. 90, 102 (E.D.N.Y. 2012) ("[T]here is no rule prohibiting the assignment of class membership. . . . Ranis's status as an assignee therefore does not prevent it from joining or representing the class."); In re Wellbutrin Sr Direct Purchaser Antitrust Litig., No. 04-5525, 2008 WL 1946848, at *4 (E.D. Pa. May 2, 2008) (noting that the Third Circuit has "long recognized that antitrust claims can be assigned" and that "numerous courts have certified litigation classes in which the named plaintiffs were operating under an assignment."); In re Cardizem CD Antitrust Litig., 200 F.R.D. 297, 305 (E.D. Mich 2001) (permitting an assignee to "stand in [a direct purchaser's] shoes" for purposes of class certification).

Here, there is no reason to believe the actual assignments are invalid, nor does the Court find any evidence that ASC and Meijer do not share the same interests as the rest of the class (in fact, ASC also sues on behalf of itself as a direct purchaser). Direct Purchasers Compl. ¶ 19. Consistent with the

11

case law of this Court and that of several other jurisdictions,
the Direct Purchasers have fulfilled the requirements of Rule
23(a)(4).  ASC and Meijer are included in the proposed Direct
Purchasers class and may serve as class representatives.

### C.   Rule 23(b)(3): Predominance

The named Direct Purchasers seek class certification under
Rule 23(b)(3), which permits a class action where "the court
finds that the questions of law or fact common to class members
predominate over any questions affecting only individual
members" and where "a class action is superior to other
available methods for fairly and efficiently adjudicating the
controversy."  Fed. R. Civ. P. 23(b)(3).  The named Direct
Purchasers note that predominance has been established in "every
antitrust case brought by direct purchasers seeking overcharge
damages due to suppressed generic competition," because
anticompetitive conduct uniformly deprives direct purchasers of
less expensive generics.  Pls.' Mem. 14.  Countering this
assertion, the Defendants argue that there is no common proof of
injury and damages because the named Direct Purchasers' economic
model fails to account for variations in price and generic
switch rate and improperly relies on averages.  Defs.' Opp'n 15-
16.

The key inquiry is "whether proposed classes are
sufficiently cohesive to warrant adjudication by

representation." <u>Anchem Prods., Inc.</u> v. <u>Windsor</u>, 521 U.S. 591, 623 (1997).  The named Direct Purchasers' burden under this Rule and its recent interpretation in <u>Comcast Corp.</u> v. <u>Behrend</u>, 133 S. Ct. 1426, 1430 (2013), is simply to present a common damages model, limited to and reflecting only the theories of liability accepted by the Court.

This Court must subject the proffered arguments and expert reports to rigorous scrutiny to determine whether the named Direct Purchasers present a "reasonable, judicially recognized methodology for calculating damages and [show] that the data needed to make these calculations is available and common to the class." <u>In re Neurontin Antitrust Litig.</u>, Nos. 02-1830(FSH), 2011 WL 286118, at *10 (D.N.J. Jan. 25, 2011).  Arguments pertaining to specific damages allocation need not be entertained at this class certification stage; they are properly addressed upon the jury determination of liability.

As discussed in its End-Payors' class certification analysis, this Court follows the legal standards outlined in <u>Wal-Mart</u>, 131 S. Ct at 2541, and <u>Comcast</u>, 133 S. Ct. at 1426, in its "rigorous analysis" of the predominance of questions common to the class. <u>Wal-Mart</u>, 131 S. Ct. at 2551.  Rule 23 certification ought not turn into a "full-blown merits analysis." <u>In re: Cathode Ray Tube Antitrust Litig.</u>, No. C-07-5944-SC, 2013 WL 5391159, at *5 (N.D. Cal. Sept. 19, 2013).  The

Court's conclusions here are not evidentiary "findings" of fact,
but are merely preliminary conclusions that here allows this
litigation to move beyond the class certification stage.  See
Mem. & Order 18 ("Fact-finding emerges only after full
evidentiary exposition, including searching cross-examination,
none of which has taken place here.").  Upon review of the
parties' filings and expert reports, the Court concludes that
the named Direct Purchasers have sufficiently demonstrated
antitrust impact and damages common to the class.

### 1.    Common Proof of Antitrust Impact

Like the End-Payor plaintiffs, the named Direct Purchasers
allege the Defendants "engineered an overarching scheme" of
utilizing reverse payment agreements to delay generic entry,
resulting in antitrust impact and injury to Nexium purchasers.
Direct Purchasers Compl. ¶ 5; Corrected Consol. Am. Class Action
Compl. & Demand Jury Trial ("End-Payors' Compl.") ¶ 5, ECF No.
114.  This Court agrees that each member of the putative Direct
Purchaser class alleges the same claims arising from a "unified
course of anticompetitive conduct;" namely, AstraZeneca's
lawsuits against its generic rivals and the resulting reverse
payment agreements.  Pls.' Mem. 15-16.  Here, the theory of
liability for antitrust violations is straightforward, but
establishing proof of common impact and damages requires a

closer look to determine that all class members suffered common
impact as a result of the Defendants' actions.

The Court's standard of review, as outlined in the End-
Payors' class certification analysis, see Mem. & Order 26-27,
requires that the moving party demonstrate that "all class
members were victims," Wal-Mart, 131 S. Ct. at 2552, n.7, but
the party need not demonstrate the "precise amount of damages
incurred by each class member." In re Rail Freight Fuel
Surcharge Antitrust Litig.-MDL No. 1869, 725 F.3d 244, 252 (D.C.
Cir. 2013). As the First Circuit has acknowledged, the
plaintiffs' theory

> must include some means of determining that each
> member of the class was in fact injured, even if the
> amount of each individual injury could be determined
> in a separate proceeding. Predominance is not
> defeated by individual damages questions as long as
> liability is still subject to common proof. This is
> because the class action can be limited to the
> question of liability, leaving damages for later
> individualized determinations.

In re New Motor Vehicles Canadian Export Antitrust Litig., 522
F.3d 6, 28 (1st Cir. 2008) (internal citations omitted).

The Direct Purchasers present common proof of antitrust
impact in the form of overcharges. The Supreme Court has "long
recognized [overcharges] as the principal measure of damages for
plaintiffs injured as customers." In re Relafen Antitrust
Litig., 218 F.R.D. 337, 344 (D. Mass. 2003); see Hanover Shoe,
Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 494 (1968)

(accepting overcharges as the basis for calculating damages).
Citing to findings from Dr. Hartman's expert report, the Direct
Purchasers list three forms of antitrust impact they intend to
prove at trial: (1) Defendants' conduct had a market-wide
effect, artificially inflating esomeprazole prices; (2) all or
nearly all class members would have purchased generics at a
lower price; and (3) all or nearly all class members would have
purchased brand Nexium at a lower price.  Pls.' Mem. 16-17.

### a.    Market Effect: Brand Erosion

"Generics are priced substantially below their branded
counterparts and quickly capture sales from the brand," id. at
17, and AstraZeneca, in its own internal forecasts, expected
generic Nexium to have the same market effect.  Hartman Decl. ¶
32.  AstraZeneca and the Generic Defendants are well-versed in
this market phenomenon, as demonstrated by the Generic
Defendants' own "brand erosion" predictions and by AstraZeneca's
internal analyses and emails, estimating brand erosion of 90
percent within three months of generic entry.  Id.  The Generic
Defendants predict the minimum first-year generic market share
would fall within a range from 60 percent- Ranbaxy, 85 percent-
Dr. Reddy's, to 90 percent- Teva.  Id.  Ranbaxy, for example,
estimates 50 percent price erosion within a year and 95 percent
erosion within two to six years.  Id.  Dr. Hartman repeatedly
emphasizes that his own yardstick predictions are more

"conservative" than those of the Defendants, although the Court is unsure whether this is a statement addressing the damages model as a whole or if Dr. Hartman is referring to his brand erosion calculations.  Id. ("Compared to Teva, I use more conservative generic market share yardsticks and more conservative brand price yardsticks.").  Whoever presents the more conservative yardstick measurement, it is indisputable that the Defendants, and specifically AstraZeneca, recognized that entry of an authorized generic would result in rapid brand erosion and in the price decline of both brand and generic Nexium.  The next step turns on whether all putative class members suffered overcharge damages and whether these damages can be demonstrated with common proof of impact.

### b.   Generic Bypass Effect

Dr. Hartman calculates two sets of overcharge damages: $25,600,000,000 for a generic entry date in April 2008 and $8,200,000,000 for a generic entry date in January 2012.  Id. at ¶¶ 62-66.  These damages were calculated based on "yardstick" percentages, derived from sales data for Prevacid and its generic, lansoprazole, a similar proton pump inhibitor in the same category as Nexium.  Id. at ¶ 61 (incorporating National Sales Perspective data from IMS Health, a vendor of pharmaceutical industry data).  Overcharges were measured based on the number of units of Nexium purchased by direct purchasers

17

during the class period, "regardless of whether some of those units would not have been purchased by those wholesalers during a period of earlier generic entry" due to "generic bypass."  Id. at ¶ 55.

Generic bypass -- where generic manufacturers sell directly to end-purchasers and retailers, bypassing the wholesale level -- was addressed by this Court in In re Relafen Antitrust Litig., 346 F. Supp. 2d 349, 368-69 (D. Mass. 2004), which held that reducing damages to plaintiff wholesalers under a bypass defense is inconsistent with Hanover Shoe, 392 U.S. at 489.  In Hanover Shoe, 392 U.S. at 489, the Supreme Court rejected a "passing on" defense which, if allowed, would prevent plaintiffs from recovering damages based upon the amount of overcharges passed through to final payors.  Id. ("We hold that the buyer is equally entitled to damages if he raises the price for his own product.  As long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows."); see also In re Relafen, 346 F. Supp. 2d 349, 369 ("Moreover, as Illinois Brick makes clear, Hanover Shoe permits a direct purchaser to recover the 'full amount of the overcharge,' Illinois Brick Co. v. Illinois, 431 U.S. 720, 733, 745-46 (1977), even if he is otherwise benefited, Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc., 131 F.3d 874, 885 (10th Cir. 1997).").

18

Dr. Hartman states he was advised by the representative plaintiffs to assume the Court will rule that overcharge calculations need not account for generic bypass, although he is able to incorporate generic bypass into his model.  Hartman Decl. ¶ 57.  The Defendants respond by pointing out that Dr. Hartman "offered no methodology to account for the varying extent of generic bypass . . . . that would not require analysis for each individual direct purchaser."  Johnson Rpt. ¶ 43.

The Court draws the following conclusions.  First, the issue of generic bypass primarily affects the measure of damages, a matter exclusively reserved to jury determination at trial.  Second, this Court adheres to its ruling in In re Relafen that generic bypass cannot preclude recovery and that plaintiffs only need a "viable method" for demonstrating damages common to the class.  In re Neurontin, 2011 WL 286118, at *10; see also In re Wellbutrin XL Antitrust Litig., 2011 WL 3563385 at *16; In re K-Dur Antitrust Litig., No. 01-1652 (JAG), 2008 WL 2699390, at *15 (D.N.J. Apr. 14, 2008) ("Moreover, because Defendants concede that 45 of the proposed Class members purchased some amount of generic K-Dur, they cannot contend that these Class members were entirely bypassed. . . . Defendants' arguments regarding the effects of generic bypass relate to the quantum of damages, rather than the fact of injury."), aff'd In re K-Dur Antitrust Litig., 686 F.3d 197, 223 (3d Cir. 2012),

vacated on other grounds sub nom., Upsher-Smith Labs., Inc. v.
Louisiana Wholesale Drug Co., 133 S. Ct. 2849 (2013) (mem.),
reinstated sub nom., In re K-Dur Antitrust Litig., Nos. 10-2077,
10-2078, 10-2078, 10-4571, 2013 WL 5180857 (3d Cir. Sept. 9,
2013).  Finally, it is clear that proving the actual effects of
generic bypass is not a burden that the named Direct Purchasers
bear in demonstrating predominance of common issues of law or
fact under Rule 23(b)(3).  At this stage, like questions of
individualized damage, generic bypass cannot preclude
certification of the plaintiff class.

### c.   Variations in Sales Price and Use of Averages

The Defendants challenge both the assertion of common
antitrust impact and Dr. Hartman's methodologies by arguing that
"fact of injury" requires individual inquiry into each class
member's "purchase strategies, volumes, and net prices."  Defs.'
Opp'n 14 (stating that plaintiffs' common proof "must include
some means of determining that each member of the class was in
fact injured.") (quoting In re New Motor Vehicles, 522 F.3d at
28).  Specifically, the Defendants point out two issues with the
named Direct Purchasers' model: (1) the "enormous" variation in
the sales price of Nexium; and (2) Dr. Hartman's use of averages
in calculating net prices and rates of generic switching.
Defs.' Opp'n 14-15.

The average net price paid for each brand Nexium pill, during the proffered class period of August 27, 2008 to May 30, 2013, is calculated to be $4.42, with the highest average net price peaking at $5.41 per pill and the lowest average prices at $0.43 and $1.94 per pill, paid by DMS Pharmaceutical Group Inc. and Good Samaritan Hospital & Health, respectively.  Johnson Rpt. ¶ 7, Ex. 6, Average Net Prices Nexium Direct Purchasers During Class Period.  The Defendants use this range to argue that the two class members paying $0.43 and $1.94 per pill paid "far below the but-for generic price[s]" of "roughly $1.00-3.00/pill" and were thereby uninjured, defeating the predominance requirement.  Defs.' Opp'n 14.  The Defendants' expert, Dr. Johnson, further criticizes Dr. Hartman's damages model for failing to account for the widely varying deductions and discounts received by direct purchasers from AstraZeneca. Johnson Rpt. ¶ 20.  Thus, failing to account for chargebacks, rebates, and discounts "will directly cause actual net prices paid by direct purchasers to diverge from the average price used by Dr. Hartman."  Johnson Rpt. ¶ 23 (listing discounts ranging from 29 percent to 90 percent).

Moreover, the Defendants argue that averages are "inadequate" when "there is evidence that individual class members do not conform to the average."  Defs.' Opp'n 16 (citing In re New Motor Vehicles, 522 F.3d at 28).  In light of Dr.

Johnson's finding that four putative class members made 94 percent of the total purchases of brand Nexium, the Defendants argue that the use of averages "unacceptably masks the significant variation" among class members.  Defs.' Opp'n 16 (quoting Reed v. Advocate Health Care, 268 F.R.D. 573, 592 (N.D. Ill. 2009)).  Dr. Johnson also points out that one putative class member, Good Samaritan Hospital & Health, made only a single purchase of 1,000 brand Nexium pills –- for less than half the average Nexium brand price at the time -- raising doubt as to whether Good Samaritan would have bought generic Nexium in a but-for world, "at a time when Dr. Hartman's but-for generic prices are not clearly lower than the price Good Samaritan actually paid for brand Nexium."  Johnson Rpt. ¶ 37.

Upon consideration of the parties' expert reports and theories on brand erosion and generic bypass, this Court concludes that the Direct Purchasers are able to present a common impact theory at trial, and that at this stage of litigation, a showing of common impact has been satisfied.  See supra section II.C.1.a.  The Defendants' focus on the variations in purchase price among the putative class members directly challenges the Direct Purchasers' damages model, but it does not weaken their assertion of common impact.  First, as discussed in the Court's End-Payor class analysis, antitrust impact "occurs the moment the purchaser incurs an overcharge" and is

22

conceptually different from the task of assessing antitrust damages.  Mem. & Order 26.  Second, individualized damages are reserved for determination at trial.  See supra section II.C.1.b.

As to the use of averages, Wal-Mart may have struck down the use of a "sample set" measurement, 131 S. Ct. at 2544, 2561, but the Supreme Court did not bar the use of averages or aggregate damages measurements in class certification.  The sample set in that case applied to a class of "some 1.5 million female employees" of Wal-Mart, id. at 2544 -- a much different factual scenario than the one presented by the identifiable class members in the present case.  Adhering to the Supreme Court's directive, this Court rejects the use of "Trial by Formula" in crafting a class and concludes that the Direct Purchasers' proffered methodology, utilizing both averages and "but-for" calculations, is both reasonable and judicially recognized.

The Court recognizes that uninjured direct purchasers may be included within the sweep of the proposed class, but emphasizes that the presence of uninjured class members is not fatal to class certification.  See Mem. & Order 27 ("Several courts, however, have held that at this class certification stage of litigation, the inclusion of uninjured class members is not fatal to class certification.").  Class certification does

not turn on whether a moving party has addressed all possible

variations and nuances in its damages calculations.  The

Defendants, in their attempt to undercut Dr. Hartman's damages

model, rely too heavily on pointing out missing factors in the

damages model, arguing that Dr. Hartman failed to account for

differences among types of customers, buying power of individual

wholesalers, regional preferences for Nexium, and individual

purchase price.  Johnson Rpt. ¶ 20-24.  At this stage of

litigation, the Court recognizes that while it must address

"considerations that are enmeshed in the factual and legal

issues comprising the plaintiff's cause of action," Wal-Mart,

131 S. Ct. at 2552 (quoting General Tel. Co. of Southwest v.

Falcon, 457 U.S. 147, 160 (1982)), it should not engage in a

"full-blown merits analysis," In re: Cathode Ray Tube, 2013 WL

5391159, at *5.  As in In re: Cathode Ray Tube, it appears the

Defendants here are "trying to push . . . the Court toward a

full-blown merits analysis, which is forbidden and unnecessary

at this point."  Id. (internal citation omitted).

### 2.  Common Proof of Damages

Finally, the Direct Purchasers address common proof of

damages under the rubric of Comcast, 133 S. Ct. at 1433

(vacating class certification which failed properly to propose

proof of damages "capable of measurement on a classwide

basis.").  In both Comcast and Amgen, Inc. v. Connecticut

Retirement Plans and Trust Funds, 133 S. Ct. 1184 (2013), the
Supreme Court held that predominance fails when "[q]uestions of
individual damage calculations will inevitably overwhelm
questions common to the class." See Comcast, 133 S. Ct. at
1433; Amgen, 133 S. Ct. at 1196.  As discussed in this Court's
End-Payors' analysis however, see Mem. & Order 32, this rule
does not preclude the use of aggregate damages calculations.
They are "implied by the very existence of the class action
mechanism itself."  In re Pharm. Indus. Average Wholesale Price
Litig., 582 F.3d 156, 197 (1st Cir. 2009).  "Aggregate
computation of class monetary relief is lawful and proper.
Courts have not required absolute precision as to damages . . .
."  Id. (quoting 3 Herbert B. Newberg & Alba Conte, Newberg on
Class Actions § 10.5, at 483-86 (4th ed. 2002)).

     The Direct Purchasers present two preliminary damages
calculations based on the April 2008 and January 2012 but-for
generic entry dates, with damages continuing to accrue to class
members.  Pls.' Mem. 19.  First, they argue that Dr. Hartman's
"yardstick" methodology has been endorsed by the First Circuit,
and district courts within this circuit, in numerous delayed-
generic cases.  Id. at 19 n.67; Pls.' Reply Brief 15 n.56
(citing In re Pharm., 582 F.3d at 197, New England Carpenters
Health Benefits Fund v. First DataBank, Inc., 248 F.R.D. 363,

371 (D. Mass. 2008) (Saris, J.), In re Tyco Int'l, Ltd.

Multidistrict Litig., 535 F. Supp. 2d 249, 256 (D.N.H. 2007)).

The Defendants challenge this assertion by arguing that

"common issues . . . do not predominate when individualized

inquiries are necessary" to measure varying damages among the

class. Defs.' Opp'n 17. Similar to their criticisms of the

End-Payors' expert methodology, see Defs.' End-Payor Mem. 13-14,

the Defendants point out that Dr. Hartman fails to account for

actual brand prices, but-for generic prices, purchases by brand

loyalists, and generic and other-drug conversion rates. Defs.'

Opp'n 17-18. For example, individual discounts to direct

purchasers "ranged from less than 5% to more than 90%," and the

generic conversion rates of Dr. Hartman's benchmark drug

Prevacid ranged from "roughly 0% to 90%, depending upon the

category of trade." Defs.' Opp'n 17-18. Less persuasive here

are the Defendants' arguments pointing to the potential

inaccuracies in the but-for pricing of Nexium due to factors

like brand-loyal purchases and conversion to other drugs. Id.

These variations, the Defendants argue, are ignored by the use

of averages calculations, see id. at 18, and without

individualized inquiries, will result in the unlawful recovery

of damages by uninjured direct purchasers.

The Court acknowledges that variation in actual price paid

among the direct purchasers may preclude some class members from

recovery if it is shown that various rebates, discounts, or
buying practices did not result in net positive damages.  At
this stage, however, the Court looks to see whether the Direct
Purchasers are able to show common damages with their proffered
methodology.  As with the End-Payors, the Direct Purchasers here
advance a single, class-wide theory of harm: Defendants'
unlawful conduct delayed the entry of lower-priced generic
Nexium, see Direct Purchasers Compl. ¶¶ 10-12, clearly
differentiating this case from the facts in Comcast, which
rejected a damages model because it failed solely to incorporate
the court's accepted theory of liability.  133 S. Ct. at 1430.
With respect to actual damages calculations, the Court notes
that, in contrast with the End-Payors, here precise sales data
for the purchases of brand Nexium are readily available for all
direct purchasers.  See Johnson Rpt. Ex. 2, Net Sales Nexium
AstraZeneca Direct Purchasers.  Echoing the suggestion made in
the Court's End-Payor class certification opinion, see Mem. &
Order 37, having this sales data will prove useful if a jury is
able to establish a baseline supracompetitive overcharge, from
which individual class members may calculate their recovery.
Id. ("Perhaps, if liability is established, competent evidence
may lead to a jury finding of the average amount of the
supracompetitive overcharge on a capitation basis.  It may then
be appropriate to use this average as a baseline for further

27

proceedings.”); see Tobias Barrington Wolff, Managerial Judging and Substantive Law, 90 Wash. U. L. Rev. 1027 (2013).

Here, two sets of common damages are calculated and presented under a reasonable and judicially acceptable methodology, based upon existing sales data by the identifiable direct purchasers and benchmarked against a similar drug, Prevacid, and its generic. The Direct Purchasers have thus met the requirement of proving common damages under Rule 23(b)(3).

### 3. **Superiority**

Lastly, the Direct Purchasers address the second prong of Rule 23(b)(3) and contend that class action treatment is superior to other methods to achieve “economies of time, effort, and expense.” Pls.’ Mem. 20 (quoting In re Relafen, 218 F.R.D. at 346). They argue in favor of the superiority of the class action device, based on the fact that, like the End-Payors in this case, the Direct Purchasers bring their antitrust allegations under a consolidated theory of liability, targeting three specific reverse payment agreements with a single entity, AstraZeneca. Because this case is “no more complicated than Relafen,” the Direct Purchasers assert that class action treatment would be a superior method of adjudicating their claims. Id. at 20 n.71.

The Defendants’ counterarguments are powerful: they first point out that class members are economically well-suited for

individual suits because of the "nearly $1 billion" in damages
claimed per plaintiff.  Defs.' Opp'n 19.  Further, the
Defendants note that class claims are concentrated in three of
the largest class members (who account for 87.7 percent of all
class purchasers), and that these members have no need for class
action treatment to resolve their claims.  Id. at 19-20.

    This is a close call.  Even so, considering the complex
nature of this litigation, the fact that complete joinder of the
Direct Purchaser class is impracticable, and the "desirability"
of concentrating litigation in this single forum, Fed. R. Civ.
P. 23(b)(3), the Court here concludes that class action
treatment is superior to other methods for "fairly and
efficiently adjudicating the controversy."  Id.


**III. CONCLUSION**

    Accordingly, this Court GRANTS the Direct Purchasers'
Motion for Class Certification under Federal Rule of Civil
Procedure 23(a) and (b)(3).  The Court certifies the following
class:
All persons or entities in the United States, including U.S.
territories, who purchased branded Nexium directly from
AstraZeneca at any time during the period August 27, 2008,
through the date the Court enters an order certifying the class
(the "Class").

Excluded from the Class are the Defendants, their officers, directors, management, employees, subsidiaries, and affiliates, and all federal governmental entities.[2]


**SO ORDERED.**


                                        /s/ William G. Young
                                        WILLIAM G. YOUNG
                                        DISTRICT JUDGE

---

        [2] Pursuant to the Court's order denying AstraZeneca and Ranbaxy's motion for partial summary judgment, the Direct Purchasers' claims, relating to Ranbaxy's alleged exclusion from the market as a result of the AstraZeneca-Ranbaxy settlement agreement, are not yet time-barred under the four-year federal statute of limitations.  Order, ECF No. 546.