# EXHIBIT 3

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEXIUM (ESOMEPRAZOLE) ANTITRUST LITIGATION | MDL No. 2409<br><br>Civil Action No. 1:12-md-2409 |
| This Document Relates To:<br><br>Direct Purchaser Class Actions<br>End-Payor Class Actions | |

### REPORT OF RICHARD G. FRANK AND THOMAS G. MCGUIRE
### ECONOMIC ANALYSIS OF THE NEXIUM SETTLEMENT AGREEMENTS

Because this report may cite some documents that the defendant(s) designated "Highly Confidential" or "Attorney Confidential," we have stamped our report "Highly Confidential." By affixing this stamp, we do not intend to convey that we, or Plaintiffs' counsel, believe that the subject matter of this report or the documents cited therein is, in fact, highly confidential.



*Thomas McGuire*

10.      I am a Professor of Health Economics in the Department of Health Care Policy at Harvard Medical School.  For the past 35 years I have conducted research on a variety of issues including: the economics of managed care, health insurance and health care payment systems, drug pricing and procurement, the economics of health care disparities by race and ethnicity, and the economics of mental health policy.  I teach health economics in Harvard University's Ph.D. program in Health Policy.

11.      I was the 1981 recipient of the Elizur Wright Award from the American Association of Risk and Insurance recognizing an "outstanding contribution to the literature on risk and insurance" for my book *Financing Psychotherapy*.  In 1991, I received the Carl Taube Award

from the American Public Health Association for "outstanding contributions to public health." I am a member of the Institute of Medicine (IOM), a Research Associate at the National Bureau of Economics Research, and served for ten years as an editor of the leading journal in the field of health economics, the *Journal of Health Economics*. I am an editor of the *Handbook of Health Economics*, Volume 2, and authored the chapter on "Demand for Health Insurance" in that volume. I have been a research referee for a variety of academic journals and am the author of more than 150 refereed journal articles, books and monographs.

12.     Two of my jointly authored papers received "best paper of the year" awards for 2008, from Academy Health for research on physician-patient interaction and from the National Institute for Health Care Management for work on incentives in managed care plans. Also in 2008, I received the Everett Mendelsohn Excellence in Mentoring Award from Harvard's Graduate School of Arts and Sciences. I have recently published four papers on the economics of drug procurement, insurance coverage for drugs and competition between branded and generic drug products.[3]

13.     I received an AB degree from Princeton University and a PhD degree in economics from Yale University. Attachment A contains my curriculum vita and a listing of my recent testimony. My rate of compensation in this matter is $625 per hour.



---

[3] See T.G. McGuire and S. Bauhoff, "Adoption of a Cost-Saving Innovation: Germany, UK and Simvastatin," in N. Klusen, F. Verheyen and C. Wagner, eds., "England and Germany in Europe – What Lessons Can We Learn from Each Other?" Baden-Baden, Germany: Nomos, 2011, pp. 11-26; E.R. Berndt, T.G. McGuire and J.P. Newhouse, "A Primer on the Economics of Prescription Pharmaceutical Pricing in Health Insurance Markets," *Forum for Health Economics & Policy*, 14(2), 2011, Article 10; J. Glazer and T.G. McGuire, "A Welfare Measure of 'Offset Effects' in Health Insurance," *Journal of Public Economics*, 96, 2012, pp. 520-523; and J. Glazer, H. Huskamp and T.G. McGuire, "A Prescription for Drug Formulary Evaluation: An Application of Price Indices," *Forum for Health Economics and Policy*, 15(2), 2012, Article 3.



## IX.   ANALYSIS OF THE ASTRAZENECA-TEVA DECISION TO SETTLE

185.   In December 1999, Impax sought FDA approval to market a generic version of Prilosec.[193]  AstraZeneca immediately filed a patent infringement complaint against Impax for their 10- and 20-mg generic Prilosec, and a second complaint for the 40-mg generic Prilosec shortly after Impax filed that application.

186.   In September 2004, the FDA granted Impax final approval to market 10- and 20-mg generic omeprazole products.[194]  Impax granted Teva the rights to distribute, sell, and market the generic product.  Despite AstraZeneca's pending patent infringement complaints, Teva began



---

[193]  Decision by Judge Bryson, *In Re: Omeprazole Patent Litigation,* United States Court of Appeals for the Federal Circuit, case no. 01-CV-9351, 00-CV-7597, 01-CD-2998, and M21-81, August 20, 2008.

[194]  Decision by Judge Bryson, 2008, *op. cit.*

---

selling the 10- and 20-mg generic Prilosec at-risk in 2004.[195]  On May 31, 2007, the court determined that Impax infringed AstraZeneca's patents and owed AstraZeneca damages for all sales of generic Prilsosec before October 20, 2007, which the court set as the effective date of Impax's ANDA.  After losing appeals, on January 6, 2010, Teva and Impax agreed that Teva would pay AstraZeneca $9 million in exchange for a release from other damage liability.[196]

187.    Also on January 6, 2010, Teva and Impax also signed an agreement stating that AstraZeneca's Nexium patents were valid and enforceable,[197] effectively agreeing to delay entry until after the expiration of Ranbaxy's 180-day exclusivity period, set by the AstraZeneca-Ranbaxy agreement to end 180 days after May 14, 2014.

**A.    The AstraZeneca Settlements Pay Teva/Impax for Delay and Are Anticompetitive**

188.    We treat the two AstraZeneca-Teva/Impax agreements as a package.  The first agreement, settling AstraZeneca's Prilosec infringement claims, constitutes a "payment" to Teva/Impax, absolving Teva/Impax of damages for a payment well below what AstraZeneca could have reasonably expected had it pursued the litigation.  The second agreement implements the delay, with Teva sacrificing its opportunity to advance the date of generic competition with branded Nexium.

*Quantifying the Payment for Delay*

189.    AstraZeneca's payment to Teva/Impax is the difference between the $9 million and what Teva/Impax would have paid AstraZeneca had the latter made independent business decisions about pursuing the Prilosec litigation ignoring any considerations regarding Nexium. Teva/Impax was judged to have infringed, so the main open question just prior to settlement was how much Teva/Impax would have to pay AstraZeneca.

190.    At the time of Teva's launch, five other generic manufacturers were selling omeprazole in the US.  In calculating the amount that Teva would have reasonably owed AstraZeneca it is

---

[195]  IMS NSP data.

[196]  AZ-NX-MDL-00000296-326 at 302-304.

[197]  AZ-NX-MDL-00000254-295.

important to take the existence of other entrants into consideration. It is likely that, if Teva had not entered, buyers of Teva's generic product would have purchased from one of the other five generics and not from the brand. As such, it is reasonable and certainly conservative to evaluate the Prilosec agreement based on a reasonable royalty.

191.    From the Prilosec generic at-risk launch in 2004 through the first quarter of 2006, Teva and Impax made $21.5 million in profits.[198] IMS data indicate that Teva's sales during this period were $72.7 million. During the balance of the damage period, from the second quarter of 2006 through the third quarter of 2007, Teva's gross sales totaled an additional $82.6 million.[199] We conservatively assume that Teva would have at least doubled their total profits during this period, which implies that Teva's profits totaled approximately $43.0 million for the entire damage period.

192.    If AstraZeneca had claimed an 80% royalty fee, which it did in multiple distribution agreements with Ranbaxy, Teva/Impax would have owed AstraZeneca $34.4 million ($43.0 million*80%).

193.    AstraZeneca's net payment to Teva/Impax is thus our estimate of what it could have collected, conservatively put at $34.4 million, less future litigation costs, which at that point would be quite low, say $2-3 million, and less the payment they collected from Teva/Impax, $9 million. Thus, the payment from AstraZeneca to Teva/Impax was at least $24.4 million. This is a conservative estimate because, we understand from counsel, it is possible that the amount that would have been paid to AstraZeneca would have been trebled by the court.

*The Delay Is Anticompetitive*

194.    Teva had the option of pushing for a court decision on the validity of AstraZeneca's Nexium patents to determine whether these would be infringed by a Teva generic product. Had a court decided AstraZeneca's patents were invalid or not infringed, Ranbaxy would have been put in a position of losing its 180-day period if it did not begin marketing the generic within 75

---

[198]   Teva-ESO-023577-80 at 78.

[199]   IMS NSP data.

days of the court decision. A ruling favorable to Teva would have undermined the AstraZenca-Ranbaxy settlement of delaying generic entry until May 27, 2014.

195.   We can apply the logic developed above in Section VII to the question of whether, with respect to the AstraZeneca-Teva agreement, the delay in the settlement between AstraZeneca and Teva, *i.e.*, the affirmation of the entry date in the AstraZeneca-Ranbaxy agreement, was anticompetitive. The argument is straightforward and definitive.

196.   With some probability, Teva would have won in court, accelerating the date of generic entry before May 27, 2014. As long as there is some probability Teva would have won, the expected (or average) date of generic entry in connection to the AstraZeneca-Teva litigation, the competitive standard, *must have been before* May 27, 2014. Therefore, the AstraZeneca-Teva settlement, by delaying generic entry to May 27, 2014, delayed entry beyond the expected date with competitive behavior, and is therefore anticompetitive.

197.   Thus, the pair of AstraZeneca-Teva agreements effected a pay for delay. Teva was paid in the form of a sweetheart settlement (not for fair value) from AstraZeneca in the Prilosec patent litigation an amount conservatively estimated at $42 million. In exchange, Teva agreed to cease its efforts to bring a generic Nexium to market, delaying the expected date of the availability of generic Nexium.





Richard G. Frank                          Thomas G. McGuire

August 23, 2013                           August 23, 2013