# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re: Nexium (Esomeprazole) Antitrust Litigation* | MDL No. 2409 |
| This Document Relates To: | Civil Action No. 1:12-md-02409-WGY |
| ALL ACTIONS | |

**ASTRAZENECA AND RANBAXY DEFENDANTS' MEMORANDUM
CONCERNING TRIAL PROCEDURE AND PLAINTIFFS' BURDEN OF PROOF**

AstraZeneca and Ranbaxy ("Defendants") respectfully submit this memorandum to address issues discussed at the Pretrial Conference of December 11, 2013 and identified by the Direct Purchaser and End Payor Class Plaintiffs in their Pretrial Conference Submissions [Docket Nos. 637 and 704].[1]

Defendants agree that the Court should bifurcate the proceedings in this matter. Defendants disagree, however, that the Court may bifurcate all elements of liability and damages as proposed by the Direct Purchaser Class Plaintiffs in a manner consistent with the parties' Seventh Amendment rights, as the liability question of injury-in-fact cannot be separated from the determination of damages. The most fair and efficient form of bifurcation would involve a single trial on all liability issues, except fact-of-injury, with all Plaintiffs (Direct Purchaser and End Payor Classes and the Retailer Opt-Out Plaintiffs) before one jury, and if necessary a second trial on fact-of-injury and damages involving all Plaintiffs before a second jury after an appropriate interval of time (Defendants suggest approximately two months). This is the only way to comply with the Supreme Court's mandate that an issue may not constitutionally be separated for a different trial unless it is "'so distinct and separable from the others that a trial of it alone may be had without injustice.'" *Franchi Const. Co. v. Combined Ins. Co. of Am.*, 580 F.2d 1, 7 (1st Cir. 1978) (quoting *Gasoline Prods. Co. v. Champlin Co.*, 283 U.S. 494, 500 (1931)).

In the event there is a finding on all issues for Plaintiffs in the first trial, an interval of roughly two months before the second trial would provide the parties a sufficient opportunity to consider settlement and the feasibility of streamlining the fact-of-injury and damages trial in

---

[1] Defendants have not attempted to address every issue raised by Plaintiffs in their Submissions, but only to cover a number of significant topics "for discussion purposes only." Direct Purchasers' Submission at 1 n.1.

1

light of the findings made and the evidence submitted at the first trial.  This process will maximize efficiency while protecting the rights of all parties to a fair trial.  This structure also takes into account the burdens and difficulties in seating a jury for more than six weeks in a complex case such as this.

I.      **PLAINTIFFS' BURDEN OF PROOF POST-*ACTAVIS.***

While *Actavis* has left the bench and bar wondering exactly how trials in cases like this should proceed, the Supreme Court did supply complete clarity on one point—that Plaintiffs' claims are subject to a full-fledged rule-of-reason analysis, not a watered-down "quick-look" analysis that relieves Plaintiffs of their burden of proof in any material respect or otherwise permits "strong inferences" that effectively accomplish the same thing.  *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2237-38 (2013).  The critical point that seems to be lost on Plaintiffs is that *Actavis* did *not* rule for the FTC on liability as a matter of law; it determined only that the claim was not *barred* as a matter of law, and that the FTC "should have been given the opportunity to prove its antitrust claim."  *Id.* at 2234.  "[T]he FTC must prove its case as in other rule-of-reason cases."  *Id.* at 2237.

Plaintiffs' burden here is thus the same as it would otherwise be in any rule-of-reason case brought by a private party.  Per the First Circuit, this "ordinarily require[s]" of Plaintiffs "a burdensome multi-part showing: [1] that the alleged agreement involved the exercise of market power in a relevant economic market, [2] that this exercise had anti-competitive consequences, and [3] that those detriments outweighed efficiencies or other economic benefits.  This is the so-called rule of reason calculus."  *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir. 2004).  To fall within the scope of *Actavis*, i.e., to show that the "agreement" at issue is, under *Actavis*, potentially actionable and worthy even of consideration under the rule of reason, Plaintiffs must first prove that AstraZeneca's settlements involved

2

"large, unjustified reverse payments" to the Generic Defendants. Plaintiffs must then establish anticompetitive consequences, antitrust injury and causation, all required elements of the rule of reason on which they bear the burden of proof.

### A. Plaintiffs' Burden to Prove Market Power.

"[W]hether the Defendants exercised market power in the relevant market," is, as the Court has stated, "[t]he first rule-of reason criterion to address." *In re Nexium (Esomeprazole) Antitrust Litig.*, No. 12-md-02409-WGY, 2013 WL 4832176, at *11 (D. Mass. Sept. 11, 2013). "[U]nder section 1 of the Sherman Act, a plaintiff must demonstrate that 'the defendant had market power in the relevant market, and the specific intent to restrain competition.'" *Id.* at *12 (quoting *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 851 (1st Cir. 1985)). In an attempted monopolization case "under section 2 of the Sherman Act, a plaintiff must show that 'the defendant had the specific intent to monopolize the relevant market, and a dangerous probability of success.'" *Id.* (quoting *CVD*, 769 F.2d at 851).[2]

According to Plaintiffs, *Actavis* "strongly suggests that proof of a large, unexplained payment eliminates, or at least reduces, the typical need for the plaintiff to adduce evidence on the separate element of market power." Direct Purchasers' Submission at 7. Had the *Actavis* Court meant to upset antitrust law by "eliminat[ing]" Plaintiffs' burden to demonstrate market power in a rule-of-reason case, it surely would have done so expressly. It did not; it reiterated instead that reverse-payment cases were just like other rule-of-reason cases. 133 S. Ct. at 2237. The language from *Actavis* that Plaintiffs cite in support of their novel proposition addresses one of "five sets of considerations" that led the Court "to conclude [only] that the FTC should have

---

[2] For a monopolization case under Section 2, the plaintiff must prove that the defendant had monopoly power in a properly defined relevant market. *Diaz Aviation Corp. v. Airport Aviation Servs., Inc.*, 716 F.3d 256, 265 (1st Cir. 2013).

been given the opportunity *to prove* its antitrust claim." *Id.* at 2234 (emphasis added). The Court did not relieve the FTC of its burden of proof on an essential element of a rule-of-reason claim. At most, the size of an alleged reverse payment may be "a strong indicator of [market] power" that must be considered in the context of other evidence of the market, *id.* at 2236; it is not, however, a *substitute* for proof of market power.

**B.     Plaintiffs' Burden to Prove Large, Unjustified Reverse Payments.**

Plaintiffs also must prove that the settlements between AstraZeneca and the Generic Defendants involved a "large, unjustified reverse payment." 133 S. Ct. at 2237. Only settlements involving such a payment—not all settlements, and not even all reverse-payment settlements—can give rise to antitrust liability.[3] Moreover, a large and unjustified payment is only the threshold requirement to establish a claim; it does not dictate a liability ruling in Plaintiffs' favor. Plaintiffs still must satisfy all of the elements imposed under the rule-of-reason standard. *Id.*

None of the patent settlements here involved a "payment" in the normal sense—a transfer of cash from the patentee to the generic challenger, as in *Actavis*. Instead, Plaintiffs apparently intend to attempt to prove this element of their claim with evidence that business arrangements or settlements of other litigation were actually "large, unjustified reverse payments." The issues for each of the patent litigation settlements are briefly summarized:

AstraZeneca-Ranbaxy Settlement. Plaintiffs contend that business agreements AstraZeneca entered into with Ranbaxy on the day of the settlement, such as contracts to manufacture and formulate API, amounted to a reverse payment. Plaintiffs did not address those

---

[3] As set forth in their recently filed motions, Defendants do not believe Plaintiffs' claims are sufficient to survive summary judgment. For purposes of this Submission only, Defendants nonetheless assume all these claims will be tried.

4

business agreements in their Submissions or at the December 11 Status Conference, and for good reason.  Under *Actavis*, agreements between the patentee and the generic manufacturer for services "such as distributing the patented item or helping to develop a market for that item" do not amount to a reverse payment if they constitute "fair value for services," as this does not raise "the same concern that a patentee is using its monopoly profits to avoid the risk of patent invalidation or a finding of noninfringement."  133 S. Ct. at 2236.  To press this theory at trial, Plaintiffs have to present evidence the agreements paid Ranbaxy more than "fair value" for the services Ranbaxy rendered.  No Plaintiff expert has so opined, and no fact evidence supports this theory.  To streamline this case, the Court should grant summary judgment for Defendants, at the very least, on Plaintiffs' claims to the extent that they challenge the Ranbaxy business agreements.

Plaintiffs' focus in this case has always been on the so-called "No AG" provision of the settlement, which granted Ranbaxy an exclusive license to market generic Nexium during the period when the FDA, under the Hatch-Waxman Act, would keep other generic competitors out of the marketplace.  Plaintiffs must demonstrate that this exclusive license was unlawful, rather than a reasonable business license.  Plaintiffs must also demonstrate that this license will, in fact, be triggered in or after May 2014.  If Ranbaxy is unable to exercise or otherwise forfeits its first-filer exclusivity rights, then there is no payment even under Plaintiffs' expansive theory of what constitutes a "payment" under *Actavis*.  Plaintiffs also have to prove that the alleged payment was "large" and "unjustified."

Finally, on this issue, Plaintiffs further must demonstrate that this term of the settlement was unreasonable and unjustified in 2008, at the time and in the circumstances of the AstraZeneca-Ranbaxy patent settlement.  "[T]he reasonableness of agreements under the

antitrust laws [is] to be judged at the time the agreements are entered into." *Valley Drug Co. v. Geneva Pharm., Inc.*, 344 F.3d 1294, 1306 (11th Cir. 2003); *see Polk Bros. v. Forest City Enters.*, 776 F.2d 185, 189 (7th Cir. 1985) ("A court must ask whether an agreement promoted enterprise and productivity at the time it was adopted."). The evidence AstraZeneca and Ranbaxy will present on this will demonstrate that the exclusive license was a reasonable part of a litigation settlement that brought certainty to the parties' future businesses and gave Ranbaxy the right to market generic Nexium in 2014, even though Ranbaxy could have been excluded from the market until 2019 had AstraZeneca prevailed in the underlying patent litigation.

AstraZeneca's Settlements with Teva and DRL.  Plaintiffs' Submissions say nothing of the "reverse payment" elements of their Teva and DRL settlement claims. In their Complaints, Plaintiffs contend that AstraZeneca made "payments" to each of these Generic Companies by settling other pending patent litigation against them for less than AstraZeneca allegedly would have recovered had it fully and successfully litigated those claims.

With respect to Teva, Plaintiffs cite AstraZeneca's agreement to accept $9 million *from* Teva to settle a claim over Teva's infringing sales of generic Prilosec. (Teva had been found to have infringed AstraZeneca's patents in a prior trial and the case had been remanded for additional proceedings and a trial on damages.) This theory, if it proceeds to trial, would at a minimum require Plaintiffs to prove (i) that the $9 million Prilosec settlement was not merely the discounted compromise of a damages claim under *Actavis*; and (ii) that AstraZeneca's compromise of its damages claim for $9 million was so unreasonable as to constitute a reverse payment. Plaintiffs must further prove the amount of the alleged reverse payment (i.e., the size of the excess discount adjusted for litigation costs avoided), and that such reverse payment was "large" given all of the factual circumstances including the size of the Nexium opportunity and

6

"unjustified" when compared to the potential value of its claim (taking into account factors such as AstraZeneca's foregone litigation costs in both cases).

Plaintiffs' Submissions do not address these hurdles, nor could they, as their expert roster does not include any witness who has valued Teva's exposure in *Prilosec* by assessing what AstraZeneca could have recovered as a reasonable royalty in that litigation.[4] There is no competent evidence that the $9 million settlement in that case was a disguised payment of any sort, that it was anything other than a reasonable compromise of Teva's *Prilosec* exposure. This evidentiary failure is one basis on which Defendants have moved for summary judgment. A grant of summary judgment on this issue will significantly streamline the trial by avoiding the need for a "trial within a trial" on the question of Teva's potential exposure in *Prilosec*.

Plaintiffs' theory that DRL received a "reverse payment" requires similar proof. DRL won the *Accolate* case on summary judgment. AstraZeneca was appealing, and DRL was seeking its attorneys' fees. The parties agreed to a no-money, "walk away" settlement of this case at the same time they settled the *Nexium* litigation. Plaintiffs' "reverse payment" theory here requires proof that (i) AstraZeneca would have won its appeal; (ii) on remand AstraZeneca would have obtained a more favorable claim construction, proved infringement, and proved damages; (iii) AstraZeneca would have prevailed on appeal again; and (iv) the damages AstraZeneca would have collected there would have been so high as to render its compromise

---

[4] Plaintiffs must establish evidence of the reasonable royalty rate that AstraZeneca likely would have obtained in a *Prilosec* damages trial in order to assess whether AstraZeneca would have obtained a more favorable result either through a trial or settlement in the absence of the Nexium settlement.

settlement with DRL unreasonable (and at a minimum would have far exceeded its foregone litigation costs in both the *Nexium* and *Accolate* cases).[5]

All the Court needs to know about this dizzying array of contingent probabilities is that no Plaintiff expert has even attempted to opine on this point. Particularly in light of this evidentiary failure, this issue is ripe for summary judgment. If these *Accolate* issues are eliminated, this will again streamline the trial by avoiding the need for a distracting inquiry into the merits of the *Accolate* litigation and DRL's potential exposure under hypothetical circumstances that never happened and where Plaintiffs offer, not evidence, but mere speculation.

### C. Plaintiffs' Burden to Prove Anticompetitive Effects, Antitrust Injury, and Causation.

The rule-of-reason analysis further requires Plaintiffs to prove that any alleged reverse-payment settlement had anticompetitive consequences. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29 (1984) (plaintiff must prove that an allegedly anticompetitive agreement "violated the Sherman Act because it unreasonably restrained competition"); *Eastern Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n*, 357 F.3d 1, 5 (1st Cir. 2004) (plaintiff had burden to show that arrangement "would have anti-competitive effects outweighing the legitimate economic advantages that it might provide"). This requires proof that the defendants' actions "were inimical to the competitive process," *Euromodas, Inc. v. Zanella, Ltd.*, 368 F.3d 11, 21 (1st Cir. 2004) (citation omitted), and constituted "impermissible exclusionary practices

---

[5] As to Plaintiffs' antitrust claim regarding the DRL *Nexium* settlement, Plaintiffs are simultaneously arguing that AstraZeneca's patent claims in the *Nexium* litigation were weak, but its patent claims in the *Accolate* litigation were strong, and that therefore it intentionally under-recovered in the *Accolate* case to compensate for its over-recovery in the *Nexium* case—an extraordinarily convoluted theory that, if the Court allows it past summary judgment, will require the jury to simultaneously evaluate two different patent infringement cases within the present antitrust case.

with the design or effect of protecting or enhancing its monopoly position," *Sterling Merchandising, Inc. v. Nestle, S.A.*, 656 F.3d 112, 125 (1st Cir. 2011) (affirming grant of summary judgment for defendant).

Closely related to this required element is Plaintiffs' burden of proving antitrust injury and causation. *See id.* at 121 (Plaintiffs "bear[] the burden of proving antitrust injury."). To do so they "must show not only that they were injured as a result of the defendant's [alleged] actions and that those actions constituted an antitrust violation, but also that their injury is the type of injury the antitrust violation would cause to competition." *Id.* (emphasis in original); *see also SAS of P.R. v. P.R. Tel. Co.*, 48 F.3d 39, 43 (1st Cir. 1995).

Plaintiffs necessarily cannot establish any anticompetitive effect, antitrust injury or causation without proof that generic Nexium would have *lawfully* entered the market before May 27, 2014, but for the settlement agreements. "No cognizable antitrust injury exists where the alleged injury is a byproduct of the regulatory scheme or federal law rather than of the defendant's business practices." *CBC Cos. v. Equifax, Inc.*, 561 F.3d 569, 573 (6th Cir. 2009) (quotation omitted); *see also In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 791-92 (8th Cir. 2006) (antitrust injury cannot be based on a conspiracy to suppress competition from an unlawful product); *RSA Media, Inc. v. AK Media Group, Inc.*, 260 F.3d 10, 15 (1st Cir. 2001); *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 268-69 (3d Cir. 1998).

To prove the elements of antitrust injury and causation in this case, at least with respect to AstraZeneca, Plaintiffs must establish at a minimum three separate things: (i) that one or more of the Generic Defendants would have obtained final FDA approval of generic Nexium before May 27, 2014, as such approval is required to bring any medication to market, *see* 21 U.S.C. § 355(a); (ii) that one of these companies would have actually launched their generic Nexium

9

before that date; *and* (iii) that these generic products would not have infringed AstraZeneca's valid patent rights. Absent proof on each of these three things, Plaintiffs necessarily cannot establish either antitrust injury or causation.

## II. TRIAL SHOULD BE BIFURCATED INTO TWO SEPARATE PHASES BEFORE TWO DIFFERENT JURIES.

Bifurcation would be appropriate in this case so long as such bifurcation requires Plaintiffs to prove each element of liability, except for fact-of-injury, in the first phase of trial. Because fact-of-injury is intertwined with damages, those questions should be tried together in the second phase. Consistent with Defendants' Seventh Amendment rights, it would not be permissible for different juries to decide fact-of-injury and damages. *Franchi Const. Co.*, 580 F.2d at 7.

For a number of reasons, however, it is neither efficient nor fair to empanel a single jury to hear a first phase of trial that is estimated to last six weeks, and then immediately thereafter a complex trial on fact-of-injury and damages. Defendants therefore propose that the Court try these cases in two phases, as follows: Phase I would involve, as to all parties, liability issues (as further described below) except for fact-of-injury; if the jury finds for Plaintiffs against some or all Defendants in this first phase, a roughly two-month break in the proceedings would follow, during which the parties could attempt to narrow or resolve the remaining issues; and if unsuccessful, Phase II would involve a trial on fact-of-injury and damages before a different jury.

### A. Bifurcation Is Appropriate Only if the Court Requires the Fact-of-Injury Element of Liability to Be Tried in the Second Phase with Damages and Requires All Plaintiffs to Participate in the First Phase.

Under Defendants' bifurcation proposal, Phase I would involve a consolidated trial on all liability issues except fact-of-injury. Plaintiffs bear the burden of proving each of the issues

10

below in order to establish all of the elements of liability, except fact-of-injury suffered by each group of Plaintiffs:

(i) relevant market definition and whether AstraZeneca possessed market power or monopoly power (or, in the case of attempted monopolization, whether there was a dangerous probability that AstraZeneca would gain monopoly power) in a properly defined relevant market;

(ii) whether AstraZeneca made a large, unjustified reverse payment to each of the Generic Defendants;

(iii) whether a large, unjustified reverse payment—if proven—caused anticompetitive effects;

(iv) whether any proven anticompetitive effects outweighed procompetitive benefits resulting from the challenged agreements;

(v) whether any Generic Defendant would have obtained FDA approval to market a generic version of Nexium prior to May 27, 2014 in the absence of the settlement agreements; and

(vi) whether any Generic Defendant would have manufactured and launched a noninfringing generic Nexium product prior to May 27, 2014 in the absence of the settlement agreements.[6]

Direct Purchaser Class Plaintiffs have proposed a consolidated liability trial with the End Payor Class Plaintiffs, but inexplicably exclude from that trial the Retailer Opt-Out Plaintiffs, who are suing based on partial assignments from direct purchaser class members. If the Court does not enter summary judgment against the Retailer Opt-Out Plaintiffs, there is no rational

---

[6] Evidence regarding patent validity and infringement is relevant to answering a number of these questions in the case. This issue is addressed in AstraZeneca's Submission Concerning Evidence of Patent Infringement and Validity [Docket No. 728].

basis for excluding those plaintiffs from the consolidated trials. The Retailer Opt-Out Plaintiffs seek the same type of damages (direct purchaser overcharges) as the Direct Purchaser Class Plaintiffs, on the basis of the same liability theories, *see* 12/11/13 Hr'g Tr. at 51 ("We haven't differed with anything that we've heard so far from the plaintiffs [sic] point of view."), but have elected merely to proceed individually rather than as part of a class. The Direct Purchaser Class Plaintiffs' proposal exposes Defendants, the Court, and another jury to a redundant second trial on liability, for no good reason.

In addition, the Direct Purchaser Class Plaintiffs' proposal is not, in fact, a complete liability trial, because it omits a central element of Plaintiffs' liability case—the determination of fact-of-injury. *See Van Dyk Research Corp. v. Xerox Corp.*, 631 F.2d 251, 255 (3d Cir. 1980) (plaintiff suing under § 4 of the Clayton Act must prove "illegal conduct was a material cause of its injury"). Direct Purchaser Class Plaintiffs propose that the jury in a liability trial determine "whether generic esomeprazole makers would have been charged less (at wholesale) for generic esomeprazole than AstraZeneca charged for branded Nexium (at wholesale)." Direct Purchasers' Submission at 9. But resolving this issue does not answer the question of whether the Direct Purchasers would have been actually injured by any such difference—for example, whether the Direct Purchasers would have purchased generic Nexium at all, or whether they would have purchased it directly from the Generic Defendants. Nor does resolving this issue answer the question of what volumes of generic product, if any, the Direct Purchasers would have purchased. Answering those questions is necessary for determining fact-of-injury —simply knowing whether or not generic Nexium would have cost less than branded Nexium is not sufficient to prove the Direct Purchaser Class was injured in fact.

The Direct Purchaser Class Plaintiffs' proposal offers no clue as to how fact-of-injury could be determined as to the End Payor Class Plaintiffs. Their proposal does not provide for any determination regarding what prices the End Payor Class Plaintiffs (insurers and consumers) would have paid for generic Nexium or whether they would have purchased generic Nexium at all instead of the brand. The End Payor Class Plaintiffs' Submission recognizes this critical omission and proposes that fact-of-injury be included with damages in the second trial phase. End Payors' Submission at 2 n.1. The Court cannot enter a liability verdict for either the Direct Purchaser or End Payor Classes (or the Retailer Opt-Out Plaintiffs) without a finding from a jury on fact-of-injury.

The facts and issues presented by the fact-of-injury element will, to a large degree, overlap with the issues relevant to damages. Accordingly, separating these issues into two different trials before separate juries would raise significant Seventh Amendment issues. "[T]he United States Supreme Court has held that issues may not be separated for the purpose of a new trial unless 'it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice.' The *Gasoline Products* standard has been held applicable to a consideration of the separation of issues for trial in the first instance before separate juries." *Franchi Const. Co.*, 580 F.2d at 7 (citation omitted) (quoting *Gasoline Products Co. v. Champlin Co.*, 283 U.S. 494, 500 (1931)); *see also Hydrite Chem. Co. v. Calumet Lubricants Co.*, 47 F.3d 887, 890 (7th Cir. 1995) ("[O]ne must carve at the joint. To divide a trial so that the issue of injury and the issue of damages are tried in two separate trials is a recipe for confusion.") (citation omitted).

Because fact-of-injury and damages are not "distinct and separable," they should be tried together, separate from the initial trial phase on all other liability issues, and tried before a second jury in a second trial (if necessary after the first phase).

### B. The Court, the Juries, and the Parties Would Benefit from a Break between the First and, if Necessary, Second Trial Phases.

In their Submission, the Direct Purchaser Class Plaintiffs argue that bifurcating liability and damages issues "may result in a verdict or settlement that would narrow the issues, potentially obviating the need to proceed with the later damages phases." Direct Purchasers' Submission at 10; *see id.* at 17 (a finding of liability in Phase I "would narrow the issues and could make settlement more likely, possibly removing the need for a determination on damages"). Of course, a finding of no liability would eliminate the need for any further phase at any time. Assuming that a second phase is necessary, Defendants agree with the Direct Purchasers Class Plaintiffs' sentiment so long as the first and second trials are configured so that fact-of-injury is tried with damages in the second trial phase. But the Direct Purchaser Class Plaintiffs' proposal to have a single jury hear all phases of the trial, *seriatim* and without a break, is inconsistent with their stated goal. Instead, as the Court recognized at the December 11, 2013 Pretrial Conference, the Court and the parties would benefit from a break, or "timeout," between the two phases of the trial. 12/11/13 Hr'g Tr. at 28 ("So, this business about a timeout makes sense from the Court's point of view, too.").

Requiring a single jury to hear both phases of this trial, as requested by the Direct Purchaser Class Plaintiffs, *see* Direct Purchasers' Submission at 8, would ensure that a jury would be required to sit for longer than the six weeks a first trial is estimated to take. This would create an unreasonable burden on jurors and could lead to many otherwise qualified jurors being excused for hardship. The damages trial in this case will be complex, requiring detailed factual

14

presentations about Nexium historic sales as well as the sales of other drugs in the PPI class. There will be detailed expert witness damages analyses performed by different experts for each of the Plaintiff groups, as well as different defense experts for direct and indirect purchasers. These proceedings will not be a short, simple follow-on trial to the first phase trial. Accordingly, a second jury should be empaneled for any fact-of-injury and damages trial.

Direct Purchaser Class Plaintiffs' proposal also would deprive the Court and the parties of any meaningful opportunity to use the jury's findings in Phase I to narrow the issues to be tried in Phase II, or to avoid it altogether, such as through stipulation, partial motions for summary judgment, or settlement. There is no realistic possibility of realizing any of these benefits if, after the conclusion of the first trial, the second trial immediately commences.

### C. Fact-of-Injury and Damages for All Plaintiffs Should Be Heard in the Second Trial Phase.

The Class Plaintiffs' submissions make clear that their goal is to maximize the extent to which the same overcharge damages (if any are proven) are double-counted as between the Direct Purchaser Class Plaintiffs' claims under federal antitrust law and the End Payor Class Plaintiffs' claims under state laws, before then being trebled under each regime. *See, e.g.*, Direct Purchasers' Submission at 11-12 (purporting to seek to avoid "prejudice" that would result from allocating overcharge damages between direct and indirect purchasers rather than awarding the same overcharge damages to each class of plaintiffs, prior to trebling); End Payors' Submission at 3 (purporting to seek to avoid juror "confus[ion]" that might prevent the award of overcharge damages to the End-Payor class that are duplicative of damages awarded to direct purchasers for exactly the same overcharge). Defendants disagree that it is necessary, desirable, or permissible

to design the Court's trial procedures in a manner purposefully calculated to ensure duplicative recovery for the exact same overcharges.[7]

Moreover, there are significant issues common to the damages determinations for the Direct Purchasers and End Payors.  As but one example, both Dr. Hartman for the Direct Purchasers and Dr. Rosenthal for the End Payors assume that data regarding generic Prevacid provides the proper benchmark for determining but-for quantities and prices of generic Nexium.  Defendants disagree.  Resolving that issue in a single trial would be far more efficient than having two juries decide essentially the same question.

To the extent the Court concludes that fact-of-injury and damages determinations for Direct Purchaser and End Payors should be separated, the second jury can first consider the issue of fact-of-injury and damages for Direct Purchaser Plaintiffs (both Class and Opt-Outs) and then consider the same issues for End Payor Plaintiffs.

---

[7] Nor does the Supreme Court's holding in *California v. ARC Am. Corp.*, 490 U.S. 93 (1989), necessitate proceedings designed to ensure duplicative recovery for the same overcharge to both direct and indirect purchasers, as suggested by Direct Purchasers, *see* Direct Purchasers' Submission at 15 n.50.  The *ARC* Court did not consider, much less resolve in plaintiffs' favor, whether a federal court is permitted to award duplicative overcharge damages to multiple classes of plaintiffs; rather, it held that *Illinois Brick*, which prohibits any indirect purchaser from recovering antitrust damages under federal law, does not require that state-law claims permitting indirect purchaser recovery be completely preempted by federal law such that indirect purchasers should be prohibited from recovering their damages from a *common settlement pool*.  *ARC Am.*, 490 U.S. at 100.

| | |
|---|---|
| Dated:  January 15, 2014 | Respectfully submitted, |
| /s/ Lisa Fales | /s/ Dane H. Butswinkas |

| | |
|---|---|
| J. Douglas Baldridge (*pro hac vice*)<br>Lisa Jose Fales (*pro hac vice*)<br>Danielle R. Foley (*pro hac vice*)<br>Sarah Choi (*pro hac vice*)<br>VENABLE LLP<br>575 7th Street, NW<br>Washington, DC 20004<br>Ph: 202-344-4000<br>Fax: 202-344-8300<br>jdbalridge@venable.com<br>ljfales@venable.com<br>drfoley@venable.com<br>schoi@venable.com<br><br>Leslie F. Su (BBO No. 641833)<br>MINERVA LAW, P.C.<br>300 Brickstone Square, Suite 201<br>Andover, MA 01810<br>Ph: 978-494-4695<br>leslie.su@minervalawpc.com<br><br>*Counsel for Ranbaxy Pharmaceuticals, Inc., Ranbaxy Inc., and Ranbaxy Laboratories, Ltd.* | Dane H. Butswinkas (*pro hac vice*)<br>John E. Schmidtlein (*pro hac vice*)<br>Paul B. Gaffney (*pro hac vice*)<br>WILLIAMS & CONNOLLY LLP<br>725 Twelfth Street, N.W.<br>Washington, DC 20005<br>Ph: 202-434-5000<br>Fax: 202-434-5029<br>DButswinkas@wc.com<br>JSchmidtlein@wc.com<br>PGaffney@wc.com<br><br>Timothy C. Hester (*pro hac vice*)<br>COVINGTON & BURLING LLP<br>1201 Pennsylvania Avenue, NW<br>Washington, DC 20004<br>Ph: 202-662-6000<br>Fax: 202-662-6291<br>thester@cov.com<br><br>William A. Zucker, Esq., BBO # 541240<br>MCCARTER & ENGLISH, LLP<br>265 Franklin Street<br>Boston, MA 02110<br>Ph: 617-449-6500<br>Fax: 617-607-9200<br>wzucker@mccarter.com<br><br>Michael P. Kelly (*pro hac vice*)<br>MCCARTER & ENGLISH, LLP<br>Renaissance Centre<br>405 N. King Street, 8th Floor<br>Wilmington, DE 19801<br>Ph: 302-984-6301<br>Fax: 302-984-2493<br>mkelly@mccarter.com<br><br>*Counsel for AstraZeneca LP, AstraZeneca AB, and Aktiebolaget Hassle* |

## **CERTIFICATE OF SERVICE**

I, James H. Weingarten, hereby certify that this document was electronically filed and served using the Court's ECF system on January 15, 2014.

/s/ James H. Weingarten
James H. Weingarten