# Exhibit 2

Page 304

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - X

IN RE:  NEXIUM (ESOMEPRAZOLE          )   MDL No. 2409

MAGNESIUM) ANTITRUST LITIGATION       )

                                      )   Case No.

This document relates to:             )   1:12-MD-02409-WGY

All End-Payor Class Actions           )

- - - - - - - - - - - - - - - - - X

VIDEOTAPED DEPOSITION OF

THOMAS G. McGUIRE, Ph.D., VOLUME II

Tuesday, February 11, 2014, 8:44 a.m.

Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.

One Financial Center

Boston, Massachusetts 02111


------ Reporter:  Kimberly A. Smith, CRR, RDR ------


-------------------------------------------------------

DIGITAL EVIDENCE GROUP

1726 M Street NW, Suite 1010

Washington, DC  20036

(202) 232-0646

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 316

1      Q.  Well, you were performing an analysis of a

2  hypothetical negotiation, correct?

3      A.  Yes.

4      Q.  And there are two sides to a hypothetical

5  negotiation, correct?

6      A.  Yes.

7      Q.  Who were the two sides in the Apotex case?

8      A.  Well, it would have been Apotex and

9  AstraZeneca.

10     Q.  So wouldn't it be relevant to know what

11  Apotex was saying in that hypothetical negotiation?

12     A.  Well, it might have been.  But the

13  hypothetical negotiation that I'm concerned with,

14  only one of those parties was in that hypothetical

15  negotiation.  And that's AstraZeneca.  So I focused

16  on AstraZeneca.

17     Q.  So sitting here today, you don't have any

18  idea what royalty percentage Apotex argued for in

19  the dispute with AstraZeneca?

20     A.  I don't remember.

21     Q.  So you don't know whether it was 7 percent

22  or 50 percent?

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 317

1                    MR. RADICE:  Objection.

2                    You can answer.

3                    THE WITNESS:  I don't remember.

4        BY MR. SCHOEN:

5            Q.  But you think you did know at some point in

6        time?

7            A.  I don't remember that either.  Sorry.

8            Q.  What royalty did AstraZeneca actually

9        recover from Apotex as a percentage of profits in

10       its patent infringement case?

11           A.  50 percent.

12           Q.  So your testimony here is that if the

13       Prilosec case had gone to trial, you believe that

14       Teva, the fifth generic entrant, would have been

15       required to pay AstraZeneca a royalty equal to

16       60 percent of Teva's profits, even though Apotex,

17       the fourth generic entrant, was only required to pay

18       a royalty equal to 50 percent of its profits?

19                   MR. RADICE:  Objection.

20                   You can answer.

21                   THE WITNESS:  Well, I wouldn't phrase it

22       that way.  You know, what I was analyzing was a

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 321

1      that would have an outcome.  And that's it.  And

2      those are the numbers I came up with.  And how then

3      they are, you know, followed on, that's -- that's

4      something different.

5          Q.  Well, you did something more than conduct a

6      Georgia-Pacific analysis, didn't you?

7              MR. RADICE:  Objection.

8              THE WITNESS:  I conducted a Georgia-

9      Pacific analysis.  And then in Table 2 and 3, I used

10     those numbers to compare it to $9 million.

11     BY MR. SCHOEN:

12         Q.  Was that something the court asked you to

13     do?

14             MR. RADICE:  Objection.

15             You can answer.

16             THE WITNESS:  My understanding is I was

17     asked to conduct a reasonable royalty analysis,

18     which I did.  And this I regarded to be an

19     informative conclusion from that analysis.

20     BY MR. SCHOEN:

21         Q.  Well, you understand that in the Apotex

22     case, the court conducted a reasonable royalty

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 322

1    analysis under the Georgia-Pacific factors?

2        A.  Yes.

3        Q.  And in the Apotex case, you said that the

4    court arrived at the conclusion that, based on the

5    application of that Georgia-Pacific analysis, that a

6    reasonable royalty in that case was equal to

7    50 percent of Apotex's profits, correct?

8        A.  Yes.

9        Q.  Yet your conclusion here is that for Teva,

10   a reasonable royalty would be 10 percent higher than

11   the reasonable royalty found in the Apotex case?

12       A.  Yes.

13       Q.  Even though Teva was the fifth generic

14   entrant and Apotex was the fourth generic entrant?

15       A.  Yes.

16       Q.  Tell me everything that you rely on for

17   your opinion that AstraZeneca would have recovered a

18   10 percent higher royalty from Teva, the fifth

19   entrant, than it did from Apotex, the fourth entrant

20   for the same drug.

21       A.  Well, this is -- would be a rehearsal of my

22   report.  And I'm not sure if you would like me to go

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 323

1   paragraph by paragraph through that and repeat that.

2   I'm happy to do that if that's what you're asking.

3             MR. SCHMIDTLEIN:  Your report didn't

4   ask -- didn't do an analysis of why the award is

5   higher than Apotex --

6             MR. RADICE:  Are you going to question

7   one at a time or . . .

8             MR. SCHMIDTLEIN:  -- so don't give us

9   that.  Answer the question.

10            MR. WEXLER:  Hey, hey, hey.  Watch your

11  tone, please.

12            THE WITNESS:  I guess I'm not sure I

13  understand what the -- the, sort of -- the point of

14  the question is.

15  BY MR. SCHOEN:

16    Q.  Can you show me where in your report, sir,

17  it explains why you believe that AstraZeneca would

18  have recovered a 60 percent royalty from Teva when

19  it recovered only a 50 percent royalty from Apotex.

20    A.  Okay.

21            MR. RADICE:  Objection.  Asked and

22  answered.

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 324

1          You can answer to the extent you can.

2          THE WITNESS:  Well, I -- in my report,

3    I considered a range of comparables that included

4    the Apotex comparison, which was at the low end of

5    the other comparables.

6          And factoring in -- and if you would

7    like to -- you know, we can go through them piece by

8    piece if you want -- but factoring in not only the

9    low end but the other comparables, some of which

10   were, you know, business arrangements by AstraZeneca

11   involving the same drugs, then -- and those were

12   higher than 50 percent.

13         So considering these factors together,

14   it made sense to me that the reasonable royalty

15   would be 60 percent.

16   BY MR. SCHOEN:

17     Q.  The agreements you were just referencing

18   were authorized generic distribution agreements;

19   is that correct?

20         MR. RADICE:  Objection.

21         You can answer.

22         THE WITNESS:  Well, they're the

Page 325

1    agreements referenced in my report.

2    BY MR. SCHOEN:

3        Q.  Well, you said there were higher numbers

4    and you mentioned 80 percent and 90 percent.  The

5    80 percent and 90 percent numbers in your report

6    relate to what you described as authorized generic

7    distribution agreements, correct?

8        A.  Well, these particular agreements, the

9    Ranbaxy agreement, the Plendil agreement, those were

10   also authorized generics and also the, kind of the

11   industry standard reference, which I'm sure you know

12   what I'm talking about, that also referred to

13   authorized generics.

14       Q.  Well, when you said that for the same drug,

15   that there were other arrangements that had an

16   80 percent figure, by that, you're referring to the

17   authorized generic distribution agreement between

18   AstraZeneca and Ranbaxy for Prilosec; is that

19   correct?

20       A.  That's one of them, yes.

21       Q.  Well, to the extent that that's relevant to

22   a Georgia-Pacific analysis, that would have been

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 326

1   relevant to a Georgia-Pacific analysis for Apotex

2   and AstraZeneca as well because that dispute also

3   concerned Prilosec; isn't that right?

4           MR. RADICE:   Objection.

5           THE WITNESS:   So you're asking now about

6   a Georgia-Pacific analysis, AstraZeneca and Apotex --

7   BY MR. SCHOEN:

8       Q.   Yes.

9       A.   -- and what might be relevant for that.

10      Q.   Um-hum.

11      A.   Well, that I didn't do, so I'm a little

12  reluctant to, on the spot here, you know, go back

13  and do another Georgia-Pacific analysis.

14      Q.   What is the possible reason that the

15  Georgia-Pacific analysis would come out any

16  different for Teva than it would for Apotex, where

17  you're talking about the same exact drug, Prilosec,

18  and the only difference is that Teva entered the

19  market as the next generic entrant nine months later?

20      A.   Well, I did one Georgia-Pacific analysis.

21  I didn't do two Georgia-Pacific analyses.  So I can't

22  tell you why this one would have been exactly that

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 327

1    one.  I did mine according to what I regarded to be

2    the request, and I considered relevant factors.

3              And they were -- they sort of fell

4    across the range.  And I made my judgment.  And it

5    was 60 percent.

6         Q.  Is there anything that you rely on for your

7    opinion that AstraZeneca would have recovered a

8    10 percent higher royalty from Teva than it did from

9    Apotex, other than the statements that are set forth

10   in your report?

11        A.  Well, the statements in my report contain

12   the analyses I relied upon.  I think that answers

13   your question.

14        Q.  Are you opining that AstraZeneca definitely

15   would have recovered more from Teva than it did from

16   Apotex?

17        A.  It's my opinion that the reasonable royalty

18   was 60 percent.

19        Q.  Is that your opinion to a reasonable degree

20   of certainty?

21        A.  I would say yes.

22             MR. RADICE:  Objection.

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 328

1            You can answer.

2    BY MR. SCHOEN:

3        Q.   Would you agree with me that it's possible

4    that someone applying a Georgia-Pacific reasonable

5    royalty analysis could come to the conclusion that a

6    royalty of 50 percent would be appropriate for Teva,

7    50 percent of its profits?

8        A.   It could be.

9                MR. RADICE:   Objection.

10               You can answer.

11               THE WITNESS:   It could be.   I'm sorry.

12   BY MR. SCHOEN:

13       Q.   It could be?

14       A.   I just wanted to make sure the court

15   reporter heard my answer.

16       Q.   Would you agree with me that a court or

17   jury applying a Georgia-Pacific analysis could have

18   come to the conclusion that a royalty that was

19   40 percent of Teva's profits would have been

20   reasonable in the case between Teva and AstraZeneca

21   relating to Prilosec?

22               MR. RADICE:   Objection.

Page 332

1    other.

2    BY MR. SCHOEN:

3         Q.   Can you identify for me, sir, one reason

4    why you believe Teva would warrant a higher royalty

5    percentage of its profits than Apotex?

6         A.   Because of the other comparables I used in

7    my report that were much higher than 50 percent.

8         Q.   And why weren't those comparables relevant

9    to an analysis of the royalty that Apotex should pay?

10             MR. RADICE:   Objection.

11             You can answer.

12             THE WITNESS:   I -- They may have been.

13   I don't know what the Apotex analysis consisted of.

14   BY MR. SCHOEN:

15        Q.   Do you agree with me that two experts

16   applying a Georgia-Pacific analysis could reasonably

17   come to very different conclusions about the

18   percentage royalty that's appropriate in a

19   particular case?

20        A.   That happens.

21        Q.   Don't you say later in your report that

22   50 percent could be a reasonable royalty rate here?

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 333

1           MR. RADICE:  Objection.

2           THE WITNESS:  Well, I do an analysis of

3    50 percent, as you know, in Tables 2 and 3.  I think

4    it's informative for the court to see that.

5    BY MR. SCHOEN:

6        Q.  Why did you use 50 percent?

7        A.  I used that as a lower bound.

8        Q.  Why didn't you use 40 percent?

9        A.  Because I chose 50 percent as a lower bound.

10   I thought that was the right lower bound.

11       Q.  Do you believe that 50 percent could be a

12   reasonable royalty in this case of somebody looking

13   at the Georgia-Pacific factors and determining a

14   reasonable royalty for Teva in the Prilosec matter,

15   could they determine that 50 percent is a reasonable

16   royalty?

17           MR. RADICE:  Objection.

18           You can answer.

19           THE WITNESS:  Well, you know, I did my

20   analysis, which I determined what I thought the

21   reasonable royalty would be.  I know just factually,

22   other cases, people come to different opinions.

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 342

1    speculations and ones that I don't.  And this seems

2    unlikely to me.

3    BY MR. SCHOEN:

4        Q.  Again, sir, my question isn't whether you

5    think it's likely or unlikely.  My question is, do

6    you agree with me that it's possible that, absent

7    the settlement, that AstraZeneca would have

8    recovered from Teva a lower royalty rate as a

9    percentage of profits than the 50 percent it

10   recovered from Apotex?

11       A.  Possible, but unlikely.

12       Q.  You're saying it's unlikely.  Can you put a

13   percentage on that?

14           MR. RADICE:  Objection.

15           THE WITNESS:  Not really.

16   BY MR. SCHOEN:

17       Q.  Did you do anything to quantify the

18   possibility that AstraZeneca would have recovered

19   from Teva a royalty rate lower than 60 percent had

20   the case gone to trial instead of settling?

21       A.  By quantifying the possibility, you mean

22   did I estimate the likelihood of various potential

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 343

1    outcomes?  No, I didn't do that.  If I understood

2    your question correctly.

3         Q.  So that was not part of your analysis:

4    to estimate the likelihood of various potential

5    outcomes?

6         A.  No, it was not part of my analysis.

7         Q.  In paragraph 2 of -- I'm sorry -- in

8    paragraph 3 of your report, the second bullet

9    point -- and this is in Exhibit 4 -- you say that if

10   you apply your 60 percent to your profit estimate

11   for Teva and apply interest, you get royalty damages

12   of $33.1 million; is that correct?

13        A.  I see that, yes.

14        Q.  You're not suggesting that a $33.1 million

15   damage award was the only possible outcome of the

16   Prilosec case had it gone to trial?

17             MR. RADICE:  Objection.

18             You can answer.

19             THE WITNESS:  This -- this was my

20   conclusion of a reasonable royalty analysis.

21   That's -- that's what I did.

22   BY MR. SCHOEN:

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 345

1    with precision in every case, could you?

2        A.   I didn't see that as my role.

3        Q.   Because you can't do that.  Nobody could do

4    that, could they?

5        A.   Well, that's not my role.  I'm -- I had a

6    discrete assignment here to do a reasonable royalty

7    analysis, not to forecast likelihood of legal

8    outcomes.

9        Q.   And you made your best estimate?

10       A.   I did.

11       Q.   Your Table 2 in your report shows -- also

12   makes an estimate of damages at a 90 percent

13   reasonable royalty rate; is that correct?

14       A.   Yes.  I believe so.  Let me just catch up

15   to you here.  Yes.

16       Q.   Do you believe that 90 percent is a

17   possible reasonable royalty that someone could find,

18   conducting a Georgia-Pacific analysis relating to

19   the Teva Prilosec matter?

20       A.   I considered that to be a reasonable upper

21   bound here.

22       Q.   Tell me everything you rely on to support

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 347

1      A.  I can't.

2      Q.  Can you identify for me a single patent

3  infringement case in which a court awarded royalty

4  damages equal to 80 percent of the infringer's

5  profits?

6      A.  I can't do that either.

7      Q.  70 percent?

8      A.  I can't do that either.

9      Q.  60 percent?

10     A.  Sorry.

11     Q.  You can't do that either for 60 percent?

12     A.  That's right.

13     Q.  Now, you say that 60 percent of Teva's

14  profits is now your best estimate of what Teva

15  should have had to pay in the Prilosec case absent a

16  settlement; is that correct?

17     A.  Yes.

18     Q.  In your first report in this case, you said

19  80 percent was your best estimate; is that correct?

20          MR. RADICE:  Objection.

21          THE WITNESS:  No.  That was a

22  different -- a different analysis.

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 356

1     the next exhibit, please.

2                    (McGuire Exhibit 6 was marked

3                    for identification.)

4     BY MR. SCHOEN:

5         Q.  Do you have Exhibit 6 in front of you?

6         A.  I do.

7         Q.  Do you recognize Exhibit 6 as Judge Cote's

8     decision in the Apotex case --

9         A.  Yes.

10        Q.  -- in which it awarded royalty damages

11    equal to 50 percent of Apotex's profits on its

12    infringing Prilosec sales?

13        A.  Yes, I do.

14        Q.  Could you direct your attention to page 122

15    of that decision, please.

16                And if you direct your attention

17    specifically to the first full paragraph on page 122,

18    do you see where Judge Cote said that "the settlement

19    agreement between Teva and Astra in 2010 resulted in

20    a payment to Astra of the equivalent of 54 percent

21    of Teva's profits from its infringing sales"?

22        A.  I see that, yes.

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 357

1      Q.   So do you agree with me that under the

2   definition of "profits" that the Apotex court was

3   using, the $9 million that Teva paid in the Prilosec

4   settlement was equal to 54 percent of Teva's profits?

5      A.   Well, I agree that the sentence says

6   54 percent.  And I'm sure the court did the math

7   right.  The base here included Teva plus Impax

8   profits.  And the court chose to take out the Impax

9   part of that, so . . .

10     Q.   Impax was the party that was manufacturing

11  the Prilosec for Teva, correct?

12     A.   Yes.

13     Q.   So under the definition of "profits" that

14  the Apotex court was using, it thought it appropriate

15  to deduct that cost in computing profits before

16  arriving at the determination that a 50 percent

17  royalty as a percentage of profits was appropriate,

18  correct?

19            MR. RADICE:   Objection.

20            You can answer.

21            THE WITNESS:   Well, I'm not really

22  prepared to interpret what the judge was deciding

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 358

1    here.  I can read it, but I -- I don't want to

2    interpret it.

3    BY MR. SCHOEN:

4        Q.  Well, you just said that she did -- that

5    the way it was computed was because the payments to

6    Apotex were deducted as a cost before arriving --

7    I'm sorry -- the payments to Impax were deducted as

8    a cost before arriving at the profit numbers,

9    correct?

10       A.  I believe that's where this 54 percent came

11   from.

12       Q.  So the Apotex court thought that was the

13   appropriate way to compute profits in this

14   circumstance?

15              MR. RADICE:  Objection.

16              You can answer.

17              THE WITNESS:  I'm sure it was put in

18   here for a reason.  I don't -- I really don't want

19   to interpret the appropriateness of what the court

20   thought they were doing here.

21   BY MR. SCHOEN:

22       Q.  But your analysis uses a different

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 359

1    definition of "profits" than what the Apotex court

2    did?

3       A.  Well, the -- it includes the full profits

4    of the Impax/Teva parties.  The definition is still

5    net sales minus cost.  But the -- how much of that

6    you include is different, yes.

7       Q.  So in your view, when you compute a

8    reasonable royalty, it's appropriate to apply the

9    percentage royalty that you arrive at to the profits

10   of both Teva and Impax, while the Apotex court took

11   a narrower view of profits and said that the

12   payments to Impax out of those profits should be

13   deducted before you apply the royalty percentage;

14   is that a fair statement?

15              MR. RADICE:  Objection.

16              You can answer.

17              THE WITNESS:  Well, I did what I did.

18   And I don't think you characterize what I did

19   correctly.  And I'm just reading here.  And I

20   believe that's what -- where the 54 percent came

21   from.

22   BY MR. SCHOEN:

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 362

1          MR. SCHOEN:  Do you mind reading the

2      question back.

3                  (Record read as requested.)

4          THE WITNESS:  Yes.  I'm not sure.

5          Can I untether a second and get a cup of

6      coffee?  We don't have to take a break.

7          MR. RADICE:  Let's go off the record.

8          Can we go off the record?

9          MR. SCHOEN:  Yes.

10         THE VIDEOGRAPHER:  The time is 9:39.

11     We're off the record.

12                 (Recess at 9:40 a.m.,

13                 resumed at 9:49 a.m.)

14         THE VIDEOGRAPHER:  We are back on the

15     record.  The time is 9:49.

16     BY MR. SCHOEN:

17        Q.  Dr. McGuire, I'd like to put in front of

18     you what's previously been marked as Exhibit 3 to

19     your deposition.

20         MR. RADICE:  This is the one marked last

21     time, right?

22         MR. SCHOEN:  Yes.

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 363

1    BY MR. SCHOEN:

2         Q.  Do you have Exhibit 3 in front of you?

3         A.  I do, yes.

4         Q.  And you cite Exhibit 3 as one of the

5    documents you relied on or cited in your supplemental

6    report that's Exhibit 4?

7         A.  Yes.

8         Q.  You cite it in Footnote 68 of your report?

9         A.  I'm sure you're correct, but let me just

10   confirm.

11             Okay.  Yes.

12        Q.  You say that you are unsure when this

13   report was created or what numbers were used to

14   generate it; is that correct?

15        A.  That's correct.

16        Q.  Did you review Mr. Green's report in this

17   case?

18        A.  I did.

19        Q.  Did you review the portion of his report

20   where he explained how this report was generated and

21   what Jamie Berlanska of Teva told him about the

22   report?

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 364

1      A.  Yes, I did.

2      Q.  Do you know what Jamie Berlanska's position

3   is at Teva?

4      A.  He's a financial officer.  I forget his

5   exact position.

6      Q.  She.

7      A.  She.

8      Q.  She's the comptroller.

9      A.  Sorry.

10      Q.  And do you have any basis to disagree with

11   the description that Ms. Berlanska provided to

12   Mr. Green about how this report was generated?

13      A.  Well, I just -- I don't mean to impugn the

14   comptroller of Teva.  It was just unclear to me what

15   all the elements in the document consisted of.

16      Q.  Well, you say you weren't -- "It's unclear

17   to me how this document was created."

18           But didn't Mr. Green explain in the

19   report that it was created out of reports that tie

20   to Teva's audited financial statements?

21      A.  Yes, he did.

22      Q.  And do you have any basis to disagree with

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 365

1       that statement?

2           A.   No.

3           Q.   Now, you say that -- In paragraph 54, you

4       say it's unclear whether this document was created

5       contemporaneously or not.

6                   Do you see that statement?

7           A.   Yes.

8           Q.   Is it your view that contemporaneous

9       records are more accurate or reliable?

10          A.   They can be.

11          Q.   Do you know whether Teva provided quarterly

12      contemporaneous reports to Impax concerning Teva's

13      Prilosec's sales?

14          A.   I'm not aware.

15          Q.   You don't know one way or the other?

16                  MR. RADICE:   Objection.

17                  You can answer.

18                  THE WITNESS:   I don't remember seeing

19      them.

20      BY MR. SCHOEN:

21          Q.   Did you review the entirety of Mr. Green's

22      report in this case?

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 366

1        A.  I believe I did, yes.

2                    (McGuire Exhibit 7 was marked

3                    for identification.)

4    BY MR. SCHOEN:

5        Q.  Do you have Exhibit 7 in front of you?

6        A.  I do, yes.

7        Q.  I'd like to direct your attention to

8    Exhibit E of Exhibit 7.  And you recognize Exhibit 7

9    as Mr. Green's report in this case, which you

10   reviewed before preparing your reports here,

11   correct?

12       A.  Yes.

13       Q.  Do you recall looking at Exhibit E to

14   Mr. Green's report?

15       A.  Yes.

16       Q.  Does this refresh your recollection that

17   Teva provided quarterly reports to Impax about

18   Teva's gross and net sales of Prilosec?

19       A.  Yes, it does.

20       Q.  Did you review those reports?

21       A.  I reviewed this report.  I don't think I

22   reviewed the actual Teva reports.

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 367

1          Q.   Did you ask for them?

2          A.   No.

3          Q.   So did you undertake any analysis to

4     compare how the numbers in Teva's quarterly reports

5     regarding its sales and profits for Prilosec

6     compared to what was in either Exhibit 3 or

7     Exhibit 5?

8          A.   Exhibit 3.   Sorry.   I'm just kind of

9     catching back to you here.   I believe I did.   There

10    was some confirmation of the numbers I used for my

11    basis in relation to a later report that was, you

12    know, with -- you know, they were close.   So I did

13    do some confirmation.   I don't recall all the details

14    of it.

15         Q.   You have no basis to disagree with the

16    summary of the royalty reports that's in Exhibit E

17    to Mr. Green's report, Exhibit 7, do you?

18         A.   No.

19         Q.   And do you see that Exhibit E indicates

20    that Teva's net sales totaled $38.4 million relating

21    to Prilosec?

22         A.   Yes, I see that.

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 371

1    BY MR. SCHOEN:

2        Q.   Correct?

3        A.   That's correct.

4        Q.   Yet you still think it's reasonable to

5    assume your $43 million extrapolation, even though

6    the documents show that the actual net sales were

7    lower than the profits that you're assuming?

8            MR. RADICE:   Objection.

9            You can answer.

10           THE WITNESS:   Well, I did think I was

11   using reasonable numbers to base my profit estimates,

12   yes.

13   BY MR. SCHOEN:

14       Q.   When did the -- when did the settlement

15   between Teva and AstraZeneca occur relating to

16   Prilosec?

17       A.   That was 2008.

18       Q.   Are you sure about that?

19       A.   No, wait a minute.   No, I'm not sure about

20   that.

21       Q.   Does January 2010 refresh your recollection?

22       A.   Yes, 2010.   Yes.

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 372

1      Q.   You agree that's the correct date?

2      A.   Yes.

3      Q.   So as of 2010, would Teva and AstraZeneca

4   have had any reason to have to make extrapolations

5   about what Teva's actual Prilosec sales were through

6   2007?

7      A.   Repeat the question for me.

8      Q.   As of 2010, would Teva and AstraZeneca have

9   had any reason to have to make extrapolations about

10  what Teva's actual Prilosec sales were through 2007?

11     A.   I see.   Presumably, they would have had

12  information about that.

13     Q.   You agree with me that if you have actual

14  data, that it's always better to use the actual data

15  than an extrapolation?

16     A.   I agree with that.

17     Q.   If you direct your attention back to your

18  supplemental report, which is Exhibit 4, in

19  paragraph 59 of your report, you talk about how you

20  arrived at your estimates of what you call an

21  effective payment from AstraZeneca to Teva?

22     A.   Yes, I see that.

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 378

1    the costs incurred to that point were already

2    $8 million, wouldn't that be relevant to what you

3    would extrapolate the future costs to be?

4        A.  Not necessarily.  As they -- No, not

5    necessarily.

6        Q.  So just to be clear, you didn't undertake

7    any inquiry at all as to what AstraZeneca's actual

8    legal costs were in the Prilosec case prior to the

9    settlement?

10       A.  They were sunk costs.

11       Q.  I'm not asking whether you think --

12       A.  And so --

13       Q.  -- they're sunk costs.

14       A.  And so I did not investigate them for the

15   reason that they had already been incurred.

16       Q.  Did you undertake any inquiry as to what

17   legal costs AstraZeneca was projecting for the

18   remainder of the Prilosec case at the time it

19   settled?

20       A.  No, I did not.

21       Q.  You didn't think that was relevant to your

22   analysis either?

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 379

1       A.   I had a reasonable estimate of that amount.

2       Q.   How did you have a reasonable estimate of

3   that amount?

4              MR. RADICE:   Objection.

5              You can answer.

6              THE WITNESS:   The basis that we've

7   already discussed.

8   BY MR. SCHOEN:

9       Q.   But you don't know specifically what

10  AstraZeneca was estimating they would be?  You're

11  just looking at what you say the mean costs are for

12  this type of litigation?

13      A.   I was looking at the material I had to make

14  what I thought was a reasonable estimate.

15      Q.   And my question is, sir, did you make any

16  inquiry to see whether there was any other material

17  you could gather to better inform this estimate?

18      A.   I thought the material that I had access to

19  was sufficient to -- for my purposes.

20      Q.   Do you know how much AstraZeneca incurred

21  in legal fees in its case against Apotex with regard

22  to the damages phase of that case?

Page 380

1      A.   I don't know.

2      Q.   Did you think that might be relevant for

3   your analysis here?

4      A.   Well, again, it's a division in time and

5   it's only future costs that are the relevant one for

6   this consideration.  And so a total that includes

7   some mix of all the costs that would have been

8   incurred, it's hard to know where in that process

9   this -- you know, you would need to stop and consider

10  what costs might be going forward.

11     Q.   Apotex was found to infringe in the same

12  trial as Teva, correct?

13     A.   I believe that's true, yes.

14     Q.   You don't know?

15     A.   I believe that's true.

16     Q.   Do you know whether the cases were remanded

17  for damages proceedings at the same time?

18          MR. RADICE:  Objection.

19          You can answer.

20          THE WITNESS:  I don't know.

21  BY MR. SCHOEN:

22     Q.   So you don't think it would be relevant to

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 410

1    BY MR. SCHOEN:

2        Q.  But your reasonable royalty analysis that's

3    reflected in Exhibit 4, that's done?  There's no

4    work that's ongoing with respect to that?

5                MR. RADICE:  Objection.

6                THE WITNESS:  Not so far as I know.

7    BY MR. SCHOEN:

8        Q.  Are you aware of any errors in Exhibit 4?

9        A.  No.

10       Q.  Did anybody check the report for errors

11   before it went out?

12       A.  I -- Yes, I believe they did.

13       Q.  Who?

14       A.  This -- you know, standard procedure at GMA

15   would be to check the report.  I don't know the

16   person.  Don't know who did it.

17       Q.  Have you ever personally had any involvement

18   in the negotiation of a patent license?

19       A.  Not personally.

20       Q.  Or in some other capacity?

21       A.  What do you mean?

22       Q.  I mean, have you ever had any involvement

Page 414

1  confidentiality order and it could extend all the

2  way to your engagement itself, then I would instruct

3  you not to the answer the question.  If you know

4  that it's not, please answer.

5             THE WITNESS:  I certainly signed a

6  confidentiality order.  I believe it's confidential.

7  I'm happy to do whatever I need to do to have that

8  clarified and follow up.  But I'm reluctant to

9  disclose the parties at this time.

10 BY MR. SCHOEN:

11     Q.  Please identify for me every case other

12 than the present Nexium dispute in which you have

13 been asked to perform a reasonable royalty analysis

14 applying the Georgia-Pacific factors.

15     A.  That's the case I identified in my report,

16 which is the Lakeland case.

17     Q.  That's Lakeland Medical vs. Astellas?

18     A.  Yes.

19     Q.  And that's the only prior time before your

20 work in this case that you've attempted to perform a

21 Georgia-Pacific reasonable royalty analysis?

22     A.  Yes.  That's correct.

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 415

1        Q.  Are you relying on your experience in the

2    Lakeland case as part of the basis for your opinions

3    here?

4        A.  No.

5        Q.  Did the Lakeland case go to trial?

6        A.  No.

7        Q.  So you have never testified in court as an

8    expert on reasonable royalty damages; is that

9    correct?

10       A.  That's correct.

11       Q.  Was the Lakeland case a patent infringement

12   case?

13       A.  It was an antitrust case, which --

14       Q.  So you --

15       A.  Sorry.  -- which involved the but-for world

16   in which a patent would have been licensed.

17       Q.  So you have never testified at trial or at

18   deposition as a damages expert in a patent

19   infringement case; is that correct?

20       A.  That's correct.

21       Q.  The analysis that you performed in the

22   Lakeland case was in support of plaintiffs' motion

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 416

1    for class certification; is that correct?

2        A.   I don't think so.   I'm -- I'm not sure what

3    the legal position of that report was.

4        Q.   You don't recall submitting a report in

5    support of the plaintiffs' motion for class

6    certification in the Lakeland case?

7        A.   I'd have to look and see what the title was.

8    But if that's what it says, that's what it says.

9        Q.   Do you recall that the court denied class

10   certification in the Lakeland case?

11       A.   I do recall that.

12       Q.   And that after that, the case pretty quickly

13   ended?

14       A.   I believe that's correct.

15       Q.   And you said the Lakeland case was an

16   antitrust matter.   Did it involve tie-in claims?

17   Is that correct?

18       A.   Yes.

19       Q.   You opined in that case that if Astellas

20   were required by the antitrust laws to offer a

21   standalone license for the product at issue, it

22   would have charged zero dollars because the cost of

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 417

1    administering a license program would exceed the

2    license fees that Astellas could collect; is that a

3    fair statement?

4        A.   That was the -- a part of my report was

5    regarding the standalone license that Astellas would

6    have been able to charge, and I came to a zero.

7        Q.   Did you analyze all 15 Georgia-Pacific

8    factors to reach that conclusion?

9        A.   I considered all 15 factors, yes.

10       Q.   How long was your report in that case?

11       A.   Pretty long.  I've been --

12       Q.   Did Astellas agree with your position in

13   that case?

14       A.   No, I don't think they did.

15       Q.   Do you recall that Astellas had an expert

16   that said Astellas would have claimed a royalty of

17   much higher than zero if it had to offer a standalone

18   license?

19       A.   I think that's correct.

20       Q.   And why did you reject that contention?

21       A.   Oh, gosh.

22            MR. RADICE:  Again, as with the last

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 424

1    that's listed here is testimony on September 20,

2    2013, right?

3        A.   That's right.

4        Q.   Do you know what happened in the Andrx case?

5        A.   I believe the Andrx case resolved with

6    AstraZeneca receiving no damages.

7        Q.   And there was a judgment entered in the

8    Andrx case to that effect.  Is that your

9    recollection?

10       A.   I believe so, yes.

11       Q.   Did you see that judgment?

12       A.   Well, if it's not listed here, then I didn't

13   see it.

14       Q.   You didn't think what happened in the Andrx

15   case was relevant to your analysis so that it should

16   be discussed in your report and included in your

17   list of materials relied on?

18            MR. RADICE:   Objection.

19            You can answer.

20            THE WITNESS:   Well, I listed the

21   materials I relied on.  And my report contains the

22   information I thought was informative to me.

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 450

1    question.

2        Q.  You didn't -- You're not aware of any other

3    case involving a reasonable royalty where somebody

4    looked at an authorized -- authorized generic

5    distribution agreement to determine a license

6    royalty rate?

7        A.  I'm not aware of any other case, no.

8        Q.  And, in fact, neither the Andrx court nor

9    the Apotex court looked at any authorized generic

10   distribution agreements in assessing what a

11   reasonable royalty would be for Prilosec in those

12   cases?

13           MR. RADICE:  Objection.

14           THE WITNESS:  I'm not sure what they

15   would have looked at.

16   BY MR. SCHMIDTLEIN:

17       Q.  Well, didn't you look hard at what those

18   courts looked at?  Didn't you think that was

19   important to examine?

20       A.  Well, I did.  I read the opinion.

21       Q.  And you didn't see any evidence that those

22   courts looked at authorized generic distribution

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 465

1    legal costs that were saved by settling the patent

2    litigation involved in the case at issue, which in

3    this case would be the AstraZeneca/Teva Nexium

4    litigation, correct?

5        A.   Okay.  I believe that's correct, yes.

6        Q.   You did that in connection with your Ranbaxy

7    analysis.  When you did your Ranbaxy analysis, you

8    analyzed what were the saved litigation costs that

9    AstraZeneca saved from the -- when it settled the

10   Ranbaxy Nexium case, right?

11       A.   Yes.  So far so good.

12       Q.   But when you did your analysis in -- of the

13   Prilosec analysis here and you're determining what

14   the alleged payment was, you look only at the saved

15   litigation expenses from the Prilosec litigation,

16   correct?

17       A.   Let me see how I refer to them there.

18            Well, I simply refer to avoid litigation

19   costs and use the $2 million as an estimate of what

20   they would have saved in -- by conducting the

21   settlement.  I don't think I qualify it there.

22       Q.   So is it -- is the $2 million in avoided

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 466

1    costs from the Prilosec litigation or the Nexium

2    litigation?

3              MR. RADICE:  Objection.

4              You can answer.

5              THE WITNESS:  Well, it's just avoided

6    litigation costs as an estimate of what they would

7    have saved had they not settled [sic].

8    BY MR. SCHMIDTLEIN:

9        Q.  So which is it?  It's your analysis.  You

10   tell me.  Is the $2 million from the Teva Prilosec

11   litigation or the Teva Nexium litigation?

12             MR. RADICE:  Objection.

13             You can answer.

14             THE WITNESS:  Well, I believe it's the

15   estimate of the settlement of the two cases that

16   occurred at that time.

17   BY MR. SCHMIDTLEIN:

18       Q.  So now you're saying it's $2 million for

19   both cases?  Really?

20             MR. WEXLER:  Objection.

21             THE WITNESS:  I believe what that

22   estimate is, is the saved litigation costs once they

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 467

1    settled matters with Teva.

2    BY MR. SCHMIDTLEIN:

3        Q.  From what cases?

4        A.  Well, it would be from both cases.

5        Q.  And where did you come up with $2 million

6    in savings for both cases?

7        A.  Well, I was treating them as a -- as kind

8    of a unified effort.

9        Q.  So you cite to an FTC study that talks

10   about the litigation costs for one case, and then

11   you extrapolate that and say that's the same

12   litigation costs for two separate cases?  Is that

13   what you're doing?

14       A.  Well, I used the $2 million as an estimate

15   of the future litigation costs here.

16       Q.  You don't know what future litigation costs

17   you were referring to in your report, do you?

18            MR. RADICE:  Objection.

19            THE WITNESS:  No, that's not true.

20   BY MR. SCHMIDTLEIN:

21       Q.  Sitting here right now, you're not sure

22   what that $2 million refers to, whether it was the

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 468

1    Prilosec patent case, the Nexium patent case, or

2    both?

3              MR. RADICE:   Objection.

4              THE WITNESS:   No, that's not true.

5    I think to bring this -- this analysis back into the

6    context of the earlier analysis, which is the

7    purpose of the -- adding Tables 2 and 3 here, then

8    this is what AstraZeneca would have saved had it

9    settled with Teva, an estimate of that.

10   BY MR. SCHMIDTLEIN:

11       Q.   You're saying that $2 million is an estimate

12   of what AstraZeneca would have saved from having to

13   continue litigating through trial the Prilosec case

14   and separately litigating through trial the Nexium

15   case; is that right?

16       A.   That's -- that's the $2 million estimate.

17       Q.   So -- and you agree that the right way to

18   look at that is to look at the saved litigation costs

19   for both cases, right?

20       A.   From AstraZeneca's point of view, the --

21   the payment above litigation costs would be the

22   9 plus the estimate of the saved litigation.

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 469

1      Q.   From both cases?

2      A.   From both cases.

3      Q.   Now, you make reference to the Andrx offer

4   to settle for 70 percent of profits; is that right?

5      A.   Yes.

6      Q.   That's one of the comparables you looked at

7   to come up with the 60 percent royalty rate?

8      A.   Yes.

9      Q.   And during your deposition testimony, I've

10   also heard you refer to that as 70-50 earlier today;

11   is that right?

12     A.   Yes.

13     Q.   And I didn't see the 50 percent in your

14   report anywhere.  I only saw the 70 percent.

15          Can you explain what you're now

16   discussing with respect to 50 percent.

17     A.   Well, there was a 70 percent offer by

18   Andrx, and I'm not sure it was part of the same

19   offer or in subsequent offers, there was a 50 percent

20   that was also offered by them for other products.

21     Q.   Explain to me exactly what the 70 percent

22   offer comprised.

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 470

1       A.   Comprised?

2       Q.   Yes.   Tell me exactly what that -- the

3   settlement that included the 70 percent offer, can

4   you describe that settlement for me, that settlement

5   proposal.

6       A.   It was by Andrx after they had been found

7   to infringe, a proposal to settle the litigation,

8   which would involve, I believe, a license for Andrx

9   to sell the authorized generic, I think,

10  40-milligram version of Prilosec.

11      Q.   Anything else that was part of that

12  settlement proposal?

13      A.   I'm not sure it was that proposal or other

14  proposals.   There were either other components or

15  other proposals also made by Andrx.

16      Q.   Tell me about any other settlement proposals

17  you understand were made by Andrx.

18      A.   The -- Another component or proposal

19  involved selling of other strengths, I think lower

20  strengths, for 50 percent reasonable royalty.

21      Q.   Anything else?

22      A.   Not that I recall.

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 471

1      Q.  Do you remember what the lower strengths

2   were?

3      A.  You mean the milligrams?

4      Q.  Yes.

5      A.  I believe 10 and 20, but I'm not 100 percent

6   sure.

7      Q.  Now, with respect to the first offer on the

8   40 milligram, that's the 70 percent royalty that was

9   offered; is that right?

10     A.  Yes.

11     Q.  And I believe you said -- make sure I get

12  this right -- you said, "It was by Andrx after they

13  had been found to infringe, a proposal to settle the

14  litigation, which would involve, I believe, a

15  license for Andrx to sell the authorized generic,

16  I think, 40-milligram version of Prilosec."

17         Am I reading that right?

18     A.  I believe so, yes.

19     Q.  When you say "a license to sell an

20  authorized generic," what do you mean by that?

21     A.  That in this -- it probably may be better

22  described by "distribute the authorized generic."

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 472

1      Q.  Well, what Andrx was proposing there was a

2   license that would allow them to continue

3   manufacturing the drug, correct?

4      A.  Well, my understanding of it, I answered

5   the earlier question.

6      Q.  Well, you're talking about distribution of

7   an authorized generic drug.  The Andrx -- Andrx

8   wasn't an authorized generic drug distributor, right?

9              MR. RADICE:  Objection.

10             THE WITNESS:  I'm not sure I understand

11   what you're getting at.

12   BY MR. SCHMIDTLEIN:

13      Q.  An authorized generic distribution

14   agreement involves the branded company manufacturing

15   the product, the generic company buying the product

16   from the brand, and distributing it for the brand,

17   correct?

18      A.  Okay.

19      Q.  Andrx was never an authorized generic

20   distributor, correct?

21      A.  Well, I may have misunder- -- misremembered

22   that.

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 473

1      Q.   Andrx had actually manufactured the product.

2    That's why they were getting sued, right?

3      A.   That was the infringement, yes.

4      Q.   And Andrx's settlement proposal was that it

5    be licensed so that it could continue to manufacture

6    the product, correct?

7      A.   I would have to go back and refresh myself

8    on that.

9      Q.   At the time -- the 70 percent offer that

10   they made was -- was with respect to future sales of

11   the product, not past sales, correct?

12     A.   Well, I think they hadn't sold.  So it

13   would be sales, all of which would have been in the

14   future.

15     Q.   And as part of that settlement proposal,

16   Andrx also was requesting a release for any damages

17   in connection with the product that they had

18   manufactured but not yet sold, correct?

19     A.   That's my understanding.

20     Q.   And would you agree with me that that would

21   tend to reduce the effective 70 percent rate to a

22   lesser number because Andrx was also requesting

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 474

1     value for the release of any damages on the

2     manufactured product?

3          A.   Well, I don't know.  I interpret this as in

4     the context of a reasonable royalty analysis, in

5     which here is an offer of potential willing parties

6     and one person makes an initial offer.

7          Q.   But part of that offer also included,

8     forgive all of my liability in connection with this

9     product that I have manufactured and that

10    AstraZeneca was seeking damages on, correct?

11         A.   Well, that's true.  But I think that's

12    typical of an ex-post reasonable royalty analysis

13    after someone might have infringed.  The same with

14    Teva.

15         Q.   The hypothetical negotiation that Georgia-

16    Pacific talks about talks about going forward -- a

17    royalty on the product sold.  It's not royalty on

18    product sold, plus forgive me for a bunch of damages

19    for something else, right?

20         A.   Well, a reasonable royalty analysis is as

21    if the willing parties are coming together prior to

22    an infringement and deciding what they would agree

Page 475

1    on.

2         Q.   Right.  And the 70 percent number here

3    involves more than that.  It involves a forgiveness

4    for other liability, correct?

5         A.   Well, I think you're trying to introduce a

6    distinction that I don't see as special here.

7    That in a reasonable royalty analysis feeding into

8    damages, it would also settle whatever -- it would

9    settle the case.  And this would also be a proposal

10   to settle the case.

11        Q.   But it would be a proposal to settle a case

12   based on a reasonable royalty hypothetical license

13   for the product that was actually the infringing

14   product sold, right?

15        A.   Right.

16        Q.   And a going-forward payment or a going-

17   forward royalty potentially if they -- if they

18   negotiated a potential license going forward?

19        A.   Well, maybe or maybe not.

20        Q.   Right.  But here, they were asking for

21   something more than the 70 percent.  They were

22   asking for -- We'll pay you 70 percent, but then you

6c383cfa-9972-4ab8-bc31-38a8a8506b83

Page 476

1    also have to forgive us for the liability for our

2    past manufactured product?

3        A.   It was a proposal to settle the case, as I

4    understood.

5        Q.   The -- this -- the 70 percent was the

6    royalty proposed on 40-milligram, correct?

7        A.   I believe so.

8        Q.   And you said the 50 percent was on 10- to

9    20-milligram, correct?

10       A.   I believe so, yes.

11       Q.   What Prilosec dosage had Teva sold and was

12   subject to damages for in its litigation against

13   AstraZeneca?

14       A.   I think the lower doses.

15       Q.   So the right number to look at for Andrx is

16   50 percent, not 70 percent, right?

17              MR. RADICE:  Objection.

18              THE WITNESS:  No.  I don't agree with

19   that.

20   BY MR. SCHMIDTLEIN:

21       Q.   Why?  Why do you look at -- why do you look

22   at -- isn't it -- why do you look at a license for

6c383cfa-9972-4ab8-bc31-38a8a8506b83