UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

No. 12-md-02409-WGY

In Re: NEXIUM (ESOMEPRAZOLE)
ANTITRUST LITIGATION

*********

For Hearing Before:
Judge William G. Young

Motion Hearing

United States District Court
District of Massachusetts (Boston)
One Courthouse Way
Boston, Massachusetts 02210
Friday, July 11, 2014

********

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
bulldog@richromanow.com

A P P E A R A N C E S

THOMAS M. SOBOL, ESQ.
Hagens Berman Sobol Shapiro, LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Email: Tom@hbsslaw.com
and
JOHN D. RADICE, ESQ.
Radice Law Firm, P.C.
34 Sunset Boulevard
Long Beach, NJ 08008
Email: Jradice@radicelawfirm.com
and
BRUCE E. GERSTEIN, ESQ.
Garwin Gerstein & Fisher, LLP
88 Pine Street, 14th Floor
New York, NY 10005
Email: Bgerstein@garwingerstein.com
For plaintiffs

LAURENCE A. SCHOEN, ESQ.
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center.
Boston, MA 02111
Email: Laschoen@mintz.com
For Teva defendants

JOHN E. SCHMIDTLEIN, ESQ.
PAUL B. GAFFNEY, ESQ.
Williams & Connolly, LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Email: Jschmidtlein@wc.com
For AstraZenca defendants

KEVIN D. McDONALD, ESQ.
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001
Kdmcdonald@jonesday.com
For the Dr. Reddy's defendants

P R O C E E D I N G S

(Begins, 2:00 p.m.)

THE COURT: Well, good afternoon and welcome. I understand why these particular motions in limine are ones that you very much would like the Court's decision on. I have prepared for this hearing and I have read all your extensive materials. In the main I am reminded why it is wise not to give oral hearings on motions in limine, most yield to analysis on the papers, and in large measure it's a waste of time.

In two aspects -- in one aspect I genuinely would be aided by an oral hearing and I look forward to it and those are the motions that are directed to the effect or role that the exercise of the attorney-client privilege has played here and that I look forward to your oral argument. The other one that I'd like to hear a little argument on is Teva's motion to preclude the plaintiffs from untimely disclosing a new reasonable royalty expert, and that's where we're going to start. The others I'll decide today, but I don't need oral argument on them. And let's start with the -- the arguments are not going to exceed 10 minutes on a motion here, but let's start with that one, Teva's motion to preclude the plaintiff from untimely disclosing a new reasonable royalty expert, Docket Number 921.

Yes, Mr. Schoen.

MR. SCHOEN: Thank you, your Honor.

The deadline for affirmative expert disclosures in this case lapsed last summer in August of 2013 for the CMO that was agreed to by the parties and entered by this court. On June 30th of this year, just a few days ago, more than 10 months after that deadline, the plaintiffs have indicated that they would like to disclose a brand new reasonable royalty expert named Shannon McCool.

THE COURT: But they do that in essence in response to rulings I've made.

MR. SCHOEN: Well, your Honor, you didn't make a ruling, you did make a comment during the conference in chambers. There was no ruling modifying the CMO. That conference was 2 1/2 months ago. They certainly didn't act promptly after that. And to the extent that was a ruling permitting them to disclose a new expert at some unspecified later date, we submit that that's a ruling that should be revisited because we don't think -- while the Court does have -- certainly has discretion in settling scheduling matters, to allow just one party to have an entirely new expert this close to trial without giving all the other parties the same opportunity, we think is not, you know, an appropriate

exercise of discretion in these circumstance, particularly where they haven't shown the things that you need to show under Rule 37, and as the First Circuit has interpreted Rule 37, to allow untimely experts.

The First Circuit has said that it needs to be either substantially justified or harmless and we submit that they can't make either of those showings here. It's not substantially justified because this issue, how the Prilosec royalty damages that might have been recovered by AstraZeneca compared to the Teva settlement payment that was actually made, that has always been the sole basis for their allegation of a reverse payment as to Teva. It's not some new issue, it's not something that just came up, it's always been what their claim is based upon.

So to say they didn't disclose an expert, they could appropriately deal with that issue at the time of the affirmative expert disclosures, and to allow them, nearly one year later this close to trial, to come forward with such an expert, we think is not appropriate, and if that happens, then it creates this incentive, this type of gamesmanship, when it comes to experts. Why disclose your experts in accordance with the CMO if you can just come forward with the new expert two months before trial or three months before trial?

There's no -- if that becomes the rule, the entire system can't work.

There are 38 experts that were timely disclosed in this case by the two sides combined. To start allowing new ones now, this close to trial, and particularly where your Honor made that comment in April, it's now the end of June and we're now into summer, if this expert is permitted, we have to depose him, we have to re-***Daubert*** --

THE COURT: Do you have to depose him in view of my order -- Greg Joseph wrote a really excellent, I thought, comment in litigation about how it's frequently tactically unwise to depose an expert. But of course I leave you to your own tactics.

MR. SCHOEN: We do believe we have ***Daubert*** grounds here, your Honor, and we believe we're entitled to more fully discover, there's a lot in his report that's not explained, and we think we have the right -- we certainly had the right to take expert depositions of timely-disclosed experts, so I'm not sure why we wouldn't be entitled to do the same here.

THE COURT: I didn't suggest that you didn't have that right. Not at all. I just made a comment on tactics.

MR. SCHOEN: Certainly, your Honor.

The other issue here is that not only -- and I'll get into it, I think there are at least four categories of prejudice here, which I can get into. Certainly one of them is not only are they proposing to disclose this new expert, Dr. McCool, but they also say they want to have Dr. McGuire testify as to royalties. So now, having not disclosed -- timely disclosed any reasonable royalty opinion at all at the affirmative expert disclosure deadline or at the rebuttal expert deadline, now they want to have two experts testify on that topic where the defendants, who timely disclosed an expert, Mr. Green, in accordance with the deadline for this court, now only have one. So now we'd be in a position where they have more experts than we do and subject to --

THE COURT: Well, I'm not going to permit that, it's going to be one expert per discipline. So I'm not troubled by that.

MR. SCHOEN: So the prejudice, your Honor, comes down to a couple of categories here. One is that they get the benefit of seeing our rebuttal and our responsive disclosures before they had to make their affirmative disclosure. Because the way the CMO is set up, as is normally the case, is the plaintiffs make their disclosures on issues they have the burden of

proof on and then there are responsive disclosures. They get the benefit --

THE COURT: Right. I think I understand the argument, and I recognize I'm cutting you off, but I want to give you a little time for rebuttal here because I have another comment I want to address to you.

MR. SCHOEN: Sure.

THE COURT: But what do you say to these arguments because they are not without merit?

MR. RADICE: Your Honor, John Radice on behalf of the plaintiffs. Several points I'd like to make, and I think it's helpful to go back through the history of what happened here.

Point Number 1. The Court is well-equipped to handle and manage its own docket. What happened here is plaintiffs did not think, at the outset, that they needed to do a reasonable royalty report. Teva argued that we needed to. Teva has now argued in another case that you don't need to do that. But be that as it may, the Court ordered that we do one for Dr. McGuire. We did that.

After Dr. McGuire submitted his reasonable royalty report, the Court expressed some concern not with what Dr. McGuire did, but more with who Dr. McGuire was. He was an economist who --

THE COURT: No, I have in mind my own ruling.

MR. RADICE: Exactly. And so we went out, as invited by the Court -- absolutely no gamesmanship, but as invited by the Court, and contacted and contracted with an expert who was in the industry for decades and he issued a new report. He looked at what Dr. McGuire did. He said, "I largely agree with it." He had some different experiences. He added to it. He added new data points. He added new information. But I think one useful product of this exercise is that it shows that Dr. McGuire's report is on a sound footing to begin with.

But when -- I think another point of history is important here. In December of 2013, defendants offered a dozen new expert reports, supplemental expert reports. At that point trial was scheduled for February, two months away, and the plaintiffs objected to that and the Court said, "Supplementation is okay. I'm going to let those in." Right now we've issued one new expert report more than three months before the earliest that trial is going to start.

THE COURT: Why do you say the earliest?

MR. RADICE: Well, we issued it at the end of January.

THE COURT: No, I -- aren't we going to trial

in October?

MR. RADICE: I hope so. I understood the Court's ruling to be that the trial would start no earlier than the first week of October.

THE COURT: Well, that's when I expected to start.

MR. RADICE: Excellent.

THE COURT: Go ahead.

MR. RADICE: But that is at least three months -- we issued this new report at least three months before trial would start. We've offered deposition dates.

If you look at the cases we've cited -- I know your Honor has read them, but in situations where there is even less time before trial, there was two months before trial, even less time before trial, the Court's finding no prejudice. There's no harm -- and this is Point Number 2, there's no harm to Teva here. They have the report. They -- as Teva said -- and these aren't my words, these are Teva's words, "This is not a new issue."

THE COURT: What do you say about the fact that the case management order contemplated simultaneous exchange, now you've had the chance to digest theirs, are they not prejudiced?

MR. RADICE: Well, I think that is easily -- I do not think they're prejudiced, but to the extent that they are, that's easily handled by allowing them to submit another report.

THE COURT: All right. Thank you. Now we'll -- I will be back to you, Mr. Schoen, but let me take that under advisement, just for a moment. I propose to make rulings this afternoon because you do need to know how we're going forward.

Now I want to turn to the attorney-client business and the motions that address that issue in part sail past each other, but I think I'm going to start with the plaintiffs' motion. I'd like to hear you develop it. But it seems that you're asking for rather sweeping relief. You're asking that I bar them from introducing evidence on a wide range of rather significant issues and -- isn't that right?

MR. GERSTEIN: Your Honor, yes, it's right, but we would ask for --

(Interruption by Court Reporter.)

THE COURT: Excuse me. The Court Reporter is absolutely right. I recognize most of you. I need a record. So when you speak for the first time, then would you introduce yourself. And forgive me. Let's follow that protocol.

MR. GERSTEIN: My name is Bruce Gerstein, Garwin Gerstein & Fisher, for the plaintiffs.

THE COURT: And I'll hear you, Mr. Gerstein.

MR. GERSTEIN: Your Honor, yes, we ask for what appears to be broad relief, but there's a reason for it and it has to be seen in the context of the litigation in this case so far. So that's what I would like to address and where we are in the case.

First of all, in context, we have to see what is the issue. Under ***Actavis --*** and that's what -- the case that you litigated on, it contemplates different burdens between the plaintiffs and the defendants. Our burden initially is to show this large payment. There is an agreement to delay. After that defendants can come forth with procompetitive justifications. It's very important, it's their burden, they have the choice of what they're going to put forth in the evidence and in this case they went out and did two things. They came out with their procompetitive justifications that they advised us of, is that they're going to rely on what is business justifications from their management as to why it was reasonable to settle, why they believe it was reasonable --

THE COURT: I --

MR. GERSTEIN: -- um, why it was justified.

THE COURT: I follow that.

MR. GERSTEIN: Well, but there's some importance. They don't say it specifically that they're justifying the specific terms that are the focus of the issue of the ***Actavis*** litigation, they're arguing about the question of settlement and the concept of settlement. When we try to specifically question them as to the specifics, the particulars of the settlement, they're the focus of the litigation, for example, the date. "How did you reach the date of May 2014 versus 2012, which is recommended by" --

THE COURT: Mr. Gerstein, I don't fault you, I simply call to your attention that I have read the material.

MR. GERSTEIN: Okay.

THE COURT: That part I understand. Why -- they have an answer to that. Their answer is they're not going to rely on the specific negotiations at all, they're simply going to take the economic realities of the industry -- well, this is what they say, I'll ask them whether that's what they say, but they're going to say they take the economic realities of the industry, they analyze them, and they're going to put forth their justification without the need for any of the specifics that you're talking about.

MR. GERSTEIN: But, Judge, that's not what they're doing and that's what the problem is. They're putting together their understanding, their knowledge as fact witnesses, for the decision-making process, but they're telling an incomplete story. They're going to go out and tell why we believe it was -- based on our knowledge and our business reasons, why it was reasonable to settle -- not specifically to settle at those terms, not whether or not if those terms were different in the settlement agreements, but whether it would have been their business justification to -- they're not looking at it from --

THE COURT: But if they're willing to defend themselves at that level of generality, why shouldn't I let them?

MR. GERSTEIN: Because we will be precluded from a reasonable cross-examination to see whether or not their economic "explanations," as they say, comport with their understanding, their subjective understanding of their decision-making at the time, and that is the --

THE COURT: One of the problems -- and I'm telegraphing questions I'm going to ask them. One of the problems I had with the way they've addressed it is they're like setting these people up as experts, someone who looks at all these documents and now can tell you of

their procompetitive justification. And, you know, if you could do that, if that's so well-known and in the industry one could understand that, and we don't get into the details of the specific negotiation that led to the specific result, why ought -- there's much in your memo that I understand, but simply saying they cannot present testimony on a subject seems to me to go too far.

MR. GERSTEIN: But the problem I have, Judge, is there is the problem of specifically looking -- they're looking -- what you're suggesting is that they can be looking at this from objective criteria, while in fact the ***Actavis*** analysis and their procompetitive justifications are subjective. So you're basically substituting the objective versus what they believed were appropriate business justifications, whether or not they would have had the same business justifications subjectively specifically without that. I go back to --

THE COURT: But if that's the way -- this is just a motion in limine, it's not the motion for directed verdict. If that's how they're going to do it, if they are so, um, concerned about the attorney-client privilege that all they are going to do is come forward with these general justifications. If you are confident that those fall short under ***Actavis***, when they're done,

you will move, at least as to that aspect of the case, for a directed verdict, and if you are right as to the law, I will grant it. Right?

MR. GERSTEIN: That would be correct, your Honor, it goes to relevance and what is a very, very slippery slope. I don't want to quote you back from your own language, but --

THE COURT: Oh, feel free.

MR. GERSTEIN: Well, then I'm going to.

THE COURT: As Churchill once said, "I have frequently had to eat my words and on the whole they taste rather well."

(Laughter.)

MR. GERSTEIN: Judge, I'm not asking you to eat your words, just to refocus. You had mentioned -- for example, when you were contemplating a trial, on how a trial would look, what is significant, and you specifically said, as I view it that we're going to have two types of evidence here, we're going to have primary evidence -- and by "primary evidence," I mean the evidence of what people actually were doing, the typical type of evidence at trials, things that we look at what they thought they were doing, e-mails, agreements, memorandums, meetings minutes, and the like. It's their subjective thoughts.

What they've done is now put in the concept of conceptually we have business justifications, they're going to try to support that not as to the specific terms, but as to the settlement concept generally saying, "Patent litigation is risky as a whole without" --

THE COURT: Why shouldn't I allow them to do that?

MR. GERSTEIN: Because it would be prejudicial. The case that we looked at --

THE COURT: You know, I teach trial practice and I always say, "Never argue to a judge that it would be prejudicial, that's another definition for 'relevant.'"

MR. GERSTEIN: Well, "yes" and "no" because I'm arguing under 403 of the Federal Rules of Evidence.

THE COURT: Ah, that's different, that has to be substantially outweighed.

MR. GERSTEIN: And that's the point. It is specifically unfair prejudice, as the rule states.

THE COURT: Right.

MR. GERSTEIN: And the question we have here goes to the basic concept that the Court dealt with in the ***Bilzarian*** case, where in that case the defendant was seeking an in-limine ruling from the Court specifically

that he can testify as to its good faith, it was specifically said that, "I will not testify as to the content of what my lawyers said or that I even communicated with my lawyers about this." The Court said that it would be unfair and prejudicial if we -- in this case it was the prosecution, could not properly cross-examine him because he was clearly informed by what their lawyers said.

THE COURT: But the prejudice, the prejudice adheres in putting forward a witness as a fact witness. I think I understand your argument, but I think I should ask them what they intend to do and why it's appropriate in light of that argument.

Who's going to speak to that?

MR. SCHMIDTLEIN: Good morning, your Honor, John Schmidtlein, on behalf of AstraZeneca. I'm going to be presenting the primary legal argument for all the defendants. As your Honor knows, all the defendants filed separate opposition briefs.

THE COURT: Right.

MR. SCHMIDTLEIN: If there are particular issues raised as to a particular defendant, my colleagues are going to be prepared to deal with it.

THE COURT: That's fine.

Have I grasped how you intend to do this?

MR. SCHMIDTLEIN: I think there's a lot of sort of misunderstanding going on here and let me see if I can't pick some of it out.

THE COURT: It's why I said your motions seemed to go past each other.

MR. SCHMIDTLEIN: I agree with you.

THE COURT: Well, who's going to testify about these issue of which they're going to complain?

MR. SCHMIDTLEIN: Business executives are going to testify about business justifications, the business reasons, nonprivileged.

THE COURT: And these business executives are the business executives that negotiated the settlements?

MR. SCHMIDTLEIN: Not necessarily. The settlements were negotiated by lawyers.

THE COURT: Yes.

MR. SCHMIDTLEIN: So lawyers have testified about those settlement negotiations. Those are nonprivileged. They have taken lots and lots of deposition testimony from in-house lawyers, outside lawyers, from all the parties here, about the settlement negotiations.

THE COURT: Right.

MR. SCHMIDTLEIN: Drafts of the settlements have been discovered. They haven't been prevented from

understanding any of that. And those witnesses may well testify at trial to talk about what was or wasn't discussed as part of those settlement negotiations. We're not claiming privilege over that. We're also not claiming privilege over nonprivileged business justifications for the settlement, and those nonprivileged business justifications are both relevant and are entirely appropriate to be considered by the jury in this case in sort of a rule-of-reason balancing test.

The cases they cite that say you can't -- first of all, there is no precedent, there is no case that says you cannot offer nonprivileged evidence because you invoked privilege on a topic that is related. The ***Bilzarian*** case that they cite is completely not on point, a First Circuit case.

THE COURT: Well, let me say it to you and see if we understand, because you do seem to be talking at cross-purposes and I must understand.

If you put on a percipient witness and that percipient witness was asked in a -- in pretrial discovery, um, "Why did you do this?" and the privilege is invoked, one would imagine that I will not let you put on this witness now, I will not let that percipient witness answer that question.

That doesn't surprise you?

MR. SCHMIDTLEIN: Correct, and we are not -- and they don't point out a single example in their brief. We absolutely agree. This is not a sword-and-shield situation here. If a witness -- if a particular witness was asked a question and that witness invoked privilege, we cannot put that witness on and ask the same question at trial. I absolutely agree with that.

They didn't ask for the business justifications in these depositions, they asked for privileged information, they asked for privileged communications, and we invoked privilege, and that was entirely appropriate.

The First Circuit in ***Bilzarian*** said, "You want to testify at trial, you want to get up and say, 'I didn't think that my conduct in the case was unlawful, I thought the securities transaction I was engaging in, subjectively I believe they were lawful'." And the Court properly said, "Well, if you're going to say that, then they are entitled to ask you, 'Did the lawyers advise you to the contrary?'" None of the defendants in this case are going to -- have asserted advice of counsel and none of them are going to get on the stand and say, "We entered into these transactions and did the settlements because our lawyers told us they were

lawful."

THE COURT: But they are going to be asked what their business justification was.

MR. SCHMIDTLEIN: Correct.

THE COURT: They're going to give their business justification. And they may be searchingly cross-examined about that.

MR. SCHMIDTLEIN: Absolutely. But what they can't ask them for is, "What did your lawyers advise you about the settlement?" The legal communications they're not entitled to ask about, we have invoked privilege as to those, but they can ask about nonprivileged business justifications and the case law is uniform, is uniform that that is entirely appropriate. And that's our position.

THE COURT: Thank you.

So what am I missing here?

MR. GERSTEIN: What you're missing is -- and this is the problem that we have. If they offer business justifications that we believe that the settlements were in our business interest because it saves money, it saves employees' time, et cetera, and we want to ask them about the specific particulars of the settlement, and if you remove those particulars --

THE COURT: Well, take your example, "Why did

you pick such and such a date?"

MR. GERSTEIN: We were totally foreclosed from asking those questions in depositions.

THE COURT: Well, you know, I've looked at these briefs, but if I entered an order consistent with what I just said, you know, if, in the mechanics of this trial, you -- if they offer any evidence as to that and -- suppose at trial you asked that, all right?

MR. GERSTEIN: Yes, sir.

THE COURT: We'll take that as an example, you say, "Well, why did you pick that date?" If that happened, no one's going to assert the privilege, are they?

MR. SCHMIDTLEIN: I don't believe so. I don't think we asserted privilege. I don't think any of our witnesses in this case were asked, "Why did you pick that date?"

THE COURT: Oh, well, if that's --

MR. SCHMIDTLEIN: We think that there was a -- that Ranbaxy proposed one date in the negotiation, we countered with another date. That evidence was testified to in the case.

THE COURT: Yeah. So I propose to allow all of that. I -- you see it's the problem of a motion in limine, I'm not disposed to simply rule out broad or

narrow areas, I am disposed vigorously to prevent the attorney-client privilege from being used as a sword and a shield. So I don't see from the get-go that if we get the actual negotiations and we get the business justifications from the people who made the determinations, why you need to ask -- and to conjure with ***Bilzarian***, "And was that against the advice of your lawyers?" That would seem to be a reasonable invocation of the privilege.

MR. GERSTEIN: Your Honor, I accept that and if that's the way you're going to proceed -- but I will say this, in the depositions throughout -- and I can quote back because we have them as our exhibits, they did take the blanket-sweeping privilege. And that was our problem that we did not have --

THE COURT: And they're going to have to live with that because I'm telling you, as I sit here, any blanket sweeping invocation of the privilege -- you see we're using language where we've got to look at the actual documents, and I'm not going to spend weeks going over it, because I don't know how the trial is going to eventuate. But I will tell you that it is an evidentiary objection on your part, when they come forward with anything, if they have asserted a privilege as to that matter, then you will say "I object." You

don't have to get into the attorney-client, you say "I object, sword shield," something like that, and there will be a sidebar conference and I will decide, and that's how we'll proceed.

Are you okay with that?

MR. GERSTEIN: I'm okay, your Honor.

THE COURT: Are you okay with that?

MR. SCHMIDTLEIN: Yes, your Honor.

MR. GERSTEIN: One point of clarification, when you say "that matter," do you mean the subject matter because you told me --

THE COURT: No, no, I cannot rule, and it's not even particularly helpful to have a discussion, because I cannot make a prudential ruling, and I'm not. I'm simply not going to let any of the defendants use the attorney-client privilege as a sword and a shield. I will understand it better as the trial goes on and I will make appropriate rulings.

MR. GERSTEIN: Thank you, your Honor.

THE COURT: And the defense is all right with that?

MR. SCHMIDTLEIN: Yes, your Honor.

THE COURT: All right. Well, then like, um, Mr. Schoen, I don't think I need to get back to you, respectfully.

(Laughter.)

MR. SCHOEN: My heart is broken, your Honor.

THE COURT: That played out a little differently than I thought. But I'm fine with it.

Then what I'm going to do is rule on all these motions and then allow you to ask questions.

The plaintiffs' motion to exclude the expert testimony of Gregory Bell, that's denied. Of course challenges, particular challenges may be made at trial. But it's denied.

The plaintiffs' -- um, let's see. I dealt with Docket Number 917. That's the plaintiffs' motion to preclude the introduction of evidence on topics as to which the attorney-client privilege was asserted.

Plaintiffs' motion for live trial testimony via contemporaneous transmission, Docket Number 830, I'm fine with that and the burden is entirely on the plaintiffs. Don't think I'm going to bat in some other court and our video hookups go court to court. The burden is entirely on you. But if I can get the visage of the person on the screen in this courtroom and examination can go on, then I'm fine with that. But it's your burden. As to this court's facilities and ability to do video conferencing, we will cooperate fully.

Defendants' motion to preclude argument or evidence based upon the attorney-client privilege, 844, I've dealt with that.

To preclude -- on the one Mr. Schoen argued, 921, to preclude the untimely disclosing of the new reasonable royalty expert, that's denied, but it's going to be one expert per discipline. And if we're going to have a ***Georgia Pacific*** analysis, we'll hear it from one person.

MR. SCHOEN: Your Honor, if I might ask if an order be entered requiring them to clarify immediately which of those experts it's going to be, um, so that we can prepare for trial, given that we should have done, as of August, which experts they're going to be using?

THE COURT: I think that's not unfair.

Who's going to testify?

MR. SOBOL: Monday, your Honor? Tom Sobol.

THE COURT: That's all right. Monday they'll tell you.

MR. SCHOEN: The other thing, your Honor, is also a request that they be required -- if it is Dr. McCool, who we didn't have a chance to depose previously, that they be ordered to produce him for deposition in Boston before the end of July and provide at least three dates when that could occur.

THE COURT: They said that they would cooperate. I'm not entering an order. I expect cooperation.

MR. SCHOEN: Thank you.

THE COURT: Let's see. The defendants' motion for reconsideration -- DRL's motion for reconsideration is 916, it's reconsideration of a Docket entry 905. Reconsideration is denied.

But I have not been asleep on this case. I am working hard on an extensive opinion that explains each of the Court's substantive denials and indeed the grant of the motion for summary judgment, and I'm hopeful to have that to you early next month. It will discuss matters about which there's been extensive briefing and oral argument, but it does -- it will, I trust, give you a good idea of what I think about the law.

Now, I'll entertain questions.

MR. SOBOL: If I may, your Honor?

THE COURT: Yes.

MR. SOBOL: One of my colleagues raised an issue this morning -- and I apologize to bring it up late with you and the defense lawyers, but I think it might be helpful for anyone. The suggestions was that the parties exchange drafts of jury instructions in the middle of August and then have a couple of weeks to

respond to those drafts later in August so that perhaps in September the parties can at least tee up, as an initial thought, where they were at that point regarding jury instructions. I think the notion was that there had been a little bit of ships passing at night and the extent to which certain issues are going to be addressed at the trial and how it might be helpful to have that addressed. So usually we would meet and confer with the defendants about this and I just thought I would run that suggestion by you.

THE COURT: I appreciate you're doing it, and I don't think I'm going to order it, but I will say this.

Again -- and I get this from David McLaughlin, now a superb justice of the Massachusetts Superior Court, I had a big -- and it was one of the initial cases under the Environmental Protection Act and like, as the case is today, the courtroom was filled with suits and we were all talking about whether we even could go to trial in view of the administrative regulations and the like, and he represented an individual defendant -- there were big corporations, everybody else were corporate lawyers, and of course Mr. McLaughlin always portrayed himself as just a country lawyer from the Cape -- and those are the most dangerous kind --

(Laughter.)

-- and he stood up and he said this, "What is the verdict slip going to look like?" And indeed that so concentrated the minds of the lawyers on the essentials that I -- I think it's an excellent suggestion. I encourage you to do it, but I do not order it. I will find time in September to discuss it and suggest to you that a -- I think it will make more sense to you once you see my opinion. So I hope -- not that I'm cutting any new ground, but you wrestle with these cases and their applications to the summary judgment record, I think it will be helpful to you where I think things are falling short, and in the case of causation as to Ranbaxy, why I did what I did.

So I encourage that and I will make time in September, apart from the final pretrial conference, to discuss those matters. Thank you.

Other questions?

MR. McDONALD: Your Honor, Kevin McDonald representing the Dr. Reddy's defendants. I had a question about the motion on the video testimony --

THE COURT: Yes.

MR. McDONALD: -- and your ruling. Just to clarify, um, I understood you to be saying that you'll be happy to have this courthouse hook up anything that

the plaintiffs hook them up with.

THE COURT: Or the defense, I mean.

MR. McDONALD: Exactly. But I wanted to clarify because we don't have control over some of the witnesses that they may want to pursue and if those witnesses don't want to cooperate with the plaintiffs in appearing for this, my own concern is that they will say to a judge somewhere else in the country, "No, Judge Young has ordered that this happen." And so I wanted to make sure that you're just saying that, as far as you're concerned, if it does happen, that's fine.

THE COURT: I've said what I've said. I don't think it needs clarification. It's the parties's responsibility. That's as much clarification.

MR. McDONALD: Thank you.

THE COURT: I have in mind very much your motion for reconsideration. In this draft, yet draft opinion, we've dealt with that directly. Don't think we just brushed that off. I've denied it, but I've dealt with it. You are somewhat differently situated and I'll get it to you just as soon as I can.

MR. GAFFNEY: Your Honor, Paul Gaffney for AstraZeneca.

With respect to the contemporaneous transmission motion, there was a proposed protocol attached to their

motion which -- I think given your Honor's ruling, that it's fine with me, but they'll work it out. I think maybe we need to revisit the mechanics of that. There was no discussion about that ahead of time.

There is one issue though that was raised in the briefing, which is their request that if they do put on a witness by video transmission who's a former or current employee, they ask that that person -- that the defendants themselves be precluded from calling that witness live in their case.

THE COURT: No, well, I would not be disposed to do that.

MR. GAFFNEY: Thank you.

THE COURT: Again, the reason I answer that without argument is I found that it's a good idea always to follow the same routine because all the lawyers can play off the same routine and mine is easily discoverable. Changes from the same routine aren't necessary in many cases, but the burden is on the one who wants to change it. My routine would always be to allow such a witness to be called and it is in this case, absent some special reason.

All right. I do thank you. I appreciate this. I would like to meet with you actually on the charge and verdict slip. I wish you a good summer. I am working

on the, um -- I am working on the opinion. But come to the sidebar before I let you go.

(Sidebar off the record.)

THE COURT: We'll recess.

(Ends, 2:45 p.m.)

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the foregoing record is a true and accurate transcription of my stenographic notes before Judge William G. Young, on Friday, July 11, 2014, to the best of my skill and ability.

/s/ Richard H. Romanow 07-25-14
__________________________
RICHARD H. ROMANOW Date