1                UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS

3                            No. 12-md-02409-WGY

4

5

6    In Re:  NEXIUM (ESOMEPRAZOLE)
     ANTITRUST LITIGATION
7

8

9

10                    * * * * * * * * *

11

12                 For Hearing Before:
                  Judge William G. Young
13

14                 Charge Conference

15

16                United States District Court
                 District of Massachusetts (Boston)
17                One Courthouse Way
                 Boston, Massachusetts 02210
18                Wednesday, October 15, 2014

19

20                    * * * * * * * *

21

22         REPORTER: RICHARD H. ROMANOW, RPR
                  Official Court Reporter
23               United States District Court
           One Courthouse Way, Room 5510, Boston, MA 02210
24                  bulldog@richromanow.com

25

```
 1                    A P P E A R A N C E S

 2

 3    THOMAS M. SOBOL, ESQ.
          Hagens Berman Sobol Shapiro, LLP
 4        55 Cambridge Parkway, Suite 301
          Cambridge, MA 02142
 5        Email: Tom@hbsslaw.com
      and
 6     STEVE D. SHADOWEN, ESQ.
          Hilliard & Shadowen, LLC
 7        39 West Main Street
          Mechanicsburg, PA 17055
 8        Email: Steve@hilliardshadowenlaw.com
          For plaintiffs
 9

10    LAURENCE A. SCHOEN, ESQ.
          Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
11        One Financial Center.
          Boston, MA 02111
12        Email: Laschoen@mintz.com
      and
13     KAREN N. WALKER, ESQ.
          Kirkland & Ellis, LLP
14        655 Fifteenth Street, N.W., Suite 1200
          Washington, DC 20005
15        Email: Kwalker@kirkland.com
          For Teva defendants
16

17    JOHN E. SCHMIDTLEIN, ESQ.
       PAUL B. GAFFNEY, ESQ.
18    DANE H. BUTSWINKAS, ESQ.
          Williams & Connolly, LLP
19        725 Twelfth Street, N.W.
          Washington, DC 20005
20        Email: Jschmidtlein@wc.com
          For AstraZenca defendants
21

22

23

24

25
```

```
1   (Continued.)

2

3   JAMES D. BALDRIDGE, ESQ.
        Venable, LLP
4       575 7th Street, N.W.
        Washington, DC 20004
5       Email: Jdbaldridge@venable.com
        For Ranbaxy defendants

6

7   KEVIN D. McDONALD, ESQ.
        Jones Day
8       51 Louisiana Avenue, N.W.
        Washington, DC 20001
9       Kdmcdonald@jonesday.com
        For the Dr. Reddy's defendants

10

11  BARRY REFSIN, ESQ.
        Hangley Aronchick Segal Pudlin & Schiller
12      One Logan Square, 27th Floor
        Philadelphia, PA 19103
13      Email:  Brefsin@hangley.com
        For Rite Aid Corporation

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S
 2         (Begins, 10:00 a.m.)
 3         THE CLERK:  Now hearing MDL matter 12-02409, In re
 4    Nexium.
 5         THE COURT:  Well, good morning, counsel.
 6         I want to start with the one document that was
 7    timely filed and that's the defendants' proposed jury
 8    verdict.  I found that very helpful and, um, I have
 9    revised my proposed verdict slip accordingly.
10         There's a lot of verbiage in there.  You drafted
11    it as though it was some sort of foreclosure document.
12         (Laughter.)
13         THE COURT:  Well, you may think that's humorous,
14    but I'm not just going for any of that.  Simplicity is
15    the thing.  But I have rethought my verdict slip and so
16    the Clerk will pass out to you the current iteration.  I
17    also note in the papers not timely filed, which were
18    received in the Clerk's office at 7:00 last night --
19    where do you think I am at 7:00 last night?  I was at a
20    meeting.  And though I got into the office before 8:00
21    this morning, I've been teaching a class.  So if you
22    think I've gone over these papers, I have not.  And
23    candidly you people have let me down.  You knew since
24    last Friday that I had the time and I wanted to have
25    this charge conference.
```

1          I have just looked at these proposed preliminary

2     instructions.  So while I'm willing to work with you,

3     what you get is in large measure what you give me a

4     chance to think through.

5          So let's go first to this jury verdict slip.  I

6     note and I'm gratified that there is a stipulation that

7     the Section 2 claims under the Sherman Act are out.

8     Now, when I look at this carefully I see that's only the

9     direct purchaser class.

10          Is that true on the part of all the plaintiffs?

11          MR. SHADOWEN:  Your Honor, Steve Shadowen on

12     behalf of the end payers.  We filed a similar document

13     yesterday.

14          THE COURT:  Thank you.  So everybody's in on that.

15     So -- yes?

16          MR. SCHMIDTLEIN:  Actually the retailer opt-out

17     plaintiffs have not filed.

18          THE COURT:  Thank you.

19          MR. REFSIN:  Your Honor, Barry Refsin, for Rite

20     Aid and CVS.  We still need to discuss that with our

21     clients and we plan to do that shortly.

22          THE COURT:  The trial begins Monday.

23          MR. REFSIN:  We will have it by then.  We expect

24     to be consistent with the others.

25          THE COURT:  Well, all right.  In my mind, in the

1    light of that, if they go along, that obviates Question

2    2 because market power doesn't have to be shown under

3    the Clayton Act, correct?

4         MR. SCHMIDTLEIN:  It's actually market power does

5    have to be shown under a Section 1 claim, which is the

6    claim that they're proceeding under.

7         THE COURT:  I'm with you.  So since Section 1 of

8    the Sherman Act is in, I ought leave my market power

9    question in?

10        MR. SCHMIDTLEIN:  Correct.  Monopoly power doesn't

11   have to be in, but market power does have to be in.

12        THE COURT:  Right

13        MR. SHADOWEN:  Your Honor, we would take great

14   exception to, um, the way this is --

15        THE COURT:  Well, I'll give you --

16        MR. SHADOWEN:  In terms of -- it's very clear

17   First Circuit law that we do not need to show a relevant

18   market.  We do need to show market power, which is a

19   much less showing than monopoly power under Section 2.

20        THE COURT:  Well, you're -- I've got a changing

21   target here.  You might favor me with some law in a

22   brief, because on Monday this document or some iteration

23   of this document will be placed before the jury as part

24   of my preliminary charge so they know who has to prove

25   what.  So, you know, I don't expect to work all weekend.

```
 1    I'm here tomorrow.  I'm here Friday.  Monday we're
 2    picking the jury.  I'd like --
 3          Rather than just conclusions, you agree with that,
 4    right?
 5          MR. SCHMIDTLEIN:  I agree with --
 6          THE COURT:  That I shouldn't talk about -- the
 7    question should be revised, "Did AstraZeneca exercise
 8    market power?"
 9          MR. SCHMIDTLEIN:  Correct, your Honor.
10          THE COURT:  And stop there?
11          MR. SCHMIDTLEIN:  Um, we think it's "Exercise
12    market power in a relevant market?"
13          THE COURT:  Well, you disagree with what he just
14    said?
15          MR. SCHMIDTLEIN:  If that's the point he's trying
16    to make, that he doesn't have to prove relevant market,
17    yeah, we disagree with that.
18          MR. SHADOWEN:  And we have First Circuit law that
19    says we don't have to prove market power in a relevant
20    market, it's just --
21          THE COURT:  Now you see the weakness of this?  We
22    can sit here and we can make these conclusory statements
23    and with all respect to you, they're meaningless.  I've
24    got to make prudential rulings based upon a record.
25    You've not favored me with the tools.  I expect you to
```

1    do so by the close of business on Friday.  I'll work on

2    the case, but I need to have the data in front of me.

3           All right.  Let's -- recognizing that that's an

4    issue, we'll go through the plaintiffs.

5           What other issues do the plaintiffs have with the

6    jury verdict as now set up?

7           MR. SOBOL:  If I may, your Honor?

8           THE COURT:  Yes.

9           MR. SOBOL:  Tom Sobol for the direct purchaser

10   class.

11          First, um, it's not necessarily an issue, but I

12   want to discuss a point to make that there's a clarity

13   with respect to it.  Number 1, the Court indices that

14   it would ask the jury whether the AstraZeneca-Teva

15   patent litigation, the settlement of that litigation was

16   a result -- would result in a substantial and

17   unjustified payment by AstraZeneca to Teva?  So two

18   things with respect to that.

19          Of course the language -- I would assume that the

20   Court plans on obviously, in its jury instructions, will

21   define "substantial" in a way that's consistent with

22   *Actavis* where the Supreme Court --

23          THE COURT:  Well, what word did they use?

24          MR. SOBOL:  They used the word "large," your

25   Honor.

1          THE COURT:  Well, all right.  Then I like "large"

2     better.

3          MR. SOBOL:  Yes.  And, second, I am assuming that

4     the unjustified part of this, the Court has previously

5     indicated at the last conference before -- um, in this

6     case, the Court had indicated that the plaintiffs of

7     course have a burden to be able to show that there was a

8     large payment.  If there are to be procompetitive

9     justifications, that's the justification part here, then

10    it's the defendants that need to come forward with what

11    those supposed procompetitive justifications are.

12         THE COURT:  That's how I understand it.

13         MR. SOBOL:  Okay.  So although the Court has -- I

14    think it's fair to have this all in one question, I'm

15    simply pointing out that the plaintiffs bear the burden

16    on proving that there's a large payment and we believe

17    that the instructions should indicate --

18         THE COURT:  And unjustified.

19         MR. SOBOL:  Well, um, I think not, your Honor,

20    because if -- I believe under *Actavis* the Supreme

21    Court's use of the word "unjustified" means whether

22    there are justifications that are procompetitive.

23         THE COURT:  Look, this is how this is going to

24    play out.  You've given me no -- I'll now amend Question

25    1 so it says "in a large and unjustified payment by

1    AstraZeneca to Teva," and I've already ordered that

2    that's the evidence I'm going to hear first.  Once I've

3    heard all that evidence, I am not bifurcating the trial

4    we've already bifurcated.

5         MR. SOBOL:  Sure.

6         THE COURT:  Once you've put in all your evidence

7    on that point, then you're to notify the Court.  That's

8    the pretrial order.  I will expect, because they seem to

9    be champing at the bit here, they will then move for a

10   directed verdict.  I will entertain argument on that

11   motion and I will resolve it.

12        Now, if I resolve it against the plaintiffs, I

13   will be satisfied that I have created a sufficient

14   record and I assume I will be satisfied with my ruling

15   that the case is teed up for appeal.  If I deny their

16   motion for a directed verdict at that juncture, the case

17   will continue to the point where the plaintiffs rest

18   entirely.  I do agree with you that I think it is up to

19   the defense to come up with the procompetitive

20   justifications.

21        MR. SOBOL:  Sure.

22        THE COURT:  That's true.  And so when you rest, if

23   you, um, eluded directed verdict at that earlier stage

24   in the trial, at least on that point and there would be

25   others, causation and the like, you -- but on that point

1    you probably will elude a directed verdict at the close

2    of all your evidence.  Then we'll see what the defense

3    comes up with as procompetitive justifications which,

4    I've already said this, you not only will cross-examine,

5    but you may then come up with, if it's genuine, genuine

6    rebuttal.  Now that's how I expect to manage the trial.

7    But I'm going to leave the word "unjustified" in there.

8         MR. SOBOL:  Very good, your Honor.  I think we're

9    exactly of the mind of how we're going to proceed.

10        THE COURT:  All right.

11        MR. SOBOL:  Number 2, with the Court's leave,

12   we'll file a very brief brief on Friday regarding why

13   there's no need for -- to show relevant antitrust market

14   given the absence of those other claims.

15        THE COURT:  Thank you.  I'm eager.

16        MR. SOBOL:  Okay.

17        I have no comment with respect to Number 3.  Well,

18   we'll do that in the instructions.  No comment with

19   respect to Number 4.

20        With respect to Number 5, there's only one small

21   amendment that I would suggest, your Honor, and that's

22   this, and it's important to have the background of it.

23   So we want of course the jury verdict in the first phase

24   of this trial to tell us enough information so that if

25   the plaintiffs prevail, when we go to the damages phase

1    the delay of generics is sufficiently teed up so that

2    they know what generics were delayed and when.

3        Now, we know of course, as you put in here, and

4    it's correct, you know, "When did they first have come

5    to the market?"  That is correct.  But the question then

6    also is whether there would have been other generics

7    that may have entered at that time or six months

8    thereafter, in other words the AstraZeneca-authorized

9    generic.

10       Now I would make this suggestion, your Honor, and

11   then I have it in some very simple language.  The

12   damages differ significantly if it's only one generic

13   that enters the market or more than one generic that

14   enters the market because the price goes down

15   significantly as additional generics enter the market.

16   Therefore the short amendment to Question 5 would be,

17   comma, "and would an authorized generic or other

18   generics have launched thereafter and if so how many?"

19   Or something like that, if you may.

20       THE COURT:  Uh-huh.

21       MR. SOBOL:  The notion here again is --

22       THE COURT:  I think I understand.

23       MR. SOBOL:  Okay.

24       THE COURT:  All right.

25       What's the defense say about the proposed jury

1    instruction?

2         MR. SCHMIDTLEIN:  The issue of how many authorized

3    generics I guess that would have entered and what impact

4    that would have had on the pricing and therefore the

5    alleged damages, um, strikes me -- I think about --

6    without having talked to my colleagues, it strikes me as

7    that sounds like an issue that should be addressed in a

8    subsequent phase of the case.  I don't think addressing

9    all of those issues in this phase of the case seems to

10   be -- at least what I think we had contemplated was

11   going to be part of this phase of the trial.

12        Obviously at this point we know that, um, based on

13   your rulings, Ranbaxy and DRL would not come to the

14   market.  So the only generic that's really at issue,

15   could it have come to the market before May of 2014, is

16   Teva, and that's really what this trial is about.  I

17   don't know what other generics they think that they're

18   going to be introducing evidence that would have come to

19   the market.

20        THE COURT:  Well, but if I accept your comment,

21   then I would say, "And would an authorized generic have

22   entered thereafter?"  That would have been a Nexium

23   authorized generic and they might well have done that.

24   That makes perfect sense.  And if the answer to that is

25   "yes," that is going to affect the damage calculations

1    and I do want to get as much information from this jury

2    as I can.

3         MR. SCHMIDTLEIN:   I'm just trying to just think on

4    my feet here.   I mean the authorized generic issue

5    obviously only relates to the Ranbaxy agreement in which

6    the Court has ruled cannot form the basis for liability.

7         THE COURT:   I don't see that.   I mean "authorized

8    generic" -- I understand an "authorized generic" to be

9    an AstraZeneca-authorized generic.

10        Now, if the defense was to lose and they were to

11   pick a date -- and of course the charge will make clear

12   it has to be before the 2014 date.   If they were to pick

13   a date, what Mr. Sobol says makes some sense, "Would an

14   authorized generic have entered thereafter?"   "No."

15   "Yes."   If the answer is "yes," then we know that, and I

16   know enough from the pretrial to know that that appears

17   to have some effect on the damages.

18        MS. WALKER:   Your Honor, if I could?

19        THE COURT:   Of course.

20        MS. WALKER:   Karen Walker for Teva.

21        THE COURT:   Yes, Ms. Walker.   I'm sorry to see

22   that you are in a sling.

23        MS. WALKER:   Hopefully we're on the mend.

24        THE COURT:   I hope so.

25        MS. WALKER:   You know, again, I haven't conferred,

1    but I would think that you could just leave this

2    question as is because when your Honor divided the trial

3    up the issues that were deferred for the second phase

4    were fact of injury and damages.  And so I think once we

5    get to the point where there's a determination that

6    there was a violation and that there would have been

7    generic entry, the fact of injury, how many generics,

8    who would they have been, and how would that have

9    affected the pricing, would be a fact-of-injury question

10   being in the second phase.  So I think that --

11        THE COURT:  I hear you, but I'm telling you that

12   I'm disposed to amend -- remember these -- I could

13   always take this back at the end of the trial and say,

14   "Well, I think things differently now," but going in I

15   think I am disposed to add, after the year, comma, "and

16   would an authorized generic have entered thereafter?"

17        Now, with that taken care of, let's go to the

18   charge, the proposed charge, and about all I can do for

19   you, because, as I say again, you've let me down here,

20   is to, um, give you a general reaction to your

21   submissions.  So we'll start with the plaintiffs.

22        The plaintiffs want me to give a detailed charge

23   as to Hatch-Waxman and the patent laws.  Actually I'm in

24   favor of that.  This may be too detailed or at a level

25   of detail more than is necessary.  But having read this,

```
 1    I'm disposed to give it.
 2          The defense, though not timely, has favored me
 3    with full jury instructions and though I haven't had a
 4    chance to go over them, I'm pleased to receive them, and
 5    I want to focus on Pages 8 --
 6          MR. SCHOEN:  Your Honor, just to clarify, we filed
 7    our proposed jury instructions yesterday morning, I
 8    believe, and it was the plaintiffs that filed theirs
 9    last night at 7:00 p.m.
10          THE COURT:  Thank you.
11          MR. SCHOEN:  Just to clear up that misimpression.
12          THE COURT:  Yesterday morning is pretty late.
13          But where I'm going to start my work is on Pages
14    8, 9, 10, and 11, the summary of the applicable law.
15    Actually -- and again a very quick reading, though I
16    might reorder things to match the jury verdict form, but
17    the very quick reading looks good to me and I would
18    propose to level -- I would propose to charge in roughly
19    this fashion.  I see the dispute about "relevant market"
20    which is going to have to be resolved and I'll be alert
21    to that.  But these three pages look good to me.
22          Then I propose -- what I'm going to do now is go
23    over this charge really as we sit here and just give you
24    reactions to it.  They're not rulings, um, but
25    reactions.  And then I'll stop and hear you with respect
```

1    to the charge.

2         I have a standard charge on duty of the jury and I

3    will give it.  The same for opening instructions, and

4    I'll give that.  Well, I'll identify the parties, but

5    I'm going to be pretty vague as to the specifics.

6    Actually this is helpful because I think I'm going to

7    have to name all these parties who are named here, when

8    we go to picking the jury, to see if anyone's a part of

9    any of these operations.  And so that's helpful to me

10   and I'll use it for that.

11        "Everyone equal before the law."  Though I will

12   cover that in my own language.  I'm not going to talk

13   about limiting evidence, I'll do that at the appropriate

14   time.  Um, let's see.

15        Let's see.  "Burden of proof."  I'll give a charge

16   on burden of proof.  This charge is too complex.  I talk

17   about "fair preponderance of the evidence as more likely

18   to be true than not true."

19        "Conduct of the jury."  I will give my charge as

20   to the conduct of the jury and it is adequate.

21        I will explain how trials work.  I will explain

22   objections in my way of explaining them.  No need to

23   define "direct" and "circumstantial evidence" at the

24   beginning and I don't -- and I don't fault the defense

25   because these could be the closing charges and I make --

```
1          I'm interested that the attorney-client privilege
2    is here.  My.  My.  My.  You expect someone to take the
3    attorney-client privilege here?  We'll cover that when
4    we do.  I say no more.
5          "Credibility of the witnesses" will not be in the
6    preliminary charge.  Of course it will be in the post-
7    trial charge.
8          "Notetaking" I will explain.  This charge looks
9    pretty good.  It's the First Circuit charge.
10         "Jury questions."  I have my way of doing that and
11   I will do it my way.  Oh, actually, I see, here you have
12   -- Mr. Schoen, I give you credit for what you've done.
13   These are all the preliminary instructions.  So I guess
14   I should stop now and I will.
15         That's how I propose to deal with it.  So let me
16   stop at this point and we'll -- I'm sorry I can't give
17   you more guidance, I have not had time properly to
18   prepare.  But we'll leave with the plaintiff.
19         Comments on my comments?
20         MR. SOBOL:  Yes, your Honor.
21         First, let me beg the Court's indulgence on
22   something.  When the Court did set up the hearing it was
23   unclear to me whether or not the Court wanted
24   submissions before this hearing, so we contacted the
25   Clerk's office and, at least with the report that came
```

1   back to me, is that you were not expecting something.

2   So that's still on me.  But I just want you to know that

3   it's not as if we were trying to completely disregard

4   the notion that we wanted to try to prepare the Court

5   more.  So I apologize.

6       THE COURT:  One would think that skilled advocates

7   such as yourselves would understand in the main how

8   judges work and that a charge conference especially

9   would benefit from the value of having the charge in

10  sufficient time before to review.  Now, if defense got

11  theirs in in the morning, I will be candid with you, I

12  didn't take it home last night.  I wished I had.  But go

13  ahead.

14      MR. SOBOL:  Okay.  So two things then.

15      First, regarding the general preliminary

16  instructions, we have no comment.  I mean the Court's

17  indicated you're going to follow essentially your

18  general practice.  That's perfectly fine.

19      And then there's the question of whether and if so

20  what the Court would instruct the jury at the outset of

21  the case, before we go through things, as to what a

22  "large and unjustified payment" is under *Actavis*, okay,

23  and, um --

24      THE COURT:  Well, I see that their proposal --

25  let's -- we have something to work with, they touch on

1   that, and their proposal, um -- I could be wrong, but it

2   looks to me like they have taken language straight out

3   of *Actavis* and I would -- at least as I sit here now,

4   we're talking about the two paragraphs on the bottom of

5   Page 8 and I will tell you, um --

6           MR. SOBOL:   If I may then, your Honor?

7           THE COURT:   Yeah, let's focus on that.

8           MR. SOBOL:   That's exactly where I was trying to

9   go right to the core of it.

10          THE COURT:   Right.

11          MR. SOBOL:   So I think it's important for us to

12  take a step back.  We're working with the United States

13  Supreme Court case and that in that case itself it

14  defines what a "large and unjustified payment" is.  The

15  Court then talks about what is meant by "large" in that

16  context, your Honor.  What is meant by "large" in that

17  context is a financial incentive from the brand to the

18  generic that may influence the generic's settlement

19  decision-making.  And what we also note is that the

20  Supreme Court has indicated that (a) if the payment does

21  not exceed the brand's anticipated litigation costs,

22  that might be acceptable, and (b) in some circumstances

23  if the payment does not exceed the fair value of

24  services or goods that are being provided, then the

25  payment is not "large."

1     Now, beyond that, however, your Honor, the Supreme

2  Court has indicated that if there is a payment above

3  essentially the anticipated litigation costs of the

4  brand, then that payment, that financial incentive may

5  have an influence on the generic company's settlement

6  decisions.  And that's essentially -- and if we will,

7  your Honor, we do have obviously a draft of jury

8  instructions and you quote at length for about a page on

9  *Actavis* --

10     THE COURT:  Where is it?

11     MR. SOBOL:  You don't have it yet.  I would submit

12  it later on today.  And again, your Honor, that's why

13  I've fallen on the sword at the outset.  I have done

14  that.

15     THE COURT:  Well, fine, but saying it doesn't

16  change it.  Fine, you've fallen on the sword, and

17  someday I will get your proposal, which I must view with

18  skepticism as I view the defense, and the truth is the

19  most you're getting out of this is I'll have to go back

20  to the actual decision and take what I want to take out

21  of it and I will.

22     MR. SOBOL:  Sure.  And again to be more specific

23  though just to --

24     THE COURT:  Go ahead.

25     MR. SOBOL:  -- to do my best to educate you, your

1    Honor, and to be helpful at this hearing, if you go to

2    the last paragraph on Page 8, there's something quite

3    incorrect, as a matter of law, and something quite

4    problematic for the First Circuit or for the Supreme

5    Court.  The defendants say "Whether a payment is large

6    depends upon the circumstances of this case and may be

7    judged in comparison to, among other things, the size of

8    the relevant market."  Well, there's nothing like that

9    in *Actavis* at all.  The relative market here is about $3

10   1/2 billion because it's the esomeprazole magnesium

11   market.  There is nothing in *Actavis* that says that the

12   payment has to be large in the relative market, you

13   know.  Rather, what *Actavis* is saying is that the

14   payment has to be of a size that might influence a small

15   generic company to change its decision-making with

16   respect to the settlement agreement.  That's all.  And

17   frankly in the context of *Actavis*, any amount of money

18   over and above the avoided litigation cost of the

19   defendant may end up being the kind of external

20   extrinsic influence that's going to change the generic's

21   point of view.

22       THE COURT:  Let me say this back to you at this

23   stage in the litigation.  I mean I do find this helpful,

24   at least we're focused on things that are disputed here,

25   but what I'm likely to do, in light of your objection,

1   is to pluck what I think the relevant language is out of

2   *Actavis* directly and charge the jury on that language.

3   If I have to interpret it a little bit for the jury, I

4   will, but adhere as closely as I can to the reasoning of

5   the *Actavis* opinion for starters.

6        Now, once we've had the whole trial, maybe I can

7   revisit it.  I simply said that on quick look this

8   looked good to me.  If you don't like it, I'll see what

9   you give me, but I'll probably go back to *Actavis* and

10  you'll hear what *Actavis* actually said.

11       MR. SOBOL:  Yeah.  And from our point of view,

12  from the plaintiffs' point of view, that's the

13  preferable way.  And again not to harp on it again, your

14  Honor, but to point out a similar kind of potential

15  that's out there for you.  Later on, in that same

16  sentence, it says:  "For the revenues that may have been

17  earned in that market by the parties to the settlement."

18  Well, the revenues that may be earned in the market by

19  the parties to the settlement, AstraZeneca might earn

20  billions of dollars, the generics might earn hundreds of

21  millions of dollars, but in *Actavis* there's no mention

22  whatsoever that the payment, the influential payoff from

23  the brand to the generic has to have any relationship to

24  either the size of the relative market or the revenues

25  that those parties might earn in that market.

1          THE COURT:  I hear the argument.

2          MR. SOBOL:  Okay.

3          So -- and your Honor's already pointed out the

4     "lacing of relative market" elsewhere in this, so I

5     won't talk about that.

6          But that goes to the core and I think your

7     solution, your Honor, which, um, is perfectly acceptable

8     to the plaintiffs, is we simply parse the wording of

9     *Actavis* to make it a little bit more understandable and

10    better flowing for the jury and that's the way we

11    proceed on this.  Thank you.

12         THE COURT:  Thank you.

13         The defense?

14         MR. SCHMIDTLEIN:  Your Honor --

15         THE COURT:  You don't have to go in order, but I

16    saw Ms. Walker first.

17         MR. SCHMIDTLEIN:  Oh, I'm sorry.

18         THE COURT:  She's more noticeable because she has

19    her sling.

20         MS. WALKER:  I'll be very brief.

21         I do think Mr. Sobol did harp a little bit.  I

22    think that when you look at *Actavis* you will see that

23    some of the things that they're saying are examples, the

24    Supreme Court gave examples of traditional settlement

25    considerations which could include attorneys fees, which

1    could include fair values for services, but I just want

2    to put on the record that we disagree with the way he

3    just described it that that was an exhaustive list of

4    traditional settlement considerations that the Supreme

5    Court said should be looked at.

6         THE COURT:  Well, I understand that, but from my

7    point of view, going in and trying to preserve the

8    freedom of action both to counsel and the Court, it

9    seems to me that justice is best served if I stick to

10   their language, and if I need to expand on it or reflect

11   on it, I can do so with the advantage of having presided

12   over six weeks of trial.

13        Doesn't that make sense?

14        MS. WALKER:  Well, I'm not sure I'm following you,

15   but all I would say is where Mr. Sobol ended up, which

16   is that we should say what *Actavis* says, and I was just

17   trying to put on the record that we don't agree with his

18   characterization of what *Actavis* said.

19        THE COURT:  Oh, I'm skeptical of you all.  I will

20   go back and look at it.

21        (Laughter.)

22        THE COURT:  Yes.  Counsel?

23        MR. SCHMIDTLEIN:  Yes, that's fine.  We obviously

24   have a different view about what "large and unjustified"

25   means.  We think *Actavis* says "large and unjustified" is

1    from -- it a proxy.  If you see a large and unjustified

2    payment, the Supreme Court says that might indicate the

3    brand's view of the strength or weakness of its patents.

4    Obviously you have to look at the size of the payment in

5    relationship to what's at stake in the patent

6    litigation.  That's our point.

7          The Supreme Court also makes some language about

8    the size of the payment in respect to the potential

9    earnings of the generic company, in other words could

10   the payment be larger than what the generic company

11   could have expected to have made if they'd won the

12   patent case?  It's -- frankly it's a little bit

13   confused, the Supreme Court speaks sort of on both sides

14   of this issue.  But we certainly disagree with

15   Mr. Sobol's position that if it's larger than the saved

16   attorneys fees, then it's per se unlawful, and I'm sure

17   this is an issue that, you know, we'll be wrestling with

18   as the case unfolds.

19         As I'm sure your Honor noticed, the instructions

20   that we submitted yesterday morning before we got the

21   stipulation that was submitted by the various plaintiffs

22   yesterday afternoon includes instructions with respect

23   to those other monopolization claims.  I guess we urged

24   the retailers to sort of cast their rope here quickly so

25   we can know whether -- you know, whether these other

1    claims need to be included, and I guess just as a last

2    technical footnote on the stipulations.  They

3    technically weren't stipulations because the defendants

4    didn't sign them, these were unilaterally submitted by

5    the plaintiffs, and the only thing that we would request

6    is we want these claims -- if they want to jettison

7    these claims, we're fine with that, but they need to be

8    dismissed with prejudice.

9         THE COURT:  Well, I would make clear that's the

10    Court's understanding, if they're gone, they're gone,

11    we're not coming back in some other iteration.  And you

12    will understand that I now take them, save as to these

13    opt-out folks, they're gone.

14         Now -- all right.

15         MR. GAFFNEY:  Your Honor, one other issue.

16         (Interruption by Court Reporter.)

17         THE COURT:  Wait.  Please identify yourself.

18         MR. GAFFNEY:  Paul Gaffney for AstroZeneca.  I

19    share duties with my partner, Mr. Schmidtlein, on

20    different parts of the case.  I had focused on the

21    patent issues.

22         I just make one observation on the preliminary

23    instructions that the plaintiffs supplied last night,

24    there's some language about patents.

25         THE COURT:  Yes, there is.

1      MR. GAFFNEY:  Now, we included an instruction --

2   although it wasn't in the preliminary section, it's

3   Instruction 19, the final instructions, on Page 19.

4      THE COURT:  Thank you.

5      MR. GAFFNEY:  Ours is based on the model

6   instructions taken out of the ABA handbook because they

7   have a model instruction about antitrust cases involving

8   patents and it's noted on the basis of that.  The

9   instruction that we received last night from the

10  plaintiffs is, um -- is, um, let's just say tilted a

11  little bit toward the plaintiffs' view of patent law and

12  I would urge your Honor to look closely at these.  We

13  think ours, based on the model rule, is more faithful

14  and more evenhanded to what the jury ought to be told.

15  But your Honor has tried plenty of patent cases and will

16  be able to tell, from reading these, which one or

17  which -- or exactly what instruction to issue.

18      I just wanted to make it clear that we had our own

19  version.

20      THE COURT:  No, I'm happy to know that you have

21  your own version and I appreciate it.

22      All right.  Now, um -- yes?

23      MR. BUTSWINKAS:  Dean Butswinkas for AstroZeneca.

24  I just had one question.  You mentioned the jury slip.

25  Will each juror have their own copy of that during the

1   opening?

2          THE COURT:  Yes.

3          MR. BUTSWINKAS:  I thank you.

4          THE COURT:  Yes, and that's a very good question.

5   So I propose that they be passed out at about the time

6   we pass the notebooks out.  They'll have it.  I will

7   give my precharge.  I will direct the reporter to

8   prepare one copy of the charge and the precharge will

9   also be available to the jurors during the course of the

10  trial.

11         MR. BUTSWINKAS:  Thank you, your Honor.

12         THE COURT:  Good question.

13         Now, this has been helpful.  I don't mean to be

14  overly critical and I expect to be prepared on Monday.

15         Now, you've done a bunch of other things too and

16  of course that's fine.  It's not my practice to

17  entertain oral argument on motions in limine and I don't

18  think I'm going to vary that practice here, but it might

19  be helpful to go through these and at least give you my

20  reactions to them.

21         These are not rulings.  You must make your

22  objections known during the course of the trial.

23  Most -- well, I'll say no more.  But let me go through

24  these and once I have, if anyone wants to say anything,

25  I'll hear you on that.  That last may be a mistake.  But

1    again I'm trying to be helpful.

2        The government -- um, the government.  The defense

3    wants to exclude statements by a Ranbaxy executive that

4    appeared somewhere in the paper or papers.

5        How are you going to get these in?  They're

6    admissions by Mr. Sing and because you've got your

7    conspiracy claim -- I want to say a little bit more on

8    that, but because you've got your conspiracy claim, I

9    suppose they come in generally, but how do you get -- we

10   don't receive newspaper reports.  Have you got the press

11   release of Ranbaxy?  Well, how are you going to get it

12   in?

13       MR. SOBOL:  There are some internal records of

14   Ranbaxy which, as a matter of business, they collect

15   these reports and distribute them within Ranbaxy itself.

16   And so we can show that Ranbaxy had the reports,

17   circulated them internally, and so as a matter of course

18   they have essentially both authenticated the fact that

19   they existed and used it.

20       THE COURT:  And those are the reports -- it's not

21   the newspaper, it's going to be Ranbaxy documents?

22       MR. SOBOL:  Right.

23       Now I should be clear, your Honor, if I may?

24   Because there are about -- and I think everybody is

25   getting all uptight, you know.  Sometimes --

```
 1              THE COURT:  Don't you love it?

 2              (Laughter.)

 3              MR. SOBOL:  Well, that's what it's all about,

 4      frankly.

 5              THE COURT:  It is.

 6              MR. SOBOL:  Some of the documents have attachments

 7      to e-mails that are circulating, other ones we got

 8      produced from Ranbaxy.  These are the news reports that

 9      they produced to us.  So we know they came from

10      somewhere -- well, I should be clear about this.  Some

11      of them have an e-mail attachment to which the news

12      report is attached.  That's one category.  A second

13      category is the news report was found in the files of

14      Ranbaxy and produced to us during the course of

15      litigation, which I would also then suggest shows that

16      it could be admissible because we've been told by

17      Ranbaxy that the documents they produced to us have not

18      been doctored, they came from obviously somewhere in its

19      institution and are reflecting their memorializing -- or

20      reflecting a reading of what it is that their CEO said.

21      So that's the way we attempt to get it in.

22              Now, I don't know off hand, with all respect, your

23      Honor, whether there's some other news report that we

24      found elsewhere that we're trying to put it, that would

25      raise a different issue that I'm not addressing.  But if
```

1  it came internally from Mr. Ranbaxy and it's what their

2  CEO said about this deal, we think it should come in.

3      MR. BUTSWINKAS:  Judge, I still want the quotation

4  from the newspaper and that's the most far-fetched

5  definition of the business record exception I've ever

6  heard that because the newspaper article was at the

7  company someplace --

8      THE COURT:  Well, I'm not able to rule on it

9  because if they want it from the newspaper, they've got

10 real problems.  If they want admissions from Ranbaxy's

11 own documents, then those are admissible as to Ranbaxy,

12 and because of the rather interesting First Circuit

13 approach to conspiracy, having charged conspiracy, they

14 are putatively admissible against all of the defendants.

15 That's the law.

16     MR. BUTSWINKAS:  Your Honor, I think at a minimum

17 there is a very significant foundation question here

18 both on the foundation proving that the statement quoted

19 in the newspaper was said, for which there is no record

20 made.

21     THE COURT:  I will tell you -- again this is the

22 problem with motions in limine.  If we were doing this

23 at a trial, I would see a document.  It would go along

24 in a linear fashion.  So all I can say is I'm hostile to

25 newspaper reports until they become ancient documents.

1   These are not ancient documents.  So newspaper reports,

2   by and large, are out.  When he -- when Mr. Sobol

3   stands, he started talking about internal Ranbaxy

4   records.

5        Now, I do want to say something on conspiracy, but

6   let me hear you further.

7        MR. BUTSWINKAS:  The only thing I would say is I

8   hear what you're saying on those foundation issues and I

9   do think it's better for you to hear them in the context

10  of the trial.

11       THE COURT:  So would I.

12       MR. BUTSWINKAS:  And therefore what I would

13  request is they not be able to talk about this newspaper

14  article in their opening until you hear that foundation.

15       THE COURT:  Oh, well, they run the -- I'm not

16  making orders as to the opening unless I feel I have to.

17  Everybody runs whatever risks they want to run in the

18  opening.  I'll cut that off, if necessary, at an

19  appropriate time.

20       Now, a word about conspiracy.  The law of

21  conspiracy in the First Circuit is governed by some very

22  important decision in the criminal context, but the

23  First Circuit approaches the conspiracy doctrine not in

24  the common law fashion, but in a reverse of the common

25  law, and the First Circuit law is, under *United States*

1    *vs. Petrozziello*, that when a party alleges conspiracy,

2    the judge is to take those allegations at face value and

3    act as though the conspiracy allegations are made out,

4    and, um, the judge first exercises his duty under

5    801(d)(2)(E) at the close of the plaintiffs' case and

6    then again at the close of all the evidence, under --

7    I'm blanking on the case, but there's another case.  And

8    I take that -- with conspiracy there is a preliminary

9    finding of fact that the judge must make and the

10   preliminary finding of fact, though it is for the jury

11   ultimately, is whether the judge as factfinder comes to

12   conclude that the admission of the party is actually

13   made during and in furtherance of a conspiracy with the

14   other defendant or defendants.

15       If the dust settles and I were to conclude as a

16   matter of fact that the conspiracy is not made out, then

17   I strike out as against each party the conspiratorial

18   admissions of another party and I look to see whether

19   there's sufficient independent evidence that the jury

20   could, um, find conspiracy.

21       Now, that's all well and good and indeed in most

22   criminal cases the First Circuit approach works very

23   well and has little interference from the judge.  The

24   problem occurs when the judge doesn't make that finding

25   and yet the jury has heard this evidence.  And in those

1   circumstances, and I would hate for this to occur, and

2   of course plaintiffs trade on that because judges are so

3   hesitant to grant mistrials, but you can't unring the

4   bell.  If the plaintiffs put in prejudicial

5   conspiratorial evidence and I have to strike that out,

6   be very clear that I will take very serious the motion

7   for a mistrial and we get nowhere.

8           When you're operating under 801(d)(2)(E), the

9   judge has a fact-finding role and I take mine very

10  seriously.  Just be aware of it.  That's all.

11          Now, just going on through this, the defendants

12  make this huge motion for various topics.  I'll give you

13  my reaction to the thing.  These are not rulings.  I'm

14  not troubled by them saying -- and I'll just go through

15  it, this is Docket Number 1044 and I'm just going on the

16  titles.

17          Pay for delay agreements.  Delay agreements.

18  Reverse payment agreements.  I'm not troubled with any

19  of that.  I think I get troubled with "bribes."  I don't

20  suggest they'd do that.  Reference to the plaintiffs as

21  "victims".  I'm not troubled by that.  Obviously appeals

22  to the jurors' self-interest as consumers or taxpayers,

23  that's forbidden.

24          Financial status of the parties?  We may

25  necessarily have to get into that.  Size, location, or

1   specialization of defense counsel.  That's out.  We're

2   not interested in defense -- I'm interested in it and I

3   would honor and respect you all, but the jury is not

4   interested in it and they will not become interested in

5   it.

6       Foreign companies is not going to be emphasized

7   and I will say everyone's equal before the law.  Failure

8   of defendants' witnesses to appear at trial.  No ruling

9   on that.  We'll see how that all plays out.  That the

10  defendants acted unethically or immorally?  Well, if you

11  violate the antitrust laws of the United States and you

12  do it willfully and intentionally, it would depend on

13  truth.

14      Irrelevant matters?  Well, making motions that I

15  would exclude irrelevant matters is not terribly helpful

16  because I will exclude irrelevant matters.  "References

17  to big pharma or similar terms"?  I don't see what role

18  that plays here, but we'll see.  "Prior unrelated

19  litigation and regulatory proceedings?"  Well, if it's

20  unrelated, it's unrelated.

21      The confidential or highly confidential stamps, if

22  they appear on any of the documents that get in

23  evidence, I will tell the jury to disregard those and

24  I'll soft pedal that saying that was just part of the,

25  um, business of getting ready for trial.

1          Then they've got one on here, "irrelevant
2    documents involving discovery or privilege," if it's
3    irrelevant, it's excluded.  The rule tells me that.
4    "Media coverage of the defendants or other."  I'm not
5    interested in media coverage.  I'm not interested in
6    trial publicity.  I don't think I need to make rulings
7    on any of that.  Competent counsel would stay away from
8    all of that, um, with the excisions that I have
9    mentioned.
10         Now, let's see here.  I see the stipulation
11   regarding Section 2 claims.  I see a large number of
12   stipulated facts.  Let's stop a moment on that.
13         How do you propose to get this data before the
14   jury, would you all agree that it might become an
15   exhibit in the case?
16         MR. SOBOL:  That's the plaintiffs' proposal, your
17   Honor.
18         THE COURT:  The defense?
19         MR. SOBOL:  That it be published in some manner.
20         THE COURT:  Yeah.
21         MR. SCHMIDTLEIN:  No objection to that.
22         THE COURT:  Fine.  So you people are working, I
23   know, on your exhibit list, so we'll agree that the
24   stipulated facts, which are Document 1049, are admitted
25   in evidence and will be treated as an exhibit and the

1    parties can, um, number it.

2        Let's see here.  Now the plaintiffs, they, um,

3    have their own -- they don't want the following.

4        "Exclude the evidence about whether direct

5    purchase plaintiff passed on any overcharge or lost

6    profits."  I don't think either of those is, um,

7    appropriate for this case.  "Failure to mitigate

8    damages," that's not in this phase of the case.

9    "Reference to treble damages, attorneys fees, and

10   costs."  I would think that would be out.  "Direct

11   purchaser plaintiff financial condition"?  I don't see

12   how that would be relevant.  Those aren't rulings, but

13   that's my reaction.

14       Now, let's see here.  Oh, this business of lack of

15   standing.  I would -- I thought that I had taken care of

16   that in my --

17       Is that going to be a matter of dispute in this

18   trial or is this just an excess of caution?  Are you

19   going to attack the standing of the named plaintiffs

20   based on the assignments?

21       MR. SCHMIDTLEIN:  I don't think we are, your

22   Honor.

23       THE COURT:  Yeah, so no need to rule on that.

24       MR. REFSIN:  Your Honor, one issue on that?

25       THE COURT:  Yeah.

1        MR. REFSIN:  That also applies to the opt-out

2    plaintiffs.  We're going to file a separate motion for

3    the opt-out plaintiffs.  We have agreement that that

4    applies to all the plaintiffs in the --

5        THE COURT:  I'm going to treat the plaintiffs as

6    plaintiffs and explain to the jury -- you know, "We've

7    got all sorts of plaintiffs here, we've got wholesalers,

8    we've got retailers, we've got lawyers who represent the

9    actual consumers.  You're not going to be concerned with

10   that.  We're going to be concerned with" -- and then

11   I'll go on to the issues of the antitrust laws.  And as

12   I've already explained in the pretrial conference, I'm

13   treating the whole raft of plaintiffs as an entity, one

14   lawyer for each witness and the like.  So I think you

15   may understand that they're not going to challenge your

16   standing, they'll attack your claim.  Thank you.

17       MR. REFSIN:  Thank you.

18       THE COURT:  All right.  I don't know that I need

19   an omnibus brief in lieu of multiple briefs, but that

20   motion is allowed.

21       Oh, now, here's another, the plaintiffs have

22   another.  "Adverse impact that damages will have on the

23   defendants or the drug industry."  I don't think we're

24   going to get in any of that.  "Evidence regarding past

25   or present litigation involving the plaintiffs."  Well,

1    I'm allowed to exclude present litigation involving the

2    plaintiffs which is relevant, or their counsel, but I'm

3    only going to admit relevant evidence and I'm going to

4    be strict on it.

5         "AstraZeneca from disparaging generic drugs or

6    touting brand drugs."  Well, that's preliminary, I'm not

7    excluding that.  Maybe those will -- people do

8    believe -- at least the public believes that there is

9    sometimes a difference due to manufacturing quality

10   control, whether that's true or not.  If I look at the

11   substance here, I -- um, "denigrating generic drugs such

12   as copycat or need-to drugs," well, I don't know as I'm

13   going to forbid it.  Nor am I going to forbid

14   AstraZeneca from calling itself an "innovator," I mean

15   it had patents, that's what's at issue here.  I've

16   already ruled that the payment need not be in cash.

17        "Exclude evidence or opinions that authorize

18   generic, so are anticompetitive."  I think that's a

19   little broad here.  I would -- I don't see how

20   authorized generics could be anticompetitive.  But if

21   you've got some witness who wants to say that, we'll see

22   what the basis of that is.

23        "To exclude the live testimony of defendants'

24   witnesses who are unavailable to testify in the

25   plaintiffs' case in chief."  Oh, that make some sense.

1   I mean we're not going to play cat and mouse here with

2   this --

3          You're not going to call anyone that's not going

4   to be available to testify if they call them as an

5   adverse witness, are you, the defense?

6          MS. WALKER:  Your Honor, I can speak for Teva.  I

7   believe they've asked for two current employees in their

8   case in chief and I agreed and stipulated to bring them

9   subject to the stipulation that I could bring them back

10  if need be, et cetera.

11         MR. McDONALD:  Your Honor, Kevin McDonald on

12  behalf of Dr. Reddy's.  You have said in the past that

13  we could -- that we had the option of bringing our

14  people one time to the trial who are -- who don't live

15  in or near Boston and that is our current plan.  In

16  those cases they have depositions in the case of, I

17  believe, two of them --

18         THE COURT:  No, that's not how we're going to do

19  it.  If they want them, you bring them, and they'll come

20  one time, I'll let you examine and I'll explain it to

21  the jury.  I won't prejudice anyone.  But if they want

22  them, you bring them, if you're going to use them.

23         MR. BALDRIDGE:  Your Honor?

24         THE COURT:  Yes.

25         (Interruption by Court Reporter.)

1          THE COURT:  Would you identify yourself.

2          MR. BALDRIDGE:  Yes, Doug Baldridge on behalf of

3     Ranbaxy.

4          We had two witnesses that are no longer employees.

5     The intention, based on prior rulings, was always to

6     bring them in our case.  They would use the deposition

7     transcript in their case.

8          THE COURT:  Well, that's not how I'm doing it.  If

9     you're going to bring them, um, same as for Dr. Reddy's,

10    if you want to use them, you bring them, and I'll allow

11    your examination, so they only have to come once.

12    Unless they're really playing ball with you, then they

13    can come back.  Whatever you think is most effective.

14         MR. BALDRIDGE:  Your instruction is to bring them

15    in their case?

16         THE COURT:  Yeah, that's my instruction.

17         MR. BALDRIDGE:  Yes, your Honor.

18         THE COURT:  Okay, let's see.

19         "Motion to exclude reference that a New Jersey

20    District Court in any way approved the patent litigation

21    settlement."  Well, obviously the judge did approve it,

22    he entered a consent judgment.  This gets into the

23    whole, um, Judge Raycroft in the Second Circuit, back

24    and forth.  I think if we get into that, you may on your

25    peril.  I'll express my views.  I've already said

1   there's no **Penoyer** -- if that's the appropriate case,

2   you get no defense based on that.  I can take care of

3   that.

4        "Preclude assertion of any risk aversion".

5   (Pause.)  Well, again it's too preliminary to rule on

6   this.  If AstraZeneca's people get up and explain why

7   they entered into this, if part of that was aversion to

8   litigation risk, if that's what actually happened, I'm

9   going to let them say it.  I'm not going to let experts

10  say it.

11       I want a foundation for these things and I want a

12  foundation based on evidence.  That's where the defense,

13  if they run into trouble, that's where they're going to

14  run into trouble.  They're going to have to actually set

15  out what they actually did, then we'll hear from experts

16  tell us why that's swell.

17       (Pause.)

18       THE COURT:  I don't -- the FTC investigation?  Why

19  is that -- I would -- I don't imagine we're going to get

20  into that, are we, the FTC investigation of these

21  settlements?  The defense?

22       MR. BUTSWINKAS:  Your Honor, not the substance of

23  the investigation, but the fact of the settlement

24  agreement being submitted to the FTC as part of the

25  settlement agreement itself, and that certainly will

1    come into evidence.

2         THE COURT:  And I would -- but not what they did

3    or didn't do about it, just that it was submitted?

4         MR. BUTSWINKAS:  That's correct.

5         THE COURT:  Yeah, I would think they could have

6    that.

7         "Related supposed good character."  Well, there's

8    rules on good character or reputation and I'll follow

9    the rules.

10        Let's see.  This one about what AstraZeneca uses

11   its profits for doesn't seem to be part of this case, so

12   I would imagine that that would be out.

13        The -- all right.  And I think that's all I have

14   before me.  Except that the plaintiffs now --

15        Do I have any motion to quash the -- in this

16   court, to quash the subpoena of Lisa Jose Fails and JR

17   Despot?  Do I have a motion to quash that?

18        MR. SOBOL:  You either do have them, your Honor,

19   or its on its way from the District of Columbia.

20        THE COURT:  That's what it says.  And

21   interestingly in this related litigation, my colleague I

22   think in the Eastern District of Pennsylvania, while she

23   quashed a bunch of them, she didn't quash one, and that

24   one is situated like these two folks.

25        MR. SOBOL:  That's correct, your Honor.  It was

1    Judge Diamond in the Eastern District of Pennsylvania.

2         THE COURT:  All right.  So now Judge Chukan sends

3    this to me.  So why don't I wait till I get it and then

4    we'll see.

5         MR. SOBOL:  That's fine, your Honor.  I have filed

6    a motion to be able to be heard, because I know you

7    normally wouldn't be heard on something like this.

8         THE COURT:  Yeah, I know you've filed it, but I

9    think I have a developed record on this.  We'll see.

10   Actually I now have jurisprudence from my colleagues,

11   which I find very helpful.

12        Is there anything else we should do this morning?

13        MR. SOBOL:  If I may, your Honor?

14        THE COURT:  Go ahead.

15        MR. SOBOL:  Thank you.  I'm getting over getting

16   shot down on that.  I was really looking forward to

17   talking about MDLs and subpoena powers and that kind of

18   thing, but, so --

19        THE COURT:  I know you are, Mr. Sobol.

20        Is there anything else other than that?

21        MR. SOBOL:  Well, two issues, your Honor.

22        One of the witnesses, um -- well, I'm assuming

23   that although we have a phased trial, if there is a

24   witness who takes the stand is a live witness, one of

25   the defendant's former officers or a current employee,

1   for example, the General Counsel of AstraZeneca will be

2   one of the testifying witnesses, the notion is to go

3   through all of the testimony about that witness even

4   though some of that testimony is going to cover issues

5   that are not the Teva deal, because I can't imagine that

6   what we would want to do is have a live witness come to

7   talk about some part of the Teva deal, try to give some

8   context for that Teva deal, have that witness get off

9   the stand and then come back the next week and talk

10  about the Ranbaxy deal.

11          THE COURT:  Yeah, I'm generally okay with that.

12          MR. SOBOL:  Okay.

13          THE COURT:  But I want to know when I've heard

14  everything about the Teva deal.  You see, to me that's

15  the -- it's much less important to the jury, and I want

16  you to marshal your best case, than it is to me.  So

17  you've got to front-load everything about the large and

18  unexplained payment because, as I feel my way in this

19  new area, I adhere to my idea that we'll give the

20  defense their chance to attack that part of the case.

21          MR. SOBOL:  So let me say two things about that,

22  your Honor.  We are doing absolutely everything we

23  possibly can to front-load the Teva reverse payment

24  deal, okay?  The issue that comes up, as I've just

25  flagged, is that to do the Teva deal we have to call

1    some witnesses from, for instance, AstraZeneca.  Well,

2    those witnesses from AstraZeneca address the Teva deal,

3    but also some other aspects of the case.  So I'm

4    assuming I don't just try to carve up their testimony --

5            THE COURT:  That's my assumption as well.

6            MR. SOBOL:  Fair enough.  And that's our working

7    assumption as well, too.

8            Is there something else?  Oh, yeah.

9            I'm also assuming, your Honor, that as to our

10   experts, however, we will carve up our expert testimony.

11   In other words, for instance if Dr. McGuire is going to

12   testify about some Teva issues and some other Ranbaxy

13   issues, that kind of thing, because he's an expert, he's

14   my expert, I carve it up and I only put him on the stand

15   for the first time on the Teva thing, we have the

16   motions --

17           THE COURT:  So long as you alert me to the fact

18   you're going to recall him, that makes sense to me.

19           MR. SOBOL:  And that's an effort to be faithful to

20   your desired --

21           THE COURT:  Yes, and I appreciate it.

22           MR. SOBOL:  Okay.  And then, um -- yeah, just two

23   other points, your Honor.

24           The next is, um, there are some documents that we

25   would like to be able to publish to the jury in an

1    appropriate and professional way, but it's not through a

2    witness.  I mean there's just sort of -- there are some

3    statements and some documents, that kind of thing, that

4    at times end up being voluminous.  I'll give you a

5    particular example.

6         In order to set up the context of the Teva reverse

7    payment we need to educate the jury that some things

8    happened in the lawsuit between AstraZeneca and Teva

9    that led up to the settlement.  So there are a dozen or

10   so pleadings of things that happened in that underlying

11   case that we just want the jury to be able to understand

12   about before we get to the settlement.

13        Now, early on, I thought, well, if I need to have

14   a witness, I would have to drag one of the lawyers in

15   from that case and have them just sort of tell us what

16   happened in the case, but that, it seemed to me, to be

17   frankly a distraction and unnecessary.  What we intend

18   to do -- and the reason I'm bringing this up is we're

19   trying to tell the defendants what we plan to do day to

20   day and it matters in terms of us trying to, in good

21   faith, tell them this.  We want to be able to publish

22   the documents.  And what we would probably do, if

23   something is -- we're going to give the defendants the

24   documents, we're going to highlight for them the

25   passages that will be read to the jury, they can object

1    or not, we'll come to you beforehand about whether or

2    not we're carving it up the wrong way, and then we would

3    have somebody simply read those to the jury.

4          THE COURT:  These are exhibits?

5          MR. SOBOL:  Of course.  Nothing will be read to

6    the jury unless it's an exhibit.

7          THE COURT:  How long is this going to take?

8          MR. SOBOL:  I think we are estimating, for each of

9    the two segments, to be no more than 45 minutes each.

10         THE COURT:  That's going to be deadly dull, but

11   that may be even shorter though than calling a witness.

12         MR. SOBOL:  Right.

13         THE COURT:  It's not something on which I can

14   rule.  It's deadly dull.

15         MR. SOBOL:  Well -- right.  I can't imagine that,

16   in the course of a patent infringement case, your Honor,

17   being deadly dull to the jury.

18         (Laughter.)

19         MR. SOBOL:  But we will try to cut it down to be

20   sure.  Okay.  I hear what the Court said.  Yes.

21         THE COURT:  You know it, it's a document, I would

22   say, "Well, they'll have it in the jury room," but your

23   repost to that is that they need to hear it now because

24   live witnesses are going to say, "In light of that, we

25   did this and the like."

```
 1          MR. SOBOL:  Right.

 2          THE COURT:  Thank you.  It aids my understanding

 3     and we'll have to see how it goes.

 4          MR. SOBOL:  Fair enough.

 5          The final comment, your Honor, is it would be

 6     greatly helpful to us, both in terms of preparation and

 7     trying to provide to the Court and to the defendants our

 8     good faith order of the witnesses, if the defendants can

 9     tell us who the witnesses are that they plan calling in

10     their case so we can make sure that we're not putting

11     together deposition snippets and all the rest of that in

12     our case in chief.  So if there's some appropriate time,

13     maybe at the end of business tomorrow or on sometime on

14     Friday, that would be very helpful.  And so --

15          THE COURT:  I'm hesitant to order it, but it makes

16     sense.

17          Aren't you people going to tell them who you're

18     going to call?

19               MR. BUTSWINKAS:  Judge, we'll let them know by

20     Friday.

21          THE COURT:  That's helpful.

22          MR. SOBOL:  Thank you.

23          THE COURT:  All right.

24          Defense, anything we should do this morning?

25          MR. BUTSWINKAS:  Yes, Judge, I just have one
```

1    question.

2         THE COURT:  Yes.  You used the words earlier

3    "genuine rebuttal," and I just want to get a feel for

4    that because my genuine understanding of rebuttal is

5    evidence that was to respond to something that was

6    essentially unanticipated or surprising that happened in

7    the defense case.

8         THE COURT:  Yes, but that's not this.  But your

9    question is a good one.

10         They have to come up with enough to convince me --

11    because we're never going to get through the whole case,

12    enough to convince me that a reasonable jury could find

13    a large and, the language is, "unjustified payment."

14    All right?  When they're done with everything on the

15    Teva deal, you're going to attack that and we'll see

16    whatever I do.  But that's a directed verdict standard.

17    That I take every bit of it in their favor and make my

18    decision.

19         If they get by that, they get -- they put on the

20    rest of their case and the whole case is attacked on a

21    directed verdict at the end of their presentation.  If

22    they get by that, then you will -- you have cross-

23    examined their witnesses, but also you come up with your

24    affirmative evidence of, um, all the stuff that you want

25    to come up with, but also you come up with all your

1    procompetitive reasons for the settlement.  I have to

2    have enough that this -- that I think a jury could find

3    it was unjustified, but you're not going to sit still

4    for that, you're going to come up with all your

5    procompetitive reasons, and I'm going to let you do

6    that, that would be a significant part of the defense

7    case.

8         They'll cross-examine.  Even though we know that's

9    an issue, I'm going to let them get back on the stand

10    and say that these procompetitive -- with affirmative

11    evidence, not just cross-examination, these

12    procompetitive justifications are either a sham or don't

13    -- have no effect or the like.  That's what I mean by

14    rebuttal in this part of the case.

15         MR. BUTSWINKAS:  And my question is, just with

16    respect to rebuttal evidence, plaintiffs' rebuttal

17    evidence in general, it appears that the plaintiffs have

18    taken a lot of their affirmative experts, who are

19    identified, and they shifted them to rebuttal experts

20    even though they're to respond to issues that have been

21    long in the case.

22         THE COURT:  Well, this is very appropriate to

23    raise.  Your view of rebuttal is accurate save for these

24    procompetitive, um, justifications.  We're not really

25    going to hear the procompetitive justifications until

1    your case.  I'm going to let them attack your

2    procompetitive justifications after you are through.

3           Now, other things like causation, for example --

4    well, causation, bringing the generic to market, I'm not

5    going to have another whole plaintiffs' case downstream

6    after you've rested.

7           Am I answering your question?

8           MR. BUTSWINKAS:  Yes, understood, your Honor.

9    Thank you very much.

10           THE COURT:  All right.

11           You understand where I'm coming from?

12           MR. SOBOL:  I understand you completely, your

13    Honor.  I'm trying to identify for you what was really

14    behind that colloquy.

15           The plaintiffs don't think that we need to prove

16    in our case in chief a patent case as well.  This is not

17    going to be a patent trial.  For us to be able to prove

18    that there was a large and unjustified payment, that

19    there was causation as associated to that, when as and

20    if it delayed generics, in our view we don't have to put

21    on a patent case.

22           The defendants have lots of patent witnesses that

23    they may or may not put on, we don't know, in their

24    defense.  Now, at least in some respects we try to be

25    careful, lawyers, although we weren't very good this

1    week.  We have lots of experts that are patent experts,

2    and about chemistry and about clinical issues, more or

3    less all of that, we don't think is relevant in our

4    case.  If the defendants during their case, for whatever

5    reasons, appropriate or inappropriate or whatever, it

6    doesn't really matter, decide to raise as procompetitive

7    justifications or through some other --

8         THE COURT:  Let me interrupt you only to say that

9    I'm listening to you both and I'm not troubled in the

10   least.

11        MR. SOBOL:  Sure.

12        THE COURT:  I think I've appropriately managed the

13   case because if when you have -- forget rebuttal, if

14   when you have rested, and I'm expressing no opinion on

15   this, that I somehow get it into my mind that you should

16   have proved a patent case, you've run that risk, I

17   direct, you're done, and it goes up on appeal.

18        MR. SOBOL:  Right.

19        THE COURT:  Now, if you get by that and they put

20   on their evidence and we're hearing for the first time

21   what are in effect essentially patent witnesses, we're

22   hearing them for the first time, I'll let you rebut

23   them.  The fact that they're in the case or not is a

24   test of what is the prima facie case here.  That's your

25   risk.  I think something's in the prima facie case, you

```
 1    don't, I get no evidence on it, and the case is lost.

 2    New evidence can be rebutted under the standard rule as

 3    counsel framed it -- framed it appropriately.

 4            MR. SOBOL:  Uh-huh.

 5            THE COURT:  Procompetitive justification can be

 6    rebutted by wholly new evidence that says it's not

 7    procompetitive justification.

 8            MR. SOBOL:  Thank you, your Honor.

 9            THE COURT:  All right.

10            Well, this has been more helpful than I thought.

11    I thank you very much.  I look forward to seeing you

12    Monday morning.  If you should settle the case, a simple

13    phone call to Ms. Gaudet is all that is required.

14    Otherwise 9:00 on Monday morning.  We'll recess.

15            (Ends, 11:15 a.m.)
```

```
 1                 C E R T I F I C A T E

 2

 3

 4         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

 5    do hereby certify that the foregoing record is a true

 6    and accurate transcription of my stenographic notes

 7    before Judge William G. Young, on Wednesday, October 15,

 8     2014, to the best of my skill and ability.

 9

10

11
      /s/ Richard H. Romanow 10-17-14
12    _____
      RICHARD H. ROMANOW Date
13

14

15

16

17

18

19

20

21

22

23

24

25
```