UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re: Nexium (Esomeprazole Magnesium) Antitrust Litigation*<br><br>This Document Relates to: All Actions | MDL No. 2409<br><br>Civil Action No. 1:12-md-02409-WGY |

**PLAINTIFFS' EVIDENTIARY PROFFER AS TO DR. THOMAS G. MCGUIRE**

Plaintiffs respectfully submit this written proffer, pursuant to the provisions of Rule 702 of the Federal Rules of Evidence, as a detailed summary of the substance of Dr. Thomas G. McGuire's testimony as to: (1) AstraZeneca's payments to Ranbaxy; and (2) the implication of those payments on early entry of generic Nexium.[1] Plaintiffs attach and include McGuire's relevant reports in full in this proffer. *See* Exhs. A and B. Plaintiffs contend that the following testimony is admissible and relevant to establish:

- An no-payment expected generic entry date, i.e., a date that would prevail absent defendants' anticompetitive conduct;

- Market power;

- AstraZeneca's "serious doubts about the patent's survival." *FTC v. Actavis*, 570 U.S. ___, 133 S. Ct. 223, 2236-37 (2013).

To the extent this Court finds the proffered testimony inadmissible, plaintiffs detail the substance of Dr. McGuire's testimony as well as its relevance for plaintiffs' claims for preservation purposes. *See* Fed. R. Evid. 103(a)(2); *see also Muskat v. United States*, 554 F.3d 183, 194 (1st Cir. 2009); *Curreri v. Int'l Bhd. of Teamsters*, 722 F.2d 6, 13 (1st Cir. 1983).

---

[1] This Court has repeatedly held Dr. McGuire's expert testimony admissible under Fed. R. Evid. 702. *See*, *e.g.*, January 21, 2014 Hr'g [ECF No. 846] (finding that Dr. McGuire is qualified as an expert); September 25, 2014 Order [ECF No. 1005] (denying Defendants' motion to exclude expert testimony of McGuire); November 13, 2014 Hr'g, Tr. 4:3-5:9 (denying Defendants' motion to strike McGuire's testimony).

**I.    Substance of Dr. McGuire's Testimony as to AstraZeneca's Payments to Ranbaxy and the Implication of those Payments on Early Generic Entry.**

If called to the stand to testify, Dr. Thomas G. McGuire would state the following as per his expert opinions already disclosed to all parties:

1. AstraZeneca's agreements with Ranbaxy and Teva can be treated as a collective, delayed generic entry beyond expected dates of generic entry with litigation or settlements free of reverse payments, and were anticompetitive. Oct. 23, 2013 Opening Report, attached hereto as Exhibit A, at ¶ 3 (hereinafter "Opening Rep.").

2. The reverse payments to Ranbaxy flowing through the no-authorized generic provision exceeded the profits Ranbaxy could have made had it won in litigation and entered with its generic. *Id.*

3. If AstraZeneca and Ranbaxy had resolved the pending patent infringement litigation between them without a reverse payment component to the settlement, then the agreed launch date would have been substantially earlier than May of 2014, *i.e.*, the agreed, anticompetitive launch date selected by AstraZeneca and Ranbaxy in light of the substantial reverse payment made to Ranbaxy to delay its generic launch. *Id.*

4. When AstraZeneca settled the litigation with Ranbaxy, AstraZeneca agreed to not launch an authorized generic until 180 days after Ranbaxy launched a generic product. For a product like Nexium, the different between selling the only generic product and competing against an authorized generic during the exclusivity period can amount to hundreds of millions of dollars. *Id.* at ¶ 19.

5. The 180-day period of protected competition is highly lucrative to generic manufacturers because the generic can set a price less than the corresponding brand price but still well above production cost of the drug. *Id.* at ¶ 30.

6. Significantly, the 180-day period does not prevent the brand company from launching its own "authorized generic," which is essentially the brand company's drug but sold as a "generic" under its chemical name. Brand companies, faced with the certain and quick loss of their brand sales following entry of AB-rated generics, have increasingly launched authorized generics. This allows the brand manufacturer to maintain a portion of its sales revenues and profits that otherwise would have been lost to generic manufacturers once they launch their generic drugs. Authorized generics behave and are treated like other generics – they compete on price with other generics and qualify for automatic substitution at pharmacies like AB-rated generics. The launch of an authorized generic has become the norm for large-selling drugs like Nexium (except where the brand and generic companies have, as they did in this case, entered into an agreement that the brand will not launch its own authorized generic). In this matter, AstraZeneca

entered into such an agreement with Ranbaxy agreeing not to launch an authorized generic until after Ranbaxy's 180-day exclusivity period. *Id.* at ¶ 31.

7. Each extra year of exclusivity for Nexium generated brand sales of billions of dollars for AstraZeneca. For example, in 2012, its product sales were over $6.9 billion dollars generating product profits of almost $1.5 billion. *Id.* at ¶ 40.

8. Generic profits during the protected 180-day period are significant. The Generic Pharmaceutical Association, a trade association of generic drug companies, claims that "[t]he vast majority of potential profits for a generic drug manufacturer materialize during the 180-day exclusivity period." Ranbaxy's own forecasts confirm this for Nexium. *Id.* at ¶ 54.

9. Courts have determined, however, that a brand is permitted to market an authorized generic during the exclusivity period based on its already-approved NDA. The presence of an authorized generic means (a) that the ANDA first-filer's sales will roughly be cut in half during the 180-day period; and (b) that generic prices during the 180-day period will likely be lower than they otherwise would be without the authorized generic. Introduction of an authorized generic has become the norm of large-selling drugs subject to ¶ IV generic competition. During the 2003-08 period studied by the FTC, 19 out of 24 (almost 80%) manufacturers of the largest selling drugs whose first competition was with a generic with a 180-day exclusivity period introduced an authorized generic. The rate of authorized generic launch would have been higher had it not been for patent settlements that contain "no-authorized generic" clauses. *Id.* at ¶ 55.

10. Brand companies can compete by marketing an authorized generic head-to-head with the generic, but some brand companies (as occurred here) use the threat of such competition as a way to delay generic competition from starting. According to data reported to the FTC for fiscal years 2004-2010, of the 157 ¶ IV settlements with first-filers, 39 included a no-authorized generic provision in exchange for deferred entry by the first filer. These no-authorized generic provisions affected large-selling drugs and many billions of dollars of health care expenditures. *Id.* at ¶ 57.

11. The FTC confirmed that no-authorized generic provisions had become a way for the brand to pay a Generic in a ¶ IV settlement to delay the start of generic competition: "There is strong evidence that agreements not to compete with an authorized generic have become a way for brand-name companies to compensate generic competitors for delaying entry. These agreements can be part of 'pay-for-delay' patent settlements, which have long concerned the Commission. A review of recent brand-generic settlements reveals that agreements not to compete with ANDA-generics through an authorized generic have become a recognized mode for a brand to provide compensation to generics and, therefore, can be used as exclusion payments in patent settlement agreements. A promise not to launch an authorized generic could be an attractive and convenient way to transfer the value of this revenue impact from the brand to the first-filer; negotiations over terms

        may be particularly easy because the cost to the brand and the benefit to the generic are proportional to the size of the market and estimable by both." *Id.* at ¶ 57.

12.     The pay-for-delay/no-authorized generic patent settlement thus has a sinister symmetry: the delayed-entry clause transforms a duopoly for the molecule into a monopoly for the brand, while the no-authorized generic clause transforms a duopoly in generics during the 180-day exclusivity period into a monopoly for the generic. AstraZeneca and Ranbaxy are allocating the market in time with symmetric no-compete clauses to increase their joint profits. *Id.* at ¶ 60.

13.     The monetary value of payment with a no-authorized generic provision can be readily determined. Generics (with and without authorized generics) have competed with brands for many years and, as the FTC notes, there is considerable common understanding among large and generic drug companies about what to expect. *Id.* at ¶¶ 61-62.

14.     On April 14, 2008, six agreements were executed:

    (a)     Settlement agreement. In this agreement, Ranbaxy acknowledged all of AstraZeneca's Nexium patents as valid and AstraZeneca granted Ranbaxy a license to market generic Nexium on May 27, 2014, or upon entry by another third party. As AstraZeneca stated, "the practical effect of the exclusive license is to prevent AstraZeneca from launching, or licensing another person to launch, an authorized generic for the duration of Ranbaxy's Hatch-Waxman exclusivity period.

    (b)     Distribution agreement (Prilosec 40 mg Authorized Generic). In this agreement, AstraZeneca gave Ranbaxy the right to distribute an authorized generic version of Prilosec 40 mg in the United States. The time period was set for six months, beginning on the date a generic first went to market, with options for two additional six-month terms. After paying AstraZeneca a base purchase price and a deferred purchase price, Ranbaxy kept the remaining sales revenue.

    (c)     Bailment agreement (omeprazole). In this agreement, Ranbaxy agreed to allow AstraZeneca to ship and store 40 mg Prilosec in Ranbaxy's warehouses.

    (d)     Distribution agreement (Plendil authorized generic). In this agreement, AstraZeneca gave Ranbaxy the right to distribute an authorized generic version of Plendil in the United States. The deal started immediately and lasted until June 30, 2011. After paying AstraZeneca a base purchase price and a deferred purchase price, Ranbaxy kept the remaining sales revenue.

    (e)     Supply agreement (esomeprazole magnesium API). In this agreement, AstraZeneca agreed to purchase, and Ranbaxy agreed to supply, enough of

     the active ingredient in Nexium (esomeprazole magnesium) to make 50% of AstraZeneca's finished product. Ranbaxy agreed to begin supplying AstraZeneca once the technology transfer was complete until May 27, 2014 – terms for the technology transfer were agreed upon on June 4, 2008.

  (f) Tolling agreement (40 mg Nexium capsules). In this agreement, Ranbaxy agreed to formulate enough of AstraZeneca's ready-for-sale 40 mg Nexium product to package 33% of the amount needed for sales in the United States. Ranbaxy agreed to begin supplying AstraZeneca once the technology transfer was complete until May 27, 2014. *Id.* at ¶ 70.

15. The size of the reverse payment can also be used to draw inferences from the behavior of the generic, which accepts the payment in exchange for giving up the possibility of entry at the close of litigation. The reverse payment to Ranbaxy flowing through the no-authorized generic provision alone (not counting the peripheral provisions) exceeds the profits Ranbaxy could have made had they won in litigation and entered with their generic. *Id.* at ¶ 108.

16. The source of concerns about anticompetitive effects is the exchange of no-compete clauses: Ranbaxy agrees to delay competing with its generic in exchange for AstraZeneca agreeing not to launch an authorized generic. By precluding early entry by Ranbaxy, the settlement maintains the high profit flow from the monopoly sales of branded Nexium. This will be a number in the billions of dollars. At the negotiated date of generic entry, May 27, 2014, the flow of profits to AstraZeneca will drop, very rapidly if it does not enter with its own authorized generic, and somewhat less rapidly if it decides to share in the profits from the 180-day exclusivity period with an authorized generic. This will be a number in the hundreds of millions of dollars. *Id.* at ¶¶ 122, 124-125.

17. During the year prior to settling with Ranbaxy (2007), AstraZeneca made gross margin on Nexium of $2.4 billion. Extending the time of monopoly sales was obviously highly lucrative for AstraZeneca. According to an AstraZeneca model from April 2008, without generic entry, AstraZeneca forecasted that it would make profits, measured by gross margin less brand expenses, of approximately $1.0 billion in the second half of 2008, $1.7 billion in 2009, $1.3 billion in 2010, and $1.0 billion in 2011, for a total contribution to profit of $5 billion without a generic over these three and a half years. If we assume profits continue at $1 billion per year for 2012, 2013 and half of 2014 (before the generic does finally enter), AstraZeneca would make roughly $7.5 billion over the period from mid-2008 through mid-2014. *Id.* at ¶ 126.

18. In reality, AstraZeneca's Nexium profits exceeded these forecasts by a significant margin. For example, in 2010 contribution to profit was $1.8 billion, and in 2011, $1.5 billion, $0.5 billion above forecasts for both years. *Id.* at ¶ 127.

5

19. As a rough approximation, AstraZeneca can thus be conservatively regarded as making an additional $1 billion per year in profit for each year of delay achieved in the agreement.  *Id.* at ¶ 128.

20. The "Nexium Plan B – Working Session" of April 8, 2008, analyzed how much AstraZeneca could make by launching an authorized generic.  The analysis assumed generic entry occurred in August 2008 and AstraZeneca began marketing its authorized generic immediately upon confirmation of generic entry.  The "Plan B" working session forecast that an authorized generic would generate between $452 and $834 million in net sales for AstraZeneca during its first 17 months.  The authorized generic allows AstraZeneca to share in the profits of the generic seller during the 180-day exclusivity period and beyond.  *Id.* at ¶ 131.

21. AstraZeneca had undertaken preparations for the potential launch of an authorized generic version of Nexium by July 2008, and AstraZeneca had frequently entered with an authorized generic for its other products, namely, Toprol XL, Prilosec, Plendil, Pulmicort Respules, Accolate and Entocort.  *Id.* at ¶ 136.  The most important reason to believe that AstraZeneca would have launched an authorized generic in the absence of the no-compete clause in the settlement is simply that it was in their business interest to do so.  *Id.* at ¶ 137.

22. The large size of the reverse payment is robust to alternative assumptions, for example, that Nexium sales are 10% lower pre-generic entry; that the price of the authorized generic is 10% lower; and that the generic erosion is 10% lower.  Under each of these assumptions the profitability for AstraZeneca would be lowered from $788 million to $702-710 million.  *Id.* at ¶¶139-41.

23. Managerial risk aversion cannot account for the size of the reverse payment.  *Id.* at ¶¶ 142-157.

24. The exchange of delay for no-authorized generic benefited Ranbaxy in three ways.  First, it gave Ranbaxy the certainty of being able to use its 180-dau exclusivity period, compared to bearing some risk (even if negligible) of losing the patent suit.  Second, it saved Ranbaxy the direct costs of litigation.  Third, and most importantly, by promising not to compete with an authorized generic, AstraZeneca both (1) ceded profits to Ranbaxy during the 180-day exclusivity period; and (2) enabled Ranbaxy to charge significantly higher prices for generic Nexium during the 180-day period than it otherwise could have charged.  *Id.* at ¶ 158.

25. The additional profits from the no-authorized generic provision (how much the later-entry exceeds the early-entry) are on the order of $750 million according to Ranbaxy financial estimates.  *Id.* at ¶ 159.

26. The higher likelihood of being able to sue the 180-days is a significant benefit to a generic in ¶ IV settlements.  The dollar value of this higher likelihood can be regarded as part of the pay for delay the generic gets from the brand.  *Id.* at ¶ 161.  The dollar value can be quantified as the probability AstraZeneca would win in

6

litigation times the profits Ranbaxy would make in the 180 days. This is the expected additional profits Ranbaxy gains from eliminating the risk of losing in litigation. In one financial model, Ranbaxy estimates gross margins against an authorized generic during the 180-day exclusivity period alone to be approximately $255 million. If, for example, the likelihood AstraZeneca wins in litigation is 5%, this small risk to Ranbaxy is eliminated by the settlement. The value of this risk reduction to Ranbaxy in the use of the 180 days is 5% * $255 million = $13 million. *Id.* at ¶ 162. Savings in future litigation costs to Ranbaxy at the time of the settlement would have been on the order of a few million dollars. *Id.* at ¶ 163.

27. The "pay" Ranbaxy gains from agreeing to delay is the difference, $767 million, doubling its profits from generic Nexium. *Id.* at ¶¶ 164-167.

28. Under the agreement, Ranbaxy makes much more by settling than it does had it won in litigation. Discounting the profit stream beginning in 2014 to 2008 reduces the present value of the profits with settlement. Discounting the $1,535 million for an average of six years (2014-2008) at the 3.25% prime rate over this period reduces the value to $1,267 million. The value of the settlement taking account of the costs of delay would overall then be $1,267 million-$768 million = $499 million. *Id.* at ¶¶ 164-167.

29. The net financial value of the agreement to Ranbaxy, before considering the peripheral provisions, was at least $499 million, the present value of extra profits conferred by the settlement. The discounting exercise is one way to quantify the "loss" to Ranbaxy associated with the delay in receipt of profit flow. The peripheral provisions provide an immediate cash flow to Ranbaxy. *Id.* at ¶ 168. In sum, the series of peripheral agreements conferred between $37.6 and $57.5 million in profits to Ranbaxy during the time Ranbaxy was delaying its launch of generic Nexium. This estimate is conservative in that there is no value assigned to technology transfer. This amount should be added into the reverse payment assigned to AstraZeneca. *Id.* at ¶¶ 169-177.

30. The evidence is conclusive that the AstraZeneca-Ranbaxy settlement is anticompetitive. Economic analysis of the terms of the settlement clearly imply that the settlement implemented a delay in generic entry beyond what could have been expected if the parties had continued with litigation. *Id.* at ¶ 178.

31. AstraZeneca is conservatively estimated to have expected to pay $600 million in the form of lost profits due to the authorized generic no-compete clause, and another $37.6 to $57.5 million in the form of profits transferred to Ranbaxy in the peripheral agreements for a total reverse payment from AstraZeneca of $638 to $658 million. This sum vastly exceeds expected litigation costs which would have been on the order of $2.5-5 million at the time of settlement. AstraZeneca was willing to make a payment of this magnitude because it is buying more exclusivity and profits than it expected in the competitive (litigation) outcome. An exclusivity period longer than the competitive outcome makes the agreement anticompetitive.

*Id.* at ¶ 179. Ranbaxy is expected to make with the settlement at least $499 million above what it could have made had it won in litigation, and approximately $37.6 to $57.5 million in profits from the peripheral agreements, summing to a massive reverse payment of $537 to $557 million to Ranbaxy. This also vastly exceeds Ranbaxy's expected future litigation costs which would have been in the range of $2.5-$5 million. No reverse payment at all is necessary to settle in a competitive agreement. Only when the patent is very weak and the delay is very long would Ranbaxy require such a massive financial transfer to agree to the delay in entry. *Id.* at ¶ 180.

32. Financial markets responded with alacrity to the announcement of a settlement extending AstraZeneca's monopoly. Based on investors' expectations of the total additional profits to AstraZeneca flowing from the settlement and AstraZeneca's own forecasts of the profits they were making in each extra day of exclusivity, how many extra days of exclusivity AstraZeneca bought with the settlement can be estimated. Oct. 8, 2014 McGuire Rebuttal Report (hereinafter, "Rebuttal Rep."), attached hereto as Exhibit B, at ¶ 21.

33. It is reasonable to extrapolate from investors' favorable evaluation of the original transaction between AstraZeneca and Ranbaxy, which included the alleged reverse payments, to a similar settlement that contained no such payments but that instead adjusted the generic entry date to match investors' expectations. The market would have been neutral (and would not have responded in terms of elevated volume or price) to an AstraZeneca-Ranbaxy competitive settlement with an agreed date of generic entry of in or around January 2011. Because the efficient market constitutes a rational actor with a financial stake in the transaction, applying the well-accepted tool of the efficient markets hypotheses to the undisputed facts of market reaction to the settlements here, management of AstraZeneca and Ranbaxy, with a reasonable degree of certainty based on the area of applied microeconomics, and acting as rational business decision-makers seeking to maximize profits but having to do so without making the unlawful reverse payments from AstraZeneca to Ranbaxy, would have agreed to a date for generic entry of in or around January 2011. *Id.* at ¶ 4.

34. The expected date of generic entry is a weighted average of the dates associated with a generic win in litigation and a brand win in litigation, the weights determined by the probability the generic wins the patent litigation. *Id.* at ¶ 5.

35. There are observable indicators of the expected date. Basic economic principles of the efficient market tell us that from observed movements in the market capitalization of AstraZeneca at the time of the announcement of the settlement with Ranbaxy we may infer investors' changed expectations about additional profits that would flow to AstraZeneca due to the settlement. These additional previously unexpected profits can be used to estimate how much more time AstraZeneca would sell as a monopolist with the agreement now in place as compared to the expected time with litigation. This analysis yields an estimate of

the latest date of the "expected dated of generic entry" of January 17, 2011. *Id.* at ¶ 6.

36. The key facts are the following. Announcement of the AstraZeneca settlement on April 15, 2008 constituted "news" to investors, as indicated by a sharply elevated trading volume on a day when the overall stock-market trading volume was flat in comparison to days before and after the announcement. Industry news services contained no other announcements that might account for a favorable bump in AstraZeneca share price. This elevated trading volume was associated with an increase of approximately $3 billion of value to AstraZeneca market capitalization on the single day the settlement was announced. *Id.* at ¶ 7.

37. Independent financial analysts writing at the time of the announcement commented that the increase in AstraZeneca's stock price occurred because the "imminent threat of generics" had been removed, which increases the expected time period of monopoly profits. Financial news services also highlighted the reverse-payment features, which analysts referred to as "concessions to Ranbaxy." Summing up, one release stated, Ranbaxy expected "revenue of between $1.25 billion and $1.5 billion to accrue from the deals assigned with AstraZeneca" as part of the patent settlement agreement. Most of this revenue came from AstraZeneca's pledge not to launch an authorized generic to compete with a Ranbaxy during the 180-day exclusivity period. *Id.* at ¶ 8.

38. The change in security prices for AstraZeneca amounted to $2.96 billion in additional value. The cause of this increase, given its timing, can be attributed to the extension of the expected time that AstraZeneca could sell Nexium as a monopolist. *Id.* at ¶ 11.

39. In 2008, AstraZeneca forecasted that it would make gross margins of $1.119 billion per year on Nexium. AstraZeneca would make some sales of Nexium even after loss of exclusivity. One forecast estimated that AstraZeneca would make $0.067 billion per year from brand Nexium sales post-generic entry. Thus, the additional profit per year associated with exclusivity was $1,052 billion. The extra time that would account for the $3.534 billion in value can be found by solving for the variable T in the following equation (where dollars are expressed in billions): $T * \$1.052 = \$3.534$, or, $T = 3.4$ years or 1,226 days. The elevation in market capitalization of almost $3 billion at the announcement of the AstraZeneca-Ranbaxy agreement containing a major payment to Ranbaxy implies that investors' expected date of generic entry was May 27, 2014 less 1,226 days, i.e., January 17, 2011. *Id.* at ¶¶ 13-14.

40. There are reasons on or about January 17, 2011 can be regarded as the latest, most conservative date defining a settlement date that is not anticompetitive. Investors might have anticipated some possibility that AstraZeneca would have settled with Ranbaxy with a "pay-for-delay" agreement. This possibility would then have been capitalized in the value of the stock prior to the announcement date. With this possibility, investors would have "expected" an entry date later than the

competitive standard if the market took account of the possibility that AstraZeneca might be able to achieve an extension through an anticompetitive agreement with Ranbaxy.  In this case, May 27, 2014 less 1,226 days (i.e., January 17, 2011) is the latest and most conservative estimate of the date of entry that is not anticompetitive.  *Id.* at ¶ 15.

41. In considering a settlement date of January 17, 2011, two forms of "discounting" play into Ranbaxy's decision: the time value of money and the discount associated with uncertainty.  If Ranbaxy settles for an entry date after the close of litigation, there is a delay in making profits.  But the profit payoff with litigation must be discounted by the likelihood that Ranbaxy loses the patent litigation.  As long as the discounting due to delay is less than the discounting from the risk of loss, Ranbaxy prefers settlement.  While Ranbaxy would be better off in comparison to litigation taking a settlement with an entry date in January 2011 without any form of reverse payment, such an agreement would not match the extra profits conferred on Ranbaxy from the original agreement with the no-AG clause and later entry. Ranbaxy's stock jumped upon the announcement of a settlement, at a higher percentage rate than AstraZeneca.  *Id.* at ¶¶ 18-20.

42. Using the market's expectations as a proxy for reasonable management decisions, I conclude that a rational actor in the position of AstraZeneca would have agreed to a no-reverse payment settlement with a generic entry date of in or around January 2011 (i.e., that date that may be imputed to be the date reasonably expected by a sophisticated, efficient market) – such an agreement would yield the same expected profits as with litigation. Ranbaxy would also agree to that entry date without needing a payment from AstraZeneca; to Ranbaxy, the value of the certainty of being able to use the 180-day exclusivity period outweighs the delay from entering at the close of litigation.  *Id.* at ¶ 22.

43. On April 15, 2008, investors bid up the stock of Ranbaxy by $356 million and of AstraZeneca by almost $3 billion, in anticipation of the additional profits they each would get as the result of the settlement with reverse payments. From where did these new profits derive? The only valid explanation for the billions of dollars in extra expected profits is that they would come from higher prices paid by consumers, and that these higher prices had not been expected by the market. The April 15, 2008 agreement was not a procompetitive compromise to settle a patent dispute, it was collusion and it resulted in billions of dollars of harm to consumers and other drug purchasers.

Dated:  November 20, 2014

                                       ***/s/ Thomas M. Sobol***
                                       Thomas M. Sobol, BBO No. 471770
                                       David S. Nalven, BBO No. 547220
                                       Donna M. Evans, BBO No. 554613
                                       Kristen A. Johnson, BBO No. 667261
                                       HAGENS BERMAN SOBOL SHAPIRO LLP
                                       55 Cambridge Parkway, Suite 301
                                       Cambridge, MA 02142
                                       Tel:  (617) 482-3700
                                       Fax:  (617) 482-3003
                                       tom@hbsslaw.com
                                       davidn@hbsslaw.com
                                       donnae@hbsslaw.com
                                       kristenp@hbsslaw.com

                                       *Liaison Counsel and Co-lead Counsel for the Direct Purchaser Class*

                                       David F. Sorensen
                                       Ellen Noteware
                                       Daniel Simons
                                       Caitlin Coslett
                                       Nicholas Urban
                                       BERGER & MONTAGUE, P.C.
                                       1622 Locust Street
                                       Philadelphia, PA 19103
                                       Tel:  (215) 875-3000
                                       Fax:  (215) 875-4604
                                       dsorensen@bm.net
                                       dsimons@bm.net
                                       ccoslett@bm.net

Bruce E. Gerstein
Joseph Opper
Elena Chan
Ephraim R. Gerstein
GARWIN GERSTEIN & FISHER LLP
88 Pine Street, 10th Floor
New York, NY 10005
Tel:  (212) 398-0055
Fax:  (212) 764-6620
bgerstein@garwingerstein.com
jopper@garwingerstein.com
echan@garwingerstein.com
egerstein@garwingerstein.com

*Co-lead Counsel for the Direct Purchaser Class*

Glen DeValerio (BBO #122010)
BERMAN DeVALERIO
One Liberty Square
Boston, MA  02109
Tel: (617) 542-8300

Fax: (617) 542-1194
gdevalerio@bermandevalerio.com

Todd A. Seaver (BBO #645874)
BERMAN DeVALERIO
One California Street, Suite 900 San Francisco, CA  94111
Tel:  (415) 433-3200
Fax:  (415) 433-6382
tseaver@bermandevalerio.com

*Liaison Counsel for the End-Payor Class*

Steve D. Shadowen
HILLIARD & SHADOWEN LLC
39 West Main Street
Mechanicsburg, PA 17055
Tel: (855) 344-3298
steve@hilliardshadowenlaw.com

Anne Fornecker
Daniel Gonzales
HILLIARD & SHADOWEN LLC
919 Congress Ave., Suite 1325
Austin, TX 78701
Tel: (512) 851-8990
anne@hilliardshadowenlaw.com
daniel@hilliardshadowenlaw.com

Kenneth A. Wexler
Bethany R. Turke
Justin N. Boley
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL  60603
Tel: (312) 346-2222
Fax: (312) 346-0022
kaw@wexlerwallace.com
brt@wexlerwallace.com
jnb@wexlerwallace.com

J. Douglas Richards
George Farah
Sharon K. Robertson
Hiba Hafiz
COHEN MILSTEIN SELLERS & TOLL, PLLC
88 Pine Street, 14th Floor
New York, New York 10005
Tel: (212) 838-7797
Fax: (212) 838-7745
drichards@cohenmilstein.com
srobertson@cohenmilstein.com

Jayne A. Goldstein
POMERANTZ LLP
1792 Bell Tower Lane
Suite 203
Weston, FL 33326
Tel: 954-315-3454
Fax: 954-315-3455
jagoldstein@pomlaw.com

*Co-Lead Counsel for the End-Payor Class*

Scott E. Perwin
Lauren C. Ravkind
Anna T. Neill
KENNY NACHWALTER P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, FL 33131
Tel: 305-373-1000
Fax: 305-372-1861

*Counsel for Walgreen Plaintiffs*

Barry L. Refsin
HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA. 19103
Tel: 215-568-6200

Monica L. Rebuck
HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
4400 Deer Path Road, Suite 200
Harrisburg, PA 17110
Tel.: 717-364-1007

*Counsel for Rite Aid Plaintiffs*

Bernard D. Marcus
Moira Cain-Mannix
Brian C. Hill
Erin Gibson Allen
MARCUS & SHAPIRA LLP
One Oxford Centre, 35th Floor
Pittsburgh, PA 15219
Tel.: 412-338-3344

*Counsel for Giant Eagle, Inc.*

```
```

**CERTIFICATE OF SERVICE**

I, Thomas M. Sobol, hereby certify that I caused a copy of the foregoing to be filed electronically via the Court's electronic filing system. Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's electronic filing system.

Dated: November 20, 2014

*/s/ Thomas M. Sobol*
Thomas M. Sobol