```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3                                    No. 12-md-02409-WGY
                                     Volume 2, Pages 89-167
 4

 5

 6  In Re:  NEXIUM (ESOMEPRAZOLE)
            ANTITRUST LITIGATION
 7

 8

 9                         ********

10

11                    For Jury Trial Before:
                      Judge William G. Young
12

13

14                    United States District Court
                      District of Massachusetts (Boston)
15                    One Courthouse Way
                      Boston, Massachusetts 02210
16                    Tuesday, November 4, 2014

17

18

19                         ********

20

21

22

23          REPORTER: CHERYL B. PALANCHIAN, RMR, CRR
                      Official Court Reporter
24               United States District Court
                 One Courthouse Way, Room 5510
25                    Boston, MA 02210
```

```
 1                      A P P E A R A N C E S

 2        THOMAS M. SOBOL, ESQ.
          KRISTEN JOHNSON PARKER, ESQ.
 3          Hagens Berman Sobol Shapiro, LLP
            55 Cambridge Parkway, Suite 301
 4          Cambridge, MA 02142
            Email: Tom@hbsslaw.com
 5     and
          STEVE D. SHADOWEN, ESQ.
 6          Hilliard & Shadowen, LLC
            39 West Main Street
 7          Mechanicsburg, PA 17055
       and
 8        RICHARD ARNOLD, ESQ.
            Kenny Nachwalter, P.A.
 9          201 South Biscayne Boulevard, Suite 1100
            Miami, Florida 33131
10          For plaintiffs

11        LAURENCE A. SCHOEN, ESQ.
            Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
12          One Financial Center.
            Boston, MA 02111
13          Email: Lschoen@mintz.com
        and
14        KAREN N. WALKER, ESQ.
          KEVIN VAN WART, ESQ.
15          Kirkland & Ellis, LLP
            655 Fifteenth Street, N.W., Suite 1200
16          Washington, DC 20005
            Email: Kwalker@kirkland.com
17          For Teva defendants

18        JOHN E. SCHMIDTLEIN, ESQ.
          PAUL B. GAFFNEY, ESQ.
19        DANE H. BUTSWINKAS, ESQ.
            Williams & Connolly, LLP
20          725 Twelfth Street, N.W.
            Washington, DC 20005
21          Email: Jschmidtlein@wc.com
            For AstraZeneca defendants
22
          JAMES D. BALDRIDGE, ESQ.
23        DANIELLE R. FOLEY, ESQ.
            Venable, LLP
24          575 7th Street, N.W.
            Washington, DC 20004
25          Email: Jdbaldridge@venable.com
            For Ranbaxy defendants
```

1                           **I N D E X**

2      **WITNESS:**              **DIRECT  CROSS   REDIRECT    RECROSS**

3      TIMOTHY HESTER, cont'd.

4        By Mr. Sobol      92

5        By Mr. Butswinkas            133

6

7          **EXHIBITS**                          **PAGE**

8           98   . . . . . . . . . . . . . . 96

9           99   . . . . . . . . . . . . . .119

10          100  . . . . . . . . . . . . . .132

11          101  . . . . . . . . . . . . . .152

12          102  . . . . . . . . . . . . . .165

13

14

15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2              (Whereupon the jury entered the courtroom at

3     11:19 a.m.)

4              THE CLERK:  Court is back in session.  You may be

5     seated.

6              THE COURT:  Go ahead, Mr. Sobol.

7              MR. SOBOL:  Thank you, your Honor.

8                   TIMOTHY HESTER, (Resumed)

9                   DIRECT EXAMINATION, (Cont'd.)

10    BY MR. SOBOL:

11         Q.   Mr. Hester, I believe that we were talking about

12    certain events in April of 2008.  Isn't it your recollection

13    that once the Ranbaxy agreements were executed in the middle

14    of April of 2008 that there was some effort to shortly

15    thereafter, by AstraZeneca, settle with Teva?

16         A.   I don't -- I don't remember it that way.

17         Q.   Okay.  So you don't have any knowledge about a

18    meeting that occurred on May 1st, 2008?  I think I went

19    through that earlier this morning.

20         A.   Yeah.  With Teva?

21         Q.   Yes, sir.

22         A.   No.  I don't remember that.

23         Q.   Okay.  You do have a recollection, however, that

24    by July 2009, it's your testimony that there was an

25    agreement in principle between AstraZeneca and Teva to

1    settle the Nexium case; correct?

2         A.   That's right.

3         Q.   And that it wasn't until late August that there

4    was a separate discussion, in your view, regarding Prilosec;

5    correct?

6         A.   Right.  By late August the parties had come up

7    with a compromise number to settle the Prilosec litigation,

8    and that was separate from this earlier discussion they'd

9    had over the Nexium settlement.

10        Q.   All right.  And that occurred in the middle or

11   late August of 2009; correct?

12        A.   It might -- I mean, it's a while back, but my

13   understanding or recollection is it was toward the end of

14   August.

15        Q.   Right.

16        A.   There were discussions over the compromise

17   settlement number for the Prilosec litigation.

18        Q.   And so it's your testimony that the Nexium and

19   Prilosec settlements were not joined earlier before that

20   period of time?

21        A.   That's right.  And they weren't joined even then.

22   The parties, my understanding was the parties were willing

23   to settle each of them separately, but it made sense to look

24   at whether they could settle them together.  Because there

25   were these two disputes, made sense to look at settling two

1    disputes.

2         Q.   Well, in fact, sir, isn't it true that earlier

3    that there were discussions regarding Prilosec in that the

4    Nexium and Prilosec agreements were being drafted?

5         A.   Well, the Prilosec, the idea of that possible

6    settlement of Prilosec had been raised earlier.  My point

7    was that the parties hadn't come up with a compromise number

8    until the later part of August.

9         Q.   Your law firm provided a privilege log in this

10   case; correct?

11        A.   Right.  I mean, I think we submitted one, yes.

12        Q.   Right.  And it was done under your supervision

13   because you were the lead lawyer from your law firm;

14   correct?

15        A.   Yes.

16        Q.   Right.

17             MR. SOBOL:  Can I have GBM?

18        Q.   I put before you GBM.

19             Does that appear to be an excerpt from the

20   privilege log that your office provided in this litigation

21   on or about April 5, 2013?

22        A.   I'm really not sure.  I mean, I don't think I've

23   seen this before but -- so I really don't know what it is.

24   But I know what privilege logs are, sure.

25        Q.   Right.  And do you know, is there a person who

```
 1    works at your firm called, I think it's Gimblett or
 2    something like that?
 3         A.    Jonathan Gimblett, yes.
 4         Q.    He was one of the lawyers working under your
 5    supervision in this case; correct?
 6         A.    Yes.
 7         Q.    And don't you recall that he sent to us privilege
 8    logs regarding -- that were logging information that was not
 9    being provided because it was claimed to be attorney-client
10    privileged in this case; correct?
11         A.    I really don't know that.  I wouldn't be
12    surprised, but I don't know that.
13              MR. SOBOL:  I offer GBM, your Honor.
14              THE COURT:  No objection?
15              MR. BUTSWINKAS:  Objection.  Relevance.
16              THE COURT:  May I see it?
17              THE WITNESS:  Yes, your Honor.
18              (Handing.)
19              MR. BUTSWINKAS:  It's also hearsay, your Honor.
20              THE COURT:  Come to the sidebar.
21    SIDEBAR CONFERENCE, AS FOLLOWS:
22              THE COURT:  Well, there's something to his
23    relevance objection, only because there's so much of this
24    stuff.  Now, somewhere in here, because I recall what you've
25    been doing, it says agreements, plural, and nothing is
```

1   pulled out.  Do you need all of it?

2              MR. SOBOL:  Just the first two pages, your Honor.

3              THE COURT:  All right.  So now we're down to the

4   first two pages.  And if I admit anything, it will be the

5   first two pages.

6              So as to the hearsay objection, this is your

7   authorized agent speaking in a lawsuit.  It's not only an

8   admission, it sounds like a judicial admission.  It's not

9   hearsay, it's an admission.  Overruled.

10             (Whereupon the sidebar conference concluded.)

11             THE COURT:  The first two pages of GBM will be

12  admitted as Exhibit 98.  And I excluded the rest of it

13  simply because they don't have anything to do with anything.

14  They're not hiding anything.  First two pages are admitted,

15  Exhibit 98.

16             (Exhibit 98 received in evidence.)

17  BY MR. SOBOL:

18      Q.   So if you go to the first page of this exhibit,

19  Mr. Hester, there are three entries at the bottom that are

20  dated July 30th, 2009.  Do you see that?

21      A.   Yes, I do.

22      Q.   Okay.  And the custodian column, which is oriented

23  far left, says that these came from your files; correct?

24      A.   Yes.  I think that's probably right.

25      Q.   And the date of these entries is July 30th, 2009;

1    correct?

2        A.    Right.

3        Q.    And the first entry says, "Draft agreement

4    prepared by counsel in connection with the negotiation of

5    settlement of Prilosec patent litigation with Teva."

6        Do you see that?

7        A.    Right.  I see that.  At that time we hadn't

8    figured out whether the parties could come up with a

9    compromise number, but I did work on a draft.

10       Q.    Right.  And so you were planning for the Prilosec

11   settlement to occur at that period of time; correct?

12       A.    No.  We didn't know if the Prilosec case would

13   settle.  They had to negotiate a number first and we didn't

14   know if they could.

15       Q.    Sir, you were drafting the agreement on July 30th,

16   2009; correct?

17       A.    I did -- I did a draft of the agreement, but you

18   asked me if we were planning a settlement.  We didn't know.

19   It depended on whether the parties could negotiate a

20   compromise of the damages number in the Prilosec case.

21       Q.    Drop two items down from there, the bottom entry

22   on this page.

23       A.    Yes.

24       Q.    July 30th, 2009, "Draft agreement prepared by

25   counsel in connection with the negotiation of settlement of

1    Nexium patent litigation with Teva."

2            Did I read that correctly?

3        A.   Yes, you did.

4        Q.   So it's fair to say on the same day, July 30th,

5    2009, you were drafting both a Nexium settlement agreement

6    and a Teva -- excuse me, a Prilosec settlement agreement;

7    correct?

8        A.   Right.  And my point was that we had already

9    agreed tentatively on what the entry date would be on the

10   Nexium patent litigation and we did not yet have any number

11   that the parties had negotiated on Prilosec.  That's the

12   only point I was making.

13       Q.   But you knew enough to start drafting the

14   agreement in July of 2009 -- correct? -- for Prilosec?

15       A.   We knew the parties were thinking about the

16   possible settlement of both.  Both of these disputes were

17   ready to be settled.  So they were looking at both.

18       Q.   And wasn't it basically a preordained conclusion,

19   by the way, that both Mr. Pott and Mr. Egosi were going to

20   be able to agree on some number later that month?

21       A.   No, it was not preordained at all.  We did not

22   know.  They had a separate set of negotiations in late

23   August on what the number would be.  We did not know what we

24   did not know.

25       Q.   It was preordained enough that you start drafting

1    the agreement, however; right, sir?

2        A.   We knew there was a possibility they would settle,

3    but it depended on whether they could come up with a number.

4    This was a dispute that had been going on for years and they

5    were trying to figure out if they could settle it.  It's

6    pretty standard that you try to settle cases like this if

7    you can.

8        Q.   Were you at any of the discussions that Mr. Pott

9    and Mr. Egosi had over in England in the summer of 2009?

10       A.   No, I was not.

11            MR. SOBOL:  Well, can we come to the sidebar, your

12   Honor?

13            THE COURT:  We may.

14   SIDEBAR CONFERENCE, AS FOLLOWS:

15            MR. SOBOL:  I think we have a little sword and

16   shield here, your Honor.  Obviously the witness is telling

17   us that there's no agreement on the Prilosec number, but he

18   knows that there's agreement on the entry date on Nexium,

19   and the source for that information is Mr. Pott.

20            THE COURT:  And so?

21            MR. SOBOL:  And, accordingly, I am seeking a

22   ruling that there's some sword-shield going on here and the

23   defendant, AstraZeneca, is waiving for these discussions the

24   contents of communications between this man and Mr. Pott.

25            THE COURT:  Well, I haven't heard them asserted

1    yet.  And so I won't rule yet.

2               (Whereupon the sidebar conference concluded.)

3    BY MR. SOBOL:

4        Q.   Did you have any discussions in July of 2009 with

5    Mr. Pott about the Nexium settlement with Teva?

6        A.   I'm sure I did.

7        Q.   What did he tell you?

8        A.   I -- my memory is that he conveyed to me that we

9    had an agreement on the date of the entry date and the basic

10   terms of a Nexium settlement with Teva.

11       Q.   Did he send you any documents in connection with

12   that?

13       A.   No.  I think we were doing this by phone.  And

14   then they'd ask me to do the prepared -- prepare the draft

15   agreements.

16       Q.   Did he show you any documents of communications

17   he, Mr. Pott, any communications he had with Mr. Egosi or

18   were those all by the phone, too?

19       A.   I -- I don't -- I don't remember.  It's a while

20   back.  I don't remember him showing me any documents from

21   Egosi.  I think I was just talking to Jeff over the phone,

22   to my memory.

23       Q.   And what did Mr. Pott tell you about the

24   possibility of a settlement on the Prilosec deal in July of

25   2009?

1          A.    That this had been raised as an idea, and the

2     question was whether there was a number that would be a fair

3     compromise that the parties could negotiate.  And we didn't

4     have one yet.  We didn't know if we could settle that case.

5     It was coming later.

6          Q.    Did he tell you anything else?

7          A.    Not to my memory.  I mean, I think that was

8     basically the way we were discussing it at the time, that

9     this was a dispute on Prilosec that had been going on for

10    years.  There was a single dispute over what the damages

11    would be that Teva owed, how much money they owed to AZ.

12    Pretty conventional.  You try to settle a case like that if

13    you can.  But we didn't know if we could settle it.

14         Q.    Did Mr. Pott tell you to start drafting the

15    Prilosec settlement agreement in July of 2009?

16         A.    Yes.  I think the idea was have a draft ready if

17    we can come up with a number.  But the -- but we hadn't

18    filled in the number.  We didn't know what the number was.

19    We didn't know if the parties would come up with a number

20    that was one they could agree to on as a fair settlement of

21    the case.

22              We knew Teva owed money to AstraZeneca, and there

23    had to be a compromise, some sort of negotiation.  That

24    still was to come.  So it hadn't happened yet.  But, yes, we

25    were thinking about the possibility of getting Prilosec

1    settled.  It made sense.

2         Q.   Well, Mr. Pott instructed you to draft a Prilosec

3    settlement agreement in July of 2009; correct?

4         A.   I think that's right.

5         Q.   And he also at that time, in July 2009, instructed

6    you to dust off or draft a settlement with Teva involving

7    Nexium as well; correct?

8         A.   Well, it was two separate settlements.  But yes.

9    There was an instruction to get a draft together on Nexium

10   because we had a basic agreement on the terms on Nexium.  We

11   didn't have an agreement --

12        Q.   Two separate settlements signed exactly the same

13   day on January 6, 2010; correct?

14        A.   We didn't have an agreement yet on Prilosec.  We

15   didn't -- hadn't worked out what the number would be or

16   whether they could settle at all.  We didn't know yet.  But

17   you get things ready.  As a lawyer, one of the things I do

18   is I work ahead and get things ready, so if you can settle

19   you have it ready to go.  That's what I was doing.

20        Q.   Shifting to a different topic, sir.

21             In this settlement, in the settlement with

22   Ranbaxy, Ranbaxy was agreeing in April 2008 to wait six

23   years for its entry date, with certain exceptions; correct?

24        A.   Well, it wasn't waiting.  It was getting early

25   entry under AstraZeneca's patent that could have held it out

1    of the marketplace until 2018 or 2019.  It wasn't a question

2    of waiting.

3        Q.   Wait a second, Mr. Hester.  You went to a meeting

4    in November 2007 with Mr. Pott; correct?  Yes or no.

5        A.   Did I go to a meeting with Mr. Pott?  Yes, I did,

6    in November --

7        Q.   How many times at that meeting in November of 2007

8    did Mr. Pott ask for any date beyond May 27th, 2014?  How

9    many times did he ask for that?

10       A.   No, we --

11       Q.   How many times, sir?

12            MR. BUTSWINKAS:  It's been asked and answered.

13            THE COURT:  No, he may press it.  If you

14   understand the question you may answer it.  It calls for yes

15   or no.  You may always say you don't remember or that you

16   can't answer it yes or no.  But the question is a

17   straightforward one, how many times.

18       A.   How many times.  I don't -- the only date we

19   proposed is May 27, 2014.  I don't know how many times we

20   uttered the date.  I don't remember, like, how many times.

21       Q.   There was no mention at all in November of 2007

22   about AstraZeneca asking for any date beyond May 27, 2014;

23   correct?  Yes or no.

24       A.   There was no mention of it, but it was an

25   understanding that it was early entry.

1    Q.   Was there any mention at all at any point after

2    November 2007 by you or Mr. Pott that you were demanding a

3    date, an entry date beyond May 27, 2014, ever?

4    A.   We said if they -- if we settled the litigation,

5    we would give them the licensed entry date early under their

6    patents.  But I also told --

7    Q.   Did you mention a later date, sir?

8         MR. BUTSWINKAS:  Can he finish his answer?

9         THE COURT:  Wait a minute.  You'll have a chance

10   to inquire.

11        MR. SOBOL:  Thank you, your Honor.

12        THE COURT:  Go ahead.

13   Q.   Did you ever mention any date later than May 27th,

14   2014, in any of your conversations?

15   A.   Yes, we did.  I told Ranbaxy that if they were not

16   prepared to settle the case on the terms we proposed, we

17   would go ahead and litigate the case and win and keep them

18   out until 2018.  I told them that.

19   Q.   I see.  When did you tell them that, Mr. Hester?

20   A.   During the negotiations over the consent judgment

21   when we were talking about whether this would be a court

22   order.  And I told Ranbaxy, If you're not prepared to settle

23   the case with a court order that we can enforce, we are

24   going to continue to litigate the case and we will win and

25   hold you out until later.  That --

1          Q.    A comment, by the way, did you ever testify to

2    that effect at all during your deposition in this case, sir?

3          A.    I wasn't asked the question.

4          Q.    I see.  Now, in any event, if -- Ranbaxy, there

5    was an agreement, an entry date of May 27, 2014, with

6    exceptions; correct?  Yes or no.

7          A.    That's right.  That's correct.

8          Q.    Okay.  And the exceptions were recognizing the

9    fact that under the Hatch-Waxman scheme later generic

10   companies, like Teva or somebody else, some later generic

11   company might press the litigation and win that all the

12   patents are either invalid or not infringed or some

13   combination thereof; correct?  There was that possibility?

14         A.    What was your question?

15         Q.    The question is, aren't you aware that the reason

16   for some of the exceptions was that there was a possibility

17   that, under the Hatch-Waxman scheme, that a later generic

18   could get a victory on the patents regarding whether they

19   were all -- whether they were invalid or infringed, all of

20   them?

21         A.    Well, you call it a scheme.  It's a federal law.

22         Q.    Fair enough.

23         A.    Well, it's a pretty important difference.  It's

24   not a scheme.  It's a federal law that gives Ranbaxy a set

25   of rights and an exclusivity right that if a later generic

1    prevails in the patent litigation, then under the

2    Hatch-Waxman law, federal law, there are rights to enter

3    earlier.  That's the way it works.  And so the settlement

4    reflected that.

5        Q.   You can just use the term under "the Hatch-Waxman

6    scheme"; right?

7        A.   Well, I wouldn't call it a scheme.  I would call

8    it a federal law.  But I don't know, maybe you call it a

9    scheme.

10       Q.   Well, let's call it -- use your words.  So under

11   the federal law --

12       A.   Right.

13       Q.   Right?  It's possible, it provides the ability of

14   a later generic to come up with a different way of making

15   the product, to work around some patents under some

16   circumstances, and get to market earlier?  That's a

17   possibility; correct?  Yes or no.

18       A.   It's not quite that simple.  The later filing

19   generic has to win in Federal District Court patent

20   litigation, has to then win on appeal, and if it does both

21   of those things on all of the patents, which is often a high

22   hurdle, then it's allowed to -- then it triggers the

23   exclusivity period of that first filer.  But there's a lot

24   of process.  There's a lot of things that have to happen in

25   federal court before that happens.

1      Q.   Sure.  Right.  And then if, for instance, the

2  later generic has figured out a different way to make the

3  product such that they don't infringe -- right? -- then they

4  get to trigger the first filer's exclusivity; correct?

5      A.   Well, it's a little more complicated than that.

6      Q.   Right.  All right.

7      A.   But you have to prevail in court.

8      Q.   Sure.  A court has to have a ruling; right?

9      A.   So it's not just figuring it out, you have an idea

10  but you have to win in federal court.

11      Q.   Sure.  And then they win in federal court, they

12  win on appeal, they trigger the exclusivity of the first

13  filer.  If the first filer can't launch in 75 days, the

14  first filer forfeits; right?

15      A.   That's right.  That's the basic way that the

16  statute works.  It gives right to the first filer that get

17  triggered then by the later litigation.  That can happen.

18      Q.   Right.  And if the first filer isn't able then to

19  launch -- right? -- the 75 days goes by, they forfeit, and

20  the later generic enterer -- the later generic enters the

21  market.  As a practical matter, that later generic is going

22  to have some de facto exclusivity, some period of time

23  during which they're on the market as the only ANDA-approved

24  generic; correct?

25      A.   No, that's not right.  Because it depends on how

1    many later filers there are in the market.  You can have a

2    lot of later filers in the market, and once one of the later

3    filers wins on the patents, they can all commit.  So you can

4    have a whole bunch of generics come in.  So it's not at all

5    clear that that would be that kind of exclusivity.

6         Q.   Sure.  Well, that's because you're talking about

7    two different situations.  By the way, I should go here.

8    What these red arrows show, Mr. Hester, is that under the

9    circumstances we just talked about where a later generic

10   goes to court, wins in the district court, wins on appeal,

11   gets a judgment that all of the patents are either not valid

12   or and/or not infringed, that that later filer might be able

13   to come on to the market in a point in time earlier than

14   May 27, 2014.  Do you have that in mind?

15        A.   Yes, I have it in mind.  The May 27, 2014, was a

16   licensed entry date.  They would have some rights to come in

17   before the expiration of all of the AstraZeneca patents if

18   they prevailed in the litigation.

19        Q.   Right.

20        A.   But that's a later date.  The AstraZeneca patents

21   ran out 2018 and 2019.  So this is -- the May 27, 2014, date

22   is the early entry that AstraZeneca gave under the license

23   agreements.  But the generic challengers were challenging

24   patents that run out to 2018 and 2019.

25        Q.   Sure.  And they're trying to come on to the market

1    earlier; correct?

2         A.    Earlier than what?

3         Q.    Well, earlier than any date starting May 27, 2014,

4    or going out?

5         A.    No.   They're trying to come on earlier than the

6    end date of all the patents.   So you've got a generic that's

7    looking at all of those patents that run out to 2018, 2019,

8    it brings that challenge to see if they can defeat those

9    patents and come into the market sometime before the end of

10   those patents.   That's the way --

11        Q.    Mr. Hester, are you aware that Mr. Pott offered

12   the May 27, 2014, entry date to Teva back in 2008?

13        A.    I thought it was discussed earlier before Judge

14   Pisano even in 2007.   I think he may have -- he may have

15   mentioned that date in that initial conference before Judge

16   Pisano to discuss settling the cases.

17        Q.    For Teva?

18        A.    But Teva didn't agree.

19        Q.    Fair enough.

20        A.    Because they were going ahead to try and litigate

21   the cases.

22        Q.    Okay.   So from Teva's point of view, Teva was

23   trying, even though it was offered May 27, 2014, it wanted

24   to -- sorry -- it wanted to come on to market earlier than

25   that; correct?

1       A.   Well, the way --

2       Q.   Yes or no?

3       A.   No.  It's not that -- no.  You've got it wrong.

4  Because if Teva lost the cases, they were going to stay out

5  until 2018 and 2019.  That was the risk Teva faced.  They

6  weren't going to get May 27, 2014, by litigation.

7       Q.   Well, of course not.  I'm talking about

8  settlement, sir.

9       A.   Their risk was they were going to be held out of

10  market until 2018 or 2019.  That was the risk Teva faced if

11  they lost the patent case.

12       Q.   Mr. Hester, you just testified that Mr. Pott might

13  have offered May 27, 2014, to Teva as early as this Pisano

14  status conference in 2007; correct?

15       A.   He offered.

16       Q.   Yes or no?

17       A.   Yes.  He offered it --

18       Q.   Okay.

19       A.   -- as a settlement.

20       Q.   As a settlement.  Fair enough.  That's what we're

21  talking about.  And the settlement wasn't good enough to

22  Teva at that point?  This date wasn't good enough to Teva at

23  that time; correct?

24       A.   You've got it wrong.  Because the question was we

25  settle for May 27, 2014, or lose the patent case and end up

1    being held out until 2018, 2019.  Those were the choices for

2    Teva.  They weren't going to get some earlier date from

3    AstraZeneca.  AstraZeneca never offered an earlier date to

4    settle the cases.  If they lost the cases, they were out to

5    2018, 2019.

6        Q.   Mr. Hester, did Teva reject the offer by Mr. Pott

7    of a May 27, 2014, entry date as a settlement?

8        A.   They -- they didn't -- they didn't accept it when,

9    when, when Mr. Pott proposed it, and they went ahead and

10   litigated the case for years.  And the cases didn't go well

11   for them, to my understanding.

12           MR. SOBOL:  Objection.  Motion to strike, your

13   Honor.

14           THE COURT:  So much of the answer as begins, "the

15   cases didn't," that's stricken.  Disregard that.

16           Go ahead.

17       Q.   Sometimes when a generic is able to enter, a later

18   generic, not the first filer, but they go through and they

19   get the district court ruling, and they get the appellate

20   court ruling in their favor, sometimes the rulings are

21   invalidity as to all the patents.  That's at least

22   theoretically the possibility; correct?  Yes or no.

23       A.   Right.  Right.  If you're challenging patents, one

24   of the outcomes is you win on invalidity, you establish that

25   all the patents were invalid.  That's right.

1    Q.   And when the generic establishes that all the

2  patents are invalid, then that's the situation that you

3  mentioned a few moments ago where all the generics might be

4  able to come on to the market at some -- at an earlier point

5  in time?

6    A.   That's right.  Because then the brand doesn't have

7  any patent protection, and so others can enter the market.

8    Q.   Okay.  But sometimes a different result occurs,

9  which is the later generic has -- its product is found not

10  to infringe, meaning the way that that particular generic

11  has gone about doing something avoids infringing one of the

12  patents held by the brand company; correct?

13    A.   It would have to avoid infringing all of them.

14  But if it avoided infringing all of them, that's another way

15  that they can come in earlier.  But they have to beat them

16  all.

17    Q.   Okay.  Or have some of them be invalid and then

18  not infringe some of them?

19    A.   That's right.  That's another scenario.  It can be

20  a combination.

21    Q.   Now, I'm going to be asking you a series of

22  questions about this circumstance.  Is it fair to call this

23  a work-around generic, or is there some other word that we

24  should give that kind of generic?

25    A.   I don't know what you mean.  You mean a generic,

1    what, that doesn't infringe?

2        Q.   Yes.   Just call it a noninfringing generic?

3        A.   Yeah.   I mean, I guess I would say noninfringing.

4    I'm not sure I'd call it a work-around, but...

5        Q.   Okay.   Now, a noninfringing generic, if they are

6    successful, and then the first filer can't, you know,

7    they've triggered the first filer's exclusivity, the first

8    filer can't launch for 75 days, a noninfringing generic then

9    in that situation might have for some period of time a de

10   facto exclusivity?

11       A.   No.   I think your question's wrong.   Because the

12   first filer's exclusivity begins running once there's a

13   determination of noninfringement as to all the patents.   So

14   in that circumstance the first filer could launch.

15       Q.   Right.   So we have to wait just for 75 days to see

16   if the first filer can do so; correct?

17       A.   The first filer could still launch later, it just

18   wouldn't have its exclusivity rights.   But it would still

19   have the ability to launch later.

20       Q.   Sure.   But we wait 75 days, if the first filer

21   can't launch, the exclusivity no longer exists, and now the

22   noninfringing generic's the only generic on the market able

23   to go forward?

24       A.   No, that's not right.   Because you also have the

25   first filer that also can be in the marketplace.

1      Q.   But the hypothetical I'm giving you, sir, is that

2   the first filer can't launch.  For some reason it can't

3   launch so it forfeits.

4      A.   And -- okay.  Well, I'm not sure I understand the

5   hypothetical.  But the normal, the normal situation would be

6   if a second filer wins and triggers the exclusivity rights,

7   under Hatch-Waxman, the first filer would also be in the

8   market.  So there's going to be at least two.  But,

9   typically, in a big product like this, with an important

10  medicine, often more than two in the marketplace.

11           THE COURT:  Just so we can follow this, when he --

12  they're both lawyers.  When they talk about hypothetical,

13  they're talking about an imaginary set of circumstances, and

14  then applying the law to an imaginary set of circumstances

15  what do they think would happen.

16           All right.  Now, only one of them's testifying,

17  and that's Mr. Hester.  So you listen to what he says and

18  figure out what you make about it.  Now, you're not going to

19  be asked anything like that.  What you're going to be asked

20  is what actually was going on here, and then to apply the

21  law to what you determine was actually going on.

22           It's not inappropriate to raise a hypothetical to

23  get an answer from a witness if we imagine that this was the

24  situation, how would it work out.

25           Go ahead, Mr. Sobol.

1     Q.   I placed the Ranbaxy settlement before you,

2  Exhibit 10.

3     A.   Yes.

4     Q.   And if we go to the portion of the document that

5  is page 10, Bates stamp on the bottom right-hand corner 014.

6     A.   Right.  I see that.

7     Q.   And there's an Article 6, Covenants?

8     A.   Yes.

9     Q.   And the provision Article 6, Covenants, 6.1,

10 "Ranbaxy for itself and its affiliates hereby covenants,"

11 and if you go to the next page, there's a (b)?

12    A.   Right.  I see that.

13    Q.   And is that -- is it fair to say that that's the

14 provision under which Ranbaxy is agreeing that it will not,

15 until the entry date, launch a generic esomeprazole?

16    A.   Right.  This is a pretty standard provision you

17 see in a settlement agreement where if you give somebody a

18 license and they agree to respect your patent rights, you

19 also have them agree that they won't launch before their

20 license day.  That's what this provision did.

21    Q.   Now, if you go to up top on page 10, the section

22 5.2?

23    A.   Right.

24    Q.   Okay.  And is it fair to say that all of section

25 5.2 is the definition in the settlement agreement regarding

1    what the entry date's going to be?

2         A.   Yes, that's right.

3         Q.   Okay.  And then it starts out and it says, "For

4    purposes of this settlement agreement the entry date shall

5    be the earliest of," you see that?  And then there are three

6    things.  (a) is May 27, 2014; correct?

7         A.   That's right.

8         Q.   Now, there is also a (b) and a (c); correct?

9         A.   Right.

10        Q.   And these are exceptions to the entry date;

11   correct?

12        A.   Well, they're not exceptions, they're part of the

13   definition of the entry date.

14        Q.   Okay.  So these are dates upon which Ranbaxy might

15   be able to enter earlier, i.e., the entry date might be

16   accelerated?

17        A.   Well, I mean, you've got it a little wrong.  It's

18   the license date.  It's the -- these are the three ways that

19   Ranbaxy would have a license to enter before the expiration

20   of the patents.

21        Q.   Okay.  And so the license dates are, (a), (b), and

22   (c)?

23        A.   Right.

24        Q.   And it's the earliest of (a), (b) and (c);

25   correct?

1      A.    That's right.

2      Q.    Now, do you recall that in the November 2007

3  meeting that Mr. Pott wanted to make sure that the entry

4  date permitted AstraZeneca to give the same licensed entry

5  date to later generic companies?

6      A.    It wasn't something we discussed, to my memory, at

7  that November 2007 meeting.  We certainly put it into the

8  drafts after the meeting.

9      Q.    Well, do you recall that Mr. Pott gave testimony

10  before the FTC?

11      A.    Yes, I do.

12      Q.    Who was the lawyer that represented him?

13      A.    I did.

14      Q.    I put before you GBV.

15            Is GBV a photocopy of excerpts of the testimony

16  before -- by Mr. Pott before the FTC at which you were

17  representing him?

18      A.    It's not the full transcript, right.  These are

19  just excerpts.

20      Q.    Excerpts.  It's not the full transcript?

21      A.    Yes.  I was representing him and there was a

22  transcript.  Yes.

23            MR. SOBOL:  I offer it.

24            THE COURT:  Any objection?

25            MR. BUTSWINKAS:  Sidebar, your Honor?

1          THE COURT:  We may.

2   SIDEBAR CONFERENCE, AS FOLLOWS:

3          THE COURT:  You want the whole transcript?

4          MR. SOBOL:  No, your Honor.

5          THE COURT:  What do you want?

6          MR. SOBOL:  I want these excerpts.  This is not

7   the whole transcript.

8          THE COURT:  Oh, okay.  These excerpts.

9          MR. BUTSWINKAS:  My understanding is he's going to

10  impeach Mr. Hester with someone else's testimony.  That's

11  not proper.

12         THE COURT:  Well, he's offering it in evidence.

13  And your objection is --

14         MR. BUTSWINKAS:  Yes.  My objection is -- let me

15  explain how this came about.  They had originally designated

16  some testimony from Mr. Pott, and we had

17  counter-designations for completeness.  And they are, in a

18  sense, trying to circumvent that process by introducing

19  excerpts instead.

20         THE COURT:  All right.  So -- I'm not sure I go

21  with the circumvent.  They want a portion of his testimony,

22  which is a prior statement under oath, and of course it is

23  an admission as to AstraZeneca.  Now, I could imagine that

24  there might be materials, some other materials which you

25  would offer for completeness, but I'm not hearing objection

1    to this, unless this is misleading.

2              MR. BUTSWINKAS:  Your Honor, I got that last night

3    and so for the first time --

4              THE COURT:  I understand.  I'll give you a chance.

5              MR. BUTSWINKAS:  That's fair.

6              THE COURT:  But I'll admit it subject to your

7    coming up with completeness stuff.

8              MR. BUTSWINKAS:  Thank you.

9              (Whereupon the sidebar conference concluded.)

10             THE COURT:  GBV is admitted in evidence,

11   Exhibit 99.

12             (Exhibit 99 received in evidence.)

13   BY MR. SOBOL:

14        Q.   If you go to the page -- it's page 35 of the

15   document.  It has Bates stamp 351 in the bottom right-hand

16   corner.

17        A.   Right.  I'm there.

18        Q.   And, again, this is testimony of Mr. Pott that

19   occurred in your presence; correct?

20        A.   Right.  I was the lawyer there representing him.

21        Q.   Mr. Pott was talking about a meeting that both you

22   and he had been at; correct?

23        A.   Yes, I -- well, which one --

24        Q.   This is the November 2007 meeting.

25        A.   I maybe need to look.  Are you referring me to

1    some specific question and answer?  I may need to look at

2    that.

3        Q.   Yes, I will.  Line 17, the FTC asked Mr. Pott:

4             "QUESTION:  Do you recall what your

5    counterproposal was?"

6             And answered, "Yeah, I countered with the entry

7    date of May 27th, 2014.  I told him that the license could

8    be exclusive subject to an unlicensed entry and our right to

9    give other companies a license of the same date.  And, you

10   know, we wanted it to be a consent judgment in place with

11   admissions of validity infringement."

12       A.   Right.

13       Q.   Is that consistent with your recollection of the

14   meeting that occurred on November -- in November of 2007

15   with Ranbaxy?

16       A.   I mean, my -- it's a while back.  It's six or

17   seven years ago, but my -- I had a slightly different

18   memory, but it gets to the same place because I sent a draft

19   after this meeting with that proposal in it.  So I can't

20   remember specifically whether it came out the way Jeff

21   described it here or the way I'm remembering, but it's

22   close, either one.  There's not a big gap.

23       Q.   And do you recall that at that November 2007

24   meeting that there was discussion regarding Ranbaxy's

25   exclusivity period and that -- but that there would be

1    exceptions to its exclusivity period?

2        A.    I don't think we got into that level of detail.

3    Ranbaxy had raised this general idea that they wanted us to

4    respect their exclusivity period under Hatch-Waxman.  We

5    said we would consider that, and then we worked on the

6    language that we sent back to them.  I don't remember it

7    being in that much detail.

8        Q.    Okay.  But do you recall, as a general matter,

9    Mr. Pott indicated that, "I explained I wanted to be able to

10   settle with other parties"?

11       A.    I certainly recall that general idea that we

12   needed to have the right to settle with other parties.  It

13   was an important medicine.  We expected a number of

14   challenges.  We needed the ability to settle with other

15   generic challengers to the patents, if that came about.  And

16   it did.

17       Q.    And then do you recall that you were also at the

18   meeting in January of 2005, correct?  Excuse me, January of

19   2008; correct?

20       A.    I'm with you on '08.

21       Q.    Fair enough.  You were at that meeting, Mr. Pott

22   was there; correct?

23       A.    That's right.

24       Q.    And do you recall that there was again a

25   discussion regarding the purposes of the exceptions to the

1    May 27, 2014, date?

2         A.   Yes.  I was -- I do recall that.

3         Q.   Okay.  And what do you recall telling -- did

4    you -- what did you say to Ranbaxy, if anything, as to the

5    reasons why AstraZeneca wanted these exclusions to the

6    May 27, 2014, entry date?

7         A.   I wouldn't really call them exclusions.  They

8    weren't exclusions.  They were part of the definition of the

9    entry date.  But what we explained was that we needed the

10   flexibility to license other generic filers for the same

11   date or for a different date, and so we explained to them

12   that if we get -- did that, and if we ended up giving

13   anybody an earlier date, they would get that date too.

14        We didn't do that, but we needed the flexibility

15   to decide what we were going to do in settling with later

16   patent filers.  So that was the discussion we had around

17   that point.

18        Q.   Okay.  And do you recall that Mr. Pott explained

19   to Ranbaxy that it's a lot easier to settle in the sense

20   that you can give somebody the same date as opposed to being

21   disadvantaged by another date?

22        A.   I -- I recall that general discussion that it's

23   tough to settle with second, third, fourth, fifth, sixth,

24   filers if you say, And you're going to get a later date than

25   other people we've licensed.  It's hard to do that.  It's

1    hard to give people a patent license and tell them they're

2    getting a less good date than other people.  It's hard to

3    settle that way.

4        Q.   And do you recall Mr. Pott also saying something

5    to the effect that you have to be able to give other people

6    the date, you have to -- I wanted to give other people the

7    May 27, 2014, date?

8        A.   Well, I remember it came up because Ranbaxy had

9    proposed that there would be -- that we would license

10   everybody for a later date, and we said we wouldn't do that.

11   And we wanted the ability to choose which date we would

12   license other people.

13       Q.   So if we go back to Exhibit 10 then, the

14   settlement agreement, and 5.2?

15       A.   Right.

16       Q.   Which is the bottom of 114 -- excuse me -- 014.

17       A.   Yes.

18            MR. SOBOL:  Can you put that back on the screen?

19       Q.   So the second part of the licensed entry date,

20   (b), states -- and this is, again, it means the earliest of;

21   right?  So first we had May 27, 2014, and then there's (b),

22   "the date on which a third-party launches a generic

23   esomeprazole product in the United States following a final

24   court decision from which no appeal has been or can be taken

25   holding that all claims of the AstraZeneca patents asserted

1    in that litigation are invalid, unenforceable, or not

2    infringed by the generic esomeprazole product at issue in

3    that litigation."

4           That's what the second part of this entry date

5    definition states; correct?

6       A.    That's right.

7       Q.    And so if it turns out that there was some

8    noninfringing generic that was going to be able to come on

9    the market or trigger Ranbaxy's exclusivity, this agreement

10   was permitting Ranbaxy to also come in the market earlier;

11   correct?

12      A.    Yeah.   This is a really standard term in patent

13   settlements.

14           MR. SOBOL:   Your Honor, motion to strike.

15           THE COURT:   The motion to strike's allowed.

16   Disregard it.

17      Q.    Stick to this, sir.

18      A.    So the question is does this agreement provide

19   that Ranbaxy would be able to launch in that circumstance?

20      Q.    Yes.

21      A.    That's right.   It had -- but it wasn't just a

22   noninfringing product, there had to be court decisions.

23      Q.    Sure.   Court decision, district court, circuit

24   court, noninfringing, the noninfringing generic goes through

25   all that work but now under this agreement AstraZeneca's

1    going to let Ranbaxy enter the market anyway; correct?

2         A.    The -- that's --

3         Q.    Yes or no?

4         A.    Yes, because I -- well, yes.  And we understood it

5    was required by the law.

6         Q.    Even though, by the way, that you were getting

7    Ranbaxy to concede that its product infringed the patents,

8    you were -- AstraZeneca was going to let Ranbaxy into the

9    market earlier anyway?

10        A.    Yes.  That's -- that's the way this provision

11   worked.

12        Q.    Now, one -- well, let me ask this:  How is it --

13   in what ways does having a provision like 5.2(b) in this

14   settlement agreement, how does that help AstraZeneca in its

15   goal to get later settlers to agree to the May 27, 2014,

16   date?

17        A.    It -- that was not a focus of this language.  This

18   language is in relation to settling the case with Ranbaxy.

19   And the way to settle this patent litigation with Ranbaxy

20   included that provision.  It didn't have to do with the

21   later filers.

22        Q.    But I thought that Mr. Pott had indicated that he

23   needed the exceptions to make it easier to settle with later

24   generics?

25        A.    No.  The exception that related to licenses to

1    other generics was not (b), it was (c).

2         Q.    Okay.  Let's turn to (c).

3         A.    It was not (b).

4         Q.    All right.  Then let's turn to (c).

5              MR. SOBOL:  If you can highlight that, please.

6         Q.    And, again, we're talking about the entry date

7    meaning the earliest of, now we have (c):  The date prior to

8    May 27, 2014, on which any third party is authorized, under

9    a license granted by AstraZeneca and KBI, to commence

10   manufacturing, using, selling, offering to sell, importing,

11   or distributing generic esomeprazole in and for the United

12   States pursuant to an ANDA or an application pursuant to a

13   citation, section 355(b)(2).  That was the third portion of

14   the entry date; correct?

15        A.    That's right.  Third part of the definition.

16        Q.    And so under this definition, then, Ranbaxy was

17   going to be able to enter earlier if for some reason

18   AstraZeneca cut a deal with a later generic for that generic

19   to enter earlier; correct?

20        A.    That's right.  If AstraZeneca gave somebody else

21   an earlier license date, Ranbaxy would get it too.  So that

22   they wouldn't -- they wouldn't be disadvantaged.

23        Q.    Now, without this provision, without 5.2(c),

24   AstraZeneca could still go out and settle with a later

25   generic for an earlier date; correct?  Yes or no.

1     A.   That's not the -- that's not the right point.   The

2  right point is 5.2(c) was necessary to settle with Ranbaxy.

3     Q.   Well, I'm not talking about Ranbaxy right now.

4  I'm not talking about Ranbaxy for a moment.   If 5.2(c) was

5  not in this agreement, AstraZeneca would have been able to

6  go out and get an earlier entry date, cut a deal with

7  somebody else for an earlier entry date than May 27, 2014;

8  correct?

9     A.   Right.   5.2(c) doesn't have to do with settlements

10  with other parties, it has to do with settling with Ranbaxy.

11     Q.   Okay.

12     A.   That's right.

13     Q.   And who suggested this provision first?

14     A.   I -- I wrote this language and I suggested it in

15  the drafts that I sent to Ranbaxy.

16     Q.   Right.   And you were representing AstraZeneca;

17  correct?

18     A.   That's right.

19     Q.   Okay.   And how is it, then, in what ways does

20  having a provision like 5.2(c) in this settlement agreement

21  help AstraZeneca in its goal of getting later generics to

22  accept the May 27, 2014, date?

23     A.   It doesn't have to do with settling related

24  generics.   It has to do with settling with Ranbaxy.   5.2(c)

25  related to our ability to reach an agreement with Ranbaxy.

1    Q.   So 5.2, by the way, (c), is one of those

2    exceptions that didn't appear explicitly in the consent

3    decree; correct?

4    A.   It was cross-referenced by the reference to the

5    settlement agreement.

6    Q.   It was not explicitly in the consent decree

7    though; correct?

8    A.   In the final version of the court order, yes, it's

9    not in there specifically.

10   Q.   And it wasn't in the press release that

11   AstraZeneca issued on that settlement; correct?

12   A.   That's right.

13   Q.   Okay.  And was sharing with a generic, later

14   generic -- well, strike that.

15        Isn't it true that one of the reasons that

16   confidentiality agreement has these exceptions to share

17   certain information with later generics, for AstraZeneca to

18   be able to share with them, Hey, you know, we have this

19   5.2(c) that's going to let somebody else -- that's going to

20   let Ranbaxy into the market earlier if you're able to cut an

21   earlier deal with us?

22   A.   No, that's not true.  That's not the reason we had

23   that provision on the confidentiality.  It was a general

24   idea related to the point that if you're settling with

25   somebody later, they might want to know what was in the

1     other settlement agreements.  It was not more than that.

2         Q.   And well, isn't it the case, sir, that in later

3     dealings with, for instance, Teva or other generic

4     companies, AstraZeneca was permitted under these agreements

5     to share with those later generics that, Look, if you are

6     successful in getting an earlier entry date, we've already

7     cut a deal, Ranbaxy's going to be allowed to enter then too?

8         A.   It was -- it was something that AstraZeneca could

9     do, but we never did.

10         Q.   But you crafted the agreements to permit that to

11    occur, didn't you, sir?

12         A.   Wrote the agreements to preserve that flexibility,

13    but we never used it.

14         Q.   When Teva settled, Teva agreed to the May 27,

15    2014, entry date; correct?

16         A.   That's right.

17         Q.   And you gave Teva -- you structured that agreement

18    in a way as to make sure that AstraZeneca would tell later

19    generics, if it wanted to, that it had given Teva the right

20    to come into market earlier if that later generic was able

21    to cut an earlier entry date; correct?

22         A.   That's not right.  The language just said we had

23    the ability to disclose the terms of other settlement

24    agreements.  We weren't focused on this 5.2 language.  And,

25    as I said, we didn't -- we didn't use that flexibility, we

1    just kept the flexibility.

2        Q.   You structured the Teva agreement the same way you

3    structured the Ranbaxy agreement with respect to 5.2(c) and

4    the confidentiality agreement, didn't you?

5        A.   Well, 5.2(c) in the Teva agreement is slightly

6    different.  The confidentiality concept in the Teva

7    agreement is roughly the same as what's in the Ranbaxy

8    agreement; gave us flexibility to share the agreement with

9    others if we needed to but we didn't do it.

10            MR. SOBOL:  GAP, please.

11       Q.   Have you had any responsibilities for handling

12   settlement agreements beyond those of Ranbaxy and Teva, but

13   other generic companies that were seeking to get in the

14   market for generic Nexium?

15            THE COURT:  Could you ask the question again?  I

16   didn't --

17            MR. SOBOL:  Sure.  Sure.

18       Q.   Have you had any responsibilities beyond the

19   Ranbaxy and Teva situations for settlements involving

20   generic companies seeking to get on the market for generic

21   Nexium?

22            MR. BUTSWINKAS:  Objection.  Relevance.

23            THE COURT:  Well, he may have a few questions.

24   Overruled.

25       A.   These were -- these were generics that were

1    challenging the AstraZeneca patents?

2         Q.   Yes.

3         A.   So it was patent litigation.  And, yes, I was

4    involved in working on settlements of other patent

5    litigation beyond the Ranbaxy and the Teva litigations.

6         Q.   One is settlements with Dr. Reddy's, Sandoz,

7    Lupin, Hetero, Torrent?

8         A.   Yes.  I negotiated or worked on all of those.

9         Q.   And --

10             MR. BUTSWINKAS:  Your Honor, I misunderstood his

11   question.  I don't actually object to this line.  So...

12             THE COURT:  Okay.  Go ahead, Mr. Sobol.

13        Q.   I put before you a summary sheet that's been

14   prepared, GAP.

15             Now, you haven't seen this document before;

16   correct?

17        A.   I haven't seen the document.  I'm familiar,

18   basically, with the subject.

19        Q.   Okay.  And the generic challengers or a series of

20   generic companies that have filed ANDAs challenged

21   AstraZeneca's Nexium patents; correct?

22        A.   That's right.  That's right.  These were all

23   part -- these were all generic companies that challenged

24   AZ's patents on Nexium.

25             MR. SOBOL:  I offer it, your Honor.

```
1              MR. BUTSWINKAS:  No objection.

2              THE COURT:  Again, the letters?  Forgive me.

3              MR. SOBOL:  GAP.

4              THE COURT:  GAP is admitted, Exhibit 100.

5              (Exhibit 100 received in evidence.)

6         Q.   Mr. Hester, you've given some testimony about the

7    180-day exclusivity period.  You understand that that period

8    can, of course, be forfeited by the first to file; correct?

9         A.   Yes.  A first filer can forfeit its Hatch-Waxman

10   exclusivity.  I know that.

11        Q.   It can also selectively waive it under certain

12   circumstances; correct?  Yes or no.

13        A.   Yes, it can, under certain circumstances.

14        Q.   And it can relinquish that exclusivity under

15   certain circumstances; correct?

16        A.   Yes.  I'm not totally sure what "relinquish" means

17   in your question, but I think I can -- I understand

18   basically what you're talking about.

19        Q.   And as far as you understand they may; correct?

20        A.   Yes.  I mean, maybe you could explain what

21   "relinquish" means.

22        Q.   Give up?

23        A.   I'm not sure that's different from waiving, but --

24        Q.   Okay.  Fair enough.

25              MR. SOBOL:  Sidebar, your Honor, briefly.
```

1              THE COURT:  You may.

2  SIDEBAR CONFERENCE, AS FOLLOWS:

3              MR. SOBOL:  The Nexium purchaser would like a

4  ruling from the Court that AstraZeneca has waived the

5  attorney-client privilege with respect to communications

6  between Mr. and -- Mr. Hester and Mr. Pott in the summer of

7  2009.

8              THE COURT:  I'm not going to do it.  They

9  haven't -- I'm going to go question by question.

10             (Whereupon the sidebar conference concluded.)

11             MR. SOBOL:  Nothing further, your Honor.

12             THE COURT:  Mr. Butswinkas?

13             MR. BUTSWINKAS:  Thank you, your Honor.  Your

14  Honor, what number did you mark Exhibit GAP as?

15             THE COURT:  GAP is Exhibit 100.

16             MR. BUTSWINKAS:  Andy, would you put Exhibit 100

17  up, please?

18                      CROSS-EXAMINATION

19  BY MR. BUTSWINKAS:

20      Q.   Good afternoon, Mr. Hester.

21      A.   Good afternoon.

22      Q.   You have Exhibit 100 before you, do you not?

23      A.   Yes, I do.

24      Q.   I just have a few questions about this chart.

25             MR. BUTSWINKAS:  Thank you, Andrew.

1        Q.   I want to ask you, all of the hypotheticals that

2   the plaintiffs' counsel was asking you about, companies

3   winning the patent litigation, getting in early, affecting

4   the first filer, do you remember, generally, all those

5   questions?

6        A.   Yes.  Yes, generally.

7        Q.   In all of those hypotheticals would the generic

8   company have to have FDA approval to come on the market?

9        A.   Yes.  FDA approval is required separate and apart

10  from whether you win the patent litigation.

11       Q.   And Exhibit 100, is that a list of the companies

12  that have filed ANDAs with respect to generic Nexium?

13       A.   Yes.  So this is a list of companies that have

14  filed patent challenges on the Nexium patents.

15       Q.   And so in the left-hand column, that's the name of

16  the company?

17       A.   Yeah.  Those are all generic companies that have

18  brought challenges against the Nexium patents.

19       Q.   Okay.  And then the second column is "ANDA," and

20  there are numbers under that.  Do you know what that is?

21       A.   Yeah, ANDA is short for an abbreviated new drug

22  application, which is the number that the FDA assigns when a

23  generic files a challenge to patents, as they did here.

24       Q.   Okay.  And then the next column is entitled,

25  "Paragraph IV Notice."  Do you see that?

1          A.    Yes.

2          Q.    Do you understand what that is?

3          A.    Yes.  That's a -- a notice that the generic has to

4    give to AstraZeneca saying, in effect, Hey, I'm challenging

5    your patents and here's a notice.  It's called a

6    Paragraph IV, but it's a notice that they're challenging the

7    AstraZeneca patents.

8          Q.    And this column reflects the dates of those

9    notices?

10         A.    That's right.  That's the date that the notices

11   were sent, and the law requires them to send it by certified

12   mail on a certain day.  So those are the dates that they --

13   those notices were sent.

14         Q.    Okay.  And then the next column is entitled,

15   "30-Month Stay Expiry."  Do you see that?

16         A.    Yes.

17         Q.    Do you know what that means?

18         A.    Yes, I do.  If AstraZeneca, within 45, days after

19   it gets a Paragraph IV notice, files a patent suit against

20   the generic, then there's a 30-month stay that goes into

21   place.  What that 30-month stay means is that's 30 months

22   that the FDA is not allowed to grant approval.  So the FDA

23   cannot approve for that 30-month period.  And so this column

24   shows the days that that -- those 30-month periods ended.

25         Q.    And the next column says, "Status."  Do you see

1    that?

2         A.    Yes.

3         Q.    And the first two, Ranbaxy and Teva, are the

4    generics in this case?

5         A.    That's right.

6         Q.    And then there are one, two, three, four, five

7    other settlements.  Do you see that?

8         A.    One, two -- five.  Yes, I see that.

9         Q.    And they all have an agreed entry date?

10        A.    That's right.

11        Q.    And what are the agreed entry dates for those

12   settlements?

13        A.    For each of those settlements there was an

14   agreement to a May 27, 2014, date.  In other words, about

15   four years early on the patents.

16        Q.    And were you involved in these settlements?

17        A.    Yes.  I worked on all of these settlements.

18        Q.    And you were involved in the Ranbaxy settlement?

19        A.    Yes, I was.

20        Q.    And the Teva settlement?

21        A.    Yes, I was.

22        Q.    And so that I can make this more efficient, in all

23   your discussions and interactions with the counsel and

24   parties representing the various generics in these that

25   we've talked about here, have you ever offered a date

1    different than May 27, 2014?

2         A.    No.   That's always been the licensed entry date

3    that we have offered in any of these settlements.   It's the

4    only one.

5         Q.    And then underneath that there are -- there is

6    N/A, N/A, N/A, N/A, N/A.   Do you see that?

7         A.    Right.   So for six of them, I think, there's an

8    N/A under agreed upon entry date.

9         Q.    And are those for companies that AstraZeneca is

10   currently in patent litigation defending these patents?

11        A.    Right.   So as to those six, patent litigation is

12   ongoing and there's no settlement.

13        Q.    Okay.   I want to ask you to imagine another column

14   on this chart.   Okay?

15        A.    All right.

16        Q.    Actually, two other columns.

17        A.    Okay.

18        Q.    The first one is called, "Preliminary FDA

19   Approval."   Okay?

20        A.    Right.

21        Q.    Does Ranbaxy have preliminary FDA approval?

22        A.    Yes, Ranbaxy does.

23        Q.    So we'd have a "yes" there?

24        A.    Right.

25        Q.    How about Teva?

```
1          A.    Teva does not have preliminary approval.

2          Q.    How about Dr. Reddy's?

3          A.    No, it does not have preliminary approval.

4          Q.    Sandoz?

5          A.    Does not have preliminary approval.

6          Q.    Lupin?

7          A.    Does not have preliminary approval.

8          Q.    Hetero?

9          A.    Does not have preliminary approval.

10         Q.    Torrent?

11         A.    Does not have preliminary approval.

12         Q.    Mylan?

13         A.    It does not have preliminary approval.

14         Q.    Watson?

15         A.    It does not have preliminary approval.

16         Q.    Wockhardt?

17         A.    It does not have preliminary approval.

18         Q.    Aurobindo?

19         A.    It does not have preliminary approval.

20         Q.    Kremers?

21         A.    It did not have preliminary approval.

22         Q.    Zydus?

23         A.    It does not have preliminary approval.

24               MR. BUTSWINKAS:  You can take that down, Andrew.

25         Q.    Do you have Exhibit 95 up there, Mr. Hester?
```

1      A.   What is it?

2      Q.   It was --

3           (Indicating.)

4      A.   Oh, yes.  I think I can find that.

5           THE COURT:  It was the submission to the Federal

6  Trade Commission.

7           MR. BUTSWINKAS:  Thank you.  Yes.

8      A.   Yes.  Yes, I have it.  Yes.

9      Q.   Do you remember, generally, that you were asked

10  questions about the interrogatory answers that you said you

11  prepared to submit to the Federal Trade Commission?

12     A.   Yes, I remember that.

13     Q.   And you were asked to look at, if my memory serves

14  me correct, Interrogatory Number 6?

15          MR. BUTSWINKAS:  Which is at the bottom of page 5,

16  Andrew.

17     A.   That's right.

18     Q.   Okay.  Do you remember that, those questions?

19     A.   Yes, I do, generally.

20     Q.   And do you remember being asked whether you

21  bothered to provide the financial information related to

22  Nexium to the Federal Trade Commission?  Do you remember,

23  generally, those questions?

24     A.   Yes.

25     Q.   Let me ask you to look at Interrogatory Number 9,

1    which is on page 8.

2         A.   Yes.

3         Q.   Can you just tell the jury what the Federal Trade

4    Commission is asking there and what you supplied?

5         A.   Well, the question was the sales for Prilosec and

6    Plendil, and how we calculated those sales, how AstraZeneca

7    calculated those sales.  And we provided information on what

8    those gross U.S. sales were.

9         Q.   Did it also ask for the sales for Nexium?

10        A.   Yes, it did, as well as -- you're right.

11   Prilosec, Plendil and Nexium, asked for the sales figures

12   for all three.

13        Q.   And did you supply that information to the Federal

14   Trade Commission?

15        A.   Yes, we did.

16        Q.   Let me ask you to look at Interrogatory Number 15,

17   which is on page 12.

18        A.   Yes.

19        Q.   And if you could take a moment to review that,

20   could you, again, tell the jury what the Federal Trade

21   Commission was seeking there and what you provided?

22        A.   So on Interrogatory 15, the FTC asked for

23   information on sales for products that AZ sold to treat

24   Gastroesophageal Reflux Disease, sort of the category of

25   drugs used, like Nexium and others, used for that purpose.

1    And so we provided sales data, price data, cost data,

2    marketing expenses, rebate information, and other details on

3    the financials.  So we submitted it, that kind of

4    information, to the FTC.

5         Q.   Thank you.

6              MR. BUTSWINKAS:  Andrew, could you put Exhibit 100

7    back up?

8         Q.   I said I was going to add two columns to this,

9    Mr. Hester.  And if the next column is, "Final FDA

10   Approval," what do the answers look like?

11        A.   Not one of these generics has received final FDA

12   approval to launch a generic version of Nexium.

13        Q.   And you were asked about -- you were asked a lot

14   of questions where Mr. Sobol kept characterizing the entry

15   date definition as exceptions.

16             Do you remember, generally, those questions?

17        A.   Yes.

18        Q.   And I'm going to use his word.  Do any of those

19   exceptions -- I'm going to put it in quotes, because I know

20   you said it was part of the definitions, not exceptions --

21   do any of those exceptions provide for later entry as

22   opposed to earlier entry in the market?

23        A.   No.  I mean, those provisions just allowed the

24   entry date to move up, be earlier, in certain circumstances.

25        Q.   I'm going to shift gears.  How long have you been

1    practicing at Covington & Burling?

2         A.   I've been there 31 years.

3         Q.   And are you originally -- where are you based now?

4         A.   Our offices are in Washington.  That's where I am.

5         Q.   And is that where you're originally from?

6         A.   No.  I grew up right around here.  I was born in

7    Boston and grew up in the western suburbs.

8         Q.   And at a high level, you don't have to provide

9    great detail, will you describe your path to Covington?

10        A.   Yeah.  So I grew up here, I went to college at

11   Williams College, out in the far corner of the state, came

12   back here and worked after college for several years, then

13   went off to law school.  I clerked for a federal judge.  And

14   then I went to Covington & Burling in the fall of 1983.

15        Q.   And how would you describe your law firm?

16        A.   Well, it's one of the largest and one of the

17   oldest law firms in Washington.  We represent many companies

18   on matters involving issues with the federal government, and

19   under complex areas of law, and that's really our specialty,

20   are these areas of very complicated law.

21        Q.   When did your firm open?

22        A.   We opened in 1919.  So we're almost 100 years old

23   now.

24        Q.   And I think you described in your answers to the

25   plaintiffs' question what your general area of legal

1    expertise is, and would you just remind us of that?

2        A.    So I've been practicing in the antitrust area for

3    31 years.  Ever since I started at the firm that's been my

4    area of specialty, sort of advising companies, and also

5    litigation.  That's what I've done.

6        Q.    And do you have managerial responsibilities at

7    your law firm?

8        A.    Yes.  I'm the chairman of our law firm.  So I

9    have, sort of, overall management responsibility for running

10   our law firm.

11       Q.    I want to turn to the questions that you were

12   asked about the settlement negotiations with Teva.  Okay?

13       A.    Right.

14       Q.    Did you draft the original settlement agreement

15   between AstraZeneca and Teva for the Nexium patent case?

16       A.    Yes, I did.

17       Q.    And what was the license entry date going to be?

18       A.    It was going to be May 27, 2014.  That was the

19   license date we put in there right at the start.

20       Q.    And do you recall when you sent the first draft of

21   the Nexium patent settlement to Teva?

22       A.    Yes.  I think it was in August, late August 2009.

23       Q.    And were there negotiations over that draft after

24   that date?

25       A.    Yeah.  We worked on the language and phrasing,

1    principally, and there were some negotiations over a couple

2    of concepts that we worked through after -- after that

3    August 2009 draft that I sent.  We worked on it.

4         Q.   And during that period, did you have exchange with

5    the lawyers who were representing Teva in that negotiation?

6         A.   Yes, I did.

7         Q.   I think you have this up there, it's Exhibit

8    Number 11.  It's the Nexium settlement agreement.

9         A.   I have it.  Let's see if I can find it.  Eleven?

10        Q.   Yes.  Here, I'll give you mine.

11        A.   Sorry.

12        Q.   That's all right.  So the record's clear, do you

13   have Trial Exhibit 11 in front of you, sir?

14        A.   Yes, I do.

15        Q.   What is that document, sir?

16        A.   This is the final version of the settlement

17   agreement that AstraZeneca entered into with Teva related to

18   the Nexium patent litigation.

19        Q.   And did you meet with Teva's outside lawyers to

20   work through changes to this settlement agreement?

21        A.   Yes, I did.  I had, I think, one meeting with them

22   in December of 2009.

23        Q.   And were there changes to the first draft that you

24   had circulated?

25        A.   Yes, there were a number of changes we made.

1      Q.   And did the licensed entry date of May 27, 2014,

2  ever change?

3      A.   No.  That never changed.  It never moved.

4           THE COURT:  Just you use the word "outside

5  lawyers."  So the jury can follow, do you want to define for

6  us an outside lawyer and an inside lawyer?

7           THE WITNESS:  Yes, your Honor.  So inside lawyers

8  are people who are employed by companies, and outside

9  lawyers are people who work in law firms and who represent

10  companies.

11           THE COURT:  So with respect to this, you're an

12  outside lawyer?

13           THE WITNESS:  That's right, your Honor.

14           THE COURT:  You mentioned Mr. Pott.  He's an

15  inside lawyer for AstraZeneca?

16           THE WITNESS:  That's right.

17           THE COURT:  And you said you worked with the

18  outside lawyers for Teva?

19           THE WITNESS:  That's right.  So I was working with

20  lawyers from a law firm who were representing Teva in the

21  negotiations.

22           THE COURT:  Just so we're clear, do you remember

23  the firm?

24           THE WITNESS:  Yes.  It was Goodwin Procter.

25           THE COURT:  Thank you.  Go ahead, Mr. Butswinkas.

1          MR. BUTSWINKAS:  Thank you, your Honor.

2     Q.   As this process played out, did you ever share any

3  of the drafts of the Teva settlement agreement with any

4  representative of Ranbaxy?

5     A.   No, we never did.

6     Q.   How about an outside lawyer representing Ranbaxy?

7     A.   No, we never -- we never did.  We never shared it

8  with anybody from Ranbaxy or anybody representing Ranbaxy.

9     Q.   And I have the same question with respect to these

10 discussions.  Did anyone from Ranbaxy ever partner in your

11 settlement discussions with Teva and their representatives?

12    A.   No.  We never discussed any of the settlement

13 agreement negotiations around Teva with Ranbaxy in any way.

14    Q.   And in these negotiations, was there ever any

15 horse trading over the entry date?

16    A.   No.  We never traded the entry date off against

17 anything else.  The entry date stayed where it was at that

18 May 27, 2014, date.

19    Q.   And were there -- we've talked about these parts

20 of the entry date definition that could accelerate entry.

21 Do you remember those questions, generally?

22    A.   That's right.

23    Q.   Were there discussions concerning events that

24 could trigger an earlier entry date than May 27, 2014, with

25 Teva representatives?

1    A.   Yes.  We did talk that through at some length with

2    Teva.

3    Q.   Can you give me a description of what you recall

4    about any discussions on that topic?

5    A.   Well, during our meeting with Staci Julie, I was

6    at a meeting with her, I guess she was inside counsel, but

7    with the outside lawyers as well.  But I met with Staci

8    Julie in December of 2009, and we had a long discussion

9    about the fact that Teva needed to be in the market on the

10   first day that it could possibly be in the market.  And she

11   told me that she would be fired if she didn't have the

12   ability to get into the market if somebody else was in the

13   market.

14   Q.   And can you identify in the settlement agreement

15   that you have, Exhibit 11, in front of you, the provisions

16   that would allow Teva to come in earlier than May 27, 2014?

17   A.   Yes.  One of them was in section 5.2(c), which is

18   on page 11.

19        MR. BUTSWINKAS:  Would you put that up?  Thank you

20   very much.

21   Q.   Okay.  Will you read the language that you're

22   referring to?

23   A.   Yes.  So that is one part of the definition of the

24   entry date.  And one of the parts of that definition was the

25   date prior to May 27, 2014, on which any third-party

1    launches a generic esomeprazole product or an authorized

2    generic, and under a license or other agreement with any of

3    AstraZeneca, Merck, and KBI.

4           So, in other words, the point was if AstraZeneca

5    licensed somebody for an earlier date, Teva said they had to

6    have the ability to be in the market too.  It was extremely

7    important to them.

8         Q.   Any other provisions?

9         A.   Yeah.  There were two others that are relevant

10   here.  One is in section 5.3, which is over on page 12.

11   This is one of the provisions that we discussed at that

12   December meeting.  They said if you enter -- if you,

13   AstraZeneca, enter into a license for an earlier date you

14   have to tell us.  You have to give us notice of that.  And

15   that was when Staci said to me, If I don't have the ability

16   to be in the market day 1 when somebody else is in the

17   market, I'll get fired.

18        Q.   How is it negotiating with Ms. Julie?

19        A.   She's pretty tough.  She's -- you have to come

20   prepared.  And but it was a fair negotiation, but it was a

21   hard negotiation.  It was tough.

22        Q.   Any other provisions?

23        A.   Yeah.  Then there was another one that was very

24   important to them that they raised, and pushed us on, which

25   was 5.4.  This related to the situation where there could be

1    an unlicensed generic esomeprazole product.  In other words,

2    those earlier provisions were related to licenses that AZ

3    might grant, but 5.4 related to a situation where there was

4    an unlicensed product in the market.  And, again, they said

5    they had to have the ability to be in the market if there

6    was an unlicensed product in the market.

7         Q.   And do all of the provisions that you've just

8    described provide circumstances for earlier entry or later

9    entry than May 27, 2014?

10        A.   All of these provisions I've just discussed would

11   move the entry date earlier.

12        Q.   Now, I asked you these questions one by one.  I'll

13   cover the other side.

14             During the course of your settlement negotiations

15   with Teva, did AstraZeneca ever provided Teva with a copy of

16   its settlement agreement with Ranbaxy?

17        A.   No.  We never -- we never did.

18        Q.   And did you ever discuss the details of these

19   settlement discussions with Teva with any of -- any other

20   generic manufacturer who had filed an ANDA?

21        A.   No.  We never discussed any of the Teva

22   negotiations with any other generic.  We focused on Teva

23   alone in our discussions.  We never discussed with anybody

24   else.

25        Q.   Now, was there any agreement with Teva about

1    sending the settlement agreement to government agencies?

2         A.   Yes.  I mean, one of the provisions of the

3    settlement agreement provided that the agreement had to be

4    submitted to the Antitrust Division of the Justice

5    Department, the United States Justice Department, and it

6    also had to be submitted to the Federal Trade Commission.

7         Q.   And is that a separate agreement or is that

8    embodied in the settlement agreement itself?

9         A.   It was one of the terms that we had in the

10   agreement, that the agreement had to be submitted to the

11   Antitrust Division of the Justice Department and to the

12   Federal Trade Commission.

13        Q.   Can you find that provision in the settlement

14   agreement and point it out to the jury, please?

15        A.   Yes.

16        Q.   You're in Exhibit 11?

17        A.   Yes.  I'm sorry.  Yes, this is Trial Exhibit 11.

18   It's in Article 8, page 20.  And you can see the heading

19   there, "Notification of Settlement Agreement to the Federal

20   Trade Commission and Department of Justice."

21             So that's the provision that required us, under

22   our agreement, to submit.

23        Q.   Can you read that section to the jury, please?

24        A.   Yes.  So section 8.1 said, "Within five business

25   days following the signing date," so five days after this

1    agreement got signed, "the parties shall comply with the

2    requirements of Title IX," so forth, of the law, "by filing

3    or causing to be filed all necessary documents with the U.S.

4    Federal Trade Commission and the Antitrust Division of the

5    U.S. Department of Justice."  So that was 8.1.

6         Q.   Who originally inserted this provision in the

7    settlement agreement?

8         A.   This is language I had written and put into the

9    agreement.

10        Q.   Was it in your first draft?

11        A.   Yes, it was.  It was always in the draft.

12        Q.   And did you send the Nexium patent settlement with

13   Teva to the Antitrust Division of the United States

14   Department of Justice?

15        A.   Yes, we did.  We submitted it to the Justice

16   Department.

17        Q.   And did you send the Prilosec settlement as well?

18        A.   Yes.  We submitted the Prilosec agreement as well

19   to the Justice Department, and also to the Federal Trade

20   Commission.

21             MR. BUTSWINKAS:  I can't see here.  Excuse me.

22        Q.   I'm showing you what has been marked for

23   identification purposes as Exhibit CC.

24             Do you have that in front of you, Mr. Hester?

25        A.   Yes, I do.

1          Q.    Can you identify that, please?

2          A.    Yes.  This is a letter that was sent under my

3     signature to the Federal Trade Commission and to the

4     Antitrust Division of the Department of Justice that

5     enclosed the Nexium settlement agreement with Teva, and it

6     also enclosed the Prilosec settlement agreement with Teva.

7               MR. BUTSWINKAS:  I'd move that it be admitted,

8     your Honor.

9               MR. SOBOL:  No objection.

10              THE COURT:  It may be received.  CC is admitted in

11    evidence, Exhibit 101.

12              (Exhibit 101 received in evidence.)

13              MR. BUTSWINKAS:  Can you put that on the screen,

14    just the signature block?

15         Q.    This is the letter that you sent, Mr. Hester?

16         A.    Yes.  It was signed by Jonathan Gimblett for me.

17    It was a letter that I had prepared, but then I wasn't there

18    at the time to send it in.

19         Q.    Remind us who Jonathan Gimblett is?

20         A.    Jonathan Gimblett is a lawyer at my law firm who

21    was working with me on this.  And so he signed it on behalf

22    of me because I wasn't there when we sent this in.

23         Q.    I want to turn to the Prilosec settlement

24    agreement now, for a minute.  And did you draft that

25    settlement agreement?

1        A.   Yes, I did.

2        Q.   And was it surprising to you -- well, let me just

3   use the words of earlier questions.

4             Was it a coincidence that the Prilosec litigation

5   and the Nexium patent litigation were being settled on

6   parallel tracks?

7             MR. SOBOL:  Objection.

8             THE COURT:  No, he may have it in that form.

9        A.   It was -- it was not a coincidence.  We were

10  working on both of them around the same time.  We were

11  seeking to settle two pieces of litigation.  We were working

12  on both of them.  So when we got to the end, we signed them

13  both on the same day.

14       Q.   And do you have an understanding of when the

15  earliest settlement discussions in the Prilosec case had

16  happened between the parties, if you were involved?

17       A.   It had been years earlier.  There had been

18  discussions over time, over years, over whether to settle

19  the Prilosec case.

20       Q.   In the interactions that you had with Ms. Julie

21  and outside counsel for Teva during those months of

22  exchanges in that big book, Exhibit 77, that you saw, I

23  assume that there were some phone calls during that period?

24       A.   Yes.  There were a number of phone calls, and then

25  exchange of documents back and forth.

1          Q.    And at least one meeting?

2          A.    Yes.

3          Q.    And a lot of drafts?

4          A.    Right.

5          Q.    Okay.  During that period of time, was there ever

6     any mention by you of a discount in the Prilosec settlement

7     in order to achieve the Nexium patent settlement?

8               MR. SOBOL:  Objection.

9               THE COURT:  Put the question again?  Forgive me.

10              MR. BUTSWINKAS:  Yes, your Honor.

11         Q.    In that period of time during the negotiations

12    where you actually participated, was there ever any mention

13    by you of any kind of discount that was being given to Teva

14    in the Prilosec litigation in order to settle the Nexium

15    litigation?

16              MR. SOBOL:  Objection.

17              THE COURT:  Overruled.  You may have it.

18         A.    No.  There was never any suggestion of giving a

19    discount on Prilosec in order to get the Nexium case

20    settled.  And we viewed them as two separate settlements

21    that stood on their own.

22         Q.    Let me ask you on the other side the same

23    question.

24              In those negotiations was there ever any mention

25    by any Teva representative, whether inside Teva or outside

1    Teva, of a discount that they are receiving in the Prilosec

2    litigation in order to settle the Nexium litigation?

3        A.    Nobody ever suggested that to us at all.

4        Q.    Have you ever used IMS data in negotiating patent

5    damages settlements?

6        A.    No.  I don't use IMS data because they can be very

7    inaccurate.

8        Q.    I'm going to turn to the settlement negotiations

9    with Ranbaxy.

10       A.    Right.

11       Q.    And you -- you've described a lot of that, so I'm

12   going to be able to streamline some of the questions that I

13   had for you.

14            But could you remind us when the first meeting you

15   attended with Ranbaxy was?

16       A.    The first meeting I attended was November 2007.

17       Q.    Okay.  And what was your role there?

18       A.    Well, I was there to help with the negotiation of

19   the settlement terms and with the preparation of the

20   settlement agreement, if we were able to reach an agreement.

21       Q.    And who else attended that meeting?

22       A.    Jeff Pott was there, some other in-house folks

23   from -- from AstraZeneca were there, maybe somebody else

24   from my firm was there with me too.

25       Q.    And how about from Ranbaxy?

1           A.   Jay Deshmukh was there, there were some other

2    people, in-house people from Ranbaxy there, and also their

3    outside antitrust counsel, Lisa Fales, was there.

4           Q.   So the counterpart to you?

5           A.   Yes.

6           Q.   And who was Jay Deshmukh, if I hopefully

7    pronounced that right?

8           A.   He was an in-house.  I believe he's a lawyer.  He

9    was leading the negotiations for Ranbaxy in relation to the

10   settlement.

11          Q.   And during this meeting did AstraZeneca explain to

12   Ranbaxy its rationale for the May 27, 2014, entry date?

13          A.   Yes, we did.  We said that those were the

14   expiration dates on the medicine patents, the key medicine

15   patents for Nexium, and that was the date that we'd be

16   willing to use as the settlement allowing early entry on our

17   patents, but respecting the expiration of those key medicine

18   patents.

19          Q.   And did AstraZeneca explain at this meeting why it

20   wanted those terms in a consent judgment, which you've

21   answered some questions about?

22          A.   Yes, we did.

23          Q.   What did you say?

24          A.   And what we said was that we needed a court order

25   that we were, in effect, getting a win in the patent

1    litigation with respect to the medicine patents, and we

2    needed a court order to enforce the win we were getting

3    through the settlement of the litigation in relation to

4    validity infringement enforceability of the patents up

5    through May 27, 2014.  And we needed teeth to be able to

6    enforce the settlement.

7        Q.   And you testified earlier that Mr. Deshmukh had

8    asked about the possibility of other commercial

9    relationships.  Do you remember, generally, those questions?

10       A.   That's right.  He said, generally, that he would

11   hope that AstraZeneca would consider the possibility of

12   other commercial arrangements with Ranbaxy.

13       Q.   And when that was raised, did AstraZeneca respond?

14       A.   Yes.  We said we would consider it, but only if it

15   made independent business sense as a stand-alone deal.

16       Q.   And was there any response?

17       A.   And then Lisa Fales, the outside antitrust counsel

18   for Ranbaxy, responded and said she agreed that the business

19   deals, commercial deals, had to make independent sense

20   separate and apart from the settlement.

21       Q.   And when was the next time you met, if at all,

22   with regard to the Ranbaxy settlement after the

23   November 2007 meeting?

24       A.   It was in early January of 2008 -- 2008.  I think

25   it was January 4.

1       Q.   And who attended that meeting?

2       A.   I was there, Jeff Pott was there, I think there

3  possibly were some other AZ in-house folks, maybe one other

4  person from my firm.

5       Q.   How about for Ranbaxy?

6       A.   Mr. Deshmukh was there.  There were some other

7  in-house folks there from Ranbaxy.  I think one of their

8  outside lawyers was also there.

9       Q.   Okay.  And what had happened, if anything, in the

10 negotiations leading up to that meeting after the November

11 meeting?

12      A.   Well, after the November meeting I had put

13 together a draft of the settlement agreement which I sent

14 along to the Ranbaxy team.  We had then gotten comments back

15 from Lisa Fales.  Their outside antitrust counsel had sent

16 these comments back.  And then -- so that was what had

17 happened before the January meeting.

18      Q.   And when you got to the January meeting, who led

19 the discussion?

20      A.   I was principally leading the discussion over the

21 language of the agreement.

22      Q.   Okay.  Were there any terms agreed to at that

23 meeting?

24      A.   Yeah.  By the end of the meeting we had basically

25 come to an agreement as to all of the terms.

1        Q.    And what were they?

2        A.    Well, the key terms were, first, that there would

3    be early entry, four years early, under the AstraZeneca

4    patents to allow Ranbaxy to be licensed as of May 2014, May

5    27, 2014.  Ranbaxy agreed that the patents were valid,

6    enforceable and infringed, and would respect AstraZeneca's

7    patent rights.  And that there would be a court order that

8    would be submitted to the Court.  And that the agreement,

9    none of the terms of the agreement would go into effect

10   without the court order.

11           And that was one of the things we discussed at

12   length with them.  And so that was another important term

13   that was part of this agreement we had finalized, more or

14   less finalized by the end of that January meeting.

15       Q.    And did Ranbaxy agree at that meeting to have a

16   court order?

17       A.    Yes.  We had some back-and-forth with Ranbaxy over

18   that, but they did agree.  And they agreed with our very

19   important point that we stressed, that there had -- that the

20   agreement would not take place and would not take effect

21   unless there was a court order that gave enforceability to

22   the settlement.

23       Q.    And did you write the language of the agreement to

24   reflect that point?

25       A.    Yes, I did.

1    Q.   Okay.  And you were asked some questions about

2    whether the settlement agreement was an agreement not to

3    compete during Ranbaxy's period of exclusivity if they ended

4    up getting one.  Do you remember those, generally?

5    A.   Yes, I do, generally.

6    Q.   Okay.  Was it?

7    A.   It was not an agreement not to compete.  We were

8    careful in negotiating the language to preserve AZ's ability

9    to compete.  The only commitment we were making was that AZ

10   would not launch an authorized generic.  And we retained the

11   ability to develop other products to compete very hard with

12   the branded Nexium product, and to introduce an OTC product,

13   as AstraZeneca did.

14   Q.   What was discussed, if anything, at the -- this

15   January meeting about the possibility of AstraZeneca

16   licensing another company to the Nexium patents?

17   A.   Didn't talk about it a bit.  We were only talking

18   about settling the Ranbaxy case.

19   Q.   Let me show you what's already been marked as

20   trial Exhibit Number 10.

21        (Whereupon counsel conferred.)

22   Q.   Mr. Hester, do you have Exhibit 10 in front of

23   you?

24   A.   Yes, I have Trial Exhibit 10 here.

25   Q.   Would you please identify that, for the record?

1      A.    So this is the final version of the settlement

2  agreement between AstraZeneca and Ranbaxy related to the

3  Nexium patent litigation.

4      Q.    And can you point out the section where the entry

5  date is memorialized?

6      A.    Yes.  The entry date is set out in section 5.2 of

7  the agreement, on page 10.

8      Q.    I won't belabor that because you were asked

9  questions about it before.  You just testified about the

10  provision in the agreement that said that if there was no

11  order of the Court the agreement wouldn't take effect?

12      A.    Yes.

13      Q.    Can you cite that language?

14      A.    Yes.  So if you look at section 2.2, which carries

15  over from page 5 to page 6 of the agreement.

16          MR. BUTSWINKAS:  Thank you, Andrew.

17      A.    Section 2.2 discusses this idea that the judge,

18  the District Court Judge Pisano would be asked to enter the

19  consent judgment.  And then at the end of section 2.2 it

20  says if after 30 calendar days from the filing of the

21  consent judgment, in other words if after 30 days after the

22  court order was submitted to Judge Pisano for him to review

23  and sign, if the parties failed to secure entry of the

24  consent judgment, in other words, if Judge Pisano didn't

25  sign the consent judgment, didn't sign the court order, the

1    settlement agreement shall be null and void and shall have

2    no legal effect.

3            That was the critical language, that the

4    settlement agreement would be null and void and have no

5    legal effect if Judge Pisano did not enter the court order,

6    did not sign the court order.

7        Q.   You were asked some questions about whether

8    AstraZeneca tried to keep the settlement a secret.  Do you

9    remember, generally, those questions?

10       A.   Yes.

11       Q.   Did it?

12       A.   No.  We were not keeping it a secret.  We intended

13   all along it would be submitted and disclosed to the Federal

14   Trade Commission, to the Antitrust Division of the

15   Department of Justice, and to Judge Pisano.  That was the

16   intent of this provision with respect to Judge Pisano, that

17   if he didn't sign the consent judgment, which was part of

18   the settlement agreement, it wouldn't take effect.  But we

19   never intended to keep it a secret.

20       Q.   But there's a confidentiality provision in the

21   settlement agreement, Mr. Hester?

22       A.   A confidentiality provision is a really standard

23   thing you see in settlement agreements.

24           MR. SOBOL:  Objection, your Honor.

25           THE COURT:  Yes, sustained.  That's not responsive

1    to the question.

2         Q.   When's the last time you've done a settlement

3    agreement in your career that didn't contain a

4    confidentiality agreement?

5              MR. SOBOL:  Objection.

6              THE COURT:  No, he may answer that.  Just when.

7         A.   I've never done one without a confidentiality

8    agreement.

9         Q.   I want to show you Trial Exhibit 37, which I think

10   you were asked some questions about.

11             (Whereupon counsel conferred.)

12        Q.   Mr. Hester, do you have Exhibit 37 in front of

13   you?

14        A.   Yes, I do.

15        Q.   And can you tell us what that is?

16        A.   So this is the consent judgment, the court order,

17   that Judge Pisano signed and that caused the settlement

18   agreement to go into effect.

19        Q.   Okay.  And with respect to the -- what you've

20   described as the core medicine patents, how does this order

21   compare to what was being sought in the patent litigation?

22        A.   The relief that's set out in this court order is

23   the same relief that we would have gotten if we had won the

24   patent litigation on the medicine patents.

25        Q.   And were you involved from start to finish in the

1    drafting of the settlement agreements with Ranbaxy?

2         A.    Yes.   I was involved throughout in all of the

3    drafting.

4         Q.    Okay.   And forgive me if I'm repeating myself, but

5    did you ever send any of those drafts to anybody from Teva?

6         A.    No, we never showed anybody any drafts of the

7    Ranbaxy agreement, anybody else, never showed it to Teva or

8    anybody else.

9         Q.    And did anybody from Teva ever participate in any

10   of those negotiations?

11        A.    Nobody from Teva ever participated in any

12   negotiations with Ranbaxy.   We never discussed the Ranbaxy

13   negotiations with them.

14        Q.    You described how you personally sent the Prilosec

15   settlement agreement and the Nexium settlement agreement

16   with Teva to the Federal Trade Commission and the Antitrust

17   Division of the Department of Justice.

18        A.    That's --

19        Q.    Did you do the same thing with Ranbaxy?

20        A.    With the Ranbaxy agreement, the Nexium settlement

21   agreement and all of the commercial arrangements that the

22   parties had also entered into, I submitted all of those to

23   the Federal Trade Commission and to the Antitrust Division

24   of the Justice Department.

25        Q.    Let me show you what's been marked as Exhibit CD

1     for identification.

2              Can you identify CD, Mr. Hester?

3       A.    Yes.   This is the document, the cover letter that

4     I prepared and sent to the Federal Trade Commission and to

5     the Antitrust Division of the Justice Department that

6     enclosed the Nexium settlement agreement with Ranbaxy.  And

7     it also enclosed the other commercial deals as well.

8              MR. BUTSWINKAS:  I'd ask that it be admitted.

9              MR. SOBOL:  No objection.

10             THE COURT:  No objection?  No objection, CD's

11    admitted, Exhibit 102.

12             (Exhibit 102 received in evidence.)

13             THE COURT:  It's 1:00 and we'll stop at this

14    point.

15             MR. BUTSWINKAS:  Thank you, your Honor.

16             THE COURT:  You may step down, sir.

17             THE WITNESS:  Thank you, your Honor.

18             (Whereupon the witness stepped down.)

19             THE COURT:  All right, ladies and gentlemen, we're

20    moving right along.  We'll start at 9:30 tomorrow and take a

21    shorter recess, go to 1:00.  You've not heard all the

22    testimony.  Please, therefore, keep your minds suspended.

23    Do not discuss the case either among yourselves nor with

24    anyone else.

25             The jury may stand in recess until 9:30 tomorrow

1      morning.  I'll remain on the bench.

2              THE CLERK:  All rise for the jury.

3              (Whereupon the jury left the courtroom at

4      1:00 p.m.)

5              THE COURT:  Please be seated.  Out of the 15 days

6      available to both sides the plaintiff has used up six days,

7      one hour; defense have used up three days, two hours.

8              We'll stand in recess till 9:30 tomorrow morning.

9              MR. SOBOL:  If I may, your Honor?

10             THE COURT:  Yes.

11             MR. SOBOL:  I think it might help the parties if

12     we can get a few minutes of your time this afternoon?

13             THE COURT:  There's a court meeting this

14     afternoon.

15             MR. SOBOL:  Okay.

16             MR. SHADOWEN:  Your Honor, can we hand up the

17     McCool report showing --

18             THE COURT:  I will be very much aided with that.

19     Would you give it to the clerk?

20             MR. SCHOEN:  Your Honor, I just, on that note, I

21     point out the McCool report doesn't cite the document.  It

22     cites Dr. McGuire's report, so it doesn't cite the --

23             THE COURT:  With respect, Mr. Schoen, I can read.

24             (Proceedings adjourned.)

25

# C E R T I F I C A T E

I, Cheryl B. Palanchian, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

_____
                    CHERYL B. PALANCHIAN
                    Official Court Reporter
                    1 Courthouse Way
          South Boston, Massachusetts 02110