1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3                                    No. 12-md-02409-WGY
                                     Volume 1, Pages 1 - 65
4

5

6    In Re:  NEXIUM (ESOMEPRAZOLE)
     ANTITRUST LITIGATION
7

8

9

10                          * * * * * * * * *

11

12
                          For Jury Trial Before:
13                        Judge William G. Young

14

15
                        United States District Court
16                      District of Massachusetts (Boston)
                        One Courthouse Way
17                      Boston, Massachusetts 02210
                        Wednesday, November 12, 2014
18

19                          * * * * * * * *

20

21
                 REPORTER: RICHARD H. ROMANOW, RPR
22                      Official Court Reporter
                      United States District Court
23         One Courthouse Way, Room 5510, Boston, MA 02210
                        bulldog@richromanow.com
24

25

```
 1                 A P P E A R A N C E S

 2    THOMAS M. SOBOL, ESQ.
          Hagens Berman Sobol Shapiro, LLP
 3        55 Cambridge Parkway, Suite 301
          Cambridge, MA 02142
 4        Email: Tom@hbsslaw.com
      and
 5    STEVE D. SHADOWEN, ESQ.
          Hilliard & Shadowen, LLC
 6        39 West Main Street
          Mechanicsburg, PA 17055
 7        Email: Steve@hilliardshadowenlaw.com
      and
 8    RICHARD ARNOLD, ESQ.
          Kenny Nachwalter, P.A.
 9        201 South Biscayne Boulevard, Suite 1100
          Miami, FL 33131
10        For plaintiffs

11    LAURENCE A. SCHOEN, ESQ.
          Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
12        One Financial Center.
          Boston, MA 02111
13        Email: Laschoen@mintz.com
      and
14    KAREN N. WALKER, ESQ.
      KEVIN VAN WART, ESQ.
15        Kirkland & Ellis, LLP
          655 Fifteenth Street, N.W., Suite 1200
16        Washington, DC 20005
          For Teva defendants
17
      JOHN E. SCHMIDTLEIN, ESQ.
18    PAUL B. GAFFNEY, ESQ.
      DANE H. BUTSWINKAS, ESQ.
19        Williams & Connolly, LLP
          725 Twelfth Street, N.W.
20        Washington, DC 20005
          Email: Jschmidtlein@wc.com
21        For AstraZenca defendants

22    JAMES D. BALDRIDGE, ESQ.
      DANIELLE R. FOLEY, ESQ.
23        Venable, LLP
          575 7th Street, N.W.
24        Washington, DC 20004
          Email: Jdbaldridge@venable.com
25        For Ranbaxy defendants
```

```
1                       I N D E X

2

3   WITNESS                 DIRECT  CROSS  REDIRECT  RECROSS

4
    VENKATACHALAM KRISHNAN (By videodeposition, continued.)
5

6   JAY DESHMUKH

7        By Mr. Sobol:        12

8
    MEREDITH ROSENTHAL
9
         By Mr. Shadowen:      43
10

11

12
                      E X H I B I T S
13
```

```
14   EXHIBIT 131.......................................  9

15   EXHIBIT 132.......................................  9

16   EXHIBIT 133.......................................  9

17   EXHIBIT 134.......................................  9

18   EXHIBIT 135.......................................  9

19   EXHIBIT 136.......................................  9

20   EXHIBIT 137.......................................  9

21   EXHIBIT 138.......................................  9

22   EXHIBIT 139....................................... 48
```

```
23

24

25
```

```
 1          P R O C E E D I N G S

 2          (Begins, 9:30 a.m.)

 3          THE COURT:  Good morning.  I came out before the

 4     jury because you're entitled to know the Court's ruling

 5     on the motion to strike the testimony of McCool.  Let me

 6     say I've been very much aided both by the briefing and

 7     the arguments of counsel.  And after full consideration

 8     I do strike so much of the testimony of McCool as comes

 9     up with his 55 percent plus 10 million upfront and also

10     the dollar amounts of the supposed comparables.  The

11     ground for the Court's -- and it is a preliminary

12     finding, not a ruling, entitled to deference on appeal,

13     is that upon reflection he bases his opinion on data

14     that is not reliable.  It's not reliable because of the

15     selection of only a portion of the potential range of

16     possible comparables.

17          Now, while I strike that, I must tell you that I

18     accept, um -- I'm not so finding but I -- well, I guess

19     I am finding.  I accept Mr. Sobol's argument that the

20     qualitative aspects of his testimony, bolstered by the

21     testimony of McGuire, who, without hearing, I determined

22     the motion to strike McGuire's testimony is denied, the

23     qualitative aspects specifically that in this unique

24     circumstance there are no real comparables and the other

25     qualitative aspects of his testimony stand.
```

1        I'm not saying anything to the jury this morning

2   and I don't know that I'll have to say anything to the

3   jury because we're moving on now to the motion for a

4   directed verdict at this stage, and I will entertain the

5   defense argument and 2:00 this afternoon, and once I've

6   heard the arguments, we'll see where we stand.  But you

7   needed to know what you can base your arguments on

8   relative to McCool and I've made my ruling.

9        All right.  Bring the jury out.

10       (Pause.)

11       THE COURT:  Just as they are coming in, we are in

12   the midst of a deposition that has only a little time

13   left, when we finish that, then what's going to happen?

14       MR. SHADOWEN:  Your Honor, we're going to move the

15   admission of a deposition transcript, or a portion of

16   it, and then comes Mr. Jay Deshmukh.

17       THE COURT:  Okay.  Live or by --

18       MR. SHADOWEN:  Live.

19       THE COURT:  Fine.  And is the portion of the

20   deposition -- is this GCR?

21       MR. SHADOWEN:  It's GDM, Mr. Diggons.

22       THE COURT:  Do I have it?  Have I vetted it?

23       MR. SHADOWEN:  Yes, you have, your Honor.

24       THE COURT:  Oh.

25       MR. SHADOWEN:  These are the deposition

1    designations of the parties after the Court's rulings.

2         THE COURT:  All right.  Fine.

3         MR. SCHMIDTLEIN:  Your Honor, we object -- if they

4    want to play the video, they can play the video, but we

5    object to just moving in --

6         THE COURT:  Oh, I don't intend to put it in as an

7    exhibit.

8         (Jury enters, 9:35 a.m.)

9         THE COURT:  Good morning, ladies and gentlemen.

10   Thank you so very much for your promptness.  We're all

11   ready to go.  We were listening to a deposition and

12   we'll finish that deposition.

13        (Resumes video of Venkatachalam Krishnan.)

14   Q.    We are marking as Deposition Exhibit Venkat 20 a

15   document produced to us by Ranbaxy in this case.  It

16   appears to be a letter from a law firm of Mathews,

17   Shepherd, McKay & Bruneau dated July 19th, 2007 to the

18   Honorable Joel A. Pisano.  It's a seven-page document,

19   Bates page RAN-ESM 244 through 250.

20   In the first page of that -- the first page of that

21   letter, the first paragraph, it's noted that this letter

22   is being submitted to Judge Pisano on behalf of Ranbaxy,

23   Inc. and Ranbaxy Laboratories, Limited.  Do you see

24   that?

25   A.    Ranbaxy, yes.

1    Q.    You have no reason to believe that this law firm

2    wasn't authorized to actually file this on behalf of

3    Ranbaxy, do you?

4    A.    No.

5    Q.    I'll refer you to the last page of this exhibit.

6    Then in the next paragraph it goes on to say that

7    "Ranbaxy is willing to discuss a settlement that

8    resolves the litigation by selecting an agreed-upon date

9    for market entry of Ranbaxy's generic product wherein

10   the agreed-upon date is a compromise between market

11   entry in 2008 and the expiry of the 2014/2015 patents as

12   Ranbaxy does not infringe the patents that expire in

13   2018 and 2020.  Do you see that?

14   A.    Yes.

15   Q.    Do you believe that was a correct statement of

16   Ranbaxy's settlement position as of July 19th, 2007?

17   A.    What, the compromise?

18   Q.    Yes, what it was willing to compromise to.

19   A.    Yes.

20   Q.    Now, as we know from the agreement, one of the

21   entry dates is May 27th, 2014.  Correct?

22   A.    Correct.

23   Q.    If available to it, do you think that Ranbaxy

24   would have been willing to agree to an entry date prior

25   to that?

1    A.     That's speculation.  I don't know.

2    Q.     Would it has been palatable to Ranbaxy to agree to

3    an entry date that was prior to May 27th, 2014?

4    A.     Possibly, yes.

5      (Video ends.)

6            THE COURT:  That's it?

7            MR. SOBOL:  I think that's it.

8            THE COURT:  All right.

9            MR. SOBOL:  So the plaintiffs then move the

10   following exhibits that were played during the videotape

11   and to the jury in evidence.  EUS.  EMV.  EOQ.  ENS.

12   EOZ.  FJC.

13           THE COURT:  Wait a second.  ENS.  EOZ.  Go ahead.

14           MR. SOBOL:  FJC.  FJE.  And finally DMV.

15           THE COURT:  No objection?

16           MS. FOLEY:  Your Honor, we have an objection.  I

17   believe the last one was DMT?

18           THE COURT:  DMV.

19           MS. FOLEY:  I believe the exhibit -- is that the

20   July 19th, 2007?  This is the settlement statement of

21   Ranbaxy to the Court.  We ask that it be admitted with

22   the same limitation as other pleadings.

23           THE COURT:  And no objections to the others?

24           MS. FOLEY:  Yes.

25           THE COURT:  Fine.  Then EUS will be Exhibit 130.

1   EMV 131.

2          THE CLERK:  Judge, 131 will be EUS.

3          THE COURT:  Oh, thank you.  I'll start again.

4          EUS, 131.  EMV, 132.  EOQ, 133.  EMS, 134.  EOZ,

5   135.  FJC, 136.  FJE, 137.  DMV, 138, but it's limited

6   as I've limited other things submitted to the Court for

7   the fact, if you believe it to be a fact, that this was

8   filed in court but not for the truth of what was said

9   there.

10          (Exhibits 131 to 138, marked.)

11          THE COURT:  Go ahead.

12          MR. SOBOL:  Before we proceed with the next

13   witness, your Honor, can we have a brief sidebar?

14          THE COURT:  We may.

15

16          AT THE SIDEBAR

17          MR. SOBOL:  It's simply a small but an important

18   distinction.  The last exhibit, Exhibit 138, is a

19   settlement position paper by Ranbaxy.  We agree

20   completely that so much of that position paper that

21   asserts positions regarding the merits of the case would

22   be limited.  However, there's a portion at the end of

23   the settlement which states Ranbaxy's position vis-vis

24   settlement and that should go in for the truth of the

25   matter asserted because it's a statement of a party

1    opponent regarding what its settlement position was.

2    It's a small distinction, but I think it's important.

3         THE COURT:  He's right, isn't it, it's an

4    admission?

5         MS. FOLEY:  Yes.

6         MR. BALDRIDGE:  Completely confusing though as to

7    what the nuance is between the settlement position.

8         THE COURT:  I can't help that.  I will so -- just

9    give me the specifics.  Just mark it out.  And I'll give

10   an appropriate instruction.

11        Again, to sort of save this, if you're going to

12   recall McGuire and I look forward to McGuire being

13   recalled, um, I'm not letting McGuire get into payments

14   from Ranbaxy.  The question -- the only question as to

15   Ranbaxy is whether they knew that, um, from their deal

16   with AstraZeneca, AstraZeneca was going to pay for delay

17   as to everyone else?  In other words, did they know,

18   when they first settled, that that was -- that

19   AstraZeneca was going to buy out and pay for delay with

20   respect to the others so that the jury could find that

21   Ranbaxy conspired with AstraZeneca and Teva?  I'm not

22   interested in payments.

23        MR. SCHMIDTLEIN:  And he has no opinion on it.

24        THE COURT:  You just won that.

25        MR. SCHMIDTLEIN:  Yeah, I know.

```
1          (Laughter.)
2          Thank you, your Honor.
3
4          (In open court.)
5          THE COURT:  The document?  I should probably give
6     the charge now.
7          MR. SOBOL:  May I approach, your Honor?
8          THE COURT:  Yeah, of course.
9          And the paragraph is?
10         MR. SOBOL:  Yeah, it's -- you'll see it begins on
11    the second-to-last page, your Honor, with an obvious
12    title.
13         THE COURT:  Right.  Thank you.
14         I'm holding in my hand now what was DMV, now in
15    evidence as Exhibit 138, and it's limited.  But the
16    plaintiffs point out that here on the bottom and in
17    Roman Numeral IV, and it's on Page 6 of this document,
18    if you believe it is what it purports to be, it says
19    "Ranbaxy's Settlement Position."  Well, that's in
20    general.  I mean if that's what Ranbaxy was saying its
21    settlement position was, you can consider that that in
22    fact, if you believe it, was its settlement position.
23         Go ahead, Mr. Sobol.
24         MR. SOBOL:  Thank you, your Honor.
25         The plaintiffs call Mr. Jay Deshmukh, your Honor.
```

1        THE COURT:  He may be called.

2        MR. BALDRIDGE:  Your Honor, could I just make it

3   clear, I thought they were playing videos first, which

4   is fine, but I don't know whether those are withdrawn.

5        THE COURT:  Well, I don't either, but they called

6   a witness, and that's what we're going to hear.

7        MR. BALDRIDGE:  Yes, your Honor.

8        (Mr. Deshmukh enters courtroom.)

9        (JAY DESHMUKH, sworn.)

10

11       * * * * * * * * * * * *

12       JAY DESHMUKH

13       * * * * * * * * * * * *

14

15   DIRECT EXAMINATION BY MR. SOBOL:

16   Q.    Good morning, sir.

17   A.    Good morning.

18   Q.    Please state your name and spell your last name.

19   A.    Jay Deshmukh.  Short Jay, last name is spelled

20   "D," as in delta, "E," "S," as in "Sam," "H," as in

21   "Harry," "M," as in "Mary," "U," "K," "H," as in

22   "Harry."

23   Q.    How are you today, sir?

24   A.    Excellent.  How are you?

25   Q.    Fine.  Thank you very much.  I had caffeine with

```
1    my coffee unfortunately this morning.

2    A.    Same here.

3    Q.    Very good.

4    Now, you are a lawyer, sir, correct?

5    A.    I am a lawyer.

6    Q.    Okay.  You might pull the microphone a little bit

7    to your right so that you don't have to look this way,

8    but you might want to turn your chair.

9    A.    Sure.

10   Q.    Where did you go to law school, sir?

11   A.    Case Western in Ohio.

12   Q.    What year did you graduate?

13   A.    '92.

14   Q.    At some point you became employed at Ranbaxy,

15   correct?

16   A.    Sorry?

17   Q.    At some point you became employed at Ranbaxy?

18   A.    Yes.

19   Q.    And when was that, what year?

20   A.    1997.

21   Q.    Okay.  So what did you do as a lawyer between 1992

22   and 1997?

23   A.    I was in private practice in a couple of law firms

24   in Cincinnati, Ohio.

25   Q.    Doing what kind of law?
```

A.     Patent law.

Q.     And how long did you work at Ranbaxy, from what year until what year?

A.     Um, 1997 through 2009.

Q.     Do you recall what month in 2009?

A.     I believe it was March.

Q.     And since the time you worked at Ranbaxy, where have you worked as a lawyer?

A.     At my current law firm, Knobbe, Martens.

Q.     Located where?

A.     Well, the law firm was located primarily on the West Coast but I worked in the D.C. office.

Q.     Practicing what kind of law?

A.     Intellectual property law, patent law, trademark law.

Q.     For about the past five years since you left Ranbaxy, correct?

A.     Yeah.

Q.     Okay.  Now, during the years 2007, 2008 and until March of 2009, when you were working at Ranbaxy, what was your job responsibilities -- what were your job responsibilities?

A.     So initially it was a -- what I would call a pure in-house intellectual property position, which means you deal with things related to patents and patent

1  litigation and things of that nature, including filing

2  for patents and, um, dealing with litigations that show

3  up.  And that position then involved a little bit more

4  into -- over time into more of a General Counsel-type

5  role where I was dealing with more serious legal issues

6  which came up, um, not just related to patents and

7  trademarks, but other areas.

8  Q.    Okay.  Such as compliance matters with the FDA?

9  A.    Um, yes.

10  Q.    Okay.  By, um -- there's -- as you've probably

11  been made aware, there are some issues in this case

12  regarding some transactions that began to be negotiated

13  in the time period of July 2007, August 2007.  At that

14  point in time were you functioning basically as

15  Ranbaxy's equivalent of a General Counsel, essentially

16  having those responsibilities but not having that formal

17  title?

18  A.    I would say so.

19  Q.    Okay.  To whom did you report?

20  A.    So you're asking at that time or?

21  Q.    Um, yes, sir, at that time.

22  A.    Arun Sawhney, the CEO.

23  Q.    Okay.  So you reported directly to the CEO,

24  correct?

25  A.    Yes.

Q.     And he was based where?

A.     In India.

Q.     And you were based where?

A.     In Princeton, New Jersey.

Q.     Okay.  And was that essentially your job
responsibilities and the person to whom you reported in
the time period, the summer of 2007, up until the time
that you left Ranbaxy in March of 2009?

A.     Yes.

Q.     Now, you prepared for your deposition -- excuse
me, for your testimony here today, correct?

A.     I did.

Q.     With lawyers from, um -- that are representing
Ranbaxy in this case?

A.     Yes.

Q.     And for how long?

A.     A few hours.

Q.     Okay.  Recently?

A.     Yes.

Q.     Okay.  Now, I put before you what has been marked
previously at this trial as Exhibit 22.

Does this appear to you to be a photocopy of a
submission that was made on behalf of Ranbaxy in
connection with the Paragraph 4 certification that it
was making for a generic Nexium?

1    A.    (Looks.)  I guess you don't want me to look

2    through all the pages, but it looks like it.

3    Q.    Okay.  And is it fair to say that this document,

4    which is about 105 pages or so, is a description by

5    Ranbaxy of its position, um, with respect to 13

6    Orange-Book-listed patents of AstraZeneca with respect

7    to Nexium?

8    A.    (Looks.)  So this serves, um, the notice function

9    as mandated by the statute, and so I don't know if I

10   could agree with that, the position of Ranbaxy with

11   companies when they have to, um, launch or wish to

12   launch generic products which have patents listed in the

13   Orange Book.  As a matter of course, they have to deal

14   with the patents one way or the other.  And this is, um,

15   sort of satisfying that requirement in sending this

16   letter out.  And, um, you don't have to set out every

17   position that you may or may not have, but you do have

18   to deal with each one of the patents.

19   Q.    Okay.  So back at this time, and this is October

20   of 2005, you actually signed this document, correct,

21   sir?

22   A.    Yes, it was a requirement.

23   Q.    All right.  And you took pride at your work at

24   that time, correct?  Yes or no?

25   A.    I always take pride in my work.

1    Q.    And you take pride in this particular piece of

2    work, too, correct, sir?

3    A.    Just like everything else.

4    Q.    Okay.  And essentially the position -- if you go

5    to Page 2 of this document in the middle of the page

6    where it has a 6.

7         MR. SOBOL:  If we could have that blown up,

8    please.

9         (Enlarged on screen.)

10   Q.    Among other things this document indicates that

11   the position of Ranbaxy is that it's providing a

12   Paragraph 3 certification regarding three patents, the

13   '974, the '505, and the '230, correct?

14   A.    Yes.

15   Q.    Okay.  And that -- could you just explain to the

16   jury what means Ranbaxy's position was with respect to

17   those three patents?

18   A.    Sure.  Um, so what that means is because those

19   patents still existed in the Orange Book -- and like I

20   said one has to deal with each one of the patents which

21   exists at the time that you do this letter, um, but they

22   were going to expire fairly soon after the timing of

23   this letter.  We didn't feel the need to challenge these

24   patents.  And so therefore because we knew we were not

25   going to get approval, um, and were close to well before

1    the patents would have expired, well before our possible

2    approval, so therefore we filed what's called a

3    Paragraph 3 certification which means we're not

4    challenging these patents.

5    Q.    Okay.  And in the next paragraph, Paragraph 7, it

6    indicates 10 patents and the position with respect to

7    those 10 patents was a Paragraph 4 certification,

8    correct?

9    A.    Yes.

10   Q.    Okay.  And the position here essentially was that

11   to best of knowledge -- to the best of Ranbaxy's

12   knowledge, no valid and relevant claim of any of those

13   patents would be infringed by Ranbaxy's proposed

14   product, correct?

15   A.    Yes.

16   Q.    Okay.  And then the balance of this 105-page

17   document in large part describes the bases, or at least

18   some of the bases, upon which Ranbaxy was taking that

19   position, is that fair to say?

20   A.    I just want to point out it says in the document

21   itself, even if you just look at the letters, 115 pages,

22   and so just with that slight correction.  And then if

23   you include the confidential access, it's more like 120

24   pages.  Yes.

25   Q.    Okay.  Now, after sending this document to

1  AstraZeneca, AstraZeneca brought a lawsuit against

2  Ranbaxy, correct?

3  A.    Yes.

4  Q.    And that lawsuit, at least at the outset, asserted

5  five of the ten patents that had been listed in the

6  Orange Book as having been valid and infringed by

7  Ranbaxy, correct?

8  A.    So the lawsuit in total, I believe, asserted six

9  patents, but out of the Orange Book patents five were

10  Orange Book patents out of the 6.

11  Q.    All right.  And then there was a sixth patent, the

12  '789 patent, which was the process patent, fair to say?

13  A.    I don't remember the last three digits of the

14  process patent.  But I'll take your word for it.

15  Q.    Okay.  And then Ranbaxy filed an answer in

16  response to that complaint, correct?

17  A.    I believe so, yes.

18  Q.    And again this was a -- although you hired or

19  someone hired lawyers to represent Ranbaxy in that case,

20  correct?

21  A.    Yes, I hired them.

22  Q.    Okay.  And the position of Ranbaxy, in response to

23  the lawsuit, was that, um, each of the six patents would

24  either be invalid or not infringed, fair to say?

25  A.    Or both in some cases.

1    Q.    Fair enough.   Thank you.

2          MR. SOBOL:   DMT.

3      (On screen.)

4    Q.    Sir, I've put before you what we've marked as DMT.

5    Is DMT a photocopy of a letter that was sent on behalf

6    of Ranbaxy to Judge Pisano in connection with a

7    potential settlement conference to be held in the summer

8    of 2007?

9    A.    (Looks.)   Yes.

10         MR. SOBOL:   I offer it.

11         MR. BALDRIDGE:   Your Honor, this has already been

12   admitted under DMV just a minute ago.

13         MR. BUTSWINKAS:   It's 138.

14         MR. SOBOL:   Fair enough.

15         THE COURT:   Right, 138.   Thank you, Mr. Baldridge.

16         MR. BALDRIDGE:   Yes, sir.

17   Q.    If you would turn to the second page, the second

18   paragraph of that page, please.

19   A.    (Turns.)

20   Q.    The letter to the Court, um, in connection with

21   the potential settlement conference states:   "Nexium is

22   AstraZeneca's follow-on product to its earlier

23   blockbuster drug Prilosec.   As Prilosec was losing its

24   patent protection in 2001, it was a multi billion dollar

25   per year product for AstraZeneca.   To stem the dramatic

1    loss in sales revenue caused by the market entry of

2    generic versions of Prilosec, AstraZeneca devised a plan

3    to replace Prilosec with Nexium, a closely-related

4    product containing virtually the same active ingredient

5    in Prilosec.  AstraZeneca's plan was predicated on a

6    technique known as a, quote, 'chiral switch,' end

7    quote."

8    That was a part of a position that your company took to

9    Judge Pisano, correct?

10   A.    I wouldn't call it a "position," but these are

11   just stating facts.

12   Q.    And what is a "chiral switch," sir?

13   A.    Um, so in most -- I shouldn't say "most," many,

14   um, medical products, drugs, um, there is the active

15   ingredient -- every drug product has an active

16   ingredient and the active ingredients in products which

17   are chemically based or contain chemical compounds are

18   organic compounds which, as they, um, occur in nature

19   for the most part, are what is known as racemates, which

20   means they're a 50/50 mix of, um, a compound and the

21   other compound being a mirror image of the first

22   compound.  So this is how sort of nature, in nature you

23   mostly find these as racemates, they're blended up

24   naturally, they're 50/50.

25   Now, for the most part, only one of those two mirror

1    image compounds acts in your body when it goes in and it

2    does the trick, whatever the trick is.  And so what --

3    as the science developed in the '60s, um, chemists and

4    drug companies, pharmaceutical companies, figured out a

5    way of separating out the thing which actually does the

6    job from the thing which essentially did nothing.  And

7    so, um, what brand pharmaceutical companies typically

8    would do is to initially introduce the product which

9    contained the mixed compound and then as, um, the patent

10   life came to a close they would then introduce the

11   product which contained only the active ingredient.  And

12   that sort of, if you want to call it a "technique," was

13   -- is the chiral switch technique.  And the word

14   "chiral" has to do with chiral chemistry of what I was

15   explaining, you know, the mirror image kind of thing.

16   Q.    And if you would turn to Page 4 of this document,

17   which has at the bottom right-hand corner 247, and the

18   first paragraph of this, um, is "The legal basis for

19   Ranbaxy's claim and defenses states as follows."

20   "AstraZeneca's claims regarding the alleged superiority

21   of Nexium cannot hide the fundamental reality that there

22   is nothing new or patentable about esomeprazole.  As

23   alleged in Ranbaxy's answer, Ranbaxy intends to prove

24   that the patents in suit are not infringed by Ranbaxy's

25   ANDA product and/or invalid.  The patents in suit are

1     invalid as anticipated by or obvious over several pieces

2     of prior art."

3     Was this the position or a fact being stated by Ranbaxy

4     to the Court at this time?

5             MR. BALDRIDGE:  Objection.  Compound.

6             THE COURT:  If he can answer it, I'll allow it.

7             Can you answer the question?

8             THE WITNESS:  Sure.

9     A.    Um, this was a position that Ranbaxy was taking.

10    Q.    Okay.  And then if you turn to the final page of

11    this document, please, sir, the second paragraph.

12    A.    The final page?

13    Q.    It has at the bottom right-hand corner "250."

14    A.    Okay.

15    Q.    And in fairness to you, sir, if you look to the

16    prior page this comes under the heading, "Ranbaxy's

17    Settlement Position."  Do you see that?

18    A.    Yes.

19    Q.    Okay.  And then in the second-to-last paragraph,

20    it starts in the middle, after it cites the expiration

21    of various patents.

22    "Ranbaxy believes that it should be allowed to market

23    its generic product immediately upon resolution of this

24    case or when the 30-month stay of its FDA approval

25    expires in May 2008."

1   Was that an accurate statement at that time regarding a

2   belief of Ranbaxy with respect to this issue?

3   A.    I wouldn't even say it's a statement of a belief

4   because it just says what it thought it should be

5   allowed to do.

6   Q.    Okay.  And then in the final paragraph, sir:

7   "Ranbaxy is willing to discuss a settlement that

8   resolves the litigation by selecting an agreed-upon date

9   for market entry of Ranbaxy's generic product wherein

10   the agreed-upon date is a compromise between market

11   entry in 2008 and the expiry of the 2014/2015 patents.

12   As Ranbaxy does not infringe the patents that expired in

13   2018 and 2020, Ranbaxy believes that such a settlement

14   would account for the uncertainty to plaintiffs and

15   Ranbaxy.  Any such settlement must preserve Ranbaxy's

16   six-month exclusivity relative to generic competition.

17   Because Ranbaxy's six-month exclusivity blocks Teva's

18   market entry, such a settlement would also allow Teva to

19   obtain earlier market entry than it otherwise would have

20   obtained."

21   Was that also an accurate statement of a part of a

22   position of Ranbaxy to this court at that time?

23   A.    (Pause.)  Um, I mean this a -- what I would call a

24   "form letter," um -- yes, this was part of a position we

25   took when we sent out the form letter.

1    Q.    Okay.   Thank you.

2    Now, do you recall that you did go to a status

3    conference between Judge Pisano in July of 2007,

4    correct?

5    A.    (Looks.)

6    Q.    I don't think it's there in front of you.

7    But does that ring a bell, July of 2007, being the time

8    that you went to the status conference in front of Judge

9    Pisano?

10   A.    It really doesn't.  You know, you can tell it's

11   been 7-plus years.  But given the fact that this letter

12   is July, I would presume that the settlement conference

13   followed shortly thereafter.

14   Q.    Okay.  Do you recall that there was a settlement

15   meeting in, I think, Newark in August of 2007 with

16   AstraZeneca?

17   A.    I remember that soon after the settlement

18   conference with Judge Pisano, there was a settlement

19   meeting.

20   Q.    Okay.  And do you recall -- well, is it consistent

21   with your memory that that settlement meeting occurred

22   on or about August 27, 2007?

23   A.    Sir, I don't remember the date.

24   Q.    Okay.  Before you, um, went to -- (Pause.)

25   Before you went to the meeting with AstraZeneca in the

1    summer of 2007, did you speak with a man by the name of

2    Joseph Todisco at all about the potential meeting?

3    A.    Before the meeting with AstraZeneca?

4    Q.    Yes, sir.

5    A.    I don't remember speaking with Joe Todisco.

6    Q.    Just tell the jury who he is?

7    A.    Um, I don't remember his position exactly now, but

8    he was somebody who worked in our business development

9    department under Venkat, or Venkat Krishnan, who was his

10   boss.  So I didn't really deal much with him directly.

11   Q.    Okay.  Do you recall whether Mr. Krishnan or

12   Mr. Todisco gave you some information about the amount

13   of additional money Ranbaxy might be able to make if

14   there were a no-authorized generic clause in a

15   settlement with AstraZeneca for Nexium?

16        MR. BALDRIDGE:  Objection.  Foundation.

17        THE COURT:  No, he may ask the question, does he

18   recall it?

19   A.    So, no, I don't recall that.

20   Q.    Okay.  I put before you CWN.  It's obviously a

21   lengthy document, sir, and it has many spreadsheets.  If

22   you just look at the memo on the front page of this.

23   Does this refresh your memory as to whether or not there

24   was an analysis of some value that Ranbaxy might be able

25   to get for itself if there were a no-authorized generic

1   clause in an agreement with AstraZeneca for Nexium?

2   A.   (Looks.)  Obviously I'm not on this memo.  It's

3   from somebody to Joe Todisco.  And, no, I don't recall

4   ever seeing this.

5   Q.   Okay.  You can put that to the side then, sir.

6   Okay.  When you went to the meeting though in August of

7   2007, you did make a proposal to AstraZeneca, correct?

8   A.   Yes.

9   Q.   Okay.  And in terms of the entry date, what's your

10  best recollection as to what your proposal was for the

11  entry date?

12  A.   Um, I believe it was sometime in 2012.

13  Q.   Okay.  And do you know a man -- I'm going to

14  probably get the pronunciation incorrect, Ahmad

15  Aboelezz?

16  A.   Yes.

17  Q.   And do you recall that the month that you proposed

18  at that meeting in August was May 2012?  May?

19  A.   I don't recall that.

20  Q.   Okay.

21  A.   Specifically.

22  Q.   It could or couldn't have been, you don't

23  remember, correct?

24  A.   It could have been.

25  Q.   Okay.  In addition to proposing then some date in

1    2012, didn't you also propose that AstraZeneca provide a

2    no-authorized generic clause to Ranbaxy that would exist

3    for whatever period in the event that Ranbaxy was able

4    to have exclusivity as the first-to-file at sometime?

5    A.    So, yeah, we proposed a, um -- that only during

6    this period of exclusivity, if we were to get it, which

7    is to say if we ever launched a product, based on our

8    ANDA, then we would have, um -- we would be the only

9    generic on the market.

10   Q.    And what you were also asking them specifically

11   was that AstraZeneca would agree not to launch an

12   authorized generic during a period of exclusivity that

13   Ranbaxy might be able to have, correct?

14   A.    Yeah, we would be the only generic on the market.

15   Q.    And so you were proposing that AstraZeneca agree

16   not to compete with Ranbaxy during its exclusivity

17   period with an authorized generic?

18   A.    We didn't say anything about competition at all.

19   We were opening up the market.  We were talking about

20   opening up the market.

21   Q.    Were you talking about opening up the market and

22   allowing an authorized generic to enter the market

23   during your exclusivity?

24   A.    We -- had we ever gotten approval?  Which I

25   understand we still -- Ranbaxy still --

```
 1          MR. SOBOL:  Your Honor, motion to strike.
 2          THE COURT:  Yes, the motion to strike is allowed.
 3     Disregard it.
 4          Listen to his questions.  Answer his questions.
 5     He frames them so they can be answered "yes" or "no."
 6     Now, if you can't answer it "yes" or "no," say so.
 7          THE WITNESS:  Thank you, your Honor.
 8     A.    Um, so what was the question?
 9     Q.    The question is, isn't it fair to say, sir, that
10     you had proposed to AstraZeneca that AstraZeneca agree
11     not to launch an authorized generic during some period
12     of exclusivity that Ranbaxy might be able to enjoy?
13     A.    I've answered this question, but I'll answer it
14     again.  We propose that -- I propose that, um Ranbaxy's
15     product be the only generic product during its
16     hard-earned exclusivity period of six months.
17     Q.    Now, there was a third, um, proposal that you also
18     made to AstraZeneca that, um, a transaction be
19     structured so as not to -- so as to ensure that
20     Ranbaxy's exclusivity not be forfeited.  Is that fair to
21     say?
22     A.    I proposed that whatever agreement we came to did
23     not accidentally or inadvertently cause the exclusivity,
24     which we had fought for and we thought we had till then
25     earned, be extinguished or disappear.
```

1   Q.     Okay.   Now, at that point AstraZeneca did not

2   respond, correct, and there was a later meeting?

3   A.     I don't remember those specifics.

4   Q.     Okay.   Well, do you recall that the parties met

5   again in November of 2007, that you met with AstraZeneca

6   again in November?

7   A.     Yes, I do remember that.

8   Q.     Okay.   And isn't it fair to say that AstraZeneca

9   came back with a counter proposal on the entry date and

10  suggested -- well, May 27th, 2014?

11  A.     Um, yes, that was their position.

12  Q.     Okay.   And isn't it also fair to say that they

13  also agreed with the no-ag clause, the no-authorized

14  generic clause?

15  A.     I believe they agreed that -- with our proposal

16  that there be no other generic other than Ranbaxy and

17  their product during the six-month exclusivity.

18  Q.     Including an authorized generic, that an

19  authorized generic not be launched by AstraZeneca,

20  correct?

21  A.     That there would be only one generic during the

22  six-month exclusivity period.

23  Q.     And didn't you make a proposal about some API

24  manufacturer and dosage-form manufacturer at that

25  meeting in November of 2007?

1    A.    Yes.

2    Q.    Okay.  And isn't fair to say that you actually

3    specified that the proposal would be that 50 percent of

4    AstraZeneca's API requirement would be furnished by

5    Ranbaxy?

6    A.    Yes, 50 percent of AstraZeneca's EUS API

7    requirement, I believe it was.

8    Q.    Okay.  And you also made a proposal that Ranbaxy

9    would provide one-third of the finished dosage form of

10   the branded Nexium, correct?

11   A.    Yes.

12   Q.    And also at this meeting in November of 2007, you

13   also raised the potential for there to be distribution

14   agreements with Ranbaxy and AstraZeneca, correct?

15   A.    I believe so, yes.

16   Q.    Okay.  That topic was raised in that meeting in

17   November of 2007, correct?

18   A.    That topic being?

19   Q.    The distribution -- the potential for distribution

20   agreements.

21   A.    Yes, I believe we discussed one or two

22   distribution agreements.

23   Q.    Now, I put before you what's been previously

24   marked as Exhibit 26.  Is this a photocopy of a draft

25   settlement agreement sent in connection with the

 1   potential arrangements between AstraZeneca and Ranbaxy?

 2   A.    (Looks.)  Um, yes, it looks like it's a draft

 3   attached to an e-mail.

 4   Q.    Okay.  And if we go to the face page of the e-mail

 5   itself.

 6        MR. SOBOL:  Please, if you go back a page.

 7     (On screen.)

 8   Q.    And there's an indication here in the transmittal

 9   that "We also recognize there is an ongoing review of

10   Ranbaxy's plant in India and a discussion of a potential

11   supply agreement which is not reflected in these draft

12   terms."

13   That was what was written by Mr. Hester to your outside

14   counsel, Ms. Fales, correct?

15   A.    That's what it says.

16        MR. SOBOL:  CXI, please.

17     (On screen.)

18   Q.    I put before you what's been marked as CXI.

19   Is this, at the bottom, an e-mail transmission further

20   in connection with these agreements between AstraZeneca

21   and Ranbaxy?

22   A.    (Looks.)  Um, yeah, it looks like it's a string of

23   e-mails, um, culminating with an e-mail from Jeff Pott

24   to Ahmad and somebody else it's going to.

25        MR. SOBOL:  I offer it.

```
 1        MR. BALDRIDGE:  Your Honor, I believe this was
 2   admitted as Exhibit 27.  It's definitely been admitted,
 3   though.
 4        THE COURT:  Well, on that representation we'll
 5   just move on and take it as admitted.
 6        MR. BALDRIDGE:  No objection.
 7        MR. SOBOL:  All right.
 8        MR. VAN WART:  Your Honor, can we have a brief
 9   sidebar?
10        THE COURT:  We can.
11
12        AT THE SIDEBAR
13        MR. VAN WART:  I was concerned about all the
14   emphasis -- I'm concerned about all the emphasis of
15   these agreements with Ranbaxy having a prejudicial
16   effect on Teva when the issue is that Teva is simply a
17   -- it's a different way of getting into the --
18        THE COURT:  I don't hear you objecting.
19        MR. VAN WART:  I just objected.  Sorry.
20        THE COURT:  Well, I have nothing before me.
21        MR. VAN WART:  Okay.
22
23        (In open court.)
24   Q.   With respect to Exhibit 27, sir, isn't it fair to
25   say that there was an ongoing discussion between Ranbaxy
```

1      and AstraZeneca regarding the potential for manufacture

2      and supply arrangements between Ranbaxy and AstraZeneca

3      during this time?

4            MR. VAN WART:  Objection, your Honor.

5            THE COURT:  Yeah, come to the sidebar.

6

7            AT THE SIDEBAR

8            THE COURT:  Well, this serves up the issue that is

9      now getting briefed.  I'm reading the various things

10     that have been filed.

11          The Court has ruled -- well, I will tell you,

12     cases are a living thing, and when you hear the

13     evidence, um -- I think I'm anticipating the argument

14     this afternoon.  So let me start there.

15          The more I hear the evidence in this case the less

16     I think this case is about substantive patent law, and

17     so striking so much of McCool's testimony as I have, but

18     retaining McGuire's testimony, does not mean that the

19     case is dead, and I'm very much looking forward to the

20     arguments this afternoon.  But having said that, I've

21     ruled that Ranbaxy caused no antitrust damages.

22          The plaintiffs keep trying to get into Ranbaxy.

23     All I see that's alive for Ranbaxy is did Ranbaxy

24     conspire with AstraZeneca to prevent the entry prior to

25     March 27th, 2014, of the generic?  If there's enough

1    evidence to get to the jury on that, Ranbaxy -- we'll

2    see what the jury says.  But I'm not interested, as a

3    matter of law, in whether there was any payment from

4    AstraZeneca to Ranbaxy.  I'm not interested in had there

5    not been a payment, Ranbaxy would have done this, that

6    or the other thing, they would have gotten on the

7    market, therefore the contingent entry for which Teva

8    negotiated would have allowed Teva to get on the market,

9    which is at issue in this case.  The question is only

10   conspiracy.

11        So I have been listening to this, but informed by

12   these briefs, I think much of this is irrelevant, and

13   I'll hear you.

14        MR. SOBOL:  Thank you, your Honor.

15        The Teva case requires that we prove, among other

16   things, that Teva would have gotten entry earlier.

17        THE COURT:  Yes, I agree.

18        MR. SOBOL:  Right.  A part of our proof, in regard

19   to that, is that once the Ranbaxy date is moved up in

20   time, from May 27th, 2014 to some earlier point, in an

21   alternative settlement, that is also the date that Teva

22   would have had as well.

23        THE COURT:  I think --

24        MR. SOBOL:  If I may?  If I may?  It's quite

25   serious.

```
 1          THE COURT:  Indeed it is.  It's key.
 2          MR. SOBOL:  Yes, it is.
 3          Now, the evidence to date, quite clearly from both
 4     Mr. Hester and from Ms. Julie -- Ms. Julie was actually
 5     quite emphatic about it.
 6          THE COURT:  Oh, I have it very much in mind, "I
 7     would lose my job."
 8          MR. SOBOL:  "I would lose my job if there was any
 9     date that was earlier."
10          THE COURT:  I do listen.
11          MR. SOBOL:  I understand that.  I don't think I
12     profess to provide any new information in an argument,
13     your Honor.
14          THE COURT:  Right.
15          MR. SOBOL:  But this is my position, your Honor.
16     The plaintiffs, I think you know very clearly, we intend
17     to prove that we don't have to go down into any kind of
18     payment or Actavis issue with Ranbaxy and AstraZeneca.
19     That's not the direction we're going.
20          THE COURT:  Right.  Well, you're not.  But okay.
21          MR. SOBOL:  I'm not.  Understand what I'm doing is
22     I'm going to show that there's an agreement between
23     these two companies that is laden with payoffs and which
24     if those payoffs did not exist, the Ranbaxy date would
25     be earlier, and therefore so would Teva's be.
```

```
 1         THE COURT:  Yeah.
 2         MR. SOBOL:  I have in mind one thing, your Honor.
 3    There were some documents produced to us yesterday
 4    pursuant to your order, okay, and one of those
 5    documents, a communication between Mr. Hester and
 6    Mr. Pott, makes vividly clear that the two of them knew
 7    that providing this no-AG clause to Ranbaxy meant that
 8    they were getting a later date from Ranbaxy.  And if
 9    that no-AG clause hadn't existed, then the date would
10    have been earlier, and it would have been earlier for
11    Teva.
12         THE COURT:  Yeah, but what you have to prove,
13    where you and I -- again I'm only thinking as to what
14    your -- what you must prove here.  I take no position.
15         MR. SOBOL:  Uh-huh.
16         THE COURT:  I think you've got to show that Teva
17    would have gotten into a deal with Ranbaxy, given their
18    exclusivity, since Ranbaxy couldn't come to market and
19    would have then come to market were it not for the
20    AstraZeneca-Teva deal.  That's how, when I come either
21    this afternoon or the close of -- well, this afternoon
22    is a large and unjustified payment.  They'll certainly
23    attack you at the end of the case.  Absent enough
24    evidence that they would have gotten into a deal, I'm
25    going to direct.
```

1          MR. SOBOL:  Sure.

2          THE COURT:  Now, the business about whether Teva's

3    date would have been moved up to me is immaterial in

4    light of my rulings because Teva could never bring that

5    thing to market, which seems in accord with --

6          MR. SOBOL:  You mean Ranbaxy.

7          THE COURT:  I do mean Ranbaxy.  I'm sorry.  Yeah.

8          MR. SOBOL:  I'm searching quite honestly, your

9    Honor, where the miscommunication may be, because I

10   honestly think there's a miscommunication on my part.

11   Here's the thing.

12         What you just indicated is that we will have to

13   prove that there also had been a deal between Ranbaxy

14   and Teva.  We intend to obviously prove that.  But the

15   question is toward what end?  In other words --

16         THE COURT:  Well, they would have cut some deal

17   that they then would have brought to Teva, who could do

18   it arguably, and come to market.

19         MR. SOBOL:  But then when is the point?  If I'm

20   not able to prove that the date would have been earlier

21   for Ranbaxy --

22         THE COURT:  Well, let me do it this way.  I'm

23   delighted to know that you plan at least to rest by next

24   Tuesday.

25         (Laughter.)

1          THE COURT:  Oh, I'm very delighted.

2          (Laughter.)

3          THE COURT:  Now that being said, it may be more of

4     a proof thing that you're hung up with me.  Now, Mr. Van

5     wart is raising these relevant objections.  You prove

6     the potentiality of a deal and you'll have greater

7     leeway -- I make no promises naturally, in demonstrating

8     to me that this would have been advantageous to Ranbaxy

9     because they would have, um, because of these other

10    things, had some sort of earlier date.

11         MR. SOBOL:  Your Honor, this witness is --

12         THE COURT:  Well, I'm missing it.  I mean

13    Mr. Baldridge is shaking his head, but he's an advocate.

14    As the presiding judge, I don't know what we're doing

15    here, and I'm supposed to be taking notes not only as I

16    do for the trial, but up until five minutes from now,

17    I've got my class, and one of the notes I have written

18    to my class is that much of this seems irrelevant.  I'm

19    missing it.

20         I was interested to hear this and some of the

21    things I'm interested in, but much of it seems

22    irrelevant.  That if we had a Ranbaxy-Teva deal, the

23    potentiality of it, supported by expert testimony from

24    the documents or however way you can do it, then maybe I

25    would be more liberal.

1          MR. SOBOL:  Maybe I'll -- I'll make this

2     suggestion, your Honor, which I think is a little bit

3     odd, because I can't do anything better obviously.

4          THE COURT:  It's never odd.  We'll drop him and

5     you can bring him back.

6          MR. SOBOL:  We'll drop him and we'll go to

7     Professor Rosenthal.

8          THE COURT:  Go to wherever.  I'm much more

9     interested in him.  But it isn't what I'm interested in.

10    I'm managing the trial.  You've lost me on him.  I'll

11    let him step down -- I mean I've got to let them now ask

12    some questions.  Maybe they'll open up things.  Maybe

13    they won't.  But I'm not getting it.

14         MR. SOBOL:  As long as I can bring him back?

15         THE COURT:  You can bring him back.

16         MR. SOBOL:  Okay.

17

18         (In open court.)

19         MR. SOBOL:  Your Honor, in light of the colloquy

20    at sidebar, the plaintiffs would like to suspend their

21    inquiry of this witness at this time and reserve the

22    right to recall him at a later point in the trial.

23         THE COURT:  And I would allow that.  In fairness,

24    I will allow complete cross-examination if he's

25    recalled, but I can't just let him go before asking you

1   whether you want to examine him at this time, the

2   defense?  So if he comes back, you get complete cross-

3   examination.  If he doesn't, he doesn't.  But you tell

4   me.  And so -- unfortunately I don't have a list.

5   You've been very good at giving me lists.

6           Oh, I do have a list?

7           (Pause.)

8           THE COURT:  Oh, I do have a list.  I stand

9   corrected.  Here it is.  Thank you very much.

10           So, Mr. Baldridge, I'll ask you first?

11           MR. BALDRIDGE:  Sir, we will not cross-examine him

12   at this time.

13           THE COURT:  Not now anyway.

14           Mr. Gaffney, at this time?

15           MR. GAFFNEY:  We will reserve.

16           THE COURT:  And Mr. Van Wart at this time?

17           MR. VAN WART:  Yes, your Honor.

18           THE COURT:  So that's reserved.

19           You may step down, sir, subject to recall.

20           You may call your next witness.

21           MR. SHADOWEN:  Your Honor, the plaintiffs call

22   Professor Meredith Rosenthal.

23           THE COURT:  He may be called.

24           (Pause.)

25           THE COURT:  She may be called.  Forgive me, ma'am.

```
 1        I met our new next-door neighbors the other day
 2   and they have a daughter named Meredith and I should
 3   have done better.
 4        (MEREDITH ROSENTHAL, sworn.)
 5
 6        * * * * * * * * * * * * * * * * * *
 7        MEREDITH ROSENTHAL
 8        * * * * * * * * * * * * * * * * * *
 9
10        THE COURT:  And it's an opinion witness, so, yes,
11   may I have the report.
12
13   DIRECT EXAMINATION BY MR. SHADOWEN:
14   Q.    Professor Rosenthal, would you state and spell
15   your name for the jury, please.
16   A.    My name is Meredith Rosenthal, M-E-R-E-D-I-T-H,
17   R-O-S-E-N-T-H-A-L.
18   Q.    And am I right that you're here to testify
19   regarding one of the questions on the verdict slip that
20   is having to do with market power and the relevant
21   market?
22   A.    Yes, I am.
23   Q.    What do you do for a living?
24   A.    I am a professor of health economics and policy at
25   the Harvard School of Public Health where I am also an
```

1    Associate Dean.

2    Q.    And what positions do you currently hold at

3    Harvard?

4    A.    At Harvard I'm on the faculty in the Department of

5    Health Policy and Management where I teach, advise

6    students, and do research, and I also serve as the

7    Associate Dean for Diversity to improve our recruitment

8    of all kinds of students and faculty and ensure their

9    success at the school.

10   Q.    And what courses have you taught at the school?

11   A.    I have taught a number of courses over the years

12   including mental health policy in the U.S.  I currently

13   teach a course on the economics of health policy in the

14   U.S. context.  I have also taught a course on the

15   quality of care.  That last course I taught at Harvard

16   College for undergraduates.  My other teaching typically

17   involves master students and doctoral students in health

18   policy.

19   Q.    Is your own PhD in economics?

20   A.    My PhD is in health economics.  Help economics is

21   an applied field of microeconomics and my training

22   involves essentially all of the same coursework as a PhD

23   in economics with the exception of macroeconomic theory,

24   which is how the economy works as a whole, and in

25   addition to that I have studied the specifics of health

1    policy, institutions, and the public policy process.

2    Q.    In your academic work do you have particular

3    research interests?

4    A.    Yes, I do.  In my academic work, as you can tell

5    from the courses I teach, is focused on U.S. health

6    policy and in particular I'm interested in the economics

7    of U.S. health policy institutions including those in

8    the pharmaceutical industry and in health care delivery

9    and financing.

10   Q.    And do those research interests include the

11   economics of pharmaceutical markets?

12   A.    Yes.  My research interests include a number of

13   specific topics in pharmaceutical economics including

14   the use of formularies and benefit designs and how that

15   affects the sales of prescription drug products and the

16   total cost of prescription drug care.  I have also done

17   substantial work on marketing pharmaceutical products.

18   Q.    Have you published any articles?

19   A.    Yes, I have.  I have published more than 50

20   peer-reviewed articles, many of them in medical journals

21   such as the "New England Journal of Medicine," the

22   "Journal of the American Medical Association," as well

23   as book chapters and commentaries.

24   Q.    And have you done editorial work for journals?

25   A.    I am currently serving on an advisory board for

1      the New England Journal of Medicine for a specific

2      series that they publish, a perspective series.  I've

3      also served on the editorial board of the Journal of

4      Medical Care Research and Review.  And like most

5      academics I serve as a peer-reviewer for a wide range of

6      journals reviewing the work of my peers at least once or

7      twice every month.

8      Q.    Am I right that you have won an award from the

9      Alfred P. Sloane Foundation?

10     A.    Yes, I was an Alfred P. Sloane industries studies

11     fellow for my field work in health economics.

12     Q.    And are you a member of the Massachusetts Public

13     Health Council?

14     A.    Yes, I am an appointed member of this council that

15     advises the Commissioner of Public Health in

16     Massachusetts as well as the Governor on important

17     public health issues such as the current concern about

18     Ebola, new vaccinations, a wide range of public health

19     issues, and this body also promulgates regulations for

20     the Department of Public Health.

21     Q.    All right.  Am I right that you're also an

22     affiliate of an entity called Greylock McKinnon

23     Associates?

24     A.    Yes, I'm an academic affiliate of Greylock

25     McKinnon Associates.  Greylock McKinnon Associates is a

1    consulting firm and a litigation support firm.  They

2    have economists who work with them, like me, on matters

3    such as this one.

4    Q.    In connection with your work with Greylock, have

5    you testified in antitrust cases regarding the efforts

6    by brand manufacturers to delay generic entry?

7    A.    Yes, I have served as a testifying and consulting

8    witness in many such matters.

9    Q.    And in connection with that work have you become

10   familiar with generic erosion curves and the competitive

11   features of the pharmaceutical industry?

12   A.    Yes, one of the most important features of the

13   pharmaceutical industry relates to the role of generics

14   and as noted these generics cause brand name products to

15   lose a great deal of their sales.  That's what we mean

16   by a generic erosion curve.  These curves have been the

17   subject of my work in all of these matters.

18   Q.    Have you ever testified before Congress on health

19   economics subjects?

20   A.    On two occasions I've testified in Congress, um,

21   one of which related to pharmaceutical policy.  In

22   particular I have done some research, as I mentioned

23   earlier, on pharmaceutical marketing with a specific

24   focus on the impact of direct-to-consumer advertising.

25   I was called to a Congressional hearing to advise a

1    committee on the effectiveness of direct-to-consumer

2    advertising and its public health effects.

3    Q.    Okay.  And at my request did you prepare a CV or a

4    resume?

5    A.    Yes, I did.

6    Q.    I put before you what's been marked for

7    identification as FHA and ask you if that's your resume?

8    A.    Yes, it is.

9          MR. SHADOWEN:  And, your Honor, we move its

10   admission.

11         THE COURT:  No objection?

12         MR. BALDRIDGE:  No objection, your Honor.

13         THE COURT:  It may be received, Exhibit 139.

14         (Exhibit 139, marked.)

15   Q.    Professor Rosenthal, are you being compensated for

16   your work on behalf of plaintiffs in this case?

17   A.    Yes, I am.

18   Q.    At what rate?

19   A.    My current rate is $625 an hour.

20   Q.    And what was your assignment in this case?

21   A.    I was asked to offer an opinion about the extent

22   to which the defendant, AstraZeneca, possesses market

23   power for the drug Nexium and also what the relevant

24   market is for considering that market power.

25   Q.    And you reached a conclusion on those?

1    A.    Yes, I did.

2    Q.    Okay.  And what materials did you rely upon in

3    reaching your conclusions?

4    A.    My conclusions are based on my review of the

5    economic literature and specifically the institutions

6    and economics of the pharmaceutical industry, my review

7    of defendants' documents that were provided in this

8    matter, and my analysis of standard industry data that

9    demonstrate what happens when generic entry occurs in

10   the pharmaceutical market.  I use established economic

11   analytical methods to examine those data and come to my

12   opinions in this matter.

13   Q.    Okay.  What methodology did you use in reaching

14   your conclusions?

15   A.    The methodology I used involves analyzing pricing

16   and quantities of prescription drug products and in

17   particular those in the PPI class that I imagine you've

18   been hearing about, and my analysis uses an established

19   approach which gets at the question of market power by

20   examining what happens to a product's sales when a

21   potential competitor's price decreases in relative

22   terms.

23   Q.    We'll get to it in all kinds of detail, but in

24   very summary form, very briefly, what conclusions did

25   you reach?

1    A.    Analyzing the market conditions and institutions

2    here and the data that I describe in my report, I

3    concluded that the defendant, AstraZeneca, possessed

4    market power for Nexium and continues to do so and that

5    the relevant market for antitrust analysis is Nexium and

6    its AB-rated generic.

7    Q.    Okay.  Let's start at the beginning.  What is

8    "market power"?

9    A.    "Market power" essentially translates into the

10   ability of a firm to be able to maintain prices above

11   competitive levels.  "Above competitive levels" simply

12   means that the price is much higher than the production

13   cost of the product.

14   Q.    And does having market power mean that a

15   manufacturer can charge whatever it wants for its

16   product?

17   A.    No, under no circumstance that I know of in

18   economics can a firm charge whatever it wants.  Even a

19   firm that is the unique, the sole supplier, a true

20   monopolist as it were, has to consider the following

21   trade-offs.  If I raise my price by some amount, that

22   will increase the margin on each unit I sold, but if I

23   do so I may lose some customers.  And so there is always

24   that tension.  And even a monopolist, that is the sole

25   supplier, will eventually settle on a price where the

1    trade-offs between the quantities lost, because the

2    price is very high, and the additional margins, on each

3    unit.  So that results in a market price, not an

4    infinite price.

5    Q.    So what is a "relevant economic market"?

6    A.    The "relevant economic market" is the smallest

7    market that a firm could control and be able to maintain

8    these prices that are significantly above the marginal

9    cost of producing the product.  So --

10         THE COURT:  Well, I interrupt only to ask a

11   question.

12         What about profit?  Any firm is entitled to make a

13   legitimate profit, aren't they?

14         THE WITNESS:  Yes, your Honor, absolutely.

15         THE COURT:  So how does that work into your

16   approach here?

17         THE WITNESS:  Absolutely.  May I?

18         THE COURT:  That's my question.

19         THE WITNESS:  Thank you.

20   A.    That's absolutely right, any firm is entitled to

21   make a profit, and market power is not to suggest that

22   the firm is not entitled to make that profit.  The

23   question is whether a firm can raise prices to

24   supercompetitive levels and still be profitable in doing

25   so?  And that in and of itself translates into this idea

1    of market power.  If there are many substitutes for a

2    product available, a firm will not be able to maintain

3    prices that are as high, right, because consumers will

4    substitute away and they would lose profits.  So when we

5    observe these high profits, an economist would approach

6    that and conclude that the substitution away from the

7    products at these high prices is minimal enough that

8    high prices are still profitable.

9    Q.    All right.  When you say "substitute away," do you

10   mean buy something else?

11   A.    Substitute away from a product could be buy

12   something else, it could also be to not buy anything at

13   all.

14   Q.    Okay.  And just so we can get into the details of

15   the particular characteristics in the pharmaceutical

16   industry, can you first describe for us how competition

17   works in a typical market?

18   A.    Sure.  Absolutely.

19   So the idea of competition, as I began to say, involves

20   having multiple products that may substitute for one

21   another.  So we have firms in a competitive situation

22   that offer products that can be used by consumers for

23   the same purpose.  And then competition really is all

24   about demand.  And so products compete more closely with

25   one another to the extent that the buyers view those

1   products as interchangeable.  And that's not a

2   theoretical concept.  When economists look at

3   competition, they look at actual consumer behavior and

4   in particular competition is borne out by the idea that

5   small changes in price from a competitive level lead to

6   greater shifts in quantities.  So the loss of sales that

7   I indicated later -- earlier would follow from a

8   competitive situation.  If a product finds that it

9   cannot increase its price by a small but significant

10  amount without losing all of its sales, then that

11  suggests that there's competition in that marketplace.

12  Q.    All right.  Can you help us out by giving us --

13  saying all of that with an example, sort of teach us

14  through an example.

15  A.    Sure.

16  So if you walk in the potato chip aisle of the grocery

17  store you see many alternatives, many different brands

18  and styles of products and consumers will go to the

19  store looking for a potato chip, for example, and see

20  all the alternatives.  And one important piece of the

21  demand that I referred to earlier is the idea that

22  consumers have preferences.  In my house we like salt

23  and vinegar chips and we're not crazy about those kettle

24  chips.  And so I have my preferences and those

25  preferences determine the extent to which I'm willing to

1    substitute one product for another, one chip for

2    another.  So it may be that the price of my favorite

3    chip goes up by a little bit.  And I don't think that

4    some other chips on the row are as good and so that

5    small price change doesn't cause me to change my

6    behavior.  But a larger price change might cause greater

7    substitution across alternatives.

8    And so when we think about competition, these are the

9    kinds of questions we're asking, to what extent do

10   consumers really substitute across products in the face

11   of small relative price changes that are sustained?  A

12   particular product will have market power if it's able

13   again to raise its product above other prices.

14   For potato chips, we think people in the supermarket are

15   pretty good at looking at those prices, which by the way

16   are marked on the bags and on the shelf, and they make

17   those trade-offs, they're price-sensitive enough that

18   you'll see that most of those bags of potato chips have

19   a very similar price because they do in fact get

20   substituted for one another fairly rapidly.

21   Q.    Now, this competition between prescription drugs

22   that are in the same therapeutic class don't necessarily

23   follow this consumer preference, you know, the price

24   model that you just described?

25   A.    Right, so there are a lot of clear differences

1    between a standard consumer good and a prescription

2    drug.  First of all, we don't just walk into the

3    pharmacy, get behind the pharmacist's desk, and look at

4    those prescription drugs and decide which one to buy.

5    Moreover, we don't really have preferences for

6    prescription drugs in the same sense that we have

7    preferences for potato chips.  We come in with a symptom

8    or a problem that we've seen a physician about and we

9    rely on the physician to not only tell us the nature of

10   our problem but also what kind of therapy might help us.

11   And so a couple of things that I've just pointed out

12   there is that consumers don't directly buy prescription

13   drugs, they also don't choose them in the same way that

14   they choose other products, they rely on their

15   physician's advice to a large degree.  Not that

16   consumers have no role to play, but at the very least

17   there needs to be a dialogue between the physician and

18   the patient.

19   The other thing is that patients don't usually pay the

20   full price of their prescription drugs.  So unlike in

21   the grocery store when it's my wallet, my money that's

22   going to pay for the potato chips and I see the price

23   marked on them, that's not what happens at the pharmacy,

24   right?  The insurance company has a price that it pays

25   and the pharmacy -- the pharmacy directly bills

1    typically a PBM, which you may have heard about.  The

2    patient really just sees their co-payment.  So the

3    patient doesn't really know the full price, doesn't

4    typically bear the full price.

5    And the physician, the key decision-maker, as far as

6    health economics is concerned, the physician typically

7    knows very little about price differences across

8    prescription drugs.  And in fact it would be nearly

9    impossible for the physician to anticipate what is

10   actually going to be paid at the pharmacy for a given

11   product because those prices are outside of the

12   physician's realm.

13   And then finally just to emphasize the role of

14   insurance.  So most of us get our prescription drugs

15   under a health insurance plan.  There are certain

16   contingencies that we're required to follow under those

17   plans.  And in particular, there are co-payments that

18   are associated with what's known as a "formulary," that

19   is a list of preferred drugs for a health insurer.

20   So very different market structure than typical consumer

21   goods.  And many aspects of this market mean that price

22   is not very clear to the decision-makers, the patient

23   and the doctor, and therefore we expect price

24   competition specifically to be attenuated.

25   Q.    And by "attenuated," you mean less than usual?

A.    Yes, by "attenuated" I mean less than usual.  It's very hard for physicians and patients to shop for the lowest-price alternative.  It's hard to even get that information.

Q.    So you've contrasted for us sort of the demand characteristics, the consumer preferences side of the equation, in the typical market and then in the pharmaceutical industry.

Are there any unique characteristics of the pharmaceutical industry with respect to suppliers, on the supply side?

A.    As we've been hearing about today there are important FDA rules that govern entry into the pharmaceutical market.  Brand name drugs have to go through a process to get their products approved, and by law, by statute, those products are granted a period of exclusivity during which there can be no other chemical entities that are exactly the same that can come on the market.  So no generic entry is permitted for a period of time.

That law, which was enacted by the Hatch-Waxman Act in 1984, essentially is a way of making sure that innovative firms are protected for a period of time so that they can earn extra profits to help them recover their research and development costs.  And so that

1    structure of the market is an important feature.

2    Another structural or institutional feature of the

3    market is a set of policies that relate to the ability

4    of a pharmacist to substitute one product for another.

5    So if you go to the pharmacy with a prescription for a

6    brand-name drug, the pharmacist is allowed to -- with

7    slightly different considerations across different

8    states, but in effect is allowed to substitute an

9    AB-rated, that is a bioequivalent generic version of

10   that product, automatically, or after notifying the

11   patient in some states, but that pharmacist cannot

12   substitute any other product for that prescription.  So

13   the prescription can only be substituted at the pharmacy

14   for another product when an AB-rated generic exists.

15   And so that's a really important mechanism in this

16   market that ensures that generic substitution happens

17   much more rapidly than any other kind of substitution.

18   Q.    (Pause.)  Now, let's turn to the precise question

19   regarding the definition of a relevant market in this

20   case.  What are the possibilities?

21   A.    There are essentially two possibilities to

22   consider.  One possibility would be the therapeutic

23   class of proton pump inhibitors, the PPIs, that would be

24   the large market in which Nexium may be considered to

25   exist.  The other possibility is the chemical entity,

1    what I might use as shorthand, "the molecule," so it's

2    esomeprazole magnesium.  So those are the two -- the two

3    likely markets to consider.

4    Q.    How did you go about figuring out which one was

5    right?

6    A.    I used the standard economic approach, as I noted

7    earlier, to examining data that would allow me to

8    understand the extent to which Nexium's sales would

9    respond to changes in price of these hypothetical

10   competitors, that is other PPIs or its own AB-rated

11   generic.

12   Q.    Is that a standard test in economics for defining

13   a "relevant market"?

14   A.    Yes, this is a textbook approach in antitrust

15   analysis in economics.

16   Q.    And it's sometimes known as the "SSNIP test"?

17   A.    Yes, in its formal version it's known as the

18   "SSNIP test."

19          THE COURT:  Standing for what?

20          THE WITNESS:  Standing for "Small but Significant

21   Nontransitory Increase In Price."  I was trying to spare

22   you that.

23          (Laughter.)

24   Q.    Now, economists sometimes look to what are known

25   as "natural experiments" in order to make judgments

1    about which products are in which markets?

2    A.    Yes, very commonly economists rely on natural

3    experiments and indeed that is the most common approach

4    to examining these questions of market definition.

5    Q.    Can you explain to the jury briefly what you mean

6    by a "natural experiment"?

7    A.    Sure.  Well, the jury no doubt knows what an

8    experiment is, we think about scientists in their

9    laboratories under controlled conditions conducting an

10   experiment to understand how the world works in some

11   way, a biological mechanism, for example.  Economists,

12   because our laboratory is the economy, the market, we

13   don't get generally to run experiments, in some

14   exceptions we do, but for the most part we look for

15   policy changes or other kinds of market events that

16   alter something, a price -- very commonly and that's

17   what we'll talk about here, alter something suddenly and

18   then we can study what effect that has on quantities.

19   Q.    And did you do that here?

20   A.    Yes, I did.

21   Q.    All right.

22         MR. SHADOWEN:  Scott, can we see Figure 4, please.

23         (On screen.)

24   Q.    Professor Rosenthal, can you describe for us what

25   it is we're seeing here.

1  A.    Figure 4 shows Nexium sales over its life cycle,

2  from its entry in early 2001 through the end of my data,

3  which is January of 2013.

4       MR. SCHMIDTLEIN:  Your Honor, may we approach?

5       THE COURT:  You may.

6

7       AT THE SIDEBAR

8       MR. SCHMIDTLEIN:  She obviously has a lot of

9  slides she's about to use that are based upon data

10 that's not in the record at this point.  Our point only

11 is she can rely on it, it may be data that an expert can

12 rely upon, but the data itself is not in the record.  I

13 guess I'd like some instruction to the jury that --

14      THE COURT:  Well, now, wait a minute.  I've read

15 your briefs here and, um, without being specific, you

16 accurately state the law.  I'm not going to let her

17 throw up slides that show IMS data because while she can

18 rely on hearsay, that doesn't make the hearsay

19 admissible.  This one they have no objection to because

20 this is in her report.

21      I'm not troubled by the timing of things with this

22 expert.  So those things that have been disclosed can be

23 shown.  But I don't see any need.  You can object if she

24 starts testifying to the hearsay and I'll sustain it.  I

25 don't give advisory opinions, but as an attempt to give

1    guidance, that's what I think.

2         MR. SCHMIDTLEIN:  All these, like the chart

3    they've got up now, these are all based on IMS data.

4         THE COURT:  Well, of course, and if we're

5    wondering, so that you have an adequate record, I rule,

6    on the basis of the record that we have so far, that an

7    expert such as this may rely on IMS data.

8         MR. SCHMIDTLEIN:  Thank you.

9

10        (In open court.)

11        THE COURT:  Go ahead, Mr. Shadowen.

12   Q.   So you were explaining this, it shows the sales of

13   Nexium over its life cycle and it's based on IMS data.

14   Can you explain to the jury what IMS data is?

15   A.   The data that were used to construct this chart

16   come from a company called IMS Health, they're a data

17   collection and consulting firm that produces a series of

18   data says that allows us to examine what happens in

19   prescription drug markets product by product.  So these

20   data in particular come from retail pharmacies, they are

21   directly drawn from the cash registers of a network of

22   pharmacies that allows IMS Health to make calculations

23   month by month about the specific sales and prices for

24   all of the prescription products on the market.

25        THE COURT:  But just so I'm clear.  That may be

1   what IMS data is, and you say people in your field rely

2   on it, is that right?

3          THE WITNESS:  Yes, your Honor.

4          THE COURT:  So you use it.  But this chart we're

5   looking at here, you, and I won't say "made it up," but

6   you created it for the purposes of your analysis to

7   assist in giving testimony here?

8          THE WITNESS:  Yes, your Honor, and may I clarify?

9   The chart in particular uses data from IMS Health.

10         THE COURT:  To the jury.

11         THE WITNESS:  Excuse me.

12   A.    The chart in particular uses data from IMS Health

13   directly.  So they would provide us and they did provide

14   us with a spreadsheet with the numbers that are plotted

15   on this chart.  There were no calculations to come to

16   those numbers.  This is a graphing of the raw data from

17   IMS Health.

18         THE COURT:  Go ahead, Mr. Shadowen.

19   Q.    And is IMS data, in particular the transactions of

20   the sales data here that we're looking at, the kind of

21   data that you routinely rely upon in your academic work?

22   A.    Yes, I have published numerous articles based on

23   IMS Health in the New England Journal of Medicine and

24   other venues as many other experts in my field have done

25   as well.  I have also used these data to testify in

1    cases such as this one.  And furthermore I understand

2    that pharmaceutical manufacturers use IMS Health data

3    for strategic and tactical purposes as well.

4          MR. SHADOWEN:  Scott, if we could go to the next

5    one, please.

6      (On screen.)

7    Q.    Show us, if you could then walk us through -- you

8    referred to the SSNIP test and natural experiments, can

9    you walk us through this data in this chart and explain

10   to us the application of the SSNIP test in the natural

11   experiments that you referred to?

12   A.    Okay, so the SSNIP test that I'm going to walk you

13   through will have a number of parts, this chart is going

14   to be the first part, and in this part in particular

15   we're going to look at a series of market events and

16   what effect they appear to have in our data on the sales

17   of Nexium over time.

18         THE COURT:  Well, if you're going to do all of

19   that, it's time for a recess, and we'll start doing it

20   in -- short recess, because I started at 9:30, only 15

21   minutes.

22         Keep your minds suspended.  Do not discuss the

23   case either among yourselves, nor with anyone else.

24         You may stand in recess for 15 minutes.  We'll

25   return at 11:15 and continue.

1          We'll recess.

2          (Recess, 11:00 a.m.)

3

4              C E R T I F I C A T E

5

6          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

7     do hereby certify that the foregoing record is a true

8     and accurate transcription of my stenographic notes

9     before Judge William G. Young, on Wednesday, November

10    12, 2014, to the best of my skill and ability.

11

12

13

14    /s/ Richard H. Romanow 11-12-14
      _____
15    RICHARD H. ROMANOW Date

16

17

18

19

20

21

22

23

24

25