1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3                                   No. 12-md-02409-WGY
                                    Volume 1, Pages 1 - 57
4

5

6    In Re:  NEXIUM (ESOMEPRAZOLE)
     ANTITRUST LITIGATION
7

8

9

10                          * * * * * * * * *

11

12
                         For Jury Trial Before:
13                       Judge William G. Young

14

15
                         United States District Court
16                       District of Massachusetts (Boston)
                         One Courthouse Way
17                       Boston, Massachusetts 02210
                         Thursday, November 13, 2014
18

19                          * * * * * * * *

20

21
                  REPORTER: RICHARD H. ROMANOW, RPR
22                      Official Court Reporter
                      United States District Court
23        One Courthouse Way, Room 5510, Boston, MA 02210
                      bulldog@richromanow.com
24

25

```
 1                A P P E A R A N C E S

 2   THOMAS M. SOBOL, ESQ.
         Hagens Berman Sobol Shapiro, LLP
 3       55 Cambridge Parkway, Suite 301
         Cambridge, MA 02142
 4       Email: Tom@hbsslaw.com
     and
 5   STEVE D. SHADOWEN, ESQ.
         Hilliard & Shadowen, LLC
 6       39 West Main Street
         Mechanicsburg, PA 17055
 7       Email: Steve@hilliardshadowenlaw.com
     and
 8   RICHARD ARNOLD, ESQ.
         Kenny Nachwalter, P.A.
 9       201 South Biscayne Boulevard, Suite 1100
         Miami, FL 33131
10       For plaintiffs

11   LAURENCE A. SCHOEN, ESQ.
         Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
12       One Financial Center.
         Boston, MA 02111
13       Email: Laschoen@mintz.com
     and
14   KAREN N. WALKER, ESQ.
     KEVIN VAN WART, ESQ.
15       Kirkland & Ellis, LLP
         655 Fifteenth Street, N.W., Suite 1200
16       Washington, DC 20005
         For Teva defendants
17
     JOHN E. SCHMIDTLEIN, ESQ.
18   PAUL B. GAFFNEY, ESQ.
     DANE H. BUTSWINKAS, ESQ.
19       Williams & Connolly, LLP
         725 Twelfth Street, N.W.
20       Washington, DC 20005
         Email: Jschmidtlein@wc.com
21       For AstraZenca defendants

22   JAMES D. BALDRIDGE, ESQ.
     DANIELLE R. FOLEY, ESQ.
23       Venable, LLP
         575 7th Street, N.W.
24       Washington, DC 20004
         Email: Jdbaldridge@venable.com
25       For Ranbaxy defendants
```

```
1                    I N D E X

2

3   WITNESS                DIRECT  CROSS  REDIRECT  RECROSS

4
    MATTHEW DIGGONS (By videodeposition, continued.)
5

6   THOMAS McGUIRE:  (Recalled.)

7        By Mr. Shadowen:    31

8

9

10                   E X H I B I T S

11
```

```
12   EXHIBIT 141...................................... 24

13   EXHIBIT 142...................................... 24

14   EXHIBIT 143...................................... 29
```

```
15

16

17

18

19

20

21

22

23

24

25
```

1              P R O C E E D I N G S

2              (Jury enters, 9:00 a.m.)

3              THE COURT:  Well, good morning, ladies and

4      gentlemen.  I really, and most sincerely, I thank you.

5      Your efforts to be right on time are so important.  By

6      the end of the day today maybe I can tell you a little

7      bit about where we are.  We'll see how it goes today.

8      We're all ready to go.  We were watching and listening

9      to the deposition of a Mr. Diggons.  And we may continue

10     playing it.

11             (Continues videotape of Mr. Diggons.)

12     Q.     Below that it says "multiple generics from LoE."

13     That stands for "loss of exclusivity," correct?

14     A.     That's correct.

15     Q.     And then it says "erosion greater than Zocor

16     analog."  Do you see that?

17     A.     I do.

18     Q.     Are you familiar with Zocor?

19     A.     A little bit.

20     Q.     Who makes it, do you know?

21     A.     I think it's Merck.

22     Q.     Do you know when it went generic?

23     A.     Not off the top of my head, no.

24     Q.     Do you know what the IMS data or other data about

25     the effects of generic entry for Zocor show?

1    A.    I believe in looking at this, um, Zocor was used

2    as a single generic entry analog.

3    Q.    That is the entry of one generic competitor?

4    A.    Correct.

5    Q.    One AB-rated generic competitor?

6    A.    These are AB-rated, yeah.

7    Q.    Right.  Do you know what "AB-rated" refers to?

8    A.    I do.

9    Q.    What does it refer to?

10   A.    It means it can be switched, a branded

11   prescription can be switched at the pharmacy by the

12   pharmacist to a generic version of the same chemical

13   molecule.

14   Q.    All right.  Do you know how the Zocor analog was

15   used in this particular document?

16   A.    On the second page there's a line called "Zocor"

17   and it shows erosion rates.  Based on my knowledge of

18   having done this for other brands and using other

19   analogs, and not this document, it looks to me like it

20   was a consideration for an analog in this case.

21   Q.    So you're referring to the second page of the

22   document, Bates Page 375 at the bottom?

23   A.    Correct.

24   Q.    The lower left it has "Zocor," to the right of

25   that are a series of percentages.

1    Is that what you're referring to?

2    A.    Yes.

3    Q.    So within a couple of months Zocor lost 70 percent

4    of its branded business to the generics, is that what

5    this shows?

6    A.    That's what this data shows.

7    Q.    Let's go back to the first page for a second.  The

8    fourth bullet or slash down it says "Product sales

9    erosion into 2009 to 2011 shaped on '08 exit and

10   historical forecasted sales trends of Zestril and

11   Toprol."  Do you see that?

12   A.    I do.

13   Q.    Toprol is an AstraZeneca product?

14   A.    That's correct.

15   Q.    Do you know when it went generic?

16   A.    I believe it was in the end of 2006.

17   Q.    And what is Zestril, is that an AstraZeneca

18   product?

19   A.    It is.

20   Q.    Did that go generic at some point?

21   A.    It did.  I believe it was 2001, between 1999 and

22   2001.  It's been quite a while.

23   Q.    Okay.  And AstraZeneca also launched an authorized

24   generic version of Toprol, correct?

25   A.    That's correct.

1   Q.    Did it launch an authorized generic version of

2   Zestril?

3   A.    It did not.

4   Q.    If you'd turn to the next page, that's Bates Page

5   375.   At the top of the page it says "IMS chart August

6   27th, 2007 deck erosion curves by month, actual data

7   points."  Do you see that?

8   A.    I do.

9   Q.    But you're not positive whether the erosion refers

10  to dollar sales or units or prescriptions?

11  A.    How the percentages were developed, no, that's not

12  included in the notes.

13  Q.    And so, for example, for 2002, the second month at

14  the top saying 40 percent, the corresponding second

15  month for 2002 in the generic grouping below 60 percent,

16  shows that after two months, whatever drug this is based

17  on, after two months the brand retained 40 percent and

18  60 percent was lost to the generic, is that correct?

19  A.    Correct.

20  Q.    And that's true for all of these numbers in these

21  first two groups, correct?

22  A.    These are pretty standard volume retention erosion

23  analogs.

24  Q.    When you say "pretty standard"?

25  A.    So this would be the way that we would model the

1    generic erosion, business retention.

2    Q.    By looking at data on other drugs?

3    A.    Right.

4    Q.    Both drugs that AstraZeneca has sold that have

5    gone generic and other drugs which you get data on from

6    IMS, correct?

7    A.    Correct.

8    Q.    Well, for purposes of the effect of entry of an

9    AB-rated generic version of Nexium in April of 2008, as

10   AstraZeneca's 30(b)(6) witness, did AstraZeneca decide

11   on some other final expected numbers that would --

12   instead of the 88 percent and 12 percent numbers I

13   pointed you to?

14   A.    Our base forecast was that we maintain 100 percent

15   Nexium.

16   Q.    You looked at it, but you never came to a decision

17   about what the final erosion would look like?

18   A.    Yeah, the -- again the way that we do the forecast

19   is we develop a base-case assumption, right, which is

20   what becomes the formal "budget," to use a generic term.

21   The -- we talk about the goalposts that are around it.

22   This is one of the kind of elements within understanding

23   what those goalposts are.  Right.  So when you say that

24   it was like we decided that's what it was, I don't

25   believe that that was -- that that's what this was done

1    for.  This was -- we do these on a -- we do three

2    planning cycles a year and with every planning cycle,

3    where there's forecast uncertainty, we prepare scenarios

4    for better or for worse.

5    Q.    All right.  Why don't you turn to the next page,

6    which is Bates Page 376.

7    A.    (Turns.)

8    Q.    Are you there, sir?

9    A.    Uh-huh.

10   Q.    Okay.  Now, at the upper left corner it says

11   "Nexium P & L, February '08 MLF, base case $M."  Do you

12   see that?

13   A.    Yes.

14   Q.    The "$M" refers to the fact that these numbers are

15   expressed in millions, correct?

16   A.    That's correct.

17   Q.    So looking at the numbers, we have actual 2006 and

18   2007 product sales which for '06 is slightly over 5.8

19   billion and '07 is slightly over 6.3 billion.

20   Do you see that?  Is that correct?

21   A.    That's the gross sales, yeah.

22   Q.    Sure.  In other words, if I'm looking at a term

23   here like "product sales" that also appeared in Exhibit

24   3, is it fair to say they have the same meaning?

25   A.    Yes.  The only thing I would point out is there's

1    -- we talked about the field force allocation, so that's

2    included on this document, whereas the other document

3    that we reviewed was a system-generated report which

4    does not include those costs.  That's a new row here.

5    Q.    The new row is "FF allocation"?

6    A.    That's correct.

7    Q.    What do you call that, "Field Force"?

8    A.    "Field Force Allocation."

9    Q.    And what does that refer to?

10   A.    So that's the people costs.  And then their

11   computers, their cars, and benefits and everything

12   that's associated with the AstraZeneca sales force in

13   the United States.  It's typical that a sales

14   representative will detail multiple different brands.

15   So there's an allocation process that the company goes

16   through based on level of effort, um, number of details,

17   um, on Nexium, or Crestor -- or perhaps they carry like

18   two brands, Nexium and Crestor, there's an allocation

19   process that we go through to say "This is the level of

20   effort that this particular rep or this group of reps

21   exerted on Nexium," and they would turn that into the

22   total, a dollar cost.  And that would be then applied to

23   Nexium.  That really is done to give us a better

24   understanding of the, um, profitability, revenue, and

25   expenses, directly related to Nexium.

1    Q.    I see.  So for the top line of this, um, base case

2    -- now, this document in the lower left corner, um, says

3    "Nexium, April of 2008, February '08 MLF."  That's the

4    --

5    February '08 is the date this document was created, is

6    that correct?

7    A.    "February of 2008 MLF" refers to -- the "MLF" is

8    "Most Likely Forecast," and that's a monthly, um,

9    forecasting process that we go through.  So February '08

10   MLF would be the most likely forecast cycle that we

11   would have gone through in February of 2008.

12   Q.    I see.  I see.  Okay.  So then we have in the top

13   row again, this is back to Bates Page 376, "Product

14   Sales," we have numbers for January '08, across all of

15   '08, um, and then for all of '09, '10, and '11.  These

16   are projected figures, is that correct?

17   A.    Everything from January of '08 forward would be a

18   projected figure, correct.

19   Q.    Okay.  And these numbers project product sales for

20   '08, '09, '10 and '11, without generic entry, correct?

21   A.    That's correct.

22   Q.    And it adds up to 13, 18, 23, something over $23

23   billion, correct?

24   A.    You're adding gross sales?

25   Q.    Yes.  I'm looking at product sales.  Sorry.

1    Product sales.

2    A.    Product sales.  That looks to be the rough

3    estimate of product sales.

4    Q.    Okay.  Let's turn to the next page, which is Bates

5    Page 377.

6    A.    (Turns.)

7    Q.    Are you there, sir?

8    A.    Yes.

9    Q.    So the upper left corner it says "Nexium P & L

10   generic entry occurs April 1st, 2008."  Do you see that?

11   A.    Yes.

12   Q.    So this is a forecast of the same types of data

13   that is product sales and net sales and so forth, but

14   with the assumption of entry of an AB-rated generic

15   version of Nexium in April of 2008, correct?

16   A.    It's the generic entry scenario here.

17   Q.    Right.  And this is -- the numbers represent, for

18   purposes of this scenario in this document, the

19   projected numbers in a world in which there's a generic

20   version of Nexium during April of 2008, correct?

21   A.    Correct.

22   Q.    So, for example, um, we have in the first row

23   "Product Sales," um, sales in February of 544 million.

24   Do you see that?

25   A.    Yes.

1    Q.    Now, would that be an actual or projected number

2    given the date of this document?

3    A.    These would all be projected.

4    Q.    Okay.

5    A.    January could be actual at this point, but

6    everything else is projected.

7    Q.    Okay.  So what this document is showing in the

8    first row is that Nexium sales in February '08 before

9    generic entry in April of '08 would be expected to be

10   544 million, and in May '08, the month after generic

11   entry, brand sales were expected to drop to $82 million.

12   Is that what this shows?

13   A.    Correct.

14   Q.    And by 2010 it's below $100 million, correct?

15   A.    Yes, correct.

16   Q.    And by 2011 it's down to $33 million, correct?

17   A.    Correct.

18   Q.    Okay.

19   Now, just above the months you see percentages, um, that

20   start at 10 percent, from what I can read, and go up to

21   96 percent, it's a hard to read, and then picks up again

22   at 97, 98, 100 percent.  Do you see that?

23   A.    Yes.

24   Q.   That corresponds to generic substitution percentages

25   drawn from Bates Page 375, um, Nexium Version 2A?

1   A.    That looks to be the percentages that we used,

2   yes.

3   Q.    There's a little bit of rounding that occurred

4   when you go out, but that's where it's drawn from,

5   correct?

6   A.    It looks to me to be a correct set of numbers,

7   yes.

8   Q.    Okay.  So let's turn to the next page of this

9   document, please.

10  A.    (Turns.)

11  Q.    It's Bates Page 378.  Are you there?

12  A.    I am.

13  Q.    Upper left corner says "Nexium P & L Variance,

14  base case versus generic entry April 1st, 2008, dollar,

15  millions."  And this page represents the difference, the

16  mathematical difference between the numbers that appear

17  as a projection in a row when there's no generic entry

18  and the numbers that appear when there's a row where an

19  AB-rated generic version of Nexium is assumed to enter

20  in April of 2008, correct?

21  A.    Yeah, this third page, 378, which you just

22  referred to, looks to be the difference between the base

23  case and then this scenario that we just discussed.

24  Q.    Well, so, for example, let me take you to an

25  example.

1    If you look at Bates Page 376.

2    A.    (Turns.)

3    Q.    376, in the "Product Sales" row, July '08, Number

4    619.  Do you see that?

5    A.    Yes.

6    Q.    That represents a forecast of 619 million in

7    branded Nexium sales in July of '08?

8    A.    Product sales.

9    Q.    Right.  Product sales.

10   A.    I just want to be clear on that because usually

11   "sales" in general is net sales.

12   Q.    I gotcha.  We could use net sales for the same

13   exercise that appears.  I'm just making an example for

14   purposes of math.

15   A.    Sure.  Okay.

16   Q.    So for product sales, Bates Page 376 for July '08,

17   it's 619 million.

18   The next page of the document, Bates Page 377 for the

19   same July '08 month, now we're in a row where an

20   AB-rated generic version of Nexium is assumed to enter

21   in April of 2008, the number is 60 million.

22   Do you see that?

23   A.    Yes.

24   Q.    So then you flip to the next page, Bates Page 378,

25   and the "product sales" row for July '08 has the number

1    559 in parentheses.  Do you see that?

2    A.    Yes.

3    Q.    Which is an accounting way of showing a loss or a

4    negative, is that correct?

5    A.    It would be that the scenario is less than the

6    base case, yes.

7    Q.    Right.  So it's 559 because you take the 619

8    million that we were looking at before, the expected

9    brand sales without generic entry, you subtract 60

10   million that's expected to be sold of branded Nexium in

11   a world in which generic versions of Nexium enter in

12   April '08, and you get 559 million, which here is

13   expressed as a loss in brand sales, correct?

14   A.    Correct.

15   Q.    So when you move over to, um, the year figures

16   '08, '09, '10 and '11, um, you have four numbers all in

17   parentheses that add up to -- let's see, 16, 17 -- about

18   $22 billion.  Do you see that?

19   A.    You're talking '08, '09, '10, and '11?

20   Q.    Yes.

21   A.    That looks to be roughly 22 million.

22   Q.    Right.  And they're all in brackets or

23   parentheses, which indicates that according to this

24   document on this page, um, if an AB-rated generic

25   version of Nexium were to enter in April of '08, um,

1    AstraZeneca would lose $22 billion in Nexium product

2    sales over the period of '08 to 2011, correct?

3    A.    In product sales, yes.

4    Q.    Okay.  And similarly if we go down, um, that is

5    down the page from top to bottom on Bates Page 378, you

6    have numbers that correspond to the net sales figure

7    that add up to roughly $9 billion.  Do you see that?

8    A.    Yes.

9    Q.    You said "yes"?

10   A.    Yes.

11   Q.    Okay.  So similarly that means that according to

12   this document, um, AstraZeneca would lose approximately

13   $9 billion in net Nexium branded sales over the period

14   of '08 to 2011 if an AB-rated generic form of Nexium

15   were to enter in April '08?

16   A.    That's correct.

17   Q.    Okay.  And to take another example, move down to

18   "Gross Margin," um, the numbers in '08, '09, and '10 and

19   '11, add up to approximately -- approximately $6

20   billion.  Do you see that?

21   A.    Yes.

22   Q.    So again this represents that, according to this

23   document, AstraZeneca would lose approximately $6

24   billion in gross margin on branded Nexium if an AB-rated

25   generic version of Nexium were to enter in April of

1  2008, correct?

2  A.    Yes, under this scenario, that's correct.

3  Q.    Okay.  Sir, what I've marked as Exhibit 5 bears

4  Bates Number AZ-NEX-MDL 00847315 through -- well, in

5  other words, I'll take a step back.

6  For a drug like Arimidex that AstraZeneca sells, it

7  knows directly from its own sales data what happens to

8  its brand sales before and after a generic entry,

9  correct?

10 A.    Correct.

11 Q.    It doesn't necessarily know how much the other

12 generic companies are getting in sales without getting

13 IMS data, correct?

14 A.    IMS data would provide prescription volume, not

15 sales data.

16 Q.    Sir, Exhibit 10, bears Bates number NEX-RBX

17 3505839.  This also was blown up to make it easier to

18 read.  The front page is an e-mail from a Marion McCourt

19 to herself, dated April 26th, 2008, and then there's an

20 attachment.

21 Have you seen this document before?

22 A.    Yes.

23 Q.    When was the first time you saw it?

24 A.    Um, yesterday.

25 Q.    Did you see it in unredacted form?

1   A.    No, I did not.

2   Q.    If you turn to Bates Page 841.  Are you there,

3   sir?

4   A.    Yes.

5   Q.    Under the "Key Assumptions" right below the

6   redacted box, it says "AG pricing based on Toprol AG

7   experience, 60 percent" -- I think that's 60.  Um,

8   "discount to Nexium WAC at launch in 2008, 65 percent in

9   2009."

10   Do you see that?

11   A.    Yes.

12   Q.    So I handed you a document marked NEX-RBX 3514270,

13   marked as Exhibit 14.  It's an e-mail attachment dated

14   4-29-2007.  If you look to the attachment, the first --

15   the cover page is a "Genesis Overview"?

16   A.    Yes.

17   Q.    If you go to the last page, which is Bates Page

18   277, it says "High Level Timeline."  It says "Capsules

19   have been ordered from Capsugel."

20   What is "Capsugel"?

21   A.    I don't know.

22   Q.    It says "Formulation, early 2008."  Below that it

23   says "Packaging to support mid April 2008 availability."

24   Below that it says "8 weeks stock to support full

25   product launch."  Below that "70 to 75 million capsules

1    based on projected forecast."

2    So if I understand this correctly, that according to

3    this document AstraZeneca was looking at a -- having 70

4    to 75 million capsules of authorized generic Nexium

5    equivalent to 8 weeks of stock, um, and have it all

6    available for an April of 2008 potential launch, is that

7    correct?

8    A.    So not being directly familiar with the document,

9    what I can gather from looking -- and we talked before

10   about operations of preparation for a potential launch,

11   um, this looks like a review document that would have

12   laid out some of the volumes that would have been

13   necessary to support a launch.  There's a stocking

14   assumption here, so.  And given that it's Project

15   Genesis, Nexium AG.

16   Q.    And so the 70 to 75 million is what was thought to

17   satisfy eight weeks of demand?

18   A.    Based on this scenario.

19   Q.    Now, with respect to the -- you had mentioned that

20   there was a charge-back element to this particular line

21   item?

22   A.    Charge-backs are included in there.

23   Q.    And how so?  What do you mean by that?

24   A.    I mean, how are they included?  So managed markets

25   discounts essentially covers any price concessions from

1    the gross value of the products or the WAC down to the

2    net agreed-upon price that we would have agreed with a

3    third-party payor.  In the case of a charge-back, it

4    would be the WAC is a dollar, for example, um, we've

5    agreed, either voluntarily or involuntarily, through

6    like statutory rebates, like say with the Department of

7    Defense on the federal supply schedule, to sell to them

8    say for 75 cents.  So we sell to the wholesalers for a

9    dollar in this example.  When the wholesaler goes and --

10   or when the Department of Defense in this example buys

11   from the wholesaler, there's an agreed-upon price they

12   have with AstraZeneca that's 75 cents, the wholesaler

13   sells it to them for 75 cents.  That a 25 cent

14   difference that the wholesaler is now effectively out,

15   is charged back to AstraZeneca.

16   Q.    Now, let's take a look at Exhibit 3.

17   A.    (Looks.)

18   Q.    Do you have that in front of you?

19   A.    I do.

20   Q.    Now, you earlier described this as a U.S., um --

21   U.S. management --

22   A.    U.S. management profit and loss statement.

23   Q.    Right.  And so who decides what to include in this

24   and what not to include in it -- in terms of items?

25   A.    Well, these are actuals.

1    Q.    I understand that.  In the left column it starts

2    at "Product Sales" and goes all the way down.  We went

3    through that.  Do you recall that?

4    A.    Right.  You mean as far as what categories it

5    includes?

6    Q.    Exactly.  What items in the left column are

7    included versus any that are not included, who decides

8    that?

9    A.    You know, we've been with this format forever

10   since I worked at the company.  So it would have been --

11   this is the U.S. management P & L.  So it's the way that

12   management at whatever level is measured from the board

13   of directors looking at the CEO, to the executive vice-

14   president of North America looking at a commercial brand

15   leader, how does his brand or group of brands perform.

16   It's the best representation of the profitability of the

17   brand within a given market including the costs that are

18   directly attributable to the sales in that market.

19   Q.    Thank you.

20   A.    And then one other clarifying point.  This

21   particular exhibit is a system generated report.  So we

22   talked before about the Field Sales Allocation,

23   headquarter costs, and others -- those types of costs.

24   They're not included here because systematically they're

25   not allocated to a brand.

1    Q.    Do you have some actual knowledge of the research

2    and development dollars relating to Nexium?

3    A.    No.

4    Q.    Okay.

5    In terms of the questions you were asked about some

6    projections, I believe you testified -- and I want to be

7    very clear about this, that you are not aware of -- I'll

8    start again.

9    You're not a lawyer, correct?

10   A.    That's correct.

11   Q.    And you're not a patent expert of any kind,

12   correct?

13   A.    That's correct.

14   Q.    Okay.  And you didn't develop any personal

15   independent view of the likelihood of AstraZeneca

16   winning or losing its patent case against Ranbaxy

17   related to Nexium, correct?

18   A.    That's correct.

19   Q.    And are you aware from counsel -- this is just a

20   "yes" or "no" question.

21   Did you learn from counsel, AstraZeneca's counsel's view

22   of the likelihood of it winning or losing its case

23   against Ranbaxy?

24   A.    No.

25        (Video deposition ends.)

1          THE COURT:  That's it?  All right.  Call your next

2     witness.

3          MR. SHADOWEN:  Your Honor, for the record, um, the

4     Diggons Exhibit Number 1 is in evidence as Trial Exhibit

5     13.  Deposition Exhibit 3 is Exhibit EHV for

6     identification.  And Plaintiffs move its admission.

7          THE COURT:  Any objection to EHV?

8          MR. BUTSWINKAS:  No, your Honor.

9          THE COURT:  All right.  Admitted in evidence as

10    Exhibit 141.

11          (Exhibit 141, marked.)

12          MR. SHADOWEN:  And Deposition Exhibit 4 is in

13    evidence as Trial Exhibit 14.  And Deposition Exhibit 5

14    is in evidence as Trial Exhibit 17.  And Deposition

15    Exhibit 10 is Exhibit EGK for identification.  And

16    plaintiffs move its admission.

17          THE COURT:  No objection to EGK?

18          MR. BUTSWINKAS:  Correct, your Honor.

19          THE COURT:  It's admitted as Exhibit 142.

20          (Exhibit 142, marked.)

21          MR. SHADOWEN:  And deposition Exhibit 14 is in

22    evidence as Trial Exhibit 127.

23          THE COURT:  All right.  Call your next witness.

24          MR. SOBOL:  Your Honor may recall that yesterday,

25    outside the presence of the jury, the Court admitted in

1    evidence Exhibit 140.

2           THE COURT:  Correct.

3           MR. SOBOL:  And so we wanted to be able to publish

4    that to the jury before we proceed.

5           THE COURT:  You just want to pass it?

6           MR. SOBOL:  Yes, your Honor.

7           THE COURT:  The Clerk will pass it.

8           We haven't done this yet, but it's a common way of

9    doing it.  He properly recites that -- I mean we work

10   while you're gone, but I've admitted this document in

11   evidence so, um --

12          Oh, you made copies?

13          MR. SOBOL:  Yes, your Honor, if that's acceptable.

14          THE COURT:  That is acceptable.

15          But you don't have to carry these copies back and

16   forth.  They want you to have them.  It's in evidence.

17   That's fine.  Remember this is 1 out of 141 exhibits.

18   So I'm not going to ask you to have a whole file of 141

19   exhibits.  But if you want it, you can have it, and you

20   can tuck it in with your notebooks.  I'm just telling

21   you you don't have to.  The document's in evidence.

22          All right.  Call your next witness.

23          (Passes out to jury.)

24          MR. SOBOL:  In addition, your Honor, before we

25   also proceed the plaintiffs move into evidence ERF,

1   which is a document from the files of Teva, a Power

2   Point presentation.

3           THE COURT:  ERF, any objection, counsel?

4           MS. WALKER:  What is it?

5           MR. SOBOL:  It's the Diachi presentation.

6           MS. WALKER:  Object, your Honor.

7           MR. SOBOL:  Sidebar, your Honor?

8           THE COURT:  Well, that was pretty quick.  Let me

9   see it.

10          Come to the sidebar.

11

12          AT THE SIDEBAR

13          THE COURT:  This looks -- let me propose an

14  analysis and then see where we are.  It looks, (1)

15  relevant, and (2) it's an admission by Teva.  So why

16  shouldn't this be admissible?

17          MS. WALKER:  This was a document that they raised

18  when Ms. Staci Julie was on the stand, they asked her

19  about it.  No foundation was laid whatsoever for it.

20  There's -- it is an internal draft.  There's been no

21  foundation laid by any witness either here at trial or

22  at any deposition, your Honor.

23          THE COURT:  Okay.  Now accepting that, it's an

24  internal draft, it's a paper circulated to somebody in

25  Teva.  Doesn't that go to its weight, not its

1   admissibility?  It's both relevant and it's an

2   admission.

3           MS. WALKER:  It's hearsay, your Honor.

4           THE COURT:  It's not hearsay.

5           MS. WALKER:  It's an internal draft.

6           THE COURT:  What authority is there for that?

7           MS. WALKER:  This is not a business record.  Every

8   draft that's inside a corporation is not a business

9   record.

10          THE COURT:  Oh, I agree with that.

11          MS. WALKER:  Nobody would know who said --

12          THE COURT:  We don't, it goes to the weight.

13          MS. WALKER:  We have no idea.  It could be

14  something that somebody outside of Teva drafted.  All we

15  know is it's not an admission of Teva.  There's no

16  foundation.

17          THE COURT:  It says "Teva" on every page.

18          MS. WALKER:  We don't know any of the contacts of

19  where it came from.

20          THE COURT:  We don't.  Maybe you'd like to explain

21  it to reduce its weight.  It may be just a scrap of

22  nothing, but it is Teva's and it is relevant.

23          Now, under 801(d)(2)(D) it's an admission.  It's

24  talking about the business of Teva with Teva's

25  statements on it.  I reasonably infer some Teva employee

1    generated it.  If you can show me somebody else did,

2    that's something else.  I'm not admitting it under 8036

3    as a business record, it's coming in under 801(d) --

4    801(d)(2)(D).

5         MS. WALKER:  We would just -- for the record we

6    believe that any document that just comes out of a

7    company's files on a computer somewhere is not an

8    admission of the company.

9         THE COURT:  That may be, but this one is.

10        MR. BALDRIDGE:  Go ahead.

11        MS. FOLEY:  The problem is the plaintiffs are

12   trying to use this document to show that there was a

13   meeting between Teva and Diachi, as a shareholder of

14   Ranbaxy.  There's no foundation for that.

15        THE COURT:  Absolutely right.  So having heard

16   from you, it is limited only to Teva.

17        MR. BALDRIDGE:  And no admission as to Ranbaxy.

18        THE COURT:  Correct.

19        MR. SCHMIDTLEIN:  Or AstraZeneca.

20        THE COURT:  Or to AstraZeneca.

21        MS. WALKER:  Or, your Honor, or for the truth of

22   anything asserted.

23        THE COURT:  Wrong.  It's admitted.

24

25        (In open court.)

```
 1              THE COURT:  ERF is admitted.  It will be Exhibit
 2     143.  But there's a limitation on this one.  If you
 3     believe -- and it's entirely up to you, but when I look
 4     at it it says "Teva" on it in various places.  So I'm
 5     not clear what it is.  I don't say anything about it.
 6     It's a piece of paper.  It says "Teva" on it.  I'm
 7     admitting it in evidence but only as to these
 8     plaintiffs' case against Teva, not against AstraZeneca,
 9     not against Ranbaxy.
10              Now, there was another exhibit that we likewise
11     limited in this fashion.  This comes in, Exhibit 142 --
12     143, excuse me, but only against Teva, as limited.
13              Now, let's call the next witness.
14              (Exhibit 143, marked.)
15              MR. SHADOWEN:  Thank you, your Honor.
16              The plaintiffs recall Dr. Thomas McGuire.
17              THE COURT:  He may be recalled.
18              MR. SCHMIDTLEIN:  Your Honor, may we have a
19     sidebar?
20              THE COURT:  Yes.  Let's just remind the witness
21     and then we can have the sidebar.
22              THE CLERK:  I'd like to remind you, sir, that
23     you're still under oath.
24              THE WITNESS:  Thank you.
25
```

1          AT THE SIDEBAR

2          THE COURT:  I speak only to help.  Believe me.

3     Look, he's back on the stand.  I'm trying to stay

4     current with your various briefings.  I don't buy this

5     theory that they bought off Ranbaxy and had they not

6     bought off Ranbaxy, Ranbaxy would have been able to

7     enter in 2011, and if Ranbaxy entered in 2011, obviously

8     Teva could have entered in 2011.  This is the only --

9     that's out.  And I'm not going to let him testify to

10    that.  I settled that on summary judgment.

11         Here's how Ranbaxy stays in here.  The plaintiffs

12    have to prove that were it not for the deal with Teva,

13    where as you characterize it AstraZeneca "bought off"

14    Teva, Teva would have cut some deal with Ranbaxy, who

15    couldn't have to market, but had that first position,

16    and thereby not in the market before the key date, 2014.

17         The best I can say is that's the only theory

18    that's going to go to the jury.  That's in his report.

19         Well, Mr. Schoen?

20         MR. SCHOEN:  It's not in his report.

21         THE COURT:  Then we're not going anywhere.

22         MR. SHADOWEN:  It is in his report.

23         THE COURT:  We'll, okay, then we'll have to see.

24    We'll go question by question.

25         MR. SCHMIDTLEIN:  Can we get it right now?

```
1          THE COURT:  No, we can't get it right now because
2     I can't keep up with you, candidly.  I know how to rule
3     on questions.  And if that sounds arrogant to the Court
4     of Appeals, I say "I try to rule accurately."
5          MR. BALDRIDGE:  It didn't sound arrogant.
6          THE COURT:  No, no, I state for the record I'm
7     good and I teach evidence, I'm good three out of four,
8     three out of 5, and, you know, most of the rest of it is
9     not substantial.  And I have been reversed for an
10    evidentiary ruling -- (Walks away.)
11         (Laughter.)
12
13         (In open court.)
14         THE COURT:  Now while we're all over here, let's
15    -- before we get into Mr. McGuire, let's take a stretch
16    break and get ourselves all ready.
17         (Stretch break.)
18         THE COURT:  (To the witness.)  I guess that can
19    include you, too.
20         (Laughter.)
21         THE COURT:  All right.  Mr. Shadowen, you may
22    proceed.
23         MR. SHADOWEN:  Thank you, your Honor.
24
25    DIRECT EXAMINATION BY MR. SHADOWEN.  (Recalled witness.)
```

1    Q.    Dr. McGuire, would you please remind the jury of

2    your name and spell your last name, please.

3    A.    Thomas McGuire.  My last name is spelled

4    M-C-G-U-I-R-E.

5    Q.    And you were here before, right?

6    A.    Yes.

7    Q.    And you're a professor of health economics at the

8    Harvard Medical School?

9    A.    That's correct.

10   Q.    Now, today I'd like to discuss with you your view

11   as to whether AstraZeneca's settlements with Ranbaxy and

12   Teva were interdependent and collusive?

13   A.    Okay.

14   Q.    Please remind the jury what the term "bottle-neck"

15   means in this industry?

16   A.    Okay.  "Bottle-neck" is important to be able to

17   answer that question --

18          THE COURT:  Somehow I don't know that that mic is

19   on.  Maybe it's not on.

20          (Clerk turns on microphone.)

21          THE WITNESS:  Can you hear me, okay?  Is that all

22   right?

23          THE COURT:  Yes.  Fine.

24   A.    The concept of "bottle-neck" is important to

25   understand, um, as I mentioned last time, and then it's

1   also important to understand how the bottle-neck can be

2   used as part of the settlement agreement to effect the

3   economic circumstances of AstraZeneca and the subsequent

4   generic filers.

5   So what is a "bottle-neck"?  A bottle-neck is put in

6   place at the time there's a settlement date --

7          MR. SCHMIDTLEIN:  Objection, your Honor.  This is

8   outside the report.

9          THE COURT:  What are we talking about now?

10         MR. SHADOWEN:  Tab 1, Paragraph 49, your Honor.

11         THE COURT:  Thank you.

12         MR. SCHOEN:  Also objection as to relevance, your

13   Honor.

14         THE COURT:  Overruled as to relevance, and in the

15   middle of that paragraph he gives a definition of

16   "bottle-necking" and he may testify in accordance with

17   what he's disclosed.

18         You may give your definition.

19         THE WITNESS:  Okay.  Thank you.

20   A.   So a "bottle-neck" refers to the, um, effect of an

21   agreement between AstraZeneca and in this case the

22   first-filer Ranbaxy because it affects the date at which

23   not only the first-filer may enter but it also affects

24   the date of subsequent generic potential interest.

25         MR. SHADOWEN:  If we could have Figure 4, please.

1          (On screen.)

2          THE COURT:  Just so I'm clear on that.  Once an

3     entity is first to file its ANDA, then under this Hatch-

4     Waxman law -- now, I'm the judge of the law, but I'll

5     get your interpretation of it since you're here.

6          THE WITNESS:  Okay.

7          THE COURT:  So it stands first in line, and we've

8     heard a lot of testimony about that, and what you just

9     testified to is if there is litigation between the

10    patent holder and that first to file and then that

11    litigation gets settled, that doesn't mean that the --

12    however they've settled, it doesn't mean the first-to-

13    file loses its first-to-file position.

14         That's what you testified to?

15         THE WITNESS:  Not, not at all.

16         THE COURT:  Tell the jury.

17    A.    No, not at all, I didn't refer to that in any way

18    in the definition of the "bottle-neck."  The "bottle-

19    neck" refers to the establishing of the date that

20    affects not just the parties who just settled an

21    agreement but affects the date of potential entry for

22    subsequent generic filers as well.

23    Q.    Now, we have on the screen there a diagram that

24    you have provided for us last time.  I want to direct

25    your attention to the bottom line in the lower right-

1     hand quadrant there that says "Anticompetitive Range."

2     Do you have that?

3     A.     Yes, I do.

4     Q.     So if AstraZeneca and Ranbaxy settled in that

5     anticompetitive range, what would be the effect of the

6     bottle-neck?

7             MR. SCHOEN:  Objection, your Honor, report.

8             MR. SCHMIDTLEIN:  Objection.

9             THE COURT:  Where is that?

10            MR. SHADOWEN:  That is Tab 1, Paragraph 49, 65 and

11    66.

12            THE COURT:  (Looks.)

13            MR. SCHMIDTLEIN:  Sidebar, your Honor?

14            THE COURT:  Wait a minute.

15            (Pause.)

16            THE COURT:  Well, I have no problem with his

17    testifying consistent with 65 and 66.  Going back to 49,

18    at least as to Ranbaxy, it's somewhat conclusory and I'm

19    not disposed to allow that.

20            Will you accept just 65 and 66?

21            MR. SHADOWEN:  Certainly.

22            MR. SCHOEN:  May we have a sidebar, your Honor?

23            THE COURT:  We may.

24

25            AT THE SIDEBAR

1          THE COURT:  I guess I don't get it because 65 and

2    66, there's plenty of evidence about that.  I could

3    explain this to the jury, but I'm not so sure you want

4    me to, and maybe nobody wants me to.

5          MR. SCHOEN:  My concern, your Honor, is that I

6    just heard you say, at the last sidebar, that this

7    theory that the Ranbaxy settlement caused harm and

8    delayed Teva was out?

9          THE COURT:  It is out.

10         MR. SCHOEN:  But that's exactly what this

11   testimony is.

12         THE COURT:  Well, he can get 65, 66 --

13         How long are you going to -- are you going to get

14   from him that they would have cut a deal with Ranbaxy,

15   is he your --

16         MR. SHADOWEN:  He's not the causation person.

17         THE COURT:  Okay.

18         MR. SHADOWEN:  What he is is the interrelatedness

19   between the two agreements.  He's going to say Ranbaxy

20   wanted that 180 days and in order to do that we're about

21   to get to the contingent launch provision on Teva.

22         THE COURT:  But here's the -- right, the

23   contingent launch position is in.

24         MR. SHADOWEN:  That's what we're doing.

25         THE COURT:  But 65 and 66 is in his report and

```
 1    I'll let him testify.

 2         Here's the line I'm drawing.  This is all working

 3    fine.  You attack, he's ready with his paragraphs.  I

 4    look at them.  I'm not getting anything from

 5    pay-for-delay with respect to Ranbaxy, that's too --

 6    given my earlier rulings, that's -- while it's 403 and

 7    it puts a red herring out there.  We're not getting it.

 8    But 65 and 66 are his conclusions based upon undisputed

 9    facts.  They did settle for Ranbaxy.

10         MR. SCHMIDTLEIN:  No, but these are just factual

11    paragraphs, it has nothing to do with that Figure 4 that

12    he just asked him about.

13         THE COURT:  I can only go question by question.

14    He can testify as to 65 and 66.

15

16         (In open court.)

17         THE COURT:  You put your question, Mr. Shadowen.

18         MR. SHADOWEN:  Thank you, your Honor.

19    Q.   It's true, isn't it, Dr. McGuire, that the

20    bottle-neck itself is created as a creature of federal

21    regulation, the regulation that says no later-filer can

22    come in for 180 days, isn't that right?

23         MR. SCHOEN:  Objection.  Leading.

24         THE COURT:  Sustained on that ground.

25    Q.   Dr. McGuire, is the basic bottle-neck a creature
```

1   of federal regulation?

2   A.     The rules and regulations around generic entry and

3   ANDA filers are a creation of the Hatch-Waxman Act.  So

4   the "creature" you just described is due to the Act.

5   Q.     In your review of the record, did you see any

6   terms and conditions of the AstraZeneca-Ranbaxy

7   agreement that affected the bottle-neck or affected the

8   likelihood that any subsequent generic would be able to

9   break the bottle-neck?

10         MR. SCHMIDTLEIN:  Objection.  Report.

11         THE COURT:  Where is it?

12         MR. SHADOWEN:  It's in Tab 2, Paragraph 21.

13         (Looks.)

14         MR. SCHMIDTLEIN:  Can we be heard on this, your

15   Honor?

16         THE COURT:  No, I've announced my ruling and I

17   think I can follow the line.  There's no necessity.  He

18   may testify consistent with Paragraph 21.

19   A.     Yes, I did identify such a cause.

20   Q.     All right.

21         MR. SHADOWEN:  Scott, would you put up Trial

22   Exhibit 10.

23         (On screen.)

24   Q.     Do you want to look at it on the screen or I have

25   a hardcopy?

1   A.    Well, a hardcopy is better.  Thank you.

2     (Hands over to witness.)

3   Q.    I direct your attention to Section 5.2 of that

4   agreement, Dr. McGuire.

5   A.    I'm there.

6       MR. SCHOEN:  Objection, your Honor, the report.

7       THE COURT:  Where?

8       MR. SHADOWEN:  The same paragraph.

9       THE COURT:  Your question was?

10       MR. SHADOWEN:  I direct his attention to Paragraph

11   5.2.

12       MR. SCHMIDTLEIN:  No, that's not cited in his

13   report.

14       THE COURT:  All right.  Now let's see.

15     (Pause.)

16       THE COURT:  Yes, sustained.  He may testify but

17   only at the level of generality that's in the report.

18   That's what he disclosed.  You may argue the point.  But

19   sustained.

20   Q.    Dr. McGuire, in your review of the materials and

21   in particular the Ranbaxy-AstraZeneca agreement, did you

22   find what's sometimes called a "contingent launch" or an

23   "acceleration clause"?

24       MR. SCHOEN:  Objection, your Honor, the report.

25       THE COURT:  Sustained.  You're leading the

1    witness.  He can testify in accordance with the report.

2           So when you looked over these agreements --

3           Feel free to object to my questions.  I have no

4    expertise.

5           (Laughter.)

6           THE COURT:  No, no, no, I'm serious.

7           So when you looked over -- we'll start with the

8    AstraZeneca-Ranbaxy.

9           So AstraZeneca-Ranbaxy had litigation, they

10   settled the litigation, you understand that, correct?

11          THE WITNESS:  Yes.

12          THE COURT:  All right.  And in that did you find

13   something, um, you seem to have explained it here in

14   this Paragraph 21, that, um, related to other people who

15   were seeking to enter the market?

16          THE WITNESS:  Yes, I did, your Honor.

17          THE COURT:  What was it?

18          THE WITNESS:  It's referred to as the

19   "acceleration clause" or a "contingent entry clause."

20          THE COURT:  All Right.

21          Pick it up, Mr. Shadowen.

22   Q.   What was the effect of that clause on Teva in

23   other subsequent filings?

24          MR. SCHOEN:  Objection, your Honor, in the report.

25          THE COURT:  Overruled.  It's consistent with 21.

1    He may testify.

2    A.    The effect is to reduce the economic incentive of

3    Teva and subsequent generic ANDA filers to pursue

4    litigation against the Nexium patents.

5    Q.    How so?

6    A.    Well, as I said a minute ago, the rules are the

7    rules established by Hatch Waxman, what a generic

8    challenger needs to establish in court in order to be

9    able to enter.  That's not something that the parties

10   can change.  What they can change are the gains and

11   losses facing a subsequent ANDA filer.  They can make

12   that less attractive --

13        MR. SCHOEN:  Objection, your Honor, not in the

14   report.

15        THE COURT:  No, it's within the ambit.

16        Go ahead.  You may continue.

17   A.    The clause that I'm referring to, the acceleration

18   clause, makes it less attractive for Teva to pursue in

19   this litigation and in that way makes it therefore less

20   likely Teva would go ahead and do it.

21   Q.    Is there something different about that clause as

22   compared to the basic structure of the

23   AstraZeneca-Ranbaxy agreement?

24        MR. SCHMIDTLEIN:  Objection, report.

25        THE COURT:  No, sustained on the ground that

```
1    you're leading the witness.  Don't lead this witness.
2    Q.    Dr. McGuire, did you compare the structure of that
3    clause to the overall structure of the
4    AstraZeneca-Ranbaxy agreement?
5    A.    Yes, I did.
6    Q.    And what did you conclude?
7         MR. SCHOEN:  Objection, your Honor, report.
8         THE COURT:  Yes, where is this in the report, any
9    comparison to the Ranbaxy agreement?
10        MR. SHADOWEN:  With the initial -- that paragraph,
11   Paragraph 20, as compared to the initial report,
12   Paragraph 60.
13        THE COURT:  All right.  Let me look at 60.
14        (Pause.)
15        THE COURT:  No, sustained.  He can tell us what
16   these -- he can tell us, consistent with Paragraph 21,
17   what these contingent launch provisions do in this
18   regulatory context.
19   Q.    Dr. McGuire, in your review of the record did you
20   reach a conclusion as to whether or not the acceleration
21   clause or the contingent launch provision was in fact
22   effective in deterring earlier entry by Teva and others?
23        MR. SCHMIDTLEIN:  Objection, report.
24        THE COURT:  Yeah, sustained.  He's confined to,
25   um --
```

1          Where does it say that?

2          MR. SHADOWEN:  In Tab 1, Paragraphs 65 and 66.

3          THE COURT:  Oh, 65 and 66.  All right.

4          (Pause.)

5          THE COURT:  No, sustained.

6    Q.    Dr. McGuire, directing your attention back to

7    Paragraph 21 of your supplemental report.

8    A.    (Turns.)

9    Q.    Can you tell the jury whether or not the

10   acceleration clause was in fact effective in deterring

11   entry by Teva and others?

12         MR. SCHOEN:  Objection, report.

13         MR. SCHMIDTLEIN:  The report.

14         THE COURT:  No, sustained.  I've ruled on that.

15         Look, this isn't a game.  This is very serious.

16   But one of the rules of court that I enforce strictly is

17   when you get one of these opinion witnesses, they've got

18   to spell everything out to the other side so that the

19   other side effectively can ask their questions, and I

20   stick to that.  But -- and I'm very strict on it.

21         But let me explain the line over there, but let me

22   explain the line to Mr. McGuire.

23         I'm not trying to interfere with your testimony,

24   which after all is under oath.  It's up to the jury

25   whether to believe it or disbelieve it.  But what comes

1    closest here is this Paragraph 21, but in Paragraph 21

2    you only talk about the effect of these clauses

3    generally and his questions say, "Oh, let's come to this

4    case, how did it affect Teva?"  I don't see anything in

5    there about how it affected Teva.  But it might be

6    helpful for you to explain how do these clauses tend to

7    affect subsequent filers, then it will be up to them to

8    see if they can tie it in.

9         Do you understand the line I'm following?

10        THE WITNESS:  I think so, your Honor.

11        THE COURT:  All right.  And I know Mr. Shadowen

12   does, so we'll let him ask the questions.

13        MR. SHADOWEN:  Your Honor, with respect I would

14   direct the Court's attention to the last sentence of

15   Paragraph 21.

16        THE COURT:  In Tab 2.  Thank you.

17        (Pause.)

18        THE COURT:  Yeah, well, he may testify with

19   respect to that.

20        MR. SHADOWEN:  Okay.

21        THE COURT:  That wasn't your question,

22   respectfully.  But you may ask him that.

23   Q.   What effect, if any, did the acceleration clause

24   have with respect to the subsequent ANDA filers in this

25   case?

1    A.    It succeeded in making it less likely.  In fact

2    there were no subsequent ANDA filers that pursued this

3    through litigation.

4    Q.    Now, Dr. McGuire, did you perform an economic

5    analysis to determine what was Ranbaxy's motive to agree

6    to the acceleration clause?

7         MR. SCHMIDTLEIN:  Objection, your Honor.

8         THE COURT:  Well, did he?

9         MR. SCHMIDTLEIN:  Relevance, and not in the

10   report.

11        THE COURT:  Well, I'm more struck by that.

12        Where is it in the report?

13        MR. SHADOWEN:  Tab 1, Paragraphs 30 and 31.

14        (Pause.)

15        THE COURT:  30 through 41?

16        MR. SHADOWEN:  30 and 41.

17        THE COURT:  Thank you.

18        (Pause.)

19        THE COURT:  He can testify as to 41, save as to

20   the last sentence there, with respect to Ranbaxy, and

21   30 -- yeah, he can testify in accordance with 30.

22        Now, why don't you put your question and I'll have

23   those two paragraphs in mind, if that's what you're

24   basing it on.

25   Q.    Dr. McGuire, what if anything was Ranbaxy's motive

1    to agree to a delayed entry and to make it stick through

2    the acceleration clause?

3         MR. SCHOEN:  Objection.

4         MR. SCHMIDTLEIN:  Objection.

5         THE COURT:  Yeah, sustained.  I don't -- again at

6    the -- sustained.  And here's the line, so the witness

7    can understand.

8         I don't know how he is able to testify as to the

9    motives of people.  He looked at documents.  So the why

10   people did things is either going to come from the

11   testimony of people, from the documents, and lawyers can

12   then argue -- having seen that they can say, "Well,

13   look, this is why they would do it and the like."  We

14   may see that in this case.

15        We've got this opinion witness and he can give us

16   his opinions, and if I look at those two paragraphs,

17   again they set out considerations that companies could

18   have in this regulatory area, and he can testify in

19   accordance with those considerations at the level of

20   generality that's set forth there.

21        Go ahead.

22   Q.   Dr. McGuire, did you reach a conclusion as to

23   whether Ranbaxy had an economic motive to agree to the

24   acceleration clause?

25   A.   Yes, I did.

1   Q.    And what conclusion did you reach?

2         MR. SCHMIDTLEIN:  Objection.  Report.

3         THE COURT:  Overruled.  He may answer, consistent

4   with those paragraphs.

5   A.    The acceleration clause, as I explained, had the

6   effect of reducing the likelihood that Teva would

7   challenge and break the bottle-neck, which means for

8   Ranbaxy it became more likely that they were able to use

9   their 180-day exclusivity period and make the profits

10  associated with that.

11  Q.    And did you make an analysis, Dr. McGuire, as to

12  the relative value to a first-filer of securing that

13  180-day period of exclusivity?

14        MR. SCHMIDTLEIN:  Objection.

15        MR. SCHOEN:  Objection.

16        MR. BALDRIDGE:  Objection, form, report, summary

17  judgment opinion.

18        THE COURT:  Well, the form is okay, simply to ask,

19  "Did you form such an opinion?"  So he can answer that

20  "yes" or "no."

21  A.    I did form such an opinion.

22        THE COURT:  Where is it in the report?

23        MR. SHADOWEN:  Paragraph 54, Tab 1, your Honor.

24        (Turns.)

25        THE COURT:  No, overruled.  He may testify,

1    consistent with that paragraph.

2    A.    There's a frequently-cited document that was an

3    industry document that states that for the first-filer

4    the vast majority of profits that it makes going generic

5    will come during that 180-day period.

6         MR. SHADOWEN:  And Figure 3, please.

7         (On screen.)

8    Q.    Using this chart, Dr. McGuire, can you explain to

9    the jury the relative importance to the first-filer of

10   securing and making more certain that 180-day

11   exclusivity as compared to having a delay and getting

12   it?

13   A.    Okay.

14        THE COURT:  I didn't hear an objection, but I

15   don't understand the question.  Not that there's an

16   invitation to object, but I didn't understand that one.

17   So ask it again.

18        MR. SHADOWEN:  Sure.

19   Q.    Dr. McGuire, using Figure -- this figure on the

20   screen, can you explain to the jury the relative

21   importance to the first-filer of securing and making

22   more certain its entitlement to that 180-day

23   exclusivity?

24   A.    Yes.  This is the timeline, again, um, with the

25   time beginning around 0 up to what's there labeled "T",

1    indicating the time during which the parties would be in

2    litigation, and what you're seeing here are the

3    consequences to the brand and to the generic if the

4    generic were to win that litigation.  So at "T" the

5    Court decides the patents are not valid or infringed,

6    the generic can enter.  So what happens, as I think you

7    by now understand, brand profits plummet and the generic

8    can enter and make some profits.

9    Now, the thing to keep in mind in this figure is this is

10   not certain.  From the standpoint of the generic, as

11   we're in litigation, this is a possibility, but the

12   other possibility is they could lose that litigation and

13   these profits would then not materialize.

14        MR. SHADOWEN:  The next one, Scott, please.

15   Q.   And what are we seeing now?

16   A.   This is the delayed-entry scenario and the

17   consequences for the brand and the generic.  In the

18   delayed-entry scenario, the brand of course doesn't have

19   to worry about generic competition, continues to sell,

20   um, you know, by itself in the market at high prices and

21   makes high profits.  That's what the high blue line is

22   meant to represent.  There is, however, an agreed-upon

23   date of generic entry, which is now "t", and at that

24   point the generic can come in.

25   So an important consideration with respect to

1    interpreting this part of the figure is this now is

2    certain.  So once litigation has led to a settlement,

3    the brand is able to sell for a longer period of time,

4    the generic can't get those same profits, but can get

5    them with a certainty and not some chance of winning the

6    litigation in the earlier path.

7    Q.    And, Dr. McGuire, did you do a calculation that

8    would help -- and an economic analysis of whether

9    increasing the certainty of getting 180-day exclusivity

10   is more important to the first-filer than when it gets

11   the exclusivity?

12        MR. SCHMIDTLEIN:  Objection, your Honor.

13        THE COURT:  Grounds?

14        MR. SCHMIDTLEIN:  Relevance.  It just doesn't go

15   to anything that's --

16        THE COURT:  No, I think it's relevant.

17   A.    Yes, I did.  It's a very simple illustration, um,

18   which I think makes the point of what the generic has to

19   gain by being willing to accept a delay.  And let me

20   just pick a round number to make the point.

21   Suppose the generic profits are $500 million during the

22   period of 180-day exclusivity.  If I'm in litigation, I

23   might get that and I might get it say with a chance of

24   80 percent, if I think I'm pretty likely to win that

25   litigation.  But I don't get it 100 percent.  There's a

 1    20 percent chance I don't get it.

 2    So if I can strike an agreement with a brand and the

 3    brand says, "You have to come in a little bit later, but

 4    you get that 180 days with certainty," it means there's

 5    an additional 20 percent chance that the generic gets to

 6    make $500 million, and that's worth approximately 20

 7    percent times $500 million, and that concession then

 8    would be worth $100 million.

 9    Q.    How, if at all, does that analysis relate to the

10    acceleration clause of the --

11          MR. SCHOEN:  Objection, your Honor, the report.

12          THE COURT:  Yeah, where is it?

13          MR. SHADOWEN:  Paragraph 111, Tab 1, your Honor.

14          (Pause.)

15          MR. SHADOWEN:  Also Paragraph 82.

16          THE COURT:  Yes, he may testify consistent with

17    111 and with -- well, 111 will support that and I'll be

18    looking at 82.  He may testify.

19          MR. SCHOEN:  Sidebar, your Honor.

20          THE COURT:  You may.

21

22          AT THE SIDEBAR

23          THE COURT:  Yes.

24          MR. SCHOEN:  I don't see anything in 111 that

25    talks about the contingent launch clause.  So what

1    they're doing is taking opinions that you rendered about

2    the Ranbaxy settlement generally, about the payment, and

3    now they're rewriting his report to say that it's all

4    based on the contingent launch, and that's not what was

5    disclosed to us, your Honor.

6         THE COURT:  It's in there.  He can so testify.

7

8         (In open court.)

9         THE COURT:  Put your question, Mr. Shadowen.

10   Q.   How does that analysis, that you just described to

11   the jury, relate to the acceleration clause?

12   A.   Just connect the dots.  The acceleration clause

13   has the effect of decreasing the probability that Teva

14   would bust the bottle-neck, which has the, um -- from

15   Ranbaxy's point of view it means that Ranbaxy's more

16   likely to be able to use the 180-day exclusivity period.

17   Q.   Did the fact that Ranbaxy received a no-authorized

18   generic clause also provide an incentive for Teva to

19   join the conspiracy?

20        MR. SCHMIDTLEIN:  Objection, report.

21        THE COURT:  Where is it?

22        MR. SHADOWEN:  It's in Tab 2 and then Tab B of Tab

23   2, your Honor, Paragraph 25.

24        THE COURT:  Tab B of Tab 2?

25        MR. SHADOWEN:  Yes, your Honor, Paragraph 25.

1        MR. SCHMIDTLEIN:  And also relevance, your Honor.

2        THE COURT:  I understand.

3        (Pause.)

4        MS. FOLEY:  What paragraph?

5        THE COURT:  25, he said.

6        (Pause.)

7        THE COURT:  He may testify in accordance with

8   Paragraph 25.  Overruled.  You may have the question.

9   A.    I'm sorry.  Would you mind repeating it for me,

10  please?

11       MR. SHADOWEN:  Sure, if I can.

12  Q.    Did the fact that Ranbaxy received a no-authorized

13  generic clause as part of what plaintiffs say is a

14  payment to Ranbaxy --

15       THE COURT:  Well, try to ask questions.  Strike

16  that out.  They're all going to get a chance to argue to

17  you.  This isn't the time.  Ask questions, nonleading

18  questions.  Go ahead.

19  Q.    Did the fact that Ranbaxy received a no-authorized

20  generic clause also provide an incentive or affect

21  Teva's incentive whether or not to join the conspiracy?

22  A.    Yes, it did.

23  Q.    And how so?

24       MR. SCHOEN:  Motion to strike, your Honor.

25       THE COURT:  Yeah, um, one, the question is -- it

1    assumes facts not in evidence, and the answer is

2    stricken.  Disregard it.

3    Q.    Dr. McGuire, did the fact that Ranbaxy received --

4    how if at all did the fact that Ranbaxy received a

5    no-authorized generic clause affect Teva's incentives on

6    how to respond?

7         MR. SCHOEN:  Objection, your Honor.

8         THE COURT:  You may testify consistent with

9    Paragraph 25.

10   A.    Teva's in a position of deciding, "Do I challenge

11   the litigation or do I play ball and settle?"  Anything

12   that makes the challenge to litigation less attractive,

13   like the acceleration clause, means they're more likely

14   to settle.  Anything that makes the settling more

15   attractive will make it more likely to settle.  So it

16   has a kind of complementary effect by making the

17   settlement option more attractive to Teva.

18   Q.    And how does the no-authorized generic agreement

19   clause play into that if at all?

20   A.    The way it works is that the no-ag agreement means

21   that at the end of the 180-day exclusivity period

22   there's only one active established generic, and that

23   would be in this case Ranbaxy, at which point Teva could

24   conceivably enter.  If the no-ag clause had not been

25   there, there would be more than one established generic

1    marketing and it's just tougher to enter and make sales

2    against two than it is to enter and make sales against

3    one.

4    Q.   Dr. McGuire, did you form an opinion as to whether

5    or not AstraZeneca negotiated interdependent and

6    collusive agreements with Ranbaxy and Teva to secure an

7    industry-wide May 2014 generic entry date?

8         MR. SCHMIDTLEIN:   Objection, your Honor, the

9    report.

10        THE COURT:   You suggest that's in the report?

11        MR. SHADOWEN:   Yes, it is, your Honor.

12        THE COURT:   Where is it?

13        (Pause.)

14        MR. SHADOWEN:   I believe it's 187, your Honor.

15        MR. BALDRIDGE:   Which tab?

16        MR. SHADOWEN:   Tab 1.

17        I apologize, your Honor, it's in Paragraph 19.

18        THE COURT:   Paragraph 19, Tab 1?

19        MR. SHADOWEN:   Yes, sir.

20        (Pause.)

21        MR. SCHMIDTLEIN:   I believe it's under the section

22    entitled "Allegations" in his report.

23        (Pause.)

24        MR. SCHMIDTLEIN:   Yes, the citation for the

25    sentence --

```
 1              THE COURT:  No, no, I do understand.
 2              (Pause.)
 3              THE COURT:  Yes?
 4              MR. SHADOWEN:  It's in Paragraph 187, your Honor.
 5              THE COURT:  Well, all right.  187.
 6              Yeah, sustained as to the question in that form.
 7              MR. SHADOWEN:  Your Honor, in light of the sidebar
 8      conversations, can we take a break early this morning?
 9              THE COURT:  On the representation that's going to
10      save us time, which you readily make?
11              MR. SHADOWEN:  I absolutely do.
12              THE COURT:  Very well.
13              MR. SHADOWEN:  Thank you, your Honor.
14              THE COURT:  All right.  We will stop taking
15      testimony at this time for one half hour, until 11:00.
16      Keep your minds suspended.  You have not heard this
17      witness entirely.  Do not discuss the case either among
18      yourselves nor with anyone else.  You may stand in
19      recess.  I'll remain on the bench.
20              (Jury leaves, 10:30 a.m.)
21              THE COURT:  Please be seated.  I remain on the
22      bench not to invite argument but to say that the defense
23      objections, I've been as liberal as I know how with
24      respect to what opinions he actually gave in his report.
25      There's no report, and I've looked this over, that seems
```

1    to go to the theory, the one theory that the plaintiffs,

2    even if you survive through the weekend here, are

3    seeking to go to the jury on.  And that last question

4    was completely untethered, it was filled with pejorative

5    statements, which apparently don't represent his

6    conclusions.  At least I don't see any such conclusion.

7         So you take this half hour, see if you can't

8    shorten this up, get what you are entitled to get out of

9    this, and, um, we'll get on to causation.

10        Enough said.  We'll recess.  One half hour.  We'll

11   recess.

12        (Recess, 10:32 a.m.)

13

14              C E R T I F I C A T E

15

16        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

17   do hereby certify that the foregoing record is a true

18   and accurate transcription of my stenographic notes

19   before Judge William G. Young, on Thursday, November 13,

20   2014, to the best of my skill and ability.

21

22

23

24   /s/ Richard H. Romanow 11-13-14
     _____
25   RICHARD H. ROMANOW Date