1                    UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS

3                               No. 12-md-02409-WGY

4

5
    In Re:  NEXIUM (ESOMEPRAZOLE)
6   ANTITRUST LITIGATION

7

8

9

10                          * * * * * * * * *

11

12                     For Jury Trial Before:
                       Judge William G. Young
13

14        *EXCERPT*:  Judge's Directed Verdict Ruling

15

16                     United States District Court
                       District of Massachusetts (Boston)
                       One Courthouse Way
17                     Boston, Massachusetts 02210
                       Friday, November 21, 2014
18

19                          * * * * * * * *

20

21

22           REPORTER: RICHARD H. ROMANOW, RPR
                     Official Court Reporter
23                  United States District Court
        One Courthouse Way, Room 5510, Boston, MA 02210
24                    bulldog@richromanow.com

25

```
 1                    A P P E A R A N C E S

 2    THOMAS M. SOBOL, ESQ.
          Hagens Berman Sobol Shapiro, LLP
 3        55 Cambridge Parkway, Suite 301
          Cambridge, MA 02142
 4        Email: Tom@hbsslaw.com
      and
 5    STEVE D. SHADOWEN, ESQ.
          Hilliard & Shadowen, LLC
 6        39 West Main Street
          Mechanicsburg, PA 17055
 7        Email: Steve@hilliardshadowenlaw.com
      and
 8    RICHARD ARNOLD, ESQ.
          Kenny Nachwalter, P.A.
 9        201 South Biscayne Boulevard, Suite 1100
          Miami, FL 33131
10        For plaintiffs

11    LAURENCE A. SCHOEN, ESQ.
          Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
12        One Financial Center.
          Boston, MA 02111
13        Email: Laschoen@mintz.com
      and
14    KAREN N. WALKER, ESQ.
      KEVIN VAN WART, ESQ.
15        Kirkland & Ellis, LLP
          655 Fifteenth Street, N.W., Suite 1200
16        Washington, DC 20005
          For Teva defendants
17
      JOHN E. SCHMIDTLEIN, ESQ.
18    PAUL B. GAFFNEY, ESQ.
      DANE H. BUTSWINKAS, ESQ.
19        Williams & Connolly, LLP
          725 Twelfth Street, N.W.
20        Washington, DC 20005
          Email: Jschmidtlein@wc.com
21        For AstraZenca defendants

22    JAMES D. BALDRIDGE, ESQ.
      DANIELLE R. FOLEY, ESQ.
23        Venable, LLP
          575 7th Street, N.W.
24        Washington, DC 20004
          Email: Jdbaldridge@venable.com
25        For Ranbaxy defendants
```

1       P R O C E E D I N G S

2       (**EXCERPT** begins.)

3       (Begins, 8:50 a.m.)

4       THE COURT:  The Clerk will pass out to you the

5    tentative revised jury verdict slip.  It's exactly what

6    I explained to Mr. Schoen yesterday.  We've got a juror

7    stuck on a bus, so we have a few minutes, and I want to

8    use that time as productively as I can.

9       I am prepared to rule in part on the motions for

10   directed verdict.  They do not -- the rulings I am

11   prepared to make don't lead us to an ultimate

12   conclusion, but I can make the rulings, and I need to

13   pose a question and it is to me a fairly crucial

14   question.

15      So the various motions for a directed verdict are

16   allowed in part and denied in part.  They are allowed as

17   follows.

18      There is no sufficient evidence here that Ranbaxy

19   and Teva conspired together, that they acted otherwise

20   than in their own individual best interest.  Now, that

21   doesn't answer the question of whether the agreements

22   they separately entered into with AstraZeneca are

23   anticompetitive, but I don't want to hear the word

24   "conspiracy" as we go along here and we won't hear it in

25   closing.

1      Second, there is no adequate evidence that any of

2  these patents would be adjudicated invalid.  There is no

3  such evidence.  Now, that may be fatal to the

4  plaintiffs' case.  Let me explain.

5      The motion is denied in the following respects.

6  And I can best explain myself with reference to the jury

7  verdict slip.

8      There is adequate evidence, if you jury believes

9  it, about AstraZeneca's SSIs of market power.  Professor

10  Rosenthal gets them to the jury on that.  On the

11  totality of the evidence there is adequate evidence to

12  answer affirmatively Questions 2 and 3.

13      I have grave doubts -- I choose my words with

14  caution, that it's possible on this evidence

15  affirmatively to answer Questions 4 and 5, but for a

16  variety of prudential reasons, if this case goes forward

17  as to AstraZeneca and Ranbaxy, I intend to keep Teva

18  here through the verdict and we'll see where we are

19  then.

20      So much for rulings.  What I'm going to say now is

21  not in any way a ruling and no one should take it as a

22  ruling or anticipating a ruling.  I have a question,

23  it's a question for the plaintiffs, and it will -- and I

24  will give the defense a chance to respond to it, and

25  I'll explain how we'll address it.  And here's the

1    question.  And it's on the issue of causation.

2        If I give all intendments to Ms. Blume, not

3    engaging in the least in any credibility assessment,

4    what we have here is a putatively valid patent monopoly,

5    which AstraZeneca owns.  It's a patent monopoly, it's

6    a -- which gives AstraZeneca a remarkably profitable

7    income stream, billions of dollars.

8        Because it is such a lucrative market, one can

9    expect that others would attack it, as they are

10   privileged to do under our system -- and it's very

11   important, and in fact they do attack it.  Now, I'm not

12   talking business terms, not the validity of the patent.

13   So we've got Paragraph 4 litigation here.  And as their

14   own witnesses have said, AstraZeneca's own witnesses,

15   these are "business decisions."  And so in order to

16   defend that income stream that is worth billions, they

17   make an investment of millions of dollars defending it.

18       And, as the plaintiffs have argued, what is

19   important here is -- or what is important in terms of

20   evidence, as I see it, is not the ultimate validity of

21   the patents, I've ruled on that, but that doesn't answer

22   the question what people thought -- the business people

23   thought about the validity of the patents.  But it

24   certainly is a good investment to invest millions of

25   dollars -- 15 million is what I recall, but millions of

1    dollars to preserve your billions of dollars income

2    stream.

3         Now, if we give everything to Ms. Blume, Teva is

4    ready by sometime, she says 2009, and able -- and I

5    think the totality of the evidence could support this,

6    but I express no opinion, to launch.  Ranbaxy, holding,

7    as everyone has argued, the "keys to the kingdom," but

8    it is unable to launch, the Court has so ruled, and

9    everything in this case affirms that, has a business

10   inclination to partner with Teva and though they have

11   attacked the -- the defense has attacked that, those

12   arguments go to the weight.

13        So if that's all there was, um, I'm thinking to

14   myself, "All right, it's thin, but that gets to the

15   jury."  But then I come up against this.  In a but-for

16   world there would not be these supposed anticompetitive

17   contracts.  They would be gone.  But that doesn't mean

18   the patents would vanish.

19        And now to my question.  I'll try to frame it.

20   And I don't want an answer now, because I'm hopeful the

21   juror will be here and because everything turns on -- to

22   me everything turns on this, unless I get an adequate

23   answer to this question, the case is over.

24        So the patents are putatively valid.  The

25   plaintiffs keep talking about "pushing it out" to May

1    2014.  There's no "pushing out," the medicine patents

2    are valid till May 27th, 2014.  Though maybe AstraZeneca

3    had questions about its own patents and the like.

4    Maybe.  But what is the incentive -- what is the

5    incentive to AstraZeneca -- well, let me state it

6    another way because to me it's the crucial question.

7         If this contract with Ranbaxy violates the

8    antitrust laws, and maybe it does, what sort of

9    settlement wouldn't have violated them?  It cannot be

10   that it's any settlement that provides some value to

11   Ranbaxy beyond the, um, $15 million that you invest for

12   attorneys fees to protect your putatively valid market,

13   though that does tie into AstraZeneca.  At this point

14   the *Actavis* opinion seems at war with itself.  There's

15   got to be some settlement that would be okay.

16        And I realize how inadequate my initial charge was

17   to the jury.  I was explaining how patent cases are

18   usually settled.  That won't work in this case because

19   there is no incentive on AstraZeneca ever to give a

20   start date -- I mean most patent cases are settled with

21   a reasonable royalty license, that's what I told the

22   jury, that's been my whole professional experience.  But

23   of course that doesn't work in this type of litigation,

24   because of this waterfall effect, if you give a license,

25   your income stream drops markedly.  Just talking

1    economics, it drops by about 90 percent, if not more.

2    No rational player would ever do that.

3           So, um, I -- since they never would do that, all

4    this talk about what Ranbaxy and Teva would have done,

5    as I think about it, it ends up with a "So what?  Are

6    they going to launch at risk?"  We have a pretty good

7    analog for that.  If they launch at risk, as they did in

8    Prilosec, AstraZeneca runs in, gets a preliminary

9    injunction, as is permitted by the law, and there's

10   no -- there's no antitrust harm because they have a

11   putatively valid patent monopoly which the courts are

12   going to uphold.

13          So if there's no evidence, and there is none, that

14   the patents would ultimately be adjudicated invalid, um,

15   I don't see how you get around that question.

16          Now, here's how we're going to deal with it.  At

17   2:00, because you ought to think about this, plaintiffs

18   will get 10 minutes orally to argue that.  I haven't

19   read all these briefs just filed with the care I should.

20   I'm doing the best I can.  Maybe it's in there.  And the

21   defense will get 10 minutes to rebut.  Two things can

22   then happen.  Either I grant a directed verdict and it's

23   all over or I give you the weekend to brief the matter

24   more fully.

25          Now, that's what I have to say about directed

1    verdict.

2         This business about, um -- and I see it in the

3    witnesses.  The plaintiffs' motions, and I take them,

4    they frame them as "objections," but as to Larsson,

5    MacMillan, Luk, they're all allowed, in part.  We're not

6    starting here with patent experts or patent fact

7    witnesses.  So it's an order of proof.  I'm not saying

8    they may not testify, but they may not testify yet,

9    until I have what I consider primary evidence from the

10   people who are making the decisions that in fact they

11   relied upon this patent data to act in the marketplace

12   the way they did.  I think it's Larsson, MacMillan and

13   Luk who are the patent folks.

14        Who's Pastore?

15        MS. WALKER:  Your Honor, she's Teva's regulatory

16   witness.

17        THE COURT:  Fine.  And Lungkilde, who is he?

18        MR. GAFFNEY:  Your Honor, he is a scientist, a

19   former AstraZeneca scientist who can speak to the

20   benefits of the trihydrate form or the dihydrate form.

21        THE COURT:  Yeah, not today.  You've got to get me

22   what Mr. Schmidtlein was promising.  If the case is

23   alive, I've got to know why people were doing things.

24   Otherwise all of this -- my analysis need go no further

25   than 403.  You're launching off into something that

1    given the Court's -- and I don't fault you, but given

2    the Court's ruling that there is no evidence that these

3    patents would have been adjudicated invalid, I don't

4    think is germane.  That may be fatal to them.  If it's

5    not fatal to them, I've got to have all the business

6    dealings first.  Once I have the business dealings and

7    fine out what they were relying on -- and we'll see what

8    the strength of the cross-examination is -- if there's

9    any suggestion, "Oh, come on, you weren't really relying

10   on that, that's a fraud," then you may well back it up

11   with these fact witnesses, these perfectly fine fact

12   witnesses who actually were doing the patent stuff, um,

13   fine, if that's an issue.

14        MR. GAFFNEY:  Your Honor, may I be heard on one

15   point?

16        THE COURT:  Well, you may be -- (To the Clerk.)

17   Oh, she's not here.  You may be.

18        MR. GAFFNEY:  Among the witnesses you've just

19   mentioned, there's one, Dr. MacMillan who testifies to

20   Item 3 on the verdict form, which is whether there were

21   procompetitive --

22        THE COURT:  Who is he?

23        MR. GAFFNEY:  Dr. MacMillan is the Chairman of the

24   Chemistry Department at Princeton, he is retained, a

25   disclosed expert, he has served a report, he is here

1  this morning to testify.

2         THE COURT:  Oh, I -- then maybe I misspoke as to

3  him.

4         MR. GAFFNEY:  He's not an inventor.

5         THE COURT:  Okay.  He may not be an inventor --

6  and he's going to testify as to procompetitive effects?

7         MR. GAFFNEY:  Yes, your Honor, the license granted

8  Teva and Ranbaxy the right to use the AstraZeneca

9  process.  Now, his testimony --

10        THE COURT:  What license?

11        MR. GAFFNEY:  The license in the settlement.

12        THE COURT:  Yeah, right.

13        MR. GAFFNEY:  A component of the settlement

14  agreement licensed the generics to use the AstraZeneca

15  process.

16        THE COURT:  After May 27th, 2014?

17        MR. GAFFNEY:  Correct.  And he will testify that

18  there was not a commercially-viable noninfringing

19  alternative available.  So that license had considerable

20  rights to anyone who got rights to it, that patent.  So

21  that's what he's going to testify to.

22        THE COURT:  I see.

23        Why shouldn't I allow that?  That makes sense to

24  me.

25        MR. SOBOL:  Well, it makes less sense to us, your

1    Honor, because there's nothing in Dr. MacMillan's report

2    regarding a license or a value.  He's a patent expert on

3    the '789.

4         THE COURT:  Well, I can handle that just like I've

5    handled the others.  We'll go question by question.  But

6    they can call him and he's an opinion witness and it

7    better be in the report, and if it isn't, I'll deal it.

8         I'm not asking for a response because this is --

9    the question I pose is, to the Court, very high stakes.

10   Think of what you're going to say before you say it.

11   We'll do it at 2:00.

12        Mr. Schoen?

13        MR. SCHOEN:  I just want to raise two quick

14   points, your Honor, if the juror's not here yet.

15        THE COURT:  So I'm stuck here with you rather than

16   get a jury in the box.

17        (Laughter.)

18        MR. SCHOEN:  I promise I'll be brief.

19        THE COURT:  No, that's quite all right.

20        MR. SCHOEN:  Just two issues.  One is if your

21   Honor's inclined to keep Teva in the case, I do think

22   we've reached a point whether there needs to be an

23   instruction on Dr. McCool's testimony at some point to

24   the jury, um, so that that testimony is going to allow

25   to --

1          THE COURT:  Didn't I give an instruction to the

2     jury when I ruled?

3          MR. SCHOEN:  No, you decided not to.  You decided

4     to wait because you were tabling -- you said "Until I

5     decide the directed verdict motion, I don't want to

6     instruct them because" --

7          THE COURT:  Oh, quite right.  I think I should and

8     we should -- well, that's a good point.

9          (Laughter.)

10         MR. SCHOEN:  Once in a while I get one.

11         THE COURT:  No, no, no, don't take that as --

12     don't take the negative pregnant.

13         (laughter.)

14         THE COURT:  But I think I should do it.

15         MR. SCHOEN:  The other issue, your Honor, is with

16     respect to Question 6 on the verdict form, in light of

17     the ruling on conspiracy, which of course we agree with,

18     we do think, um, that there should be a separate

19     causation question under the two agreements, because if

20     there's no conspiracy, the question of whether just

21     linking the two agreements like that together could lead

22     to a situation where all the harm was say from the

23     Ranbaxy agreement, Teva should not be in a position to

24     be potentially liable for harm that was from the Ranbaxy

25     agreement, there needs to be some separation on the

1    verdict form.

2         THE COURT:  I thought about that and I thought

3    that -- the way I see the case -- and this is not my

4    business, but I'm trying to be transparent.

5         If you go down, if Teva goes down, if they say

6    "yes" to Questions 1, 4, and 5, then it appears that

7    there's some additional harm from Teva's agreement with

8    AstraZeneca.  I find it hard to see what that is.

9         MR. SCHOEN:  (Laughs.)

10         THE COURT:  Well, fine.  But you're in through the

11    verdict on that.  But as I assess things, if you're

12    going to win the case, you're going to win on questions

13    4 and 5, and if you don't, that's your strongest

14    argument -- I'm so old I still call it "Judgment NOV."

15    All right?  I'm not telegraphing anything because then

16    I'll have the moral force of a jury verdict and you know

17    how strongly I feel about that.

18         But I haven't forgotten the good points you made

19    yesterday.  That's why I used, and I've used it before,

20    "grave doubts."  You can go back if there was a word

21    search of everything I've said, you can see what happens

22    after I say "I have grave doubts" about something.

23    "I've got grave doubts."  But you're in the case.  And

24    so if you're in the case, that would mean there was some

25    additional harm.

1        The first though, because I think I should do

2    that, we've kept them waiting, maybe the -- because I'm

3    not letting Larsson get back on the stand, so I explain

4    that we're shortening things down, that we're at that

5    stage now, and then I explain as to Dr. McCool, um, his

6    testimony, the numbers from his testimony, that's out,

7    and let it go at that.

8        MR. SCHOEN:  So that -- just so you're going to

9    say that the specific opinions he testified to --

10       THE COURT:  As to figures, what the -- and I'll

11   give us an example, "What he had to say about whether

12   there were comparables, that's in, it's up to you

13   whether you believe it."  And we start that way.  And

14   then I guess --

15       Where do you want to start?  I'm not trying to

16   embarrass -- looking to the defense, your presentation,

17   but I am requiring that I get some evidence that I think

18   passes 403.

19       Do you want to start with MacMillan?

20       MR. GAFFNEY:  Yes, your Honor.

21       THE COURT:  Well, then I'll let you.  And then

22   we'll go to -- well, then we'll go -- who?  To Pastore,

23   the regulatory person, and the like.

24       All right.  I'll recess then.  As soon as we have

25   the jury, we'll start.  We'll recess.

1          (Recess, 9:20 a.m.)

2          (*EXCERPT* ends.)

3

4               C E R T I F I C A T E

5

6          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

7     do hereby certify that the foregoing record is a true

8     and accurate transcription of my stenographic notes

9     before Judge William G. Young, of the aforementioned

10    *EXCERPT*, on Friday, November 21, 2014, to the best of my

11    skill and ability.

12

13

14

15    /s/ Richard H. Romanow 11-21-14
      _____
16    RICHARD H. ROMANOW Date

17

18

19

20

21

22

23

24

25